Document Number Case Number
03-C-0510-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
09/23/2004 07:40:42 PM CDT

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

PENNY LEE ANDERSON and
RUSSELL D. ANDERSON, SR.,

        Plaintiffs,                      CASE NO. 03-C-0510-C

        v.                            JUDGE BARBARA B. CRABB

TRANS UNION, LLC, EXPERIAN
INFORMATION SOLUTIONS, INC., CSC
CREDIT SERVICES, INC., EQUIFAX, INC.
d/b/a EQUIFAX INFORMATION SERVICES,
LLC, APPLIED CARD SYSTEMS, INC., and
CROSS COUNTRY BANK, INC.,

        Defendants.

---

## AFFIDAVIT OF CHRISTOPHER T. LANE, ESQ.

---

I, Christopher T. Lane, Esq., hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.      I am an attorney of record for Trans Union, LLC in this matter.

2.      I am at least 18 years of age and competent to testify to the facts contained herein.

3.      Plaintiff Russell Anderson gave deposition testimony under oath in this matter on March 22, 2004.

4.      I was present during and participated in Mr. Anderson's deposition.

5.      I received and reviewed the transcript of Mr. Anderson's deposition testimony.

6.      Attached as Exhibit 1 is a true and accurate copy of pages 128 and 129 of the transcript of the deposition testimony given under oath by Russell Anderson on March 22, 2004.

7.      Plaintiff Penny Anderson gave deposition testimony under oath in this matter on March 23, 2004.

8.      I was present during and participated in Mrs. Anderson's deposition.

9.      I received and reviewed the transcript of Penny Anderson's deposition testimony.

10.     Attached as Exhibit 2 is a true and accurate copy of pages150 and 151 of the transcript of the deposition testimony given under oath by Penny Anderson on March 23, 2004.

11.     Ameriquest Mortgage's FRCP 30(b)(6) representative, Brian C. Barton, was deposed under oath on June 17, 2004.

12.     I received and reviewed the transcript of Mr. Barton's deposition testimony.

13.     Attached as Exhibit 3 is a true and accurate copy of pages 44, 45, 46, 48, 49, 52, 53, 55, 57, 58 and 66 of the deposition testimony given under oath by Brian C. Barton.

14.     I, on behalf of Trans Union, LLC, served Plaintiffs with *Trans Union, LLC's Second Set of Interrogatories to Plaintiffs* on June 10, 2004.

16.     Attached as Exhibit 4 is a true and accurate copy of *Plaintiffs' Answers to Defendant Trans Union's Second Interrogatories*, Responses to Interrogatories Number 5 and 6, dated August 3, 2004.

17.     Attached as Exhibit 5 is a true and accurate copy of *Plaintiffs' 2nd Amended Notice of Taking Telephonic Deposition of Centennial Mortgage's FRCP 30(b)(6) Representative(s)*.  This notice, advising of alleged credit denials in February and March 2001, is provided in furtherance of Trans Union's assertion that Plaintiffs' Centennial Mortgage claims are time barred.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE AND ACCURATE, TO THE BEST OF MY KNOWLEDGE AND BELIEF.

/s/Christopher T. Lane _____
Christopher T. Lane

Page 128

1     A. Yes.

2        Q. Is there any other witnesses other than a

3  person who might represent a company that you dealt with,

4  any other witnesses who would have insight into this ordeal

5  with you guys?

6        A. The only other one I could think of would be

7  Connie Gullickson from Centennial Mortgage who had to deal

8  with our mortgage.

9        Q. Anyone else?

10       A. Not that I can think of.  I don't know if she

11  would be a witness, but I know she has had to deal with that

12  throughout our mortgage and things to get our credit

13  reports.

14       Q. Do you know any Trans Union employees?

15       A. No, sir.

16       Q. Do you know of any reason why a Trans Union

17  employee would want to cause you harm?

18       A. No, sir.

19       Q. Has any Trans Union employee ever

20  misrepresented anything to you?

21            MR. GOOLSBY:  Objection; it calls for a

22  legal conclusion.

23       A. Not that I can recall, sir.  No.

24       Q. Has a Trans Union employee ever concealed

25  anything from you?

)55

Page 125 - Page 128

EXHIBIT

tabbies

1

**RUSSELL ANDERSON, SR.**          Conde:

Page 129

1      A. Not that I know of.

2           MR. GOOLSBY:  Objection; calls for
3  speculation.

4           MR. LANE:  Let him get his objection in
5  first.

6           THE WITNESS:  Okay.

7      A. Not that I know of.

8      Q. Has any Trans Union employee ever made a false
9  statement to you?

10          MR. GOOLSBY:  Objection, to the extent it
11 calls for a legal conclusion.

12     A. Not that I can recall, no.  Not to me anyway.

13     Q. When was the last time you took a look at a
14 Trans Union report?

15     A. I believe it was right before we went to -- I
16 think right before we went to our attorney.

17     Q. So you haven't ordered any since then?

18     A. I haven't gotten any, no, sir.

19     Q. Okay.  What do you know regarding the current
20 status of Trans Union's reporting?  Do you know if the
21 deceased remark was on there or not?

22     A. It was on there when we pulled it up I believe,
23 and that was in 2003.  I believe it was on there.

24     Q. When you testified earlier that you started off
25 as a lead mechanic at $16 an hour and you increased to --

Page 150

1    Q. Yes.  That was kind of a preface.

2        Did you have occasions to call them or was

3  everything that you did in writing?

4    A. See, I don't know.  I think I did, you know.

5  Occasionally I would call the different credit reporting

6  agencies, if I had a credit report reference in front of me

7  to do that.  Because a lot of times they won't let you

8  call and talk to somebody unless you have some kind of a

9  reference to talk to them about.  So it all started to run

10  together.

11    Q. Do you recall anyone from Trans Union ever

12  misrepresenting anything to you?

13    A. No.

14    Q. Do you recall anyone from Trans Union ever

15  concealing anything from you?

16        MR. GOOLSBY:  Objection; calls for

17  speculation.

18    A. Concealing?  Well, when I disputed it, they

19  kind of concealed how I was going to get it off my credit

20  report.  Right?

21    Q. Other than that?

22    A. No.

23    Q. Do you know anyone at Trans Union?

24    A. No, sir.

25    Q. Can you think of a reason why anyone at Trans

**EXHIBIT**

**2**

**IenseIt!**™

9

Page 151

1  Union would want to cause you harm?

2      A. No, sir.

3      Q. Even though you called this a glitch and you

4  say, "I think there should have been some way around it,"

5  and all of those things that you said, do you believe that

6  Trans Union did anything in this process other than relay

7  the information that was related to it?

8          MR. GOOLSBY: Objection; calls for

9  speculation.

10      A. Do I feel they did anything wrong other than

11  that?

12      Q. No, not wrong.  But that they did anything

13  other than relay information that they received from another

14  source?

15      A. I think what they did was wrong by relaying

16  inaccurate information.

17      Q. Right.  I understand that's how you feel.  But

18  I'm wondering if you think that Trans Union did anything

19  other than relate information that they got from Cross

20  Country?

21      A. Yes.  I think they chose not to fix that

22  problem with their system, that glitch.  I feel that they

23  refused to take that extra step to protect people like me

24  from having to go through what we went through.

25      Q. Let me try to phrase it a different way.

Brian C. Barton                                    **Multi**
6/17/04

Page 44

1  unemployed?

2    A.  Yes, she did.

3    Q.  Did she tell you that she was making $30,000 a

4  year?

5    A.  Yes, she did.

6    Q.  And her husband's income was zero?

7    A.  I can't remember if he was receiving any kind

8  of income.

9    Q.  But did you put any income down for him?

10    A.  No, I did not.

11    Q.  And their mortgage payment was $1,500 and

12  change?

13    A.  That's what it looks like, $1,529 that I wrote

14  down.

15    Q.  Okay.  And they had $1,000 in the bank?

16    A.  Correct.

17    Q.  And no savings account?

18    A.  Correct.

19    Q.  Would you have asked that question -- there's

20  no savings account listed here.  Would you have asked

21  about a savings account?

22    A.  I think I would have.  Again, I don't know if

23  you heard me earlier, though, this was probably one of

24  the very first applications I ever took, so there is --

25  it was a long time ago, there is a possibility I might

EXHIBIT
3

Page 45

1 have missed some steps.

2    Q. And you remember that they were trying to

3 apply to refinance their first mortgage, their second

4 mortgage and cash out about $5,000, correct?

5    A. Correct.

6    Q. Can you tell, from looking at the credit

7 report, what the outstanding balance was on their first

8 mortgage?

9    A. It looks like it was $168,225 on page five.

10    Q. And can you see their second mortgage on

11 there?

12    A. It looks like it is $23,745 on page four.

13    Q. And they wanted $5,000 on top of that,

14 correct?

15    A. Correct. I can't recall if the $5,000 was to

16 pay off some of these other debts or if it was for home

17 improvements, I don't recall that.

18    Q. Okay. So if you add the 166, the 22 and add

19 5,000 on top of that, you get approximately $193,000; is

20 that right?

21    A. I don't have a calculator in front of me.

22 That sounds right.

23    Q. Okay. So they wanted a loan for about

24 $193,000, right?

25    A. Sure.

i-Page™                          Anderson v. Trans Union, et al

Page 46

1    Q.  Do you know what the payment would be on a
2  loan of $193,000 with a five percent -- let's see, 5.95
3  percent interest rate?
4    A.  I don't have a -- I'm pretty good at math, but
5  I don't have a calculator with me here.
6    Q.  Would someone qualify for a mortgage of that
7  size with income of $30,000 a year?
8    A.  Probably not.
9    Q.  And is there a minimum score that's needed in
10  order to qualify for a loan of that size?
11    A.  You need at least a score of 500.
12    Q.  And would having a score of 500, would that
13  get you the best possible rate?
14    A.  Probably not.
15    Q.  What would you need in order to get the
16  conforming rate?
17    A.  That I do not know, I'm not an underwriter.
18        MR. ROBERTS:  Excuse me, I'm going to
19  interrupt here.  This is Keith Roberts, I'm in-house
20  counsel at Ameriquest Mortgage Company.
21        MR. CENTO:  Yes.
22        MR. ROBERTS:  And I was just brought in
23  by Dierdre Turner, so I just got a quick -- just a real
24  quick summary of the facts here, but I have to caution
25  you, it sounds as if you were exceeding the deposition

Brian C. Barton                                    **Multi**
6/17/04

Page 48

1          MR. ROBERTS:  Okay.  Well, like I said,
2  I just walked in on this and you can go ahead and resume
3  questioning him and I'll state my objections for the
4  record if I hear something that I think would expose us
5  to liability.
6          MR. CENTO:  Thank you, Keith.
7          MR. ROBERTS:  Okay.
8  BY MR. CENTO:
9     Q.  Do you consider debt-to-income ratio when
10  evaluating an application?
11          MR. LYONS:  Objection, without
12  foundation.  This man is not an underwriter, he's a loan
13  application taker.  But if you can answer it, go ahead.
14     A.  Yes, debt-to-income ratio is definitely part
15  of guidelines.
16  BY MR. CENTO:
17     Q.  So it is a factor in evaluating an
18  application?
19     A.  Yes, it is.
20     Q.  Do you know how to calculate a debt-to-income
21  ratio?
22     A.  Yes, I do.
23     Q.  And what information would you need in order
24  to calculate a debt-to-income ratio for the Andersons?
25     A.  The amount of money that's going out every

Page 49

1 month and their income.

2    Q.  And if the amount of money going out is
3 greater than the income, what kind of ratio would that
4 be?

5    A.  That would be over a hundred percent.

6    Q.  Okay.  And could a person applying for a loan
7 with a debt-to-income ratio of over a hundred percent
8 qualify for a loan through Ameriquest?

9    A.  No, they would not.

10    Q.  Sir, you said earlier that you recall you were
11 asked if she ever reapplied after this, and you said
12 that you believe at one time she did.  Did she contact
13 you about this?

14    A.  Yes, she did.

15    Q.  And when was the second application made?

16    A.  That I do not recall.

17    Q.  Did she contact you by phone or did she come
18 into your office?

19    A.  No, she contacted by phone.

20    Q.  And did you fill out another application?

21    A.  That I do not remember.

22    Q.  But wouldn't that have been more recently than
23 the application that was filled out in September?

24    A.  That is correct.

25    Q.  But you don't remember?

Brian C. Barton                                          Multi
6/17/04

Page 52

1    Q.  Did they contact you before your deposition
2 today?
3    A.  No, they have not.
4    Q.  If you'll just bear with me for a minute.
5    A.  Sure.
6    Q.  Under what circumstances, sir, were you
7 discharged from the military?
8    A.  Honorable discharge.
9         MR. CENTO:  Thank you.  I have no other
10 questions.
11        MR. LYONS:  Who's next?
12        MR. RAWLIN:  Well, this is Dustin Rawlin
13 for Experian, I suppose I can go next.
14            EXAMINATION
15 BY MR. RAWLIN:
16    Q.  Mr. Barton, you had said that in your capacity
17 I guess as an account executive, are you basically like
18 a loan officer?
19    A.  That's correct.
20    Q.  And in that capacity you understand how to
21 calculate a debt-to-income ratio?
22    A.  Yes, I do.
23    Q.  I'm looking at the Anderson's Uniform
24 Residential Loan Application, and I'm looking at the
25 second page of it which has their base employment income

Page 53

1  of $30,000.  Do you see that?

2    A.  Yes, I do.

3    Q.  And then it has a schedule of their

4  liabilities, and I think -- I do have a calculator and I

5  think I've done the calculation, I hope I'm doing it

6  right, but I come up with monthly liabilities, including

7  their real estate taxes, of about $3,070 a month.

8    A.  Okay.

9    Q.  And looking at their $30,000 income and

10  dividing that by 12 months, I come up with $2,500 a

11  month.  So according to this schedule, liabilities and

12  income, they have liabilities on a monthly basis of

13  $3,070 and income of $2,500.  Would that create a

14  debt-to-income ratio of over a hundred percent?

15    A.  Yes, it would.

16    Q.  And I believe you stated that Ameriquest would

17  not qualify someone for a loan if they had a

18  debt-to-income ratio of over a hundred percent; is that

19  right?

20    A.  That is correct.

21    Q.  Mr. Barton, I understand that you I think --

22  and maybe you can help me clarify this for me, it's a

23  process that the consumer contacts you, gives you their

24  information and then you tell them what kind of products

25  they might qualify for?

Page 55

1  that wouldn't help them, right?

2     A.  Correct.

3     Q.  Okay.  And I believe you stated that you do

4  not know the complete loan amount of refinancing the

5  Andersons were seeking?

6     A.  No, I do not.

7     Q.  But what you have on the application it would

8  appear it was somewhere in the $190,000 to $200,000

9  range?

10    A.  That would sound correct.

11    Q.  And is it also true that you don't know at

12 what rate they were trying to get the refinancing?

13    A.  I do not know.

14    Q.  Is it true that you don't know what their

15 monthly payment would have been on a refinancing?

16    A.  No, that I don't know; they did not get

17 approved for a loan.

18    Q.  Do you not know what their closing costs would

19 have been?

20    A.  I do not know that; they were not approved for

21 a loan.

22        MR. CENTO:  Objection, nonresponsive.

23 BY MR. RAWLIN:

24    Q.  And Mr. Barton, you do not know necessarily

25 what their debt-to-income ratio would have been?

Page 57

1  payment reduction, so I would think that they probably

2  were looking for a 30-year term; Russell was out of work

3  and he was going to school.

4      Q.  Mr. Barton, is it true you're not an

5  underwriter?

6      A.  That is true.

7      Q.  Do you have any underwriting training or

8  education or experience?

9      A.  A little bit.

10      Q.  Where does that come from?

11      A.  In the office, on-the-job training.

12      Q.  Is it true that you are not authorized to make

13  lending decisions at Ameriquest?

14      A.  That is correct.

15      Q.  Mr. Barton, taking a look at the Equifax

16  Mortgage Services credit report for a second.

17      A.  Sure.

18      Q.  If you could go -- let's see, I guess it's

19  about the sixth page in -- well, actually it's page five

20  in the upper right-hand corner.

21      A.  Okay.

22      Q.  And do you see there's accounts 21 through 26

23  on that page?

24      A.  Yes, that's correct.

25      Q.  And near the bottom do you see where it says

i-Page™                    **Anderson v. Trans Union, et al**

Page 58

1  "delinquency trades"?

2    A.  Correct.

3    Q.  And it looks to me, from this page and going

4  over to the next page, that there were four collection

5  accounts.

6    A.  Okay.

7    Q.  Would that negatively affect an applicant's

8  ability to get financing?

9    A.  That is correct.  I mean, there are

10  delinquencies on here.

11    Q.  And that impairs someone's ability to get a

12  mortgage or a refinancing?

13    A.  Correct, it would be probably a higher risk.

14    Q.  Mr. Barton, taking a look at the statement of

15  credit denial letter from Ameriquest.

16    A.  Okay.

17    Q.  I think you had said that in your system you

18  electronically I think click on something or mark a box

19  that just says credit denied, it is then sent to the

20  corporate headquarters; is that right?

21    A.  Correct.

22    Q.  Who makes the decision of which box to check

23  for denial reasons?

24    A.  That I'm not sure.  And on my computer screen

25  it just says there's different reasons basically for

-Page™                      Anderson v. Trans Union, et al

Page 66

1  but you have testified that you had some on-the-job
2  training and seem to be a little bit familiar with the
3  process and Ameriquest's policies.  Do you know how high
4  a debt-to-income ratio is typically allowed to go on a
5  refinancing?
6      A.  I would say the average is 50 percent.
7      Q.  And so if the percentage is above 50 percent,
8  that would negatively affect the application?
9      A.  That would be correct.
10      Q.  And if it gets too much higher than that, then
11  that's probably going to be a denial; is that correct?
12      A.  Correct.
13          MR. GIRVAN:  That's all the questions I
14  have.  Thank you.
15          THE WITNESS:  You're welcome.
16          MR. LYONS:  Anybody else?
17      All right.  The deposition is ended and you
18  attorneys can talk with the court reporter about what
19  you want to order from it.  I'm going to thank Mr.
20  Barton and -- do you have any instructions for him, Mr.
21  Roberts?
22          MR. ROBERTS:  No, that's fine.
23          MR. LYONS:  All right, good.  Then we'll
24  order the deposition.  And you, as the deponent, I will
25  tell you this, I'm not your lawyer, you do have the

| FRCP 30(b)(6) Representative Kohl's | N56 W17000 Ridgewood Dr. Menomonee Falls, WI 53051 (262) 703-7000 | Reasons for denial of credit |
|---|---|---|
| FRCP 30(b)(6) Representative Bank of America | Bank of America Corporate Ctr. 100 North Tryon St., 18th Fl. Charlotte, NC 28255 (704) 386-8486 | Reasons for denial of credit |
| FRCP 30(b)(6) Representative American Express | American Express Co World Financial Center 200 Vesey Street New York, NY 10285 (212) 640-2000 | Reasons for denial of credit |
| FRCP 30(b)(6) Representative FleetBoston Financial Corp d/b/a Fleet credit card | 100 Federal Street Boston, MA 02110 Phone: (617) 434-2200 | Reasons for denial of credit |
| FRCP 30(b)(6) Representative Conseco Inc | 11825 N. Pennsylvania Street Carmel, IN 46032 Phone: (317) 817-6100 | Reasons for denial of credit |
| FRCP 30(b)(6) Representative Cross Country Bank, Applied Card Systems, | 800 Delaware Street Wilmington, DW | Reasons they reported Plaintiffs deceased when they were not deceased. |
| FRCP 30(b)(6) Representative Defendants CSC, Equifax, Experian, and Trans Union | | |

Discovery continues. Plaintiffs will supplement their Answer in accordance with the Federal Rules of Civil Procedure.


Interrogatory No. 5: State the name, address and telephone number of every person or entity with which you have applied for credit, from which you have received credit or which has otherwise reviewed your credit report or credit rating in the last seven (7) years, and for each person or entity identified please state the type of credit transaction involved, the terms of the

Anderson 8228
Answers to TU 2nd INTs



EXHIBIT
4

credit, the amount you sought to finance and the disposition or outcome of the credit transaction.

ANSWER:   Subject to and without waiver of their general objections, Plaintiffs object to this interrogatory as it is overly broad, unduly burdensome, is intrusive, harassing, vague, ambiguous, seeks information that is beyond the scope in time of this lawsuit; and, is not reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving these objections, Plaintiffs identify the following applications for credit:

| Creditor | type of credit transaction | terms of the credit | the amount sought | outcome |
|---|---|---|---|---|
| Capitol One | Credit card | Revolving | UK | Denied |
| Ameriquest Mortgage | Mortgage Refinance | UK | $169,000 | Denied |
| Wells Fargo Home Mortgage | Mortgage

Refinancing Mortgage | 5.8250%

5.75% - 20 years conventional refinancing | $169,000

$169,000 | Approved

Approved but delayed due to reported deceased by Defendant TU |
| Wells Fargo Financial | Loan | UK | $1,500 | Approved Approved |
| FMCC | Vehicle finance | 8.9%; denied at 1.9% | $22,000 | Approved at |
| Kohl's | store line of credit

store line of credit | revolving | UK

$500 | Denied 2/14/2002

Approved |
| Bank of America | Bankcard | UK | UK | Denied |

9

| | | | | |
|---|---|---|---|---|
| Fleet Boston Financial Corp d/b/a Fleet credit card | Credit card | UK | UK | Denied |
| Conseco Inc | Installment account | UK | $2000 | Denied / 10/28/2002 |
| JC Penny | Line of credit | UK | $500 | Approved 11/1/2003 |
| Sears | Line of credit | UK | $1100 | Approved 11/2/2003 |
| Centennial Mortgage | Construction loan Mortgage | 7% over 30 years | $170,000 | Denied |
| Northwest CU | Secured loan | UK | $24,000 | Approved |
| S&C Bank | Home Improvement Loan | UK | $23,000 | Approved |
| Sallie Mae | Student loan | UK | $2,625 | Approved |

Discovery continues. Plaintiffs will supplement their Answer in accordance with the Federal Rules of Civil Procedure.

Interrogatory No. 6: With respect to each application or extension of credit identified in response to Interrogatory No. 5, please state whether you allege that any action and/or inaction of Trans Union affected such application for or extension of credit in any way. If so, please specify what effect such action and/or inaction allegedly had, including but not limited to, the denial of credit, any increase in variance in the applicable interest rate (and the amount of such increase, if any), and any variance in any of the terms of the transaction.

**ANSWER:**   Subject to and without waiver of their general objections, Plaintiffs object to this interrogatory as it is overly broad, unduly burdensome, is intrusive, harassing, vague, ambiguous,

10

and not reasonably calculated to lead to the discovery of relevant or admissible evidence. Without waiving their objections, Plaintiffs

| Creditor | TU Action | TU Action caused |
|---|---|---|
| Capitol One | Reported Plaintiffs deceased | Denial of credit |
| Ameriquest Mortgage | Reported Plaintiffs deceased | Denial of credit |
| Wells Fargo Home Mortgage | Reported Plaintiffs deceased | Delayed approval of mortgage and later delayed refinancing application |
| Wells Fargo Financial | unknown | Approved |
| FMCC | unknown | Approved |
| Kohl's | unknown | Did not cause denial |
| Bank of America | Reported Plaintiffs deceased | Denial of credit |
| Fleet Boston Financial Corp d/b/a Fleet credit card | Reported Plaintiffs deceased | Denial of credit |
| Conseco Inc | Reported Plaintiffs deceased | Denial of credit |
| JC Penny | Correctly reported Plaintiffs' credit histories | Approved |
| Sears | Correctly reported Plaintiffs' credit histories | Approved |
| Centennial Mortgage | Reported Plaintiffs deceased | Denial of credit |
| Northwest CU | unknown | Approved |
| S&C Bank | unknown | Approved |
| Sallie Mae | unknown | Approved |

Discovery continues. Plaintiffs will supplement their Answer in accordance with the Federal Rules of Civil Procedure.

Interrogatory No. 7: Identify and describe in detail each and every inaccuracy you contend exists or ever existed in any credit report prepared by Trans Union, which forms the basis of this suit or any other claims you believe you have against Trans Union. With regard to each such alleged inaccuracy, please identify: (a) the date of the credit report in which it appeared; (b) the date upon which you first became aware of the alleged inaccuracy, and how you became aware of it; (c) what you contend is inaccurate and why; and (d) all persons with

11

Anderson 8228
Answers to TU 2nd INTs

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN
### COURT FILE NO.: 03-C-0510 C

Penny Lee Anderson and
Russell D. Anderson, Sr.,

                Plaintiffs,

    -vs-

Trans Union, L.L.C.;
Experian Information Solutions Inc.;
CSC Credit Services, Inc.; and,
Equifax, Inc. d/b/a Equifax Information Services
LLC;

                Defendants.

**PLAINTIFFS' 2ND AMENDED NOTICE
OF TAKING TELEPHONIC
DEPOSITION OF
CENTENNIAL MORTGAGE'S
FRCP 30(b)(6) REPRESENTATIVE(S)**

---

**TO:   CORPORATE COUNSEL, LEGAL DEPARTMENT, CENTENNIAL
MORTGAGE, 2217 VINE STREET, SUITE 101, HUDSON, WI 54022:**

PLEASE TAKE NOTICE, that the **TELEPHONIC** deposition of Centennial Mortgage's FRCP Rule

30(b)(6) Representative(s) having the most knowledge/information about:

1.    The mortgage application initiated by Plaintiffs with Centennial Mortgage on or

    about February 1, 2001

2.    The reasons you denied Plaintiffs mortgage application(s) in February 2001 and

    March 2001

3.    The source of the credit reports you accessed in February 2001 to the present and their

    relevance to your actions regarding Plaintiffs' mortgage application.

Andersons 8228
Amended NOD 2nd
Cent. Mortgage 30b6 Rep.

              1



EXHIBIT
5

4.      the authenticity of Exhibit A as business records used in the normal course of your business

by oral examination will be taken before a qualified notary public at the **corporate offices of Centennial Mortgage, 2217 Vine Street, Suite 101, Hudson, WI 54022 at 9:30 AM CT on 9th day of September 2004** thereafter by adjournment until the same shall be completed.

IN DESIGNATING a person to appear for deposition under Rule 30(b)(6), an organization must make a conscientious good-faith endeavor to designate persons having knowledge of matters sought by the interrogator. Protective Nat. Ins. Co. of Omaha v. Commonwealth Ins. Co., 137 F.R.D. 267, 278 (D. Neb. 1989) (applying identical federal rule). If an organization fails to designate a person with knowledge, sanctions may be imposed. Arctic Cat Inc., v. Injection Research Specialists, Inc., 210 F.R.D. 680, 682-83 (D. Minn.).

An organization must not only produce such number of persons as will satisfy the request, but must also prepare them so that they may give complete, knowledgeable and binding answers on behalf of the organization. Prokosch v. Catalina Lighting, Inc., 193 F.R.D. 633, 638 (D. Minn 2000). An organization's duty to prepare its designee(s) so that they can give knowledgeable and binding answers attaches not just to matters personally known to the designee(s), but also to subjects that the organization should reasonably know. Hooker v. Norfolk So. Ry. Co., 204 F.R.D. 124, 126 (S.D. Ind. 2001); Poole ex. rel. Elliot v. Textron, Inc., 192 F.R.D. 494, 504 (D. Md. 2000).

The scope of the deposition is not limited to the matters specified in the Notice of Deposition, but is limited only as provided generally in F. R. Civ. P. 26. The matters set forth in

Andersons 8228
Amended NOD 2nd                                        2
Cent. Mortgage 30b6 Rep.

the deposition notice therefore constitute the minimum, not the maximum, about which the deponent must be prepared to speak.  Detoy v. City and County of San Francisco, 196 F.R.D. 362, 366-67 (N.D. Cal. 2000).

**YOU ARE DIRECTED,** pursuant to Rule 30 and 34 of the Federal Rules of Civil Procedure to produce the following documents and things at the time of your deposition, if not already produced:

1. any and all communications including, but not limited to, subscribers' reports regarding Plaintiffs mortgage application dated February 2001 to the present between you and any and all credit reporting agencies to which you subscribe.

2. any and all documents which reflect and refer to any and all communications between you and Plaintiffs from February 2001 to the present.

**Centennial Mortgage  is required by § 202.12 of Regulation B of the Equal Credit Opportunity Act to preserve these documents including, but not limited to, its subscriber accessed credit reports for 25 months after the date you are notified of action.**

## DEFINITIONS

The term "documents" means all the writings of any kind, including the original and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, including, without limitation, correspondence, memoranda,  notes, diaries, statistics, e-mails, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, interoffice and intra-office communications, notations of any sort of

Andersons 8228
Amended NOD 2nd
Cent. Mortgage 30b6 Rep.

3

conversations, telephone calls, meetings or communications, bulletins, printed matter, computer printouts, teletypes, telefax, invoices, worksheets, all drafts, alterations, and modifications, changes and amendments of any of the foregoing, graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotapes, recordings, motion pictures) and any electronic, mechanical, or electrical records or representations of any kind (including, without limitation, tapes, cassettes, disks, recordings and computer memories).

Dated: 7/29         2004           By:     s/ Thomas J. Lyons Jr.

**THOMAS LYONS & ASSOCIATES, P.A.**   **CONSUMER JUSTICE CENTER, P.A.**
Thomas J. Lyons, Sr.(# 65699)                Thomas J. Lyons, Jr. (# 249646)
WI Att. ID #: 1019127                             John H. Goolsby (#0320201)
342 East County Road D                        342 East County Road D
Little Canada, Minnesota 5517               Little Canada, Minnesota 5517
 (651) 770-9707                                       Telephone:  (651) 770-9707

Attorneys for Plaintiffs

Andersons 8228
Amended NOD 2nd
Cent. Mortgage 30b6 Rep.

4