Document Number Case Number
03–C–0510–C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
10/15/2004 04:19:08 PM CDT

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN
## COURT FILE NO.: 03-CV- 0510 C

Penny Lee Anderson and
Russell D. Anderson, Sr.,


        Plaintiffs,


   -vs-                               **AFFIDAVIT OF JOHN H. GOOLSBY**


Trans Union, L.L.C.;
Experian Information Solutions Inc.;
CSC Credit Services, Inc.;
Equifax, Inc. d/b/a Equifax Information Services
LLC,

        Defendants.

John H. Goolsby, Esq., being duly sworn and upon oath, deposes and says as follows:

1. That I am one of the attorneys representing Plaintiff in the above-entitled matter. I submit this affidavit in connection with Plaintiffs' Opposition to Defendants' Motions for Summary Judgment or Partial Summary Judgment.

2. That attached hereto as Exhibit A is a true and correct copy of the deposition of Janice Fogleman.

3. That attached hereto as Exhibit B is a true and correct copy of CSC Frozen Scans.

4. That attached hereto as Exhibit C is a true and correct copy of excerpts of the deposition of Kimberly Hughes.

5. That attached hereto as Exhibit D is a true and correct copy of ACDV from Experian to CCB, Aug. 8, 2000.

6. That attached hereto as Exhibit E is a true and correct copy of Thomas J. Lehner testimony before Congress.

7.  That attached hereto as Exhibit F is a true and correct copy of Declaration of Kelly Clinton Opp'n to Plaintiffs' Am. Mot for Class Cert. in <u>Anderson v. Capital One Bank</u>, File No.: 04-C-0096 C (W.D. Wisc.).

8.  That attached hereto as Exhibit G is a true and correct copy of American Express denial letter (front and back), Aug. 19, 2002.

9.  That attached hereto as Exhibit H is a true and correct copy of excerprts of the deposition of Edward McKenna, with selected exhibits.

10. That attached hereto as Exhibit I is a true and correct copy of excerpts of the deposition of Eileen Little.

11. That attached hereto as Exhibit J is a true and correct copy of excerpts of the deposition of Emily Meatte.

12. That attached hereto as Exhibit K is a true and correct copy of excerpts of the deposition of Brian Barton.

13. That attached hereto as Exhibit L is a true and correct copy of <u>Olwell v. Medical Information Bureau</u>, Civ. No. 01-1481, slip op. at 12 (JRT/FLN) (D. Minn. 2003).

14. That attached hereto as Exhibit M is a true and correct copy of <u>Curtis v. Trans Union</u>, Nos. 02-C-207, 02-C-208, 2002 WL 31748838 * 5 (N.D. Ill. Dec. 9, 2002).

15. That attached hereto as Exhibit N is a true and correct copy of <u>McKeown v. Sears Roebuck & Co., et al.</u>, File No. 03-C-0528 C (W.D. Wisc. 2004).

16. That attached hereto as Exhibit O is a true and correct copy of <u>Kronstedt v. Equifax et al.</u>, File No. 01-C-0052-C (W.D. Wisc. 2001).

17. That attached hereto as Exhibit P is a true and correct copy of <u>Wharram v. Equifax et al.</u>, File No. 02-4853 (D. Minn. 2004).

18. That attached hereto as Exhibit Q is a true and correct copy of <u>Sheffer v. Experian Information Solutions, Inc.</u>, Civ. No 02-7407, slip op. at 5 (E.D. Pa. 2003).

FURTHER YOUR AFFIANT SAYETH NOT.

<div style="text-align:right">

     s/John H. Goolsby\
John H. Goolsby

</div>

Subscribed and sworn before me\
this 14th day of Oct., 2004.


     s/Sue Wolsfeld\
Notary Public

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
COURT FILE NO.: 03-C-0510 C

PENNY LEE ANDERSON and        :
RUSSELL D. ANDERSON, SR.      :
    Plaintiffs              :
                 :
VS.                           :
                 :
TRANS UNION, L.L.C.;          :
EXPERIAN INFORMATION          :
SOLUTIONS INC.; CSC           :
CREDIT SERVICES, INC.;        :
and EQUIFAX, INC. d/b/a       :
EQUIFAX INFORMATION           :
SERVICES, L.L.C.              :
    Defendants              :



*****************************************************

ORAL DEPOSITION OF

JANICE LYNN FOGLEMAN

JUNE 2, 2004

*****************************************************

    Called as a witness by the Plaintiffs, taken before
Debbie Leonard, CSR, RMR, CRR, a Certified Shorthand
Reporter in and for the State of Texas, reported by
machine shorthand, on the 2nd day of June, 2004, from
1:07 p.m. to 4:30 p.m., at the offices of CSC Credit
Services, 652 North Sam Houston Parkway East,
Suite 400, Houston, Texas, pursuant to the Federal
Rules of Civil Procedure and the provisions stated on

the record or attached hereto.

Exhibit A

**2**

```
 1        A P P E A R A N C E S
 2   COUNSEL FOR PLAINTIFF:
          Mr. Thomas Lyons
 3        (via telephone)
          CONSUMER JUSTICE CENTER, PA
 4        342 East County Road D
          Little Canada, Minnesota 55117
 5        Phone: (651) 770-9707
 6   COUNSEL FOR DEFENDANT, TRANS UNION LLC:
          Mr. Christopher T. Lane
 7        (via telephone)
          KATZ & KORIN
 8        334 North Senate Avenue
          Indianapolis, Indiana 46204
 9        Phone: (317) 464-1100
10   COUNSEL FOR DEFENDANT, EXPERIAN INFORMATION SOLUTIONS
          INC.:
11        Mr. Dustin B. Rawlin
          JONES DAY
12        North Point
          901 Lakeside Avenue
13        Cleveland, Ohio 44114
          Phone: ( 216) 586-1004
14
     COUNSEL FOR DEFENDANT, CSC CREDIT SERVICES, INC.:
15        Mr. Chuck Webber
          FAEGRE & BENSON LLP
16        2200 Wells Fargo Center
          90 South Seventh Street
17        Minneapolis, Minnesota 55402-3901
          Phone: (612) 766-8719
18
     COUNSEL FOR DEFENDANT, EQUIFAX INFORMATION SERVICES,
19   LLC:
          Ms. Camille Averett
20        (via telephone)
          KILPATRICK STOCKTON
21        1100 Peachtree Street, Suite 2800
          Atlanta, Georgia 30309
22        Phone: (404) 815-6191
23   ALSO PRESENT:
          Ms. Danelle D. Gulley
24
     COURT REPORTER:
25        Ms. Debbie Leonard, CSR, RMR, CRR
```

**4**

```
 1        E X H I B I T S   I N D E X
 2            ORAL DEPOSITION OF
              JANICE LYNN FOGLEMAN
 3            JUNE 2, 2004
              NOS. 1 - 9
 4
 5   NUMBER   DESCRIPTION              PAGE
 6   CSC-1   Frozen Scan               8
           for Russell D. Anderson Sr.
 7         2001 Month 09
           CSC001 - 004
 8
     CSC-2   Frozen Scan               9
 9         for Penny L. Anderson
           2001 Month 09
10         CSC110 - 114
11   CSC-3  Frozen Scan               38
           for Russell D. Anderson Sr.
12         2002 Month 04
           CSC032 - 035
13
     CSC-4   Frozen Scan              39
14         for Penny L. Anderson
           2002 Month 04
15         CSC145 - 149
16   CSC-5  Frozen Scans             40
           for Russell D. Anderson Sr.
17         2002 Months 05 through 11
           CSC036 - 066
18
     CSC-6   Frozen Scans            53
19         for Penny L. Anderson
           2002 Months 05 through 11
20         CSC150 - 184
21   CSC-7  Various documents         61
           CSC230 - 241
22
     CSC-8   Frozen Scans            79
23         for Russell D. Anderson Sr.
           2002 Month 12
24         2003 Months 01 through 08
           CSC001 - 004
25
```

**3**

```
 1            I N D E X
 2                              PAGE
 3   Appearances.................................   2
 4
 5   WITNESS: JANICE LYNN FOGLEMAN
 6
         Examination By Mr. Lyons ...............   6
 7
         Examination By Mr. Webber .............   97
 8
         Further Examination By Mr. Lyons .......  103
 9
         Further Examination By Mr. Webber ......  110
10
         Further Examination By Mr. Lyons .......  110
11
12   Changes and Signature ......................  112
13   Reporter's Certificate ......................  114
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
 1        E X H I B I T S   I N D E X
                (continued)
 2
         ORAL DEPOSITION OF
 3       JANICE LYNN FOGLEMAN
         JUNE 2, 2004
 4       NOS. 1 - 9
 5
     NUMBER   DESCRIPTION              PAGE
 6
     CSC-9   Frozen Scans              86
 7         for Penny L. Anderson
           2002 Month 12
 8         2003 Months 01 through 08
           CSC185 - 229
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Janice Fogleman

6

1          JANICE LYNN FOGLEMAN,
2  having been first duly sworn, testified as follows:
3                    EXAMINATION
4  BY MR. LYONS:
5      Q.   Good afternoon, Ms. Fogleman.  My name is
6  Tommy Lyons.  I am representing the plaintiffs,
7  Penny Lee and Russell D. Anderson, in the action that
8  they have commenced that brings us here together today
9  by telephone.
10          Can you state your full name for the
11  record, spelling your last?
12      A.   Janice L. Fogleman.  It's F, as in Frank,
13  O-G-L-E-M-A-N.
14      Q.   And it is my understanding, in a stipulation
15  that was reached off the record that we'll now put on
16  the record, that your background information concerning
17  your education and your employment and training and the
18  like has not changed since your deposition was last
19  taken in the McKeown versus CSC matter; is that
20  correct?
21      A.   Correct.
22          MR. LYONS:  And Counsel, you're agreeing
23  that we may use that portion of her deposition to
24  establish those facts in this matter as well; is that
25  correct?

7

1          MR. WEBBER:  Yes.  Her employment,
2  background, and educational background, certainly,
3  yeah.
4          MR. LYONS:  Okay.
5      Q.   (By Mr. Lyons)  Ms. Fogleman, have you read
6  the Complaint that was filed in this matter by the
7  plaintiffs?
8      A.   Yes, sir.
9      Q.   How long ago did you do that?
10      A.   Yesterday.
11      Q.   All right.  And since your deposition was
12  taken in the McKeown matter, I think a couple of weeks
13  ago, have you had your deposition taken since that
14  time?
15      A.   No, sir.
16      Q.   In preparation for your deposition in this
17  matter, in the Anderson matter, what documents did you
18  review?
19      A.   There was a copy of the consumer letter, copy
20  of credit reports, and frozen scans.
21      Q.   All right.  And were there any ACIS cases
22  that you reviewed?
23      A.   Yes, sir.
24      Q.   How many?
25      A.   One.

8

1      Q.   When I reviewed the file in preparation for
2  today, I noticed that on the very first scan that was
3  produced in September, I think, of 2001, there was
4  information contained on both the scans of Mr. and
5  Mrs. Anderson that appeared as though a dispute had
6  been received by CSC prior to September of 2001.  Do
7  you agree with that statement?
8          MR. WEBBER:  The statement that there
9  was a dispute or a statement that that might appear
10  from the documents?
11          MR. LYONS:  The statement that that
12  appears from the documents.
13          MR. WEBBER:  Okay.  I guess let's be
14  specific about which ones you're looking at then.
15          MR. LYONS:  Oh, okay.  Let's start
16  marking them.  Let's see here.  Why don't we mark as
17  Deposition Exhibit Number 1 CSC 1 through 4.
18          MR. WEBBER:  Okay.  We're giving it to
19  the court reporter.
20          (Exhibit CSC-1 marked for
21          identification.)
22          MR. WEBBER:  All right.  We have it
23  marked as Exhibit 1.
24          MR. LYONS:  All right.  I will also mark
25  as Exhibit 2 --

9

1          MR. WEBBER:  Hold on.  I'm sorry to
2  interrupt.  Do you want it marked as 1 or something
3  else?  Do you want to keep it sequential with other
4  depositions?
5          MR. LYONS:  No.  That's fine.  Let's
6  call this CSC-1.
7          MR. WEBBER:  Okay.  We've got that
8  marked.
9          MR. LYONS:  Let's mark as CSC-2 frozen
10  data scan CSC 110 through 114.
11          MR. WEBBER:  Okay.  We're giving that to
12  the court reporter.
13          (Exhibit CSC-2 marked for
14          identification.)
15          MR. WEBBER:  All right.  We've got 1 and
16  2 in front of the witness.
17          MR. LYONS:  Thank you.
18      Q.   (By Mr. Lyons)  Ms. Fogleman, I'm showing you
19  what's been marked as Deposition Exhibit Number 1
20  and 2.  Identify Exhibit 1 for me, please.
21      A.   1 is a frozen scan on a Russell D. Anderson,
22  Sr., that's dated 9th month, 2001.
23      Q.   And is there a notation on Deposition
24  Exhibit 1 that indicates to you that there was a
25  consumer dispute by Russell D. Anderson, Sr., prior to

Janice Fogleman

10

1    September of 2001?
2        A.   It appears to be, yes, sir.
3        Q.   All right.  And on what CSC page are you
4    looking at?
5        A.   CSC002.
6        Q.   All right.  And what trade line was the
7    subject matter of the dispute prior to September of
8    2001?
9        A.   It shows Cross Country.  Member
10   Number 458BB02969.
11       Q.   And what was the account number related to
12   that member number?
13       A.   It shows Account Number 541490709890.
14       Q.   And is it true that that's not the complete
15   account number?
16           MR. WEBBER:  I'll object on foundation.
17           But you can answer, if you know.
18       A.   I don't know.  There's 12 digits.
19       Q.   (By Mr. Lyons) Okay.  Now, the member number
20   that you cited before, is that a CSC member number?
21       A.   The 458BB02969?
22       Q.   Correct.
23       A.   No, sir.
24       Q.   What member number is that?
25       A.   That would be an Equifax member.

11

1        Q.   Below or next to the Cross Country trade
2    line, it says "suppress erroneous trade."  Do you see
3    that?
4        A.   Yes, sir.
5        Q.   What does that mean?
6        A.   Just that the trade line was suppressed.
7    That's just the verbiage that comes up.
8        Q.   Suppressed by whom?
9        A.   It would have been suppressed by the credit
10   reporting agency.
11       Q.   Which credit reporting agency?
12       A.   It could have been CSC, or it could have been
13   Equifax.
14       Q.   And how do we know the answer to that
15   distinction of who actually put on the "suppress
16   erroneous trade"?
17           MR. WEBBER:  Do you understand the
18   question?
19       A.   Which credit bureau would have done that,
20   credit reporting agency?
21       Q.   (By Mr. Lyons) Right.
22       A.   The only way would be through an ACIS case
23   from back at that time, some type of inquiry that shows
24   which -- whether they were considered a CSC consumer or
25   Equifax consumer back at that time.

12

1        Q.   Do you know from your review of the file and
2    of any documents in preparation for this deposition
3    whether it was a CSC or an Equifax file?
4        A.   I do not know.
5        Q.   Okay.  Is there an ACIS case related to this
6    dispute that appears on CSC002?
7        A.   There's not one showing in the inquiries,
8    but -- I couldn't say because I don't know.
9        Q.   On the inquiries you're looking at, would
10   that be on the front page of Deposition Exhibit Number
11   1?
12       A.   Yes, sir.
13       Q.   And if there were an ACIS case that had been
14   created by CSC, would it appear in the inquiries
15   section of Deposition Exhibit Number 1?
16       A.   The internal or the ACIS case inquiries don't
17   appear on the frozen cases.
18       Q.   What would have appeared in the inquiry
19   section that would have helped you answer my question?
20       A.   Actually, nothing from the frozen scan.
21       Q.   Okay.  I thought that you had said previous
22   that there would be something in the inquiry section
23   that would assist you in finding out something about
24   the dispute.
25       A.   From an inquiry section of the credit file,

13

1    you can tell if an ACIS case -- if it's an internal
2    copy or consumer copy that is dated back at that time,
3    but on those scans it does not give the internal or
4    ACIS cases inquiries on a frozen scan.
5        Q.   Okay.  And the inquiries on the scan also do
6    not show the disclosures that would be produced by CSC
7    or Equifax; is that correct?
8        A.   Correct.
9        Q.   Now, does CSC or Equifax have in its -- well,
10   strike that.
11           Does CSC have in its records any ACIS
12   case related to a dispute prior to September of 2001?
13       A.   No, sir.
14       Q.   Why is that?
15       A.   Well, we don't keep the documents but for two
16   years because the ACIS system -- the software for the
17   ACIS does not -- they only go back for two years, which
18   pulls that from ACRO.
19       Q.   Does CSC retain a hard copy or a hard
20   document copy of any disputes for longer than two
21   years?
22       A.   Yes, sir.
23       Q.   All right.  And have you -- how long does CSC
24   maintain hard copies of disputes?
25       A.   30 months.

4 (Pages 10 to 13)

Janice Fogleman

14

1    Q.   How long?
2    A.   30 months.
3    Q.   Okay.  So not long enough for us to capture
4    the dispute that was generated prior to September of
5    2001; is that correct?
6    A.   We do not have information from that far
7    back, no, sir -- or yes, sir.
8    Q.   Is there any way for CSC to determine what
9    was being suppressed in Deposition Exhibit Number 1?
10            MR. WEBBER:  You mean with respect to a
11   Cross Country Bank trade line?
12            MR. LYONS:  Correct.
13   A.   The whole trade line.  The complete trade
14   line.
15   Q.   (By Mr. Lyons)  What or why was that
16   information being suppressed related to Cross Country
17   Bank?
18   A.   I don't know.
19   Q.   Below where it says Cross Country Bank and
20   the member number, it says "system affiliate internal
21   policy."  What does that mean?
22   A.   That's the suppression code that was used
23   whenever this account was suppressed.
24   Q.   And what does "system affiliate" mean?
25   A.   System affiliate could -- it's a suppression

15

1    code that is used, and that's what prints out once we
2    add that particular suppression code to the trade line.
3    Q.   Once CSC adds it or once Equifax adds it?
4    A.   I know it appears when CSC adds it.
5    Q.   Okay.
6    A.   But I don't --
7    Q.   Based on your knowledge, does that lead you
8    to believe that CSC was the one that added the
9    suppression code sometime on or about September of
10   2001?
11            MR. WEBBER:  I'll object to the form.
12            You can answer.
13   A.   At this point, looking at this document, I
14   cannot say definitely that CSC did it, nor that Equifax
15   did it.  I do not know which or who placed the
16   suppression code on this account.
17   Q.   (By Mr. Lyons)  Is Equifax an affiliate of
18   CSC, or is CSC an affiliate of Equifax?
19            MR. WEBBER:  Object to the form.
20            You can answer.
21   A.   CSC is an affiliate of Equifax.
22   Q.   (By Mr. Lyons)  All right.  So where it says
23   "system affiliate internal policy," that doesn't have
24   anything to do with the affiliate relationship between
25   Equifax and CSC?

16

1    A.   Not that I know of.
2    Q.   All right.  The date of last activity appears
3    to be April of 2000, is that correct, related to that
4    Cross Country Bank trade line?
5    A.   Yes, sir.
6    Q.   All right.  If a suppression code was
7    entered, would that show up as something that happened
8    on the date of last activity?
9    A.   I don't know.
10   Q.   Is it possible?
11            MR. WEBBER:  Is the question whether the
12   date of last activity is reflecting the addition of the
13   suppression?
14            MR. LYONS:  Correct.
15   A.   Oh, okay.  You're saying date of last
16   activity is the date that this account was suppressed?
17   Q.   (By Mr. Lyons)  Yes.
18   A.   No.
19   Q.   And why do you say that?
20   A.   Because the reporting date shows 6 of 2000.
21   That's when it was being suppressed.
22   Q.   That's when the suppression code was entered,
23   was in 6 of 2000?
24   A.   Yes, sir.
25   Q.   Okay.  But that would mean that the dispute

17

1    would have to have happened before June of 2000; is
2    that correct?
3            MR. WEBBER:  Object to the form.
4            You can answer.
5    A.   Not necessarily.
6    Q.   (By Mr. Lyons)  Well, could the dispute have
7    been -- oh, you're saying the dispute could have even
8    been later than June of 2000; is that correct?
9    A.   No.  It could have been prior to June of 2000
10   or June of 2000.
11   Q.   All right.  Then below where it says "system
12   affiliate internal policy," it says "consumer
13   disputes-reinvestigation in process."  Do you see that?
14   A.   Yes, sir.
15   Q.   What does that mean?
16   A.   That's -- that's a narrative that's normally
17   placed on a trade when there is a dispute that's
18   been -- or case created and a dispute generated through
19   ACIS.
20   Q.   Okay.  Does that lead you to believe that --
21   seeing that notation, that an ACIS case was generated
22   relating to this dispute concerning this Cross Country
23   trade line?
24   A.   Yes, sir.
25   Q.   All right.  How long would a "reinvestigation

**18**

1  in process" remain on a trade line that's been
2  disputed?
3      A.  Until the reinvestigation is completed.
4      Q.  Okay.  And a reinvestigation, does that have
5  a time limit on it?
6      A.  Yes, sir.
7      Q.  I beg your pardon?
8      A.  Yes, sir.
9      Q.  No, it does not?
10     A.  Yes, sir, it does.
11     Q.  Oh, it does.  Okay.  I apologize.  And how
12  long is the reinvestigation time frame?
13     A.  30 days.
14     Q.  All right.  Now, this frozen scan is dated
15  September of 2001, so would it be impossible for it
16  to -- for the dispute to have occurred in June of 2000
17  and have a reinvestigation still being in process in
18  September of 2001?
19     A.  When the account was suppressed, the
20  narrative of consumer disputes remained on that trade
21  item, trade line, and it's there.  It only reflects
22  internally on a frozen scan.
23     Q.  The "consumer disputes-reinvestigation in
24  process," that whole notation would remain on the trade
25  line of the consumer's file or not?

**19**

1      A.  For that particular trade line, it only can
2  be viewed internally.
3      Q.  Once the suppression code is entered; is that
4  correct?
5      A.  Correct.
6      Q.  The "reinvestigation in process," that's not
7  accurate, is it, internally if the dispute was received
8  sometime on or about June of 2000?
9      A.  That's a narrative code that was on the trade
10  item, trade line.  When the dispute was initiated, when
11  they add the suppression, they don't change anything or
12  they don't remove a narrative code.  They just put in
13  the suppression code, and it just continues to print
14  or -- continues to stay with the account, but it's not
15  viewed by anyone but internally.
16     Q.  Right.  And Ms. Fogleman, I understand that's
17  what you testified to.  What my question is is that the
18  statement "consumer disputes-reinvestigation in
19  process" is not accurate after the investigation has
20  concluded, correct?
21     A.  The account doesn't even actually exist on
22  the file at this time.  It's suppressed.
23     Q.  But it exists in CSC's internal records,
24  correct?
25     A.  It exists on the frozen scan.  It can be

**20**

1  viewed internally, which showed it was suppressed due
2  to a reinvestigation.
3      Q.  Right.  And it can be viewed both internally
4  by CSC as well as Equifax, correct?
5      A.  Correct.
6      Q.  Okay.  But as of September of 2001,
7  Ms. Fogleman, there is no reinvestigation in process
8  related to this trade line, correct?
9      A.  I don't know.
10     Q.  What do you mean, you don't know?
11        MR. WEBBER:  I don't know if she can
12  explain it any better, Counsel.
13     A.  I don't know.
14     Q.  (By Mr. Lyons)  You don't know whether there
15  was a reinvestigation still in process in September of
16  2001?
17     A.  No, I don't.
18     Q.  Well, if you wanted to find that information
19  out, who would you talk to?
20     A.  For 2001, I do not know who we would talk to.
21     Q.  You don't know whether to talk to somebody in
22  CSC or somebody at Equifax, right?
23     A.  If we talked to anybody, it would be somebody
24  at Equifax, but I don't know who at Equifax would know
25  that information.

**21**

1      Q.  Why would you talk to somebody at Equifax?
2      A.  Because that's where we obtained the frozen
3  scans from.
4      Q.  Ms. Fogleman, can you tell me whether or not
5  any other trade line was the subject of a dispute
6  related to the September 2001 scan?
7        MR. WEBBER:  You mean whether the scan
8  reflects any other items in dispute?
9        MR. LYONS:  Right.
10        MR. WEBBER:  Okay.
11     A.  No.
12     Q.  (By Mr. Lyons)  Can a reinvestigation in
13  process go on for more than 30 days?
14     A.  It depends.
15     Q.  Depends on what?
16     A.  Most reinvestigations are completed within 30
17  days.
18     Q.  But there are some that take longer than 30
19  days?
20     A.  It's a possibility.
21     Q.  Okay.  Do you know of one that's ever taken
22  longer than 30 days that you've been familiar with?
23     A.  Not offhand, no, sir.
24     Q.  Okay.  And you've handled more than -- how
25  many disputes in your career at CSC, do you think?

Janice Fogleman

22

```
1    A.  I have no idea.
2    Q.  Thousands, I would imagine, correct?
3    A.  Probably.
4    Q.  Maybe even tens of thousands?
5    A.  Possibility.
6    Q.  Even hundreds of thousands, right?
7    A.  Very possible.
8        MR. WEBBER:  Wow.
9    Q.  (By Mr. Lyons)  That's a lot of disputes,
10  isn't it?
11   A.  Yes, it is.
12   Q.  You can't think of one as you sit here today
13  that's ever taken longer than 30 days; is that right?
14   A.  Not offhand, no, sir, I can't.
15   Q.  Okay.  Now, the notation that appears in
16  Deposition Exhibit Number 1 about suppressing erroneous
17  trade, is that a hard delete or a soft delete?
18       MR. WEBBER:  Object to the form.
19       You can answer, if you know.
20   A.  It's not a delete at all.
21   Q.  (By Mr. Lyons)  It's a suppress?
22   A.  It's a suppression.
23   Q.  It could come back on later on or what?
24   A.  There is a possibility it could, if the
25  creditor changes an account number or member number or
```

23

```
1   opening date on the account.
2    Q.  But are there any timetables that would
3   expire automatically that would remove the suppression
4   code?
5    A.  No, sir.
6    Q.  Okay.  So it's going to stay on there until
7   the end of time unless the creditor or member instructs
8   CSC or Equifax to change it, correct?
9        MR. WEBBER:  Counsel, by "it" I assume
10  you're referring to the suppression code?
11       MR. LYONS:  That's correct.
12   A.  For seven years, yes.
13   Q.  (By Mr. Lyons)  What do you mean by "for
14  seven years"?
15   A.  Well, after the seven-year time frame, it
16  automatically would drop.
17   Q.  The trade line would?
18   A.  The trade line, yes, sir.
19   Q.  The entire trade line?
20   A.  The entire trade line, yes, sir, unless
21  there's a change in the member number, account number,
22  or opening date.
23   Q.  And when was the opening date of this file?
24   A.  It showed 4 of '99.
25   Q.  All right.  So seven years from that date
```

24

```
1   would be when?
2    A.  4 of 2006.
3    Q.  So in 4 of 2006, if nothing else changed,
4   that would automatically come off?  Is that what you're
5   telling me?
6    A.  Yes, sir.
7    Q.  In your review of the CSC file and CSC
8   documents, do you believe that this trade line that we
9   see on Deposition Exhibit Number 1, Page CSC002, was at
10  some point reporting as deceased?
11   A.  Can you say that again?  I'm sorry.
12   Q.  Yeah.  Do you think that this trade line that
13  we're looking at in Deposition Exhibit Number 1 related
14  to Cross Country Bank was at one point in time prior to
15  September of 2001 reporting as deceased?
16       MR. WEBBER:  Object to the form.
17       You can answer.
18   A.  Yes, sir.
19   Q.  (By Mr. Lyons)  Why do you say that?
20   A.  I saw it on a frozen scan.
21   Q.  I beg your pardon?
22   A.  From a frozen scan.
23   Q.  Frozen scan that is subsequent or previous to
24  September 2001?
25   A.  Previous.
```

25

```
1        MR. LYONS:  Okay.  I don't think I've
2   seen that scan.  Counsel, do you know why I have not
3   seen that scan?
4        MR. WEBBER:  Yeah.  I think our -- as we
5   had set out in our response to the document requests,
6   we cut it off going backwards at September of 2001
7   because that was the statute of limitations period.
8        MR. LYONS:  Okay.  Our discovery request
9   asks for it back to '99.
10       MR. WEBBER:  Right.  And our response
11  made it clear that we were producing back to September
12  of '01.  I'm sorry.  Yeah, September of '01.
13       MR. LYONS:  But if there's information
14  concerning this trade line that has to do with the
15  deceased status being on there prior to September
16  of '01, don't you think that that's relevant and fair
17  for the plaintiff to discover?
18       MR. WEBBER:  I don't know.  I don't know
19  that we're going to resolve it today either.  All I'm
20  saying is, our response to the document request said
21  exactly how far back we were going with the production,
22  so that's why it went back to September of '01.
23       MR. LYONS:  But she's got information
24  about things and she's looked at scans that I've never
25  seen concerning this very trade line, which is the
```

26

1  subject matter of this lawsuit, right?
2          MR. WEBBER: Yeah, that may very well
3  be.
4          MR. LYONS: Okay. So --
5          MR. WEBBER: I don't know how much time
6  you want to spend talking about it on the record, but I
7  mean, I'm just telling you -- you had asked the
8  question, why does it only go back to September of '01?
9  I'm saying we made it clear that that's how far back we
10  were going.
11          MR. LYONS: Well, the reason I want to
12  talk about it on the record is because I think we
13  should make a record so at least it's clear that we
14  want to ask questions about this trade line and its
15  appearance on the CSC credit file or Equifax credit
16  file from whenever it first came on to whenever it
17  finally got removed, because I think that's the subject
18  matter of this lawsuit. And if she has information
19  regarding that that she's even looked at that hasn't
20  been shared with us, I think that's unfair.
21          MR. WEBBER: Okay. And you've said that
22  for the record. I understand. And that may be -- we
23  may have to have a conversation at some later time
24  about the scope of document production.
25     Q.  (By Mr. Lyons) Well, Ms. Fogleman, what

27

1  frozen scan are you referring to that would show when
2  the deceased information was appearing related to the
3  Cross Country trade line?
4     A.  It was prior to September of 2001.
5     Q.  Right. When?
6     A.  I don't remember the date off the top of my
7  head, and I don't have it in front of me.
8     Q.  You don't have the scan in front of you?
9     A.  Only the -- from 2001, September.
10     Q.  All right. Well, where are the scans --
11  where is the scan that you looked at that provided you
12  with that information?
13     A.  They're in our legal department.
14          MR. LYONS: Okay. Well, Counsel, I
15  think we should take a break and let her go get those
16  scans so that she can answer the questions. Don't you
17  think that's a good idea?
18          MR. WEBBER: I don't know. Let me think
19  about it.
20          Why don't you -- if you've got other
21  questions, why don't you go on and -- it might take
22  some searching to find it.
23          It's also something I'm going to have to
24  take a look again at our document requests.
25          I hadn't anticipated you were going to

28

1  want to spend time talking about the scope of document
2  production, but --
3          MR. LYONS: No. What I want to spend
4  time on is the trade line that's at issue in this case.
5          So she's looked at documents. She's
6  been prepared on this trade line. And now the
7  documents that she needs to answer my questions
8  aren't -- I guess are in some other office.
9     Q.  (By Mr. Lyons) Are they there, Ms. Fogleman,
10  on the premises?
11     A.  I don't know.
12     Q.  Why did you look at it?
13          MR. WEBBER: Counsel, what I'm
14  suggesting you do is just go to some other questions.
15  We'll look and see if we can find them, rather than
16  taking a 20-minute break while somebody paws through
17  the documents.
18          MR. LYONS: I want to conduct this
19  deposition in the sequence I want to conduct it in. I
20  guess I'm asking where she saw that document.
21     Q.  (By Mr. Lyons) Ms. Fogleman, where was the
22  last place you saw that document?
23     A.  In our legal department.
24     Q.  Okay. Which is there in the building that
25  you're in right now?

29

1     A.  Correct.
2     Q.  Did you look at that document yesterday?
3     A.  Yes, sir.
4     Q.  Okay. Well, do you think that between
5  yesterday and today here at 1:40 that that document is
6  not -- has somehow been moved?
7     A.  It's a possibility. I do not know.
8          MR. LYONS: Counsel, I would ask that we
9  take a break and let's get that document and let's let
10  her answer these questions in the sequence that I'm
11  asking them.
12          MR. WEBBER: Well, we'll look for the
13  document. I'll take a look at the document response.
14          I will point out again that we made it
15  clear how far back we were going. If you intended to
16  ask questions prior to the expiration of the statute of
17  limitations, I would have expected that that would have
18  been brought up prior to the deposition today, rather
19  than waiting for the deposition and then raise
20  objections to the scope of our document production.
21          But we can certainly look for the
22  document. I'll take a look at the document request and
23  see if we're all right turning it over, in light of the
24  questions that you're now asking.
25          MR. LYONS: Okay. Thank you.

Janice Fogleman

30

1     (Recess from 1:40 p.m. until 1:44 p.m.)
2         MR. WEBBER: We're back on the record,
3  and I will state for the record that we have retrieved
4  some documents.
5         I will also point out for the record,
6  I'm looking at the Rule 30(b)(6) notice of this
7  deposition, which was issued to us. Item Number 7
8  asked us to have produced by the time of the deposition
9  "Archived snapshots of Plaintiffs' consumer credit
10  file(s) dated November 2002 to present."
11        Item Number 8 calls for, among other
12  things, all CDVs, ACDVs, et cetera, dated October 2002
13  to the present that reference plaintiffs in any way.
14        We've obviously produced documents going
15  back even a year beyond that. So I think we've
16  actually produced more than that was called for in the
17  30(b)(6) request.
18        But having said all that, as a courtesy,
19  I'm happy to try to find other documents that
20  Ms. Fogleman may have looked at on the way to this, and
21  we have done just that.
22        So go ahead, Counsel.
23        MR. LYONS: All right. I direct, for
24  the record, your attention to Paragraph 10 of the same
25  deposition notice, which says, "History summary of

31

1  Plaintiffs' credit report from the time Cross Country
2  Bank and/or Applied Card Services [sic] first reported
3  them 'deceased' to the present."
4         So I think that covers what we're
5  talking about right now, and hopefully that's what
6  Ms. Fogleman is prepared to discuss with the documents
7  that she's now retrieved.
8         MR. WEBBER: Yeah. I don't regard those
9  as history summaries. Frankly, I don't know what that
10  means because I think you've got it more right when
11  you're talking about archive snapshots.
12        But regardless, we've got some stuff
13  here.
14        MR. LYONS: Okay.
15     Q. (By Mr. Lyons) Ms. Fogleman, what do you
16  have before you?
17     A. Frozen scans on Russell D. Anderson with
18  social 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 from some months in '99, the 4th,
19  5th, 6th, 7th month, 1999.
20     Q. I'm sorry to interrupt you. What was the
21  first month that you said?
22     A. 4, April.
23     Q. 4 of '99?
24     A. Yes, sir.
25        Frozen scans for Russell D. Anderson with

32

1  social 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 for February 2003 -- excuse me --
2  February 2000, March 2000, April, May, June, July,
3  August, September, October, November, December of 2000.
4         Frozen scans on Russell D. Anderson, Sr.,
5  with social 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 for months January, February,
6  March, April, May, June, July, and August of 2001.
7         And then the rest are Bates stamped.
8     Q. Okay. The ones that have already been
9  produced, correct?
10     A. Correct.
11     Q. Okay. Now, in the documents that haven't
12  been produced, scans from April of '99 until August of
13  2001, is there a deceased code attached to the Cross
14  Country Bank line that we were discussing in Deposition
15  Exhibit Number 1?
16     A. Not until July of 2000 -- July of 1999 on
17  Russell D. Anderson.
18     Q. In July of 1999, there is a deceased code
19  attached to the same Cross Country trade line that
20  appears in Deposition Exhibit Number 1?
21     A. As Cross Country Member Number 458BB02969.
22  Actually shows reported date of 5 of '99. Open 4
23  of '99. Consumer deceased. Account Number 541490709890.
24     Q. And had an open date of what?
25     A. I'm sorry?

33

1     Q. I misunderstood what you first started to
2  say. That trade line in that frozen scan for July
3  of '99 shows an open date for that Cross Country trade
4  line as what?
5     A. 4 of 1999.
6     Q. Okay. So open at 4 of '99 and then in July
7  of 1999 it was being reported as deceased, correct?
8     A. On the July frozen scan, but it shows a
9  reporting date of May of 1999.
10     Q. So the very next month after it was opened,
11  it was reported as deceased?
12        MR. WEBBER: Object to the form,
13  foundation.
14        You can answer.
15     A. It doesn't appear until the July of 1999
16  frozen scan, but it does have a reporting date of May
17  of 1999.
18     Q. (By Mr. Lyons) Okay. So what does -- I
19  don't understand how that -- do you understand how that
20  could be?
21     A. No.
22     Q. And from 5 of '99 -- I'm sorry. From July
23  of '99 until what frozen scan does that trade line --
24  that Cross Country Bank trade line appear with the
25  deceased code attached to it?

Janice Fogleman

34

1   A.  I don't know exactly, because I've got 7/99
2   and then I go to February of 2000.
3   Q.  Okay.  You jumped from 7 of '99 to February
4   of 2000?
5   A.  Correct.
6   Q.  All right.  And in February of 2000 -- how
7   does that trade line appear in the February of 2000
8   scan?
9   A.  It shows as consumer deceased.
10  Q.  Okay.  But still no dispute yet?
11  A.  No, sir.
12  Q.  Okay.  And when does the trade line change
13  from consumer deceased to other reporting?
14  A.  June of 2000 frozen scan.  It still has
15  consumer deceased, but it shows underneath it "consumer
16  disputes-reinvestigation in process."
17  Q.  Based on that, do you believe that that is
18  when either CSC or Equifax received a dispute about
19  that deceased status?
20  A.  Yes, sir.
21  Q.  Now, in the frozen scans that you've looked
22  at in preparation for this deposition, up until
23  September of 2001, was there any other deceased trade
24  line appearing on Mr. Russell Anderson's credit file?
25  A.  From Cross Country?

35

1   Q.  From anyone.
2   A.  No, sir.  No, sir.
3   Q.  Okay.  I would like you to look at Deposition
4   Exhibit Number 2.
5   A.  Yes, sir.
6   Q.  Can you identify that document for us?
7   A.  It's a frozen scan dated September 2001 for
8   Penny L. Anderson, Social Security number of
9   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.
10  Q.  2 also contains the "suppress erroneous
11  trade" notation related to the Cross Country Bank
12  account that we were talking about in Deposition
13  Exhibit Number 1, correct?
14  A.  For account Number 541490709890.
15  Q.  You would agree that's the same one as
16  Exhibit 1, correct?
17  A.  Correct.
18  Q.  Now, have you investigated whether or not the
19  same history of reporting that you just identified for
20  me on the scans that I do not have that you're looking
21  at, is it the same thing for Penny Anderson as well?
22  A.  Can you ask -- can you say that again?  I'm
23  sorry.
24  Q.  Sure.  Have you reviewed scans for Penny
25  Anderson that pre-date September of 2001?

36

1   A.  Yes, sir.
2   Q.  And are they the same scans -- or are they
3   the same chronological time frame of the scan that you
4   reviewed for Mr. Anderson prior to September of 2001?
5   A.  There is April, May, June, July, September,
6   October, November, and December of 1999.
7   January, February, March, April, May,
8   June, July, August, September, October, November,
9   December 2000.
10  And then January, February, March, April,
11  May, June, July, and August of 2001, plus the other
12  stuff.
13  Q.  All right.  Thank you.
14  And does the Cross Country Bank trade
15  line that we discussed in Deposition Exhibit 2 appear
16  with the deceased notation attached to it prior to
17  September of 2001 related to Mrs. Anderson?
18  A.  Yes, sir.  In July of 1999.
19  Q.  All right.  Same as Mr. Anderson, correct?
20  A.  I believe so, yes, sir.
21  Q.  All right.  And does it say -- does it show
22  in that July of '99 scan that the date opened was April
23  of '99?
24  A.  Yes, sir.
25  Q.  And does it show a reporting date of May

37

1   of '99?
2   A.  Yes, sir.  With Member Number 458BB02969.
3   Q.  And does it also show in June of 2000 that
4   for Mrs. Anderson that's when the investigation was
5   initiated to that Cross Country Bank deceased trade
6   line?
7   A.  June 2000, Member Number 458BB02969 shows
8   "consumer disputes-reinvestigation in progress".
9   Q.  Okay.  Thank you, Mrs. Fogleman.
10  A.  Yes, sir.
11  Q.  Is there any source that you're aware of in
12  the CSC system or a CSC employee that would be able to
13  assist you in determining what was done in relationship
14  to that dispute, other than the suppression code that
15  follows?
16  A.  No, sir.
17  Q.  From June of 2000, on both Mr. and
18  Mrs. Anderson's CSC credit files, the suppression code
19  was entered, correct?
20  A.  Yes, sir.
21  Q.  Pardon me?
22  A.  Yes, sir.
23  Q.  Thank you.
24  From September of 2001 related to
25  Mr. Anderson's credit file, the Cross Country Bank

10 (Pages 34 to 37)

Janice Fogleman

38

1  trade line continued to be suppressed until May of
2  2002; is that correct?
3      A.  I have to look it up.  I don't remember.
4      Q.  All right.  Let me direct your attention to
5  one of the documents.  Then we'll mark it.
6              MR. LYONS:  We'll mark as Deposition
7  Exhibit Number 3 CSC032 through 035.
8              MR. WEBBER:  32 to 35?
9              MR. LYONS:  Right.
10             (Exhibit CSC-3 marked for
11             identification.)
12             MR. WEBBER:  It's marked.
13     Q.  (By Mr. Lyons)  Ms. Fogleman, I'm showing you
14  what's been marked as Deposition Exhibit Number 3,
15  frozen data scan for the month of April of 2002 related
16  to Russell D. Anderson, correct?
17     A.  Russell D. Anderson, Sr., yes, sir.
18     Q.  And it shows that Cross Country trade line
19  that we were previously speaking of, correct?
20     A.  Member Number 458BB02969 with account
21  Number 541490709890 as suppressed.
22     Q.  And it still has that reinvestigation in
23  process indication next to it; is that correct?
24     A.  Yes, sir.
25     Q.  But at that time -- now can you state whether

39

1  or not there was a reinvestigation still in process?
2      A.  No, sir.
3      Q.  You do not know if a reinvestigation was
4  still in process, or you do know that a reinvestigation
5  was not in process?
6      A.  Based on this frozen scan, I do not know.
7              MR. LYONS:  Now, if we could mark as
8  Deposition Exhibit Number 4 CSC145 through 149.
9              (Exhibit CSC-4 marked for
10             identification.)
11             MR. WEBBER:  Okay.  It's marked.
12     Q.  (By Mr. Lyons)  Mrs. Fogleman, I'm showing
13  you what's been marked as Deposition Exhibit Number 4.
14  This is the frozen data scan from April of '02 related
15  to Penny L. Anderson, correct?
16     A.  With -- yes, sir.
17     Q.  This Exhibit Number 4 still shows the Cross
18  Country Bank line, the one that we were talking about
19  earlier, correct?
20     A.  It shows Cross Country Bank Member
21  Number 458BB02969 with Account Number 541490709890 as
22  suppressed.
23             MR. LYONS:  All right.  Let's mark as
24  Deposition Exhibit Number 5 36 through -- bear with me
25  for one second.  Let's do CSC036 through 066 as

40

1  Deposition Exhibit Number 5.
2              (Exhibit CSC-5 marked for
3              identification.)
4              MR. WEBBER:  Okay.  It's marked.
5      Q.  (By Mr. Lyons)  Ms. Fogleman, I'm showing you
6  what's been marked as Deposition Exhibit Number 5.  Do
7  you agree that it -- they are frozen scans from May of
8  2002 to November of 2002 for Mr. Russell D. Anderson,
9  Sr.?
10             MR. WEBBER:  I'm sorry.  May of 2002
11  through when?
12             MR. LYONS:  Through November of 2002.
13     A.  Yes, sir.
14     Q.  (By Mr. Lyons)  Beginning in May of 2002,
15  Deposition Exhibit Number 5 at Page 036 shows another
16  entry into Mr. Anderson's credit file related to a
17  Cross Country Bank account as being reported deceased,
18  correct?
19     A.  Yes, sir.
20     Q.  This time this deceased code is attached to a
21  separate Cross Country Bank account; is that correct?
22     A.  It shows Member Number Cross Country
23  458ON08054 with an account number of 422709748440.
24     Q.  And that account appears to have been opened
25  in April of '99; is that correct?

41

1      A.  It shows open date 4 of '99, yes, sir.
2      Q.  All right.  And the first month that it was
3  reported was in May of 2002; is that correct?
4      A.  I believe so, yes, sir.
5      Q.  All right.  Now, that subscriber code or
6  member number, as you called it, is related to the same
7  Cross Country that had previously been reporting
8  Mr. Anderson as deceased up until 6 of 2000; is that
9  right?
10     A.  I don't know.
11     Q.  Can you look in the scans and find out if
12  that member number had been reporting Mr. -- strike
13  that.
14             That member number or that subscriber
15  number is a different subscriber number than the member
16  number or subscriber number that had been reporting
17  Mr. Anderson as deceased previously, correct?
18     A.  Correct.
19     Q.  All right.  Does Cross Country Bank have more
20  than one subscriber number assigned to it?
21     A.  I believe so, but I'm -- I don't know for
22  sure.
23     Q.  Who would know that information?
24     A.  Equifax.
25     Q.  Cross Country Bank doesn't subscribe to CSC;

11 (Pages 38 to 41)

Janice Fogleman

42

1  is that correct?
2      A.   They're an Equifax member.
3      Q.   In other words, they don't subscribe to CSC;
4  is that correct?
5      A.   I'm sorry, sir?
6      Q.   Cross Country Bank does not subscribe to CSC,
7  correct?
8      A.   They're not a CSC member, no, sir.
9      Q.   Had this account -- this Cross Country Bank
10  account ending -- or beginning in 4227, in your review
11  of the frozen scans prior to May of 2002 for
12  Mr. Russell D. Anderson, Sr., had that account ever
13  appeared before?
14      A.   That began with 4227 or ended with 4227?
15      Q.   Began.
16      A.   Began?
17          MR. WEBBER:  Do you want her to review
18  these, or are you just asking if she knows --
19          MR. LYONS:  I'm asking if she knows.
20      A.   No.
21          MR. LYONS:  Is she reviewing them right
22  now?
23      A.   No.  I said no.
24      Q.   (By Mr. Lyons)  Oh, I'm sorry.
25      A.   That's okay.

43

1      Q.   Beginning in May of 2002, would you agree
2  with me that the Cross Country Bank account beginning
3  in -- beginning with Number 5414 is no longer appearing
4  on the May of 2002 scan?
5          MR. WEBBER:  Object to the form.
6          You can answer.
7      A.   What was the account number again?
8      Q.   (By Mr. Lyons)  It began with 5414.
9          MR. WEBBER:  And your question was what?
10  I'm sorry, Counsel.
11          MR. LYONS:  Whether or not it's
12  appearing on the May 2002 frozen scan.
13      A.   There is an account number beginning with
14  5414 appearing on the May of 2002 frozen scan for
15  Russell D. Anderson, Sr.
16      Q.   (By Mr. Lyons)  And is that at Page CSC038?
17      A.   Yes, sir.
18      Q.   All right.  The month before, at April of
19  2002 -- I'm sorry.
20          In Exhibit Number 3, at Page 034, the
21  Cross Country Bank account 5414907 is appearing as
22  suppressed, correct, Deposition Exhibit Number 3?
23      A.   No.
24      Q.   Did you say no or yes?
25      A.   I said no.  There's two.

44

1      Q.   Two account numbers that are the same?
2      A.   Okay.  There's account number with Member
3  Number 458BB02969 with Account Number 541490709890 that
4  is suppressed.  Then there's Member Number 458BB02969
5  with Account Number 541490709116 that shows a rating of
6  an 0.
7      Q.   Which means what?
8      A.   Too new to rate or never been used.
9      Q.   Too early to rate?
10      A.   Too new to rate or never been used.
11      Q.   And do those same Cross Country Bank trade
12  lines, beginning with 5414, do they appear -- do they
13  both appear in the May 2002 frozen scan?
14      A.   No.
15      Q.   Which one appears?
16      A.   The one that appears in May of 2002 is --
17          MR. WEBBER:  Counsel, we're talking
18  about account numbers that begin 5414, correct?
19          MR. LYONS:  That's correct.
20      A.   -- Cross Country Member Number 458BB02969
21  with Account Number 541490709116.
22      Q.   (By Mr. Lyons)  If a member -- strike that.
23          Can Cross Country Bank report multiple
24  accounts with different member numbers and different
25  account information that contradicts one another

45

1  without CSC being notified of that by the system?
2          MR. WEBBER:  Object to the form of the
3  question.
4          You can answer, if you understand.
5      A.   I don't quite understand.
6      Q.   (By Mr. Lyons)  You see that Cross Country
7  Bank appears to be reporting two codes -- or two trade
8  lines, one as consumer deceased and the other one not
9  as consumer deceased.  Do you see that?
10      A.   Yes, sir.
11      Q.   Yes or no?
12          MR. WEBBER:  Which exhibit are you on?
13          MR. LYONS:  I'm on Exhibit Number 5.
14      A.   Yes, sir.
15      Q.   (By Mr. Lyons)  Okay.  Is there any procedure
16  in the system that would flag or otherwise catch a
17  member reporting information about a person that would
18  seem to be contradictory?
19          MR. WEBBER:  Object to the form of the
20  question.
21          You can answer.
22      A.   One shows reported 5 of '02.
23      Q.   (By Mr. Lyons)  Right.
24      A.   The other one shows reported 4 of '99 and no
25  updates.

Janice Fogleman

46

1    Q.   It's never been updated since 4 of '99?
2    A.   In May of 2002 scan, the 458BB02969 with
3  account number that ends in 9116 -- or do you want me
4  to say the whole account number?
5    Q.   No. I follow you.
6    A.   It shows reported in 4 of '99, opened in
7  4 of '99.
8    Q.   And then it was -- it apparently wasn't used?
9    A.   It was either never used --
10        MR. WEBBER:  Object to the form,
11  foundation.
12        You can answer, if you know.
13    A.   It shows a rating of a 0, which was too new
14  to rate or never been used.
15    Q.   (By Mr. Lyons)  Well, it couldn't be too new
16  to rate because it was opened in 4 of 99, right?
17        MR. WEBBER:  Object to the form,
18  foundation.
19    A.   It shows reported 4 of '99 and opened
20  4 of '99. There was no update. At the time in
21  4 of '99, it was rated a 0, which is too new to rate or
22  never been used.
23    Q.   (By Mr. Lyons)  CSC, prior to 5 of 2002, had
24  suppressed a deceased code by Cross Country Bank
25  related to Mr. Anderson, Sr.; is that correct?

47

1    A.   Prior to --
2    Q.   Prior to May of 2002.
3    A.   In the April 2002 for Russell D. Anderson,
4  Sr. --
5        MR. WEBBER:  This is Exhibit 3.
6        MR. LYONS:  All right.
7    A.   -- it shows Member Number 458BB02969, Account
8  Number 541490709890 as suppressed.
9    Q.   (By Mr. Lyons)  Right. So the month before
10  this -- the month before the May 2002 scan, CSC was
11  still suppressing a trade line that had been disputed
12  by Mr. Anderson concerning deceased, correct?
13        MR. WEBBER:  Object to the form,
14  foundation.
15        You can answer.
16    A.   The account was disputed, it appears, in June
17  of 2000 and it was suppressed.
18    Q.   (By Mr. Lyons)  Right. And I think we
19  already established that the item of dispute was the
20  deceased status; is that correct?
21        MR. WEBBER:  Object to the form,
22  foundation.
23        But you can answer, if you know.
24    A.   I don't know for a fact. All I know is the
25  account -- or the trade was disputed. The exact

48

1  dispute, I do not know.
2    Q.   (By Mr. Lyons)  But you know what was on it
3  before is that it was deceased, correct?
4    A.   Correct.
5    Q.   And that subsequent to that, the trade line
6  was suppressed, correct?
7    A.   Correct.
8    Q.   Okay. So based on that information, do you
9  conclude that most likely the dispute was regarding the
10  deceased code?
11        MR. WEBBER:  Object to the form. Calls
12  for speculation.
13        You can answer.
14    A.   That's what you're telling me, yes.
15    Q.   (By Mr. Lyons)  I'm just kind of pointing out
16  what the documents say. Do you think that there was
17  some other dispute that Mr. Anderson had made other
18  than the fact that he wasn't dead?
19    A.   No.
20    Q.   Okay.
21    A.   I don't know.
22    Q.   So you would agree with me that the dispute
23  of -- the dispute back in June of 2002 related to the
24  fact that he wasn't dead, correct?
25        MR. WEBBER:  Object to the form.

49

1  Misstates the testimony.
2    Q.   (By Mr. Lyons)  Is that right?
3    A.   I don't know.
4    Q.   Okay. Well, I know you didn't personally
5  investigate it, but based on the documents you have in
6  front of you, do you believe that that was the dispute?
7    A.   It's possible, yes.
8    Q.   Okay. And it's actually more than possible.
9  Isn't it probable?
10        MR. WEBBER:  Object to the form.
11    A.   It could be, yes.
12    Q.   (By Mr. Lyons)  Okay. So then my next
13  question is, so for months, from 6 of 2000, CSC was
14  suppressing that deceased code related to that Cross
15  Country Bank trade line, correct?
16        MR. WEBBER:  Object to the form.
17  Reference to the trade line.
18        You can answer.
19    A.   The account from Cross Country for Account
20  Number 541490709890 being reported under Member
21  Number 458BB02969 was suppressed.
22    Q.   (By Mr. Lyons)  Right. Related to Cross
23  Country Bank, correct?
24    A.   It says Cross Country.
25    Q.   Right. So from 6 of 2000 until 5 of 2002,

Janice Fogleman

50

1   CSC had been suppressing a Cross Country Bank trade
2   line that had previously been reporting my client as
3   deceased, correct?
4       A.  For a certain account number, yes.
5       Q.  Okay.  Then in May of 2002, CSC began to
6   report that my client was deceased related to a
7   separate Cross Country Bank account, correct?
8       A.  We have Cross Country reported May of '02 by
9   automated tape Member Number 458ON08054 with Account
10  Number 422709748440.
11      Q.  CSC was reporting that trade line from Cross
12  Country as being deceased, correct?
13      A.  Cross Country was reporting as consumer
14  deceased on that particular account number with that
15  particular member number.
16      Q.  Right.  And CSC then in turn was producing
17  reports subsequent to 5 of '02 or beginning in 5 of '02
18  with that consumer deceased notation related to that
19  Cross Country Bank account, correct?
20          MR. WEBBER:  Object to the form of the
21  question.  Also vague as to time.
22          You can answer.
23      A.  Yes.
24      Q.  (By Mr. Lyons)  Okay.  CSC kept on reporting
25  Mr. Anderson as deceased related to that Cross Country

51

1   Bank trade line until it received a dispute in November
2   of 2002; is that correct?  Look at the last scan of
3   Deposition Exhibit Number 5.
4       A.  November 2002?
5       Q.  Correct.  It's still on there, right?
6       A.  With Member Number 458ON08054 reporting 11
7   of '02 by their tape showing consumer deceased on
8   Account Number 422709748440.
9       Q.  Still on there in November of 2002, right?
10      A.  Yes, sir.
11      Q.  Okay.  Now, you keep citing different member
12  numbers, but the fact of the matter is, it's still one
13  member, right?  Cross Country Bank is only one member;
14  is that correct?
15      A.  I don't know.
16      Q.  Why don't you know that?
17          MR. WEBBER:  Can you amplify on "I don't
18  know"?
19          THE WITNESS:  I don't know.
20          MR. WEBBER:  I believe she's testifying,
21  Counsel, that she doesn't know.
22      Q.  (By Mr. Lyons)  You don't know why Cross
23  Country Bank has more than one member number?
24          MR. WEBBER:  No.  That mischaracterizes
25  her testimony.

52

1       Q.  (By Mr. Lyons)  Ms. Fogleman, do you know why
2   Cross Country Bank has more than one member number?
3           MR. WEBBER:  I'm going to object to the
4   form of the question.
5       A.  No, I don't.
6       Q.  (By Mr. Lyons)  Would you agree with me that
7   no matter how many member numbers Cross Country Bank
8   has, Cross Country Bank is a single entity?
9       A.  I do not know that.
10      Q.  Do not know that?
11      A.  No, I don't.
12      Q.  Okay.  And that's because CSC and Cross
13  Country Bank don't have a member relationship with
14  regard to these trade lines that we're talking about;
15  is that correct?
16      A.  Yes, sir.
17      Q.  Was that a yes?
18      A.  Yes, sir.
19      Q.  Now, beginning in -- well, I guess let's take
20  a look at Penny's first.
21          MR. LYONS:  Let's mark as Deposition
22  Exhibit Number 6 150 through CSC 193.
23          MR. WEBBER:  193, Counsel?
24          MR. LYONS:  Yeah.
25          THE WITNESS:  That's not right.

53

1           MR. WEBBER:  That's what he said.
2           MR. LYONS:  No, that's not right.  She's
3   right.  Too many.  Let's stop -- from 150 to 185.
4   Sorry about that.
5           (Exhibit CSC-6 marked for
6           identification.)
7           MR. WEBBER:  All right.  It's marked.
8           MR. LYONS:  Thank you.
9       Q.  (By Mr. Lyons)  Ms. Fogleman, I'm showing you
10  what's been marked as Deposition Exhibit Number 6.
11  These are frozen scans, are they not, for Penny L.
12  Anderson from the months of 5 of 2002 through November
13  2002?
14      A.  No, sir.
15      Q.  Was that a yes or a no?
16      A.  That was a no.
17      Q.  What are we missing in there?
18      A.  You've got the first page of December of '02
19  in here.
20      Q.  184 is the end of November?
21      A.  Yes, sir.
22      Q.  And then 185 is the beginning of --
23      A.  December 2002.
24      Q.  Why don't you just tear that back page off
25  that exhibit.  Let's leave it at ending at 184.

14 (Pages 50 to 53)

Janice Fogleman

54

1    MR. WEBBER: So you want Exhibit 6 to be
2  CSC150 through 184, then?
3    MR. LYONS: Yes. Thanks. Sorry about
4  that. Are we square on that?
5    THE WITNESS: Yes, sir.
6    MR. WEBBER: We're cool now.
7    Q. (By Mr. Lyons) Cross Country -- or CSC is
8  now reporting between the months of 5 and November --
9  May and November of 2002 the Cross Country Bank trade
10  line with the notation deceased; is that correct?
11    MR. WEBBER: Object to the form.
12    You can answer.
13    A. It shows Cross Country Member
14  Number 458ON08054 with Account Number 422709748440
15  consumer deceased.
16    Q. (By Mr. Lyons) That's the same account that
17  we just talked about with relation to Russell
18  Anderson's credit report that we marked in Deposition
19  Exhibit Number 5, correct?
20    A. I believe so, yes, sir.
21    Q. Is CSC responsible for maintaining the
22  accuracy of the data contained in frozen scans in
23  Exhibit Number 6?
24    MR. WEBBER: Object to the form. Calls
25  for a legal conclusion.

55

1    You can answer.
2    A. The frozen scan is a snapshot that's pulled
3  off of the Equifax system.
4    Q. (By Mr. Lyons) Okay. But it contains data
5  that is, as I understand it, maintained and updated by
6  CSC; is that right?
7    MR. WEBBER: Object to the form.
8    You can answer.
9    A. It can, yes, sir.
10    Q. (By Mr. Lyons) Okay. Ultimately, do you
11  know who is responsible for the accuracy of the
12  information on the Equifax database as it relates to
13  Penny Anderson?
14    MR. WEBBER: Object to the form. Also
15  vague as to time.
16    You can answer.
17    A. Well, it depends on where she was living at
18  the time.
19    Q. (By Mr. Lyons) Okay. Depending on where she
20  was living, it's somebody's responsibility, either
21  Equifax or CSC, correct?
22    MR. WEBBER: Object to the form.
23    You can answer.
24    A. It depends on the creditor reporting the
25  information and how they're reporting it.

56

1    Q. (By Mr. Lyons) Okay. Explain that. I
2  understood as to location, but now you're saying it
3  depends on which creditor is reporting the information?
4    A. We rely also upon the creditor to report to
5  us the true and accurate information regarding the
6  relationship they may have with the consumer.
7    Q. Okay. But that doesn't override the
8  geographical responsibility, depending on where the
9  consumer is living, right?
10    MR. WEBBER: Object to the form. Vague.
11    You can answer.
12    A. I don't know.
13    Q. (By Mr. Lyons) Well, when Penny Anderson was
14  living in New Richmond, Wisconsin, as this credit
15  report showed in May of -- as Deposition Exhibit
16  Number 6 shows from May of 2000 until November of
17  2002 -- May of 2002 until November of 2002, who was
18  responsible for the information contained in the Penny
19  Anderson credit file?
20    MR. WEBBER: Object to the form of the
21  question. Vague.
22    You can answer, if you know.
23    Q. (By Mr. Lyons) Equifax or CSC?
24    MR. WEBBER: Object to the form. She
25  can answer.

57

1    A. She would be a CSC consumer. The disputes
2  would be handled by CSC.
3    Q. (By Mr. Lyons) And the accuracy of the
4  information is the responsibility of CSC, correct?
5    MR. WEBBER: Object to the form.
6    You can answer.
7    A. And we rely upon the individual creditors to
8  report to us the true and accurate information.
9    Q. (By Mr. Lyons) In this case, that would be
10  the same creditor that was reporting Penny as alive and
11  then dead and then alive again and then dead again,
12  right?
13    MR. WEBBER: Object to the form.
14  Misstates the evidence.
15    You can answer.
16    A. I don't know -- I don't know.
17    Q. (By Mr. Lyons) Do you know whether Cross
18  Country Bank is a reliable source of information?
19    A. I would think so.
20    Q. You don't know for sure, do you?
21    A. No, sir, I don't.
22    THE REPORTER: Can we take a quick
23  break, please?
24    MR. WEBBER: Sure.
25    (Recess from 2:37 p.m. until 2:52 p.m.)

Janice Fogleman

58

1    Q.   (By Mr. Lyons)  Ms. Fogleman, we were talking
2  about the time period of May through November of 2002,
3  and I just want to make sure that I'm clear that during
4  that time frame, CSC as opposed to Equifax was
5  responsible for the information contained in Penny and
6  Russell Anderson's credit files that are stored in the
7  Equifax database; is that right?
8           MR. WEBBER:  Object to the form of the
9  question.  Also misstates her testimony.
10          You can answer.
11   A.   If the consumer -- Andersons lived within the
12  CSC coverage area, CSC would be responsible for the
13  updates and/or disputes that may have been submitted by
14  the Andersons.
15   Q.   (By Mr. Lyons)  Okay.  What about just the
16  overall accuracy of the information that is contained
17  in the Equifax database for the same time period, given
18  that the Andersons both lived in Wisconsin?
19          MR. WEBBER:  Object to the form.
20          You can answer.
21   A.   We also -- we rely on the individual
22  creditors to provide us with correct and accurate
23  information regarding the relationship that they may
24  have with the consumer.
25   Q.   (By Mr. Lyons)  Okay.  But in the end -- you

59

1  can rely on all kinds of different sources.  And, in
2  fact, CSC does.  But in the end, it's CSC that's
3  responsible, is it not, for the accuracy of the
4  information in the Equifax database for these consumers
5  that live in Wisconsin?
6           MR. WEBBER:  Object to the form.
7           You can answer.
8    A.   We're responsible for handling the disputes
9  and the reinvestigations, if any, submitted by the
10  Andersons, as well as any of the updates that may be
11  provided to us by various creditors regarding the
12  Andersons and also rely upon the individual creditors
13  to supply us with the correct and accurate information.
14   Q.   (By Mr. Lyons)  And I think I follow you, but
15  what I guess I'm trying to find out is, if there's a
16  dispute by the Andersons in this time frame of May
17  until November, because they live in Wisconsin, CSC is
18  going to handle it; is that right?
19   A.   Correct.
20   Q.   Okay.  If there's an update to the account
21  information by either an old creditor of the Andersons
22  or a brand-new creditor of the Andersons, any update is
23  going to be handled by CSC, correct?
24          MR. WEBBER:  Object to the form.
25          You can answer.

60

1    A.   No, sir.
2    Q.   (By Mr. Lyons)  Okay.  Then I misunderstood.
3  So if there's an update from a new or an old creditor
4  to the Andersons' credit file in between May and
5  December of 2002, that may not be CSC's responsibility?
6  Is that what you're telling me?
7    A.   If it's a manual update, yes, sir, it would
8  be CSC's responsibility to update the file according to
9  the instructions or directions from the individual
10  creditor that may have submitted the information on a
11  manual form.
12   Q.   Okay.  And if there's a change or updated
13  information that's not manual but tape or electronic,
14  then whose responsibility is it to make sure that
15  that's accurate?
16   A.   The creditor is to report -- or we rely upon
17  the creditor to report true and accurate, correct
18  information to us on the relationship they have with
19  the consumer.  Depending on who the creditor member is,
20  if they're a subscriber of CSC's or Equifax, as to who
21  they would submit their electronic media to.
22   Q.   Okay.  But isn't it true that CSC -- for
23  example, with Cross Country Bank in this case --
24  doesn't have a relationship with C -- Cross Country
25  Bank doesn't have a relationship with CSC about the

61

1  Andersons' information; is that true?
2           MR. WEBBER:  Object to the form.  Vague.
3           You can answer.
4    A.   Cross Country Banks, with the two various
5  member numbers, subscriber numbers, are not a CSC
6  subscriber.
7    Q.   (By Mr. Lyons)  Right.  So CSC doesn't have
8  any relationship, contractual or otherwise, with Cross
9  Country Bank regarding the reliability or accuracy of
10  the information that's being reported on the Andersons,
11  right?
12   A.   Correct.
13   Q.   In November of 2002, did CSC receive a
14  dispute directly from Mr. and Mrs. Anderson?
15   A.   Yes, sir.
16   Q.   I meant -- maybe I'm getting too complicated
17  here.  But did it go directly from the Andersons to
18  CSC, or did it go through Equifax?
19   A.   It actually was sent to Equifax and forwarded
20  to CSC.
21          MR. LYONS:  Okay.  And if we could, I
22  would like to mark as Deposition Exhibit Number 7
23  CSC230 through 241.
24          (Exhibit CSC-7 marked for
25          identification.)

Janice Fogleman

---

62

1      MR. WEBBER: We have the exhibit marked.
2   Q. (By Mr. Lyons) Ms. Fogleman, I'm showing you
3   what's been marked as Deposition Exhibit Number 7.
4   It's a series of documents that were produced in
5   discovery in this case, and it appears that the first
6   page is some kind of a letter.
7      Can you explain to me what the first page
8   of Deposition Exhibit Number 7, CSC230, is?
9   A. It's actually just a print screen of the
10  document from the system information retrieval system
11  of where our documents are imaged and stored.
12  Q. Okay. And if we flip to the second page, 31,
13  identify this document for me.
14  A. That's a copy of the letter that's -- it
15  looks like it's dated November the 2nd, 2002. It
16  appears to be signed by Penny Lee Anderson.
17  Q. Does it also contain Russell D. Anderson's
18  name down by the -- what I would call the signature
19  area?
20  A. Yes, sir.
21  Q. Okay. What date did CSC receive this
22  document?
23  A. It appears that we received it -- it looks
24  like the 24th of 2002.
25  Q. And for that information, where are you

---

63

1   looking?
2   A. At the top, above November the 2nd, 2002,
3   which is handwritten, there's a stamp just above it.
4   Q. Okay.
5   A. And it's hard to read.
6   Q. You think that it might be November 24th?
7   A. It's November twenty-something.
8   Q. Okay. And if you look at any -- could you
9   look at any other documents contained in Exhibit 7 to
10  find out when was the date that CSC started an
11  investigation into the dispute that was contained
12  within the November 2nd, 2002, letter?
13  A. Actually, the first page gives us the postal
14  date of 11/25 of 2002.
15  Q. What?
16  A. I'm sorry?
17  Q. I didn't understand what you said. What
18  document are you looking at to find out what date the
19  letter was received by CSC?
20  A. On CSC230, it gives postal date 11/25 of
21  2002.
22  Q. Okay. On the left-hand margin?
23  A. Yes, sir.
24  Q. And that's the date that it was received by
25  CSC, correct?

---

64

1   A. Yes, sir.
2   Q. And what's the process date above that?
3   A. There's not really a process date above it.
4   It just shows processed.
5   Q. I'm sorry. Go up a couple more lines, and
6   then you'll see a processed date.
7   A. Oh, I'm sorry. Yes, sir. Process date shows
8   11/29 of 2002. That's the day that the case was
9   created.
10  Q. Okay. Now, does this -- does any information
11  in Exhibit 7 show when Equifax received it?
12  A. Not exactly when they received it, no.
13  Q. All right.
14  A. It does show that they had it, because they
15  marked it for affiliate for referral to CSC, and
16  there's a date in the upper left-hand corner where it
17  begins AFF colon -- excuse me, parentheses, 313, close
18  parentheses, slash, Houston, comma, Texas, parentheses,
19  slash -- I can't read some of that information, but
20  there's a date that appears -- it could be -- it
21  actually could be 11 -- it could be 11/17 dash '02 or
22  it could be 11 dash 12, '02. I don't know which.
23  Q. Now, when is the date that CSC is required
24  under the Fair Credit Reporting Act to begin
25  calculating the dates by which it has to respond to the

---

65

1   investigation?
2      MR. WEBBER: Object to the form. Calls
3   for a legal conclusion.
4      But you can answer, if you know.
5   A. The day we receive it.
6   Q. (By Mr. Lyons) The date that CSC receives
7   it?
8   A. Yes, sir.
9   Q. Not the date that Equifax receives it, right?
10  A. I --
11     MR. WEBBER: Object to the form. Calls
12  for a legal conclusion.
13     You can answer.
14  A. We go with the date we receive it.
15  Q. (By Mr. Lyons) You would agree with me that
16  the Andersons didn't send this letter, dispute letter
17  that is CSC231, to CSC; is that correct?
18  A. No, they did not send it to CSC. That's
19  correct.
20  Q. Now, you said that it was -- it might have
21  been received on the 22nd -- no. Did you say 25th?
22  What was the postal date again?
23  A. The postal date shows 25.
24  Q. That's the date that CSC marks down as
25  receiving it?

---

Janice Fogleman

66

1    A.  Yes, sir.
2    Q.  Between the 25th and the 29th, what action,
3  if any, was taken in response to the receipt of the
4  letter?
5    A.  What do you mean?
6    Q.  Well, do you know whether anything happened
7  between the date that they received it on the 25th and
8  the date that appears on the front page of deposition
9  Exhibit 7, the process date?
10    A.  No, sir.
11    Q.  I didn't hear a response.
12    A.  I said "No, sir."
13    Q.  Okay.  Thanks.
14      So then on the 29th, what happened?
15    A.  On the 29th of November -- excuse me -- an
16  ACIS case was created on Russell D. Anderson, Sr.  And
17  a CDV was sent out -- either a CDV or ACDV was sent out
18  to Cross Country Bank regarding a dispute on an
19  account.
20    Q.  And do you know whether it was an ACDV or
21  just a CDV?
22    A.  I do not know.
23    Q.  Is there any information in Deposition
24  Exhibit Number 7 that would tell you which was sent
25  out?

67

1    A.  No, sir, it doesn't.  No, sir, there's not.
2    Q.  Okay.  And would you agree with me that the
3  information that was provided to CSC from Equifax
4  concerning this dispute was the letter that is
5  marked -- or that has got Bates numbers CSC231; a copy
6  of some kind of a credit report page that is marked as
7  CSC232; a letter to Russell Anderson, Sr., that's dated
8  August 19th, 2002, which bears CSC233; July 5th, 2002,
9  letter to Penny L. Anderson that bears the Number
10  CSC234?
11    A.  Yes, sir.
12    Q.  So CSC received all four pages of the
13  correspondence; is that correct?
14    A.  Correct.
15    Q.  Did CSC initiate an investigation on behalf
16  of Penny Lee Anderson?
17      MR. WEBBER:  On that date?
18    Q.  (By Mr. Lyons)  November 29th, 2002.
19    A.  I do not show one, no, sir.
20    Q.  All right.  Do you know whether an ACIS case
21  was generated at all related to Penny Anderson in
22  November or December of 2002?
23    A.  Not to my knowledge, no, sir.
24    Q.  Do you know why that -- why no investigation
25  was initiated related to Penny Anderson 's dispute?

68

1    A.  With the information that was submitted to
2  us, it's possible that they were unable to locate a
3  credit file on her, so they would have sent her a form
4  letter requesting additional information so that they
5  could access the credit file.
6    Q.  I apologize.  That CSC sent Ms. Penny
7  Anderson some kind of a letter?
8    A.  We would -- our policy is, if we're unable to
9  locate a credit file or access a credit file with the
10  information provided, a form letter is sent to the
11  individual requesting additional information so that we
12  can access the correct credit file.
13    Q.  Okay.  And in the CSC records that you have
14  before you marked as Exhibit Number 7, do you see any
15  notation that a letter was sent to Ms. Anderson?
16    A.  No, sir, because no case was created.  If no
17  file is located, no case is created.
18    Q.  Okay.  But do you have any knowledge of any
19  letter being sent to Ms. Anderson?
20    A.  That is our policy, but no.
21    Q.  So you haven't talked to anyone, nor
22  do you, yourself, have personal knowledge of any letter
23  being sent to Ms. Anderson?
24    A.  No.
25    Q.  What information was provided in the

69

1  November 2nd, 2002, dispute that allowed or showed
2  information that allowed CSC to access Russell
3  Anderson's credit report?
4    A.  Name and address.
5    Q.  Okay.  What address were they using for
6  Mr. Anderson?
7    A.  The letter -- well, actually, on the ACIS
8  case, it was 1614 Wildwood Avenue, New Richmond,
9  Wisconsin 54017.
10    Q.  That was off of one of the letters that was
11  attached to the dispute letter?
12    A.  That was off of the American Express letter
13  dated August 19th of 2002.
14    Q.  Okay.  And did CSC attempt to use the address
15  information that Penny Anderson had on her letter dated
16  July 5th, 2002?
17    A.  That would be the policy, yes, sir.
18    Q.  Okay.  And do you know if that was done?
19    A.  There is no ACIS case created.  If they were
20  unable to locate a credit file, they would have sent
21  her a form letter.  No case would be created and no
22  credit file is created.
23    Q.  No.  I understand that's policy.  I'm just
24  wondering if you know whether or not anyone actually
25  tried to pull her credit report or locate her credit

Janice Fogleman

70

1  report or credit file using the name and the address
2  that was present on CSC234.
3      A.  They are supposed to, but I do not know for a
4  fact.
5      Q.  Now, where is the envelope that the letter
6  came in?  Because that might have an address on it,
7  right?
8      A.  It's quite possible.
9      Q.  Is there an envelope that came with the
10 November 2nd, 2002, dispute letter?
11     A.  It's quite possible, but there's not one in
12 here.
13     Q.  Does CSC require Equifax to provide that
14 information to it for its investigation process?
15     A.  No, sir.
16     Q.  No envelope?
17     A.  No, sir.
18     Q.  Why is that, do you think?
19     A.  Well, it's very possible sometimes you get
20 things mailed by two or three people in one envelope.
21 I mean, we would hope that they would put the
22 information in the body of the letter that they're
23 sending us.  We ask them to put it in the body of the
24 letter.
25     Q.  CSC asks them to put -- asked the Andersons

71

1  to put it in the body of the letter?
2      A.  Our recordings all say include your full
3  name, your address, your date of birth, and Social
4  Security number.
5      Q.  The telephone recording that CSC left for the
6  Andersons said that?
7      A.  I don't know that a recording or anything was
8  left -- I'm talking about our recording, if someone
9  calls us.
10     Q.  Yeah.  Okay.  You're talking about if
11 somebody calls you?
12     A.  That's right.
13     Q.  But there's no evidence that the Andersons
14 ever called CSC, is there?
15     A.  I do not know.
16     Q.  You don't have any evidence of that, do you?
17     A.  I don't know, sir.
18     Q.  You don't know whether or not you personally
19 have any evidence of whether or not the Andersons
20 called CSC?
21     A.  I do not know if the Andersons ever called
22 CSC.  I do not know.
23     Q.  Okay.  Other than the envelope, do you have
24 any idea what other information Equifax may have left
25 out concerning this dispute?

72

1          MR. WEBBER:  Object to the form of the
2  question.
3          You can answer.
4      A.  No.
5      Q.  (By Mr. Lyons)  So to the best of your
6  knowledge, Ms. Fogleman, no investigation was conducted
7  on behalf of Mrs. Anderson related to this
8  November 2002 dispute, correct?
9          MR. WEBBER:  Object to the form.
10     A.  No ACIS case was created at that time.
11     Q.  (By Mr. Lyons)  Okay.  And did CSC try to
12 call Mrs. Anderson at the daytime phone that was left?
13     A.  No, sir.
14     Q.  Do you see that daytime phone number that's
15 there in CSC231?
16     A.  Yes, sir.
17     Q.  Is it policy and procedure for CSC to contact
18 a consumer who is disputing information for additional
19 information to assist them?
20         MR. WEBBER:  I'm going to object to the
21 form as vague.
22         But you can answer, if you know.
23     A.  No, sir.
24     Q.  (By Mr. Lyons)  It's not policy?
25     A.  I'm sorry, sir?

73

1      Q.  It's not policy for CSC to call a consumer
2  who's provided a number if CSC needs more information?
3          MR. WEBBER:  You're talking about by
4  telephone?
5          MR. LYONS:  Yeah.  The telephone number
6  is right on the letter.
7          MR. WEBBER:  But is your question, by
8  telephone?  I'm sorry.  I didn't hear you, Tommy.
9          MR. LYONS:  I guess I don't understand
10 your question to me.
11         MR. WEBBER:  Are you talking about
12 contact by telephone?  That's all I'm asking.
13         MR. LYONS:  Well, that's the only way I
14 think that they could get ahold of her, right, is the
15 daytime phone number that was listed in the letter.
16     Q.  (By Mr. Lyons)  Is that policy, to contact a
17 consumer by telephone when a telephone number is
18 provided to CSC?
19     A.  No, sir, it's not.
20     Q.  Why is that?
21     A.  We send them a form letter requesting
22 additional information and ask them to send that -- or
23 submit that information to us so that we can
24 complete -- or locate the credit file if we're unable
25 to.  Because of the volume, we cannot always call the

Janice Fogleman

74

1   individuals. Also, too, because of possible fraud, we
2   don't call the individuals.
3       Q.  (By Mr. Lyons) But CSC didn't treat this
4   dispute as a fraud, did it?
5       A.  Not to my knowledge, no, sir.
6       Q.  Okay.  So no investigation for Mrs. Anderson.
7           But tell me about the investigation for
8   Mr. Anderson.  A CDV or ACDV was sent to Cross Country
9   Bank.  Now, do you send it to -- does CSC send it to
10  Cross Country Bank, a certain address, or where do they
11  send it to?
12      A.  It would be to whatever is associated with
13  the particular member number for this particular
14  account.
15      Q.  All right.  And so do we know which member
16  number that was, or is it located anywhere in
17  Deposition Exhibit Number 7?
18      A.  It's not in Number 7, no, sir.
19      Q.  Does it say on Page 240 -- I'm sorry, not
20  240 -- but on 241 which member number it was sent to?
21      A.  No, sir.
22      Q.  Does it say who it was sent to?
23      A.  It shows Cross Country, but on 238 it shows
24  Applied Card Systems, PO Box 15414, Wilmington,
25  Delaware, 19850.  And it was regarding the Account

75

1   Number 4227097484406736.
2       Q.  All right.  So do you believe that CSC
3   contacted Applied Card Systems?
4       A.  They would have -- a CDV or ACDV would have
5   been generated and submitted for Cross Country Bank,
6   and that would be the address or that's where it would
7   go to, is Applied Card Systems at the P.O. Box in
8   Wilmington, Delaware.
9       Q.  Where did that address and name information
10  come from that CSC would know where to send the CDV or
11  ACDV?
12      A.  Associated with the member number and the
13  ACIS and ACRO system.
14      Q.  So CSC, it's conceivable, would send a CDV or
15  ACDV to a company that had a different name than the
16  trade line that was being reported that was disputed?
17          MR. WEBBER:  Object to the form.
18          You can answer.
19      A.  If that's what's set up in the system.  That
20  it goes to a different -- to another name, yes, sir.
21      Q.  (By Mr. Lyons) Does that seem odd to you
22  that something -- a dispute regarding a Cross Country
23  Bank account would be send to an entity called Applied
24  Card Systems?
25      A.  No, sir.

76

1       Q.  Do you understand whether there's some
2   relationship between Applied Card Systems and Cross
3   Country Bank?
4       A.  Possibly there is, yes, sir.  That's why the
5   name and the address is in the system.
6       Q.  But you would agree with me that she wasn't
7   complaining about an Applied Card System trade line,
8   correct?
9       A.  The dispute went out for the Cross Country
10  Bank for Russell D. Anderson.
11      Q.  Regarding Applied Card Systems and their
12  Account Number 422709, right?
13      A.  97484406736.
14      Q.  That didn't really have anything to do with
15  Cross Country Bank, did it?
16      A.  The account number is showing to be Cross
17  Country Bank.
18      Q.  Yeah.  The account number is showing to be
19  Cross Country Bank, but Applied Card Systems doesn't
20  appear anywhere on the trade line, does it?
21      A.  It could be the parent company or the
22  processing for Cross Country Bank.  I do not know.  I
23  would have to ask Cross Country Bank.
24      Q.  Okay.  But nobody asked Cross Country Bank
25  that question in the dispute process or in the

77

1   reinvestigation process, correct?
2       A.  What question?
3       Q.  The question you just said that's the
4   question you would have to ask Cross Country Bank.
5       A.  No, sir.
6       Q.  Okay.  Now, when was the ACDV or CDV sent
7   out?
8       A.  It would have been on or about November the
9   29th, possibly the 30th, the next day.
10      Q.  How many days does Applied Card Systems or
11  Cross Country Bank have to get back to CSC?
12      A.  They have approximately 30 days to respond.
13      Q.  They have approximately 30 days or how many?
14      A.  30 days for us to close out the case.
15      Q.  So less than 30 days?
16      A.  Correct.
17      Q.  Do you know how many days CSC will close out
18  the -- close out the investigation?  What day does CSC
19  close out the investigation?
20      A.  They close it out within two to three days of
21  the 30 days.
22      Q.  And in this particular instance, according to
23  CSC241, what day does CSC close out the investigation?
24      A.  On December the 20th, 2002.
25      Q.  Which would have been day what in the 30-day

Janice Fogleman

78

1   process?
2       A.   It probably was about day 25.  This was also
3   during the Christmas season, and if it was to come out
4   on a holiday, we would close it out prior to the
5   holiday.
6       Q.   All right.  And CSC never received a response
7   from Cross Country Bank or Applied Card Service; is
8   that right?
9       A.   Correct.
10      Q.   You don't have any information as to why that
11  was that you didn't receive a response, do you?
12      A.   No, sir.  We just didn't receive a response,
13  and it was removed due to no response.
14      Q.   Okay.  So the Cross Country Bank trade line
15  with the account number ending in 63 -- or 6736 was
16  removed from Russell Anderson's -- Russell Anderson,
17  Sr.'s CSC credit file, correct?
18      A.   Yes, sir.
19      Q.   To the best of your knowledge, Ms. Fogleman,
20  did Cross Country Bank ever report any deceased comment
21  on any trade line after December 2002 related to
22  Russell D. Anderson, Sr.?
23      A.   I do not know.
24      Q.   Well, have you looked at any frozen scans
25  that would tell you that answer?

79

1       A.   Regarding this account, it was suppressed.
2       Q.   How about any other account?
3       A.   I don't recall.
4       MR. LYONS:  Let's mark as Exhibit
5   Number 8 -- let's mark CSC067 through CSC109 as
6   Exhibit 8.
7            (Exhibit CSC-8 marked for
8            identification.)
9       MR. WEBBER:  Okay.  It's marked.
10      Q.   (By Mr. Lyons)  Marked as Deposition Exhibit
11  Number 8, these are the frozen scans for 12 of 2002
12  through 8 of 2003 related to Russell Anderson, Sr., are
13  they not?
14      A.   They appear to be, yes, sir.
15      Q.   Okay.  And it appears that after the ACIS
16  case was closed, that CSC suppressed the Cross Country
17  Bank trade line that had previously been reported as
18  deceased; is that correct?
19      A.   For Member Number 458ON08054 with the Account
20  Number 422709748440.
21      Q.   So CSC removed the deceased status from
22  Russell Anderson's CSC credit report, correct?
23      A.   The complete trade line was removed,
24  suppressed.
25      Q.   Does CSC know whether or not Cross Country

80

1   Bank continued to report the account even after they
2   suppressed the information?
3       A.   I do not know.
4       Q.   Does CSC preserve the -- or keep the tape
5   that's reported to it by Cross Country Bank?
6       A.   The tape would be submitted to Equifax.
7       Q.   Oh, that's right.  So you don't know whether
8   Equifax hangs onto it, right?
9       A.   No, sir, I don't.
10      Q.   Does Equifax, when it gets the tape from
11  CSC -- or from Cross Country Bank, does it then just
12  give it to CSC, or does it go ahead and load it into
13  the system?
14      A.   Equifax processes the tapes.
15      Q.   Okay.  And by process it, do you mean load it
16  into the system?
17      A.   Yes, sir.
18      Q.   Now, after November of 2002, specifically in
19  all the scans related to in Deposition Exhibit
20  Number 8, the Cross Country Bank trade line is listed
21  as -- that we've been discussing, "consumer disputes,
22  reinvestigation in process."  Do you see that?  On
23  every month it says the same thing.
24      A.   The narrative on the account, yes, sir.
25      Q.   But there was no reinvestigation in process

81

1   in any of those months following December of '02,
2   correct?
3       A.   Not to my knowledge, no, sir.
4       Q.   So that's not accurate, is it?
5       A.   That is a narrative that shows that the
6   account was in investigation prior to the suppression.
7       Q.   Right.  But it's not correct that a
8   reinvestigation is in process?
9       A.   It only relates to what the narrative was
10  prior to it being suppressed in December of 2002, which
11  only shows up internally.
12      Q.   And inside the file, inside the database at
13  Equifax that CSC maintains, there is information that
14  says "consumer disputes-reinvestigation in process,"
15  right?
16      MR. WEBBER:  Object to the form.
17          You can answer.
18      A.   CSC doesn't maintain the database.
19      Q.   (By Mr. Lyons)  Who maintains the database?
20      A.   Equifax.
21      Q.   What does "maintain" mean?
22      A.   They house it.  They do the other things to
23  it.
24      Q.   Do you know what they do to it?
25      A.   No, I don't.

Janice Fogleman

82

1    Q.   But Equifax didn't put on there that there's
2  an reinvestigation in process, right?
3    A.   It was a narrative that automatically was
4  added to the trade line while there was an
5  investigation when the ACIS case was created in
6  November of 2002.
7         When the account was suppressed, that
8  narrative remained on the account, but it is only
9  viewed internally, just like the suppressed account can
10  only be seen internally.
11   Q.   The entities that have access to that
12  internal information are Equifax and CSC, correct?
13   A.   Correct.
14   Q.   Anybody else?
15   A.   No, sir.
16   Q.   Now, can you tell from Deposition Exhibit
17  Number 7, page CSC235, if an entity -- any subscriber
18  viewed Mr. Russell D. Anderson, Sr.'s credit report --
19  CSC or Equifax credit report when the deceased
20  information was on there between May and December of
21  2002?
22   A.   Ask that question again.  I'm sorry.
23   Q.   I'm looking at Page 235.
24   A.   Correct.
25   Q.   Deposition Exhibit Number 7.

83

1    A.   Correct.
2    Q.   That shows a list of inquiries, correct?
3    A.   Correct.
4    Q.   I'm trying to find out whether or not,
5  between May of 2002 when the deceased item -- Cross
6  Country item reappeared on Mr. Anderson's credit
7  report, whether or not anybody saw it between May of
8  2002 and November of 2002?
9         MR. WEBBER:  I'll object to the form of
10  the question.  Misstates the evidence.
11        But you can answer.
12   A.   All the companies that inquired during that
13  time frame would have received the information supplied
14  to us by Cross Country regarding that particular
15  account.
16   Q.   (By Mr. Lyons)  Okay.  And to find out who
17  those -- or which of those entities did receive a CSC
18  credit report with that deceased information, I would
19  need the member numbers; is that right?
20   A.   Well, the ones with Tousley Ford, Stillwater
21  Ford, American Express, Wells Fargo Home Mortgage.
22        MR. WEBBER:  Counsel, are you talking
23  about between May '02 and November of '02?
24        MR. LYONS:  Right.
25        MR. WEBBER:  Okay.

84

1    A.   Oh, November?  November would be the American
2  Express, Stillwater, Tousley Ford, and then the ones
3  that are showing account review, the AR inquiries,
4  which I do not have the names of.
5    Q.   (By Mr. Lyons)  To know what those were, I
6  would need to match the subscriber code to the name,
7  correct?
8    A.   Yes.
9    Q.   All right.
10   A.   Or -- yes.
11   Q.   And in the Wells Fargo Home Mortgage in
12  December 03 and 09 of 2002, would the CSC report still
13  reflect the deceased Cross Country Bank trade line?
14   A.   On December the 3rd, December the 9th, yes,
15  sir, it would show it, but it would also show that the
16  consumer -- that the account was under investigation.
17   Q.   Under investigation of whether he was dead or
18  not or -- what would the investigation be?
19        MR. WEBBER:  Object to the form.
20        You can answer.
21   A.   They would have received the trade
22  information, as well as the narrative and notation that
23  the "consumer disputes-reinvestigation in process."
24   Q.   (By Mr. Lyons)  Ms. Fogleman, can you
25  identify or tell me whether or not a credit report that

85

1  has a deceased code information placed on it would
2  produce a credit score?
3        MR. WEBBER:  Object to the form.  Lack
4  of foundation.
5        You can answer.
6    A.   No, sir, it doesn't.
7    Q.   (By Mr. Lyons)  Is there any more information
8  concerning the November 2002 dispute by Penny and
9  Russell Anderson that you're aware of that we have not
10  discussed?
11        MR. WEBBER:  Object to the form.  If
12  you've got a specific question, I'm sure she's happy to
13  answer it.
14        MR. LYONS:  That's it.
15   Q.   (By Mr. Lyons)  Do you know of any more
16  information that we haven't discussed about the dispute
17  and the investigation by CSC, Ms. Fogleman?
18   A.   No, sir.
19        MR. WEBBER:  I object to the form.  Have
20  you answered all his questions to the best of your
21  recollection?
22        THE WITNESS:  Yes, sir.
23        MR. WEBBER:  Okay.
24   Q.   (By Mr. Lyons)  And there's nothing that you
25  and I haven't talked about that you know of or are

Janice Fogleman

86

1  aware of concerning this investigation, correct
2  Ms. Fogleman?
3         MR. WEBBER: Object to the form of the
4  question. Are you asking her to supply you with a list
5  of questions?
6         MR. LYONS: I don't want a list of
7  questions. I want to know if there's anything she
8  knows of concerning this investigation regarding this
9  dispute of Penny and Russell Anderson that she and I
10 haven't covered in this deposition so far.
11        MR. WEBBER: I'm going to object to the
12 form of the question.
13        MR. LYONS: That's fine, Counsel. You
14 can make your objection. Just let her answer the
15 question.
16     A.  Not that I'm aware of.
17     Q.  (By Mr. Lyons) Okay. Thanks.
18        MR. LYONS: Let's mark as Deposition
19 Exhibit Number 9 CSC185 through CSC229.
20        (Exhibit CSC-9 marked for
21         identification.)
22        MR. WEBBER: Okay. We got it.
23     Q.  (By Mr. Lyons) Ms. Fogleman, I'm showing you
24 what's been marked as Deposition Exhibit Number 9.
25 These are frozen scans, are they not, for Penny

87

1  Anderson between the months of December 2002 and 2003?
2         MR. WEBBER: I'm sorry. What month?
3         MR. LYONS: December of 2002, August of
4  2003. Including August of 2003.
5     A.  It appears to be, yes, sir.
6     Q.  (By Mr. Lyons) Okay. And you're not aware
7  of CSC placing a telephone call at the number that
8  Ms. -- or Mrs. Anderson provided to CSC in Deposition
9  Exhibit Number 7 anytime between December of 2002 and
10 August 2003, are you?
11     A.  No, sir.
12     Q.  And you would agree with me that between that
13 time, December of 2002 and August of 2003, CSC
14 continued to report the Cross Country Bank Account
15 Number ending in -- or beginning 4227 as deceased?
16        MR. WEBBER: Object to the form.
17        You can answer.
18     A.  No, sir.
19     Q.  (By Mr. Lyons) Say that again.
20     A.  No, sir.
21     Q.  You don't know that to be true?
22     A.  Repeat your question. I'm sorry.
23     Q.  Between December of 2002 through August of
24 2003, CSC continued to report Penny Anderson as
25 deceased related to Cross Country Bank account

88

1  beginning 4227?
2         MR. WEBBER: Object to the form.
3         You can answer.
4     A.  No, sir, we did not.
5     Q.  (By Mr. Lyons) Why do you say that?
6     A.  In January 2003 scan, on CSC192, it shows --
7  Cross Country Member Number 4580N08054 with Account
8  Number 422709748440 shows a manual entry, and it does
9  not reflect as being deceased.
10    Q.  So that was the manual reporting by Cross
11 Country Bank at that time to remove the deceased
12 status?
13    A.  Something was submitted regarding this
14 particular account, and it was updated in January
15 of '03.
16    Q.  Submitted by whom?
17    A.  It would have been submitted by Cross
18 Country.
19    Q.  To whom?
20    A.  To either Equifax or CSC.
21    Q.  And how do we know who it was?
22    A.  We don't.
23    Q.  Okay. Whose responsibility was it for
24 updating files on Wisconsin customers at that time?
25    A.  If Equifax received it, they would have

89

1  submitted it to CSC for the manual update.
2     Q.  And would there be -- would CSC keep a record
3  of that manual update?
4     A.  No, sir.
5     Q.  Why is that?
6     A.  Sheer volume of the manual updates received,
7  for security reasons.
8     Q.  So the month before, in December, they were
9  reporting it as deceased, Cross Country Bank was, same
10 account number, same member number, right?
11    A.  Yes, sir.
12    Q.  And then in January, they switched and
13 stopped reporting it as deceased, correct, same member
14 number, same account number?
15    A.  There was a manual update, yes, sir.
16    Q.  Right. And then the next month, what
17 happened? That would be February of 2003.
18    A.  February of 2003 is actually the same report
19 as it was in January 2003, which shows reporting date
20 of 1 of '03.
21    Q.  So it shows up the same way in February as it
22 did in January, correct?
23    A.  Yes, sir. Yes, sir.
24    Q.  And was that the same then in March as well?
25    A.  Yes, sir.

23 (Pages 86 to 89)

Janice Fogleman

90

1  Q. Pardon me?
2  A. Yes, sir.
3  Q. And then what about April?
4  A. In April, it shows -- it shows the same also.
5  Q. So from January to -- through April, it was
6  reporting the Cross Country Bank trade line as not
7  having Ms. Anderson deceased, correct?
8  A. Correct.
9  Q. But then in May in 2003, the deceased
10 notation back on. And I direct your attention to
11 CSC211. Is that right?
12 A. Yes, sir. It shows reported by tape or
13 automated tape, Member Number 458ON08054, reported May
14 of '03, consumer deceased, Account Number 422709748440.
15 Q. And that's the same member number and account
16 number as in January, February, March, and April,
17 correct?
18 A. Correct.
19 Q. Now, that change in the reporting by Cross
20 Country Bank from that member number on that account
21 number, does that trigger any kind of flag at CSC or
22 Equifax -- well, at CSC concerning accuracy?
23     MR. WEBBER: Object to the form.
24 Vagueness. What change?
25 Q. (By Mr. Lyons) Well, isn't there a change in

91

1  the consumer status of being deceased?
2     MR. WEBBER: Yeah. I mean, at what
3  point, though?
4     MR. LYONS: Well, it looks like there is
5  a consumer deceased in the months prior to January of
6  2003. Then there's four months with no deceased. And
7  then all of a sudden back in May of 2003 there's
8  deceased again.
9  Q. (By Mr. Lyons) Right, Ms. Fogleman?
10 A. Correct.
11 Q. Okay. So that's the change I'm talking
12 about. And when a change like that occurs, where
13 somebody goes from dead to alive to back to dead again,
14 does that send up any kind of flag or system warning to
15 CSC about the accuracy of the information?
16     MR. WEBBER: Object to the form of the
17 question.
18     You can answer.
19 A. No, sir.
20 Q. (By Mr. Lyons) Why is that?
21     MR. WEBBER: Object to the form. Also
22 lack of foundation.
23     You can answer.
24 A. It's not CSC's system, and there's nothing in
25 place in the system that I'm aware of to notify us.

92

1  Q. (By Mr. Lyons) And beginning in May
2  through -- am I right, through August of 2003, Cross
3  Country Bank continued to report to CSC that
4  Mrs. Anderson was dead related to the trade line and
5  the member number that we already discussed?
6     MR. WEBBER: Object to the form of the
7  question.
8     You can answer.
9  A. Yes, sir.
10 Q. The account that we've been discussing with
11 regard to Ms. Anderson, this Cross Country Bank
12 account, is that an individual account or joint
13 account?
14 A. It doesn't say.
15 Q. What about in the months where they were
16 reporting her as alive, from January to April of 2003,
17 does it say in there?
18 A. No, sir, it doesn't say.
19 Q. Is Cross Country Bank supposed to report that
20 information?
21     MR. WEBBER: Object to the form.
22 Foundation.
23     You can answer.
24 A. We ask them to submit the information.
25 Q. (By Mr. Lyons) Well, CSC doesn't ask them to

93

1  submit the information, do they? Equifax does?
2  A. Equifax, correct.
3  Q. Isn't that right?
4  A. Yes, sir.
5  Q. And you don't even really know or have
6  personal knowledge of whether Equifax requires them to
7  do that, do you?
8  A. No, sir.
9  Q. All right. Would you look at CSC242 and
10 24 -- or 242 to 244. Before we mark it, I would like
11 you to tell me what it is, and then we'll see if we
12 need to mark it.
13 A. It's an internal -- it's an internal copy of
14 a credit file on Russell D. Anderson, Sr.
15 Q. This is a CSC internal file?
16 A. Yes, sir. Maintenance copy.
17 Q. What's the purpose of the maintenance file?
18     MR. WEBBER: Object to the form.
19     You can answer.
20 A. It's just a way -- it's just an internal
21 copy, in-house copy, that gives the suppressed
22 accounts.
23 Q. (By Mr. Lyons) Does it provide any scoring
24 data?
25 A. Oh, no, sir.

Janice Fogleman

94

1    Q.  And do you know why there were three of them
2  run for Russell D. Anderson, Sr.?  Or actually maybe
3  there were more.  Why there were four of them?
4        MR. WEBBER:  She's only looking at 242
5  to 44.  Is that --
6    Q.  (By Mr. Lyons) I'm sorry.  Take a look at
7  242 to 254.  I think you'll find four different ones.
8    A.  245 -- well, 242 through 244 is a maintenance
9  copy for Russell D. Anderson.
10    Q.  Okay.
11    A.  245 through 247 is a copy for Penny Anderson,
12  and it's in the reporting or the inquiry mode.
13        248 through 250 is an inquiry mode on a
14  Russell Anderson, Sr.
15    Q.  All right.
16    A.  And 251 through 254 is a maintenance copy on
17  Penny.
18    Q.  And when were the reports on Penny run?
19    A.  All of these were done on September the 24th,
20  2003.
21    Q.  In response to what?
22    A.  I believe because of the lawsuit.
23    Q.  Okay.  And as a result of the lawsuit, was
24  another ACIS case started?
25    A.  That, I don't know.

95

1    Q.  Are you -- strike that.
2        The maintenance and inquiry reports that
3  you have identified, you believe that they were
4  generated as a result of the lawsuit; is that correct?
5    A.  Yes, sir.
6    Q.  Okay.  Is it your understanding that in
7  September of 2003, as a result of the lawsuit, the
8  Cross Country Bank/Applied Card Service Systems trade
9  line Account Number 4227097484406736 was deleted?
10    A.  I don't know.
11    Q.  But there's no ACIS case related to that
12  account number or a dispute in September of 2003?
13    A.  I don't have one, no, sir.
14    Q.  Do you know why or have you ever found out
15  why Cross Country Bank reported to Equifax why -- or
16  that -- let me start over.
17        Do you know why or have any information
18  as to why Cross Country Bank was reporting its
19  accounts, the accounts that we've discussed today, as
20  deceased related to Mr. and Mrs. Anderson?
21    A.  No, sir, I don't.
22    Q.  Has it ever been brought to your attention
23  prior to this lawsuit or subsequent to this lawsuit
24  that Cross Country Bank had reported someone alive as
25  deceased before?

96

1    A.  Not that I remember, no, sir.
2        MR. LYONS:  Let's take a break for about
3  five minutes.  Let me see if I -- what else I have, and
4  then we can try to wrap it up.
5        MR. WEBBER:  Okay.  Can we make it ten?
6  Is that all right?
7        MR. LYONS:  Yeah.  4:10 let's get back
8  together.
9        MR. WEBBER:  Okay.
10        (Recess from 3:56 p.m. until 4:12 p.m.)
11        MR. LYONS:  Ms. Fogleman, thank you for
12  your testimony today.  I don't have anything further at
13  this time.  Subject to later production of different
14  documents by your counsel that I believe we've
15  requested that I think he disputes, thank you for your
16  testimony today.
17        I pass the witness.
18        MR. WEBBER:  Without -- and this is
19  something we can talk about off the record, obviously,
20  but we would -- our position is that we produced the
21  documents that were required and also announced the
22  scope of documents that we were producing.  So we don't
23  believe there's any ground for reopening the
24  deposition, but that's something that will await
25  another day.

97

1        Does anybody else have any questions for
2  Ms. Fogleman?
3        MS. AVERETT:  Equifax doesn't have any.
4        MR. WEBBER:  Dustin?
5        MR. RAWLIN:  This is Mr. Rawlin for
6  Experian.  I have no questions for the witness.
7        MR. LANE:  Nor from Trans Union.
8  Thanks.
9        MR. WEBBER:  I have just a couple of
10  questions, if I might.
11        EXAMINATION
12  BY MR. WEBBER:
13    Q.  Ms. Fogleman, earlier you had some questions
14  from Mr. Lyons about whether you were aware of a
15  situation where an investigation of a dispute by CSC
16  has gone beyond 30 days.  To your knowledge, do
17  investigations always -- or are investigations always
18  completed within 30 days?
19    A.  No, sir.
20        MR. LYONS:  Objection, vague.
21    Q.  (By Mr. Webber) Can you think of -- are you
22  aware in your experience of any circumstances where it
23  has taken longer than 30 days to complete an
24  investigation of a dispute?
25    A.  Yes, sir.

Janice Fogleman

98

1   Q.   All right.  Can you name a particular file
2   right now as you sit here where an investigation took
3   longer than 30 days?
4   A.   Not a particular file, no, sir.
5   Q.   But are you aware in your experience that
6   investigations sometimes do run longer than 30 days?
7   A.   Yes, sir.
8   Q.   Can you give us an example of why an
9   investigation might run longer than 30 days?
10   A.   The consumer would send in information to
11   dispute.  We send out the information to the creditor.
12   Creditor would respond with information.  The consumer
13   then could send in additional information or have
14   additional concerns or disputes regarding that account.
15   Would send it back out to the creditor.  And this could
16   take place several times.
17   Q.   So the creditor and the consumer might go
18   back and forth several times submitting more
19   information to CSC?
20   A.   Correct.
21   Q.   And in those circumstances, would it
22   sometimes take longer than 30 days to complete an
23   investigation?
24   A.   Yes, sir.
25   Q.   Okay.  You also had some questions from

99

1   Mr. Lyons regarding Ms. Anderson's dispute, Penny
2   Anderson's dispute.
3        I think he had asked you why CSC didn't
4   telephone Ms. Anderson at the phone number that was on
5   her November 2, 2002, dispute letter.  And I think you
6   testified that CSC did not call that number because of
7   a concern about potential fraud.
8        CSC did not treat Ms. Anderson's dispute
9   as one that she had been defrauded, correct?
10   A.   Correct.
11   Q.   Okay.  What did you mean when you said that
12   CSC's concerns about potential fraud make it your
13   policy not to call a telephone number that is on a
14   dispute number?
15   A.   Well, we don't have verification of who the
16   telephone number goes to.  We don't know whether we're
17   really speaking to the individual that supposedly may
18   have sent the letter, or the person may not even be
19   there to where you could not get through to them, which
20   would actually then delay the investigation.
21   Q.   In your career at CSC, have you been aware of
22   instances where fraudulent disputes were submitted;
23   that is, the dispute that was submitted was submitted
24   by somebody other than the person to whom the credit
25   report pertained?

100

1   A.   Yes, sir.
2   Q.   And as part of that fraudulent dispute, have
3   those people in your experience sometimes submitted a
4   phone number that is not the phone number of the
5   consumer that the report pertains to?
6   A.   Yes, sir.
7   Q.   And does that create a situation where CSC
8   might unwittingly get pulled into a situation where
9   somebody is perpetrating a fraud on a consumer?
10   A.   Yes, sir.
11   Q.   Is that part of the reason why CSC does not
12   call telephone numbers in dispute letters?
13   A.   Yes, sir.
14   Q.   You also had some questions from Mr. Lyons
15   regarding the fact that in this case the entity that
16   was reporting the debt for the Andersons was apparently
17   Cross Country Bank, yet the CDV went to an entity
18   called Applied Card Systems.  Do you remember that
19   testimony?
20   A.   Yes, sir.
21   Q.   Did the CDV in this case -- or the ACDV,
22   whichever it was, did that go to the address that was
23   associated with the creditor that was reporting the
24   debt that's at issue?
25   A.   Yes, sir.

101

1   Q.   And is that the address that the creditor
2   itself, in this case Cross Country Bank, designated as
3   the address it wanted CDVs or ACDVs sent to?
4   A.   Yes, sir.
5   Q.   And is it the case that sometimes the name
6   that goes on the post office box that the CDV is sent
7   to is sometimes different from the name of the creditor
8   that is showing up on the credit report?
9   A.   Yes, sir.
10   Q.   Is that common or uncommon?
11   A.   It's common.
12   Q.   Okay.  Can you think of another example where
13   that kind of thing happens; that is, where the name
14   that is attached to the post office box that the CDV is
15   sent to is different from the name of the creditor
16   reporting the debt?
17   A.   Retailers National Bank.
18   Q.   What is Retailers National Bank?
19   A.   They actually do the card or the account
20   processing or are the entities for Mervyn's, Marshall
21   Field's, Dayton Hudson's, Target, to name a few.
22   Q.   So if a dispute were raised with respect to,
23   for example, a trade line from Target, would the CDV be
24   sent to a post office box or some other recipient
25   bearing the name Retailers National Bank?

26 (Pages 98 to 101)

Janice Fogleman

102

1   A.   Either Retailers National Bank or RNB.
2   Q.   Okay. And is that because that is who Target
3   has designated as the outfit to actually receive the
4   CDV?
5   A.   Yes, sir.
6   Q.   And is that what you believe to have happened
7   in this case; that is, that Applied Card Systems is the
8   entity or the name of the outfit that Cross Country
9   Bank designated to receive CDVs and ACDVs?
10  A.   Yes, sir.
11  Q.   Finally, I just want to make sure this is
12  clear. You had some testimony that the trade line from
13  Cross Country Bank that you've been talking about
14  sometimes had the notation "reinvestigation in process"
15  during a time that that trade line was suppressed. Do
16  you recall those questions and your testimony on that?
17  A.   Yes, sir.
18  Q.   Do the creditors during the time that the
19  trade line is suppressed ever see the words
20  "reinvestigation in process"?
21  A.   No, sir.
22  Q.   When a creditor pulls a report that has a
23  trade line that is suppressed, do they ever see any
24  information about that trade line?
25  A.   Not if the trade line is suppressed, no, sir.

103

1   Q.   Once a trade line is suppressed on your
2   internal copy -- that is, for CSC and Equifax's
3   internal copy -- is that trade line essentially frozen
4   in time as of the moment that it's suppressed?
5   A.   Yes, sir.
6   Q.   And does it remain essentially frozen in time
7   for as long as it is suppressed?
8   A.   Yes, sir.
9   Q.   And in your experience, do people at least at
10  CSC know that?
11  A.   Yes, sir.
12  Q.   So when somebody from CSC looks at a trade
13  line that says "reinvestigation in process" but
14  reflects that it was suppressed two years ago, do
15  people understand that there is probably not a
16  reinvestigation still in process?
17  A.   Yes, sir.
18  Q.   And in any event, a creditor that pulls that
19  credit report is never going to see the words
20  "reinvestigation in process"; is that correct?
21  A.   As long as the account is suppressed,
22  correct.
23     MR. WEBBER: And that's all I have.
24  Thank you.
25     FURTHER EXAMINATION

104

1   BY MR. LYONS:
2   Q.   Ms. Fogleman, Mr. Lyons. I've got a few
3   follow-ups based on the interesting questions that
4   Mr. Webber raised with you.
5       First of all, he talked with you in his
6   first series of questions about disputes that take
7   longer than 30 days. And he, I think -- although the
8   record will reflect the exact words he used. I thought
9   he said that there was some back and forth between the
10  information that was being provided by the creditor and
11  the information that was being provided by the
12  consumer. Do you remember him asking you questions
13  like that?
14  A.   Yes, sir.
15  Q.   Okay. So is it your testimony that if a
16  consumer provides a dispute about some inaccuracy that
17  they claim on the report and a creditor comes back with
18  some information that contradicts or challenges that
19  consumer's dispute, that then CSC goes back to the
20  consumer and tells them what the creditor said and
21  waits for them to respond back? I didn't understand
22  that. Can you elaborate on that?
23     MR. WEBBER: Object to the form.
24     You can answer.
25  A.   Consumer submits a dispute regarding a

105

1   certain entity. The dispute process is begun.
2       An ACDV or CDV is mailed out to the
3   creditor in question. The creditor responds. They
4   send the information back. The information then is
5   updated or notated in the credit file.
6       A report is mailed out to the consumer.
7   And then the consumer either calls in or submits it
8   back again in writing, another dispute regarding the
9   same entity, which we then would go back to that
10  company, tell them what the consumer said of what the
11  nature of the dispute is.
12      The creditor would respond. It's again
13  updated or notated on the credit file.
14      Report is sent out to the consumer. And
15  then the consumer may send it back again. And we go
16  back and forth.
17  Q.   Okay. So -- I understand. But after each --
18  after each round of the consumer disputing
19  information -- whether it's a CDV or ACDV is sent to
20  the creditor and then the response from the creditor,
21  CSC concludes that investigation at that time. That
22  investigation isn't ongoing, is it?
23  A.   That particular case is closed out, and a
24  report is sent out to the consumer. But the consumer
25  may resubmit information regarding that same entity,

27 (Pages 102 to 105)

Janice Fogleman

106

1  which we would go back to that company to reverify what
2  the consumer is now telling us.
3      Q.  Right.  Right.  Okay.  So let me make sure
4  I -- this is clear.  Let's make sure the record is
5  clear.
6          The reinvestigation of a dispute has a
7  beginning and has an end when CSC -- the end of which
8  is when CSC sends out the report to the consumer that
9  says, "Our investigation is concluded, and this is what
10  the results are," correct?
11     A.  Correct.
12     Q.  Okay.  Then if a consumer wants to start a
13  second investigation, he may -- he or she may do so by
14  submitting another dispute, correct?
15     A.  Correct.
16     Q.  So your testimony is clear, there is never
17  the situation where a dispute -- an initial dispute by
18  a consumer is somehow ongoing greater than 30 days
19  all arising out of an initial dispute to CSC, correct?
20     A.  There are times that the consumer sends in
21  information regarding a certain entity, and even before
22  it's even finished, they will send in additional
23  information regarding that same company, which then we
24  have to create and send out a second ACDV which may
25  have been just, you know, two or three days after the

107

1  first one.  And that can go on for weeks.
2      Q.  That's only if a consumer keeps sending in
3  new information to CSC, correct?
4      A.  Correct.
5      Q.  But once CSC gets information back from the
6  creditor, that's the end of the investigation, correct?
7      A.  Not if there's still information outstanding
8  regarding the additional information that the consumer
9  had submitted.  There would be more ACDVs or CDVs
10  coming back.
11     Q.  Okay.  I follow what you're saying.  But once
12  the creditor has responded to the -- to whatever
13  information CSC has conveyed from the consumer, that's
14  the end of the investigation, correct?
15     A.  For that particular dispute, you might say.
16     Q.  Okay.
17     A.  Unless there's still an outstanding dispute
18  that the consumer has submitted regarding that same
19  account, but within -- within several days or weeks of
20  the initial dispute.
21     Q.  Okay.  I just didn't -- I thought that what
22  you were saying is that somehow there was a back and
23  forth between the consumer and the creditor and CSC
24  would prolong these investigations as long as the
25  consumer kept -- or was given a chance to refute what

108

1  the creditor said before the corrected report was sent
2  out.  You're not saying that, are you?
3      A.  No.
4      Q.  Okay.  All right.  And with regard to the
5  question that Mr. Webber raised about fraud disputes
6  and CSC's concern for perpetrating frauds or being the
7  victim of frauds or helping perpetrate frauds, at no
8  time did CSC think that the Anderson dispute was a
9  fraud, correct?
10     A.  Correct.
11         MR. WEBBER:  Object to the form.  I
12  don't think I asked her about CSC helping fraud.
13     Q.  (By Mr. Lyons)  Right, Ms. Fogleman?  CSC was
14  never concerned that Mr. and Mrs. Anderson's letter of
15  November of 2000 was a fraud?
16     A.  No, sir.
17     Q.  No.  And, in fact, they treated it as though
18  it weren't a fraudulent dispute because they acted upon
19  the letter itself that was submitted by the Andersons,
20  correct?
21     A.  Correct.
22     Q.  Okay.  But for policy reasons, despite
23  believing that the letter was not fraud, it didn't
24  place a phone call to Mrs. Anderson at the number that
25  was provided, correct?

109

1      A.  Correct.
2      Q.  Okay.  Now, finally, there was talk about
3  creditors being contacted through entities that don't
4  appear on the credit report.  Do you remember
5  Mr. Webber asking you about that?
6      A.  Yes, sir.
7      Q.  And you gave him the situation of Retailers
8  National Bank being the contact person for a bunch of
9  different entities like Target and Mervyn's.  Do you
10  remember that?
11     A.  Yes, sir.
12     Q.  Okay.  But Target and Mervyn's don't appear
13  on the trade line of a consumer's credit file, do they?
14     A.  Yes, sir, sometimes they do.
15     Q.  But sometimes they don't.  Isn't that true
16  too?  Sometimes it's listed as Retailers National Bank
17  or RNB, isn't it, right on the trade line?
18     A.  Sometimes, yes.
19     Q.  Okay.  And you don't have any personal
20  knowledge, do you, that Cross Country Bank designated
21  Applied Card Services as their outfit, as Mr. Webber
22  called it, to respond to disputes, do you?
23     A.  Other than that is the address that is in the
24  system for us to submit for the ACDVs or the CDVs.
25     Q.  And that was submitted not to CSC.  That

28 (Pages 106 to 109)

Janice Fogleman

**110**

1 information wasn't submitted to CSC by Cross Country
2 Bank, was it?
3   A.  No, sir.
4       MR. LYONS:  Okay.  That's all the
5 questions I have.  Thank you, Mrs. Fogleman.
6       FURTHER EXAMINATION
7 BY MR. WEBBER:
8   Q.  Ms. Fogleman, do you believe that information
9 was submitted to Equifax?
10   A.  Yes, sir.
11   Q.  For inclusion in the system?
12   A.  Yes, sir.
13       MR. WEBBER:  That's all I've got.
14       FURTHER EXAMINATION
15 BY MR. LYONS:
16   Q.  You don't know anything about what was
17 submitted to Equifax, do you?
18   A.  I have reason to believe that it was that
19 information.  Otherwise, it wouldn't be in the system.
20   Q.  But you have no personal knowledge of that
21 information being submitted to Equifax because you're
22 not an Equifax employee, are you, Ms. Fogleman?
23   A.  No, I'm not.
24   Q.  Okay.  And so you don't have any idea what
25 was submitted or who submitted any information directly

**111**

1 to Equifax, do you?
2   A.  No, sir.
3       MR. LYONS:  Okay.  Thank you.
4       MR. WEBBER:  Tommy wants to ask the last
5 question, and I'm happy to let him do that.
6       I have no further questions.
7       Does anybody else have any?
8       MR. RAWLIN:  Even after all that,
9 Experian still has no questions.
10       MS. AVERETT:  Equifax doesn't have any
11 either.
12       MR. LANE:  None for Trans Union.
13       (Off the record at 4:30 p.m.)

**112**

1       ORAL DEPOSITION OF
        JANICE LYNN FOGLEMAN
2       JUNE 2, 2004
3       CHANGES AND SIGNATURE
4 PAGE LINE CHANGE            REASON

**113**

1       CHANGES AND SIGNATURE
        JANICE LYNN FOGLEMAN
2       Page 2
3 PAGE LINE CHANGE            REASON

11   I, JANICE LYNN FOGLEMAN, have read the
foregoing deposition and hereby affix my signature that
12 same is true and correct, except as noted above.

JANICE LYNN FOGLEMAN

THE STATE OF_____:
COUNTY OF_____:
   BEFORE ME,_____, on this day
appeared JANICE LYNN FOGLEMAN, known to me or proved to
me on the oath of_____ or through
        [description of identity card or
other document] to be the person whose name is
subscribed to the foregoing instrument and acknowledged
to me that he/she executed the same for purposes and
consideration therein expressed.
   Given under my hand on this    day of    ,
2004.

   Notary Public in and for the
   State of_____
   My commission expires:_____

29 (Pages 110 to 113)

Janice Fogleman

114

```
 1   THE STATE OF TEXAS :
 2   COUNTY OF HARRIS :
 3
         I, Debbie Leonard, CSR, RMR, CRR, a Certified
 4   Shorthand Reporter in and for the State of Texas, do
     hereby certify that the facts as stated by me in the
 5   caption hereto are true; that the above and foregoing
     answers of the witness, JANICE LYNN FOGLEMAN, to the
 6   interrogatories as indicated were made before me by the
     said witness after being first duly sworn to testify
 7   the truth, and same were reduced to typewriting under
     my direction; that the above and foregoing deposition
 8   as set forth in typewriting is a full, true, and
     correct transcript of the proceedings had at the time
 9   of taking of said deposition.
10       I further certify that I am not, in any
     capacity, a regular employee of the party in whose
11   behalf this deposition is taken, nor in the regular
     employ of his attorney; and I certify that I am not
12   interested in the cause, nor of kin or counsel to
     either of the parties.
13
         Certified by me on this _____ day of June, 2004.
14
15
16
     _____
     Debbie Leonard, CSR, RMR, CRR
17   Texas CSR No.: 8190
     Expiration Date: 12/31/05
18
19
20
21
22
23
24
25
```

30 (Page 114)



EXHIBIT

CSC-2
DL 6/8/04

```
FROZEN 61B 2001 MONTH 09 NAME/SSN RECORDS
*************************************************

ANDERSON                PENNY L                                    FN 009-335O526-00-259   ANDERSON,PENNY,L
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017                                                1614,WILDWOOD,AVE,NEWR,WI,54017

                                                                   FILE SINCE 11/07/90
ANDERSON,PENNY,L
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00.
1380,HERITAGE,DR,APT 7,NEWR,WI,54017, TAPE RPTD 11/99
  TELEPHONE NUMBER (603) 888-6334 SPEC 02/01.
13,BATCHELDER,AVE,UNIT 1,MANC,NH,03101, TAPE RPTD 05/99
  TELEPHONE NUMBER (603) 668-0384 SPEC 07/99.
FORMER NAME-ROSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
  BORN 12/11/1970,SS-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
   LAKEVIEW HOSPITAL
*INQS- 32 INQUIRIES SINCE 00/64,SLUMBERLND,286HF3586,07/30/01, 07/27/01
PRM 850BB24906, 07/18/01, PRM 133B1503S, 06/28/01 ,AR 404FF03555, 06/16/01
,AR 850BB24906, 05/21/01 ,AR 850BB26906, 04/29/01 ,AR 850BB24906, 03/26/01
,AR 404FF03555, WELLSFARGO,491FM6356,03/20/01 ,EU 146ZB13616/2401
02/00 03/14/01 ,EU 6162B04898/144,00, CENTENNIAL,234FMS103,12/02/01,28130
,12/22/00, ,EU 146ZB13616/2401, 01/24/01 ,AR 404FF03555,'-MOBILE,91O1,28130
STANDARD,491FM6252, CAPONE,BANK,5484B8672,12/02/00, TOUSLEY,FD,613AN604,11/06/00,
AR 901B843850, 09/27/00 ,EU 6162B04898/144, 09/28/00
08/01/00 ,EU 146ZB13616/2401, NO AM MTG,491FMS106,09/13/00 ,EU 146ZB13616/2401,
EU 1B1ZB01975/NORT, 06/02/00 ,EU 1B1ZB01494/NORT,05/02/00, 06/06/00
NO AM MTG,491FMS106, IR/MG,1B01G726,04/28/00, ,EU 1SZBOOO86/NORT,
PRM 165FM19202.
```

PAGE 1

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 4012S00040,2    CREDIT BUREAU INC.
ANDERSON          PENNY L
1614 WILDWOOD AVE  NEW RICHMOND  WI 54017

FN 009-3350526-00-259

| * FIRM/ID CODE | RPTD | OPND | H/C | TRM | BAL | P/D | CS | MR | ECOA | ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|
| CROSSCNTRY*45B0N0B0054 | 09/01 | 05/98 | 4300 | 129 | 4272 | R1 | | 40 | I | 42709724010 |
| 30(00)60(00D)90+(00D) | | | | | | | | | | DLA 09/01 |
| CREDIT CARD | | | | | | | | | | |
| AMOUNT IN H/C COLUMN IS CREDIT LIMIT | | | | | | | | | | |
| WFFINANCE *668FP04491 | 08/01 | 07/01 | 15 | | 938 | | R1 | | J | 196-28428475 |
| 30(00)60(00D)90+(00D) | | | | | | | | | | DLA 08/01 |
| CHARGE | | | | | | | | | | |
| FMC  *905FA04045 | 08/01 | 06/99 | 21K | 351 | 11K | | I1 | 26 | J | JHA2183DN0 |
| 30(00)60(00D)90+(00D) | | | | | | | | | | DLA 07/01 |
| AUTO | | | | | | | | | | |
| FORD CRDT *905FA03831 | 08/01 | 11/00 | 16K | 283 | 14K | | I1 | 09 | J | EBA36121R7 |
| 30(00)60(00D)90+(00D) | | | | | | | | | | DLA 07/01 |
| AUTO | | | | | | | | | | |
| SALLIE MAE*845FZ00120 | 08/01 | 03/01 | 2625 | 62 | 1224 | | I1 | 04 | I | 1589006102F |
| 30(00)60(00D)90+(00D) | | | | | | | | | | DLA 08/01 |
| STUDENT LOAN | | | | | | | | | | |
| SALLIE MAE*845FZ00120 | 08/01 | 03/01 | 2000 | 29 | 584 | | I1 | 04 | I | 1589006101F |
| 30(00)60(00D)90+(00D) | | | | | | | | | | DLA 08/01 |

PAGE 2

CSC111

```
              CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040,2     CREDIT BUREAU INC.
ANDERSON                  PENNY L
1614 WILDWOOD   AVE  NEW RICHMOND   WI  54017              FN 009-3350526-00-259


STUDENT LOAN
CROSS CTRY 458BB02969 06/00 04/99 SUPPRESS ERRONEOUS TRADE                        541490709890
                                                                             DLA 04/00
SYSTEM AFFILIATE INTERNAL POLICY
CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
SEARS  *6450C09286 09/01 06/98  550        391         R1 38 I               35781349
   30(00)60(00)90+(00)                                                   DLA 09/01
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
WELLSFARGO*612FM00449 08/01 05/01 170K 1K  167K       I1 01 J               472857170
   30(00)60(00)90+(00)                                                   DLA 08/01
REAL ESTATE MORTGAGE
FHA MORTGAGE
JCP/MCCBG *404FF03555 07/01 08/98 1700 75  1436        R1 35 I              -1916502337
   30(00)60(00)90+(00)                                                   DLA 07/01
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CAP I BANK*650BB01498 08/01 01/99 488 10   127        R1 31 I               412174152831
   30(00)60(00)90+(00)                                                   DLA 08/01

PAGE 3
```

CSC112

```
          CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040,2      CREDIT BUREAU INC.
ANDERSON             PENNY L                            FN 009-3350526-00-259
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017


CREDIT CARD
USAG LOAN *655FZ28868 04/01 08/93 2000 79M    0     I1 24 I    158900601437024
  30(00)60(00)90+(00)                                          DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ28868 04/01 07/93 2625 68M    0     I1 14 I    158900601387935
  30(00)60(00)90+(00)                                          DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAM9       *16B8B00821 06/01 10/00 166K 1K     0     I    J    330061214B152
  30(00)60(00)90+(00)
REAL ESTATE MORTGAGE
FHA MORTGAGE
K&USA-ASF *155FA00737 02/00 08/95 21K 357     0     I1 52 C             516497
  30(00)60(00)90+(00)                                          DLA 02/00
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*45B8B02969 04/99 04/99 500          J     R0   J    54149070116
  30(00)60(00)90+(00)                                          DLA 04/99

PAGE 4
```

CSC113

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
TO 401ZS00040,2
ANDERSON        PENNY L
1614 WILDWOOD AVE  NEW RICHMOND  WI  54017                FN 009-3350526-00-259

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152BB00795 03/94 07/93 2625        0   I1 07 I   10000158900601
  3O(00)60(00)90+(00)                                      DLA 03/94
ACCOUNT TRANSFERRED OR SOLD
STUDENT LOAN
BANK ONE *152BB00795 10/93 08/93 2000        0   I0    I   10000158900603
  3O(00)60(00)90+(00)                                      DLA 10/93
ACCOUNT TRANSFERRED OR SOLD
STUDENT LOAN
CAP 1 BANK*85088O1498 04/99 10/94 197 241 241 R9           52910713237 3
  3O(00)60(01)90+(04) 08/95-R5,07/95-R5,06/95-R5           DLA 03/95
CHARGED OFF ACCOUNT
CREDIT CARD

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
                                      PO BOX 981221

CSC114


EXHIBIT
CSC-4
70    6/26/17

```
          FROZEN 623 2002 MONTH 04 NAME/SSN  RECORDS
      ***********************************************

ANDERSON                    PENNY L                      FN 009-3350522-00-259
1614 WILDWOOD  AVE  NEW RICHMOND   WI  54017

                                                         FILE SINCE 11/07/90
ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00,
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99.
.BATCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-ROSSD,PENNY,L.
FORMER NAME-ROMSTOM,PENNY,L.
.LAKEVIEW HOSPITAL
    BORN 12/11/1970 SS#-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
*INQS- 45 INQUIRIES SINCE 00/64,03/08/02 ,PRM 162ZB16948, 02/26/02
PRM 163FM19202, 02/22/02 ,AR 850BB24906, 02/18/02 ,PRM 496FM03218, 02/12/02
,PRM 625UT0017B, 02/11/02 ,PRM 667IG29914, 01/28/02 ,AR 850BB24906, 01/19/02
,AR 850BB24906, 12/27/01 ,PRM 496FM03218, 11/09/01 ,AR 850BB24906, 10/29/01
,PRM 162ZB16948, 10/08/01 ,AR 850BB24906, 09/28/01 ,PRM 162ZB16948, 09/27/01
,AR 404FF03555, 09/11/01 ,PRM 484ZB01456, 08/14/01 ,PRM 444ZZ04598,
SLUMBERIND.286HF3586,07/30/01, 07/27/01 ,AR 850BB24906, 07/18/01
PRM 153BB15035, 06/28/01 ,AR 404FF03555, ,AR 850BB24906, 07/18/01
,AR 850BB24906, 06/04/01 ,PRM 163FM19202 05/21/01,PRM 163FM19202, 06/16/01
,AR 850BB24906, WELLSFARGO,491FM6356,03/26/01, AR 850BB24906, 04/29/01
,700.03/14/01,EU 616ZB04698/144.00, CENTENNIA,234FM31035,03/26/01 162Z1S616/24I01
0/,2011,00,ENE-WAMSTOM.05/27/00,T-MOBILE,910UT28130,12/22/00, CAPONEBANK
,494J8672,  03/22/00 100SLEY FO,613ANG604,11/06/00 STANDARD,491FM623,09/29/00,
09/28/00 ,EU 616ZB04698/144.00 09/27/00 ,EU 181ZB03096/NORT, 09/13/00
EU 162B16616/24I01, 08/01/00 ,EU 162ZB316I6/24I01, NO AM MTG,491FM3106,06/06/00,
EU 401ZB02525/WELL, IR/MG,1801G726,04/28/00, 04/28/00 ,EU 152ZB00086/NORT,
EU 181ZB01975/NORT,
NO AM MTG,491FM3106,04/28/00.
    PAGE 1
```

ANDERSON,PENNY,L
1614,WILDWOOD,AVE,NEWR,WI,54017

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

```
TO 401ZS00040.2      CREDIT BUREAU INC.                    FN 009-3350522-00-259
ANDERSON               PENNY L
1614 WILDWOOD   AVE   NEW RICHMOND    WI   54017
```

```
*  FIRM/ID CODE        RPTD  OPND  H/C  TRM  BAL  P/D  CS  MR  ECOA  ACCOUNT NUMBER
CROSSCNTRY*45B0N0B054  04/02 05/98 4300       0        R1  47  I     422709724010
   30(00)60(00)90+(00)                                             DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
WFFINANCE *668FP04491 03/02 07/01 1500       0        R1  07  J     196-28428475
   30(00)60(00)90+(00)                                             DLA 12/01
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CROSS CTRY 45B8B02969 06/00 04/99 SUPPRESS ERRONEOUS TRADE         541490709690
                                                                  DLA 04/00
SYSTEM AFFILIATE INTERNAL POLICY
CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
S&C BANK *668B854029 03/02 12/01  22K  25I  22K           I1  02  J  406995201287126
   30(00)60(00)90+(00)                                             DLA 03/02
HOME IMPROVEMENT LOAN
SALLIE MAE*464FZ001Z0 03/02 03/01 2625  62  831          I1  11  I  1589006102F
   30(00)60(00)90+(00)                                             DLA 03/02
STUDENT LOAN
```

PAGE 2

CSC146

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 40IZSD0040.2          CREDIT BUREAU INC.
ANDERSON                 PENNY L                         FN 009-3350522-00-259
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017

SALLIE MAE*895F2O0120 03/02 03/01 2000 29          396    I1 11 I        15B9006101F
  30(OO)60(OO)90+(OO)                                                 DLA 03/02
STUDENT LOAN
JCP/MCCBG *404FF03555 04/02 08/98 1900             0      R1 44 I        -1916502337
  30(OO)60(OO)90+(OO)                                                 DLA 01/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
SEARS  *645DC09286 04/02 06/98  550 10   133             R1 45 I        35781349
  30(OO)60(OO)90+(OO)                                                 DLA 04/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
FMC    *905FA04045 03/02 06/99  21K 351 9477             I1 33 J        JHA2183DN0
  30(OO)60(OO)90+(OO)                                                 DLA 03/02
AUTO
FORD CRDT *905FA0383I 03/02 11/00  16K 283  12K         I1 16 J        EBA36121R7
  30(OO)60(OO)90+(OO)                                                 DLA 03/02
AUTO
WELLSFARGO*612FM00449 03/02 05/01 170K 1K  166K         I1 08 J        4728571702
  30(OO)60(OO)90+(OO)                                                 DLA 03/02

PAGE 3

CSC147

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 40JZSD0040,2          CREDIT BUREAU INC.
ANDERSON          PENNY L
1614 WILDWOOD AVE  NEW RICHMOND   WI  54017          FN 009-3350522-00-259


REAL ESTATE MORTGAGE
FHA MORTGAGE
CAP 1 BANK*8508B801498 02/02 01/99 1253        0    R1 37 I    412174152831
  30(00)60(00)90+(00)                                           DLA 02/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ28868 04/01 08/93 2000 79M     0    I1 24 I    158906601437024
  30(00)60(00)90+(00)                                           DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ28868 04/01 07/93 2625 68M     0    I1 14 I    158906601387935
  30(00)60(00)90+(00)                                           DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG *16880821 06/01 10/00 166K 1K             0    I      J    330061214B152
  30(00)90U+(00)90+(00)
REAL ESTATE MORTGAGE
FHA MORTGAGE
K8USA-ASF *155FA00737 02/00 08/95 21K 357      0    I1 52 C    516497
  30(00)60(00)90+(00)                                           DLA 02/00

PAGE 4
```

CSC148

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 4QIZS00040.2      CREDIT BUREAU INC.                    FN 009-3350522-00-259
ANDERSON              PENNY L
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017


PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*458B8BO2969 04/99 04/99  500           RO    J          541490709116
30(OD)60(OO)90+(OO)                                             DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152B8BO0795 03/94 07/93 2625      0     I1 07 I    1000015890O0601
30(OD)60(OO)90+(OO)                                             DLA 03/94
BANK ONE *152B8BO0795 10/93 08/93 2000      0     I0      I    1000015890O0603
30(OD)60(OO)90+(OO)                                             DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/013*COLL 07/99 668YC4921 FOR WORLDCOM,$248,10/01 PAID
          BAL-10/01 $, DLA:06/99, I,741619


REF TO CSC CREDIT SERVICES,                          PO BOX 981221,
    ,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

CSC149



FROZEN 623 2002 MONTH 05 NAME/SSN RECORDS
************************************************

ANDERSON                    PENNY L
1614 WILDWOOD   AVE   NEW RICHMOND   WI   54017

FN 009-3350522-00-259

ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00,
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99,
13,BATCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-ROSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
BORN 12/11/1970,SSS-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
LAKEVIEW HOSPITAL.

FILE SINCE 11/07/90

*INQS- 44 INQUIRIES SINCE 00/64,04/18/02 ,PRM 496FM03218,04/18/02
AR 105FM11640,04/10/02 ,PRM 251UT0017B,04/08/02 ,PRM 850BB01498, 03/08/02
,PRM 162BB16948, 02/26/02 ,PRM 156FM19202, 02/22/02 ,AR 850BB24906, 02/18/02
,PRM 496FM03218, 02/12/02 ,PRM 625UT0017B, 02/11/02 ,PRM 667BG29914,
01/28/02 ,AR 850BB24906, 01/19/02 ,AR 850BB24906, 12/27/01 ,PRM 496FM03218,
11/09/01 ,AR 850BB24906, 10/29/01 ,PRM 162BB16948, 10/08/01 ,AR 850BB24906,
09/28/01 ,PRM 162BB16948, 09/27/01 ,AR 404FF03555, 09/11/01 ,PRM 484BB01456,
08/14/01 ,PRM 444ZF04598, SLUMBERLND,286HF3586,07/30/01 ,07/27/01
AR 850BB24906, 07/18/01 ,PRM 133BB15035, 06/28/01 ,AR 404FF03555, 06/23/01
,PRM 165FM19202, 06/16/01 ,AR 850BB24906, 06/04/01 ,PRM 163FM19202, 05/21/01
,PRM 351UT04201, WELLSFARGO,491FM6356,03/20/01, 03/20/01 ,EU 146ZB13616/2401
,D0 ,03/21/01 ,EU 146ZB13616Z04898/144,00, CENTENNIAL,234FM31033, 02/02/01,
02/01/01 ,EU 146ZB13616Z04898/144,00, T-MOBILE,910UT2B130,12/22/00, CAPONEBANK
,484BB672,12/02/00 TDUSLEY FO 61 YA0604,11/06/00, STANDARD,491FM623,09/29/00,
09/28/00 ,EU 616ZB04898/144, 09/25/00 ,118/2401096/NORT,09/13/00
,EU 146ZB13616/2401, 08/01/00 ,EU 146ZB13616/2401, AM MTG,491FM3106,06/06/00,
06/06/00 ,EU 181ZB01975/NORT, 06/02/00 ,EU 181ZB01694/NORT.

PAGE 1

ANDERSON,PENNY,L
1614,WILDWOOD,AVE,NEWR,WI,54017

CSC150

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2   CREDIT BUREAU INC.
ANDERSON          PENNY L                          FN 009-3350522-00-259
1614 WILDWOOD  AVE  NEW RICHMOND   WI  54017
```

```
*   FIRM/ID CODE        RPTD  OPND  H/C  TRM  BAL  P/D  CS  MR  ECOA  ACCOUNT NUMBER
CROSSCNTRY*4580N08054  05/02 05/98 4300        0        R1  48  I      42270972401 0
    30(00)60(00)90+(00)                                                DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
CROSSCNTRY*4580N08054  05/02 04/99 CONSUMER DECEASED
                                                                       42270974844 0
CREDIT CARD                                                            DLA 05/02
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SEARS  *645DC09286     05/02 06/98 550  10  257,       R1  46  I       35781349
    30(00)60(00)90+(00)                                                DLA 05/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
JCP/MCCBG *404FF03555  05/02 08/98 1900     0          R1  45  I       -191650233 7
    30(00)60(00)90+(00)                                                DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
SALLIE MAE*845FZ00120  04/02 03/01 2625 62  773        I1  12  I       15890061D2F
    30(00)60(00)90+(00)                                                DLA 04/02

PAGE 2
```

CSC151

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZSD0060,2    CREDIT BUREAU INC.
ANDERSON             PENNY L                        FN 009-3350522-00-259
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017

STUDENT LOAN
SALLIE MAE*845FZ00120Z 04/02 03/01 2000 29   368   I1 12 I     1589006101F
    30(00)60(00)90+(00)                                      DLA 04/02
STUDENT LOAN
FMC        *905FA04045 04/02 06/99 21K 351 9126   I1 34 J      JHA2183DN0
    30(00)60(00)90+(00)                                      DLA 04/02
AUTO
FORD CRDT *905FA03831 04/02 11/00 16K 283  12K    I1 17 J     EBA36121R7
    30(00)60(00)90+(00)                                      DLA 04/02
AUTO
S&C BANK  *668B855029 04/02 12/01 22K 251  22K    I1 03 J    40699520128712G
    30(00)60(00)90+(00)                                      DLA 04/02
HOME IMPROVEMENT LOAN
WELLSFARGO&612FM00449 04/02 05/01 170K 1K 166K    I1 09 J      472857170Z
    30(00)60(00)90+(00)                                      DLA 04/02
REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINANCE *668FP04491 03/02 07/01 1500      0     RI 07 J     196-28428475
    30(00)60(00)90+(00)                                      DLA 12/01

PAGE 3

CSC152

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2      CREDIT BUREAU INC.
ANDERSON             PENNY L                           FN 009-3350522-00-259
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017

CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CAP 1 BANK*B5DBB01498 02/02 01/99 1253        0          R1 37 I        412174152831
  30(00)60(00)90+(00)                                                   DLA 02/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ28868 04/01 08/93 2000 79M    0          I1 24 I        1589006014370724
STUDENT LOAN                                                            DLA 02/01
  30(00)60(00)90+(00)
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ28868 04/01 07/93 2625 68M    0          I1 14 I        1589006015587935
STUDENT LOAN                                                            DLA 02/01
  30(00)60(00)90+(00)
ACCOUNT TRANSFERRED OR SOLD
AAMG    *168BB00821 06/01 10/00 166K 1K       0          I      J       33006121648152
  30(00)60(00)90+(00)
REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUSA-ASF *155FA007737 02/00 08/95 21K 357    0          I1 52 C        516497
  30(00)60(00)90+(00)                                                   DLA 02/00

PAGE 4

CSC153

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS0040,2    CREDIT BUREAU INC.                    FN 009-3350522-00-259
ANDERSON              PENNY L
1614 WILDWOOD AVE  NEW RICHMOND  WI  54017

PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*4588B02969 04/99 04/99  500            R0    J        54149070911б
  30(00)60(00)90+(00)                                    DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE  *152BB00795 03/94 07/93 2625  0       I1 07 I     1000015890060l
  30(00)60(00)90+(00)                                    DLA 03/94
BANK ONE  *152BB00795 10/93 08/93 2000  0       I0    I     1000015890060З
  30(00)60(00)90+(00)                                    DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/01*COLL 07/99 668YC692l FOR WORLDCOM,$248,10/01 PAID
         BAL-10/01 $,  DLA: 06/99, I,/741619

REF TO CSC CREDIT SERVICES,
  ,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
                                        PO BOX 981221,

CSC154

FROZEN 623 2002 MONTH 06 NAME/SSN RECORDS
*******************************************

ANDERSON                                                      FN 009-335D522-00-259
1614 WILDWOOD AVE   NEW RICHMOND   WI   54017

                    PENNY L                                  FILE SINCE 11/07/90

ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00.
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99.
13,BATCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-ROSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
BORN 12/11/1970,SSS-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
LAKEVIEW HOSPITAL,
*INQS-40 INQUIRIES SINCE 00/64.05/30/02 ,PRM 401ZZ85680, 04/18/02
PRM 496FM03218  06/18/02,AR 103FM11640,04/10/02 ,PRM 625UT00178, 04/08/02
,PRM 850BB0149B, 03/08/02 ,PRM 162BI1694B,02/26/02 ,PRM 163FM19202,
02/22/02 ,AR 850BB24906, 02/18/02 ,PRM 496FM03218, 02/12/02 ,PRM 625UT00178,
02/11/02 ,PRM 667IG29914, 01/28/02 ,AR 850BB24906, 01/19/02 ,AR 850BB24906,
12/27/01 ,PRM 496FM03218, 11/09/01 ,AR 850BB24906, 10/29/01 ,PRM 162BI1694B,
10/08/01 ,AR 850BB24906, 09/28/01 ,PRM 162BI1694B  09/27/01 ,PRM 404FF03555,
09/11/01 ,PRM 484BB01456, 08/14/01 ,PRM 444ZZ0459B, SLUMBERLND,286HF35B6
AR 730/01, 07/27/01 ,AR 850BB24906, 07/18/01 ,PRM 133BB15035, 06/28/01
03/20/01 ,PRM 404FF03555, 06/23/01 ,PRM 163FM19202, WELLSFARGO,491FM6356, 03/20/01,
,234FM31033  03/02/01 ,EU 162B13616/2401,00 ,03/14/01 ,EU 616ZB04898/144,00 , CENTENNIAL
,12/22/00 ,CAPONEBANK, 02/01/01 ,EU 162B13616/2401, T-MOBILE, 910UT2B130
STANDARD,491FM625,09/29/00 ,EB 484BB672,12/02/00, TOUSLEY F0,613AN604,11/06/00,
EU 1BIZB03096/NORT, 09/13/00 ,EU 616ZB04898/144, 09/27/00
EU 162B13616/2401, 06/06/02 ,PRM 4040N01216.

PAGE 1

ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017

CSC155

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 40IZS00D40,2        CREDIT BUREAU INC.                    FN 009-3350522-00-259
ANDERSON               PENNY L
1614 WILDWOOD   AVE  NEW RICHMOND   WI  54017

| * FIRM/ID CODE | RPTD | OPND | H/C | TRM | BAL | P/D | CS | MR | ECOA | ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|
| CROSSCNTRY*4580N08054 | 06/02 | 05/98 | 4300 | | 0 | | R1 | 49 | I | 42270972401O |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 12/01 |
| ACCOUNT CLOSED AT CONSUMERS REQUEST | | | | | | | | | | |
| PAID ACCOUNT/ZERO BALANCE | | | | | | | | | | |
| WFFINANCE *668FP04491 | 05/02 | 07/01 | 1500 | | 0 | | R1 | 09 | J | 196-2B428475 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 12/01 |
| CHARGE | | | | | | | | | | |
| AMOUNT IN H/C COLUMN IS CREDIT LIMIT | | | | | | | | | | |
| CROSSCNTRY*4580N08054 | 06/02 | 04/99 | CONSUMER DECEASED | | | | | | | 42270974844O |
| | | | | | | | | | | DLA 06/02 |
| CREDIT CARD | | | | | | | | | | |
| AMOUNT IN H/C COLUMN IS CREDIT LIMIT | | | | | | | | | | |
| S&C BANK *668B054029 | 05/02 | 12/01 | 22K | 251 | 22K | | I1 | 04 | J | 406995201287126 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 05/02 |
| HOME IMPROVEMENT LOAN | | | | | | | | | | |
| FMC *905FA04045 | 05/02 | 06/99 | 21K | 351 | 8775 | | I1 | 35 | J | JHA21B3DN0 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 05/02 |
| AUTO | | | | | | | | | | |

PAGE 2

CSC156

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 4012SD0040.2        CREDIT BUREAU INC.                FN 009-3350522-00-259
ANDERSON               PENNY L
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017


FORD CRDT *9D5FA03831 05/02 11/00  16K 283   11K     I1 18 J    EBA36121R7
  30(00)160(00)90+(00)                                        DLA 05/02
AUTO
SALLIE MAE*845FZ00120 05/02 03/01 2625 62    715     I1 13 I    1589006102F
  30(00)160(00)90+(00)                                        DLA 05/02
SALLIE MAE*845FZ00120 05/02 03/01 2000 29    341     I1 13 I    1589006101F
  30(00)160(00)90+(00)                                        DLA 05/02
JCP/MCCBG *404FF03555 06/02 08/98 1900         0     R1 46 I    -191650233 7
  30(00)160(00)90+(00)                                        DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
SEARS     *645DC09286 06/02 06/98  550        234    R1 47 I    35781349
  30(00)160(00)90+(00)                                        DLA 06/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
WELLSFARGOX612FM00449 05/02 05/01 170K  1K 166K      I1 10 J    4728571702
  30(00)160(00)90+(00)                                        DLA 05/02
REAL ESTATE MORTGAGE
FHA MORTGAGE


PAGE 3
```

CSC157

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 40JZSD00040.2    CREDIT BUREAU INC.
ANDERSON            PENNY L
1614 WILDWOOD AVE NEW RICHMOND  WI 54017            FN 009-3350522-00-259


CAP 1 BANK*850BB01498 02/02 01/99 1253        0        R1 37 I    41217415283I
  30(00)60(00)90+(00)                                            DLA 02/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ28868 04/01 08/93 2000 79M    0        I1 24 I    158900601437024
  30(00)60(00)90+(00)                                            DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ28868 04/01 07/93 2625 68M    0        I1 14 I    158900601387935
  30(00)60(00)90+(00)                                            DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG   *168BB00821 06/01 10/00 166K 1K        0        I       J  330061214815 2
  30(00)60(00)90+(00)
REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUSA-ASF *155FA00737 02/00 08/95 21K 357     0        I1 52 C    5164 97
  30(00)60(00)90+(00)                                            DLA 02/00
PAID ACCOUNT/ZERO BALANCE

PAGE 4
```

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 40IZS00040.2    CREDIT BUREAU INC.                    FN 009-3350522-00-259
ANDERSON              PENNY L
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017

AUTO
CROSS CTRY*458BB02969 04/99 04/99  500              RO    J    54149070911б
  30(00)60(00)90+(00)                                          DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE  *152BB00795 03/94 07/93 2625
  30(00)60(00)90+(00)                          0     I1 07 I   1000015890001601
BANK ONE  *152BB00795 10/93 08/93 2000                        DLA 03/94
  30(00)60(00)90+(00)                          0     I0    I   1000015890001603
*PUBLIC RECORDS AND OTHER INFORMATION                         DLA 10/93
10/01*CCIL 07/99 668YC4921 FOR WORLDCOM,$248.10/01 PAID
         BAL-10/01 $,  DLA: 06/99, 1,741619

REF TO CSC CREDIT SERVICES,                     PO BOX 981221,
  ,EL PASO,TX,/799B-1221,800/392-7816,WWW.CSCCREDIT.COM

CSC159

```
      FROZEN 623 2002 MONTH 07 NAME/SSN  RECORDS
      ***********************************************

ANDERSON                         PENNY L                      FN 009-3350522-00-260
1614 WILDWOOD    AVE   NEW RICHMOND    WI  54017

                                                              FILE SINCE 11/07/90

ANDERSON,PENNY,L.
1614,WILDWOOD,AVE.,NEWR,WI,54017, TAPE RPTD 12/00.
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99.
13,,BATCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-ROSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
BORN 12/11/1970,SSS-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
LAKEVIEW HOSPITAL,
*INQS- 40 INQUIRIES SINCE 00/64,BANKAMERIC,241BB24B0,07/02/02, 06/13/02
,PRM 850BB01498, 06/06/02 ,PRM 4040N01216, 05/30/02 ,PRM 401ZZ83680 04/18/02
,PRM 496FM03218, 04/18/02 ,AR 105FM11640, 04/10/02 ,PRM 625UT00178, 04/08/02
,PRM 850B01498, 03/08/02 ,PRM 162BB16948, 02/26/02 ,PRM 163FM19202,
02/22/02 ,AR 850BB24906, 02/18/02 ,PRM 496FM03218, 02/12/02 ,PRM 625UT00178,
02/11/02 ,PRM 6671629914, 01/28/02 ,AR 850BB24906, 01/19/02 ,AR 850BB24906,
12/27/01 ,PRM 496FM03218, 11/09/01 ,AR 850BB24906, 10/29/01 ,PRM 162BB16948,
10/08/01 ,AR 850BB24906, 09/28/01 ,PRM 152BB24468, 09/27/01 ,AR 404FF03555,
09/11/01 ,PRM 484BB01456, 08/14/01 ,PRM 444ZZ04498, 08/13/01 SLUMBERLND,286HF3586
,07/30/01 , 07/27/01 ,AR 850BB24906, 07/18/01 ,PRM 133BB15255, WELLSFARGO
,491FM6356,03/20/01 , 03/20/01 ,EU 146ZB13616/2401,00  03/14/01
EU 616ZB049B/144,00 ,EU CENTENNIAL,234FM51033,02/02/01, 02/01/01
EU 146ZB13616/2401, ,T-MOBILE,9IOUT28130,12/22/00, CAPONEBANK,4B4BB672,12/02/00,
TOUSLEY,FORD,613AN614,11/06/00, STANDARD,491FM623,09/29/00, 09/28/00
EU 146ZB13616/2401, ,EU 181ZBD3096/NORT, 09/13/00 ,EU 146ZB13616/2401,
08/01/00 ,EU 146ZB13616/2401,


PAGE 1
```

ANDERSON,PENNY,L
1614,WILDWOOD,AVE,NEWR,WI,54017

                                                          CSC160

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 40JZS00040.2    CREDIT BUREAU INC.
ANDERSON           PENNY L
1614 WILDWOOD  AVE  NEW RICHMOND   WI  54017           FN 009-3350522-00-260


*  FIRM/ID CODE        RPTD  OPND  H/C  TRM  BAL  P/D CS  MR ECOA  ACCOUNT NUMBER
WELLSFARG0*612FM00449 06/02 05/01 170K  1K  166K         I1 11 J      4728571702
   30(00)60(00)90+(00)                                                DLA 06/02
REAL ESTATE MORTGAGE
FHA MORTGAGE
CRDSSCNTRY*4580N08054 07/02 05/98 4300        0       R1 50 I      422709724010
   30(00)60(00)90+(00)                                                DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
WFFINANCE *668FP04491 06/02 07/01 1500        0       R1 10 J      196-28428475
   30(00)60(00)90+(00)                                                DLA 12/01
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CRDSSCNTRY*4580N08054 07/02 04/99 CONSUMER DECEASED               422709748440
                                                                     DLA 07/02
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
S&C BANK *668B854029 06/02 12/01 22K 251 22K         I1 05 J      406995201287126
   30(00)60(00)90+(00)                                                DLA 06/02

PAGE 2
```

CSC161

CSC162

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2      CREDIT BUREAU INC.
ANDERSON             PENNY L
1614 WILDWOOD AVE  NEW RICHMOND  WI 54017               FN 009-3350522-00-260

PAGE 3

```
HOME IMPROVEMENT LOAN
JCP/MCCBG *404FF03555 07/02 08/98 1900           0    R1 47 I   -191650233?
30(00)60(00)90+(00)                                            DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
SEARS *6450C09286 07/02 06/98 550      470       R1 48 I   3578I349
30(00)60(00)90+(00)                                       DLA 07/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SALLIE MAE*845F2001I20 06/02 03/01 2625 62   658   I1 14 I   1589006102F
30(00)60(00)90+(00)                                        06/02
SALLIE MAE*845F2001I20 06/02 03/01 2000 29   313   I1 14 I   1589006101F
30(00)60(00)90+(00)                                        06/02
FMC *905FA04045 05/02 06/99 21K 351 8775           I1 35 J   JHA2183DN0
30(00)60(00)90+(00)                                        DLA 05/02
AUTO
AUTO CRDIT *905FA03831 05/02 11/00 16K 283 11K     I1 18 J   EBA36121R7
FORD 30(00)60(00)90+(00)                                    DLA 05/02
AUTO
```

CSC163

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZSQ0040.2     CREDIT BUREAU INC.
ANDERSON            PENNY L
1614 WILDWOOD AVE   NEW RICHMOND  WI  54017          FN 009-3350522-00-260

PAGE 4

```
CAP 1 BANK*850BB01498 02/02 01/99 1253        0    R1 37 I    41217415283I
30(00)60(00)90+(00)                                           DLA 02/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655F288668 04/01 08/93 2000 79M    0    I1 24 I    1589006013437024
30(00)60(00)90+(00)                                           DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655F288668 04/01 07/93 2625 68M    0    I1 14 I    1589006013187935
30(00)60(00)90+(00)                                           DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG *168BB00821 06/01 10/00 166K 1K          0    J          3300612148152
30(00)60(00)90+(00)                                           DLA 02/01
REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUS-ASF *155FA00737 02/00 08/95 21K 357      0    I1 52 C    516497
30(00)60(00)90+(00)                                           DLA 02/00
PAID ACCOUNT/ZERO BALANCE
```

CSC164

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.

TO 401ZS00040,2
ANDERSON                    PENNY L
1614 WILDWOOD AVE  NEW RICHMOND  WI  54017

FN 009-3350522-00-260

AUTO
CROSS CTRY*4588802969 04/99 04/99   500                    RO    J              54149070911G
  30(00)60(00)90+(00)                                                           DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152BB07795 03/94 07/93 2625                      I1 07 I              100001589006601
  30(00)60(00)90+(00)                             0        0                    DLA 03/94
BANK ONE *152BB07795 10/93 08/93 2000                      I0    I              100001589006603
  30(00)60(00)90+(00)                             0        0                    DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/01*COLL 07/99 668YC4921 FOR WORLDCOM,$248,10/01 PAID
  BAL-10/01 $, DLA: 06/99,I,741619

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,

```
                    FROZEN 623 2002 MONTH 08 NAME/SSN RECORDS
         ****************************************************

ANDERSON                  PENNY L                        FN 009-3350522-00-264
1614 WILDWOOD  AVE  NEW RICHMOND    WI   54017

                                                       FILE SINCE 11/07/90

ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017,TAPE RPTD 12/00
   TELEPHONE NUMBER (715) 246-2213 SPEC 07/02.
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99.
13,BATCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-ROSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
   BORN 12/11/1970,SSS-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
   LAKEVIEW HOSPITAL
*INQS.  40 INQUIRIES SINCE 00/64.FORD MOTOR,613AN16734,08/15/02,STWTR FORD
,613AN16404,08/07/02,TOUSLEY FD,613AN604,08/05/02,PRM 625UT00178,
BANKAMERIC,241BZ480,07/02/02,PRM 40IZZ83680,04/18/02,PRM 496FM03218,04/18/02
,AR 105FM11640,05/31/02,PRM 625UT00178,PRM 625UT00178,03/08/02
,PRM 162BB16948,02/26/02,PRM 163FM19202,02/22/02,AR 850BB24906,02/18/02
,PRM 496FM03218,02/12/02,PRM 67IG29914,PRM 667IG29914,
01/28/02 ,AR 850BB24906,01/19/02,AR 850BB24906,12/27/01,PRM 496FM03218,
11/09/01 ,AR 850BB24906,10/29/01,PRM 162BB1948,12/27/01,AR 850BB24906,
09/28/01 ,PRM 162BB16948,09/27/01,AR 404FFI3555,09/11/01,PRM 489BB01456,
SLUMBERLND,286HF3586,07/30/01, WELLSFARGO,491FM6356,03/20/01 03/20/01
,DZ 146ZB13616/2401,00, 03/14/01 ,EU 616ZB04898/144,00, CENTENNIAL,234FM31033
,491FM623,494BB672,12/02/00,TOUSLEY FD,613AN604,11/06/00, STANDARD
09/13/00 ,EU 146ZB13616/2401,  EU 616ZB04898/144, 09/27/00 ,EU 181ZB03096/NORT,

PAGE 1
```

ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017

CSC165

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

```
TO 401ZSD0040,2    CREDIT BUREAU INC.
ANDERSON           PENNY L
1614 WILDWOOD   AVE   NEW RICHMOND   WI   54017        FN 009-3350522-00-264
```

| * FIRM/ID CODE | RPTD | OPND | H/C | TRM | BAL | P/D | CS | MR | ECOA | ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|
| WELLSFARGO*612FM00449 | 08/02 | 05/01 | 170K | 1K | 165K | | I1 | 13 | J | 4728571702 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 08/02 |
| REAL ESTATE MORTGAGE | | | | | | | | | | |
| FHA MORTGAGE | | | | | | | | | | |
| CROSSCNTRY*4580N08054 | 08/02 | 05/98 | 4300 | | 0 | | R1 | 51 | I | 422709724010 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 12/01 |
| ACCOUNT CLOSED AT CONSUMERS REQUEST | | | | | | | | | | |
| PAID ACCOUNT/ZERO BALANCE | | | | | | | | | | |
| WFFINANCE*66(FP00491) | 07/02 | 07/01 | 1500 | | 0 | | R1 | 11 | J | 196-28428475 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 12/01 |
| CHARGE | | | | | | | | | | |
| AMOUNT IN H/C COLUMN IS CREDIT LIMIT | | | | | | | | | | |
| FMCC  *644FA04640 | 07/02 | 06/99 | 21K | 351 | 8073 | | I1 | 37 | J | JHA21B3DN0 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 07/02 |
| AUTO | | | | | | | | | | |
| FMCC  *644FA04640 | 07/02 | 11/00 | 16K | 283 | 11K | | I1 | 20 | J | EBA36121R7 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 07/02 |
| AUTO | | | | | | | | | | |

PAGE 2

CSC166

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2       CREDIT BUREAU INC.
ANDERSON           PENNY L                              FN 009-3350522-00-264
1614 WILDWOOD   AVE   NEW RICHMOND   WI   54017

SBC BANK  *668BB54029 07/02 12/01  22K 251  22K       I1 06 J       406995201287126
  30(00)60(00)90+(00)                                               DLA 07/02
HOME IMPROVEMENT LOAN
CROSSCNTRY*4580N08054 08/02 04/99 CONSUMER DECEASED                 422709748440
                                                                   DLA 08/02
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SALLIE MAE*8845Z200120 07/02 03/01 2625 51          I1 15 I         158900610 2F
  30(00)60(00)90+(00)                                               DLA 07/02
SALLIE MAE*8845Z200120 07/02 03/01 2000 26          I1 15 I         1589006101F
  30(00)60(00)90+(00)                                               DLA 07/02
JCP/MCCBG *404FF03555 08/02 08/98 1900    0         R1 48 I         -191650 2337
  30(00)60(00)90+(00)                                               DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
SEARS     *645DC09286 08/02 06/98 750 10  785       R1 49 I          357811349
  30(00)60(00)90+(00)                                               DLA 08/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT

PAGE 3

CSC167

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 40IZSD0040.2     CREDIT BUREAU INC.
ANDERSON            PENNY L
1614 WILDWOOD AVE   NEW RICHMOND   WI  54017

FN 009-3350522-00-264

```
CAP I BANK*B50BB01498 02/02 01/99 1253      0      R1 37 I      41217415283I
30(00)60(00)90+(00)                                             DLA 02/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655F228868 04/01 08/93 2000 79M  0      I1 24 I      15890060I437024
30(00)60(00)90+(00)                                             DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655F228868 04/01 07/93 2625 68M  0      I1 14 I      158906013879 35
30(00)60(00)90+(00)                                             DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG  *168BB008B21 06/01 10/00 166K 1K      0      I    J       330061214815 2
30(00)60(00)90+(00)
REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUSA-ASF *155FA00737 02/00 08/95 21K 357   0      I1 52 C      516497
30(00)60(00)90+(00)                                             DLA 02/00
PAID ACCOUNT/ZERO BALANCE
```

PAGE 4

CSC168

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2     CREDIT BUREAU INC.                    FN 009-3350522-00-264
ANDERSON          PENNY L
1614 WILDWOOD AVE  NEW RICHMOND  WI  54017

AUTO
CROSS CTRY*458BB02969 04/99 04/99  500                    RO    J         54149070911b
  30(00)60(00)90+(00)                                                    DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE  *152BB00795 03/94 07/93 2625            0        I1 07 I        1000015890060l
  30(00)60(00)90+(00)                                                    DLA 03/94
BANK ONE  *152BB00795 10/93 08/93 2000            0        IO    I        1000015890060B
  30(00)60(00)90+(00)                                                    DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/01*XCOL 07/99 668YC492l FOR WORLDCOM $248,10/01 PAID
       BAL-10/01 $, DLA: 06/99, I,74161B

REF TO CSC CREDIT SERVICES,                      PO BOX 981221,
  ,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

CSC169

```
FROZEN 623 2002 MONTH 09 NAME/SSN  RECORDS
***************************************************

ANDERSON                  PENNY L                           FN 009-3350526-00-264   ANDERSON,PENNY,L
1614 WILDWOOD  AVE  NEW RICHMOND    WI   54017                                      1614,WILDWOOD,AVE,NEWR,WI,54017

                                                            FILE SINCE 11/07/90
ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00
  TELEPHONE NUMBER (715) 246-2213 SPEC 07/02.
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99.
13,BATCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-ROSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
  BORN 12/11/1970,SSS-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
  ,LAKEVIEW HOSPITAL
*INQS- 38 INQUIRIES SINCE 00/64,FORD MOTOR,613AN16734,08/15/02, STWTR FORD
 ,613AN16404,08/07/02,TOUSLEY FO,613AN604,08/05/02, 07/26/02 ,PRM 625UTD0178A,
BANAMERIC,241B82480,07/02/02,PRM 850BB01498, 06/06/02
PRM 404GN0126, 05/30/02 ,PRM 401ZZB3680, 04/18/02 ,PRM 496FM0321B, 04/18/02
 ,AR 103FM11640, 04/24/02 ,PRM 625UTD0178, 04/08/02 ,PRM 850BB01498, 03/08/02
 ,PRM 162B81948, 02/26/02 ,PRM M19208, 02/22/02 ,AR 850B82490G, 02/18/02
 ,PRM 496FM0321B, 02/12/02 ,PRM 625UTD0178, 02/12/02 ,PRM 667IG29914,
01/28/02 ,AR 850B824906, 01/19/02 ,AR 850B824906, 12/27/01 ,PRM 496FM0321B,
11/09/01 ,AR 850B824906, 10/29/01 ,PRM 162B81948, 10/08/01 ,PRM 850B82490G,
09/28/01 ,PRM 162B81948, 09/27/01 ,AR 404FF03555, SLUMBERLND,286HF3586,
,07/30/01, WELLSFARGO,491FM6356, 03/20/01 ,EU 146ZB13616/2401,00,
05/14/01,(EU 616ZB04898/144,00 , CENTENNIAL,234FM31033,02/02/01, 02/01/01
TOUSLEY FO,613AN604,11/06/00, STANDARD,491FM623,09/29/00, 09/28/00
EU 616ZB04898/144,, 09/27/00 ,EU 181ZB03096/NORT.

PAGE 1
```

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TD 401ZS00040.2    CREDIT BUREAU INC.
ANDERSON           PENNY L                          FN 009-3350526-00-264
1614 WILDWOOD AVE  NEW RICHMOND  WI  54017

| * FIRM/ID CODE | RPTD | OPND | H/C | TRM | BAL | P/D | CS | MR | ECOA | ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|
| WFFINANCE *668FP04491 | 08/02 | 07/01 | 1500 | | 0 | | R1 | 12 | J | 196-2842B475 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 12/01 |
| CHARGE | | | | | | | | | | |
| AMOUNT IN H/C COLUMN IS CREDIT LIMIT | | | | | | | | | | |
| CROSSCNTRY*4580N08054 | 09/02 | 04/99 | CONSUMER DECEASED | | | | | | | 422709748440 |
| | | | | | | | | | | DLA 09/02 |
| CREDIT CARD | | | | | | | | | | |
| AMOUNT IN H/C COLUMN IS CREDIT LIMIT | | | | | | | | | | |
| S&C BANK *668BB54029 | 08/02 | 12/01 | 22K | 251 | 22K | | I1 | 07 | J | 406995201287126 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 08/02 |
| HOME IMPROVEMENT LOAN | | | | | | | | | | |
| FMCC *644FA04640 | 08/02 | 06/99 | 21K | 351 | 8073 | | I1 | 38 | J | JHA2183DN0 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 08/02 |
| AUTO | | | | | | | | | | |
| FMCC *644FA04640 | 08/02 | 11/00 | 16K | 283 | 11K | | I1 | 21 | J | EBA36121R7 |
| 30(00)60(00)90+(00) | | | | | | | | | | DLA 08/02 |
| AUTO | | | | | | | | | | |
| FMCC *644FA04640 | 08/02 | 08/02 | 27K | 456 | 27K | | I0 | | J | EBA156971Y |

PAGE 2

CSC171

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2    CREDIT BUREAU INC.
ANDERSON          PENNY L
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017

FN 009-3350526-00-264

AUTO
SEARS       *645DC09286 09/02 06/98 750 10   775      R1 50 I      35781349
30(00)60(00)90+(00)                                                DLA 09/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SALLIE MAE*845FZ00120 08/02 03/01 2625 51   559      I1 16 I     1589006102F
30(00)60(00)90+(00)                                                DLA 08/02
SALLIE MAE*845FZ00120 08/02 03/01 2000 26   264      I1 16 I     1589006101F
30(00)60(00)90+(00)                                                DLA 08/02
WELLSFARGO&&125FH00049 08/02 05/01 170K 1K   165K    I1 13 J      4728571702
30(00)60(00)90+(00)                                                DLA 08/02
REAL ESTATE MORTGAGE
FHA MORTGAGE
CROSSCNTRY*4580N08054 08/02 05/98 4300      0        R1 51 I     422709724010
30(00)60(00)90+(00)                                                DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
JCP/MCCB6 *404FF03555 08/02 08/98 1900      0        R1 48 I     -1916502337
30(00)60(00)90+(00)                                                DLA 12/01

PAGE 3

CSC172

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZSD0040.2     CREDIT BUREAU INC.
ANDERSON       PENNY L                                    FN 009-3350526-00-264
1614 WILDWOOD AVE  NEW RICHMOND  WI  54017

ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK #850BB01498 02/02 01/99 1253          0     R1 37 I     41217415283
30(00)60(00)90+(00)                                                DLA 02/02

ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ28868 04/01 08/93 2000 79M       0     I1 24 I     158900601437024
30(00)60(00)90+(00)                                                DLA 02/01

STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ28868 07/93 2625 68M             0     I1 14 I     158900601387935
30(00)60(00)90+(00)                                                DLA 02/01

STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG *163BB08821 06/01 10/00 166K 1K             0      I  J       330061214815

REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUSA-ASF *155FA00737 02/00 08/95 21K 357        0     I1 52 C     516497
30(00)60(00)90+(00)                                                DLA 02/00

PAGE 4

CSC173

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2    CREDIT BUREAU INC.                    FN 009-3350526-00-264
ANDERSON             PENNY L
1614  WILDWOOD  AVE  NEW RICHMOND  WI  54017

PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*458BB02969 04/99 04/99  500              R0     J      54149070911G
   30(00)60(00)90+(00)                                           DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152BB00795 03/94 07/93 2625          0   I1 07 I       10000158900601
   30(00)60(00)90+(00)                                          DLA 03/94.
BANK ONE *152BB00795 10/93 08/93 2000          0   I0    I      10000158900603
   30(00)60(00)90+(00)                                          DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/01*COLL 07/99 668YC4921 FOR WORLDCOM,$248.10/01 PAID
            BAL-10/01 $, DLA: 06/99, I,741619

REF TO CSC CREDIT SERVICES,
    ,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
                                                    PO BOX 981221,

CSC174

```
              FROZEN 623 2002 MONTH 10 NAME/SSN  RECORDS
          ***********************************************

ANDERSON             PENNY L                      FN 009-350522-00-264
1614 WILDWOOD AVE   NEW RICHMOND   WI   54017

                                                  FILE SINCE 11/07/90

ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00
TELEPHONE NUMBER (715) 246-2213 SPEC 07/02.
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99.
1S,BATCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-RODSD,PENNY,L.
FORMER NAME-ORNSTON,PENNY,L.
BORN 12/11/1970 SS- 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
,LAKEVIEW HOSPITAL
*INQS- 34 INQUIRIES SINCE 00/64.FORD MOTOR,613AN16734,08/15/02,,STWTR FORD
,613AN16404,08/07/02, TOUSLEY FO,613AN6404,08/05/02,07/26/02,,PRM 625UT00178,
BANKAMERIC,241BB2480,07/02/02, 06/13/02 ,PRM 850BB01498, 06/06/02
PRM 4040N01216, 05/30/02 ,PRM 401ZZ83680, 04/18/02 ,PRM 496FM03218, 04/18/02
,AR 103FM11640, 04/10/02 ,PRM 625UT00178, 04/08/02 ,PRM 850BB01498, 03/08/02
,PRM 162BB16948, 02/26/02 ,PRM 163FM19202, 02/22/02 ,AR 850BB24906, 02/18/02
,PRM 496FM03218, 02/12/02 ,PRM 625UT00178, 02/11/02 ,PRM 667IG29914,
01/28/02 ,AR 850BB24906, 01/19/02 ,AR 850BB24906, 12/27/01 ,PRM 496FM03218,
11/09/01 ,AR 850BB24906, 10/29/01 ,PRM 162BB16948, SLUMBERLND,286HF3586
,07/30/01, WELLSFARGO,491FM6356,03/20/01 ,EU 162BI3616/2401,00,
03/14/01, EU 61ZZB04898,01/44,01 CENTENNIAL,234FM31033,02/02/01, 102
EU 162BI3616/2401, 10/14/02 ,AR 491FM9970,10/11/02 ,AR 105FM11640,
T-MOBILE,910UT28130,12/22/00, CAPONEBANK,484BB672,12/02/00, TOUSLEY FO
,613AN604,11/06/00.
*  FIRM/ID CODE      RPTD  OPND  H/C TRM  BAL P/D CS  MR ECOA  ACCOUNT NUMBER

PAGE 1
```

ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017

CSC175

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2      CREDIT BUREAU INC.                          FN 009-3350522-00-264
ANDERSON             PENNY L
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017


FMCC     *644FA04640  06/99  21K  351    0        I1  39  J           JHA21B3DN0
30(00)60(00)90+(00)                                                 DLA 08/02
AUTO
FMCC     *644FA04640  09/02  11/00  16K  283   10K     I1  22  J      EBA36121R7
30(00)60(00)90+(00)                                                 DLA 09/02
AUTO
FMCC     *644FA04640  09/02  08/02  27K  456   26K     I0      J      EBA156671Y
30(00)60(00)90+(00)                                                 DLA 09/02
AUTO
CROSSCNTRY*4580N08D54  10/02  04/99  CONSUMER  DECEASED               4227097A8440
                                                                    DLA 10/02

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SALLIE MAE*865FZ00120  09/02  03/01  2625  51         I1  17  I      1589006102F
30(00)60(00)90+(00)                                                 DLA 09/02
SALLIE MAE*865FZ00120  09/02  03/01  2000  26  239    I1  17  I      1589006101F
30(00)60(00)90+(00)                                                 DLA 09/02
NW AIR CU *613FC15148  10/02  09/02  25K  315  25K    I0      J        15539774
30(00)60(00)90+(00)                                                 DLA 10/02

PAGE 2
```

CSC176

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 40IZS00040.2    CREDIT BUREAU INC.
ANDERSON              PENNY L
1614 WILDWOOD AVE  NEW RICHMOND  WI  54017          FN 009-3350522-00-264


SECURED
SEARS      *6450C09286 10/02 06/98 750 18   779   R1 51 I          35781349
30(00)60(00)90+(00)                                               DLA 10/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
JCP/MCBG  *404FP03555 10/02 08/98 1900      0     R1 50 I      -1916502337
30(00)60(00)90+(00)                                               DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
S&C BANK   *668BB54029 09/02 12/01 22K 251  22K   I1 08 J   406995201287126
30(00)60(00)90+(00)                                               DLA 09/02
HOME IMPROVEMENT LOAN
WELLSFARGO*612FM00449 09/02 05/01 170K 1K  165K   I1 14 J       472857 1702
30(00)60(00)90+(00)                                               DLA 09/02
REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINANCE *668P04491 08/02 07/01 1500       0     R1 12 J      196-28428475
30(00)60(00)90+(00)                                               DLA 12/01
CHARGE


PAGE 3
```

CSC177

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040.2      CREDIT BUREAU INC.
ANDERSON              PENNY L                          FN 009-3350522-00-264
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017


AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CROSSCNTRY*45B0N08054 08/02 05/98 4300      D      R1 51 I      422709724010
30(00)60(00)90+(00)                                             DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK*85BB0149B 02/02 01/99 1253       0      R1 37 I      412174152831
30(00)60(00)90+(00)                                             DLA 02/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ28868 04/01 08/93 2000 79M  D      I1 24 I      158900601437024
30(00)60(00)90+(00)                                             DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ28868 04/01 07/93 2625 68M  0      I1 14 I      158900601387935
30(00)60(00)90+(00)                                             DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG      *168BB08821 06/01 10/00 166K 1K   D      I  J         3300612148152
30(00)60(00)90+(00)

PAGE 4
```

CSC178

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO <01ZSD0040,2     CREDIT BUREAU INC.
ANDERSON             PENNY L                    FN 009-3350522-00-264
1614 WILDWOOD AVE NEW RICHMOND WI 54017

REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUSA-ASF *155FA00737 02/00 08/95   21K 357    0     I1 52 C
   30(00)60(00)90+(00)                                        DLA 02/00   516497
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*45BBB02969 04/99 04/99   500              R0    J           541490709116
   30(00)60(00)90+(00)                                        DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152BB00795 03/94 07/93 2625       0     I1 07 I       1000015890001
   30(00)60(00)90+(00)                                        DLA 03/94
BANK ONE *152BB00795 10/93 08/93 2000       0     I0    I       1000015890000603
   30(00)60(00)90+(00)                                        DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/01*CDLL 07/99 668YC492I FOR WORLDCOM $248,10/01 PAID
        BAL-10/01 $,   DLA: 06/99, 1,741619

REF TO CSC CREDIT SERVICES,                 PO BOX 981221,
   ,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

CSC179

FROZEN 623 2002 MONTH 11 NAME/SSN RECORDS
*****************************************

ANDERSON                    PENNY L                              FN 009-350522-00-265
1614  WILDWOOD  AVE  NEW RICHMOND   WI  54017

                                                                FILE SINCE 11/07/90

ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00
  TELEPHONE NUMBER (715) 246-2213 SPEC 07/02.
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99.
15,BATCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-ROSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
BORN 12/11/1979,-SSS-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
*LAKEVIEW HOSPITAL,*
*INQS-32 INQUIRIES SINCE 00/64,CONSECOFIN,613FP20487,10/28/02,10/14/02
AR 491FM98970,10/11/02 ,AR 103FM11640 FORD MOTOR,613ANI6734,08/15/02,
STWTR FDRD,613AN16404,08/07/02,TOUSLEY FD,613AN604,08/05/02,07/26/02,
PRM 625UT00178, BANKAMERIC,241BB2480,07/02/02,06/13/02_PRM 850BB01498,
06/06/02 ,PRM 404DN01216, 05/30/02 ,PRM 401ZZB3680, 04/18/02 ,PRM 496FM03218,
04/18/02 ,AR 103FM11640 ,04/10/02 ,PRM 625UT00178, 04/08/02 ,PRM 850BB01498,
03/08/02 ,PRM 162BB16948, 02/26/02 ,PRM 163FM19202, 02/22/02 ,AR 850BB24906,
02/28/02 ,PRM 496FM03218, 02/12/02 ,PRM 625UT00178, 02/11/02 ,PRM 667IG29914,
02/23/02 ,AR 850BB24906, 01/19/02 ,AR 850BB24906, 12/27/01 ,PRM 496FM03218,
SLUMBERLND,286HF3586,07/30/01, WELLSFARGO,491FM6356,03/20/01, 03/20/01
EU 146ZB13416/2401,01 ,EU 146ZB13616/2401, T-MOBILE,910UT28130,12/22/00,
,02/02/01, 02/01/01 ,EU 162ZB0489B/144,00, CENTENNIAL,234FM51033
CAFONEBANK,484BB672,12/02/00
*          FIRM/ID CODE       RPTD  DPND  H/C TRM  BAL P/D CS  MR ECOA   ACCOUNT NUMBER
WELLSFARGD*612FM00449 11/02  05/01 1/0K 1K   165K    1K  16 J            472857I702
  30(00)60(00)90+(00)                                                   DLA 11/02

PAGE 1

ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017

CSC180

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2    CREDIT BUREAU INC.
ANDERSON              PENNY L                              FN 009-3350522-00-265
1614  WILDWOOD  AVE  NEW RICHMOND  WI  54017


REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINANCE *668FP04491 10/02 07/01 1500              991       R1 14 J    196-28428475
   30(00)60(00)90+(00)                                                DLA 10/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
NW AIR CU *613FC15148 11/02 09/02 25K 315  24K              I1 01 J    13539774
   30(00)60(00)90+(00)                                                DLA 11/02
SECURED
CROSSCNTRY*4580N08054 11/02 04/99 CONSUMER DECEASED                   42270974B440
                                                           I1 01 J    DLA 11/02
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
S&C BANK *668B854029 10/02 12/01 22K 251    0              I1 09 J    4069952D1287126
   30(00)60(00)90+(00)                                                DLA 09/02
HOME IMPROVEMENT LOAN
SEARS  *645DC09286 11/02 06/98  750    0                   R1 52 I    35781349
   30(00)60(00)90+(00)                                                DLA 11/02
CHARGE

PAGE 2
```

CSC181

```
CSC CREDIT SERVICES  PO BOX 981221  EL PASO TX 79998-1221  800/392-7816
TO 401ZS00040,2      CREDIT BUREAU INC.
ANDERSON                  PENNY L
1614 WILDWOOD   AVE   NEW RICHMOND   WI   54017          FN 009-3350522-00-265


AMOUNT IN H/C COLUMN IS CREDIT LIMIT
JCP/MCCBG *404FF03555 11/02 08/98 1900         0   R1 51 I      -1916502337
ACCOUNT CLOSED AT CONSUMERS REQUEST                            DLA 12/01
PAID ACCOUNT/ZERO BALANCE
SALLIE MAE*845F200120 10/02 03/01 2625 51    460   I1 18 I      1589006102F
  30(00)60(00)90+(00)                                          DLA 10/02
SALLIE MAE*845F200120 10/02 03/01 2000 26    214   I1 18 I      1589006101F
  30(00)60(00)90+(00)                                          DLA 10/02
FMCC      *644FA04640 10/02 06/99 21K 351      0   I1 40 J      JHA21B3DN0
  30(00)60(00)90+(00)                                          DLA 08/02
AUTO
FMCC      *644FA04640 10/02 11/00 16K 283    10K   I1 23 J      EBA36121R7
  30(00)60(00)90+(00)                                          DLA 09/02
AUTO
FMCC      *644FA04640 10/02 08/02 27K 456    26K   I1 02 J      EBA15G671Y
  30(00)60(00)90+(00)                                          DLA 09/02
AUTO
CROSSCNTRY*4580N080054 08/02 05/98 4300        0   R1 51 I      4272097240I0
  30(00)60(00)90+(00)                                          DLA 12/01

PAGE 3
```

CSC182

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2    CREDIT BUREAU INC.
ANDERSON              PENNY L.
1614 WILDWOOD   AVE   NEW RICHMOND   WI   54017

FN 009-3350522-00-265

```
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK*850B801498 02/02 01/99 1253    0   R1 37 I   412174152831
  30(00)60(00)90+(00)                                    DLA 02/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ8868 04/01 08/93 2000 79M 0   I1 24 I   158900601437024
STUDENT LOAN                                             DLA 02/01
  30(00)60(00)90+(00)
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ8868 04/01 07/93 2625 68M 0   I1 14 I   158900601387935
STUDENT LOAN                                             DLA 02/01
  30(00)60(00)90+(00)
ACCOUNT TRANSFERRED OR SOLD
AAMG      *668B00821 06/01 10/00 166K 1K  0   I      J   330061214B152
  30(00)60(00)90+(00)
REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUSA-ASF *15SFA00737 02/00 08/95 21K 357 0   I1 52 C   516497
  30(00)60(00)90+(00)                                    DLA 02/00
```

PAGE 4

CSC183

```
              CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2    CREDIT BUREAU INC.
ANDERSON           PENNY L
1614 WILDWOOD AVE NEW RICHMOND WI 54017                FN 009-3350522-00-265


PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*458BB02969 04/99 04/99 500          RO   J    541490709116
 30(00)60(00)90+(00)                                     DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152BB00795 03/94 07/93 2625    0     I1 07 I   100001589006001,
 30(00)60(00)90+(00)                                     DLA 03/94
BANK ONE *152BB00795 10/93 08/93 2000    0     I0    I   100001589006003
 30(00)60(00)90+(00)                                     DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/01*COL 07/99 668YC4921 FOR WORLDCOM,$248,10/01 PAID
      BAL-10/01 $, DLA: 06/99, 1,741619


REF TO CSC CREDIT SERVICES,
 ,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
                                    PO BOX 981221,
```

CSC184



EXHIBIT
CSC-9
DL 6/2/04

```
            FROZEN 623 2002 MONTH 12 NAME/SSN  RECORDS
            **********************************************

ANDERSON                         PENNY L                    FN 009-3350522-00-268
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017

                                                            FILE SINCE 11/07/90
ANDERSON,PENNY,L.
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00
     TELEPHONE NUMBER (715) 246-2213 SPEC 07/02.
1380,HERITAGE,DR,APT 17,NEWR,WI,54017, TAPE RPTD 11/99.
13,BATCHELDER,DR,AVE,UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-RUSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
BORN 12/11/1970,SSS-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
  *LAKEVIEW HOSPITAL.
*INQS- 33 INQUIRIES SINCE 00/64,12/09/02 ,EU 401ZB02533/WELL,08, 12/03/02
EU 401ZB02533/WELL,08, CONSECOFIN,615FP20487,10/28/02, 10/14/02
AR 491FM68970,10/11/02 ,AR 103FM11640, FORD MOTOR,613AN16734,08/15/02,
STWTR FORD,613AN16604,08/07/02,TOUSLEY FO,613AN604,08/05/02, 07/26/02,
  PRM 625UT00178, BANKAMERIC,241B82480,07/07/02, 06/13/02 ,PRM 850BB01498,
06/06/02 ,PRM 4040N01210, 06/13D/02 ,PRM 401ZZ35680, 06/18/02 ,PRM 496FM03218,
04/18/02 ,AR 103FM11640, 04/10/02 ,PRM 625UT00178, 04/08/02 ,PRM 850BB01498,
03/08/02 ,PRM 162BB16948, 02/26/02 ,PRM 163FM19202, 02/22/02 ,AR 850BB24906,
02/18/02 ,PRM 496FM03218, 02/12/02 ,PRM 625UT00178, 02/11/02 ,PRM 667J629914,
01/23/02 ,AR 850BB24906, 01/19/02 ,AR 850BB24906, 12/27/01 ,PRM 496FM03218,
SLUMBERLND,386HR3556,07/30/01, WELLSFARGO,491FM63556,03/20/01, 03/20/01
EU 162BJ62401,02/01/01 ,EU 616ZB04898/144,00, CENTENNIAL,234FM31033
,02/02/01,02/01/01 ,EU 162BJ5616,240//,MOBILE,910U28130,12/22/00.
*    FIRM/ID CODE       RPTD OPND  H/C  TRM  BAL  P/D CS MR ECOA  ACCOUNT NUMBER
NW AIR CU *613FC15148  12/02 09/02  25K  315  24K      II 02 J        15539774
  30(0D)6D(0D)9D+(00)                                            BIA 12/02

PAGE 1
```

CSC185

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 40)ZS00040.2     CREDIT BUREAU INC.
ANDERSON          PENNY L
1614 WILDWOOD   AVE   NEW RICHMOND   WI   54017          FN 009-3350522-00-268

SECURED
CROSSCNTRY*4580N08D54 12/02 04/99 CONSUMER DECEASED                         422709748440
                                                                           DLA 12/02
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
JCP/MCCBG *494FF03555 12/02 08/98 1900        0                            -1916502337
  30(0D)60(00)90+(0D)                                                      DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
FMCC     *644FA04640 11/02 06/99 21K 351      0            R1 52 I          JHA21B3DN0
  30(00)60(00)90+(0D)                                     I1 41 J          DLA 08/02
AUTO
FMCC     *644FA04640 11/02 11/00 16K 283    10K           I1 24 J          EBA36121R7
  30(0D)60(00)90+(0D)                                                      DLA 11/02
AUTO
FMCC     *644FA04640 11/02 08/02 27K 456    26K           I1 03 J          EBA156671Y
  30(00)60(00)90+(0D)                                                      DLA 11/02
AUTO
SEARS   *645DC09286 12/02 06/98 750           0           R1 53 I           35781349
  30(00)60(00)90+(0D)                                                      DLA 12/02

PAGE 2

CSC186

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 491ZS00040.2     CREDIT BUREAU INC.
ANDERSON            PENNY L
1614 WILDWOOD AVE  NEW RICHMOND  WI  54017          FN 009-3350522-00-268


CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SALLIE MAE*845FZ00120 11/02 03/01 2625 51   410   I1 19 I   1589006102F
 30(00J)60(00J)90+(00)                                      DLA 11/02
SALLIE MAE*845FZ00120 11/02 03/01 2000 26   189   I1 19 I   1589006101F
 30(00J)60(00J)90+(00)                                      DLA 11/02
WELLSFARGO*612FM00449 11/02 05/01 170K 1K   165K  I1 16 J   4728571702
 30(00J)60(00J)90+(00)                                      DLA 11/02
REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINANCE *668FP04491 10/02 07/01 1500      991   R1 14 J   196-28428475
 30(00J)60(00J)90+(00)                                      DLA 10/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
S&C BANK *668B854029 10/02 12/01 22K 251  0       I1 09 J   4069952012B7126
 30(00J)60(00J)90+(00)                                      DLA 09/02
HOME IMPROVEMENT LOAN
CROSSCNTRY*458ON08054 08/02 05/98 4300    0       R1 51 I   4227097240I0
 30(00J)60(00J)90+(00)                                      DLA 12/01

PAGE 3
```

CSC187

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 40IZSQ0040.2     CREDIT BUREAU INC.
ANDERSON              PENNY L
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017

FN 009-3350522-00-268

ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK*8508801498 02/02 01/99 1253                    0    R1 37 I       412174152831
    30(00)60(00)90+(00)                                                     DLA 02/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ28868 04/01 08/93 2000 79M               0    I1 24 I      158900601437024
    30(00)60(00)90+(00)                                                    DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ28868 04/01 07/93 2625 68M              0    I1 14 I      158900601387935
    30(00)60(00)90+(00)                                                   DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG       *168BB00821 06/01 10/00 166K 1K             0    I   J        3300612148152
    30(00)60(00)90+(00)
REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUSA-ASF *155FA00737 02/00 08/95  21K 357            0    I1 52 C           516497
    30(00)60(00)90+(00)                                                   DLA 02/00

PAGE 4

**CSC188**

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2      CREDIT BUREAU INC.                    FN 009-3350522-00-268
ANDERSON           PENNY L
1614 WILDWOOD   AVE  NEW RICHMOND   WI   54017

PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*45&BB02969 06/99 04/99  500                  R0    J        54149070911 6
     30(00)60(00)90+(00)                                              DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152BB00795 03/94 07/93 2625              0    I1 07 I       10000158900601
     30(00)60(00)90+(00)                                              DLA 03/94
BANK ONE *152BB00795 10/93 08/93 2000              0    I0 I          10000158900603
     30(00)60(00)90+(00)                                              DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/70)*COLL 07/99 668YC4921 FOR WORLDCOM,$248,10/01 PAID
     BAL-10/01 $, DLA: 06/99, I,741619

REF TO CSC CREDIT SERVICES,                        PO BOX 981221,
     ,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

**CSC189**

CSC190

```
FROZEN 623 2003 MONTH 01 NAME/SSN RECORDS
******************************************

ANDERSON
1614,HALLEWOOD BLVD NEW RICHMOND WI 54017

ANDERSON,PENNY,L.                                           FN 009-3350494-00-272
1614,HALLEWOOD,BLVD,NEWR,WI,54017, TAPE RPTD 12/00
TELEPHONE NUMBER (715) 246-2213 SPEC 07/02                  FILE SINCE 11/07/90
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99.
13,B,MCCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-CASU,PENNY,L.
FORMER NAME-ORMISTON,PENNY,L.
BORN 12/11/1970 SSS-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
.LAKEVIEW HOSPITAL

*INQS- 30 INQUIRIES SINCE 00/64 12/09/02, EU 401ZBD2533/WELL,08, 12/03/02
EU 401Z802533/WELL,08, CONSECOFIN,6134P20687,10/28/02,07/14/02
AR 491FM8970,10/11/02 ,AR 103FM11640,08/15/02,
STWTR FORD,6133AN1404,08/07/02, TOUSLEY FO,6134AN604,08/05/02,
PRM 625UT001/8, BANKAMERIC,6241B82480,07/07/02, 06/13/02, PRM
06/06/02 ,PRM 404UN0121/8, 05/30/02, PRM 625UT001/78,
04/18/02 ,AR 103FM11640 04/16/02, PRM 401ZZ8353680, 04/11/02, PRM 404FM0321B,
03/08/02 ,PRM 162ZB16948, 02/26/02, PRM 625UT001/78, 04/08/02, PRM 850BB01498,
02/18/02 ,PRM 496FM0321B, 02/22/02 ,PRM 165FM19202, 02/22/02 ,AR 850BB24906,
01/31/02 ,PRM 496FM0321B, 02/12/02 ,PRM 667IG2991/4, PRM 667IG2991/4,
.03/20/02 ,AR 850BB24906, SLUMBERLND,286HF3586,01/7/8, WELLSFARGO,491FM6356
CENTENNIAL, 03/20/02, EU 1462ZB136167/2401,01 EU 1462ZB136167/2401,00,
WELLSFARGO%612FM00449 .02/02/01, 02/01/01, EU 1462ZB136167/2401,00,
     3C(00)6D(00)9D+(00)    RPTD   OPND  H/C  TRM  BAL  P/D CS MR ECOA   ACCOUNT NUMBER
                           01/03 05/01 170K 1K 165K   II 18 J     DLA 01/03   472857/702
                                                                             ACCOUNT NUMBER
                                                                             472857/702

PAGE 1
                                                                             DLA 01/03

                            PENNY L                          ANDERSON,PENNY,L.
                    BLVD NEW RICHMOND WI 54017                1614,HALLEWOOD,BLVD,NEWR,WI,54017
```

CSC191

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.
PENNY L
NEW RICHMOND    WI    54017

FN 009-3350494-00-272

TO 401ZS00040.2
ANDERSON
1614 HALLEWOOD BLVD

PAGE 2

```
REAL ESTATE MORTGAGE
FHA MORTGAGE
FMCC    *644FAD4640 01/03 08/02   25K 456  24K      I1 05 J   31681373
        30(00)60(00)90+(00)
AUTO
FMCC    *644FAD4640 01/03 11/00   15K 283 9255      I1 26 J   DLA 01/03
        30(00)60(00)90+(00)
AUTO
SALLIE MAE*845FZ00120 12/02 03/01 2625 51  410      I1 20 I   25529880
        30(00)60(00)90+(00)
SALLIE MAE*845F7001120 12/02 03/01 2000 26  189     I1 20 I.  15890061O2F
NW AIR CU *613FC15148 01/03 09/02  25K 315  24K     I1 03 J   15890061O1F
        30(00)60(00)90+(00)
SECURED
SEARS   *6445DC09286 01/03 06/98   750      0        R1 54 I   12/02 15539774
CHARGE  30(00)60(00)90+(00)                                    DLA 01/03
                                                               357B1349
                                                               DLA 01/03
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
```

CSC192

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
PENNY L
NEW RICHMOND   WI   54017

FN 009-3350494-00-272

TO 401ZS00040.2
ANDERSON
1614 HALLEWOOD BLVD

PAGE 3

```
JC*/MCCBG *404FF03555 01/03 08/98 1900      0   R1 53 I    -19165D2337
30(00)60(00)90+(00)                                        DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
WFFINANCE *668FP04491 11/02 07/01 1500    991   R1 15 J    196-28428475
30(00)60(00)90+(00)                                        DLA 11/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CROSSCNTRY 4580N08054 01/03 04/99 1900 35       II 30      42270974A440
30(00)60(00)90+(00)                                        DLA 12/02
FMCC *6444FA04640 11/02 06/99     21K  351  0   II 41 J    JHA2183DN0
30(00)60(00)90+(00)                                        DLA 08/02
AUTO
S&C BANK *668BB54U29 10/02 12/01 22K  251   0   II 09 J    4069952012B7126
30(00)60(00)90+(00)                                        DLA 09/02
HOME IMPROVEMENT LOAN
CROSSCNTRY*4580N08054 08/02 05/98 4300      0   R1 51 I    42270972401D
30(00)60(00)90+(00)                                        DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
```

CSC193

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.

PENNY L

TO 401ZS00040.2
ANDERSON
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017

FN 009-3350494-00-272

PAGE 4

PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK*85#00B01498 02/02 01/99 1253 0 R1 37 I 412174152831
30(00)60(00)90+(00)                                           DLA 02/02

ACCOUNT CLOSED AT CONSUMER'S REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *65#5Z28868 04/01 08/93 2000 79M 0 I1 24 I 158906014370024
30(00)60(00)90+(00)                                            DLA 02/01

STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *65#5Z28868 04/01 07/93 2625 68M 0 I1 14 I 158906013879935
30(00)60(00)90+(00)                                            DLA 02/01

STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG *168#B00B21 06/01 10/00 166K 1K 0 I J 350061214B152
*168#B00B21

REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUS-ASF *155FA00737 02/00 08/95 21K 357 0 I1 52 C DLA 02/00 516497
30(00)60(00)90+(00)

CSC194

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 4012S00040,2        CREDIT BUREAU INC.
ANDERSON                  PENNY L
1614 HALLEWOOD BLVD  NEW RICHMOND  WI  54017

FN 009-3350494-00-272

PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*4458B802969 04/99 04/99    500                      RO    J      541490709116
                                                                             DLA 04/99
CREDIT 30(00)60(00)90+(00)
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *15128807795 03/94 07/93 2625
    30(00)60(00)90+(00)
BANK ONE *15128807795 10/93 08/93 2000          0   I1 07 I  100001589006601
*PUBLIC RECORDS AND OTHER INFORMATION                         DLA 03/94
    30(00)60(00)90+(00)                         0   I0    I  100001589006603
10/01*COLL 07/99 668YC4921 FOR WORLDCOM $248,10/01 PAID       DLA 10/93
    BAL-10/01 $,  DLA: 06/99, 1,741619

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,

CSC195

```
FROZEN 623 2003 MONTH 02 NAME/SSN RECORDS
******************************************

ANDERSON
1614  HALLEWOOD  BLVD  NEW RICHMOND  WI  54017            PENNY L

                                    FN 009-3350526-00-272
                                    FILE SINCE 11/07/90

ANDERSON,PENNY,L.
1614,HALLEWOOD,BLVD,NEWR,WI,54017

ANDERSON,PENNY,L.
1614,HALLEWOOD,BLVD,NEWR,WI,54017
TELEPHONE NUMBER (715) 246-2213 SPEC 07/02
1380,HERITAGE,DR APT 17,NEWR,WI,54017. TAPE RPTD 12/00
13,BIRCHWOOD,AVE UNIT 1,MANC,NH,03103. TAPE RPTD 11/99.
FORMER NAME-URMSTON,PENNY,L.
FORMER NAME-GISSON,PENNY,L.
BORN 12/11/1970 SS#-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
,LAKEVIEW HOSPITAL.

*INQS- 26 INQUIRIES SINCE 00/64 ,02/03/03 ,PRM 615ZZ13725, 12/09/02
,EU 4012B02533/WELL,08, 12/03/02 ,EU 4012B02533/WELL,08,CONSECOFIN,613FP20487
,12/28/02, 10/14/02 ,AR 491FM98970,10/11/02 ,AR 105FM11640,
,613AN12574,08/15/02 ,STWTR FORD,613AN16404,08/07/02,OUSLEY FORD MOTOR
,08/05/02 ,PRM 625UT00178, BANKAMERIC,241BB24600,07/02/02,613AN6604
,/PRM 850BB01498, 06/06/02,/PRM 404DN0126, 05/30/02 ,PRM 4012ZZ85680,06/13/02
04/18/02 ,PRM 496FM05218, 04/08/02 ,AR 105FM11640, 04/10/02 ,PRM 625UT00178,
04/08/02 ,PRM 850BB01498, 03/10/02 ,AR 103FM11640, 04/10/02 ,PRM 625UT00178
02/22/02 ,AR 850BB24906, 02/26/02 ,PRM 163FM19202,
,07/30/01 WELLSFARGO,491FM6356,03/20/02 ,PRM 496FM03218, SLUMBERLND,286HF3586
,07/16/01 ,EU 616ZB04898/144,00. 03/20/01, ,EU 146ZB13616/Z401,00,

WELLSFARGO*412PM00449 RPTD OPND H/C TRM BAL P/D CS MR ECOA  ACCOUNT NUMBER
30(00)36(00)90++(00) 02/03 05/01 170K 1K 164K I1 19 J  47285717 02
1614(R)/,/1/,/1/                                         DLA 02/05
REAL ESTATE MORTGAGE

PAGE 1
```

CSC196

CSC CREDIT SERVICES  PO BOX 981221  EL PASO TX 79998-1221  800/392-7816

CREDIT BUREAU INC.

TO 401ZS00040.2

ANDERSON PENNY L

1614 HALLEWOOD BLVD  NEW RICHMOND  WI  54017

FN 009-3350526-00-272

FHA MORTGAGE
NW AIR CU *613FC15148 02/03 09/02 25K 315 24K I1 04 J DLA 02/03
13539774
30(00)60(00)90+(00)
SECURED
30(00)60(00)90+(00)
SALLIE MAE*845FZ00120 01/03 03/01 2625 51 310 I1 21 I DLA 158906102F
01/03
30(00)60(00)90+(00)
SALLIE MAE*845FZ00120 01/03 03/01 2000 26 138 I1 21 I DLA 158906101F
01/03
FMCC *644FA04640 02/03 08/02 25K 456 23K I1 06 J DLA 31681373
02/03
30(00)60(00)90+(00)
AUTO
FMCC *644FA04640 02/03 11/00 15K 283 8727 I1 27 J DLA 25529080
02/03
30(00)60(00)90+(00)
AUTO
JCP/MCCBG *404FF03555 02/03 08/98 1900 0 R1 54 I DLA 12/01
-191650
30(00)60(00)90+(00) 2337
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
SEARS *6450C09286 02/03 06/98 750 0 R1 55 I DLA 357781349
30(00)60(00)90+(00) 02/03

PAGE 2

CSC197

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040,2   CREDIT BUREAU INC.
ANDERSON         PENNY L.
1614 HALLEWOOD BLVD   NEW RICHMOND   WI   54017
                                                         FN 009-3350526-00-272

CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
WFFINANCE *668FP0449I 12/02 07/01 1500                    591   R1 16 J   196-284284475
  30(00)60(00)90+(00)                                                     DLA 12/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CROSSCNTRY *4580N08054 01/03 04/99 1900 35                      I1 30     422709748440
  30(00)60(00)90+(00)                                                     DLA 12/02
FMCC      *644FA04640 11/02 06/99 21K 351         0            I1 41 J    JHA21835DN0
  30(00)60(00)90+(00)                                                     DLA 08/02
AUTO
S&C BANK  *668BB854029 10/02 12/01 22K 251        0            I1 09 J    406995201287126
  30(00)60(00)90+(00)                                                     DLA 09/02
HOME IMPROVEMENT LOAN
CROSSCNTRY *4580N08054 08/02 05/98 4300           0            R1 51 I    422709724010
  30(00)60(00)90+(00)                                                     DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK*850BB01498 02/02 01/99 1253            0            R1 37 I    412174152831
  30(00)60(00)90+(00)                                                     DLA 02/02

PAGE 3
```

CSC198

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
PENNY L
TO 401ZS00040.2
ANDERSON
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017
FN 009-3350526-00-272

PAGE 4

ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ88668 04/01 08/93 2000 79M 0 I1 24 I 158900601437024
30(00)60(00)90+(00) DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ88668 04/01 07/93 2625 68M 0 I1 14 I 158900601387935
30(00)60(00)90+(00) DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG *168BB00821 06/01 10/00 166K 1K 0 I J 330061214B152
30(00)60(00)90+(00)
REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUSA-ASF *155FA007337 02/00 08/95 21K 357 0 I1 52 C 516497
30(00)60(00)90+(00) DLA 02/00
PAID ACCOUNT/ZERO BALANCE
AUTO
CRISS CTRY*458BB02969 04/99 04/99 500 R0 J 541490709116
30(00)60(00)90+(00) DLA 04/99

CSC199

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
TO 401ZSD0040,2
ANDERSON, PENNY L
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017                    FN 009-3350526-00-272

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152BB00795 03/94 07/93 2625
3O(00)60(00)90+(00)          0        I1 07 I        100001SB900601
                                                    DLA 03/94
BANK ONE *152BB00795 10/93 08/93 2000
3O(00)60(00)90+(00)          0        I0      I      100001SB900603
                                                    DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/01*CDLL 07/99 6*8*C*492I FOR WORLDCOM, $248, 10/01 PAID
BAL-10/01 $, DLA: 06/99, 1,741619

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,

CSC200

```
FROZEN 623 2003 MONTH 03 NAME/SSN RECORDS
*************************************************

ANDERSON
1614 HALLEWOOD BLVD  NEW RICHMOND  WI  54017

                                                          PENNY L
                                                          NEW RICHMOND   WI   54017

ANDERSON,PENNY,L.                                                    FN 009-3350526-00-272
1614,HALLEWOOD,BLVD,NEWR,WI,54017 TAPE RPTD 12/00
TELEPHONE NUMBER (715) 246-2213 SPEC RPTD 02.                        FILE SINCE 11/07/90
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99.
13,BATCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-ROSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
BORN 12/11/1970 SSS-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
LAKEVIEW HOSPITAL

*INQS-23 INQUIRIES SINCE 00/66 02/12/03
PRM 615ZZ13725,12/13/02,AR 910UZ52883, 02/03/03
12/03/02,EU 401ZB02533/WELL,08,AR 45B0N08054,12/09/02,EU 401ZB02533/WELL,08,
AR 491FM9870,10/11/02,AR 103FM1164D FORD MOTOR C61 IANL734,07/15/02,
SNTR FORD,613ANL6404,08/07/02,TOUSLEY FD,613AN604,08/05/02,
PRM 625UT00178,06/13/02,BANKAMERIC,241BB248D,07/02/02,PRM 850BB01498,
06/06/02,PRM 251BNDI216,05/30/02,PRM 401ZZ83680,04/18/02,PRM 496FM03218,
06/18/02,AR 103FM6149,04/10/02,PRM 625UT00178,04/08/02,PRM 850BB01498,
SLUMBERLND,266UFM5586,04/09/02,PRM 496FM6356,03/20/01,
EU 1462B13516/2401,00,07/30/01,WELLSFARGO,491FM6356,03/20/01,03/20/01

*                              FIRM/ID CODE        RPTD  OPND  H/C TRM BAL  P/D CS MR ECOA  ACCOUNT NUMBER
WELLSFARGO&612FM00449 03/03 05/01 170K 1K 164K    I1 20 J                  DLA 03/03    4728571702
REAL ESTATE MORTGAGE
FHA MORTGAGE
```

                                                          ANDERSON,PENNY,L.
                                                          1614,HALLEWOOD,BLVD,NEWR,WI,54017

CSC201

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
TO 401ZS00040.2
ANDERSON        PENNY L
1614 HALLEWOOD BLVD   NEW RICHMOND   WI 54017
FN 009-3350526-00-272

NW AIR CU *613FC15148 03/03 09/02   25K  315  24K   I1 05 J   DLA 13539774
30(00)60(00)90+(00)                                                    03/03
SECURED
FMCC *6644FA04640 03/03 08/02   25K  456  23K   I1 07 J   DLA 31681373
30(00)60(00)90+(00)                                                    03/03
AUTO
FMCC *6644FA04640 03/03 11/00   15K  283  8477  I1 28 J   DLA 25529880
30(00)60(00)90+(00)                                                    03/03
AUTO
JCP/MCCBG *404FF03555 03/03 08/98 1900         0   I1 28 J   DLA -19165
30(00)60(00)90+(00)                                                    02337
ACCOUNT CLOSED AT CONSUMERS REQUEST                                    12/01
PAID ACCOUNT/ZERO BALANCE
SEARS *6650C09286 03/03 06/98  750        0   R1 56 I   DLA 35781549
30(00)60(00)90+(00)                                                    03/03
CHARGE
SALLIE MAE*6845F200120 02/03 03/01 2625  51  259   I1 22 I   DLA 158906102F
30(00)60(00)90+(00)                                                    02/03
AMOUNT IN H/C COLUMN IS CREDIT LIMIT

PAGE 2

CSC202

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
PENNY L
NEW RICHMOND WI 54017

FN 009-3350526-00-272

TO 401ZS00040.2
ANDERSON
1614 HALLEWOOD BLVD

```
SALLIE MAE*845FZ001 20 02/03 03/01 2000 26     113   I1 22 I   DLA 02/03   158900610LF
  30(00)60(00)90+(00)                                391   R1 17 J   DLA 196-2842847S
WFFINANCE *668FP04491 01/03 07/01 1500                               DLA 01/03
CHARGE  30(00)60(00)90+(00)
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CROSSCNTRY 4580N0805A 01/03 04/99 1900 35              I1 30   DLA 12/02   422709748440
  30(00)60(00)90+(00)
FMCC *664FA06640 11/02 06/99  21K 35I       0         I1 41 J   DLA 08/02   JHA21B3DN0
  30(00)60(00)90+(00)
AUTO
S&C BANK *668B854029 10/02 12/01 22K 25I     0        I1 09 J   DLA 09/02   406995201287126
  30(00)60(00)90+(00)                                          DLA 12/01
HOME IMPROVEMENT LOAN
CROSSCNTRY*4580N0805A 08/02 05/98 4300      0        R1 51 I   DLA 12/01   422709724010
  30(00)60(00)90+(00)
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK*850B8014498 02/02 01/99 1253     0        R1 37 I   DLA 02/02   412174152831
  30(00)60(00)90+(00)                                          DLA 02/02
```

PAGE 3

CSC203

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2        CREDIT BUREAU INC.
ANDERSON               PENNY L
1614 HALLEWOOD BLVD    NEW RICHMOND    WI    54017          FN 009-3350526-00-272

PAGE 4

ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ28868 04/01  08/93 2000 79M    0    I1 24 I    1589006014370024
301(00)60(00)90+(00)                                                        DLA 02/01

STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ28868 04/01  07/93 2625 68M    0    I1 14 I    1589006013587935
301(00)60(00)90+(00)                                                        DLA 02/01

STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG *16388008421 06/01 10/00 166K 1K          0    I    J     3300612148152
301(00)60(00)90+(00)

REAL ESTATE MORTGAGE
FHA MORTGAGE
KBUSA-ASF *155FA00737 02/00 08/95 21K 357      0    I1 52 C    DLA 02/00   516497
30(00)60(00)90+(00)

PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*458B802669 04/99 04/99 500              RO    J     541490709116
30(00)60(00)90+(00)                                                        DLA 04/99

CSC204

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2          CREDIT BUREAU INC.
ANDERSON                      PENNY L
1614 HALLEWOOD  BLVD  NEW RICHMOND  WI  54017

FN 009-3350526-00-272

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152ZB00795 03/94 07/93 2625              0        I1 07 I      1000015890060I
30(00)60(00)90+(00)                                                     DLA 03/94
BANK ONE *152ZB00795 10/93 08/93 2000              0        I0    I     1000015890060I
30(00)60(00)90+(00)                                                     DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION                                  I000015890060603
10/01*COLL 07/99 668YC4921 FOR WORLDCOM, $248,10/01 PAID               DLA 10/93
BAL-10/01 $, DLA: 06/99, I,741619

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,

CSC205

```
            FROZEN 623 2003 MONTH 04 NAME/SSN RECORDS
            ***************************************************

ANDERSON                                                    FN 009-3350522-00-272
1614 HALLEWOOD  BLVD   NEW RICHMOND    PENNY L    WI  54017
                                                  WI  54017        FILE SINCE 11/07/90       ANDERSON,PENNY,L
                                                                                             1614,HALLEWOOD,BLVD,NEWR,WI,54017

ANDERSON,PENNY,L. 1614,HALLEWOOD,BLVD,NEWR,WI,54017, TAPE RPTD 12/00
  TELEPHONE NUMBER (715) 246-2213 SPEC 10/02
1380,HERITAGE,DR APT 17,NEWR,WI,54017, TAPE RPTD 11/99,
13,BATCHELDER,AVE UNIT 1,MANC,NH,03103, TAPE RPTD 05/99,
FORMER NAME-RUSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
BORN 12/11/1975 SSS-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
          LAKEVIEW HOSPITAL

                                                          RPTD  OPND   H/C TRM  BAL  P/D  CS  MR  ECOA   ACCOUNT NUMBER
*INQS-18 INQUIRIES SINCE 00/64 03/19/03 ,AR 103FMI1640 ,02/12/03
AR 910UZ528B3 ,02/03/03 ,PRM 615ZZ13725,12/13/02,AR 450BN08054, 12/09/02
,EU 401ZB02533/WELL 08, 12/03/02 ,EU 401ZB02533/WELL 08, CONSEQFIN
,613FP2048J ,10/28/02, 10/14/02 ,AR 491FM98970, 10/11/02 ,AR 103FMI1640,
FORD MOTOR,613ANI6734,08/15/02, STWR FORD,613ANI6404,08/07/02, TOUSLEY FD
,613ANI6404, PRM 85/28,, 07/26/02 ,PRM 625UT0017B, BANKAMERIC,241BB2480,07/02/02,
06/13/02 ,PRM 85/28,  08/02  06/06/02 ,PRM 401ZZ85680,
SLUMBERLND,286HF3586,07/30/01,PRM 401ZZ85680,
*  FIRM/ID CODE                                  05/30/02 ,PRM 401ZZ85680,
WFFINANCE *668FP04491 03/03 07/01 1500    0    RI 19  J    196-284284475    DLA 04/03
CHARGE              30(00)60(00)90+(00)                          DLA 05/03
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
FMC *644FA04640 04/03 08/02  25K  456   22K  II 08  J    31681373
          30(00)60(00)90+(00)
```

CSC206

```
                    CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                               CREDIT BUREAU INC.
TO 401ZS00040.2                        PENNY L
ANDERSON
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017                     FN 009-3350522-00-272


AUTO
FMCC      *644FA0464Q 04/03 11/00       15K 283 8228     I1 29 J    DLA 04/03  25529880
AUTO
SALLIE MAE*845FZ00120 03/03 03/03 03/01 2625 51   194    I1 23 I    DLA       15890061O2F
  30(00)60(00)90+(00)                                                         03/03
SALLIE MAE*845FZ00120 03/03 03/03 03/01 2000 26    80    I1 23 I    DLA       15890061O1F
  30(00)60(00)90+(00)                                                         03/03
JCP/MCCBG *404FF03555 04/03 08/98 1900              0    R1 56 I    DLA       -19165O2337
  30(00)60(00)90+(00)                                                         12/O1
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
SEARS     *645DC09286 04/03 06/98 750               0    R1 57 I    DLA 04/03  35781349
  30(00)60(00)90+(00)
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT                               DLA 04/03
WELLSFARGO*612PM00449 03/03 05/03 05/01 170K 1K 164K     I1 20 J    472B571702
  30(00)60(00)90+(00)                                                         DLA 03/03
REAL ESTATE MORTGAGE
```

PAGE 2

CSC207

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                    CREDIT BUREAU INC.
TO 401ZSD0040.2     PENNY L
ANDERSON
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017        FN 009-3350522-00-272

FHA MORTGAGE
NW AIR CU *613FC15148 03/03 09/02      25K  315   24K   I1 05 J   DLA 03/03   15539774
  3C(00)60(00)90+(00)
SECURED
CROSSCNTRY 45BONB8054 01/03 04/99 1900 35              I1 30      DLA 12/02   42270974Q4640
  30(00)60(00)90+(00)
FMCC    *644FA04640 11/02 06/99  21K 351          0    I1 41 J    DLA 08/02   JHA21B3DN0
  30(00)60(00)90+(00)
AUTO
S&C BANK *668BB54029 10/02 12/01  22K  251        0    I1 09 J    DLA 09/02   406995201287126
  30(00)60(00)90+(00)
HOME IMPROVEMENT LOAN
CROSSCNTRY*45BONB8054 08/02 05/98 4300            0    R1 51 I    DLA 12/01   42270972401O
  30(00)60(00)90+(00)
ACCOUNT CLOSED AT CONSUMERS REQUEST                              DLA 12/01
PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK*B50BB01498 02/02 01/99 1253            0    R1 37 I                4121741528301
  30(00)60(00)90+(00)                                            DLA 02/02
ACCOUNT CLOSED AT CONSUMERS REQUEST

PAGE 3
```

CSC208

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040.2              CREDIT BUREAU INC.
ANDERSON                        PENNY L
1614 HALLEWOOD BLVD  NEW RICHMOND      WI  54017                    FN 009-3350522-00-272

PAGE 4

```
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ28868 04/01  08/93 2000  79M       0   I1 24 I   158900601437024
   30(00)60(00)90+(00)                                            DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ28868 04/01  07/93 2625  68M       0   I1 14 I   158900601387935
   30(00)60(00)90+(00)                                            DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG           *16B8B08B21 06/01  10/00 166K 1K     0   I  I  J   33006121148152
   30(00)60(00)90+(00)
CLOSED ACCOUNT
FHA MORTGAGE
KBUS-A-LSF R155FA00737 02/00  08/95 21K  357        0   I1 52 C   DLA 02/00
   30(00)60(00)90+(00)                                            516497
AUTO
PAID ACCOUNT/ZERO BALANCE
CROSS CTRY*455B8B029969 04/99  04/99  500              R0      J  54149070911G
   30(00)60(00)90+(00)                                            DLA 04/99
```

CSC209

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2
ANDERSON          CREDIT BUREAU INC.
                  PENNY L
1614 HALLEWOOD BLVD   NEW RICHMOND   WI   54017
                                        FN 009-3350522-00-272

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152BB00795 03/94 07/95 2625
30(00)60(00)90+(00)                    0    I1 07 I     1000015890060l
BANK ONE *152BB00795 10/93 08/95 2000                   DLA 03/94
30(00)60(00)90+(00)                    0    I0  I       A1000015890060
*PUBLIC RECORDS AND OTHER INFORMATION                  DLA1000015890060 3
10/01XCOL-179,668YC492I FOR WORLDCOM,$248,10/01 PAID    DLA 10/93
BAL-10/01 $, DLA: 06/99,1,741619

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
                                        PO BOX 981221,

CSC210

```
FROZEN 623 2003 MONTH 05 NAME/SSN  RECORDS
***************************************

ANDERSON       HALLEWOOD   BLVD   NEW RICHMOND   WI   54017
1614                       PENNY L

                                                        FN 009-3350522-00-272    ANDERSON,PENNY,L.
                                                                                 1614,HALLEWOOD,BLVD,NEWR,WI,54017
                                                        FILE SINCE 11/07/90

ANDERSON,PENNY,L.
1614,HALLEWOOD,BLVD,NEWR,WI,54017, TAPE RPTD 12/00
TELEPHONE NUMBER (715) 246-2213 SPEC 07/03.
1380,HERITAGE DR,APT,NEWR,WI,54017, TAPE RPTD 11/99.
15,BATCHELDER,AVE,UNIT,1,MANC,NH,03103, TAPE RPTD 05/99.
FORMER NAME-ROSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
BORN 12/11/1970,SSS-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
-LAKEVIEW HOSPITAL,,,

*INQS- 19 INQUIRIES SINCE 00/64-03/19/03 ,AR 103FMI1640,02/12/03
AR 910IZZ8835,02/03/03 ,PRM 61SZZI3725,12/13/02,AR 4580N0B054,12/09/02
,EU 401ZB02533/WELL,08, ,EU 401ZB02553/WELL,08, CONSECOFIN
,GI5FP2048710/28/02,12/02,11402 ,AR 491FM9710,10/11/02,AR 103FMI1640,
FORD MOTOR,6133AN16754,08/15/02 ,SWTR FORD,6133AN16404,07/02,TOUSLEY FD
,6133AN604,08/05/02, 07/26/02 ,PRM 62SUT00178,BANKAMERIC,
06/13/02 ,PRM 85UB801498,06/06/02 ,PRM 404QNO1216,05/36/02,
05/16/03 ,AR 491FM00011, SLUMBERLND,286HF3586,07/30/01.

* FIRM/ID CODE        RPTD      OPND   H/C  TRM   BAL   P/D  CS  MR  ECDA   ACCOUNT NUMBER
WFFIRWG*X668FP06491   04/03    07/01  1500              0    RI  20  DLA 03/03  196-28428475

AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CHARGE
WELLSFARGOX612FM00449 05/03 05/01 170K 1K    0         I1  22  J   DLA 04/03  472857I702
30(00)36(00)90+(00)
```

PAGE 1

CSC211

```
                              CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                                        CREDIT BUREAU INC.
TO 4012SO0040,2                           CREDIT BUREAU INC.
ANDERSON                           PENNY L
1614 HALLEWOOD       BLVD   NEW RICHMOND   WI  54017

                                                                            FN 009-3350522-00-272

PAGE 2

REAL ESTATE MORTGAGE
FHA MORTGAGE
WELLSFARGO*241FM01630    05/03  04/03  169K  1K    169K   J         DLA 05/03
  30(00)60(00)90+(00)                                                7080125431015
REAL ESTATE MORTGAGE
CONVENTIONAL MORTGAGE
NW AR CT*613FC15148      05/03  09/02  25K   315   24K    I1 07 J   DLA 05/03
  30(00)60(00)90+(00)                                                13539774
SECURED
CROSSCMTRY*4580N08054    05/03  04/99 CONSUMER DECEASED             DLA 05/03
                                                                     4227097748440
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
FMCC*644FA04640          05/03  08/02  25K   456   22K    I1 09 J   DLA 05/03
  30(00)60(00)90+(00)                                                31681373
AUTO
FMCC  *644FA00640        05/03  11/00  15K   283   7977  I1 30 J   DLA 05/03
  30(00)60(00)90+(00)                                                25529880
AUTO
```

CSC212

```
CSC CREDIT SERVICES  PO BOX 981221  EL PASO TX 79998-1221  800/392-7816
                    CREDIT BUREAU INC.
                    PENNY 1
TO 401ZS00040.2
ANDERSON
1614 HALLEWOOD BLVD  NEW RICHMOND  WI  54017          FN 009-3350522-00-272


SALLIE MAE*864SFZ001?N 04/03 03/01 2525 51  19%  I1 24 I  DLA I55?906102F
30(00)60(00)90+(00)                                          04/03
SALLIE MAE*864SFZ001220 04/03 03/01 2000 26  80   I1 24 I  DLA 15890610IF
30(00)60(00)90+(00)                                          06/03
JCP/MCCBG *40(00)F03555 05/03 08/98 1900 0        I1 57 I  DLA -1916502337
30(00)60(00)90+(00)                                          12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
SEARS     *645DC09286 05/03 06/98 750 10      74  R1 58 I  DLA 35781349
30(00)60(00)90+(00)                                          05/03
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
FMCC      *644FA04640 11/02 06/99 21K 351     0   I1 41 J  JHA2183DN0
30(00)60(00)90+(00)                                          08/02
AUTO
S&C BANK  *668BB54029 10/02 12/01 22K 25I     0   I1 09 J  4069952012B7126
30(00)60(00)90+(00)                                          09/02
HOME IMPROVEMENT LOAN
CRDSSCNTRY*4580N08054 08/02 05/98 4300        0   R1 51 I  422709724010
30(00)60(00)90+(00)                                          12/01

PAGE 3
```

CSC213

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.

TO 401ZS00040.2
ANDERSON                    PENNY L
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017

FN 009-3350522-00-272

ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK*850B801498 02/02 01/99 1253        0    R1 37 I    412174152831
30(00)60(00)90+(00)                                           DLA 02/02

ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ28668 04/01 08/93 2000 79M    0    I1 24 I    158900601437024
30(00)60(00)90+(00)                                           DLA 02/01

STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ28668 04/01 07/93 2625 68M    0    I1 14 I    158900601387935
30(00)60(00)90+(00)                                           DLA 02/01

STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG *1168B80021 06/01 10/00 166K 1K          0    I  J       330061214815Z
30(00)60(00)90+(00)

CLOSED ACCOUNT
FHA MORTGAGE
K8USA-ASF *155FA00737 02/00 08/95 21K 357     0    I1 52 C    516497
30(00)60(00)90+(00)                                           DLA 02/00

PAGE 4

CSC214

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.
PENNY L

TO 401ZS00040.2
ANDERSON
1614 HALLEWOOD BLVD  NEW RICHMOND  WI  54017                    FN 009-3350522-00-272

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
PO BOX 981221,

PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*46588B02969 04/99 04/99       500                RO  J              54149070911 6
  30(00)60(00)90+(00)                                                      DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE   *1528B00795 03/94 07/93 2625        0        I1 07 I       100001589006 01
  30(00)60(00)90+(00)                                                      DLA 03/94
BANK ONE   *1528B00795 10/93 08/93 2000        0        IO    I       100001589006 01
  30(00)60(00)90+(00)                                                      DLA 03/94
*PUBLIC RECORDS AND OTHER INFORMATION                                100001589006 03
10/01*COL 07/99 668YC6492I FOR WORLDCOM,$248,10/01 PAID              DLA 10/93
  BAL-10/01 $, DLA: 06/99, I,741619

CSC215

PAGE 1

```
FROZEN 623 2003 MONTH 06 NAME/SSN  RECORDS
***********************************************

ANDERSON                    PENNY L
1614 HALLENWOOD  BLVD  NEW RICHMOND   WI  54017        FN 009-3350526-00-273

ANDERSON,PENNY.L                                        FILE SINCE 11/07/90
1614,HALLENWOOD,BLVD,NEWR,WI,54017, TAPE RPTD 12/00     ANDERSON,PENNY.L
1300,HERITAGE,DR,APT 17,INNR,WI,54246-2213 SPEC 03/03.  1614,HALLENWOOD,BLVD,NEWR,WI,54017
13,BATCHELDER,AVE UNIT 11,MANC,NH,03103, TAPE RPTD 11/99.
FORMER NAME-ROSSO,PENNY.L
FORMER NAME-URMSTON,PENNY.L
BORN 2/11/1970.SSS-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
BLAKEVIEW HOSPITAL,'.,.'

*INQS- 19 INQUIRIES SINCE  00/04.,FLEET CC,4580N8049,06/09/03,05/22/03
PRM 62SUT00178,05/16/03,AR 491FMD001,03/19/03,AR 103FM11660,02/12/03
,AR 910U252683,,02/03/03,PRM 62SZ213725,12/13/02,AR 4580N8054,02/12/03
,EU 401ZB02533/WELL,08,  12/03/02,AR 491FM970,12/09/02
,613SPP20407,10/28/02, 10/14/02,AR 491FM970,EU 401ZB02533/WELL,08,CONSECOFIN
,FORD MOTOR,613AN16734,08/15/02,STWTR FORD,613AN16404,08/07/02,AR 103FM11640,
,613AN04/08/02,07/26/02,PRM 62SUT00178,05/16/03,PRM 850B01498,
BANKAMERIC,0600062480,07/02/02,SLUMBERLND,286HF3586,07/01/01
* FIRM/ID CODE                      OPND   H/C  BAL  P/D  CS MR ECOA    ACCOUNT NUMBER
SECURED                             RPTD   TRM                  I1 08  J
30(00)60(00)90+(00)                        25K  315              08  J
NW AIR CU *613FC15148              06/03   23K                           1359774
CROSSCNTRY*4580N8054 06/03                                             DLA 06/03
CREDIT CARD 06/03 04/99 CONSUMER DECEASED                             4227097'48440
                                                                       DLA 06/03
```

CSC2216

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
TO 401ZS00040.2    PENNY L.
ANDERSON
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017

FN 009-3350526-00-273

PAGE 2

```
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
WELLSFARGO*241FM01630 06/03 04/03 169K 1K  169K    I1 01 J    708012543101 5
  30(00)60(00)90+(00)                                          DLA 06/03
REAL ESTATE MORTGAGE
CONVENTIONAL MORTGAGE
FMCC       *644FA04640 06/03 08/02  25K 456  22K    I1 10 J    31681373
  30(00)60(00)90+(00)                                          DLA 06/03
AUTO
FMCC       *644FA04640 06/03 11/00  15K 283 8012    I1 31 J    25529880
  30(00)60(00)90+(00)                                          DLA 06/03
AUTO
WFFINANCE  *668FP04491 05/03 07/01 1500        0    I1 21 J    196-28428475
  30(00)60(00)90+(00)                                          DLA 03/03
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
JCP/MCB6   *404FF03555 06/03 06/98 1900        0    R1 58 I    -19165 02337
  30(00)60(00)90+(00)                                          DLA 12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
```

CSC211

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040.2      CREDIT BUREAU INC.
ANDERSON                PENNY L
1614 HALLEWOOD BLVD   NEW RICHMOND   WI   54017
                                              FN 009-3350526-00-273

PAGE 3

SEARS      *645DC09286. 06/03 06/98  750      0   R1 59 I            35781349  DLA 06/03
CHARGE
30(00)60(00)90+(00)
   AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SALLIE MAE*845F701120 05/03 03/01 2625  51  91  I1 25 I  15890061O2F  DLA 05/03
30(00)60(00)90+(00)
SALLIE MAE*845FZ00120 05/03 03/01 2000  26  28  I1 25 I  15890061O1F  DLA 05/03
WELLSFARGOX&12FM00449 05/03 05/01 170K  1K   0  I1 22 J   4/728571702 DLA 04/03
30(00)60(00)90+(00)
REAL ESTATE MORTGAGE
FHA MORTGAGE
FMC       *6444FAQ4640 11/02 06/99  21K 351   0  I1 41 J  JHA21B3DN0  DLA 08/02
30(00)60(00)90+(00)
AUTO
S&C BANK  *668BB54029 10/02 12/01  22K 251   0  I1 09 J  40699520128F7126 DLA 09/02
HOME IMPROVEMENT LOAN
30(00)60(00)90+(00)
CROSSCNTRY*45B0N08054 08/02 05/98 4300       0  R1 51 I  422709724010 DLA 12/01
30(00)60(00)90+(00)
```

CSC218

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 40IZSD0040/.2          CREDIT BUREAU INC.
ANDERSON                  PENNY L
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017

FN 009-3350526-00-273

ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK*8508801496 02/02 01/99 1253              0      R1 37 I
30(00)60(00)90+(00)                                          4121741528 31
                                                             DLA 02/02

ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655F2B8868 04/01 08/93 2000 79M          0      I1 24 I
30(00)60(00)90+(00)                                          158900601437024
                                                             DLA 02/01

STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655F2B8868 04/01 07/93 2625 68M          0      I1 14 I
30(00)60(00)90+(00)                                          158900601387935
                                                             DLA 02/01

STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG      *168BB00821 06/01 10/00 166K 1K           0      I  J
30(00)60(00)90+(00)                                          3300612148152

CLOSED ACCOUNT
FHA MORTGAGE
KBUSA-ASF *155FA00737 02/00 08/95 21K 357                  I1 52 C   DLA 02/00
30(00)60(00)90+(00)                                                   516697

PAGE 4

CSC2719

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
TO 401ZS00040,2
ANDERSON     PENNY L
1614 HALLEWOOD BLVD  NEW RICHMOND  WI  54017

FN 009-3350526-00-273

PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*458B8029969 04/99 04/99  500  RO  J  541490709116  DLA 04/99
30(00)60(00)90+(00)
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152B80795 03/94 07/93 2625
30(00)60(00)90+(00)
BANK ONE *152B80795 10/93 08/93 2000      0  I1 07 I  10000158690601  DLA 03/94
30(00)60(00)90+(00)
*PUBLIC RECORDS AND OTHER INFORMATION    0  I0    I  10000158906603  DLA 10/93
10/01*COL 07/99 668YC4921 FOR WORLDCOM,$248,10/01 PAID
BAL 10/01 $, DLA: 06/99, 1,741619

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,

CSC220

```
                    FROZEN 623 2003 MONTH 07 NAME/SSN RECORDS
                    ***************************************

ANDERSON                    PENNY L
1614  HALLEWOOD  BLVD  NEW RICHMOND  WI  54017

                                                    FN 009-3350526-00-273
ANDERSON,PENNY,L,HALLEWOOD,NEWR,WI,54017. TAPE RPTD 12/00
1614,HALLEWOOD,BLVD,NEWR,WI,54017.
  TELEPHONE NUMBER 715,246-2213 SPEC 06/03.                    FILE SINCE 11/07/90
13.BATCHFINDER AVE UNIT 1,NEWR,WI,54017; TAPE RPTD 11/99.
1380, HERITAGE DR APT 171,NEWR,WI,54013; TAPE RPTD 05/99.
FORMER NAME-ROSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.                                   ANDERSON,PENNY,L
BORN 12/11/1970.SSS-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                                1614,HALLEWOOD,BLVD,NEWR,WI,54017
*LAKEVIEW HOSPITAL.
*INQS-INQUIRIES SINCE 00/64.06/24/03 ,AR 491FM00011, FLEET CC,6580N0849
,06/09/03 DISNEY250UT01178,11,05/16/03 ,AR 491FM00011,05/12/03
PRM 8508A01498,05/22/03 PRM 625UT01178,11 .
,PRM 615ZZ13725,12/13/02 ,AR 4580N00856,02/12/03 ,AR 9100Z52883,02/03/03
12/03/02 ,EU 401ZB02533/WELL,08, CONSECOFIN,615FP2047,10/23/02
,AR 491FM09870,10/11/02 ,AR 103FM11640, FORD MOTOR,613AN12734,08/19/02
SNWR FORD,613AN16404,08/07/02, TOUSLEY FO,613AN606,08/05/02
*PRM FIRM11007/8, BANKAMERIC,241BB62480,07/02/02, SLUMBERLND,286HF35586,07/30/01.
NW AIR CU X6135FC15148 RPID  OPND  H/C TRM BAL P/D CS MR ECOA    ACCOUNT NUMBER
SECURED 30(00)60(00)90+(00)  07/03 09/02 25K 315 23K   I1 09 J            13539774
WFFINANCE X668FP04491 06/03 07/01 1500         0         RI 22 J   DLA 07/03  196-2842B475
CHARGE 30(00)60(00)90+(00)                                         DLA 05/03  DLA 03/03
```

PAGE 1

CSC221

```
CSC CREDIT SERVICES  PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2        CREDIT BUREAU INC.
ANDERSON               PENNY L
1614 HALLEWOOD BLVD  NEW RICHMOND  WI  54017

                                                    FN 009-3350526-00-273


AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CROSSCNTRY*4580N08054 07/03 04/99 CONSUMER DECEASED

CREDIT CARD                                                  42270974840
AMOUNT IN H/C COLUMN IS CREDIT LIMIT                         DLA 07/03
FMCC  *6644FA04640 07/03 08/02  25K 456 21K  I1 11 J         31681373
AUTO  30(00)60(00)90+(00)                                    DLA 07/03
FMCC  *6644FA04640 07/03 11/00  15K 283 7759 I1 32 J         25529080
AUTO  30(00)60(00)90+(00)                                    DLA 07/03
WELLSFARGO*241FM01630 07/03 04/03 169K 1K 168K I1 02 J       70801256431015
REAL ESTATE MORTGAGE 30(00)60(00)90+(00)                     DLA 07/03
JCP/MCCBG *4064FD3555 07/03 08/98 1900  0    R1 59 I         -19166502337
ACCOUNT CLOSED AT CONSUMERS REQUEST 30(00)60(00)90+(00)      DLA 12/01
PAID ACCOUNT/ZERO BALANCE
SEARS *645DC09286 07/03 06/98 750 10 365 R1 60 I             357781349
30(00)60(00)90+(00)                                          DLA 07/03


PAGE 2
```

CSC222

```
                              CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 4012ZS00040.2                          CREDIT BUREAU INC.
ANDERSON                                        PENNY L
1614 HALLENWOOD BLVD   NEW RICHMOND   WI 54017                          FN 009-3350526-00-273

CHARGE
AMOUNT  IN H/C COLUMN IS CREDIT LIMIT
SALLIE MAE*464957Z00120  06/03 03/01 2625 51         I1 26 I    DLA         158900610ZF
   30(00)60(00)90+(00)                                          06/03
SALLIE MAE*84957Z00120   06/03 03/01 2625 51         I1 26 I    DLA         158900610ZF
   30(00)60(00)90+(00)                                          06/03
WELLSFARGO*412FM00449    06/03 03/01 2000 26         I1 26 I    DLA         158900610IF
   30(00)60(00)90+(00)                                          06/03
REAL ESTATE MORTGAGE     05/03 05/01 170K 1K         I1 22 J    DLA         4728571702
   30(00)60(00)90+(00)                                          04/03
FHA MORTGAGE
FMCC
   30(00)60(00)90+(00)
AUTO   *8444FA04640       11/02 06/99  21K  351    0  I1 41 J    DLA         JHA2183DND
S&C BANK *668BBS4029      10/02 12/01  22K  251    0  I1 09 J    DLA         406995201ZB7126
HOME IMPROVEMENT LOAN                                           09/02
CROSS_CNTRY*45BON080S4   08/02 05/98 4300         0             DLA         422709724010
   30(00)60(00)90+(00)                               R1 51 I    DLA         12/01
ACCOUNT CLOSED AT CONSUMERS REQUEST

PAGE 3
```

CSC223

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2     CREDIT BUREAU INC.
ANDERSON                    PENNY L
1614 HALLEWOOD    BLVD   NEW RICHMOND   WI   54017          FN 009-3350526-00-273

PAGE 4

PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK*850B8011498 02/02 01/99 1253          0      RI 37 I
30(00)60(00)90+(00)
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655FZ8868 04/01 08/93 2000 79M        0      I1 24 I      412174152831      DLA 02/02
30(00)60(00)90+(00)
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655FZ8868 04/01 07/93 2625 68M        0      I1 14 I      158900601387935   DLA 02/01
30(00)60(00)90+(00)                                                                    DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG *168B00B21 06/01 10/00 166K 1K              0      I      J      3300612148152    DLA 02/01
30(00)60(00)90+(00)
CLOSED ACCOUNT
FHA MORTGAGE
KBUSA-ASF *155FA00737 02/00 08/95 21K 357        0      I1 52 C      DLA 02/00    516497
30(00)60(00)90+(00)

CSC224

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401Z500040.2          CREDIT BUREAU INC.
ANDERSON                      PENNY L
1614 HALLEWOOD BLVD   NEW RICHMOND   WI  54017           FN 009-3350526-00-273

PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*4458B802969 04/99 04/99   500                 R0  J      541490709116
CROSS(00)601(00)90+(00)                                                DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *1528B807795 03/94 07/93 2625                   0   I1 07 I  100001589906O1
30(00)601(00)90+(00)                                                   DLA 03/94
BANK ONE *1528B807795 10/93 08/93 2000                   0   I0    I  100001589906O3
30(00)601(00)90+(00)                                                   DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/01XCOL 07/99 668YC492I FOR WORLDCOM,$248,10/01 PAID
BAL-10/01 $, DLA: 06/99, I,741619

REF TO CSC CREDIT SERVICES,                         PO BOX 981221,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

CSC225

PAGE 1

```
                 FROZEN 623 2003 MONTH 08 NAME/SSN  RECORDS
    **********************************************************
ANDERSON
1614  HALLEWOOD  BLVD   NEW RICHMOND  WI  54017

                                                  PENNY L

ANDERSON
1614  HALLEWOOD  BLVD  NEWR,WI,54017                      FN 009-3350494-00-275
1614,HALLEWOOD,BLVD,NEWR,WI,54017
   TELEPHONE NUMBER (715) 246-1213                         FILE SINCE 11/07/90
                                                   ANDERSON,PENNY,L,
                                                   1614,HALLEWOOD,BLVD,NEWR,WI,54017
ANDERSON,PENNY,L,
1614,HALLEWOOD,BLVD,NEWR,WI,54017,TAPE RPTD 12/00
   TELEPHONE NUMBER (715) 246-1213 SPEC 07/03.
1380,HERITAGE,DR APT 17,NEWR,WI,54017,TAPE RPTD 11/99.
13,BATCHELDER,AVE UNIT 1,MANC,NH,03103,,TAPE RPTD 05/99.
FORMER NAME-RODSSO,PENNY,L.
FORMER NAME-URMSTON,PENNY,L.
   BORN 12/11/1970,SSS-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
*LAKEVIEW HOSPITAL
   3(CK/LSS
*INQS 18 INQUIRIES SINCE 00/04,06/24/03,AR 491FM00011,FLEET CC,4580N0049
  ,06/09/03,  05/22/03,PRM 625UT00179,AR 491FM00011,05/12/03
  PRM 850B801498, 03/19/03,AR 103FM11640,02/12/03,AR 491IM00011,05/16/03,AR 491FM00011,05/12/03
  ,PRM 6152I13725,12/13/02, AR 4580N0054,02/12/03,AR 910U252883,,02/03/03
  12/03/02,EU 401ZB02533/WELL,0B,,CONSECOFIN,615FP2064,EU 401ZB02533/WELL,0B,
  AR 491FM00970,,10/11/02,AR 103FM11640,,FORD MOTOR,615ANL6734,10/14/02
  STWTR,615FP2064,,08/07/02,AR 103FM11640, TOUSLEY FD,613AN6404,,08/05/02, 10/15/02.
  ,2541B82480,07/24/02.
   30(CK/LSS-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/07/02.
* FIRM/ID CODE/
NW AIR CU *6153FC15148 08/03
   30(00)60(00)90+(00)
SECURED
WFFINANCE *668FP04491 07/03 07/01 1500              0        R1 23 J
CHARGE
  30(00)60(00)90+(00)
```

```
         RPTD   OPND   H/C  TRM  BAL  P/D  CS MR ECOA   ACCOUNT NUMBER
         08/03  09/02  25K  31S  23K       I1 10 J    DLA 08/03   13539774
                                                      BANKAMERIC
                                                      DLA 03/03   196-28428475
```

CSC226

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.
PENNY L
NEW RICHMOND WI 54017

FN 009-3350494-00-275

TO 401ZS00040.2
ANDERSON
1614 HALLEWOOD BLVD

AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CROSSCNTRY*4580N08054 08/03 04/99 CONSUMER DECEASED          DLA 08/03
42270974B440

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
FMCC        *644FA06640 08/03 08/02 25K 456 21K      I1 12 I   DLA 08/03
30(00)60(00)90+(00)                                                    31681373
AUTO
FMCC                   08/03 11/00 15K 283 7509      I1 33 J   DLA 08/03
30(00)60(00)90+(00)
AUTO        *644FA06640
WELLSFARGO*241FM01630 08/03 04/03 169K 1K 168K       I1 03 J   DLA 08/03
30(00)60(00)90+(00)                                                    25529880
REAL ESTATE MORTGAGE                                          708012563101S
SALLIE MAE*845FZ00120 07/03 03/01 2625 51 0          I1 27 I   DLA 08/03
30(00)60(00)90+(00)
SALLIE MAE*845FZ00120 07/03 03/01 2000 26 0          I1 27 I   DLA 158900610ZF
30(00)60(00)90+(00)                                               06/03
JCP/MCCBG *404FF03555 08/03 08/98 1900 0             R1 60 I   DLA 158900610IF
30(00)60(00)90+(00)                                               06/03
                                                              -19165O2337
                                                              DLA 12/01

PAGE 2

CSC227

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.

TO 6012ZS00040,2      PENNY L
ANDERSON
1614 HALLEWOOD BLVD  NEW RICHMOND  WI 54017

FN 009-3350494-00-275

PAGE 3

```
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
SEARS      *6645DC09286 08/03 06/98 750 16  711      R1 61 I    DLA 35781349
CHARGE     30(00)60(00)90+(00)                                  DLA 08/03
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
WELLSFARGO#6127M00449 05/03 05/01 170K 1K  0        I1 22 J    DLA 04/03
REAL ESTATE MORTGAGE 30(00)60(00)90+(00)                       472285771702
FHA MORTGAGE
FMCC       *644FA04640 11/02 06/99 21K 351  0        I1 41 J    DLA 08/02
AUTO       30(00)60(00)90+(00)                                  JHA21B5DN0
S&C BANK   *6683B54029 10/02 12/01 22K 251  0        I1 09 J    DLA 09/02
HOME IMPROVEMENT LOAN 30(00)90+(00)                            40699520128726
CROSSCNTRY*6580N08054 08/02 05/98 4300    0          R1 51 I    DLA 12/01
           30(00)60(00)90+(00)                                  4227/09724010
ACCOUNT CLOSED AT CONSUMERS REQUEST
```

CSC228

```
                                   CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040.2                         CREDIT BUREAU INC.
ANDERSON                                      PENNY L
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017                              FN 009-3350494-00-275


PAGE 4


PAID ACCOUNT/ZERO BALANCE
CAP 1 BANK *655B0B01498 02/02 01/99 1253           0    RI 37 I    41217415Z831
30(00)60(00)90+(00)                                               DLA 02/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
USAG LOAN *655F228B68 04/01 08/93 2000 79M         0    I1 24 I    1589006014370Z4
30(00)60(00)90+(00)                                               DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
USAG LOAN *655F228868 04/01 07/93 2625 68M         0    I1 14 I    158900601387935
30(00)60(00)90+(00)                                               DLA 02/01
STUDENT LOAN
ACCOUNT TRANSFERRED OR SOLD
AAMG *16BB0B821 06/01 10/00 166K 1K                0    I  J      33006121481S2
30(00)60(00)90+(00)
CLOSED ACCOUNT
FHA MORTGAGE
KBUSA-ASF *155FA00737 02/00 08/95 21K 357          0    I1 52 C    DLA 02/00
30(00)60(00)90+(00)                                               516497
```

CSC229

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZSD0040.2          CREDIT BUREAU INC.
ANDERSON                 PENNY L
1614  HALLEWOOD  BLVD    NEW RICHMOND  WI  54017          FN 009-3350494-00-275

PAID ACCOUNT/ZERO BALANCE
AUTO
CRDS CTRY*4458BB02969 04/99 04/99   500          RU   J   541490709116
300(00)90+(00)                                              DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
BANK ONE *152BB00795 03/94 07/95 2625        0    I1 07 I   100001589006601
300(00)60(00)90+(00)                                        DLA 03/94
BANK ONE *152BB00795 10/93 08/93 2000        0    I0     I  100001589006603
300(00)60(00)90+(00)                                        DLA 10/93
*PUBLIC RECORDS AND OTHER INFORMATION
10/01DKCOL 07/99 668YC4921 FOR WORLDCOM,$248,10/01 PAID
BAL-10/01 $, DLA: 06/99, 1,741619

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
PO BOX 981221,

CSCC001

PAGE 1

```
FROZEN 618 2001 MONTH 09 NAME/SSN RECORDS
********************************************

ANDERSON
1614 WILDWOOD AVE  NEW RICHMOND WI 54017

ANDERSON, RUSSELL,D,SR              RUSSELL D SR                    FN 004-3350430-00-649
1614,WILDWOOD,AVE,NEWR,WI,54017,    NEW RICHMOND WI 54017          FILE SINCE 07/31/88
TELEPHONE NUMBER (603) 668-0384 SPEC 02/01.                        ANDERSON, RUSSELL,D,SR
1380,HERITAGE,DR APT 17,NEWR,WI,54017, CRT RPTD 04/00              1614,WILDWOOD,AVE,NEWR,WI,54017
TELEPHONE NUMBER (603) 668-0384 SPEC 06/00.
13,BATCHELDER,AVE,HANCO,NH,03103, CRT RPTD 09/99.
BORN 09/05/1960. SS-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
.DELTA AIR LINES.

*INQS-   27 INQUIRIES SINCE 00/64 07/19/01       ,PRM 850BB01498, 07/05/01
PRM 850BB01498, 04/09/01, PRM 850BB01498, .WELLSFARGO,491FM6356,03/20/01,
03/2FM3103,03/06/01,EU 1462BI3616/2401,00, 03/14/01,EU 6162B06498,491FM6356,03/20/01,
,25FM3103,03/02/01,02/02/01, 02/01/01, EU 1462BI3616/2401, .CENTENNIAL
,12/16/00, CONEBANK, 4848B82625,12/01/00,, EU 1462BI3616/2401, HHLD BANK, 163BB22075
TOUSLEY FO,613AN60H,11/06/00,, STANDARD, 491FM623,09/27/00, .PRM 850BB01498,
EU 6162B06498/144, 09/28/00,,PRM 850BB01498,
09/21/00, ,PRM 6130M1534B, 09/15/00, AR 9018N13050,09/27/01, .EU 181ZB05096/NORT,
EU 1462BI3616/2401, NO AM MTG,491FM3106,06/06/00,08/01/00
EU 1462BI3616/2401, RY.MG,1801G926,04/28/00, 07/31/01
EU 401ZB01975/NORT, 06/02/00,,EU 181ZB01694/NORT, 05/02/00
NO AM MTG,491FM3106,04/11/00 RPTD. 04/28/00, ,EU 1462BI3616/2401,
* FIRM/ID CODE   RPTD. OPND
WFFINANCE 491FM5106,04/26/26,04/28/00 08/01 07/01
30(00)0160(00)190+(00)
CHARGE
```

ACCOUNT NUMBER
196-2842B475


EXHIBIT
CSC-1
10
6/2/04

```
       CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040,2      CREDIT BUREAU INC.
 ANDERSON                   RUSSELL D SR
 1614  WILDWOOD  AVE  NEW RICHMOND  WI  54017            FN 004-3350430-00-649

NELNET LNS*146FZ00277 08/01 08/96  18K 230  20K     I1 59 I          39478472005
   30(00)60(00)90+(00)                                           DLA 08/01
STUDENT LOAN
FMC        *905FA04045 08/01 06/99  21K 351  11K     I1 26 J           JHA2183DN0
   30(00)60(00)90+(00)                                           DLA 07/01
AUTO
FORD CRDT *905FA03831 08/01 11/00  16K 283  14K     I1 09 J           EBA36121R7
   30(00)60(00)90+(00)                                           DLA 07/01
AUTO
CROSS CTRY 458BB02969 06/00 04/99 SUPPRESS ERRONEOUS TRADE         541490709890
                                                                 DLA 04/00
SYSTEM AFFILIATE INTERNAL POLICY
CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
WELLSFARGO*612FM00449 08/01 05/01 170K 1K  167K     I1 01 J           4728571702
   30(00)60(00)90+(00)                                           DLA 08/01
REAL ESTATE MORTGAGE
FHA MORTGAGE
AAMG       *168BB00821 06/01 10/00 166K 1K     0     I1 05 J        3300612148152
   30(00)60(00)90+(00)                                           DLA 05/01

 PAGE 2
```

CSC002

CSC003

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
RUSSELL D SR
1614 WILDWOOD AVE  NEW RICHMOND  WI  54017

TO 401ZS00040.2
ANDERSON

FN 004-3350430-00-649

PAGE 3

```
REAL ESTATE MORTGAGE
FHA MORTGAGE
WF1 FINANCE*61J5FP20316  04/00 12/94  21K 365   0  I1 08 I   9565-1481519
30(00)60(00)90+(00)                                          DLA 11/99
PAID ACCOUNT/ZERO BALANCE
KBUSA-ASF *155FA00737    02/00 08/95  21K 357   0  I1 52 M   516497
30(00)60(00)90+(00)                                          DLA 02/00
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*45BBBD2969    04/99 04/99      500      RO   J    541490709116
30(00)60(00)90+(00)                                          DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR *152FP11898      02/97 12/94  21K 365   0  I1 25 I   6357-4714733
30(00)60(00)90+(00)                                          DLA 02/97
ACCOUNT TRANSFERRED OR SOLD
HELNET LNS*X66762027     12/96 07/92 2625 74M   0  I1 44 I   394784720001
30(00)60(02)90+(06) 03/96-I5,02/96-I5,01/96-I4               DLA 10/96
STUDENT LOAN
```

CSC004

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.
RUSSELL D SR
RUSSELL

TO 401ZS00040.2
ANDERSON
1614 WILDWOOD AVE NEW RICHMOND WI 54017

FN 004-3350430-00-649

REFINANCED
NELNET LNS4146F200277 03/96 03/93 2625 69M            0       I5 28 I      3947 84720 04
30(10)160(01)90+(08) 12/95-I5,11/95-I5,10/95-I5                            DLA 01/96
STUDENT LOAN
*PUBLIC RECORDS AND OTHER INFORMATION
05/92 BANKRUPTCY 677VF1012  IND,INDIVID,VOL CH-7,LIAB 32085,ASSET 1246
,CASE NO- 92I18377
02/00 COLL 02/98 456YC284 FOR AMERY REGIONAL,$109,02/00 PAID
BAL-02/00 $0,DLA: 05/97,I,86966
08/95 JUDG 152VS558,$809,DEF- RUSSELL ANDERSON,CASE NO- CV9504022FD
,THE SADDLE CLUB APTS

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,



CSC032

EXHIBIT
CSC-3
DL

PAGE 1

```
FROZEN 623 2002 MONTH 04 NAME/SSN  RECORDS
*********************************************

ANDERSON                RUSSELL D SR                    FN 004-3350526-00-649    ANDERSON,RUSSELL D SR
1614 WILDWOOD AVE  NEW RICHMOND  WI 54017                                        1614,WILDWOOD,AVE,NEWR,WI,54017
ANDERSON,RUSSELL,D,SR.                                  FILE SINCE 07/31/88
1614,WILDWOOD,AVE,NEWR,WI,54017,
1580,HERITAGE,DR,HUDS,WI,54017,
13,BATCHELDER,AVE,MINC,NH,03103,
BORN 09/05/1960 SSS-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
,DELTA AIR LINES.

*INQS- 38 INQUIRIES SINCE 00/64.03/14/02.,PRM 850BB0149B.02/22/02.
AR 850BB2490C,01/28/02.,AR 850BB2490G.,01/19/02.AR 850BB2490G.,01/09/02
AR 491FM98970,11/27/01.,PRM 491FM98970.11/16/01.,PRM 850BB0149B.11/09/01
,PRM 850BB01498.11/08/01.,PRM 850BB01498.11/02/01.,PRM 491FM98970,10/10/01
,PRM 6130M15348,09/26/01.,PRM 850BB2490G.10/08/01.,PRM 682FP94677,10/03/01
07/19/01.,PRM 850BB01498.07/15/01.PRM 850BB01498.09/07/01.,PRM 496FM03218.,
,03/20/01.,03/20/01.EU 146ZB13616/2401,00.03/14/01 WELLSFARGO,491FM6356
CENTENNIAL,334FM31033.02/02/01.02/01/01 EU 146ZB13616/2401 HHLD BANK,00,
,11/08/2005.12/16/00.,CAPONEBANK,484BB2262,12/01/00.,TOWSLEY FD,613ANG04
,EU 181ZB03096/NDRT,491FM6623,09/29/00.09/28/00.EU 616ZB904898/144,09/27/00
EU 146ZB13616/2401. NO AM MTG,491FM5166/2401.,08/01/00
EU 181ZB01975/NDRT,06/02/00.EU 181ZB01694/NDRT.,06/06/00
NO AM MTG,491FM5106.,IR/MG,180IG726.04/28/00.04/28/00.,EU 155ZB00086/NDRT,
NELNET HM/DT CODE00277   RPTD    OPND    H/C TRM   BAL P/D CS MR ECOA    ACCOUNT NUMBER
3B(00)360(00)390+(00)            01/02   08/96     18K 230   I1 64 I     -3947847/2001
                                                                        DLA 12/01
```

CSC033

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.

TO 4012ZS00040,2        CREDIT       RUSSELL  D SR
ANDERSON                        RUSSELL  D SR
1614 WILDWOOD AVE   NEW RICHMOND  WI  54017                    FN 004-3350526-00-649

STUDENT LOAN
WFFINANCE *668FP04491 03/02 07/01 1500        0        R1 07 J      196-28428475
30(00)60(00)90+(00)                                                 DLA 12/01
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CROSS CTRY 458B02969 06/00 04/99 SUPPRESS ERRONEOUS TRADE

SYSTEM AFFILIATE INTERNAL POLICY                                    54149070989O
CONSUMER DISPUTES-REINVESTIGATION IN PROCESS                        DLA 04/00
S&C BANK *6668B54029 03/02 12/01 22K 251 22K         I1 02 J
30(00)60(00)90+(00)                                                 40699520128712G
HOME IMPROVEMENT LOAN                                               DLA 03/02
FMC      *905FA04045 03/02 06/99 21K 351 9477        I1 33 J
30(00)60(00)90+(00)                                                 JHA21883DN0
AUTO                                                                DLA 03/02
FORD CRDT *905FA03831 03/02 11/00 16K 283 12K        I1 16 J
30(00)60(00)90+(00)                                                 EBA3611R7
AUTO                                                                DLA 03/02
WELLSFARGO*612FM00649 03/02 05/01 170K 1K 166K       I1 08 J
30(00)60(00)90+(00)                                                 472857172
                                                                    DLA 03/02

PAGE 2

CSC034

```
                    CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                              CREDIT BUREAU INC.
                                   RUSSELL D SR
TO 401ZS00040.2
ANDERSON
1614 WILDWOOD AVE   NEW RICHMOND   WI   54017                    FN 004-3350526-00-649

PAGE 3

REAL ESTATE MORTGAGE
FHA MORTGAGE
CAP 1 BANK*850BB01498 03/02 08/01 306    0  R1 07 I      529115205619
                                                        DLA 03/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
AANG       *168BB00821 06/01 10/00 166K 1K 0  I1 05 J   330061214B152
                                                        DLA 05/01
REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINACCP1*61.3FP20316 04/00 12/94 21K 365 0  I1 08 I   9565-1401SL119
  30(00)60(00)90+(00)                                   DLA 11/99
PAID ACCOUNT/ZERO BALANCE
KBUSA-ASF *155FA00737 02/00 08/95 21K 357 0  I1 52 M    516497
  30(00)60(00)90+(00)                                   DLA 02/00
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*45BBB02969 04/99 04/99 500    0  R0    J     541490709116
  30(00)60(00)90+(00)                                   DLA 04/99
```

CSC035

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
TO 4012ZS00040,2
ANDERSON                RUSSELL    D SR
1614 WILDWOOD    AVE    NEW RICHMOND   WI   54017

FN 004-3350526-00-649

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR  *152FPI1898 02/97 12/94 21K 365    0       I1 25 I    4357-471487 33
 30(00)60(00)90+(00)                                           DLA 02/97
ACCOUNT TRANSFERRED OR SOLD
NELNET LNS*146F20027 12/96 07/92 2625 74M    0       I1 44 I   3947847 2001
 30(00)60(00)90+(03) 03/96-15,02/96-15,01/96-14                DLA 10/96
STUDENT LOAN
REFINANCED
NELNET LNS*146F20277 03/96 03/93 2625 69M    0       I5 28 I   3947847 2004
 30(00)60(00)90+(04) 12/95-I5,11/95-I5,10/95-I5                DLA 01/96
STUDENT LOAN
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 456YC84 FOR AMEY REGIONAL,$109,02/00 PAID
      BAL-02/00 $0 DLA: 05/97,8969666
08/95 JUDG 152VSS58,$809,DEF- RUSSELL ANDERSON,CASE NO- CV95040022FD
      ,THE SADDLE CLUB APTS

CSC036

PAGE 1

```
FROZEN 623 2002 MONTH 05 NAME/SSN RECORDS
*********************************************

ANDERSON          RUSSELL D SR        NEW RICHMOND   WI  54017
1614 WILDWOOD AVE

FN 004-3350490-00-649                     ANDERSON,RUSSELL,D,SR
FILE SINCE 07/31/88                       1614,WILDWOOD,AVE,NEWR,WI,54017

ANDERSON,RUSSELL,D,SR.
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00.
1380,HERITAGE,DR APT 17,NEWR,WI,54017, CRT RPTD 04/00.
13,BATCHELDER,AVE,MANC,NH,03103, CRT RPTD 09/99.
BORN 09/05/1960,SSS-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

*IN-DELIA AIR LINES*
AR 103$M11640,031$INQUIRES SINCE 04/19/02 , PRM 850BB01498,04/18/02 
09/26/01,,PRM 850BB01498, 09/07/01,,PRM 850BB01498, 02/22/02,AR 850BB24906,01/28/02
07/05/01,,PRM 850BB01498, 03/16/01,WELLSFARGO,491FM98970,01/09/06, AR 491FM98970,11/27/01
,AR 491FM98970, 11/16/01, ,PRM 850BB01498, 11/09/01, ,AR 850BB24906, 11/08/01
,PRM 850BB01498, 11/02/01, ,PRM 491FM98970, 10/10/01 ,PRM 850BB01498,
10/08/01 ,AR 850BB24906, 10/08/01 ,PRM 682FD94877, 10/03/01 ,PRM 613DM15348,
09/26/01 ,PRM 850BB01498, 09/07/01 ,PRM 496FM032I8, 07/19/01 ,PRM 850BB01498,
07/05/01 ,PRM 850BB01498, 05/24/01 ,AR 491FM96556,03/20/01 ,AR 850BB24906,
EU 1662B13616/2401,03/16/01 ,EU 616ZM06898/144,00, CENTENNIAL, 236FM31033
,02/02/01 ,AR 02/01/01 ,EU 1662B13616/2401 ,HHLD BANK, 163BB20175/2/16/00,
CAPONEBANK, 484BB26629,12/01/00, TOUSLEY FD,613ZAN694,11/26/00, STANDARD,
,491FM623,09/29/01,,09/28/00 ,EU 616ZD04898/144, 09/27/00 ,EU 1812B03096/NORT,
09/13/00 ,EU 1662B13616/2401, 08/01/00 ,EU 1662B13616/2401, NO AM MTG
,491FM31616/NORT, 06/06/00 ,EU 1812B01975/NORT, 06/02/00
EU 1812B01616/NORT.
* FRM/ID CODE                          RPTD  DPND  H/C  TRM  BAL  P/D  CS  MR  ECOA  ACCOUNT NUMBER
CROSSCNTRY#4580N08054  05/02  04/99 CONSUMER DECEASED                         4227097/48440
                                                                              DLA 05/02
```



CSC037

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                    CREDIT BUREAU INC.
                    RUSSELL D SR
                    NEW RICHMOND WI 54017        FN 004-3350490-00-649

TO 401ZS00040.2
ANDERSON
1614 WILDWOOD AVE

PAGE 2

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
FMC *905FA04045 04/02 06/99 21K 351 9126      I1 34 J    JHA21830N0
  30(00)60(00)90+(00)                                    DLA 04/02
AUTO
FORD CRDT *905FA03831 04/02 11/00 16K 283 12K   I1 17 J    EBA36121R7
  30(00)60(00)90+(00)                                    DLA 04/02
AUTO
S&C BANK *6688B54029 04/02 12/01 22K 251 22K    I1 03 J    406995201287126
  30(00)60(00)90+(00)                                    DLA 04/02
HOME IMPROVEMENT LOAN
WELLSFARGO*612FM00449 04/02 05/01 170K 1K 166K  I1 09 J    472857I1702
  30(00)60(00)90+(00)                                    DLA 04/02
REAL ESTATE MORTGAGE
FHA MORTGAGE
NELNET LNS*146FZ00277 01/02 08/96 18K 230 20K   I1 64 I    -39478472001
  30(00)90(00)90+(00)                                     DLA 12/01
STUDENT LOAN
WFFINANCE *668FP04491 03/02 07/01 1500 0        R1 07 J    196-28428475
  30(00)60(00)90+(00)                                    DLA 12/01
```

CSC049

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 601ZSQ0040,2        CREDIT BUREAU INC
ANDERSON             RUSSEL D SR
1614 WILDWOOD  AVE   NEW RICHMOND  WI 54017

FN 004-3350490-00-649

PAGE 3

| | | |
|---|---|---|
| CHARGE | | |
| AMOUNT IN H/C COLUMN IS CREDIT LIMIT | | |
| CAP 1 BANK*850BB01698 03/02 08//01 306 | 0 | R1 07 I   5291152035619  DLA 03/02 |
| 30(00)60(00)90+(00) | | |
| ACCOUNT CLOSED AT CONSUMERS REQUEST | | |
| PAID ACCOUNT/ZERO BALANCE | | |
| AMGB *168BB00821 06/01 10/00 166K 1K | 0 | I1 05 J   330061214B152  DLA 05/01 |
| 30(00)60(00)90+(00) | | |
| REAL ESTATE MORTGAGE | | |
| FHA MORTGAGE | | |
| WFFINACCPT*6135FP20316 04/00 12/94 21K 365 | 0 | I1 08 I   9565-148151I9  DLA 11/99 |
| 30(00)60(00)90+(00) | | |
| PAID ACCOUNT/ZERO BALANCE | | |
| KBUSA-ASF *155F00077 02/00 08/95 21K 357 | 0 | I1 52 M   516497  DLA 02/00 |
| 30(00)60(00)90+(00) | | |
| PAID ACCOUNT/ZERO BALANCE | | |
| AUTO | | |
| CROSS CTRY*4588B02969 04/99 04/99 500 | | R0 J   54190709116  DLA 04/99 |
| 30(00)60(00)90+(00) | | |

CSC0039

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC
TO 401ZS00040.2        RUSSELL D SR
ANDERSON
1614 WILDWOOD   AVE   NEW RICHMOND   WI  54017

FN 004-3350490-00-649

```
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR *4409FP11419 02/97 12/94 21K 365      0    I1 25 I      4357-4/140733
 30C(00)60C(00)90+(00)                                         DLA 02/97
ACCOUNT TRANSFERRED OR SOLD
NELNET LNS*146FZ00277 12/96 07/92 2625 74M    0    I1 44 I     3947847200I
 30C(00)60C(00)90+(03) 03/96-I5,02/96-I5,01/96-I4             DLA 10/96
STUDENT LOAN
REFINANCED
NELNET LNS*146FZ00277 03/96 03/93 2625 69M    0    I5 28 I     3947847200A
 30C(00)60C(00)90+(03) 12/95-I5,11/95-I5,10/95-I5            DLA 01/96
STUDENT LOAN
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COL 02/98 456VC284 FOR AMERY REGIONAL $109,02/00 PAID
 BAL-02/00 $0, DLA- 05/97, I-896966
08/95 JUDG 152VS558,$809,DEF- RUSSELL ANDERSON,CASE NO- CV9504022FD
 ,THE SADDLE CLUB APTS
```

REF TO CSC CREDIT SERVICES,                          PO BOX 981221,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

CSC040

PAGE 1

FROZEN 623 2002 MONTH 06 NAME/SSN RECORDS
*******************

ANDERSON   RUSSELL D SR
1614 WILDWOOD AVE NEW RICHMOND WI 54017

FN 004-3350526-00-649
ANDERSON, RUSSELL D SR
1614,WILDWOOD,AVE,NEWR,WI,54017

FILE SINCE 07/31/88

ANDERSON, RUSSELL D SR.
1614,WILDWOOD,AVE,NEWR,WI,54017. TAPE RPTD 12/00.
1300,HERITAGE,DR APT 17,NEWR,WI,54017, CRT RPTD 04/00.
13,BATCHELDER,AVE,MANC,NH,03103, CRT RPTD 09/99.
BORN 09/05/1960,SSS-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

*INQS- 16,INQUIRIES SINCE 00/64.05/06/02,PRM 850BB01498,04/19/02
,PRM 350BB01498, 04/18/02 ,AR 103FM11640, 03/22/02,AR 850BB24906, 03/14/02
, PRM 850BB01498, 02/22/02 ,AR 850BB24906, 01/28/02 ,AR 850BB24906, 01/19/02
,AR 850BB24906, 01/09/02 ,AR 491FM98970, 11/27/01 ,AR 491FM98970, 11/16/01
, PRM 350BB01498, 11/09/01 ,AR 850BB24906, 11/08/01 ,PRM 850BB01498, 11/02/01
, PRM 491FM98970, 10/10/01 ,PRM 850BB01989, 10/08/01 ,AR 850BB24906, 10/08/01
,PRM 492FP04877, 10/03/01 ,PRM 612DM15348, 09/26/01, PRM 850BB01498.
09/07/01, PRM 496FM03218, 07/19/01, PRM 850BB01498, 07/05/01, PRM 850BB01498.
WELLSFARGO, 491FM63356,03/20/01, 03/20/01, ,EU 146ZB1361612401,00, 03/14/01
ENG 616ZB04898/144,00,CENTENNIAL,234EM31033,02/02/01,, 02/01/01
,EU 146ZB1361612401,00, HHLD BANK, 438RB2275, 12/18/00, CAPONEBANK,484BB2629
,12/01/00, TOOSLEY CO,613AM601,11/06/00 STANDARD,491FM623,09/29/00, 09/28/00
,EU 616ZB04898/144, 09/27/00 ,EU 181ZB303096MORT, 09/13/00,, 09/13/00
,EU 146ZB1361612401, 08/01/00 ,EU 146ZB1361612401, 06/06/02 ,PRM 404CM01216.
* FIRM/ID CODE         RPTD   OPND   H/C   TRM   BAL P/D CS MR ECOA  ACCOUNT NUMBER
WFBFINANCE,668FP04491  05/02 07/01 1500      0      RL 03 J         196-28428475
CHARGES                          DLA 12/01

ANDERSON, RUSSELL D SR
1614,WILDWOOD,AVE,NEWR,WI,54017

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 4012500040,2 CREDIT BUREAU INC.
ANDERSON RUSSELL D SR FN 004-3350526-00-649
1614 WILDWOOD AVE NEW RICHMOND WI 54017

AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CROSSCNTRY*458ON08054 06/02 04/99 CONSUMER DECEASED 422709748440
DLA 06/02

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
S&C BANK *668B854029 05/02 12/01 22K 251 22K I1 04 J 406995201287126
30(00)60(00)90+(00) DLA 05/02
HOME IMPROVEMENT LOAN
FMC *905FA04045 05/02 06/99 21K 351 8775 I1 35 J JHA2183DN0
30(00)60(00)90+(00) DLA 05/02
AUTO
FORD CRDT *905FA03831 05/02 11/00 16K 283 11K I1 18 J EBA36121R7
30(00)60(00)90+(00) DLA 05/02
AUTO
NELNET LNS*146F200277 01/02 09/96 17K 228 20K I1 64 I 39478472001
30(00)60(00)90+(00) DLA 01/02
STUDENT LOAN
WELLSFARGO*612FM00449 05/02 05/01 170K 1K 166K I1 10 J 4728571702
30(00)60(00)90+(00) DLA 05/02

CSC041

CSC042

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.
RUSSELL D SR

TO 401ZSDO040.2
ANDERSON
1614 WILDWOOD AVE NEW RICHMOND WI 54017

FN 004-335052G-00-649

REAL ESTATE MORTGAGE
FHA MORTGAGE
CAP 1 BANK*950BB01498 03/02 08/01 306 0 R1 07 I 5291152203619
30(00)60(00)90+(00) DLA 03/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
BANG **168U00821 06/01 10/00 166K 1K 0 I1 05 J 3900612140152
30(00)60(00)90+(00) DLA 05/01
REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINAC*F*613FP020316 04/00 12/94 21K 365 0 I1 08 I 9565-14815119
30(00)60(00)90+(00) DLA 11/99
PAID ACCOUNT/ZERO BALANCE
K3HUSA-ASF *155FA00737 02/00 08/95 21K 357 0 I1 52 M DLA 02/00
30(00)60(00)90+(00) 516497
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*458BB02569 04/99 04/99 500 RO J 5414907C9116
30(00)60(00)90+(00) DLA 04/99

CSCO43

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401280040,2      CREDIT BUREAU INC.
ANDERSON              RUSSELL  D SR
1614 WILDWOOD AVE  NEW RICHMOND  WI  54017                    FN 004-3350526-00-649

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SONSTAR  *409FP11419 02/97 12/94  21K 365    0         I1 25 I    4357-471-48733
30(00)60(00)90+(00)                                              DLA  02/97
ACCOUNT TRANSFERRED OR SOLD
MELNET LN8*1466*0002*7 12/96  07/92 2625 78M    0         I1 44 I    39478*72001
30(00)60(01)90+(03) 03/96-15,02/96-15,01/96-14                  DLA  10/96
STUDENT LOAN
REFINANCED
MELNET LN8*1466*0002*7 03/96 03/93 2625 69M    0         I5 28 I    39478*720C4
30(00)60(00)90+(02) 12/95-15,11/95-15                          DLA  01/96
STUDENT LOAN
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 (COLL 02/98 #56*C284 FOR NMERX REGIONAL,$109,02/00 PAID
BAL-02/00 $0, DLA-05/97, I-896966
08/95 JUDG 152V055A,S805,DEF- RUSSELL ANDERSON,CASE NO- CV950402FD
,THE SADDLE CLUB APTS

REF TO CSC CREDIT SERVICES,                       PO BOX 981221,
,EL PASO,TX, 79998-1221,800/392-7816,WWW.CSCCREDIT.COM

CSC044

FROZEN 623 2002 MONTH 07 NAME/SSN. RECORDS
**************************

ANDERSON                    RUSSELL D SR
1614 WILDWOOD AVE NEW RICHMOND WI 54017

ANDERSON, RUSSELL,D,SR.                                    FN 004-3350522-00-649    ANDERSON,RUSSELL,AVE,NEWR,WI,54017
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00
  TELEPHONE NUMBER (715) 246-2213 SPEC 07/02.                   FILE SINCE 07/31/88
1380,HERITAGE,DR APT 17,NEWR,WI,54017, CRT RPTD 04/00.
L3,BATCHELDER,AVE,MANC,NH,03103, CRT RPTD 09/99.
SOCIAL 02/25/1962 DOB-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

 *INQS- 36 INQUIRIES SINCE 00/64,06/13/02 ,PRM 850BB01498, 06/26/02
 PRM 404CN01216, 05/06/02 ,PRM 850BB01496, 04/19/02 ,PRM 850BB01498, 04/18/02
 ,AR 102FN11660, 03/22/02 ,AR 850B824906, 03/14/02 ,PRM 850BB01498, 02/22/02
 ,AR 850B824906, 01/25/02 ,AR 850B824906, 01/19/02 ,AR 850B824906, 01/09/02
 ,AR 491FM88870, 11/27/01 ,AR 491FM88990, 11/16/01 ,PRM 850BB01498, 11/09/01
 ,AR 850B824906, 11/08/01 ,PRM 850BB01499, 11/02/01 ,PRM 491FM88990, 11/05/01
 ,PRM 850BB01498, 10/08/01 ,AR 850B824906, 10/08/01 ,PRM 682FY01877, 10/03/01
 ,PRM 633ML13343, 09/26/01 ,PRM 850BB01498, 09/07/01 ,PRM 496FM03218,
 07/19/01 ,PRM 850BB0198, 07/19/01,WELLSFARGO,491FM6356, 03/20/01, 03/20/01
 EU 146ZB13616,2401,00, 03/14/01, CENTENNIAL,234FM31033
 02/02/01, 02/01/01, EU 146ZB13616/2401, HHLD BANK,163BB22075,12/16/00,
 CAPONEBANK,494BB2629,12/01/00, TOUSLEY FO,613AN604,11/06/00, STANDARD
 ,491FM621,09/29/00, 09/29/00, EU 616ZB04838/144, 09/27/00,EU 181ZB03095/NORT.
 09/13/00,EU 146ZB13616/2401, 08/01/00 ,EU 146ZB13616/2401,
 * PRM/ID CODE,MND//C TRM  BAL P/D CS MR ECOA
 WELLSFARGO*612FM00449 06/02 05/01 170K 1K 16R     I1 I1 J          DLA 06/02
  30(00)60(00)90+(00)

```
       CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2      CREDIT BUREAU INC.
 ANDERSON                    RUSSELL D SR                    FN 004-3350522-00-649
 1614  WILDWOOD  AVE  NEW RICHMOND  WI  54017

REAL ESTATE MORTGAGE
FHA MORTGAGE
CAP 1 BANK*850BB01498 07/02 06/02  162 15   162     R1 01 I        517805222521
   30(00)60(00)90+(00)                                           DLA 07/02
CREDIT CARD
WFFINANCE *668FPC4491 06/02 07/01 1500        0     R1 10 J        196-28428475
   30(00)60(00)90+(00)                                           DLA 12/01
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
NELNET LNS*146FZ00277 06/02 09/96  17K 228  20K     I1 69 I         39478472001
   30(00)60(00)90+(00)                                           DLA 06/02
STUDENT LOAN
CROSSCNTRY*458ON08054 07/02 04/99 CONSUMER DECEASED                422709748440
                                                                 DLA 07/02
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
S&C BANK  *668BB54029 06/02 12/01  22K 251  22K     I1 05 J     406995201287126
   30(00)60(00)90+(00)                                           DLA 06/02
HOME IMPROVEMENT LOAN

 PAGE 2
```

CSC045

CSC046

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.

TO 401ZSD0040,2
ANDERSON  RUSSELL D SR
1614 WILDWOOD AVE  NEW RICHMOND WI 54017

FN 004-3350522-00-649

PAGE 3

TMC                                    JMA2183GNO
*905FA03015  05/02  06/99  21K  351  8775  I1 35 J  DLA 05/02
30(00)60(00)90+(00)

AUTO
FORD CRDT *905FA03831  05/02  11/00  16K  283  11K  I1 18 J  EBA161219T
30(00)60(00)90+(00)                                           DLA 05/02

AUTO
CAP 1 BANK*550BB01498  03/02  08/01  306  0  R1 07 Z  52911S203819
30(00)60(00)90+(00)                                  DLA 03/02
ACCOUNT CLOSED AT CONSUMERS REQUEST

PAMG ACCOUNT/ZERO BALANCE
AAMG  *168BB0091  06/01  10/00  166K  1K  0  I11 05 J  3300B621148152
30(00)60(00)90+(00)                                       DLA 05/01

REAL ESTATE MORTGAGE
FHA MORTGAGE
WFHFINACCPT*513FZC0316  04/00  12/94  21K  365  0  I1 08 I  9565-148151119
30(00)60(00)90+(00)                                          DLA 11/99

PAID ACCOUNT/ZERO BALANCE
KBUSA-ASF  *155FA00737  02/00  08/95  21K  357  0  I1 52 M  DLA 02/00
30(00)60(00)90+(00)                                          516697

```
      CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2      CREDIT BUREAU INC.
 ANDERSON                 RUSSELL D SR                  FN 004-3350522-00-649
 1614  WILDWOOD  AVE  NEW RICHMOND  WI  54017

PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*458BB02969 04/99 04/99  500              R0    J        541490709116
   30(00)60(00)90+(00)                                          DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR   *409FP11419 02/97 12/94  21K 365    0     I1 25 I      4357-47148733
   30(00)60(00)90+(00)                                          DLA 02/97
ACCOUNT TRANSFERRED OR SOLD
NELNET LNS*146FZ00277 12/96 07/92 2625 74M    0     I1 44 I        39478472001
   30(00)60(01)90+(03) 03/96-I5,02/96-I5,01/96-I4               DLA 10/96
STUDENT LOAN
REFINANCED
NELNET LNS*146FZ00277 03/96 03/93 2625 69M    0     I5 28 I        39478472004
   30(00)60(00)90+(01) 12/95-I5                                 DLA 01/96
STUDENT LOAN
*PUBLIC RECORDS AND OTHER INFORMATION
 02/00 COLL 02/98 456YC284 FOR AMERY REGIONAL,$109,02/00 PAID
           BAL-02/00 $0,  DLA: 05/97, I,896966

 PAGE 4
```

CSC047

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 4012S00040,2 CREDIT BUREAU INC.
ANDERSON RUSSELL D SR FN 004-3350522-00-649
1614 WILDWOOD AVE NEW RICHMOND WI 54017

REF TO CSC CREDIT SERVICES, PO BOX 981221,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

CSC048

```
     FROZEN 623 2002 MONTH 08 NAME/SSN  RECORDS
     ******************************************

ANDERSON                  RUSSELL D SR                  FN 004-3350522-00-653  ANDERSON,RUSSELL,D,SR
1614  WILDWOOD  AVE  NEW RICHMOND  WI  54017                                   1614,WILDWOOD,AVE,NEWR,WI,54017

ANDERSON,RUSSELL,D,SR.                                   FILE SINCE 07/31/88
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00
    TELEPHONE NUMBER (715) 246-2213 SPEC 07/02.
1380,HERITAGE,DR APT 17,NEWR,WI,54017, CRT RPTD 04/00.
13,BATCHELDER,AVE,MANC,NH,03103, CRT RPTD 09/99.
 BORN 09/05/1960.SSS-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
  ,DELTA AIR LINES, , ,.
*INQS-  37 INQUIRIES SINCE 00/64.AMEX,1900N1836,08/18/02, STWTR FORD
,613AN16404,08/07/02, TOUSLEY FO,613AN604,08/05/02, 06/13/02 ,PRM 850BB01498,
06/06/02 ,PRM 404ON01216, 05/06/02 ,PRM 850BB01498, 04/19/02 ,PRM 850BB01498,
04/18/02 ,AR 103FM11640, 03/22/02 ,AR 850BB24906, 03/14/02 ,PRM 850BB01498,
02/22/02 ,AR 850BB24906, 01/28/02 ,AR 850BB24906, 01/19/02 ,AR 850BB24906,
01/09/02 ,AR 491FM98970, 11/27/01 ,AR 491FM98970, 11/16/01 ,PRM 850BB01498,
11/09/01 ,AR 850BB24906, 11/08/01 ,PRM 850BB01498, 11/02/01 ,PRM 491FM98970,
10/10/01 ,PRM 850BB01498, 10/08/01 ,AR 850BB24906, 10/08/01 ,PRM 682FP04877,
10/03/01 ,PRM 613DM15348, 09/26/01 ,PRM 850BB01498, 09/07/01 ,PRM 496FM03218,
WELLSFARGO,491FM6356,03/20/01, 03/20/01 ,EU 146ZB13616/2401,00, 03/14/01
 EU 616ZB04898/144,00, CENTENNIAL,234FM31033,02/02/01, 02/01/01
 EU 146ZB13616/2401, HHLD BANK,163BB22075,12/16/00, CAPONEBANK,484BB2629
,12/01/00, TOUSLEY FO,613AN604,11/06/00, STANDARD,491FM623,09/29/00, 09/28/00
  ,EU 616ZB04898/144, 09/27/00 ,EU 181ZB03096/NORT, 09/13/00
 EU 146ZB13616/2401.
*   FIRM/ID CODE       RPTD  OPND  H/C TRM  BAL P/D CS MR ECOA  ACCOUNT NUMBER
WELLSFARGO*612FM00449 08/02 05/01 170K 1K  165K     I1 13 J          4728571702
   30(00)60(00)90+(00)                                          DLA 08/02
```

CSC049

CSC050

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.
RUSSELL D SR
ANDERSON
TO 401ZS00040.2
1614 WILDWOOD AVE   NEW RICHMOND   WI 54017

FN 004-3350522-00-653

REAL ESTATE MORTGAGE
FHA MORTGAGE
NELNET LNS*L46F200277 08/02 09/96   17K 228   19K   I1 71 I   3947847P001
  30(00)60(00)90+(00)                                                        DLA 08/02
STUDENT LOAN
WFFINANCE *668FP04491 07/02 07/01 1500           0           R1 11 J   196-284284475
  SC(00)60(00)90+(00)                                                        DLA 12/01
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
FMCC      *664FA06640 07/02 06/99 21K 351   8073             I1 37 J   JHA21B3DN0
  30(00)60(00)90+(00)                                                        DLA 07/02
AUTO
FMCC      *664FA04660 07/02 11/00 16K 283   11K             I1 20 J   EBA36121R7
  SC(00)60(00)90+(00)                                                        DLA 07/02
AUTO
CAP 1 BANK*8850B801498 08/02 06/02 485  15    522           R1 02 I   517805222521
  30(00)60(00)90+(00)                                                        DLA 08/02
CREDIT CARD
SRC BANK  *6668BD54029 07/02 12/01 22K 251    22K           I1 06 J   4069952012871126
  30(00)60(00)90+(00)                                                        DLA 07/02

PAGE 2

CSC051

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/592-7816
TO 401ZS00040.2    CREDIT BUREAU INC.
ANDERSON    RUSSELL D SR
1614 WILDWOOD AVE   NEW RICHMOND   WI  54017

FN 004-3350522-00-653

PAGE 3

HOME IMPROVEMENT LOAN
CROSSCNTRY*4580N08054 08/02 04/99 CONSUMER DECEASED                    422709748440
                                                                       DLA 08/02

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CAP 1 BANK*85080B01498 03/02 08/01  306        0    R1 07 I           529115203619
ACCOUNT CLOSED AT CONSUMERS REQUEST                                    DLA 03/02
AAMG *168BB00821 06/01 10/00 166K 1K           0    I1 05 J           33061214B152
PAID ACCOUNT/ZERO BALANCE                                              DLA 05/01
   30(00)60(00)90+(00)
REAL ESTATE MORTGAGE
*168BB00821
FHA MORTGAGE
WFFNACPT*613FP20316 04/00 12/94  21K 365       0    I1 08 I           9565-148151119
   30(00)60(00)90+(00)                                                 DLA 11/99
PAID ACCOUNT/ZERO BALANCE
KBUSA-ASF *155FA00737 02/00 08/95  21K 357          I1 52 M           516497
   30(00)60(00)90+(00)                                                 DLA 02/00
PAID ACCOUNT/ZERO BALANCE

CSC052

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.

TO 401ZSO0040.2
ANDERSON RUSSELL D SR
1614 WILDWOOD AVE   NEW RICHMOND   WI 54017

FN 004-3350522-00-653

AUTO
CROSS CITRY*458B802969 04/99 04/99 500 R0 J 541490709116
30(00)60(00)90+(00) DLA 04/99

CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR *H409FP11410) 02/97 12/94 21K 365 0 I1 25 I 4357-471487733
30(00)x60(00)90+(00) DLA 02/97

ACCOUNT TRANSFERRED OR SOLD
NELNET LNS*146FZ00277 12/96 07/92 2625 74M 0 I1 44 I 394784720001
30(00)60(00)90+(03) 03/96-I5,02/96-I5,01/96-I4 DLA 10/96
STUDENT LOAN
REFINANCED

NELNET LNS*146FZ00277 03/96 03/96 2625 69M 0 I5 28 I 394784720004
30(00)60(00)90+(00) DLA 01/96
STUDENT LOAN
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 456YC284 FOR AMERY REGIONAL,$109,02/00 PAID
BAL-02/00 $0, DLA: 05/97, 1,896966

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,

CSC053

FROZEN 623 2002 MONTH 09 NAME/SSN RECORDS
***************************************

ANDERSON
1614 WILDWOOD AVE   NEW RICHMOND WI 54017

ANDERSON,RUSSELL D SR.
1614,WILDWOOD,AVE,NEWR,WI,54017,   RUSSELL D SR   NEW RICHMOND WI 54017
TELEPHONE NUMBER (715) 246-2215 SPEC 07/02.
1380,HERITAGE,DR APT 17,NEWR,WI,54017, CRT RPTD 04/00.
13,BATCHELDER,AVE,MANC,NH,03103, CRT RPTD 09/99.
BORN 09/05/1960,SSS-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

FN 004-3350522-00-653
FILE SINCE 07/31/88

ANDERSON,RUSSELL D SR
1614,WILDWOOD,AVE,NEWR,WI,54017

PAGE 1

| | OPND | RPTD | H/C | TRM | BAL | P/D | CS | MR | ECOA | ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | DLA 09/02 | |

*INGE- 35 INQURIES SINCE 00/04. AMEX 1900N1836,08/18/02, STWTR FORD
,613AN1604,08/07/02, TOUSLEY FO,613AN1604,08/02/02, PRM 850BB01498,
06/06/02 , PRM 4040N01216, 05/06/02,PRM 850BB01498,06/13/02,PRM 850BB01498,
04/18/02 ,AR 103FM11640, 03/22/02,AR 850B824906,03/14/02,PRM 850BB01498,
02/22/02 ,AR 850B824906, 01/28/02,AR 850B824906,01/19/02,AR 850B824906,
01/09/02 ,AR 491FM98970, 11/27/01,AR 491FM98970,11/16/01,AR 850B824906,
11/09/01 ,AR 850BB2496, 11/08/01, PRM 850BB01498,11/02/01,PRM 491FM98970,
10/10/01 ,PRM 850BB01498, 10/08/01,AR 850BB24906,09/26/01,PRM 682FP0877,
10/03/01 ,PRM 613DM11538, 09/26/01, PRM 850BB01498,WELSARGO491FM98256,
03/20/01 ,03/20/01 ,EU 1462N1361616/240I,00. 03/14/01 HHLD BANK,
CENTENNIAL,234FM31033,02/02/01, EU 1462N1361616/240I, TOUSLEY FO,613AN604,
,1638B2207,12/16/00, CAPONEBANK,4864B82629,12/01/00,EU 616ZB04898/144,,00,
,116/01,STANDARD,491FM623,09/29/00,09/28/00 ,EU 616ZB04898/144,, 09/27/00
* FIRM/ID CODE              RPTD
NELNET LNSX146F200277 09/02 09/96
30(00)060(00)90+(00)

CSC054

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.

TO 401ZS00040.2
ANDERSON                    RUSSELL D SR
1614 WILDWOOD   AVE   NEW RICHMOND   WI   54017

FN 004-3350522-00-653

PAGE 2

STUDENT LOAN
PAYMENT DEFERRED
CAP I BANK*8B50BB01498 09/02 06/02  522 15      497   R1 03 I      517805222521
30(00)60(00)90+(00)                                                DLA 09/02
CREDIT CARD
WFFINANCE*668FP04491 08/02 07/01 1500               0   R1 12 J      196-28428475
30(00)60(00)90+(00)                                                DLA 12/01
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CROSSCNTRY*45B0N08054 09/02 04/99 CONSUMER DECEASED
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT                                4227097484640
S&C BANK *668B854029 08/02 12/01  22K  251   22K   I1 07 J      40699520128B7126
30(00)60(00)90+(00)                                                DLA 08/02
HOME IMPROVEMENT LOAN
FMCC        *644FA04640 08/02 06/99  21K 351 8073   I1 38 J      JHA21B5DN0
AUTO                                                               DLA 08/02
30(00)60(00)90+(00)

CSC055

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                    CREDIT BUREAU INC.
                    RUSSELL D SR
TO 401ZS00040.2
ANDERSON
1614 WILDWOOD AVE  NEW RICHMOND WI 54017
                                              FN 004-3350522-00-653

PAGE 3

FMCC        *644FA04640 08/02 11/00  16K  283  11K  I1 21 J    EBA53612187
  30(00)60(00)90+(00)                                          DLA 08/02
AUTO
  30(00)60(00)90+(00)
FMCC        *644FA04640 08/02 08/02  27K  456  27K  I0    J    EBA156G71Y
AUTO
WELLSFARGOD%612FM00449  08/02 05/01 170K  1K  165K  I1 13 J    47285717Q2
  30(00)60(00)90+(00)                                          DLA 08/02
REAL ESTATE MORTGAGE
FHA MORTGAGE
CAP 1 BANK*650BD01498   03/02 08/01       306    0  R1 07 I    52911520361G
  30(00)60(00)90+(00)                                          DLA 03/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
AAMG        *168BB00821 06/01 10/00 166K  1K    0  I1 05 J    3530612148152
  30(00)60(00)90+(00)                                          DLA 05/01
REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINACCPT%613FP20316   04/00 12/94  21K  365    0  I1 08 I    9565-14815119
  30(00)60(00)90+(00)                                          DLA 11/99
```

CSC056

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
RUSSELL D SR
NEW RICHMOND WI

TO 401ZS00040.2
ANDERSON
1614 WILDWOOD AVE NEW RICHMOND WI 54017

FN 004-3350522-00-653

PAGE 4

PAID ACCOUNT/ZERO BALANCE
KBUSA-ASF *155FA00737 02/00 08/95 21K 357 0 I1 52 M DLA 02/00 516497
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*4588B02969 06/99 06/99 500 R0 J 54149070916 DLA 04/99
30(00)60(00)90+(00)
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR *409FP11419 02/97 12/94 21K 365 0 I1 25 I 4357-47148733 DLA 02/97
30(00)60(00)90+(00)
ACCOUNT TRANSFERED OR SOLD
NELNET LNS*16FZ00277 12/96 07/92 2625 74M 0 I1 44 I 3947847001 DLA 10/96
30(00)60(00)90+(03) 03/96-15,02/96-15,01/96-14
STUDENT LOAN
REFINANCED
NELNET LNS*146FZ00277 03/96 03/93 2625 69M 0 I5 28 I 39478472004 DLA 01/96
30(00)60(00)90+(00)
STUDENT LOAN

CSC057

141

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.

TO 401ZS00040,2
ANDERSON          RUSSELL D SR
1614 WILDWOOD  AVE  NEW RICHMOND  WI  54017

FN 004-3350522-00-653

*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 456YC284 FOR AMERY REGIONAL $109,02/00 PAID
BAL-02/00 $0, DLA: 05/97, I,896966

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,

CSC058

```
                    FROZEN 623 2002 MONTH 10 NAME/SSN RECORDS
                    *******************************************
```

ANDERSON                    RUSSELL  D SR                              FN 004-3350458-00-653
1614   WILDWOOD   AVE   NEW RICHMOND   WI  54017

                                                                      FILE SINCE 07/31/88        ANDERSON,RUSSELL,D,SR
                                                                                                 1614,WILDWOOD,AVE,NEWR,WI,54017

ANDERSON,RUSSELL,D,SR.
1614,WILDWOOD,AVE,NEWR,WI,54017, TAPE RPTD 12/00
1380,HERITAGE,DR,APT 17,NEWR,WI,54017, CRT RPTD 04/00.
3,BATCHELDER,AVE,MANC,NH,03103, CRT RPTD 09/99.
BORN 09/1959 SOCSS-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
DELTA AIR LINES/BUSINESS-

*INQS- 30 INQUIRIES SINCE 00/06, 09/27/02 ,AR 850BB24906, AMEX 190QN1836
,08/18/02, STWTR FORD,613ANI6404,08/07/02, TOUSLEY FO,613ANG404,
06/13/02 ,PRM 850BB01498, 06/06/02 ,PRM 40QN0121G,05/06/02 ,PRM 850BB01498,
06/19/02 ,PRM 850BB01498, 04/18/02 ,AR 103FM11640, 03/22/02 ,AR 850BB24906,
03/14/02 ,PRM 850BB01498, 02/22/02 ,AR 850BB24906, 01/28/02 ,AR 850BB24906,
01/19/02 ,AR 850BB24906, 01/12/02 ,AR 491FM98970, 11/27/01 ,AR 491FM98970,
11/16/01 ,AR 850BB01498, 11/09/01 ,AR 850BB24906, 11/08/01 ,PRM 850BB01498,
11/02/01 ,PRM 491FM98970, WELLSFARGO,491FM6356,05/20/01 ,PRM 850BB01498,
,02/02/01 ,02/01/01 ,EU 1462B13161/2401,.00,03/14/01 ,EU 616ZB04898/144.00, CENTENNIAL,234FM31033
,03FM11640, HHLD BANK,1635BB2075,12/16/00, CAFONEBANK,4848B2629,12/01/00,
TOUSLEY FO,613BB2601,11/06/00.

*     FIRM/ID CODE  OPND  RPTD  H/C  TRM  BAL  P/D  CS  MR  ECOA   ACCOUNT NUMBER
FMCC  30(00)60(00)90+(00)
      *646FA04640   09/02 06/99  21K  351   0   I1  39   J               JHA2185DN0
AUTO                                                                     DLA 08/02
FMCC  30(00)60(00)90+(00)
      *646FA04640   09/02 11/00  16K  283  10K  I1  22   J               EBA36121R7
                                                                         DLA 09/02
PAGE 1
```

CSC0059

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.
RUSSELL D SR
ANDERSON
TO 401ZS00040,2
1614 WILDWOOD AVE   NEW RICHMOND   WI  54017

FN 004-3350458-00-653

PAGE 2

```
AUTO
FMCC          *644FA046640 09/02 08/02 27K  456  26K        I0  J    EBA15667IY
  3(C(00)60(00)90+(00)                                                DLA 09/02

AUTO
CAP 1 BANK*8508B01498 10/02 06/02 522   7            R1 04 I  517805222521
  3(C(00)60(00)90+(00)                                                DLA 10/02

CREDIT CARD
CROSSCNTRY*45BDN08054 10/02 04/99 CONSUMER DECEASED          422709748440
CREDIT CARD                                                          DLA 10/02

AMOUNT IN H/C COLUMN IS CREDIT LIMIT
NW AIR FCU *613FC15148 10/02 09/02 25K  315  25K         J    135397774
SECURED                                                             DLA 10/02
  3(C(00)60(00)90+(00)

S&C BANK  *668BB5602G 09/02 12/01 22K  25I  22K        I1 08 J 406995201287126
  3(C(00)60(00)90+(00)                                              DLA 09/02

HOME IMPROVEMENT LOAN
WELLSFARG0*612FM004449 09/02 05/01 170K  1K  165K      I1 14 J 472085711702
  3(C(00)60(00)90+(00)                                              DLA 09/02
```

CSC060

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

                    CREDIT BUREAU INC.
                       RUSSELL D SR
TO 401ZS00040.2
ANDERSON
1614 WILDWOOD AVE  NEW RICHMOND WI 54017

                                          FN 004-3350458-00-653

REAL ESTATE MORTGAGE
FHA MORTGAGE
NELNET LNS*146FZ00277 09/02 09/96  17K 22B 19K  I1 72 I  DLA 09/02
                                                         3947847001
STUDENT LOAN
PAYMENT DEFERRED
WFFINANCE *668FP04491 08/02 07/01 1500       0  R1 12 J  DLA 12/01
                                                         196-28428475
CHARGE
30(00)60(00)90+(00)
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
CAP 1 BANK*850BB01408 03/02 08/01 306         0  R1 07 I  DLA 03/02
                                                          5291152035619
30(00)60(00)90+(00)
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
AAMG *168BB00821 06/01 10/00 166K 1K          0  I1 05 J  DLA 05/01
                                                          3530612148152
REAL ESTATE MORTGAGE
FHA MORTGAGE
30(00)60(00)90+(00)
WFFINACCPT*613FP20316 04/00 12/94 21K 365     0  I1 08 I  9565-16815119
                                                          DLA 11/99
30(00)60(00)90+(00)

PAGE 3
```

CSC061

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
RUSSELL D SR
NEW RICHMOND WI 54017

TO 401ZS00040.2
ANDERSON
1614 WILDWOOD AVE

FN 004-335045B-00-653

PAGE 4

PAID ACCOUNT/ZERO BALANCE
KBUS*-ASP *X15FA0073/ 02/00 08/95  21K  357  0  I1 52 M   DLA 02/00    516497
  3C(00)60(00)90+(00)
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*45B8B02969 04/99 04/99  500          R0  J   561690709116  DLA 04/99
  3C(00)60(00)90+(00)
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR  *409FP11419 02/97 12/94  21K  365  0  I1 25 I   4357-47148733 DLA 02/97
  3C(00)60(00)90+(00)
ACCOUNT TRANSFERRED OR SOLD
NELNET LNS*146F200227 12/96 07/92 2625 74M  0  I1 44 I   59478472001   DLA 10/96
  3C(00)60(00)90+(U1) 03/96-I5
STUDENT LOAN
REFINANCED
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 456YC284 FOR AMERY REGIONAL,$109,02/00 PAID
  BAL-02/00 $0, DLA: 05/97, I,896966

CSC062

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2
ANDERSON                CREDIT BUREAU INC.
1614 WILDWOOD            RUSSELL D SR
                AVE   NEW RICHMOND  WI  54017

FN 004-33504-58-00-653

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,

CSC063

```
FROZEN 623 2002 MONTH 11 NAME/SSN  RECORDS
*********************************************
*********************************************

ANDERSON                          RUSSELL D SR          FN 004-3350522-00-653      ANDERSON,RUSSELL,D,SR
1614 WILDWOOD  AVE  NEW RICHMOND  WI 54017                                         1614,WILDWOOD,AVE,NEWR,WI,54017

ANDERSON,RUSSELL,D,SR,WI,54017 ,TAPE RPTD 12/00                    FILE SINCE 07/31/88
  TELEPHONE NUMBER (715) 246-2213 SPEC 10/02.
1380,HERITAGE,DR APT 17,NEWR,WI,54017, CRT RPTD 04/00.
13,BATCHELDER,AVE,MANC,NH,03103, CRT RPTD 09/99.
  DCSN 0574857/1960,SSS-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
       DELTA AIR LINES.

*INQS- 26 INQUIRES SINCE 00/64.10/17/02 ,PRM 682FM28517, 10/14/02
  AR 491FM98970,10/11/02 ,AR 103FM11640,09/27/02 ,AR 850BB24906, AMEX
 ,190N1836,08/18/02, STWTR FORD,613AN1640,08/17/02, TOUSLEY FO,613AN604
 ,08/05/02, 06/13/02, ,PRM 850BB01498, 06/06/02, ,PRM 404DN0126, 05/06/02
 ,PRM 850BB01498, 04/19/02 ,PRM 850BB01498, 04/18/02 ,AR 103FM11640, 03/22/02
 ,AR 850BB24906, 03/14/02 ,PRM 850BB01498, 02/22/02 ,AR 850BB24906, 01/28/02
 ,AR 850BB24906, 01/19/02 ,AR 850BB24906, 01/09/02 ,AR 491FM98970, 11/27/01
 ,AR 491FM98970, WELLSFARGO,491FM6356,03/20/01, EU 1662B13616/2401
 ,00, 03/14/01 ,EU 1662B13616/2401 HHLD BANK,234FM3035,02/20/01,
 02/01/01 ,EU 1662B13616/2401 CENTENNIAL,234FM3035,12/16/00, CAPONEBANK
 ,404BB2629,12/01/00.
*
WELLSFARGO CODE           RPTD  OPND  H/C  TRM  BAL  P/D CS  MR ECOA   ACCOUNT NUMBER
  3C(00)60(00)90Y00449   11/02  05/01 170K  1K  165K     I1 16  J     DLA 11/02  4728571702
REAL ESTATE MORTGAGE
FHA MORTGAGE
CAP 1 BANK,850BB01498   11/02  06/02           522  7       R1 05  I         517805222521
  3C(00)60(00)90+(00)                               7              DLA 11/02

PAGE 1
```

CSC064

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2
ANDERSON                    CREDIT BUREAU INC.
1614 WILDWOOD AVE NEW RICHMOND WI 54017    RUSSELL D SR          FN 004-3350522-00-653

CREDIT CARD
WFFINANCE *664BFP04491 10/02 07/01 1500        991        R1 14 J    196-28428475
  30(00)60(00)90+(00)                                                DLA 10/02
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
NW AIR CU *613FC15148 11/02 09/02 25K 315 24K            I1 01 J    13539774
  30(00)60(00)90+(00)                                                DLA 11/02
SECURE
CROSSCNTRY*458DN08054 11/02 04/99 CONSUMER DECEASED                 42270974B440
                                                                     DLA 11/02
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
S&C BANK *668B54029 10/02 12/01 22K 251  0              I1 09 J    40699520128712G
  30(00)60(00)90+(00)                                                DLA 09/02
HOME IMPROVEMENT LOAN
FMCC *664FA06640 10/02 06/99 21K 351  0                 I1 40 J    JHA2183DN0
  30(00)60(00)90+(00)                                                DLA 08/02
AUTO
FMCC *664FA06640 10/02 11/00 16K 283 10K               I1 23 J    EBA3612IR7
  30(00)60(00)90+(00)                                                DLA 09/02

PAGE 2

CSC065

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
RUSSELL D SR
1614 WILDWOOD AVE NEW RICHMOND WI 54017
FN 004-3350522-00-653

TO 401ZSD0040,2
ANDERSON

```
AUTO
FMCC        *644FA04640 10/02 08/02      27K 456  26K   I1 02 J   DLA 09/02   EBA156071Y
30(00)60(00)90+(00)
AUTO
NELNET LNS*146FZ00277 10/02 09/96        17K 228  19K   I1 73 I   DLA 10/02   39478472001
30(00)60(00)90+(00)
STUDENT LOAN
PAYMENT DEFERRED
CAP 1 BANK*650B01498 03/02 08/01            306    0   R1 07 I   DLA 03/02   529115203619
30(00)60(00)90+(00)
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
AAMG        *168BB00821 06/01 10/00      166K 1K    0   I1 05 J   DLA 05/01   330612140152
30(00)60(00)90+(00)
REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINA*CCFT*613FP20316 04/00 12/94        21K 365   0   I1 08 I               9565-14815119
30(00)60(00)90+(00)                                                           DLA 11/99
PAID ACCOUNT/ZERO BALANCE
```

PAGE 3

CSC066

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.
RUSSELL D SR
NEW RICHMOND WI 54017

TO 401ZS00040.2
ANDERSON
1614 WILDWOOD AVE

FN 004-3350522-00-653

KBUSA-ASF *X15SFA00737 02/00 08/95 21K 357 0 I1 52 M 516497
3C(00)60(00)90+(00)
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRX*45BBB02969 04/99 04/99 500 R0 J 5414907/09116
30(00)60(00)90+(00) DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR *X409F1141Q 02/97 12/94 21K 365 0 I1 25 I 4357-47148733
3C(00)60(00)90+(00) DLA 02/97
ACCOUNT TRANSFERRED OR SOLD
NELNET LNSX146F200277 12/96 07/92 2625 74M 0 I1 44 I 3947847Z001
30(00)60(00)90+(00) DLA 10/96
STUDENT LOAN
REFINANCED
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02?98 456YC284 FOR AMERY REGIONAL,$109,02/00 PAID
BAL-02/00 $0, DLA: 05/97, 1,896966

PO BOX 981221,
REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

CSC067

```
                    FROZEN 623 2002 MONTH 12 NAME/SSN RECORDS
                    *****************************************

ANDERSON
1614 HALLEWOOD    BLVD    NEW RICHMOND  WI   54017
                                                 RUSSELL D    SR

ANDERSON,RUSSELL,D,SR.                                           FN 004-335043D-00-658
1614,HALLEWOOD,BLVD,NEWR,WI,54017.
TELEPHONE NUMBER (715) 246-2213 SPEC 10/02.                      FILE SINCE 07/31/88
I380 HERITAGE,DR,APT 17,NEWR,WI,54017, CRT RPTD 04/00.
I3,BATCHELDER,JR,ANE,MANS,NH,03103,
BORN 09/05/1960 SS-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.
*DELTA AIR LINES*
*INGS- 26 INQUIRIES SINCE 00/64 12/09/02 ,EU 401ZB0Z533/WELL 08, 12/03/02
EU 401ZB0Z533/WELL08, 11/23/02 ,AR 850BB24906, 10/17/02 ,PRM 662FM62657,
10/14/02 ,AR 491FM98970, 10/11/02 ,AR 103FM11640, 09/27/02 ,AR 850BB24906,
AMEX,15900M183,08/18/02, STWTR FORD,613AN16404,08/07/02, TOUSLEY FO,613AN604
,08/05/02, PRM 850BB01498, 06/06/02 ,PRM 404ON01216,
PRM 850BB01498, 04/19/02 ,PRM 850BB01498, 04/18/02 ,AR 103FM11640, 03/22/02
,AR 850BB24906, 03/14/02 ,PRM 850BB01498, 02/22/02 ,AR 850BB24906, 01/28/02
,AR 850BB24906, 01/19/02 ,AR 850BB24906, 01/09/02 ,AR 491FM98970,
WELLSFARGO,491FM6356, 03/20/01, ,EU 146ZB13616/2401, 03/14/01
,EU 162BB14698/2144,00., CENTENNIAL,234FM31033,02/02/01, 02/01/01
*
EU 162BB14698/2144,00,
CAP 1 BANK*850BB01498 12/02 06/02  522  15    61       R1 06  L 7/02
3DC007060(00)90+(00)                                    DLA 12/02
CREDIT CARD                                                  DLA 12/02
CROSSCNTRY 450DN08054 12/02 04/99 SUPPRESS ERRONEOUS TRADE
```

PAGE 1

```
          RPTD  OPND  H/C  TRM  BAL  P/D  CS  MR  ECOA    ACCOUNT NUMBER
                                                          517805222521
                                                          4227097*48440
```

ANDERSON, RUSSELL,D,SR
1614,HALLEWOOD,BLVD,NEWR,WI,54017

EXHIBIT
CSC-8
DL 6/21/04

CSC068

CSC CREDIT SERVICES  PO BOX 981221  EL PASO TX 79998-1221  800/392-7816

CREDIT BUREAU INC.

RUSSELL D SR

TO 401ZS00047.2
ANDERSON
1614 HALLEWOOD BLVD  NEW RICHMOND  WI  54017

FH 004-3350430-00-658

PAGE 2

NO RESPONSE
CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
NW AIR U*&1SFC15148 12/02 09/02 25K 315 24K  I1 02 J  13539774  DLA 12/02
SECURED
NELNET LNS*1146FZ00277 11/02 09/96 17K 228 19K  I1 74 I  39478472001  DLA 11/02
STUDENT LOAN
PAYMENT DEFERRED
FMCC *&44FA04640 11/02 06/99 21K 351 0  I1 41 J  JHA21B3DN0  DLA 08/02
30(00)60(00)90+(00)
AUTO
FMCC *&44FA04640 11/02 11/00 16K 283 10K  I1 24 J  EBA36121R7  DLA 11/02
30(00)60(00)90+(00)
AUTO
FMCC *&44FA04640 11/02 08/02 27K 456 26K  I1 03 J  EBA156971Y  DLA 11/02
30(00)60(00)90+(00)
AUTO
WELLSFARGO%612FM00449 11/02 05/01 170K 1K 165K  I1 16 J  472857I702  DLA 11/02
30(00)60(00)90+(00)

CSC069

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

CREDIT BUREAU INC.
RUSSELL D SR
1614 HALLEWOOD BLVD   NEW RICHMOND   WI   54017

TO 401ZS00040.2
ANDERSON

FN 004-3350430-00-658

REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINANCE *6668FP04491 10/02 07/01 1500 991 R1 14 J 196-28428475
30(00)60(00)90+(00)                                           DLA 10/02

CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
S&C BANK *6668B54029 10/02 12/01 22K 251 0 I1 09 J 40699520128712 6
30(00)60(00)90+(00)                                           DLA 09/02

HOME IMPROVEMENT LOAN
CAP 1 BANK*8850BR01498 03/02 08/01 306 0 R1 07 I 52911520361 9
30(00)60(00)90+(00)                                           DLA 03/02

ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
AANG *1688B00821 06/01 10/00 1K66K 1K 0 I1 05 J 33061214815 2
30(00)60(00)90+(00)                                           DLA 05/01

REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINACCPT*6133FP20316 04/00 12/94 21K 365 0 I1 08 I 9565-1481511 9
30(00)60(00)90+(00)                                           DLA 11/99

PAGE 3

CSC070

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                        CREDIT BUREAU INC
                          RUSSELL D SR
                1614 HALLEWOOD BLVD NEW RICHMOND WI 54017
                                                        FN 004-3350430-00-658

TO 40IZSN0040.2
ANDERSON
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017

PAGE 4

PAID ACCOUNT/ZERO BALANCE
KBUSA-ASP *315F5702737 02/00 08/95   21K 357    0    I1 52 M   DLA 02/00
30(00)60(00)90+(00)                                                     516497
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*45BBB02969 04/99 04/99      500         R0    J    54149070911G  DLA 04/99
30(00)60(00)90+(00)
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR *409FP11419 02/97 12/94   21K 365    0    I1 25 I    4357-47148733  DLA 02/97
30(00)60(00)90+(00)
ACCOUNT TRANSFERRED OR SOLD
NELNET LN3*146F200277 12/96 07/92 2625 74M   0    I1 44 I    3947B472001  DLA 10/96
STUDENT LOAN
30(00)60(00)90+(00)
REFINANCED

*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 456YC2B4 FOR AMERY REGIONAL,$109.02/00 PAID
BAL-02/00 $0, DLA: 05/97, I,696966
```

CSC0071

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2
ANDERSON
1614 HALLEWOOD BLVD

CREDIT BUREAU INC.
RUSSELL D SR
NEW RICHMOND   WI   54017

FN 004-335043d-00-65B

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
PO BOX 981221,

CSC072

```
FROZEN 623 2003 MONTH 01 NAME/SSN RECORDS
***************************************************

ANDERSON                    RUSSELL D SR
1614  HALLEWOOD  BLVD  NEW RICHMOND  WI  54017

                                                        FN 004-3350526-00-661
ANDERSON,RUSSELL,D.,SR.                                 FILE SINCE 07/31/88
1614,HALLEWOOD,BLVD.,NEWR,WI,54017, TAPE RPTD 12/00
TELEPHONE NUMBER (715) 246-2213 SPEC 10/02
1380,HERITAGE,AVE,APT,17,NEWR,WI,54017, CRT RPTD 09/99.
13,BATCHELDER,LANE,MANC,NH,03103, CRT RPTD 04/00.
BORN 09/05/1960 SS-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
 ,DELTA AIR LINES.
*INQS- 25 INQUIRIES SINCE 00/64.12/25/02 ,AR 850B824906, 12/09/02
EU 401ZB02533/WELL,08, 12/03/02 ,EU 401ZB02533/WELL,08, 11/23/02
AR 850B824906, 10/17/02 ,PRM 682FM28517, 10/14/02,AR 49IFM08970, 10/11/02
AR 103FM11216, 09/27/02 ,AR 850B824906,       ,AMEX,1900N1836, 08/18/02,
STWTR FORD,613AN16,004,08/07/02, TOUSLEY FO,613AN604,08/05/02, 06/13/02
PRM 850BB01498, 06/06/02 ,PRM 404GN0126, 05/06/02 ,PRM 850BB01498, 04/19/02
 ,PRM 850BB01498, 04/18/02 ,AR 103FM1140,    03/29/02 ,AR 850B824906, 03/14/02
WELLSFARGO,49IFM6356, 03/20/01, ,EU 146ZB1366,02485,850B824906,
EU 1662B10489/144,00, CENTENNIAL,234FM31033,02/22/01 03/14/01
 FIRM/ID CODE
* 30C007600(00)90+(00)
NELNET LNSX146FZ00277 01/03 09/96  17K  228  19K  II 76  DLA 01/03  394784720001
STUDENT LOAN
PAYMENT DEFERRED
WELLSFARGO246IZFM00449 01/03 05/01 170K  1K 165K  II 18  DLA 01/03  472857/1702
 30C007600(00)90+(00)

PAGE 1
```

| | RPTD | OPND | H/C | TRM | BAL | P/D | CS | MR ECOA | ACCOUNT NUMBER |
|---|---|---|---|---|---|---|---|---|---|

ANDERSON, RUSSELL, D., SR
1614,HALLEWOOD,BLVD.,NEWR,WI,54017

CSC073

```
                    CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040,2                  CREDIT BUREAU INC.
ANDERSON                         RUSSELL D SR
1614 HALLENOOD  BLVD  NEW RICHMOND WI 54017                        FN 004-3350526-00-661

REAL ESTATE MORTGAGE
FHA MORTGAGE
FMCC      *664FA04640  01/03 08/02      25K 456  24K      I1 05 J   DLA 01/03   31681373
          30(00)60(00)90+(00)
AUTO
FMCC      *664FA04640  01/03 11/00      15K 283  9255     I1 26 J   DLA 01/03   25529880
          30(00)60(00)90+(00)
AUTO
CAP 1     BANK*85DB01498  01/03 06/02   522 15   21       R1 07 I   DLA 01/03   517805222521
          30(00)60(00)90+(00)
CREDIT CARD
CROSSCNTRY  458DN08056  12/02 04/99  SUPPRESS ERRONEOUS TRADE      422709748440  DLA 12/02

NO RESPONSE
CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
NW AIR CU *613FC15148  01/03 09/02   25K 315  24K         I1 03 J              13539774   DLA 01/03
          30(00)60(00)90+(00)
SECURED
WFFINANCE *668FP04491  11/02 07/01  1500      991         R1 15 J              196-2842B475  DLA 11/02
          30(00)60(00)90+(00)

PAGE 2
```

CSC074

```
                    CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZSU0040,2          CREDIT BUREAU INC.
ANDERSON                     RUSSELL D SR
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017

                                                                  FN 004-3350526-00-661

CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
FMCS 30(00)60(00)90+(00)
FHCS *646FA0464Q 11/02 06/99 21K 351  0  I1 41 J          JHA21B3DN0
SRC BANK *668BB54Q29 10/02 12/01 22K 251  0               DLA 08/02
AUTO 30(00)60(00)90+(00)
HOME IMPROVEMENT LOAN
CAP 1 BANK*850BB01498 03/02 08/01    306  0  I1 09 J       40699520128712 6
                                                          DLA 09/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
30(00)60(00)90+(00)
PAID ACCOUNT/ZERO BALANCE                     R1 07 I     529115203619
                                                          DLA 03/02
AAMG *168BB008421 06/01 10/00 166K 1K  0  I1 05 J         330612148152
REAL ESTATE MORTGAGE                                      DLA 05/01
*168BB008421
30(00)60(00)90+(00)
FHA MORTGAGE
WFI INACCP1*613FP20316 04/00 12/94 21K 365  0  I1 08 I    9565-1481511 9
PAID ACCOUNT/ZERO BALANCE                                 DLA 11/99
```

CSC075

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

```
TO 4012500040,2
ANDERSON              CREDIT BUREAU INC.
1614 HALLEWOOD        RUSSELL D SR
                      BLVD  NEW RICHMOND WI 54017        FN 004-3350526-00-661

KBUSA-ASF *X15SFA00737 02/00 08/95  2IK 357   0   I1 52 M   DLA 02/00   516497
  30(00)60(00)90+(00)
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*4688B0C2969 04/99 04/99       500   R0   J      DLA 04/99   5614907091116
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR *4409FP11419 02/97 12/97 2IK 365   0   I1 25 I     DLA 02/97   4357-47148733
  30(00)60(00)90+(00)
ACCOUNT TRANSFERRED OR SOLD
NELNET LN5*146FZ00277 12/96 07/92 2625 74M   0   I1 44 I   DLA 10/96   3947847200I
  30(00)60(00)90+(00)
STUDENT LOAN
REFINANCED
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 456YC284 FOR AMERY REGIONAL,$109,02/00 PAID
BAL-02/00 $0, DLA: 05/97, 1,896966

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
                                          PO BOX 981221,
```

CSC076

```
ANDERSON
1614 HALLEWOOD  BLVD  NEW RICHMOND  WI  54017

             FROZEN 623 2003 MONTH 02 NAME/SSN RECORDS
             *********************************************

ANDERSON,RUSSELL,D,SR.          RUSSELL D SR          FN 004-3350526-00-661
1614,HALLEWOOD,BLVD,NEWR,WI,54017.  NEW RICHMOND  WI  54017   FILE SINCE 07/31/88
  TELEPHONE NUMBER (715) 246-2213
1380,HERITAGE,DR APT 17,NEWR WI,54017 SPEC 10/02.
13,BATCHELDER,AVE,MANC,NH,03103,CRT RPTD 04/00.
BORN 09/05/1960,SSS-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 CRT RPTD 09/99.

*DELTA AIR LINES.
*INGS-,6 INQUIRIES, SINCE 00/64,02/03/03,PRM 61SZ13725, 01/29/03
AR 850BB24906,12/23/02,AR 850BB24906, 12/09/02,FU 401ZB02533/WELL,08,
12/03/02,EU 401ZB02533/WELL,08,11/23/02,AR 850BB24906,10/21/02
AR 850BB24906, 10/17/02,PRM 682FM28517, 10/14/02,AR 491FM09970,10/11/02
AR 103FM1640, 09/27/02,AR 850BB24906,08/20/02,AR 850BB24906, 10/11/02
08/05/02, 06/13/02,PRM FORD 613AN1640,08/07/02,AR 850BB24906,
PRM 850BB01498, 06/17/02,STWTR FORD 613AN1640,08/07/02,613AN604
 ,AR 850BB24906, 04/19/02,PRM 850BB01498, TIOUSLEY FD,613AN604
WELLSFARGO,491FM6356,/03/20/01,.AR 850BB24906, 05/06/02
 FIRM/ID CODE                                     103FM1640, 03/22/02
*EU 6162ZB0489B/144,00.   RPTD  OPND  H/C  TRM BAL P/D CS MR ECOA ACCOUNT NUMBER
WELLSFARGO&61ZFM00449   02/03 05/01 170K 1K 164K  II 19 J   47285717702
REAL ESTATE MORTGAGE                                        DLA 02/03
FHA MORTGAGE
NELNET LNS%146FZ00277   02/03 09/96  17K 228  19K  I1 77 I
 3C(00)60(00)90+(00)                                        DLA 02/03
                                                         3947847/2001

PAGE 1

ANDERSON, RUSSELL,D,SR
1614,HALLEWOOD,BLVD,NEWR,WI,54017
```

CSC077

```
                    CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                              CREDIT BUREAU INC.
TO 401ZSO0040,2                   RUSSELL D SR
ANDERSON
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017

                                                              FN 004-3350526-00-661

STUDENT LOAN
PAYMENT DEFERRED
NW AIR CU *613FC15148 02/03 09/02    25K 315   24K    I1 04 J    DLA 02/03  13539774
30(00)60(00)90+(00)
SECURED
CROSSCNTRY 4580N08054 12/02 04/99 SUPPRESS ERRONEOUS TRADE               4227097 48440
                                                                           DLA 12/02
NO RESPONSE
CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
FMCC                        07/03 08/02   25K 456  23K   I1 06 J          31681373
*644FA04640                                                               DLA 02/03
AUTO
FMCC *644FA04640 02/03 11/00  15K 283 8727              I1 27 J           25529880
AUTO 30(00)60(00)90+(00)                                                  DLA 02/03
WFFINANCE *668FP04491 12/02 07/01 1500          591    R1 16 J           196-2842
30(00)60(00)90+(00)                                                        8475
CHARGE                                                                    DLA 12/02
AMOUNT IN H/C COLUMN IS CREDIT LIMIT

PAGE 2
```

CSC078

```
                    CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                                      CREDIT BUREAU INC.
                                        RUSSELL D SR
TO 401ZSQ0040.2  ANDERSON
1614 HALLEWOOD   BLVD   NEW RICHMOND  WI  54017                    FN 004-3350526-00-661

CAP 1 BANK*85C5BD1498  01/03 06/02  522  15   21  R1 07 I       517805222521
  30(00)60(00)90+(00)                                                  DLA 01/03
CREDIT CARD

FMCC *644FA06640       11/02 06/99  21K  35I    0  I1 41 J      JHA21B53DNO
  30(00)60(00)90+(00)                                                  DLA 08/02
AUTO

S&C BANK *66B8B54029   10/02 12/01  22K  25I    0  I1 09 J      40699520128712
  30(00)60(00)90+(00)                                                  DLA 09/02
HOME IMPROVEMENT LOAN

CAP 1 BANK*850BBD1498  03/02 08/01  306         0  R1 07 I      52911520361
  30(00)60(00)90+(00)                                                  DLA 03/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE

AAMG *1688B00821       06/01 10/00  166K 1K     0  I1 05 J      33061214B152
  30(00)60(00)90+(00)                                                  DLA 05/01
REAL ESTATE MORTGAGE
FHA MORTGAGE

WFFINACCP1*613FP20316  04/00 12/94  21K  365    0  I1 08 I      9565-148I5119
  30(00)60(00)90+(00)                                                  DLA 11/99

PAGE 3
```

CSC079

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS000G0,2      CREDIT BUREAU INC.
ANDERSON            RUSSELL D SR
1614 HALLEWOOD      BLVD  NEW RICHMOND WI 54017            FN 004-3350526-00-661

PAGE 4

```
PAID ACCOUNT/ZERO BALANCE
KBUSA-ASF *155FA00737 02/00 08/95   21K 357    0    I1 52 M    DLA 02/00    516497
PAID   30(00)60(00)90+(00)
AUTO ACCOUNT/ZERO BALANCE
CROSS CTRY*45BB002969 04/99 04/99    500         R0   J        DLA 04/99    54190709116
CREDIT CARD    30(00)60(00)90+(00)
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR*409FP11419 02/97 12/94   21K 365    0    I1 25 I       DLA 02/97    4357-471-48733
30(00)60(00)90+(00)
ACCOUNT TRANSFERED OR SOLD
NELNET LNSX166FZ0027 12/96 07/92 2625 74M   0    I1 44 I       DLA 02/97    39478472001
30(00)60(00)90+(00)
STUDENT LOAN
REFINANCED                                                    DLA 10/96
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COL 02/98 456YC2B4 FOR AMERY REGIONAL,$109,02/00 PAID
BAL-02/00 $0, DLA: 05/97, I,896966
```

CSC080

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2
ANDERSON
1614 HALLEWOOD
BLVD    NEW RICHMOND    WI    54017

CREDIT BUREAU INC.
RUSSELL D SR

FN 004-3350526-00-661

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,

CSC081

```
FROZEN 623 2003 MONTH 03 NAME/SSN  RECORDS
**************************************************

ANDERSON                    RUSSELL D SR
1614  HALLEWOOD  BLVD  NEW RICHMOND  WI  54017

                                                    FN 004-3350526-00-661

                                                    FILE SINCE 07/31/88

ANDERSON,RUSSELL,D,SR                               ANDERSON,RUSSELL,D,SR
1614,HALLEWOOD,BLVD,NEWR,WI,54017,                  1614,HALLEWOOD,BLVD,NEWR,WI,54017
  TELEPHONE NUMBER (715)246-2213 SPEC 10/02.
1380,HERITAGE,DR,APT 17,NEWR,WI,54017,  TAPE RPTD 12/00
13,BATCHELDER,AVE,MANC,NH,03103, CRT RPTD 09/99.
  BORN 09/05/1960.SSS-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  CRT RPTD 04/00.
  DELTA AIR LINES, INC
*INQ- 2, INQUIRIES SINCE 00/64.02/03/03 ,PRM 615ZZ137ZE5 ,01/29/03
  AR 850BB2490G,12/25/02 ,AR 850BB24906, 12/09/02 ,EU 401ZB0253/WELL,08,
12/03/02 ,EU 401ZB0253/WELL,08, 11/23/02 ,AR 850BB24906, 10/21/02,
  AR 850BB24906, 10/17/02,PRM 68ZGM28517, 10/14/02 ,AR 491FM98970,
  AR 103FM11640, 09/27/02 ,AR 850BB24906, ,AR 850BB24906, 10/11/02
AMEX 191MON1836,08/18/02, SIWIR FORD,613ANK604,08/20/02 ,AR 850BB24906,
  08/05/02,06/31/02,,PRM 850BB01498, 06/06/04,18/07/02, TOUSLEY FD,613ANK604
PRM 850BB01498, 06/13/02,,PRM 850BB01498, ,PRM 404QN01216, 05/06/02
  ,AR 850BB24906, 09/02,,,PRM 850BB01498, 04/18/02 ,AR 103FM11640,03/22/02
  ,,00, 02/19/03, ,AR 850BBARGU,491FMG356,03/20/01, 03/20/01 ,EU 1462B136161/2401
*FIRM/ID CODE          RPTD  OPND  M/C TRM  BAL  P/D CS MR ECOA  ACCOUNT NUMBER
WELLSFARG0*612FMD0449 03/03 05/01 170K   16K         I1 20 J     4/28571702
  REAL ESTATE(00)90+(00)                                          DLA 03/03
FHA MORTGAGE 30G(00)60(00)30+(00)
CAP 1 BANK*850BB01498  03/03 06/02  524  15  224  R1 09 I        517ฒ05222521
  30C(00)60(00)90+(00)                                            DLA 03/03
```

PAGE 1

CSC082

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

                    CREDIT BUREAU INC
                    RUSSELL D SR
TO 401ZS00040.2     BLVD NEW RICHMOND WI 54017
ANDERSON
1614 HALLEWOOD                                   FN 004-3350526-00-661

CREDIT CARD
MM AIR CU *x615FL15148 03/03 09/02   25K 315 24K    I1 05 J    DLA 03/03    13539774
SECURED 30(00)X60(00)90+(00)
CROSSCNTRY 4580N08054 12/02 04/99 SUPPRESS ERRONEOUS TRADE

NO RESPONSE CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
FMCC *x644FA04640 03/03 08/02   25K 456 23K    I1 07 J    DLA 12/02    4227097148440
30(00)60(00)90+(00)

AUTO
FMCC *x644FA04640 03/03 11/00   15K 283 847    I1 07 J    DLA 03/03    31681373
30(00)60(00)90+(00)

AUTO *x668FP04491 01/03 07/01 1500              I1 28 J    DLA 03/03    25529880
WFFINANCE 30(00)60(00)90+(00)

CHARGE 30(00)60(00)90+(00)                 391  R1 17 J    DLA 01/03    196-28428475
AMOUNT IN H/C COLUMN IS CREDIT LIMIT

NELNET LNS*146FZ00277 02/03 09/96  17K 228 19K  I1 77 I    DLA 02/03    39478472001
30(00)60(00)90+(00)

PAGE 2
```

CSC083

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                        CREDIT BUREAU INC.
                        RUSSELL D SR
TO 4012ZS00040.2
ANDERSON
1614 HALLEWOOD   BLVD NEW RICHMOND WI 54017
                                                      FN 004-3350526-00-661

PAGE 3

STUDENT LOAN
PAYMENT DEFERRED
FMCC  *644FA006640 11/02 06/99 21K 351     0  I1 41 J  DLA    JHA21833DN0
      *664B9B54029  10/02 12/01 22K 251     0  I1 09 J  DLA 08/02
S&C BANK
AUT 30(00)60(00)90+(00)
    30(00)60(00)90+(00)                                        406995201287126
HOME IMPROVEMENT LOAN                                          DLA 09/02
CAP 1 BANK*8508B01690B 03/02 08/01  306     0  R1 07 I         529115203619
    30(00)60(00)90+(00)                                        DLA 03/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
AAMG  *4168B808821 06/01 10/00 166K 1K      0  I1 05 J         330612148152
    30(00)60(00)90+(00)                                        DLA 05/01
REAL ESTATE MORTGAGE
FHA MORTGAGE
WFFINACCPT*6613FP20316 04/00 12/94 21K 365  0  I1 08 I         9565-14815119
    30(00)60(00)90+(00)                                        DLA 11/99
PAID ACCOUNT/ZERO BALANCE
```

CSC084

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 4012S00040,2
ANDERSON                CREDIT BUREAU INC.
1614 HALLEWOOD BLVD     RUSSELL D SR
                        NEW RICHMOND WI 54017

FN 004-3350526-00-661

KBUSA-ASF *155FA00757 02/00 08/95  21K 357        0        I1 52 M
  30(00)60(00)90+(00)
PAID ACCOUNT/ZERO BALANCE                                                DLA 02/00
AUTO                                                                     516497
GROSS CTRY*458B8029669 04/99 04/99   500                    R0      J
CREDIT CARD
  30(00)60(00)90+(00)                                                    DLA 04/99
AMOUNT IN H/C COLUMN IS CREDIT LIMIT                                     561490709116
SUNSTAR *440FP11419 02/97 12/94  21K 365                    I1 25 I
  *440FP11419
ACCOUNT TRANSFERRED OR SOLD                                              4357-471487335
  30(00)60(00)90+(00)                                                    DLA 02/97
NELNET *NSX146F200277 12/96 07/92 2625 74M   0             I1 44 I
  30(00)60(00)90+(00)                                                    DLA 02/97
STUDENT LOAN                                                             394784720B1
REFINANCED                                                               DLA 10/96

*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 456YC284 FOR AMERY REGIONAL, $109,02/00 PAID
                BAL-02/00 $0, DLA: 05/97, I,896966

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCREDIT.COM
                                                         PO BOX 981221,

CSC084

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
RUSSELL D SR
TO 4012S00040.2
ANDERSON
1614 HALLEWOOD BLVD  NEW RICHMOND  WI  54017

FN 004-3350526-00-661

KBUSA-ASF *155FA00737 02/00 05/95 21K 357    0    I1 52 M    DLA 02/00
PAID 30(00)60(00)90+(00)                                      516497
AUTO ACCOUNT/ZERO BALANCE
CROSS CTRY*4458BB02669 04/99 04/99  500         R0  J    54149D709116
CREDIT CARD                                             DLA 04/99
30(00)60(00)90+(00)
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR *4409FP11419 02/97 12/94 21K 365    0    I1 25 I    4357-47148733
30(00)60(00)90+(00)                                        DLA 02/97
ACCOUNT TRANSFERED OR SOLD
NELNET LNS*1%6F20027 12/96 07/92 2625 74M   0    I1 44 I    39478472001
30(00)60(00)90+(00)                                        DLA 10/96
STUDENT LOAN
REFINANCED
*FINANCED 02/00 456YC284 FOR AMERY REGIONAL,$109,02/00 PAID
PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 $0, DLA: 05/97, I,896966
BAL-02/00 $0,

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
PO BOX 981221,

CSC085

```
                                     FROZEN 623 2003 MONTH 04 NAME/SSN  RECORDS
                                     ***********************************************
ANDERSON
1614 HALLEWOOD  BLVD   NEW RICHMOND  WI  54017

ANDERSON,RUSSELL,D,SR.                                                      FN 004-3350522-00-661
1614,HALLEWOOD,BLVD,NEWR,WI,54017,TAPE RPTD 12/00
   TELEPHONE NUMBER (715) 246-2213 SPEC 03/03.                              FILE SINCE 07/31/88
1380,HERITAGE,DR,APT 1715,NEWR,WI,54017, CRT RPTD 03/03.
13,BATCHELDER,AVE,MANC,NH,3103, CRT RPTD 04/00.
   BORN 09/05/1960.SSS-364-79-4/2C
*DELIA AIR LINES.                                                           ANDERSON,RUSSELL,D,SR
*INQUIRIES SINCE  00/04.04/07/03 ,PRM 180FM1599J,03/19/03,                 1614,HALLEWOOD,BLVD,NEWR,WI,54017
   PRM 4580BN17591,  03/19/03 ,AR 103FM11640,
   ,AR 850BB24906, 02/19/03 ,AR 850BB24906, 03/18/03
   ,AR 850BB24906, 12/25/02,AR 850BB24906, 01/29/03
12/03/02 ,EU 401ZB02535/WELL,08,AR 61SLZ13725, 12/09/02
   AR 850BB24906, 10/17/02 ,PRM 682FMB25/02 ,AR 850BB24906, 10/21/02
AMEX,103FM11640, 09/27/02 ,PRM 682FMB25/02 ,AR 850BB24906, 10/14/02
   AR 103FM11640, 09/27/02 ,AR 491FM98970, 10/11/02
.08/05/02,AMN1856, 08/18/02, STWIR FORD, 613AN1640,AR 850BB24906,
   PRM 850BB01498, 06/06/02 ,TOUSLEY FD,613AN604
* FIRM/ID CODE  03/25/02, PRM 4040N01216, 05/06/02
WFFINANCE *66BFP04491 03/03 07/01 1500
CHARGE (00)160(00)90+(00)                                     BAL P/D CS MR ECOA    ACCOUNT NUMBER
AMOUNT IN H/C COLUMN IS CREDIT LIMIT    OPND H/C TRM           0         RI 19 J   196-2B42B475
CROSSCNTRY 4580N08054 12/02 04/99 SUPPRESS ERRONEOUS TRADE    RI 19 J    DLA 03/03

                                                                           422709748440
PAGE 1                                                                     DLA 12/02
```

CSC0086

```
CSC CREDIT SERVICES  PO BOX 981221  EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040,2        CREDIT BUREAU INC.
ANDERSON                    RUSSELL D SR
1614 HALLEWOOD BLVD  NEW RICHMOND  WI  54017              FN 004-3350522-00-661

PAGE 2

NO RESPONSE
CONSUMER DISPUTES-REINVESTIGATION   IN PROCESS
FMCC       *644FA04640 06/03 08/02 25K 456 22K  I1 08 J   31681373
  30(00)60(00)90+(00)
AUTO
FMCC       *644FA04640 04/03 11/00 15K 283 8228  I1 29 J  DLA 04/03
  30(00)60(00)90+(00)                                      31681373
AUTO                                                       25529880
NELNET LM5*146FZ002277 03/03 09/96 17K 228 19K  I1 78 I   DLA 04/03
  30(00)60(00)90+(00)
STUDENT LOAN                                               59478472001
PAYMENT DEFERRED                                           DLA 03/03
WELLSFARG0K612FM00449 03/03 05/01 170K 1K 164K  I1 20 J   4728571702
  30(00)60(00)90+(00)                                      DLA 03/03
REAL ESTATE MORTGAGE
FHA MORTGAGE
CAP 1 BANK*850BBD1498 03/03 06/02 524 15 224  R1 09 I     5178052225251
  30(00)60(00)90+(00)                                      DLA 03/03
CREDIT CARD
```

CSC087

```
                                  CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS000040.2                      CREDIT BUREAU INC.
ANDERSON                                   RUSSELL D SR
1614 HALLEWOOD BLVD                     NEW RICHMOND WI 54017
                                                                          FN 004-3350522-00-661
PAGE 3
```

```
NW AIR CU *613FC15148 03/03 09/02 25K 315   24K  I1 05 J      13539774
SECURED *32CG0160(00)90+(00)
FMCC      *644FA06640 11/02 06/99 21K 351    0   I1 41 J      DLA 03/03
          30(00)60(00)90+(00)
AUTO                                                          JHA2183DN0
S&C BANK  *668BB54029 10/02 12/01 22K 251    0   I1 09 J      406995201287126
          30(00)60(00)90+(00)                                DLA 09/02
HOME IMPROVEMENT LOAN
CAP 1 BANK*6508B1498  03/02 08/01 306        0   R1 07 I      529115203619
          30(00)60(00)90+(00)                                DLA 03/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE
AAMG      *168BB00B21 06/01 10/00 166K 1K     0   I1 05 J     330612148152
          30(00)60(00)90+(00)                                DLA 05/01
CLOSED ACCOUNT
FHA MORTGAGE
WFFINACCPT*613FP20316 04/00 12/94 21K 365     0   I1 08 I     9565-16815119
          30(00)60(00)90+(00)                                DLA 11/99
```

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040,2      CREDIT BUREAU INC.
 ANDERSON
                     RUSSELL D SR
1614  HALLEWOOD  BLVD  NEW RICHMOND  WI  54017          FN 004-3350522-00-661

PAID ACCOUNT/ZERO BALANCE
KBUSA-ASF *155FA00737 02/00 08/95  21K 357   0    I1 52 M
   30(00)60(00)90+(00)                                          516497
PAID ACCOUNT/ZERO BALANCE                                 DLA 02/00
AUTO
CROSS CTRY*458BB02969 04/99 04/99  500
   30(00)60(00)90+(00)                            R0    J
CREDIT CARD                                                 541490709116
AMOUNT IN H/C COLUMN IS CREDIT LIMIT                      DLA 04/99
SUNSTAR   *409FP11419 02/97 12/94  21K 365   0    I1 25 I
   30(00)60(00)90+(00)                                      4357-47148733
ACCOUNT TRANSFERRED OR SOLD                               DLA 02/97
NELNET LNS*146FZ00277 12/96 07/92 2625 74M   0    I1 44 I
   30(00)60(00)90+(00)                                      39478472001
STUDENT LOAN                                              DLA 10/96
REFINANCED
*PUBLIC RECORDS AND OTHER INFORMATION
 02/00 COLL 02/98 456YC284 FOR AMERY REGIONAL,$109,02/00 PAID
         BAL-02/00 $0,  DLA: 05/97, I,896966
```

CSC089

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2
ANDERSON    CREDIT BUREAU INC.
1614    RUSSELL D SR
    HALLEWOOD   BLVD   NEW RICHMOND   WI   54017

FN 004-3350522-00-661

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,

CSC090

FROZEN 623 2003 MONTH 05 NAME/SSN RECORDS
**************************************************

ANDERSON
1614 HALLEWOOD BLVD        RUSSELL D SR        NEW RICHMOND WI 54017

FN 004-3550522-00-661

ANDERSON,RUSSELL,D,SR.
1614,HALLEWOOD,BLVD,NEWR,WI,54017, TAPE RPTD 12/00
1380,HERITAGE,NUMBER (715) 246-2213 SPEC 03/03.
13,BATCHELDER,AVE,APT17,NEWR,WI,54017, CRT RPTD 04/00.
BORN 09/05/1969, SEX-M,MH,03103, CRT RPTD 09/99.
.SS-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

FILE SINCE 07/31/88

ANDERSON,RUSSELL,D,SR
1614,HALLEWOOD,BLVD,NEWR,WI,54017

.DELTA AIR LINES ,
*INQS- 32 INQUIRIES SINCE 00/64 06/22/03 ,AR 850BB24906, 04/11/03
PRM 4580NI1759, 04/07/03, PRM 180FMI5591, 03/25/03
,PRM 4580NI1759, 03/19/03 ,AR 103FMI1640, 03/19/03 ,AR 82SUT00178,
,AR 850BB24906, 12/19/03 ,AR 850BB24906, 02/03/03 ,PRM 850BB24906, 03/18/03
,AR 850BB24906, 12/25/02 ,AR 850BB24906, 615SZI3725, 01/29/03
12/03/02 ,EU 401ZB02533/WELL,B8, ,PRM 850BB24906, 01/29/03
AR 850BB24906, 10/17/02 ,AR 850BB24906, 12/09/02 ,EU 401ZB02533/WELL,B8,
,AR 103FMI1640, 09/27/02 ,PRM 682FM2B1/02 ,AR 850BB24906, 10/21/02
AME, AR 103FMI1640, 09/27/02 ,AR 850BB24906, 10/11/02
,08/05/02, 103NI1836,08/18/02, STWTR FORD,613ANI6404,08/07/02
AR 491FM00012, 05/21/02 ,PRM 850BBDI498, 06/06/02 ,PRM LOUISLEY FG,613AN604
* ,PRM 906BB01608, 05/03/03,AR 850BB24906, 04/17/03 ,PRM 4040NI1216, 05/16/03
* FIRM/ID CODE     RPTD     OPND     PRM 217BB02373, 04/17/03
WFFINANCE *668FP044491 04/03 07/01     PRM 217BB02373, 03/21/03, PRM 906BB01808
CHARGE                           1500     0    BAL P/D CS MR ECOA ACCOUNT NUMBER
380(00)60(00)90+(00)                     H/C TRM     RI 20 J    196-28428475
AMOUNT IN H/C COLUMN IS CREDIT LIMIT     0              DLA 03/03

CSC091

```
                                CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221  800/392-7816
                                         CREDIT BUREAU INC.
TO 4012ZS00040.2                           RUSSELL D SR
ANDERSON
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017                                      FN 004-3350522-00-661

PAGE 2

NELNET LNS*166FZ00277  05/03 09/96  17K  228  19K   I1 6G I    3947847Z001
STUDENT LOAN                                                                DLA 05/03
PAYMENT DEFERRED
WELLSFARGO&612FM00449  05/03 05/01  170K  1K    0   I1 22 J    472N571702
REAL ESTATE MORTGAGE                                                        DLA 04/03
FHA MORTGAGE
WELLSFARGO#Z41FM01630  05/03 04/03  169K  1K  169K   I1    J   7080125431015
REAL 30(00)60(00)90+(00)                                                    DLA 05/03
ESTATE MORTGAGE
CONVENTIONAL MORTGAGE
CAP 1 BANK*8530BB01498  05/03 06/02  524   8    8   R1 11 I    517805222521
30(00)60(00)90+(00)                                                         DLA 05/03
CREDIT CARD
NW AIR CU *613FC15148  05/03 09/02  25K  315  24K   I1 07 J    13539774
SECURED                                                                     DLA 05/03
30(00)60(00)90+(00)
CROSSCNTRY 4580N08054  12/02 04/99 SUPPRESS ERRONEOUS TRADE    4227097Z04440
                                                                            DLA 12/02
```

CSC092

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                    CREDIT BUREAU INC.
TO 401ZS00040.2
ANDERSON       RUSSELL D SR
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017        FN 004-3350522-00-661

FMCC       *644FA04640 05/03 08/02 25K 456 22K   I1 09 J   31681373
AUTO       30(00)60(00)90+(00)                                        DLA 05/03
FMCC       *644FA04640 05/03 11/00 15K 283 7977  I1 30 J
AUTO       30(00)60(00)90+(00)                                        DLA 05/03
FMCC       *644FA04640 11/02 06/99 21K 35I   0   I1 41 J   25529880
AUTO       30(00)60(00)90+(00)                                        DLA  JHA21B3DND
S&C BANK   *668BB54029 10/02 12/01 22K 25I   0   I1 09 J            08/02
CAP 1 BANK*85080B01498 03/02 08/01 306       0   R1 07 I   406995201287126
HOME IMPROVEMENT LOAN 30(00)60(00)90+(00)                            DLA 09/02
           30(00)60(00)90+(00)                            529115203619
ACCOUNT CLOSED AT CONSUMERS REQUEST                                  DLA 03/02
PAID ACCOUNT/ZERO BALANCE
AAMG       *168BB00821 06/01 10/00 166K 1K    0  I1 05 J   33061214BL52
           30(00)60(00)90+(00)                                       DLA 05/01

CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
NO RESPONSE

PAGE 3
```

CSC093

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZSO0040.2        CREDIT BUREAU INC
ANDERSON               RUSSELL D SR
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017              FN 004-3350522-00-661

PAGE 4

CLOSED ACCOUNT
FHA MORTGAGE
WFFINACCPT*6135FP20316 04/00 12/94   21K 365    0    I1 08 I    9565-14815119
30(00)60(00)90+(00)                                             DLA 11/99
PAID ACCOUNT/ZERO BALANCE
KBUS-ASF *155FA00737 02/00 08/95     21K 357    0    I1 52 M    516497
30(00)60(00)90+(00)                                             DLA 02/00
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*45BBB02969 04/99 04/99    500        J    R0         54140D709116
30(00)60(00)90+(00)                                             DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR *409FP11419 02/97 12/94      21K 365    0    I1 25 I    4357-4714733
30(00)60(00)90+(00)                                             DLA 02/97
ACCOUNT TRANSFERRED OR SOLD
HELNET LNS*146F20027/12/96 07/92 2625 74M       0    I1 44 I    39478472001
30(00)60(00)90+(00)                                             DLA 10/96
STUDENT LOAN
```

CSC094

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2
ANDERSON              CREDIT BUREAU INC.
1614 HALLEWOOD         RUSSELL D SR
          BLVD      NEW RICHMOND   WI   54017          FN 004-3350522-00-661

REFINANCED
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 456YC284 FOR AMERY REGIONAL, $109,02/00 PAID
         BAL-02/00 $0, DLA: 05/97, I,896966

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
                                    PO BOX 981221,

CSC095

Case: 3:03-cv-00510-bbc   Document #: 70   Filed: 10/15/04   Page 192 of 437

PAGE 1

```
                    FROZEN 623 2003 MONTH 06 NAME/SSN RECORDS
                    *************************************

ANDERSON
1614 HALLEWOOD BLVD                    RUSSELL D SR
ANDERSON,RUSSELL,D,SR                  NEW RICHMOND WI 54017
1614,HALLEWOOD,BLVD,NEWR,WI,54017;                               FN 004-3350526-00-661
    TELEPHONE NUMBER (715) 246-2213 TAPE RPTD 12/00
1380,HERITAGE,DR,APT 17,NEWR,WI,54017, SPEC 06/03.                    FILE SINCE 07/31/88
13,BATCHELDER,AVE,MANC,NH,03103, CRT RPTD 04/00.
   BORN 09/1960,SSS-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
   DELA AIRLINES.
*INQS- 31 INQUIRES, SINCE 00/64. 05/16/03 ,AR 491FH00011, 05/16/03
   AR 850BB24906, 04/22/03 ,AR 850BB24906, 04/17/03 ,PRM 217BB02373, 04/17/03
   ,PRM 906BB0180B, 04/11/03 ,PRM 4580NI1759, 04/07/03 ,PRM 180FM1591,
03/25/03 ,PRM 625UT00178, 03/21/03 ,PRM 217BB02373, 03/21/03 ,PRM 906BB0180B,
03/19/03 ,PRM 4580NI1759, 03/19/03 ,AR 850FM10640, 03/17/03 ,AR 850BB24906,
03/18/03 ,AR 850BB24906, 02/19/03 ,AR 850BB24906, 02/03/03 ,PRM 615ZZ137725,
01/29/03 ,AR 850BB24906, 12/25/02 ,AR 850BB24906, 12/09/02 ,EU 401ZB02533/WELL
   ,08, 12/09/02 ,PRM 401ZB02533/WELL,08, 11/23/02 ,AR 850BB24906,
AR 850BB24906, 10/17/02 ,PRM 682FM28517, 10/14/02 ,AR 491FH00071, 10/11/02
   ,AR 103FM11640, 09/27/02 ,PRM 682FM28517, 10/14/02 ,AR 850BB24906, 10/11/02
TOUSLEY ,401BB17022, AMEX,1900NI836,08/18/02, STWIR FORD,613ANI1640A,08/07/02,
   ,PRM 180FM1591, 08/20/02 ,AR 491FH99070, 07/30/02
   FTRV,FD1,613ANI604, 08/05/02.
* HEAD
NELNET (NSN146F200277 06/03 17K 228       19K   I1  81  I
30C00)160(00)90+(00)                              3947847200I
STUDENT LOAN                                         DLA 06/03
PAYMENT DEFERRED
```

CSC0096

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                    CREDIT BUREAU INC.
TO 4012ZSA0040,2       RUSSELL D SR
ANDERSON
1614 HALLWOOD BLVD  NEW RICHMOND WI 54017        FN 004-3350526-00-661

PAGE 2

NW AIR CU *613FC1514A 06/03 05/02 25K 315 23K  I1 08 J  DLA 06/03  13539774
SECURED 30(00)60(00)90+(00)
CAP 1 BANK*850BB01498 06/03 06/02 524 15 426   R1 12 ?  DLA 06/03  517805222521
CREDIT CARD 30(00)60(00)90+(00)
CROSSCNTRY 4580N08054 12/02 04/99 SUPPRESS ERRONEOUS TRADE
NO RESPONSE
CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
WELLSFARGO*X41FM01630 06/03 04/03 169K 1K 169K I1 01 J  DLA 12/02  4227097484440
REAL ESTATE MORTGAGE
30(00)60(00)90+(00)
CONVENTIONAL MORTGAGE
FMCC *644FA04640 06/03 08/02 25K 456 22K       I1 10 J  DLA 06/03  70801256431015
AUTO 30(00)60(00)90+(00)
FMCC 30(00)60(00)90+(00) 06/03 11/00 15K 283 8012 I1 31 J DLA 06/03  31681373
                                                                    25529880
                                                                    DLA 06/03
```

CSC097

```
                    CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
                                    CREDIT BUREAU INC.
TO 401ZS00040.2                        RUSSELL D SR
ANDERSON
1614 HALLEWOOD BLVD  NEW RICHMOND WI  54017                         FN 004-3350526-00-661

PAGE 3

AUTO
WFFINANCE *668FP04491 05/03 07/01 1500        0              R1 21 J       196-28428475
30(00)60(00)90+(00)                                                        DLA 03/03
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
WELLSFARGO*612FM00449 05/03 05/01 170K 1K     0         I1 22 J      4728571702
30(00)60(00)90+(00)                                                        DLA 04/03
REAL ESTATE MORTGAGE
FHA MORTGAGE
FMC *644FA04640 11/02 06/99 21K 351   0             I1 41 J       JHA2193DN0
30(00)60(00)90+(00)                                                        DLA 08/02
AUTO
S&C BANK *668BB54029 10/02 12/01 22K 251  0         I1 09 J       406995201287126
30(00)60(00)90+(00)                                                        DLA 09/02
HOME IMPROVEMENT LOAN
CAP 1 BANK*850B01498 03/02 08/01 306  0        R1 07 I       529115203619
30(00)60(00)90+(00)                                                        DLA 03/02
ACCOUNT CLOSED AT CONSUMER'S REQUEST
PAID ACCOUNT/ZERO BALANCE
```

CSC098

```
                    CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TD 401ZS00040.2          CREDIT BUREAU INC.
ANDERSON                 RUSSELL D SR
1614 HALLEWOOD BLVD      NEW RICHMOND   WI  54017                    FN 004-3350526-00-661


AAMG   *168RBRA0821   06/01 10/00 166K  1K      0   I1 05 J    3500612148152
                                                              DLA 05/01
  30(00)60(00)90+(00)
CLOSED ACCOUNT
FHA MORTGAGE
WFFINANCCP*K4613FP20316  04/00 12/94  21K  365  0   I1 08 I    9565-1481S119
                                                              DLA 11/99
  30(00)60(00)90+(00)
PAID ACCOUNT/ZERO BALANCE
KBUSA-ASF  *K15FFA00737  02/00 08/95  21K  357  0   I1 52 M    516497
                                                              DLA 02/00
  30(00)60(00)90+(00)
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*K68BB02969    04/99 04/99       500      J          5414907/09116
                                                              DLA 04/99
  30(00)60(00)90+(00)
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR    *K49FP11419   02/97 12/94  21K  365   0  R0         4357-471L48733
                                                              DLA 02/97
  30(00)60(00)90+(00)
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
ACCOUNT TRANSFERRED OR SOLD
NELNET LNSX146FP20277    12/96 07/92 2625 74M    0  I1 25 I    39478472001
                                                              DLA 10/96
  30(00)60(00)90+(00)
PAGE  4
```

CSC0099

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 4012ZS00040,2       CREDIT BUREAU INC.
ANDERSON               RUSSELL D SR
1614  HALLEWOOD  BLVD   NEW RICHMOND   WI   54017

                                            FN 004-3350526-00-661

STUDENT LOAN
RETURNACCOUNT
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 456YC2B4 FOR AMERY REGIONAL,$109,02/00 PAID
BAL-02/00 $0,  DLA: 05/97, I,896966

REF TO CSC CREDIT SERVICES,                    PO BOX 981221,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

CSC100

```
FROZEN 623 2003 MONTH 07 NAME/SSN RECORDS
****************************************
1614 HALLEWOOD   BLVD  NEW RICHMOND  WI  54017
ANDERSON

ANDERSON,RUSSELL,D,SR                                        FN 004-3350526-00-661
1614,HALLEWOOD,BLVD,NEWR,WI,54017,TAPE RPTD 12/00
.TELEPHONE NUMBER (715) 246-2213 SPEC 06/03.               FILE SINCE 07/31/88
1380,THERITAGE,DR,APT 17,NEWR,WI,54017 CR 08/PID 04/00.
13,BATCHELOR,AVE,MANC,NH,03103, CRT RPTD 09/99.
BORN 09/05/1940,SS-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
.DELTA AIR LINES-

*INQS-  33 INQUIRIES SINCE 00/64 06/24/03 ,AR 491FM00011,06/13/03            ANDERSON,RUSSELL,D,SR
PRM 4580NII759, 05/30/03 ,PRM 401BI7022, 05/16/03 ,AR 491FM00011,            1614,HALLEWOOD,BLVD,NEWR,WI,54017
,AR 850BB24906, 04/22/03 ,AR 850BB24906, 04/17/03 ,PRM 217BB02373, 05/16/03
,PRM 906BB01808, 04/11/03 ,PRM 4580NII759, 04/17/03 ,PRM 180FMI5991, 04/17/03
03/25/03 ,AR 650UT00178, 03/21/03 ,PRM 217BB02373, 03/21/03 ,PRM 180FMI5991,
03/19/03 ,PRM 4580NII759, 03/19/03 ,AR 103FMI1640, 03/21/03 ,PRM 906BB01808,
03/18/03 ,AR 850BB24906, 12/25/02 ,AR 850BB24906, 02/03/03 ,AR 850BB24906,
01/29/03 ,AR 850BB24906, 12/19/02 ,AR 850BB24906, 03/03/03 ,PRM 850BB24906,
,AR 08, 12/03/02 ,EU 401ZB02533/WELL 11/23/02 ,AR 850BB24906, 652EZ33725,
,AR 850BB24906, 10/17/02 ,PRM 682FM28517, 11/23/02 ,EU 401ZEZ33725,
,AR 1900NII640, 09/27/02 ,AR 850BB24906, 10/14/02 ,AR 491FM98970, 10/11/02
AMEX-,08/05/02 ,08/18/02, STWTR FORD,613ANI6404,08/07/02, TOUSLEY FD,613AN604
*,08/05/02 FIRM/ID CODE                      RPTD OPND  H/C TRM BAL P/D CS MR ECOA   ACCOUNT NUMBER
CAP I BANK*850BB01498                        07/03 06/02  524  15  459 RI 13 I        517805222521
30C0016D(00)994(00) CREDIT CARD                                                      DLA 07/03
```

CSC101

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040.2          CREDIT BUREAU INC.
ANDERSON                 RUSSELL D SR
1614 HALLEWOOD BLVD  NEW RICHMOND   WI   54017          FN 004-3350526-00-661

PAGE 2

NW AIR CU *613FC15148 07/03 09/02      25K 315  25K      I1 09 J    DLA 07/03    13539774
30C00)60(00)90+(00)
SECURED                                                             DLA 07/03
WFFINANCE *668FP04491 06/03 07/01 1500        0          R1 22 J    196-28428475
30(00)60(00)90+(00)                                                 DLA 03/03
CHARGE IN H/C COLUMN IS CREDIT LIMIT
AMOUNT
CROSSCNTRY 4580N08054 12/02 04/99 SUPPRESS ERRONEOUS TRADE
                                                                    4227097*48440
NO RESPONSE                                                         DLA 12/02
CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
FMCC *644FA04640 07/03 08/02     25K 456  21K           I1 11 J     31681373
30(00)60(00)90+(00)                                                 DLA 07/03
AUTO
FMCC *644FA04640 07/03 11/00     15K 283 7759          I1 32 J      25529880
30(00)60(00)90+(00)                                                 DLA 07/03
AUTO
WELLSFARG0*241FM01630 07/03 04/03 169K 1K 168K        I1 02 J       708012543I015
30(00)60(00)90+(00)                                                 DLA 07/03

CSC102

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC
TO 401ZS00040.2              RUSSELL SR
ANDERSON
1614 HALLEWOOD BLVD NEW RICHMOND WI 54017

FN 004-3350526-00-661

REAL ESTATE MORTGAGE
NEI NET LN33146FZ0UZ27 06/03 09/96   17K 22B   19K   I1 81 I   3947847200I
    30(00)60(00)90+(00)                                                   DLA 06/03
STUDENT LOAN
PAYMENT DEFERRED
WELLSFARG0%612FM00449 05/03 05/01 170K 1K   0   I1 22 J   4728571702
REAL ESTATE MORTGAGE                                                      DLA 06/03
FHA MORTGAGE
    30(00)60(00)90+(00)
FMCC
    *%644FA04640 11/02 06/99   35I   0   I1 41 J   JHA21B3DN0
AUTO                                                                      DLA 08/02
    30(00)60(00)90+(00)
SKC BANK *668BB54029 10/02 12/01 22K 25I   0   I1 09 J   40699520128712G
HOME IMPROVEMENT LOAN                                                     DLA 09/02
CAP 1 BANK%650BB01498 03/02 08/01 306   0   R1 07 I   529115203619
    30(00)60(00)90+(00)                                                   DLA 03/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
PAID ACCOUNT/ZERO BALANCE

PAGE 3

CSC103

```
                    CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 4012S00040,2            CREDIT BUREAU INC.
ANDERSON                      RUSSELL D SR
1614 HALLENWOOD BLVD NEW RICHMOND WI 54017                    FN 004-3350526-00-661


AAMG   *1LC8DC0CC21 06/01 10/00 166K 1K   0  I1 05 J   3350612148152
        30(00)60(00)90+(00)                                DLA 05/01
CLOSED ACCOUNT
FHA MORTGAGE
WFTINACCPT*k613FP20316 04/00 12/94 21K 365 0 I1 08 I   9565-148I5119
        30(00)60(00)90+(00)                                DLA 11/99
PAID ACCOUNT/ZERO BALANCE
KBUSA-ASF *1SSFA00737 02/00 08/95 21K 357  0  I1 52 M   516497
        30(00)60(00)90+(00)                                DLA 02/00
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*458BB02969 04/99 04/99      500    R0    J   5414907/09116
        30(00)60(00)90+(00)                                DLA 04/99
CREDIT CARD
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
SUNSTAR  *409FP11419 02/97 12/94 21K 365  0  I1 25 I   4357-471487J3
        30(00)60(00)90+(00)                                DLA 02/97
ACCOUNT TRANSFERRED OR SOLD
NELNET LNS*146F200277 12/96 07/92 2625 74M 0 I1 44 I   394/8472001
        30(00)60(00)90+(00)                                DLA 10/96

PAGE 4
```

CSC104

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00040,2     CREDIT BUREAU INC.
ANDERSON            RUSSELL D SR
1614 HALLEWOOD BLVD  NEW RICHMOND   WI   54017                    FN 004-3350526-00-661

STUDENT LOAN
REFINANCED
*PUBLIC RECORDS AND OTHER INFORMATION
02/00 COLL 02/98 456YC284 FOR AMERY REGIONAL,$109,02/00 PAID
BAL-02/00 $0, DLA: 05/97, I,896966

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM
                                          PO BOX 981221,

CSC105

```
                        FROZEN 623 2003 MONTH 08 NAME/SSN RECORDS
                        ***********************************************

ANDERSON
1614  HALLEWOOD  BLVD   NEW RICHMOND   WI  54017

                                                              FN 004-3350526-00-663

ANDERSON,RUSSELL,D,SR
1614,HALLEWOOD,BLVD,NEWR,WI,54017                             FILE SINCE 07/31/88   ANDERSON,RUSSELL,D,SR
                                                                                    1614,HALLEWOOD,BLVD,NEWR,WI,54017
TELEPHONE NUMBER (715) 246-2213 SPEC.
1380,HERITAGE,DR,APT 17,NEWR,WI,54017, CRT RPTD 07/03.
13,BATCHELDER,AVE,MANC,NH,03103, CRT RPTD 06/00.
BORN 09/05/1946, SS-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
.DELTA AIR LINES.

*INQS-  39 INQUIRIES SINCE 00/64.
AR 850B2Z4906, 07/17/03 ,PRM 402FA14696, 07/14/03 ,PRM 285FA00632, 07/25/03
,PRM 491FM00011, 06/19/03 ,PRM 857F26096, 06/13/03 ,PRM 4580N11759, 06/24/03
,PRM 401BBIZ02Z, 05/16/03 ,AR 491FM00011, 05/16/03 ,PRM 4580N11759, 05/30/03
,AR 850B2Z4906, 04/17/03 ,PRM 217BB0Z373, 04/16/03 ,AR 850B2Z4906, 04/22/03
,PRM 4580N11759, 04/17/03 ,PRM 217BB0Z373, 03/25/03 ,PRM 906BB01808, 04/11/03
03/21/03 ,PRM 217BB0Z373, 03/21/03 ,PRM 180FM15991, 03/25/03 ,PRM 906BB01808,
03/19/03 ,AR 103FM1640, 03/21/03 ,PRM 906BB01808, 03/19/03 ,PRM 625U00178,
02/19/03 ,AR 850BB2496, 02/03/03 ,AR 850B2Z4906, 03/18/03 ,AR 850BB2496,
12/25/02 ,AR 850BB2496, 12/09/02 ,PRM 4615221Z3725, 01/29/03 ,PRM 4580N11759,
,EU 401ZBB2Z53WELL,08, 11/23/02 ,EU 401ZBB2Z53WELL,08, 12/09/02 ,AR 850BB2Z4906,
10/17/02 ,PRM 4580N11756, 10/21/02 ,AR 850B2Z4906, 10/21/02 ,AR 850BB2Z4906,
09/27/02 ,AR 850BB2B517, 10/14/02 ,PRM 491FM9887,10, 10/21/02 ,AR 850B2Z4906,
AMEX,1900N1856,08/18/02, STWTR FORD,613AN16404,08/07/02, TOUSLEY FO,613AN6404
,08/05/02.
*  FIRM/ID CODE
NW AIR CU *613FC15148 08/03 09/02
         36(00)60(00)90+(00)
```

PAGE 1
                                                              RPTD   OPND   H/C  TRM  BAL  P/D  CS  MR  ECOA   ACCOUNT NUMBER
                                                                                                            15539774
                                                              DLA 08/03

CSC106

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040,2        CREDIT BUREAU INC.
ANDERSON               RUSSELL D SR
1614 HALLEWOOD BLVD    NEW RICHMOND   WI   54017

                                              FN 004-3350526-00-663

PAGE 2

SECURED
C4P  1 BANK*850BBD1498 08/03 06/02  524 16   555  R1 14 I  5178052225521
CREDIT CARD                                                 DLA 08/03
30(00)60(00)90+(00)
WFFINANCE *668FP0449I 07/03 07/01 1500      0  R1 23 J  196-28428475
30(00)60(00)90+(00)                                        DLA 03/03
CHARGE
AMOUNT IN H/C COLUMN IS CREDIT LIMIT
NELNET LNS*146F200277 07/03 09/96 17K 228   19K  I1 82 I  3947B472001
30(00)60(00)90+(00)                                        DLA 07/03
REFINANCED
STUDENT LOAN
CROSSCNTRY 4580N080S4 12/02 04/99 SUPPRESS ERRONEOUS TRADE
NO RESPONSE
CONSUMER DISPUTES-REINVESTIGATION IN PROCESS
FMC *644FA04640 08/03 08/02  25K 456  21K  I1 12 J  4227097484640
                                                       DLA 12/02
AUTO 30(00)60(00)90+(00)                               31681373
                                                       DLA 08/03
```

CSC107

```
CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
TO 401ZS00040.2       CREDIT BUREAU INC.
ANDERSON              RUSSELL D SR
1614  HALLEWOOD  BLVD  NEW RICHMOND  WI  54017       FN 004-3350526-00-663

PAGE 3

FMCC       *644FA04640 08/03 11/00  15K 283 7509   I1 33 J   DLA 08/03
AUTO       30(00)60(00)90+(00)                                25529880
WELLSFARG0*241FM01630 08/03 04/03 169K 1K  168K    I1 03 J   DLA 08/03
REAL ESTATE MORTGAGE  30(00)60(00)90+(00)                    70801256431015
WELLSFARG0*612FM00449 05/03 05/01 170K 1K    0     I1 22 J   DLA 08/03
REAL ESTATE MORTGAGE  30(00)60(00)90+(00)                    472857217102
FHA MORTGAGE                                                 DLA 04/03
FMCC       *644FA04640 11/02 06/99            0    I1 41 J
           30(00)60(00)90+(00)                               JHA21835DN0
AUTO                                                         DLA 08/02
SRC BANK  *6688B54029 10/02 12/01  22K 251    0    I1 09 J   40699520128716
           30(00)90+(00)                                     DLA 09/02
HOME IMPROVEMENT LOAN
CAP 1 BANK*85BB01498 03/02 08/01  306         0    R1 07 I   529115203619
           30(00)60(00)90+(00)                               DLA 03/02
ACCOUNT CLOSED AT CONSUMERS REQUEST
```

CSC108

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816
CREDIT BUREAU INC.
TO 401ZS00040,2         RUSSELL D SR
ANDERSON              BLVD  NEW RICHMOND  WI  54017
1614 HALLEWODD

FN 004-3350526-00-663

PAGE 4

PAID ACCOUNT/ZERO BALANCE
AANG           *168BB00B821 06/01 10/00 166K 1K        0     I1 05 J    3300612146152
30(00)60(00)90+(00)                                                     DLA 05/01
CLOSED ACCOUNT
FHA MORTGAGE
WFFINACCPT*613FP20316   04/00 12/94  21K 365    0     I1 08 I    9565-14815119
30(00)60(00)90+(00)                                                     DLA 11/99
PAID ACCOUNT/ZERO BALANCE
KBUSA-ASF *815FA00737  02/00 08/95  21K 357    0     I1 52 M    516497
30(00)60(00)90+(00)                                                     DLA 02/00
PAID ACCOUNT/ZERO BALANCE
AUTO
CROSS CTRY*4658B02969  04/99 04/99  500               R0    J
30(00)60(00)90+(00)
CREDIT CARD                                                     5614907109116
AMOUNT IN H/C COLUMN IS CREDIT LIMIT                            DLA 04/99
SUNSTAR *849FPP11419  02/97 12/94  21K 365    0     I1 25 I    4357-47148733
30(00)60(00)90+(00)                                                     DLA 02/97
ACCOUNT TRANSFERED OR SOLD

CSC109

CSC CREDIT SERVICES PO BOX 981221 EL PASO TX 79998-1221 800/392-7816

TO 401ZS00I40.2
ANDERSON          CREDIT BUREAU INC.
1614  HALLEWOOD  BLVD  RUSSELL D SR
                      NEW RICHMOND  WI  54017

FN 004-3350526-00-663

*PUBLIC RECORDS AND OTHER INFORMATION
02/00 CCL 02/98 456YC284 FOR AMERY REGIONAL
BAL-02/00 $0, DLA: 05/97, I,896966                     $109,02/00 PAID

REF TO CSC CREDIT SERVICES,
,EL PASO,TX,79998-1221,800/392-7816,WWW.CSCCREDIT.COM

PO BOX 981221,
,EL PASO,TX,79998-1221,

1

1           UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WISCONSIN
2           COURT FILE NO.:  03-C-0510 C

3

4   PENNY LEE ANDERSON AND
    RUSSELL D. ANDERSON, SR.,
5
        Plaintiffs,
6
    vs.
7
    TRANS UNION, L.L.C.;
8   EXPERIAN INFORMATION SOLUTIONS, INC.;
    CSC CREDIT SERVICES, INC.; and,
9   EQUIFAX, INC. d/b/a EQUIFAX INFORMATION
    SERVICES, L.L.C.;
10
        Defendants.                 COPY
11

12                   ORAL DEPOSITION

13                         OF

14                  KIMBERLY HUGHES

15                   JULY 1, 2004

16

17       ORAL DEPOSITION of KIMBERLY HUGHES, produced as a

18   witness at the instance of the Plaintiffs, taken in the

19   above-styled and numbered cause on the 1st day of July,

20   2004, from 9:07 a.m. until 2:49 p.m., before Sandra E.

21   Leas, a Certified Shorthand Reporter, Registered

22   Professional Reporter, by machine shorthand, in and for

23   the State of Texas, at Jones Day, located at 2727

24   Harwood, in the City of Dallas, County of Dallas and

25   State of Texas.

Exhibit C

Kimberly Hughes

Page 2

A P P E A R A N C E S

MR. THOMAS JOHN LYONS (via telephone)
Thomas Lyons & Associates, P.A.
Consumer Justice Center
342 East County Road D
Little Canada, Minnesota 55117

APPEARING FOR THE PLAINTIFFS

MR. DUSTIN B. RAWLIN
Jones Day
901 Lakeside Avenue
Cleveland, Ohio 44114

APPEARING FOR EXPERIAN

MR. LEWIS PERLING (via telephone)
Kilpatrick Stockton
1100 Peachtree Street NE
Suite 2300
Atlanta, Georgia 30309

APPEARING FOR EQUIFAX

MR. ERIK GIRVAN (via telephone)
Faegre & Benson, LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, Minnesota 55402-3901

APPEARING FOR CSC CREDIT SERVICES, INC.

MR. CHRIS LANE (via telephone)
MS. ANGELA ROBINSON
Katz & Korin, P.C.
334 North Senate Avenue
Indianapolis, Indiana 46204-1708

Page 3

I N D E X

WITNESS: KIMBERLY HUGHES

Examination by Mr. Lyons ..... PAGE 4

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Experian documents 124-154 | 19 |
| 2 | ACDV, Experian document 013 | 29 |
| 3 | Experian Correction Summary, 90-93 | 55 |
| 4 | Experian Correction Summary, 14-27 | 62 |
| 5 | Experian Personal Credit Report, 66-77 | 71 |
| 6 | Experian Summary, 094-097 | 90 |
| 7 | Experian Summary, 28-31 | 109 |
| 8 | November 2, 2002, To Whom it May Concern document, 32-36 | 114 |
| 9 | CAPS document, 0037 | 132 |
| 10 | Experian Correction Summary, 64-65 | 135 |
| 11 | Experian Correction Summary | 145 |
| 12 | Return this dispute response to document, 62-63 | 160 |
| 13 | Experian Personal Credit Report, 52-61 | 167 |
| 14 | Experian Personal Credit Report, 40-51 | 168 |
| 15 | Experian Correction Summary, 38-39 | 182 |
| 16 | Deposition Notice | 185 |

Page 4

KIMBERLY HUGHES,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. LYONS:
    Q.  Ma'am, can you state your name for the record,
spelling your last.
    A.  Kimberly Hughes, H-u-g-h-e-s.
    Q.  Ms. Hughes, my name is Tommy Lyons.  How are
you?
    A.  I'm good.  Thank you.
    Q.  You and I have met before; is that correct?
    A.  Yes, that's correct.
    Q.  All right.  And on previous occasions, I think
the most recent being in April of this year, you gave a
deposition in the Shahauser (phonetic) case.
        Do you remember that?
    A.  Yes, I do.
    Q.  To help expedite and expediate this matter
today, I could ask you a lot of background questions
about your education and your employment.  And I'm
wondering if there's anything that's changed between
that time and now, that you know of, concerning either
your residential status or your -- or your employment
status.
        MR. RAWLIN:  I'm going to object to the

Page 5

form, but you can go ahead, Ms. Hughes, if you know.
    A.  Nothing has changed.
    Q.  (By Mr. Lyons)  Okay.  Now, since that time in
April -- I think it was on the 24th, but I'm not -- I'm
not 100 percent sure about that -- have you given any
deposition testimony since that time?
    A.  Mr. Lyons, I just really don't recall.
    Q.  Okay.  When -- when was the last deposition you
gave?
    A.  I don't recall.  I could have looked on my
calendar before I left this morning, had I known I
needed to know that, but I don't recall.  I work with a
lot of cases.
    Q.  Right.  And -- okay.  So let me just ask you
this:  It's July 1st today.  In the last two weeks, do
you think you've given a deposition?
    A.  No, I haven't.
    Q.  All right.  And it may not be that you gave any
depositions between April and today; is that correct?
    A.  Thinking now, I think I've given one.
    Q.  All right.  And do you remember where that
deposition took place?
    A.  It took place here at the Jones Day offices.
    Q.  All right.  In preparation for your deposition,
did you speak with anyone outside the presence of your

Page 6

1   attorney?
2       A.  No, I haven't.
3       Q.  What documents have you reviewed in preparation
4   for your deposition?
5       A.  I reviewed the documents that I believe that
6   Mr. Rawlin brought this morning for the deposition.
7           MR. RAWLIN:  And those would be Experian's
8   Rule 26 initial disclosures, which were produced to
9   plaintiff, and I believe the confidential documents that
10  you have received pursuant to the protective order
11  entered in this case, I believe on Tuesday.
12      Q.  (By Mr. Lyons)  Any other documents besides
13  those, Ms. Hughes?
14      A.  Not that I can think of, no.
15      Q.  Okay.  Are you familiar with a case called
16  Sternaman versus Cross Country Bank and Experian
17  litigated back in 1999?
18          MR. RAWLIN:  I'm going to object to form
19  and foundation.  That's beyond the scope of the 30(b)(6)
20  notice.  And I don't think it's relevant to today's
21  case.  And I'm going to continue to instruct the witness
22  not to answer.  It's far beyond the scope of the
23  30(b)(6) notice.  That's not even mentioned in the
24  notice.
25          MR. LYONS:  Okay.  So I take it you're

Page 7

1   going to seek a protective order for that?
2           MR. RAWLIN:  Well, I don't think I need to
3   seek a protective order.  You didn't say that you were
4   going to be questioning that witness.  Your notice of
5   deposition does not list that as one of the topics that
6   you were going to inquire about.
7           MR. LYONS:  But you -- counsel, the
8   deposition notice that I served on Experian does not
9   limit my questions to only those topic areas included in
10  the deposition notice.
11          Do you agree with that?
12          MR. RAWLIN:  I don't believe I do agree
13  with that.  I mean, you say, we're going to take the
14  deposition of the folks with the most knowledge about
15  these topics, A through M.  We served an objection to a
16  number of those categories.  And there's no topic here
17  regarding a prior case that Experian litigated three
18  years ago.
19          MR. LYONS:  So you're instructing her not
20  to answer under Rule 26C of the Federal Rules of Civil
21  Procedure?  I assume you're going to move for a
22  protective order, is that correct, in instructing her
23  not to answer?
24          MR. RAWLIN:  I will if I have to.  I just
25  don't understand how it's relevant to today.  I mean,

Page 8

1   it's not something that you put in your notice as being
2   something that you wanted a 30(b)(6) representative to
3   testify about.  I mean, also, to the extent that it
4   would go into attorney-client privileged communications,
5   I'm going to object on that ground.
6           I mean, Ms. Hughes is not a lawyer.  I
7   don't understand why she would be expected to testify
8   about a case that was litigated three years ago.
9           MR. LYONS:  I want to know --
10      Q.  (By Mr. Lyons)  Ms. Hughes, do -- do you
11  remember, or have you ever had any involvement in the
12  Sternaman versus Experian case?
13      A.  No, I don't.  I didn't.
14      Q.  You did not have any involvement in that case?
15      A.  No.
16      Q.  All right.  Have you ever heard of it before?
17          MR. RAWLIN:  I'm going to object to the
18  extent it calls for attorney-client privileged
19  communications, and instruct the witness not to answer,
20  to the extent that any of her knowledge comes from
21  conversations she's had with counsel.
22          But outside of conversations you've had
23  with your attorneys, you can answer, Ms. Hughes.
24      A.  No, I don't have any knowledge of that case.
25      Q.  (By Mr. Lyons)  All right.  Are you aware, or

Page 9

1   were you aware, prior to this case, the Anderson case,
2   there being any problems with Cross Country Bank's
3   investigation procedures concerning disputes received by
4   Experian?
5           MR. RAWLIN:  I'm going to object on form,
6   foundation.  It's outside the scope of the 30(b)(6)
7   notice.
8           Again, this witness is here to testify
9   about Experian's reinvestigation policy and procedures
10  and how these particular consumers' disputes were
11  handled, not to testify about Cross Country Bank's
12  reinvestigation procedures.
13          Ms. Hughes is not an employee of Cross
14  Country Bank.  And I think she's also just testified she
15  doesn't have any knowledge of the Sternaman case.
16          MR. LYONS:  I didn't say anything about
17  Sternaman.  You just brought that up.  I asked her about
18  Cross Country Bank.
19          MR. RAWLIN:  Well, again --
20          MR. LYONS:  You're instructing her not to
21  answer?
22          MR. RAWLIN:  Well, again, Mr. Lyons, I'm
23  looking at your notice of deposition.  There's nothing
24  in here about having Experian to have someone designate
25  to testify about Cross Country Bank's reinvestigation

Kimberly Hughes

Page 18

1  form.
2        MR. LYONS:  -- including Experian?
3        MR. RAWLIN:  I'm going to object to the
4  form.
5        Go ahead, Ms. Hughes, if you know.
6     A.  I've reviewed all of our internal documents
7  that have been produced, and I'm aware of any
8  investigations that Experian has conducted in this
9  matter.
10    Q.  (By Mr. Lyons)  Related to them complaining
11 that Experian was reporting them as deceased on the
12 Experian credit report?
13    A.  Yes, sir, that's correct.
14    Q.  And how many times do you believe that Experian
15 has conducted an investigation into a dispute by the
16 plaintiffs that they were being reported as deceased by
17 Experian inaccurately?
18    A.  Are you asking me collectively?
19    Q.  Yes.  How many total times?
20    A.  Well, I don't have the facts of it memorized,
21 but I believe each plaintiff may have -- we may have
22 conducted two investigations.  But, again, I'm going
23 from memory.
24    Q.  All right.
25    A.  We can count when we get to the logs, if you'd

Page 19

1  like.
2     Q.  And is it the logs that you would need to
3  review to find out the number of times collectively?
4     A.  Well, yes, that would detail our dispute
5  activity.
6     Q.  All right.
7        MR. LYONS:  Let's mark as Deposition
8  Exhibit Number 1, Experian documents 124 through 154.
9        MR. RAWLIN:  Mr. Lyons, do you want to
10 attach those all as one exhibit, or would you like them
11 separated out by plaintiff?
12       MR. LYONS:  Let's mark it as all one
13 exhibit.
14       MR. RAWLIN:  And, for the record, these
15 documents have been marked highly confidential.  They
16 are being -- have been produced subject to a protective
17 order, I believe was entered by the court on June 29th,
18 and will be treated pursuant to that protective order.
19       (Exhibit 1 marked).
20       MR. RAWLIN:  Okay.
21    Q.  (By Mr. Lyons)  Ms. Hughes, do you have the
22 exhibit in front of you?
23    A.  Yes, I do.
24    Q.  I'm showing you what's been marked as
25 Deposition Exhibit Number 1, and what I would like for

Page 20

1  you to do is find for me by Experian page number the
2  first time that you believe that Experian responded to a
3  dispute on the plaintiff reported by Experian as
4  deceased.
5        MR. RAWLIN:  I'm going to object to the
6  form of the question.
7        Go ahead, if you know.
8     A.  I'm looking at Experian 139.  Is that the way
9  you would like me to identify?
10    Q.  (By Mr. Lyons)  Excellent.  Thank you very
11 much.
12    A.  Okay.  I believe this log is for Mr. Anderson.
13 It looks like we had a dispute that we received from him
14 on August 8th of 2000.
15    Q.  And you see that down on the bottom of --
16 towards the bottom of the page where it says, Dispute
17 taken by phone?  Or where do you see that information
18 concerning the date?
19    A.  Well, in the paragraph there, I see that we
20 received the dispute on August 8th of 2000, and we
21 entered the dispute on August 8th of 2000.
22    Q.  Okay.  Am I correct when I look down towards
23 the bottom of Experian 139 that it looks like this
24 dispute was by phone?
25    A.  That is correct.

Page 21

1     Q.  Okay.  In response to the dispute that the
2  consumer was saying he was not deceased, I look up above
3  in the middle of the page, and then I see, The dispute
4  reads.
5        Do you see that kind of towards the middle
6  of the page?
7     A.  Yes, I do.
8     Q.  All right.  And can you identify -- or confirm
9  for me or explain to me what the dispute reason was as
10 Experian entered it in its notes?
11    A.  The dispute is an external dispute.  It's
12 disputing the ECOA code, and we're saying that it should
13 be a 2, which is a joint account.  And we gave
14 additional text from the consumer, and we passed on to
15 Cross Country that the consumer says this account is
16 being reported incorrectly, they're not deceased.
17    Q.  And is it "they" meaning both of them, or
18 "they" -- what was the "they" referring to?
19    A.  I believe that's referring to plaintiffs.  At
20 this point in time, I believe a dispute was received on
21 both Mr. and Mrs. Anderson.
22    Q.  Okay.  So this would be the first dispute as to
23 Russell and to Penny Anderson?  Is that your testimony?
24       MR. RAWLIN:  Well, I'm going to object to
25 the extent it mischaracterizes the documents.  I think

6 (Pages 18 to 21)

Page 22

1  the document that Ms. Hughes is looking at is a log for
2  Mr. Anderson. I'm going to object to the form.
3        Mrs. Hughes, if you know, you can go ahead
4  and answer.
5        THE WITNESS: I don't even recall what he
6  asked. I'm sorry.
7        MR. LYONS: Madame Court Reporter, can you
8  read it back for her?
9        (Record read).
10    A. Yes, that's correct.
11    Q. (By Mr. Lyons) And your counsel said something
12  about how this dispute page or this page just is limited
13  to Russell.
14        Is there a similar page for Penny that
15  you're aware of?
16    A. No, we were not able to retrieve, I believe,
17  the log for this time frame for Mrs. Anderson, but we do
18  have a CDF, which, as you know, is the results of our
19  investigation around this time frame. I'd have to look
20  at that to tell you if -- if I believe it occurred on
21  the same date. But I do know around this time frame we
22  did conduct an investigation for Mrs. Anderson as well.
23    Q. And is there -- there's been some -- there's
24  been some purging of some documents or some log notes.
25  Is that your testimony regarding Penny, or where are

Page 23

1  those documents?
2        MR. RAWLIN: Object to the form, and
3  foundation.
4        If you know, Mrs. Hughes.
5    A. I do not know what happened to those. They are
6  maintained in an archive system, and when I requested
7  the archive for Ms. Anderson, those documents were not
8  available.
9    Q. (By Mr. Lyons) Did you know whether or not
10  there was any other place in the system that they could
11  be located?
12        MR. RAWLIN: Object to foundation.
13    A. To my knowledge, there's not.
14    Q. (By Mr. Lyons) Now, where it says dispute
15  reason equals external, what is external?
16    A. That means we're contacting a source outside of
17  Experian.
18    Q. And ECOA's code disputed is -- what does the U
19  mean?
20    A. That means we were requesting an update to the
21  account.
22    Q. And I don't -- is requesting an update the same
23  thing as sending a CDC requesting investigation, or is
24  it different?
25    A. No, it's the same.

Page 24

1    Q. Okay. Now, at the time that Experian received
2  the dispute from the Andersons in August of 2000, did
3  Experian have reason to believe that -- or any
4  information to believe that this was some kind of false
5  or frivolous dispute?
6        MR. RAWLIN: Object to the form and object
7  to foundation.
8    A. Experian doesn't really make a decision to
9  the -- to the accuracy, I guess, if that's a good word,
10  for the dispute. We don't decide if -- if the consumer
11  is correct, or if the subscriber is correct. We simply
12  conduct an investigation for the accuracy of the data.
13    Q. (By Mr. Lyons) Okay. So there's an
14  investigation into the accuracy of the data as it's
15  being furnished to Experian by Cross Country?
16    A. Yes, that's correct.
17    Q. All right. So for purposes of an
18  investigation, is -- is it fair to say that Experian
19  assumed that the dispute by the consumer is authentic
20  and real?
21        MR. RAWLIN: Object to the form.
22        But if you understand the question,
23  Ms. Hughes, go ahead.
24    A. I do understand the question. I would say
25  that, in good faith, Experian does assume that the

Page 25

1  disputes that it's receiving are honest disputes from
2  consumers. We both know that's not always the case, but
3  we would treat each consumer as if their dispute were an
4  honest and real dispute, yes.
5    Q. (By Mr. Lyons) Okay. And as far as you know,
6  because this was a telephonic dispute, did Experian ask
7  or request any additional information from the -- from
8  the Andersons to justify or verify that they, in fact,
9  were alive?
10        MR. RAWLIN: Object to form and
11  foundation.
12        Go ahead.
13    A. No, they did not.
14    Q. (By Mr. Lyons) All right. At this time in
15  August of 2000, in general, what was the policy and
16  procedure of Experian in responding to a dispute such as
17  this where a consumer is saying they're not deceased?
18    A. Experian, as with all of its disputes, contacts
19  the reporting source to verify the accuracy of the
20  information.
21    Q. Now, is this type of a dispute handled in a
22  priority manner by a special department of Experian, or
23  not?
24        MR. RAWLIN: Objection to the form and
25  foundation.

0710510160001

```
PROGRAM: CAPRESPA        EXPERIAN - CONSUMER ASSISTANCE - CAPS      PAGE: 1165
RUN DATE: 08/15/00            AUTO ADJV RESPONSE ACTIVITY REPORT
RUN TIME: 03:11:03
```

01 SUBCODE: 1216565  ACCOUNT#: 541480708890312
02 UPDATE 30 DISPUTE REASON CODE: 025 DISPUTES ECOA/ASSOCIATION CODE.
03
04 DATE SENT: 08/08/2000  MLBX: 6183531  DATE DUE: 08/15/2000  RESPONSE DATE: 08/14/2000  OFFICE NUM: 0001
05 CONSUMER STATES: ECOA:2;
06 EXP DISPUTE TEXT: CON SAYS THIS ACCT IS BEING REPORTED INCORRECTLY - THEY ARE NOT DECEASED
08

SUBSCRIBER: CROSS COUNTRY BANK

```
09 CONSUMER IDENTIFICATION:                        SUBSCRIBER CONSUMER ID:
10   NAME: ANDERSON, RUSSELL, DENNIS  SR            ANDERSON, RUSSELL, SR
11   AKA: ANDERSON, RUSSELL
12   SSN: 394784720
13   CURR ADDRESS: 1380 HERITAGE DR APT17
14                 NEW RICHMOND, WI
15           ZIP: 54017-2503
16   PREV ADDR 1:
17   PREV ADDR 2:
18           ZIP:
19 DATE OF BIRTH:              AGE: 40              AGE:
21 RESPONSE CODE 035: VERIFIED AS REPORTED
```

| | SUBSCRIBER RESPONSE | CONSUMER CLAIMS | ON PROFILE |
|---|---|---|---|
| 29 | | | |
| 30 TRADE INFORMATION: | | | |
| 31 PAYMENT STATUS | | | 21-DECEASED |
| 32 BALANCE | :418 | | 170 |
| 33 BALANCE DATE | :08/14/2000 | | 06/10/2000 |
| 34 AMT PAST DUE | | | |
| 35 PYMT LVL DATE | | | 06/2000 |
| 36 ORIG DELINQ DATE | :07/2000 | | 06/2000 |
| 37 CREDIT LIMIT AMT | | | 900 |
| 38 HIGH CRED/ORIG AMT | | | 210 |
| 39 CHARGE OFF AMT | | | |
| 40 ACCOUNT COND | | | DECEASED |
| 41 SCH MONTHLY PAY | | 2 | 35 |
| 42 ASSOC CODE | :2 | | X |
| 43 DATE LAST PAY | | | |
| 44 OPEN DATE | | | 04/1999 |
| 45 SPECIAL COMMENT | | | |
| 46 TERMS | | | 010 |
| 47 ACCOUNT TYPE | | | 18-CRC |

```
NAME VERIF FLAG: 1 = DIFFERENT
CURR ADDR VERIF: 2 = SAME
PREV ADDR VERIF: 3 = UNKNOWN
SSN VERIF FLAG : 2 = SAME
================= OTHER PROFILE DATA =================
HISTORY GRID: 00000EEEEE00000DDDDDDDD  00/00/00
================= OTHER RESPONSE DATA =================
MANNER OF PAYMENT FROM SUBSCRIBER: 01
***** ACCOUNT STATUS OVERRIDE: 11
**** SPECIAL COMMENTS OVERRIDE:
AUTHORIZED VERIFIER: RUTHY ECHOLS
                PHONE: 302-467-4500
```

DEPOSITION EXHIBIT #20

EXP/AND00013

Exhibt D

**Testimony before The House Committee on Financial Services,**
**Subcommittee on Oversight and Investigations**
**and**
**The House Ways and Means Committee,**
**Subcommittee on Social Security**

**November 8, 2001**

**Thomas J. Lehner, Executive Vice President**
**American Financial Services Association**

## Introduction

Chairwoman Kelly, Chairman Shaw, members of the committee, thank you for inviting me to testify. I am Tom Lehner, Executive Vice President of American Financial Services Association. AFSA is the leading trade association for market funded financial services companies. Our 400 member companies include consumer and commercial finance companies, auto finance/leasing companies, mortgage lenders, credit card issuers and industry suppliers.

I am here to address the issue of Identity Theft using Social Security numbers, and specifically the industry's use of the Social Security Administration's Death Master File (DMF).

Social Security numbers are the most unique identifier of individuals in the United States. The financial services industry uses these identifiers for a variety of reasons, such as customer verification, credit checks, bankruptcy filings, and monetary judgments such as tax liens. Unfortunately, the use of Social Security numbers is not secure. They are readily available and indeed used by companies, state and local governments, colleges, and even by consumers who print their numbers on their checks.

Thieves steal the Social Security numbers, and ultimately the identity of individuals both living and dead.

Financial institutions, such as credit card companies and banks, have incurred significant losses resulting from misuse of social security numbers. Consumers have also experienced monetary losses, impaired credit, and legal problems because others have amassed debts using their identities.

## Industry use of the Death Master File

Financial firms have an obvious interest in making sure that individuals who open accounts are who they say they are. Companies rely on the Social Security Death Master File to protect against theft. In most cases, firms do not directly subscribe to the Death Master File, but access it indirectly via credit reporting agencies or other vendors who subscribe to it. This is both more efficient and less costly to the consumer.

Exhibit E

November 8, 2001
Testimony of Thomas J. Lehner, AFSA
Page 2

For example, bank issuers of credit cards routinely obtain consumer reports on card applicants from credit reporting agencies. Because the credit bureaus periodically update their files by comparing information to the Death Master File, the credit report will contain an indicator if the individual has been reported as deceased, and the bank can use this information to decline the application or investigate the circumstances.

Other financial firms, such as securities broker-dealers, also access the Death Master File as part of the account opening process. Third party vendors who utilize Death Master File information typically do this screening.

Consumer lenders regularly use information from credit reporting agencies to review and adjust the status of existing accounts as well. It also helps to verify customers seeking to refinance existing mortgages, or who are interested in other services offered by the institution.

Naturally, financial firms have other sources of information that might indicate that a customer has died and that access to the account should be frozen or terminated. The principal source is family members, who call to notify the institution of the death of the customer, and may request changes in the name on the account or the address where statements are sent. Lawyers and estate executors are another source of this information.

## Problems with the Death Master File

Whether financial institutions obtain information about deceased individuals directly from the Death Master File, or indirectly from other subscribers to the File, they have an interest in obtaining accurate and current data.

Delays between the date on which an individual dies and the date on which this information is made available to the public through the Death Master File increases the opportunities for identity thieves to defraud survivors, beneficiaries, and financial institutions.

One of the disadvantages of the current Social Security numbering system is that the agency is not always immediately notified upon the death of an individual. There appears to be no requirement for local officials to notify SSA when someone dies.

Despite their best intentions, having incomplete and incorrect information makes it very difficult for the Social Security Administration to issue an accurate Death Master File.

November 8, 2001

Testimony of Thomas J. Lehner, AFSA

Page 3

**Steps the industry has taken**

Many companies have established internal processes that deal with fraud and identity theft. In addition, companies work with customers who are victims of identity theft, and they also work with prosecutors to pursue those responsible.

**Suggested improvements**

AFSA supports efforts to encourage the Social Security Administration to obtain death information promptly and report it more frequently.

We also support the continued dialogue between credit reporting agencies and financial institutions to facilitate the flow of Death Master File information in bureau files. For example, there may be a need to change procedures so that when creditors report account status information to credit reporting agencies, and this information is placed in a file of a customer about whom the bureau has received death information, the creditor is made aware of that fact on a timely basis.

We believe that more financial institutions would consider subscribing to the data directly if the information provided was real time and accurate. Whether financial institutions obtain information about deceased individuals directly from the DMF, or indirectly from other subscribers to the DMF, it is in our interest and that of the consumer that we obtain correct and current data.

We're hopeful that the Social Security Administration will make both the procedural and policy changes necessary to ensure the security of our individual unique identifiers, our Social Security numbers. Thank You.

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**
**COURT FILE NO.:  04-C-0096 C**

Penny Lee Anderson and Russell D. Anderson,
Sr., on behalf of themselves and all others
similarly situated,

                          Plaintiffs,                    **DECLARATION OF JAMES CLINTON**
                                                         **KELLY IN OPPOSITION TO**
                                                         **PLAINTIFFS' AMENDED MOTION FOR**
      -vs-                                               **CLASS CERTIFICATION**

Capital One Bank,

                          Defendant.

I, James Clinton Kelly, declare as follows:

1.      I submit this declaration in opposition to plaintiffs' Amended Motion for Class
Certification.  Unless stated on information and belief, I have personal knowledge of the facts
stated herein and could and would testify competently thereto if called as a witness.

2.      I am employed by Capital One Services, Inc. ("COSI"), the entity that provides
credit card servicing operations to Defendant Capital One Bank ("Capital One").  I am a Senior
Compliance Advisor and have had this position since December 2003.  Prior to that time and
since March 1999, I have held various other positions at COSI, namely, senior credit analyst,
front line manager, project manager, and compliance adviser.

3.      In my capacity as a Senior Compliance Advisor, I advise the direct marketing center
on compliance matters relating to the credit decisioning process, application processing, and the
selection of names for solicitation mailing.  To that end, I have familiarized myself with
publications by the Federal Reserve regarding, among others things, the Fair Credit Reporting
Act ("FCRA") and Equal Credit Opportunity Act.

                                                                                    Exhibit F

4.    In addition, and since I have been employed by COSI, I have learned about the practices and procedures of what are described in the FCRA as consumer reporting agencies ("CRAs") — companies commonly referred to as "credit bureaus."

### Capital One's Handling of Applicants Reported as Deceased

5.    Capital One Bank is one of the largest credit card issuers in the United States. Every month it receives approximately one million applications for the extension of credit.

6.    With their credit card applications, applicants must provide Capital One with a social security number. Capital One uses that social security number to obtain, electronically, credit reports from CRAs.

7.    If a CRA's database on a particular social security number reflects that the individual assigned that number is deceased, the CRA will not produce certain credit scores for that individual. In all events, it will alert the entity seeking the credit report that such individual is being reported as deceased.

8.    Under Capital One's credit decisioning system, any report that an applicant is deceased immediately terminates the underwriting process and causes the application to be rejected.

9.    I have reviewed Exhibits 1 through 3 of the Andersons' complaint in the instant action. Prior to April 2004, Capital One mailed letters in response to applications generating a deceased report that were virtually identical to those received by the Andersons.

10.   Between February 20, 2002 and February 20, 2004, Capital One mailed approximately 124,000 such letters.

### Amendment to Letter in April 2004

11.   In April 2004, Capital One amended the letter that it issues as a result of the deceased report to include, among other things, the name of any CRA from which Capital One obtained a credit report in connection with that credit application. I caused the letter, which was brought to my attention because of this lawsuit, to be revised because I believed it should contain

2

standard language used by Capital One Bank in providing adverse action notices to consumers under the FCRA. I did this despite information and belief that Capital One originally believed it had no obligation to provide information regarding the source of the information to a person reported as deceased.

    12.    Capital One has replaced the original letter with the revised letter on its system, and the original letter no longer exists.

    13.    Since the revision, Capital One sends the amended letter automatically in response to a deceased report. Capital One mails no other version of the letter in response to a deceased report.

    I declare under the penalty of perjury, under the laws of the United States, that the foregoing is true and correct. Executed in Goochland County, Virginia this 20th day of August, 2004.

 

                                         James Clinton Kelly

STATE OF _Virginia_            )
                              ) to-wit:
CITY/COUNTY OF _Henrico_     )

    Subscribed and sworn to before me this _20_ day of August, 2004, by
_James Clinton Kelly_.

                                    _Rebecca Lynn_
                                    Notary Public

My commission expires: _2/28/05_



American Express Centurion Bank
PO Box 31525
Salt Lake City, UT 84131

August 19, 2002



Russell D Anderson Sr
1614 Wildwood Avenue
New Richmond, WI 54017-2400

04388

Ililililililililililililililililililililil

Reference: 2002230 60 00754 USD

Dear Russell D Anderson Sr:

Thank you for your interest in *Blue* from American Express. At this time, we are unable to open an account for you.

Your application was processed using a credit scoring system which assigns numerical values to the various pieces of information we consider in evaluating your application. Your application did not score enough points to qualify for an account at this time for the following reasons:

       Risk score not available due to report of deceased status.

Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed in this letter. You have a right under the Fair Credit Reporting Act to obtain a free copy of your report from the reporting agency, if you request it no later than 60 days after you receive this notice. If you find that any information contained in the report you receive is inaccurate or incomplete, you have the right to dispute the matter with the reporting agency. Please understand that the reporting agency played no part in our decision and cannot supply you with specific reasons why we denied credit to you.

An important notice concerning your rights is included.

Thank you for your interest in our service.

Sincerely,

*Donna Potts*

Donna Potts
New Accounts Department

DP/ag

CD21251 7/99    WALLACE

Exhibit G

## IMPORTANT NOTICE CONCERNING YOUR RIGHTS

If you would like further information regarding your application, please contact American Express at the following address: American Express Centurion Bank, P.O. Box 31525, Salt Lake City, UT 84131-9925, within 60 days from your receipt of this letter.

Notice to U.S. Residents
The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning American Express Centurion Bank is the Federal Deposit Insurance Corporation, Credit Card Center, 2345 Grand Boulevard, Suite 100, Kansas City, MO 64108. The federal agency that administers compliance with this law concerning American Express Travel Related Services Company, Inc. is the Federal Trade Commission, Equal Credit Opportunity, Washington D.C. 20580.

Notice to Ohio Residents
The Ohio state laws against discrimination require that all creditors make credit equally available to all creditworthy customers and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

Notice to Washington Residents
The Washington state laws against discrimination prohibit discrimination in credit transactions because of race, creed, color, national origin, sex, or marital status. The Washington State Human Rights Commission administers compliance with this law.

CREDIT BUREAU AGENCY(S)

Trans Union Corp.
2 Baldwin Place
PO Box 1000
Chester PA 19022-1000
(800) 888-4213

Equifax Credit Info
Building E Suite 5200
1140 Hammond Drive
Atlanta GA 30328
(800) 685-1111

1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
COURT FILE NO.:   03-C-0510 C

PENNY LEE ANDERSON AND          :
RUSSELL D. ANDERSON, SR.,
                                :
            Plaintiffs
                                :
      vs.
                                :
TRANS UNION, L.L.C.,
EXPERIAN INFORMATION            :
SOLUTIONS, INC., CSC            :
CREDIT SERVICES, INC.,
and EQUIFAX, INC., d/b/a        :
INFORMATION SERVICES, LLC.,
                                :
            Defendants



            Deposition of EDWARD McKENNA taken pursuant
to notice at the law offices of Ballard, Spahr, Andrews
& Ingersoll, LLP, 919 North Market Street, Wilmington,
Delaware, beginning at 10:08 a.m., on Monday, June 28,
2004, before Allen S. Blank, Registered Merit Reporter
and Notary Public.


APPEARANCES:

      MARTIN C. BRYCE, JR., ESQUIRE
      BALLARD, SPAHR, ANDREWS & INGERSOLL, LLP
      1735 Market Street, 51st Floor
      Philadelphia, PA 19103-7599
            For - Cross Country Bank and
                  Applied Card Systems


VIA TELEPHONE:

      THOMAS J. LYONS, ESQUIRE
      THOMAS J. LYONS & ASSOCIATES, P.A.
      342 East County Road D
      Little Canada, MN 55117
            For - Plaintiffs

Edward McKenna



**Page 2**

1  APPEARANCES: CONTINUED - VIA TELEPHONE
2      CHRISTOPHER T. LANE, ESQUIRE
       KATZ & KORIN
3      334 North Senate Avenue
       Indianapolis, IN 46204-1708
4
           For - Defendant Trans Union
5
       DUSTIN B. RAWLIN, ESQUIRE
6      JONES, DAY
       901 Lakeside Avenue
7      Cleveland, OH 44144-1190
8          For - Defendant Experian Information.
               Solutions, Inc.
9
       MARTIN S. CHESTER, ESQUIRE
10     FAEGRE & BENSON, LLP
       2200 Wells Fargo Center
11     90 South Seventh Street
       Minneapolis, MN 55402-3901
12
           For - CSC Credit Services, Inc.
13
       LEWIS P. PERLING, ESQUIRE
14     KILPATRICK STOCKTON, LP
       1100 Peachtree Street
15     Atlanta, GA 30309-4530
16         For - Equifax, Inc., d/b/a Information
               Services, LLC
17
18             * * * * * *
19         EDWARD McKENNA,
20     the deponent herein, having first been
21     duly sworn on oath, was examined and
22     testified as follows:
23             EXAMINATION
24  BY MR. LYONS:

**Page 3**

1  Q  Sir, what is your full name?
2  A  Edward McKenna.
3  Q  And how old are you?
4  A  Sixty.
5  Q  What's the extent of your education?
6  A  Some college. High school graduate.
7  Q  And what's your address?
8  A  109 Hawthorne Court West, Hockessin,
9  Delaware.
10  Q  Would you spell Hockessin?
11  A  H-o-c-k-e-s-s-i-n.
12  Q  And what has your work history been with
13  Cross Country Bank? When did you start with them and
14  what kind of jobs have you held?
15  A  I have started with them in November of 2000
16  as executive vice-president and am responsible for
17  overall risk for the company.
18  Q  And your work history before 2000 for the
19  majority of your adult life has been spent in what
20  industry, if you could refine it down to that?
21  A  In the credit card industry since about
22  1968.
23  Q  All right. A real pioneer?
24  A  I guess.

**Page 4**

1  Q  And your job title you have given us, what
2  are the duties of that job as executive vice-president?
3  A  Primarily maintain control of operations
4  that affect the bank, credit risk, other risks
5  including funding, liquidity, customer service,
6  operation, payment processing. Without direct
7  responsibility for doing those things, I have to
8  monitor them to make sure they are under control.
9  Q  Are you involved in any way in the risk
10  assessment involving litigation with the bank?
11  A  No, I am not.
12  Q  Have you ever given your deposition before
13  under any circumstances?
14  A  Yes, I have.
15  Q  How many times?
16  A  Once.
17  Q  And where were you employed when you gave
18  your deposition?
19  A  Cross Country Bank.
20  Q  Did it have anything to do with the FCRA,
21  Fair Credit Reporting Act?
22  A  Yes, I believe it did. I don't remember the
23  exact circumstances.
24  Q  And do you remember when you gave that

**Page 5**

1  deposition?
2  A  It's probably several years ago.
3  Q  So it would be back after you joined in
4  November of 2000?
5  A  Yes, sir.
6  Q  And do you have a copy of that deposition
7  handy in your workplace or at your home?
8  A  No, I do not.
9  Q  Have you read that deposition when it was
10  reduced to typewritten English in the form of a
11  transcript?
12  A  I believe so.
13  Q  Do you know whether or not that transcript
14  still exists?
15  A  I have no idea.
16  Q  And where did you read it, sir?
17  A  I believe it was sent to me following the
18  deposition to review for accuracy.
19  Q  And did you keep the deposition or return it
20  to the lawyers or destroy it?
21  A  I returned it to the lawyers.
22  Q  And what law firm was that, sir?
23  A  In all honesty, I don't remember who was
24  representing us at that deposition.

Edward McKenna

14

1 and made clear that we would not be presenting a
2 witness on and we would not allow a witness to answer.
3 That being said, I'll give you a little bit of latitude
4 to get into this generally. But at some point, I'm
5 warning you, I'm going to instruct the witness not to
6 answer.
7        MR. LYONS: And that's understood, Mr.
8 Bryce. I just kind of want to get some background of
9 what this witness did over there.
10        MR. BRYCE: Yeah, that I understand. So
11 I'll let him answer that question. I just wanted to
12 put that on the record. So you can go ahead, sir.
13        MR. LYONS: Thank you.
14        THE WITNESS: I was responsible as the
15 president of the company for delivering those services
16 that I described earlier for Cross Country Bank. And
17 at the time, we did have another client.
18 BY MR. LYONS:
19    Q    Now, have you looked into this specific
20 circumstance regarding Penny Anderson and Russell
21 Anderson being reported deceased by Cross Country Bank?
22        MR. BRYCE: Objection to the form. You can
23 answer.
24        THE WITNESS: Yes, I have.

15

1 BY MR. LYONS:
2    Q    All right. And have you determined why it
3 was that from time to time either or both of the
4 plaintiffs were reported as deceased?
5        MR. BRYCE: Objection to the form. You can
6 answer.
7        THE WITNESS: Yes, I did.
8 BY MR. LYONS:
9    Q    All right. Let's start with Penny Anderson.
10 And I would ask you, sir, what did you learn as to why
11 she was reported deceased by Cross Country Bank?
12        MR. BRYCE: Objection to the form. You can
13 answer.
14        THE WITNESS: As a result of a change of
15 address that occurred early when the account -- just
16 after the account opened, an obscure flag was set
17 incorrectly on the account and apparently results in
18 reporting a deceased notation on the account.
19 BY MR. LYONS:
20    Q    And what is an obscure flag?
21    A    It's one that's not used for credit bureau
22 reporting by us. It had nothing to do with the change
23 of address. It's not our standard procedure for
24 reporting accounts as deceased or in any other way.

16

1 And, as I said, it was inadvertently set and that was
2 unknown to us until very late in this process.
3    Q    And did you determine when that was set at
4 the time of a change of address?
5    A    I believe it was in 1999.
6    Q    And at that time, did Penny Anderson have
7 one or more accounts with Cross Country Bank?
8    A    One account.
9    Q    And at that time, did Russell Anderson have
10 any accounts with Cross Country Bank?
11    A    The same account. One account.
12    Q    So that was a joint account?
13    A    Correct.
14    Q    And can you identify the obscure flag any
15 more precisely than just obscure flag that you
16 testified to?
17    A    There is -- I don't know the technical terms
18 for it. But there is, in a change of address, you
19 obviously change the street name, city, state, zip
20 code. You might change telephone numbers. And there
21 is a sub flag that was used at some time in the past by
22 the processer, which was First Data Resources, that
23 would mark an account as deceased for purposes of
24 apparently mailing purposes. That's why it was in

17

1 conjunction with an address change. We never used it
2 for that purpose. And it was simply set incorrectly.
3    Q    And do you know who set it incorrectly?
4    A    I don't know. An associate at Applied Card
5 Systems but I don't know whom.
6    Q    All right. Now, you say an associate at
7 Applied Card Systems. And I think you indicated that
8 apparently Applied Card Systems provides the services
9 that you testified to earlier for Cross Country Bank
10 and other of its customers; is that it?
11    A    That's correct.
12    Q    And one of the services I think you said was
13 some kind of data entry. True?
14    A    It is, yes.
15    Q    And what is First Data Resources?
16    A    That is the company that provides account
17 recordkeeping for credit card accounts so that they can
18 be billed and serviced.
19    Q    All right. And is that a company that does
20 that for Applied Card Systems or how would you describe
21 that operation?
22        I'm hesitant to use the word relationship.
23 But if that's the word we have to use, I'd like to know
24 a little bit more about what First Data's connection to

Edward McKenna

**18**

1  Applied Card Systems is in regard to this
2  recordkeeping.
3      MR. BRYCE: Objection to the form. You can
4  answer.
5      THE WITNESS: Actually, First Data provides
6  the service for Cross Country Bank and we allow Applied
7  Card Systems to access that system, to view our
8  records.
9  BY MR. LYONS:
10     Q    All right. And if you were going to tell me
11  the distinction between the services that those two
12  entities provide to Cross Country Bank, what is the
13  distinction in the services?
14     A    First Data Resources provides back office
15  bookkeeping records, the actual mechanical records,
16  data processing records of the account. Applied Card
17  Systems accesses those records and communicates
18  directly with the customer. First Data Resources does
19  not communicate directly with the customer.
20     Q    And just to take it one step further. Does
21  First Data Resources, then, do they receive checks or
22  other forms of payment and make the posting and
23  actually send out the mailing, the bills?
24     MR. BRYCE: Objection to the form.

**19**

1      THE WITNESS: They only send out the
2  statements. They do not receive payments or other
3  correspondence.
4  BY MR. LYONS:
5      Q    And does Applied Card Systems, then do they
6  receive the payments?
7      A    Yes.
8      Q    And in receiving the payments, somehow they
9  communicate that to First Data Resources so that First
10  Data Resources can properly state payments that have
11  been made on the bill, correct?
12     A    That is correct.
13     Q    And then does Applied Card Systems also get
14  the charge information when somebody uses a credit card
15  for one of its customers and then transmits that
16  information to First Data Resources?
17     A    No, they do not.
18     Q    Who has got the data base again?
19     A    First Data Resources.
20     Q    And Applied Card Systems can access that
21  data base and make those charge information entries and
22  the address changes and things like that, correct?
23     A    Not the charge information. But address
24  changes and things like that.

**20**

1      Q    How does the charge information get to the
2  data base?
3      A    Through First Data Resources. Directly from
4  wherever.
5      Q    From the point of sale?
6      A    The point of sale to a bank to First Data
7  Resources.
8      Q    Okay. All right. So there was a flag on
9  Penny Anderson, an obscure flag, which occurred
10  sometime around the change of address. What more do
11  you know about Penny Anderson being reported as
12  deceased by Cross Country Bank in the years after that
13  obscure flag was placed?
14     MR. BRYCE: Objection to the form. You can
15  answer.
16     THE WITNESS: You keep referring to Penny.
17  It's the account that had the flag on it. It wasn't
18  specific to Penny or Russell.
19  BY MR. LYONS:
20     Q    All right.
21     A    And that flag created that notation every
22  time it was reported to the credit bureau.
23     Q    It appears, and correct me if I'm wrong, Mr.
24  McKenna. At some point, the deceased notation came off

**21**

1  of that account, is that correct? Am I correct?
2      A    Yes, that's correct.
3      Q    And subsequent to it coming off, it went
4  back on? Do you remember that?
5      A    No, it did not.
6      Q    When did it come off?
7      A    Just I believe very late 2003. I'd have to
8  look at the specifics to get the date. But late 2003.
9      Q    And that was on one account, correct?
10     A    Yes.
11     Q    Were there any other Cross Country accounts
12  that either or both of these plaintiffs had that had
13  the deceased notation on it?
14     A    The account was apparently originally opened
15  as a Master Card account. It was subsequently
16  converted to a Visa account. The Master Card account
17  then being closed. And for a period of time, both the
18  Master Card and the Visa account were reported.
19     Q    And is that the usual procedure for Cross
20  Country Bank to report a closed account for some period
21  after the account's been closed?
22     A    Yes.
23     Q    Now, if you would be so kind, tell us what
24  the distinction is between a Master Card issued by

6 (Pages 18 to 21)

Edward McKenna

22

1   Cross Country Bank and a Visa card issued by Cross
2   Country Bank?
3        MR. BRYCE: Is this limited to a certain
4   time frame or are you talking about the Andersons
5   specifically?
6   BY MR. LYONS:
7        Q   Do you understand that question, Mr.
8   McKenna?
9        A   Yeah, I understand it.
10       Q   Okay. There really isn't any time -- I
11  don't have any time period in mind. I'm just wondering
12  what the difference was. The obvious time is, of
13  course, when it occurred, when there was a change from
14  one to the other. But I'm curious if this witness
15  knows what the distinction is between a Master Card and
16  a Visa card as issued by Cross Country Bank at or about
17  the time that the transaction with the Andersons
18  occurred?
19       MR. BRYCE: I'll object to the form and to
20  the extent I think you're going beyond the items in the
21  subpoena you sent me. But I'll let the witness answer.
22       MR. LYONS: Okay.
23       MR. BRYCE: Subject to those objections.
24       MR. LYONS: Sure.

23

1        THE WITNESS: Cross Country Bank had, in the
2   past, issued Master Cards as a matter of marketing.
3   And in approximately 2000, the year 2000, made a
4   strategic decision that we would prefer to market Visa
5   accounts and converted the Master Card accounts to
6   Visa. Functionally, they both are general purpose
7   credit cards that are used, if you will, in the exact
8   same way. It's purely a marketing decision on Cross
9   Country Bank's part to issue one or the other.
10  BY MR. LYONS:
11       Q   Excuse me if I sound a little bit naive
12  about this. But is Master Card like a separate company
13  from the Visa Card Company?
14       A   Both Master Card and Visa are organizations,
15  associations, that represent their particular brand,
16  Master Card or Visa. They are actually owned by the
17  membership of both associations.
18       Q   And as far as you know, can a bank be a
19  member of both associations?
20       A   Yes.
21       Q   All right. And the distinction, you say
22  it's in marketing. But I guess I always get them
23  confused and maybe that's the genesis of this question
24  is, what is the difference between the two of them? Is

24

1   there any, other than the name?
2        MR. BRYCE: Objection to the form.
3        MR. LYONS: Okay. You can answer.
4        THE WITNESS: Other than the name, there
5   isn't. I'm sure each brand would attempt to
6   distinguish themselves. But functionally, they are
7   both the same.
8   BY MR. LYONS:
9        Q   Does one or the other market to a higher or
10  a lower income group of people or do they generally
11  market to the same consumers across the board?
12       MR. BRYCE: Objection to the form. It lacks
13  foundation. You can answer, if you're able, sir.
14       THE WITNESS: There is no distinction that
15  either markets to any specific group.
16  BY MR. LYONS:
17       Q   Now, I know you're involved in risk. But
18  take a look at Exhibit B to Deposition Exhibit 1.
19       A   Yes, sir.
20       Q   The Silver Preferred Card letter. Is Silver
21  Preferred Services a part of Cross Country Bank or is
22  there a connection between the two of them?
23       A   Yes.
24       Q   All right. And what is that connection?

25

1        A   Silver Preferred is an upgraded service to
2   accounts that have performed very well and that we want
3   to add some additional value to them.
4        Q   This was back in the year or this letter
5   says May 15, 2000. That's before you came on board.
6   Can we tell from this letter whether it was a Visa card
7   or a Master Card?
8        A   Yes. This was a Master Card. You can tell.
9        Q   How can you tell that, sir?
10       A   In the reference, RE: --
11       Q   Yes, sir.
12       A   The account number begins with five.
13       Q   All right.
14       A   All Master Cards begin with five.
15       Q   All right. And then what does Visa begin
16  with?
17       A   Four.
18       Q   And are there other numbers that are used to
19  identify the card association like does three mean
20  something?
21       A   Three is used primarily by American Express.
22  I don't know if it's limited to them.
23       Q   Okay. And then how about six?
24       A   That's used by Discover. And, again, I

Edward McKenna

26

1   don't know if it's limited to them.
2       Q    Do you know what two is?
3       A    No, I don't.
4       Q    How about seven?
5       A    No, I don't.
6       Q    Now, do you know, on May 15th, 2000, if
7   Penny Anderson was being reported deceased by Cross
8   Country Bank?
9       A    I know the account was being reported with
10   that flag I indicated. The account was also being
11   reported with a good credit history and open and
12   available for use.
13       Q    And do you know why, then, or any of the
14   reasons for Cross Country sending out the Silver
15   Preferred card notice to Penny Anderson if the account
16   was being reported as deceased?
17       MR. BRYCE: Two things there, Mr. Lyons.
18   Number one, he has already testified, I believe, that
19   he had never seen Exhibit B before.
20       MR. LYONS: Okay.
21       MR. BRYCE: And, number two, in our motion,
22   we specifically made it clear that we would not allow
23   him to answer any questions with respect to Exhibit B.
24       MR. LYONS: All right.

27

1       MR. BRYCE: Nevertheless, I'll give you a
2   little bit of latitude here but not much further.
3       MR. LYONS: Thank you.
4       MR. BRYCE: If you can answer the question,
5   sir, you can.
6       THE WITNESS: The account was an outstanding
7   account. It was in excellent condition. Up-to-date.
8   Paid well. And the Silver Preferred mailing that we
9   did was an acknowledgment of that and to reward, if you
10   will, the customer so they would continue doing
11   business with us.
12   BY MR. LYONS:
13       Q    If there was a deceased tag on the account,
14   what, if any, does that role, would that play in terms
15   of whether to send out a higher credit limit to the
16   account holder?
17       MR. BRYCE: Objection to the form. You're
18   misstating his testimony. You can answer, if you're
19   able, sir.
20       THE WITNESS: Yeah. We did not have a
21   deceased flag on the account. The account, as far as
22   we were concerned, was open, up-to-date, being paid
23   properly and it was in good standing. Buried in the
24   record, as I indicated earlier, this obscure flag was

28

1   set that, unbeknownst to us, generated a comment that
2   the account had a deceased status.
3   BY MR. LYONS:
4       Q    And that was being reported to the credit
5   reporting agencies?
6       A    Yes.
7       Q    All right. And for purposes of dealing with
8   your accountholder, you weren't concerned with how
9   their credit history general y, which might be
10   reflected on the credit report, you were interested in
11   their account history with the bank before the Silver
12   Card service would be extended; is that your testimony?
13       MR. BRYCE: Objection to the form. You can
14   answer.
15       THE WITNESS: We were not looking
16   specifically at that credit bureau history. We had
17   their account to deal with.
18   BY MR. LYONS:
19       Q    And the account history was satisfactory or
20   outstanding, as you have said, and, therefore, you
21   wished to extend them more credit?
22       A    Correct.
23       Q    Now, are you, sir, acquainted with the
24   methods or method by which Cross Country Bank reports

29

1   on its customers to the credit reporting agencies?
2       A    Yes.
3       Q    And, number one, to whom does Cross Country
4   Bank report?
5       A    To three of the plaintiffs -- or the
6   defendants, excuse me, named, Experian, Trans Union and
7   Equifax. And I know what CSC is but I do not know for
8   sure if we report directly to them.
9       Q    And what do you know CSC to be?
10       A    It's a fairly new credit bureau that is
11   attempting to get the same position in the credit
12   industry and the other three bureaus.
13       Q    Now, in your past life, when you were at
14   Applied Credit Systems, before you came to Cross
15   Country Bank, were you aware of these credit reporting
16   agencies during that time also?
17       A    Yes.
18       Q    And when you were at Chase Manhattan, the
19   same?
20       A    They didn't exist the exact same way. But,
21   yes.
22       Q    All right. Now, what is the method by which
23   Cross Country reports to the credit reporting agencies?
24       A    It's an automated monthly reporting from --

8 (Pages 26 to 29)

Edward McKenna

130

1 of which seem to be a few other documents. I don't
2 know if you want me to separate these or just put the
3 whole thing in as you sent it.
4          MR. LYONS: Pull off the last page that has
5 already been marked as Exhibit --
6          MR. BRYCE: 1, I think. Oh, 14. Excuse me.
7          MR. LYONS: So pull that sheet off. And the
8 rest of them, as a matter of fact, that's a duplicate.
9 Those last two pages ought to come off. Everything
10 else, even though it looks different, is the record
11 dump. It just changed format.
12          MR. BRYCE: Yeah, I think that's correct.
13 So that's what I have done. I have pulled off the last
14 two pages and I'm giving the record dump to the court
15 reporter to mark as 25.
16          MR. LYONS: All right. The record dump is
17 now going to be 25.
18          MR. BRYCE: Yeah.
19          (McKenna Deposition Exhibit No. 25 was
20 marked for identification.)
21          MR. LYONS: Sorry for interrupting.
22          MR. CHESTER: This is Marty Chester with
23 CSC. I'll go ahead.
24               EXAMINATION

131

1 BY MR. CHESTER:
2    Q    Mr. McKenna, my name is Marty Chester and I
3 represent CSC Credit Services.
4          First, are you aware of any communications
5 between your company and CSC?
6    A    Not specifically, no.
7    Q    Have you seen any notations in the records
8 and exhibits that you have looked at today that
9 indicate any communication between your company and
10 CSC?
11   A    The only thing I think I saw that referred
12 at all to CSC may have been in the record dump. And it
13 may have been simply part of, you know, an indication
14 of where they sent these monthly reports to. I see
15 nothing directly from us to CSC.
16   Q    Can you identify for me what you were
17 referring to in the record dump?
18   A    You know, I saw it once. And, again, it
19 wasn't our communication directly to you. It was
20 just -- if that's where it was. I shouldn't have done
21 it. I shouldn't have opened that up.
22          I can't find it specifically.
23   Q    I would ask you to review the document and
24 see if you can find that.

132

1          MR. RAWLIN: Mr. Chester, this is Mr.
2 Rawlin. I was wondering, while the witness is looking
3 through the dump report, if we might take a two minute
4 break to use the restroom.
5          MR. CHESTER: Fine with me.
6          MR. RAWLIN: Does anyone else have any
7 objection?
8          MR. BRYCE: That's fine.
9          (A brief recess was taken.)
10          THE WITNESS: Exhibit 14 is what I was
11 thinking of. On the last page of Exhibit 14. It's a
12 Universal Data Form. The date at the bottom is
13 10/15/2003. Not the very bottom. The very bottom is
14 10/28/03.
15 BY MR. CHESTER:
16   Q    Okay. I think that is page five of Exhibit
17 14?
18   A    Yes. I think that's the number of pages. I
19 thought it was CSC. But up in the third line after
20 Universal Data Form on the right side, it says,
21 Equifax, Experian, Innovis SC and TU SC. I thought
22 Innovis and CSC. I had that in mind when I said I had
23 seen something.
24   Q    Just to clarify. When you thought there was

133

1 a reference in the document to CSC, actually, you were
2 incorrect?
3    A    That's correct. I was thinking of Innovis
4 that I had seen on that document.
5    Q    Okay. So in these documents, you are aware
6 of no entries in the account notes or any of the other
7 documents related to CSC?
8    A    That is correct.
9    Q    And you have no, to your knowledge, there is
10 no record of your company getting an ACDV from CSC?
11   A    That's correct.
12   Q    And no record, to your knowledge, of your
13 company getting a request for verification from CSC?
14   A    That is correct.
15   Q    If you could take a look at, while we are on
16 Exhibit 14, just at page two, which I believe is, at
17 the top, it's got the fax header, 10/3/02. Underneath
18 it says E-Oscar web report?
19   A    Correct. From Trans Union?
20   Q    That's correct.
21   A    Yes.
22   Q    So you have no indication that any response
23 to this was ever sent to CSC, is that correct?
24   A    That's correct.

Edward McKenna

**134**

1    Q    Likewise, if you could take a look, please,
2  at page three of Exhibit 14.
3    A    No reference to CSC.  It doesn't appear to
4  have been sent to them.
5    Q    And also page four, no indication that
6  either page three or page four of Exhibit 14 were sent
7  to CSC?
8    A    That's correct.
9    Q    You referenced before the codes at the top,
10 close to the top of page three and page four of Exhibit
11 14, the Universal Data Form?
12   A    Yes.
13   Q    And those codes state, they are indicated
14 subscriber codes and then there is a number after it?
15   A    That's correct.
16   Q    And you indicated that each of those codes
17 refers to one of the credit reporting bureaus, is that
18 correct?
19   A    That's my understanding, yes.
20   Q    On each of those UDF's in Exhibit 14, there
21 are three codes, right?
22   A    Yes.
23   Q    And to your knowledge, do any of those codes
24 refer to CSC?

**135**

1    A    They do not.
2    Q    Are you familiar with the relationship
3  between CSC and any of the other credit reporting
4  bureaus?
5    A    No, I'm not.
6        MR. CHESTER:  I don't have anymore
7  questions.  Thank you, sir.
8           EXAMINATION
9  BY MR. RAWLIN:
10   Q    Mr. McKenna, hello.
11   A    Yes, sir.
12   Q    Dusty Rawlin.  And I represent Experian in
13 this matter.  I have a few questions for you.
14   A    Okay.
15   Q    Apart from the regular tape recording to
16 Experian, the ACDV's we have seen today went from
17 Experian and the Universal Data Forms, would Cross
18 Country Bank have had any other communication with
19 Experian, to the best of your knowledge?
20   A    To the best of my knowledge, no.
21   Q    Mr. McKenna, do you have any confirmation
22 that any of the UDF's we have seen today -- and by
23 UDF's, I'm referring to handwritten UDF's dated
24 December 12, 2002, or the E-Oscar UDF dated October

**136**

1  15th, 2003?  Do you have any confirmation that any of
2  those Universal Data Forms were received by Experian?
3    A    No, I do not.
4    Q    Mr. McKenna, if I could have you pull out
5  the two or I guess there is three ACDV's from Experian.
6    A    Were they an exhibit?
7    Q    They were.  I think each exhibit.
8  Unfortunately, I don't have them, those numbers handy.
9    A    Okay.  Let me look through here.
10       The ones I'm looking at I don't believe were
11 Experian.  They were Trans Union.
12       MR. RAWLIN:  Tom, do you have a list of
13 exhibit numbers?
14       MR. LYONS:  I'll look through here.  Exhibit
15 19 is an Experian.  Exhibit 20 is an Experian.  Exhibit
16 21 is an Experian.
17       THE WITNESS:  Okay.  I just wasn't sure
18 which ones they were.
19       MR. LYONS:  I think those are the only ones,
20 Dustin.
21       MR. RAWLIN:  I think that that's right.
22       THE WITNESS:  I have 19 in front of me for a
23 start.  The others are right next to it.
24 BY MR. RAWLIN:

**137**

1    Q    Exhibit 19, could you please tell me what
2  date is on that ACDV?
3    A    Upper right, 11/11/2003.
4    Q    Okay.  Then Exhibit 20 at ACDV?
5    A    Slightly different format.  And the date
6  is -- it's in the middle of it.  8/8/2000.
7    Q    8/8/2000?
8    A    Correct.
9    Q    And Exhibit 21 would be dated 11/18/2002?
10   A    That's correct.
11   Q    Looking at Exhibit 20, Mr. McKenna.
12   A    Yes.
13   Q    That is an ACDV from Experian dated August
14 8, 2000, correct?
15   A    Yes.
16   Q    And if I could have you look at line number
17 six?
18   A    Yes.
19   Q    In dispute text, consumer says that account
20 has been reported incorrectly.  They are not deceased.
21 Do you see that?
22   A    I do see take.
23   Q    And looking at line number 22, the response
24 code from Cross Country Bank is, verified as reported,

Edward McKenna

138

1   is that correct?
2       A    Yes.
3       Q    I believe you had told Mr. Lane that you
4   understood that a verified as reported would result in
5   no change to the account information, is that correct?
6       A    That's correct.
7       Q    And taking a look at Exhibit 21, which is an
8   ACDV from Experian dated November 18th, 2002?
9       A    Yes.
10      Q    Line number two says, dispute reason, code,
11  disputes ECOA/association code?
12      A    Yes.
13      Q    And then at line number five, consumer
14  states, ECOA:1?
15      A    Yes.
16      Q    And then also at line 22, response code,
17  verified as reported?
18      A    Yes.
19      Q    And, again, you understand that by
20  responding verified as reported, no change would be
21  made to the account information, correct?
22      A    Yes.  No change to the account information
23  as we reported it.  On both of those exhibits, at the
24  bottom, 20 and 21 Exhibits, the subscriber response

139

1   indicated the ECOA Code, the association code down
2   there, and the account condition as blank.
3       Q    And, Mr. McKenna, I believe you have also
4   stated that when Cross Country Bank then reported the
5   next monthly cycle, it taped to Experian and that sub
6   flag we were talking about was on this account
7   information, the account would have, regardless, would
8   have reported that to CC Bank?
9       A    We know that now, yes.
10      Q    And just to be clear.  The sub flag you're
11  referring to, if we look at the credit bureau dump
12  report, which I believe has been marked Exhibit 25?
13      A    Yes.
14      Q    Look at the first page of that exhibit.
15  This sub flag would be reflected by the middle column
16  about halfway down where it says, CHD-deceased-flag B?
17      A    Correct.
18      Q    Mr. McKenna, looking through the Exhibit 25
19  for the credit bureau dump report referring to
20  Experian, what I have seen is that from October 10th of
21  2001, through November 10th of 2003, Cross Country Bank
22  reported to Experian that this account should be
23  notated as deceased, is that correct?
24      A    That's correct.  That we reported that flag.

140

1   The only reason I clarify it is, we didn't know that
2   flag was being reported.
3       Q    That flag, though, appears on that credit
4   dump report?
5       A    Yes, it does.
6       Q    From October 2001 through November 2003?
7       A    Beyond that.
8       Q    And that flag, we now know, results in the
9   account being reported as deceased?
10      A    Yes.
11      Q    Mr. McKenna, is it your understanding that,
12  regardless of what happened with the ACDV responses
13  that Cross Country Bank sent to Experian and regardless
14  of the Universal Data Forms that Cross Country Bank
15  sent to Experian, as long as that sub flag B was on the
16  monthly tape, the account in question would continue to
17  come up as deceased?
18      A    Yes.
19      Q    All right.  I believe you may have testified
20  to this.  But let me ask you.
21          When a representative or operator at Cross
22  Country Bank or Applied Card Systems got either a
23  dispute from Experian or dispute from the consumer,
24  when pulling up their screens to do research on this

141

1   account, they would not have been able to see that sub
2   flag?
3       A    That's correct.
4       Q    Mr. McKenna, are there instances in which
5   Cross Country Bank intends to report a consumer entity?
6       A    Yes.
7       Q    This is a silly question.  But when does
8   that happen?
9       A    When we're notified somebody is deceased, we
10  usually ask for a death certificate.  Depending on how
11  we find out about it.  Sometimes we'll go out and being
12  informed that someone is deceased and unable to reach
13  anyone else, we might get the death certificate
14  ourselves by going to the county Bureau of Vital
15  Statistics or something like that.  And when we get
16  that, when we are first given the indication, we put an
17  external status on the account of I, that I spoke of
18  before, and that's what we use as the vehicle to flag
19  the account, to stop billing and to report deceased
20  status to the credit bureau.
21      Q    But, Mr. McKenna, the status of deceased
22  serves a useful function in terms of some of Cross
23  Country Bank's reporting to the credit bureaus?
24      A    Very much so.

36 (Pages 138 to 141)

Edward McKenna

142

1    Q    And it is important for Cross Country Bank
2    to be able to report on a month-to-month basis whether
3    a consumer is, in fact, deceased?
4        MR. BRYCE: Objection to the form. You can
5    answer.
6        THE WITNESS: Yes.
7    BY MR. RAWLIN:
8    Q    Mr. McKenna, you stated that Penny and
9    Russell Anderson had apparently had a Master Card
10   account that was converted to a Visa account?
11   A    Correct.
12   Q    And that for a period of time, it would be
13   Cross Country Bank's policy to report both of those
14   accounts to the credit bureaus?
15   A    Yes.
16   Q    Is it fair to say that if sub flag B was
17   associated with the Master Card or the Visa, it would
18   be associated with both of them?
19   A    Yes.
20   Q    And when I say both of them, I want to
21   clarify. When I say both of them, I mean both the
22   Master Card account number and the Visa account number?
23   A    Yes, both accounts.
24   Q    Mr. McKenna, do you know as of what date sub

143

1    flag B was removed from this account?
2    A    The only specific record of it is in the
3    dump itself. And in April of 2004, it was still
4    present. Wait a minute. Let me take that back. Wait
5    a minute. I may have my date wrong. I may have read
6    the wrong heading.
7        No, it's earlier than that. Some of these
8    letters are hard to read.
9    Q    Maybe if I could help a little bit. If I
10   could direct your attention to the dump that did
11   December 10th, 2003?
12   A    Yeah. That appears to be an N, not a B
13   anymore.
14   Q    And if you look over at the first column
15   almost near the bottom, ECOA Code 2, do you see that as
16   changed from an X for prior dump report?
17   A    Prior dump was an X. Yeah, in November, it
18   was a B in the deceased flag and an X in the ECOA flag.
19   And in December of 2003, it was an N in the deceased
20   flag, which I presume means not deceased. And a two in
21   the ECOA flag.
22   Q    Would that lead you to believe that between
23   November 10th, 2003, and December 10th, 2003, that that
24   sub flag was removed?

144

1    A    It was identified finally and removed.
2    Q    I had a question about I believe it's been
3    marked Exhibit 18.
4    A    Okay.
5    Q    The first page.
6    A    Yes, sir.
7    Q    You had said this document is dated October
8    2nd, 2003?
9    A    Correct.
10   Q    You said that Cross Country Bank was
11   reporting that sub flag at this time, that the status
12   code INT/EXT, it would have been recorded as an I?
13   A    Not the sub flag.
14   Q    Okay. Not the sub flag?
15   A    That's a different -- status codes are
16   different flags. INT statuses are internal statuses to
17   the bank that relates to delinquency and overlimit
18   condition. There is only three settings for it. D, O
19   and X. X meaning both conditions. And the external
20   status is a series of revocation statuses that close
21   the account, usually the consumer's request, the bank's
22   request, fraud, loss, or in the case of deceased, we
23   put an I on the account.
24   Q    But because of the sub flag, even without an

145

1    I after that dash, which was an INT-EXT, this account
2    could have still come up as deceased?
3    A    That's what we have since learned, yes.
4        MR. RAWLIN: Mr. McKenna, thank you very
5    much. I don't have anymore questions at this time
6    subject to recross.
7        MR. LYONS: This is Tom Lyons. I do have a
8    couple questions.
9        EXAMINATION
10   BY MR. LYONS:
11   Q    And let's just stay with Exhibit 25, the
12   record dump.
13       The ECOA Code X means what, sir?
14   A    I believe it means that they don't have a
15   specific code.
16   Q    And when is that used?
17   A    I think it's the absence of information, not
18   the presence of information.
19   Q    Now, this record dump that we are looking
20   at, this is produced by First Data or by ACS?
21   A    First Data.
22   Q    Okay. And First Data then communicates
23   directly with the reporting bureaus, is that it?
24   A    That is correct.

37 (Pages 142 to 145)

10/03/2003 FRI 14:57  FAX                                                    ☒003/005

```
                                    UNVERIFIED                Created: 11/14/2002
ADVS ID: 690544        AUTOMATED CONSUMER DISPUTE VERIFICATION   Sent: 11/14/2002
Clinic?: U                                                    Received: 11/14/2002
                                                          Response Due: 11/20/2002
    User:
---------------------- ORIGINATOR INFORMATION ----------------------
TRANS UNION                                 Office: 912 Mailbox#:UPROD
P.O. BOX 3000                                                  Source: TUN
CHESTER                       PA 19022-3000Ctrl#:1148627430020103_3AN

---------------------- RESPONDER INFORMATION ----------------------
Subscriber #: B 24UB126  Short Name: CRS CNTY BK

---------------------- DISPUTE INFORMATION ----------------------
  Dispute #1: 028- Subscriber comment/remarks message disputed.

---------------------- CONSUMER INFORMATION ----------------------
Acct#: 4227097484406736                 GC SSN        D.O.B.        Age
Name.: ANDERSON, RUSSELL D.            S 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 09/01/1960
AKA..: ,                               / Phone #: (000)246-2213
Current Address:
   Street..: 1614 HALLEWOOD BV
   City, ST: NEW RICHMOND, WI              Zip: 54017- 2400
Previous Address:
   Street..: 1380 HERITAGE DR 17
   City, ST: NEW RICHMOND, WI              Zip: 54017-
```

```
-------------------- CURRENT/HISTORICAL ACCOUNT INFORMATION --------------------
Date   | /---- Present Status ----\ | High | Pmt Hist. Curr: B   |Type|
Opened | Date    Cond  Balance Past Due| Balance| 1-12: 000000000000 |Acct:MOP
04/1999|10/01/2002      1847      0|    1959|13-24: 000000000000 |  R | 01
```

```
Metro Stat| Credit :    |Date of|Date of  Serious/ |  Date |Hist. Status |
 Date Code|  Limit |Trm|Lst Pmt.Action |ChrgOff Amt|Closed|#Mo. 30 60 90|ECOA
        /        1900|   /   |       |           |      |  0   0  0  0|  X
```

```
Acct|Own/| Monthly|Pmts|  Max. Delinquency |Max.Delinq|Max.Delinq|Most Recent
Type|Rent| Payment| Due| Date  Amount MOP| Date MOP| Date MOP|1:   /
 18 |    |        |  0|   /            |    /     |    /     |2:   /
```

```
Code/Remark:   /                          SCC:     Undef.Amt:
```

```
Remark1: DECEASED
Remark2:
```

Joint card holder





10/03/2003 FRI 14:57  FAX                                                    ☑004/005

E-Oscar Web - Reports                                               Page 1 of 2

**Return this dispute response to:**

TransUnion LLC

2 Baldwin Place Crum Lynne, PA 19022--

FAX # 6105464602

**Account Number**    4227097484406736

**Subscriber Code**    Applied Card Systems/24UB126

Date : 01-08-2003

Control # 11486278500501001N

**FCRA Response Due Date** 01-15-2003

**Response Date**    01-17-2003

Please check the SAME box for each identification item appearing on the which is identical to your records;or provide differing information in the shaded area.

|  | SAME |  |
|---|---|---|
| **Name/Gen Code** PENNY L ANDERSON / — | ☐ | **Name/Gen Code** penny - anderson / — |
| **Address** 1614 HALLEWOOD BV, NEW RICHMOND WI 54017-- | ☐ | **Address** 1614 hallewood blvd, new richmond WI 54017-2400 |
| **Prev Name/Prev Gen Code** URMSTON,PENNY · ROSSO,PENNY,L / — | ☐ | **Prev Name/Prev Gen Code** ---/ — |
| **Prev Address** 1614 WILDWOOD AV, NEW RICHMOND WI 54017-- | ☐ | **Prev Address** - ---- |
| **SSN/DOB** 001589006 / 12-01-1970 | ☐ | **SSN/DOB** - / 01-01-1980 |
| **Telephone Number** 0002462213 | ☐ | **Telephone Number** 6036680384 |
| **2nd Prev Addr** 1380 HERITAGE DR 17, NEW RICHMOND WI 54017-- |  |  |

**Consumer States/Comments:**

Dispute Code 1: 101:Consumer not liable for account (i.e. ex-spouse, business). If liable, provide complete ID and ECOA

Dispute Code 2: 107:Disputes Special Comment/Compliance Condition Code/narrative remarks. Verify accordingly

FCRA Relevant Information:

**Please write clearly and report changed information in the shaded box directly below where it is currently reported.**

| Verified as Reported ☑ | | | | Change Data as Shown ☐ | | | Delete Account ☐ | | |
|---|---|---|---|---|---|---|---|---|---|
| **Acct Status** | **Pay Rate** | **MOP** | **Cond/Cumm Status** | **Date Opened** | **Balance** | **Amt Past Due** | **High Cr/Org** | **Credit limit** | **Org Chg Amt** |
| - | - | - | - | 04-01-1999 | 1141 | 0 | 1952 | 1900 | - |
| 11 | - | - | - | - | - | - | - | - | - |

| **Acct Type** | **Portf Type** | **Terms Dur** | **Freq** | **Activity Date** | **Date Closed** | **Date of Last Pymnt** | **Sch Pymnt** | **ECOA** | **Status Date (EXP only)** | **FCRA DC** |
|---|---|---|---|---|---|---|---|---|---|---|
| - | - | - | - | 12-01-2002 | - | - | - | X | - | - |
| 18 | R | REV | - | - | - | - | 35 | 1 | - | - |

| **COC** | **SCC** | **CII** | **Orig Cr Name** | **Orig Cr Class** | **Spec Pymnt Ind** | **Deferred Start Date** | | **Balloon Date** | **Balloon Amt** |
|---|---|---|---|---|---|---|---|---|---|
| - | - | - | - | - | - | - | | - | - |
| - | - | - | - | - | - | - | | - | - |

**Accounts History**

| | | | | | | | | | | | | | | | | | | | | | **Agency ID** | **Sec Mktg Agency Acct #** | **Mortgage ID** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 0 | 0 | | - | - | - |
| 0 | 0 | 0 | 0 | 0 | B | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | **Actual Pymnt** | **Portfolio Indicator** | **Prchsd from/Sol** |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | - | - | - |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | **Remarks :** DECEASED | | - |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | | |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | | |

https://www.e-oscar-web.net/eoscarweb/com.att.eoscar.reports.PrintServletACDVDetails          10/3/03

## UNIVERSAL DATA FORM

This form is for reporting or updating account information on

☐ New   ☐ Delete   ☐ Change

changes makes trade current is previous delinquency to be dated ed?

☒ YES   ☐ NO

You regularly report data    ☐ Automated    ☒ Manual
Do not include security password with codes below

| | |
|---|---|
| Subscriber Name | Cross Country Bank |
| Subscriber Address | 800 Delaware Ave 8th Floor |
| | Wilmington, DE 19801 |

Subscriber Code  458BB02969
Subscriber Code  1216355TNAI
Subscriber Code  B244B008

### CONSUMER INFORMATION

| Surname | First | M | Suffix | SSN | DOB/Age |
|---|---|---|---|---|---|
| Anderson | Penny | | | 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 | 01 1940 |

| Current Address | | | City | State | ZIP |
|---|---|---|---|---|---|
| 1614 Hallewood Blvd | | | New Richmond | WI | 54017 |

| Previous Address | | | City | | State | ZIP |
|---|---|---|---|---|---|---|

| Current Employer Name | | Occupation | | City | State |
|---|---|---|---|---|---|

| Co Applicant Surname | First | M | Suffix | SSN | DOB/Age |
|---|---|---|---|---|---|
| Anderson | Russell | | | 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 | |

Additional Co Applicant Information (Complete only for joint Account)

| Co-Applicant Surname | | | City | State | ZIP |
|---|---|---|---|---|---|
| Anderson | | | New Richmond | WI | 54017 |

| Co Applicant Employer Name | | Occupation | | City | State |
|---|---|---|---|---|---|

### CURRENT HISTORICAL ACCOUNT INFORMATION

| Account Number | Date Open | Present Status Delete | High Balance | Payment History | Type Acct/ MOP |
|---|---|---|---|---|---|
| 5414-9070 9890-3912 | | Date 12/7/02   Current Balance   Amount Past Due | | nd case what is History MOP | UR |
| Cross Country Bank | | | | ☐   No of Payments Delinquent | |

| Metro Status Code | Credit Lim | Terms/ Amount | Maximum Delinquency   Date Amount HOP | Status or Closed Date | ████████ ECOA |
|---|---|---|---|---|---|
| | | | | | ████ 2 |

| Type of Loan/Collateral | Special Comments/Remarks   Delete | | | | History Status |
|---|---|---|---|---|---|
| | | | | | No. Months   30 days   60 days   90 days |

When you sign this form you certify that your computer and/or manual records have been audited to reflect any changes made

Reason for deletion or status change from adverse to favorable  delete tradeline account
Converted and replaced with Visa

Authorized Signature _____  Date  12/17/03
Em Idare Emie
Please Print Name _____   Telephone (561) 995-8820

# UNIVERSAL DATA FORM

This form is for reporting or updating account information on:
☐ New   ☐ Delete   ☒ Change

change makes rate current  if previous delinquent history to be deleted?
☐ YES   ☒ NO

You regularly report data   ☐ Automated   ☒ Manual
Do not include security password with codes below

Subscriber Name: Cross Country Bank
Subscriber Address: 800 Delaware Ave 5th Floor
Wilmington, DE 19801

Subscriber Code: 458BB02989
Subscriber Code: 1216356TNAI
Subscriber Code: B244B008

## CONSUMER INFORMATION

| Surname | First | M | Suffix | SSN | DOB/Age |
|---|---|---|---|---|---|
| Anderson | Penny | | | 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 | 01-1965 |

Current Address: 1614 Hazelwood Blvd   City: New Richmond   State: WI   ZIP: 54017

Previous Address: ____   City: ____   State: ____   ZIP: ____

Current Employer Name: ____   Occupation: ____   City: ____   State: ____

| Co-Applicant Surname | First | M | Suffix | SSN | DOB/Age |
|---|---|---|---|---|---|
| Anderson | Russell | | | 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 | |

Additional Co Applicant Information (Complete only for joint Account)

Co-Applicant Surname: Anderson   City: New Richmond   State: WI   ZIP: 54017

Co-Applicant Employer Name: ____   Occupation: ____   City: ____   State: ____

## CURRENT HISTORICAL ACCOUNT INFORMATION

| Account Number | Date Open | Present Status | Date | Current Balance | Amount Past Due | High Balance | Payment History | | Type Acct/MOP |
|---|---|---|---|---|---|---|---|---|---|
| 4227-0474 8440-6736 | 04/99 | Open | 12/9/02 | | | | indicate whether MOP History or No. of Payments Delinquent ☐ | | R1 |

Cross Country Bank

| Method of Status Code | Credit Limit | Terms/Amount | Maximum Delinquency Date Amount MOP | Status or Closed Date | | | ECOA |
|---|---|---|---|---|---|---|---|
| 11 | 1900 | | | ███████ | | | 2 |

| Type of Loan/Co Lessee | Special Comments/Remarks | Historical Status |  |  |  |
|---|---|---|---|---|---|
| R | Removal of deceased status | No. of Months | 30 days | 60 days | 90 days |

When you sign this form you certify that your computer and/or manual records have been adjusted to reflect any changes made

Reason for deletion or status change from adverse to favorable: due to system error, applicant and co-applicant are being reported as deceased remove deceased status.

Authorized Signature: _____   Date: 12/12/02
Emidare Emie   (561) 995-8820

Please Print Name: ____   Telephone: ____

E-Oscar Web - Reports

## Universal Data Form

| This form is for reporting or updating account information: | If Change makes trade current is previous delinquent history to be deleted? |
|---|---|

| | | | |
|---|---|---|---|
| Change ☑ | Delete ☐ | Add ☐ | Yes ☐     No ☐ |

| Subscriber Name: Applied Card Systems | Equifax SC | 458BB02969 | Innovis SC | - |
|---|---|---|---|---|
| Subscriber Address: 4700 Exchange Court  Boca Raton  Florida  33431~ | Experian SC | 1218355 | TU SC | 24UB128 |

### CONSUMER INFORMATION

| Last Name Anderson | First Penny | Middle - | Gen. - | SSN 001589006 | DOB 01-01-1960 |
|---|---|---|---|---|---|

| Current Address 1614 HALLEWOOD BLVD | | City New Richmond | State WI | Zip + 4 54017~ |
|---|---|---|---|---|
| Previous Address - | | City - | State - | Zip + 4 - |
| Consumer Information Indicator - | ECOA 2 | | Phone # - | |

### EMPLOYMENT INFORMATION

| Employer Name - | | Occupation - | | |
|---|---|---|---|---|
| Current Address - | City - | State - | Zip + 4 --- | |

### ASSOCIATED CONSUMERS INFORMATION

| Last Name - | First - < | Middle - | Gen. - | SSN - | DOB - |
|---|---|---|---|---|---|
| Current Address - | | City - | State - | Zip + 4 --- | |
| Consumer Information Indicator - ECOA - | | | Phone: - | | |
| Last Name - | First - | Middle - | Gen. - | SSN - | DOB - |
| Current Address - | | City - | State - | Zip + 4 --- | |
| Consumer Information Indicator - ECOA - | | | Phone: - | | |

### Account Information

| | | | | Payment History 1-84 Months |
|---|---|---|---|---|
| Account Number | Date Opened | Billing Date | Current Balance | Amount Past Due |
| 4227097484406736 | 04-16-1999 | | 1929 | |

| Terms Duration/Frequency | Date Closed | Actual Payment | Date of Last Payment | Account Status | Account Type |
|---|---|---|---|---|---|
| - / - | - | | 10-02-2003 | 11 | 01 |

| Portfolio Type | Credit Limit | High Credit | Scheduled Monthly | Special Comment Code |
|---|---|---|---|---|
| R | | | | |

| Payment rating | Activity Date | FCRA 1st Date of Delinquency | Original Charge off Amount | Compliance Condition Code |
|---|---|---|---|---|
| - | 10-10-2003 | - | - | XB |

| Original Creditor Name | Creditor Classification |
|---|---|
| - | - |

| Purchased Portfolio or Sold to Name | Portfolio Indicator |
|---|---|
| - | - |

| Mortgage Agency Identifier | Secondary Marketing Agency Account # | Specialized Payment Indicator | Deferred Payment Start Date | Deferred Payment Due Date | Deferred Payment Amount |
|---|---|---|---|---|---|
| - | | - | - | - | - |

| Mortgage Identification # (MIN) | AUD Control # |
|---|---|
| - | 2371341 |

**When you sign this form, you certify that your computer and/or manual records have been adjusted to reflect any changes made.**

**Authorized Signature:**

**Date: 10-15-2003**

Please Print Name: CASSANDRA HARMON

**Telephone: 5619958820**

# E-Oscar Web - Reports

**Return this dispute response to:**

Experian

701 Experian Pkwy Allen, TX 75013--

FAX #  9723903809

**Account Number**  4227097484406736

**Subscriber Code**  Applied Card Systems/1216355

Date : 11-11-2003

Control #  1551151243001

**FCRA Response Due Date**  11-18-2003

**Response Date**  12-04-2003

Please check the SAME box for each identification item appearing on the CD which is identical to your records;or provide differing information in the sha area.

|  |  | SAME |  |  |
|---|---|---|---|---|
| **Name/Gen Code** | RUSSELL DENNIS ANDERSON / Senior | ☐ | **Name/Gen Code** | ---/-- |
| **Address** | 1380 HERITAGE DRIVE APT 17, NEW RICHMOND WI 54017-- | ☐ | **Address** | 1614 HALLEWOOD BLVD, NEW RICHMOND WI 54017-2 |
| **Prev Name/Prev Gen Code** | ---/-- | ☑ | **Prev Name/Prev Gen Code** | ---/-- |
| **Prev Address** | 1614 HALEWOOD BLVD, NEW RICHMOND WI 54017-- | ☑ | **Prev Address** | -.--- |
| **SSN/DOB** | 394784720 / 09-05-1960 | ☐ | **SSN/DOB** | -/- |
| **Telephone Number** | - | ☑ | **Telephone Number** | - |
| **2nd Prev Addr** | -.--- |  |  |  |

| Consumer States/Comments: |
|---|
| Dispute Code 1: 106:Disputes present/previous Account Status, History. Verify accordingly |
| Dispute Code 2: |
| FCRA Relevant Information:<br>CONSUMER STATES HE IS NOT DECEASED AND THIS ACCT NEEDS TO BE UPDATED - VERIFY ALL‖‖‖‖‖‖‖ECOA:2‖‖‖‖‖ |

**Please write clearly and report changed information in the shaded box directly below where it is currently reported.**

Verified as Reported ☐          Change Data as Shown ☑          Delete Account ☐

| Acct Status | Pay Rate | MOP | Cond/Cumm Status | Date Opened | Balance | Amt Past Due | High Cr/Org | Credit limit | Org Chg Amt |
|---|---|---|---|---|---|---|---|---|---|
| 11 | - | - | / CURRENT | 04-16-1999 | 1929 | - | 1900 | 1969 | - |
| - | - | - | - | - | 1369 | - | - | 1900 | - |

| Acct Type | Portf Type | Terms Dur | Freq | Activity Date | Date Closed | Date of Last Pymnt | Sch Pymnt | ECOA | Status Date (EXP only) | FCRA DO |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 | I | 000 | M | 01-10-2003 | | 10-02-2003 | 49 | X | 01-01-2003 | |
| 18 | R | - | - | 11-14-2003 | | 11-14-2003 | 0 | 2 | - | |

| CCC | SCC | CII | Orig Cr Name | Orig Cr Class | Spec Pymnt Ind | Deferred Start Date | Balloon Date | Balloon Amt |
|---|---|---|---|---|---|---|---|---|
| XB | - | - | - | - | - | - | - | - |
| XR | - | - | - | - | - | - | - | - |

**Accounts History**

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| - | - | - | - | - | - | - | D | D | D | D | D | D | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | |
| - | - | - | - | - | - | - | - | - | - | - | - | - | - | | | | | |

| Agency ID | Sec Mktg Agency Acct # | Mortgage ID |
|---|---|---|
| - | - | - |
| - | | |

| Actual Pymnt | Portfolio Indicator | Prchsd from/Sol |
|---|---|---|
| 641 | - | - |
| 1200 | — | - |

| Remarks : - |
|---|
| |

DF Contact # : 6619958820

DEPOSITION EXHIBIT #19

EXP/AND00062

12/12/2003

E-Oscar Web - Reports

**Authorized Name EMILDA EMIL** _____ **Tel #** ( 581 )995 8820 _____

**When you sign this form you certify that you have verified the accuracy of the entire item and that your company's records will be adjusted to reflect the changes noted above.**

EXP/AND00063

2880742016001

```
PROGRAM: CAPRESPA       EXPERIAN - CONSUMER ASSISTANCE - CAPS        PAGE:  135
RUN DATE: 11/29/02                AUTO ACDV RESPONSE ACTIVITY REPORT
RUN TIME: 01:46:08
```

```
01 SUBCODE: 1216365  ACCOUNT#: 4227097484406738                SUBSCRIBER: CROSS COUNTRY BANK
02 UPDATE  30  DISPUTE REASON CODE: 025 DISPUTES ECOA/ASSOCIATION CODE.
03
04 DATE SENT: 11/18/2002    MLBX: 6183531  DATE DUE: 11/25/2002  RESPONSE DATE: 11/28/2002   OFFICE NUM: 0001
05 CONSUMER STATES: ECOA:1;
08
09 CONSUMER IDENTIFICATION:                                SUBSCRIBER CONSUMER ID:
10     NAME: ANDERSON, PENNY, LEE                          : ANDERSON, PENNY,
11      AKA: ANDERSON, PENNY,                              : UNKNOWN
12      SSN: 001588006                                     :
13 CURR ADDRESS: 1614 HALLEWOOD BLVD                       :
14             : NEW RICHMOND, WI                          :
15        ZIP: 54017                                       : 54017-2400
16 PREV ADDR 1: 1614 WILDWOOD AVE                          : UNKNOWN
17 PREV ADDR 2: NEW RICHMOND, WI                           : UNKNOWN
18        ZIP: 54017                                       : UNKNOWN
19 DATE OF BIRTH:              AGE:  32                                       AGE:
21
22 RESPONSE CODE 035: VERIFIED AS REPORTED
28                              SUBSCRIBER         CONSUMER
29                              RESPONSE           CLAIMS          ON PROFILE
30 TRADE INFORMATION:                                                                       NAME VERIF FLAG: 1 = DIFFERENT
31   PAYMENT STATUS    : 11-CURR ACCT                            21-DECEASED               CURR ADDR VERIF: 1 = DIFFERENT
32   BALANCE           : 738                                          1,453                PREV ADDR VERIF: 3 = UNKNOWN
33   BALANCE DATE      : 11/28/2002                               05/10/2002               SSN VERIF FLAG : 2 = SAME
34   AMT PAST DUE      :                                                                   ============================= OTHER PROFILE DATA =============================
35   PYMT LVL DATE     :                                         05/2002
36   ORIG DELINQ DATE  :
37   CREDIT LIMIT AMT  :                                              1900                 HISTORY GRID: 00000000000000000000000  00/00/00
38 HIGH CREDIT/ORIG AMT: 1950                                        1959                 ============================= OTHER RESPONSE DATA =============================
39   CHARGE OFF AMT    :
40   ACCOUNT COND      : OPEN                                     DECEASED
41   SCH MONTHLY PAY   : UNKNOWN                                        44                 MANNER OF PAYMENT FROM SUBSCRIBER: 01
42   ASSOC CODE        :                            1                 X
43   DATE LAST PAY     : 11/2002                                  04/2002
44   OPEN DATE         :                                          04/1999                 AUTHORIZED VERIFIER: LISA PINKNEY
45   SPECIAL COMMENT   :                                              010                         PHONE: 561-995-8820
46   TERMS             :                                          18-CRC
47   ACCOUNT TYPE      :
48
49 RESPONDER'S NARRATIVE/COMMENTS:
   JOINT ACCOUNT
```

DEPOSITION
EXHIBIT
#21
6/28/04 msk
PENGAD-Bayonne, N.J.
EXP/AND00037

```
                              TRANS UNION CORPORATION          DATE: 11/26/02  TIME: 06:34
                              CONSUMER RELATIONS                           PAGE: 4164
   KKVRB508-1            CRS ACDV/ACTV RESPONSES AUTOMATICALLY PROCESSED

DEPT: N                                    CONTROL: 14862795 002 04    MA/SM: 0922  SUB LOC: 001
.IBER RESPONSE DATE: 11/25/02              DATE:    11/14/02
OMPLY WITH F.C.R.A., A RESPONSE IS REQUIRED BY: 11/20/02

                                   VERF    SUBSCRIBER CHANGES TO CONSUMER DEMOGRAPHIC DATA:
                                   (D) NAME: ANDERSON,PENNY,***************,
:: ANDERSON,PENNY,L                     AKA: *****************,**************,************
A: ROSSO,PENNY,L
R: 1614  HALLEWOOD BV              (D) ADDR: 1614 HALLEWOOD BLVD
   NEW RICHMOND ,WI 54017                    NEW RICHMOND ,WI 54017-
V: 1614  WILDWOOD AV               (U) PREV: ******************************************
   NEW RICHMOND ,WI 54017                    *****************************,**.*****
/DOB/PHONE: 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 /  12/01/70  / 000-246-2213    (S) SSN/DOB/PHONE:          /          /

                                   CNTL# 14862795 002 04   DATE RECD: 11/06/02  PRI: 3

SUMER       SUBSCRIBER COMMENT/REMARKS MESSAGE DISPUTED
ATES
MENTS

        SUBSCRIBER NAME     SUB.CODE    OPENED  RPT'D    BAL.OWING   PAST DUE  HIGH CRDT  PAYMENT      TP.ACCT  MOP
        ACCOUNT NUMBER      CREDIT LIMIT TERMS           LAST PYMT MAX.DELQ.DATE MD.AMT MD.MOP HISTORY          ECOA
        TYPE LOAN           COLLATERAL/FLAG              SP.COMMENTS/STATUS/REMARKS  CLOSED   MOS 30 60 90

.IFIED  CRS CNTY BK         R 24UB126   04/99  10/02A    $1847      $0       $1959    111111111111    R  01
AS      4227097484406736         $1900                                               111111111111       X
ORTED: X  CREDIT CARD                          DECEASED                              0   0   0   0

                                        11/02A

                                                                                     ***

                              DECEASED   / NOT DECEASED
                              ACCT OPEN

SPONSE CODES:    035 VERIFIED AS REPORTED.


SPONSE NARRATIVE:
NSUMER MESSAGE:
THORIZED PHONE/NAME:    561-995-8820   /   LINNEIR CLARKE
```

TIJ0051

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
COURT FILE NO. 03-C-0510 C
-   -   -

PENNY LEE ANDERSON and              :
RUSSEL D. ANDERSON, SR.             :
                                    :
          (Plaintiffs)              :
                                    :
     vs.                            :
                                    :
TRANS UNION, LLC.; EXPERIAN         :
INFORMATION SOLUTIONS, INC.;        :
CSC CREDIT SERVICES, INC. and       :
EQUIFAX, INC., d/b/a EQUIFAX        :
INFORMATION SERVICES, LLC           :
                                    :
          (Defendants)              :


-   -   -

SEPTEMBER 23, 2004
-   -   -


          Oral Deposition of EILEEN LITTLE,

taken pursuant to notice, held at Hilton

Hotel, Executive Board Room, 4509 Island

Avenue, Philadelphia, Pennsylvania,

commencing at 9:48 a.m. on the above date,

before Michelle T. Cascio, Shorthand

Reporter-Notary Public, there being present.


FORTE & ASSOCIATES
Court Reporting & Videography
1601 Lombard Street
Philadelphia, Pennsylvania 19146
(215) 731-1000

Eileen Little

Page 2

APPEARANCES:

CONSUMER JUSTICE CENTER, P.A.
BY:  THOMAS J. LYONS, JR., ESQUIRE
342 East County Road D
Little Canada, Minnesota  55117
Attorney for Plaintiffs Anderson

KATZ & KORIN, P.C.
BY:  JOHN CENTO, ESQUIRE
     ANIKA M. CALLOWAY, ESQUIRE
334 North Senate Avenue
The Emelie Building
Indianapolis, Indiana  46204
Attorney for Defendant Trans Union

JONES DAY
BY:  JEFF MANGHILLIS, ESQUIRE
(Via Telephone)
901 Lakeside Avenue
Cleveland, Ohio  44114
Attorney for Defendant Experian

FAEGRE & BENSON
BY:  ERIK GIRVAN, ESQUIRE
(Via Telephone)
90 South 7th Street
2200 Wells Fargo Center
Minneapolis, Minnesota  55402
Attorney for Defendant CSC

Page 3

- - -
INDEX

EXAMINATION BY:              PAGE:
    MR. LYONS                  4

EXHIBIT MARKED:              PAGE:
    Trans Union-1              6
    Trans Union-2              9
    Trans Union-3             12
    Trans Union-4             15
    Trans Union-5             15
    Trans Union-6             16
    Trans Union-7             32
    Trans Union-8             33
    Trans Union-9             40
    Trans Union-10            46
    Trans Union-11            57
    Trans Union-12            58
    Trans Union-13            62
    Trans Union-14            68
    Trans Union-15            70
    Trans Union-16            74
    Trans Union-17            78
    Trans Union-18            80
    Trans Union-19            81
    Trans Union-20            82
    Trans Union-21            83
    Trans Union-22            84
    Trans Union-23            98
    Trans Union-24            99
    Trans Union-25           114
    Trans Union-26           115
    Trans Union-27           116
    Trans Union-28           117
    Trans Union-29           118
    Trans Union-30           118
    Trans Union-31           122
- - -

Page 4

```
 1               - - -
 2            PROCEEDINGS
 3
 4       EILEEN LITTLE, after having first
 5   been duly sworn, was examined and testified
 6   as follows:
 7               - - -
 8            EXAMINATION
 9               - - -
10   BY MR. LYONS:
11       Q.   Would you state your name for the
12   record, ma'am, spelling your last.
13       A.   Eileen Little, L-I-T-T-L-E.
14       Q.   Good morning.  How are you?
15       A.   All right.  Thank you.
16       Q.   My name is Tommy Lyons.  I've taken
17   your deposition on a number of occasions.  The
18   most recent was about three months ago in another
19   matter.
20            To shorten this up today, I would
21   just like to stipulate with your counsel that the
22   information concerning your background, your
23   employment, your education -- instead of asking
24   you those questions today, that we just stipulate
```

Page 5

```
 1   to that background information?
 2            MR. LYONS:  Counsel, are you okay
 3   with that?
 4            MR. CENTO:  We'll stipulate to that.
 5   BY MR. LYONS:
 6       Q.   Ms. Little, is there anything that's
 7   changed since the last time I deposed you either
 8   with regard to your employment or your education?
 9       A.   No.
10            MR. MANGHILLIS:  Off the record for
11   one second.
12               - - -
13            (Whereupon, a brief discussion was
14   held off the record.)
15               - - -
16   BY MR. LYONS:
17       Q.   Ms. Little, your current position
18   with Trans Union is what?
19       A.   Group manager.
20       Q.   And what group do you manage?
21       A.   Consumer relations.
22       Q.   And your office is located here in
23   Pennsylvania?
24       A.   Crum Lynne, yes.
```

Page 6

1    Q.    Other than your lawyer, have you
2  spoken with anyone in preparation for your
3  deposition today?
4    A.    No.
5    Q.    Have you reviewed any documents?
6    A.    Yes.
7    Q.    What did you review?
8    A.    Consumer relations documents.
9    Q.    And there are about 200 pages of
10  that roughly?
11    A.    I don't really know how many pages.
12    Q.    But did you review consumer
13  relations documents related to Russell and Penny
14  Anderson?
15    A.    Yes.
16                      - - -
17        (Whereupon, Exhibit Trans Union-1
18    was marked for identification by the court
19    reporter.)
20                      - - -
21  BY MR. LYONS:
22    Q.    Ms. Little, I'm showing you what's
23  been marked as Deposition Exhibit 1.  Have you
24  ever seen this document before?

Page 7

1    A.    I don't believe I did, no.
2    Q.    There is the notice of taking
3  deposition of Trans Union's 30(b)(6)
4  representative, and there are several topic areas
5  listed on pages 1 through 3 that either you or
6  people in addition to you are going to be
7  responsible for testifying about today.
8        I'm wondering if I could find out
9  from either you or your counsel which subject
10  areas you will be testifying about today?
11        MR. CENTO:  I'll go through each one
12    and give you the witness's name.
13        MR. LYONS:  Thank you.
14        MR. CENTO:  A is Bill Stockdale.  B
15    is Bill Stockdale, C is Bill Stockdale, D
16    will be Ms. Little, E will be Eileen, F is
17    Bill Stockdale, G and H are Bill/Eileen
18    Little, I is Lynn Romanowski who you will
19    depose later today, J is Eileen Little, K is
20    Eileen Little, L is Eileen and M is Eileen.
21        Also, we have the same stipulation
22    in this case regarding Bill Stockdale's
23    deposition that, unless something else comes
24    up, the deposition he gave in McKean you can

Page 8

1    use.
2        MR. LYONS:  I've got to look at that
3    again.  I think that there are additional
4    questions in this case that I want to ask
5    him about.
6  BY MR. LYONS:
7    Q.    Ms. Little, have you reviewed the
8  Plaintiffs' complaint in this action?
9    A.    No.
10    Q.    Can you tell me generally what you
11  understand the allegations by the Plaintiffs are
12  in this matter?
13    A.    That they were being reported as
14  deceased on one of the accounts.
15    Q.    And is it your understanding that
16  they disputed that deceased information with
17  Trans Union?
18    A.    Yes.
19    Q.    And was that deceased information
20  removed by Trans Union?
21    A.    Yes.
22    Q.    When; just recently or a long time
23  ago?
24    A.    I believe it was January 20, '03.

Page 9

1        Can I ask a question?
2    Q.    Sure.
3    A.    What account are you talking about,
4  the Visa or the MasterCard?
5    Q.    That's a fair question, and we're
6  going to get into both of them.
7                      - - -
8        (Whereupon, Exhibit Trans Union-2
9    was marked for identification by the court
10    reporter.)
11                      - - -
12  BY MR. LYONS:
13    Q.    I'm showing you now what has been
14  marked as Exhibit 2.  Can you identify this
15  document for me?
16    A.    This is a copy of a credit report
17  dated 8/8/00.
18    Q.    And, just so we're clear, I thought,
19  for purposes of today's deposition, what we would
20  do is start with Russell Anderson, work through
21  his chronology and then we'll talk about Penny
22  Anderson.  Okay?
23    A.    That's fine.
24    Q.    So Exhibit 2 is Trans Union 0235

Eileen Little

Page 10

1  through 0240, correct?
2      A.    Yes.
3      Q.    And this is a credit report for
4  Russell D. Anderson, Sr.; is that right?
5      A.    Yes.
6      Q.    And is it your understanding that
7  there was no other trade line that was reporting
8  either Russell or Penny deceased from the years
9  2000 to 2004 other than Cross Country Bank?
10         MR. CENTO:  Objection; vague and
11     ambiguous, lack of foundation.
12         THE WITNESS:  Correct.
13  BY MR. LYONS:
14     Q.    And, if you look for me in
15  Deposition Exhibit 2, do you see any deceased
16  notation with regard to Russell Anderson?
17     A.    Yes.
18     Q.    On what page?  If you could identify
19  it using the bates number.
20     A.    237.
21     Q.    Thank you.
22         And that is related to account
23  number ending 3912, correct?
24     A.    Correct.

Page 11

1      Q.    And is it your understanding that
2  that is a MasterCard or a Visa?
3      A.    That's a MasterCard.
4      Q.    And why do you say that?
5      A.    You can tell by the account numbers.
6  MasterCards are 54.
7      Q.    The statement below that line that
8  we see on 237 says "The following accounts are
9  reported with no adverse information."  Do you
10  understand that being reported as deceased is, in
11  fact, adverse information?
12         MR. CENTO:  Objection; vague and
13     ambiguous.
14         THE WITNESS:  It depends on the
15     creditor, you know, who he's applying to,
16     how they're going to view it.
17  BY MR. LYONS:
18     Q.    But do you understand that that can
19  be viewed as adverse information by creditors?
20     A.    Yes.
21     Q.    So the statement "The following
22  accounts are reported with no adverse
23  information", is that from the point of view of
24  Trans Union; that Trans Union doesn't believe

Page 12

1  that any information below this line is adverse
2  to the consumer?
3      A.    Yes.
4         MR. CENTO:  Objection; vague and
5     ambiguous.
6  BY MR. LYONS:
7      Q.    And your answer was?
8      A.    Yes.
9         MR. LYONS:  Next I'd like to mark as
10     Exhibit 3 Trans Union 029 through 034, and
11     we're going to go off the record for a
12     minute please.
13              - - -
14         (Whereupon, a brief discussion was
15     held off the record.  Exhibit Trans Union-3
16     was marked for identification by the court
17     reporter at that time.)
18              - - -
19  BY MR. LYONS:
20     Q.    Ms. Little, I'm showing you what's
21  been marked as Deposition Exhibit 3.  Can you
22  identify this document for me?
23     A.    This is a corrected copy that was
24  generated 9/6/00 for Russell Anderson.

Page 13

1      Q.    And this credit report shows that,
2  after TU had completed a reinvestigation, the
3  account was deleted; is that correct?
4      A.    Correct.
5         MR. CENTO:  I'm going to enter just
6     a general objection to the use of the words
7     "credit report" in reference to this
8     document.  This is actually a consumer
9     disclosure or investigation results.  I mean
10     you can call them what you want.
11  BY MR. LYONS:
12     Q.    You call them disclosures, Ms.
13  Little; is that correct?
14     A.    Yes.
15     Q.    Okay.  I'll try to do the same then.
16         Now, the consumer disclosure is
17  different than the credit report or the reports
18  that the furnishers receive; is that correct?
19     A.    Yes.
20     Q.    And there is information, is there
21  not, in the Trans Union database that doesn't
22  appear in the disclosures; is that correct?
23     A.    No, no.  A disclosure will have
24  everything to the consumer.  What is returned

4 (Pages 10 to 13)

Eileen Little

Page 14

1  back to a subscriber would not have anything that
2  -- information suppressed.  So the consumer gets
3  more information than the subscriber.
4        Q.    But the consumer doesn't get the
5  history of the payments like the subscriber does;
6  is that correct?
7             MR. CENTO:  Objection; lack of
8  foundation.
9  BY MR. LYONS:
10       Q.    For example, Exhibit 3 doesn't show
11 the history of every monthly payment?
12       A.    It does give the payment pattern,
13 correct.
14       Q.    And is that how you refer to that at
15 Trans Union, as a payment pattern?
16       A.    Yes.
17       Q.    And, between September 6, 2000,
18 which is the date of Exhibit 3, to the present,
19 do you know if Trans Union has changed its
20 disclosures to include payment pattern?
21       A.    We have not changed anything, no.
22            MR. LYONS:  Next I'd like to mark as
23 deposition Exhibit 4 241 through 245.
24                   - - -

Page 15

1             (Whereupon, Exhibit Trans Union-4
2  was marked for identification by the court
3  reporter.)
4  BY MR. LYONS:
5        Q.    Ms. Little, I'm showing you what has
6  been marked as Deposition Exhibit 4.  Can you
7  identify this document for me?
8        A.    It's a consumer disclosure dated
9  January 16, 2001.
10       Q.    For Russell Anderson, Sr., correct?
11       A.    Yes.
12       Q.    And, anywhere in Deposition Exhibit
13 4, is there an indication that Mr. Anderson is
14 deceased?
15       A.    No.
16            MR. LYONS:  I'm going to mark as
17 Exhibit 5 TU166 through 170.
18                   - - -
19            (Whereupon, Exhibit Trans Union-5
20 was marked for identification by the court
21 reporter.)
22                   - - -
23 BY MR. LYONS:
24       Q.    Ms. Little, I'm showing you what has

Page 16

1  been marked as Deposition Exhibit 5.  Have you
2  seen this multi-paged exhibit before?
3        A.    Yes.
4        Q.    Can you identify for me what it is?
5        A.    It's a consumer dispute that we
6  received November 6, 2002.
7        Q.    And is it your understanding that
8  the dispute letter that is the top page of
9  Exhibit 5 also had included with it the three
10 documents behind it labeled 167, 168 and 169?
11       A.    Yes.
12            MR. LYONS:  Next I'd like to mark as
13 Exhibit 6 TU95 through TU157.
14                   - - -
15            (Whereupon, Exhibit Trans Union-6
16 was marked for identification by the court
17 reporter.)
18                   - - -
19 BY MR. LYONS:
20       Q.    Ms. Little, I'm showing you what's
21 been marked as Deposition Exhibit 6, and I will
22 represent to you and you will see that this is
23 the order of the documents that were produced to
24 me by Trans Union.

Page 17

1             I believe these documents represent
2  all the internal Trans Union consumer relations
3  system documents pertaining to Russell D.
4  Anderson, Sr.; however, from my review of these
5  documents, I'm not sure that they're in any kind
6  of chronological order.  So bear with me and help
7  me if you can to make some sense of the
8  chronological order of these.
9             If you look back at Deposition
10 Exhibit 5, this appears to be a November 2002
11 dispute received by Trans Union.  Can you help me
12 find that in Deposition Exhibit 6 or where it
13 would appear in Deposition Exhibit 6?
14       A.    TU0140.
15       Q.    TU140?
16       A.    Right, and 141, 142.  I think they
17 are the only three.
18       Q.    Okay.  Let's talk for a minute about
19 140, 141 and 142.  If we look back at 140, there
20 is a date.  It says "Date Received:  11/6/02."
21 Do you see that?
22       A.    Yes.
23       Q.    And that 11/6/02 date matches up
24 with the date that we see stamped as received on

Eileen Little

Page 18

1   Exhibit 5?
2       A.    Yes.
3       Q.    And what does that date reflect, the
4   date that TU received the dispute from the
5   consumer?
6       A.    Yes.
7       Q.    To the right of that, you'll see
8   where it says "Priority:  3."  What does that
9   mean?
10      A.    Okay.  If there was a priority on
11  this CVD, they would have their code there.  3
12  just means location 3.  So the Crum Lynne office
13  did this.
14      Q.    And TU140 is showing the original
15  reporting or as the reporting appeared on
16  November 6, 2002 by Cross Country Bank related to
17  the 6736 account, correct?
18      A.    Yes.
19      Q.    And you understand that to be a Visa
20  account?
21      A.    Yes.
22      Q.    Now, do you know today whether or
23  not this MasterCard account that we spoke of
24  previously and the Visa account that we're

Page 19

1   focusing on now are one in the same account?
2       A.    I believe they are.
3       Q.    And what leads you to believe that?
4       A.    A letter that they had sent in from
5   the bank stated that.
6       Q.    And that letter was in January of
7   2003; is that right?
8       A.    I'm not sure of the date that we
9   received it.
10      Q.    We'll look at the letter in a minute
11  because it is contained within the document that
12  you have reviewed, correct?
13      A.    Yes.
14      Q.    The Visa Cross Country Bank account
15  that we're looking at on page 140 had a deceased
16  notation; is that correct?
17      A.    Yes.
18      Q.    And we know that in two ways from
19  looking at Deposition Exhibit 140.  There is an X
20  in the ECOA code on the very right-hand margin of
21  the page; is that correct?
22      A.    Yes.
23      Q.    And, in addition to that, there is a
24  "DEC" code appearing in the middle of the trade

Page 20

1   line, correct?
2       A.    Yes.
3       Q.    What's the MIN56?
4       A.    It's their minimum monthly payment,
5   $56.
6       Q.    And, to the right of that, it says
7   028.  What does that number represent, just to
8   the right of where it says MIN56?  Is that the
9   number of months that this thing had been
10  reporting?
11      A.    Oh, you're above that now.  Yes.
12  Out of 28 months, it's never been over 30, 60 or
13  90.  It's part of the payment history.
14      Q.    Now, in response to the November 2,
15  2000 letter that we've marked as Deposition
16  Exhibit 5, what information out of that package
17  was forwarded on to Cross Country Bank?
18      A.    Out of Exhibit 5?
19      Q.    Correct.
20          MR. CENTO:  Objection to the form;
21  vague and ambiguous with respect to the term
22  "information".
23  BY MR. LYONS:
24      Q.    And is that standard operating

Page 21

1   procedure at Trans Union not to forward on
2   documents that are contained within the dispute
3   letter or the dispute letter itself to the data
4   furnisher, correct?
5          MR. CENTO:  Same objection.
6          THE WITNESS:  Correct.
7   BY MR. LYONS:
8       Q.    Now, what department of Trans Union
9   handled the November 2, 2002 dispute by Mr.
10  Anderson?  And, if you look at another document,
11  would you identify that document for me please.
12      A.    TU156.  I was looking to see if I
13  recognize the operator number and I don't.  So I
14  don't know who handled it.
15          MR. CENTO:  I object to that last
16      question as well in terms of referencing
17      that dispute as a November 2nd dispute.
18      Trans Union received that dispute on
19      November 6th I believe was the testimony.
20  BY MR. LYONS:
21      Q.    So, on Trans Union 156, the November
22  2002 dispute is displayed; is that correct?
23      A.    Yes.  I can give you the operator
24  number, but I don't know the name.

Eileen Little

Page 22

1    Q.    The operator was 3244?
2    A.    Yes.
3    Q.    And you don't recall who that is?
4    A.    Right.
5    Q.    And do you know whether priority
6 processing handled this dispute or whether or not
7 the written dispute department handled it?
8    A.    I believe the written dispute
9 department handled it.
10    Q.    And is there any document in here
11 that would identify for you specifically which
12 department handled it?
13    A.    No.
14    Q.    And the procedure at Trans Union to
15 have the written dispute department handle this
16 was because it wasn't from any third party like a
17 lawyer or attorney general; is that right?
18    A.    That's correct.
19    Q.    As well as the fact that the
20 Andersons weren't complaining about being denied
21 for a mortgage; is that right?
22    A.    I believe, in August, in their first
23 correspondence or call, it was outsourced to
24 priority because of a mortgage pending.

Page 23

1    Q.    And that was in August of 2000?
2    A.    Yes.
3    Q.    So what did Trans Union do to
4 investigate the November 2002 dispute?
5    A.    We sent the bank a dispute form,
6 asking them to verify the information they were
7 reporting.
8    Q.    And do you have either 140, 141 or
9 142 reflective of the communications sent to the
10 bank?
11    A.    Well, 140 does respond to -- tells
12 you what they responded back in the DAVE field,
13 the 15/35.
14    Q.    That indicates what?
15    A.    It means they verified -- 1 is his
16 name, 5 is the Social Security number, and the 35
17 is verified as reported.
18    Q.    And that was an ACDV response from
19 the bank?
20    A.    Yes.
21    Q.    And that went automatically back
22 into the system without being reviewed by a human
23 being at Trans Union, correct?
24    A.    Yes.

Page 24

1    Q.    What is TU141?
2    A.    That's the expanded trade set of the
3 same trade line as 140.
4    Q.    And what does that indicate?
5    A.    It's just additional information
6 regarding that trade on the date it was reported,
7 date of last sale, payment history.
8    Q.    And what code did Trans Union relate
9 to the bank related to the November 2002 dispute
10 by the Andersons?
11    A.    The dispute code was B7.
12    Q.    And that code is shown on TU141,
13 correct?
14    A.    Yes.
15    Q.    But it doesn't say anything about
16 the consumer saying he's not dead; is that
17 correct?
18    A.    That's correct.
19        MR. CENTO:  I would object to the
20    form of that last question.
21 BY MR. LYONS:
22    Q.    And that code doesn't indicate in
23 any way, shape or form that the Andersons are
24 being denied credit due to the deceased status;

Page 25

1 is that correct?
2    A.    It doesn't indicate they're being
3 denied credit, no.
4    Q.    What is TU142?
5    A.    This is a screen print of the
6 consumer relations system indicating what was
7 changed.
8    Q.    So is it fair to say that this is
9 like an ACDV response form or not?
10    A.    No.  It's how the account
11 information was being shown before and after our
12 investigation.
13    Q.    And then what's over there on File
14 A?  What does that mean?
15    A.    If there is more than one file, they
16 will identify it as A file, B file and so on.
17 It's just to identify the file that the trade
18 line came off of.
19    Q.    So, if this were reported on someone
20 else's credit report, it would show up under File
21 A; is that your understanding?
22    A.    No, no.
23        MR. CENTO:  Objection; vague and
24    ambiguous.

Eileen Little

Page 26

```
1          THE WITNESS:  If he needed two
2     files, if Mr. Anderson had two files, one
3     under his name and social that didn't say
4     senior and then another file under senior,
5     there would be a possible file, but it still
6     matches his identification.  That second
7     file would be classified as a B file.
8  BY MR. LYONS:
9     Q.    Like a fragmented file?
10    A.    Yes.
11    Q.    Is that right?
12    A.    Yes.
13    Q.    And you see in the ECOA field that
14 it says "Consumer deceased", and then in the
15 remark code it says "Consumer deceased" in the
16 before column, correct?
17    A.    Yes.
18    Q.    And there's nothing in the after
19 column, and that means nothing was changed by
20 Cross Country Bank; is that correct?
21    A.    Correct, because they stated
22 verified as reported.
23    Q.    Is TU106, 107 and 108 the same thing
24 as TU140, 141 and 142?
```

Page 27

```
1     A.    Yes.
2     Q.    So that's just duplicates?
3     A.    Yes.
4     Q.    They are identical, correct?
5     A.    Correct, yes.
6     Q.    If you would look at the first page
7  of Deposition Exhibit 6, which is TU95, is this
8  the document that refers to the dispute back in
9  August of 2000 that was sent to priority
10 processing?
11    A.    Yes.
12    Q.    And do you know how that dispute was
13 conveyed to Trans Union at that time in August of
14 2000?
15    A.    I believe it was a telephone call.
16    Q.    Does the history summary show that?
17    A.    Yes, it does.
18    Q.    And what document are you looking at
19 now?
20    A.    TU153.
21    Q.    And that shows a telephone call?
22    A.    Well, the first line where it says
23 8/8/00, that "J" before the control number tells
24 me it was a telephone call.
```

Page 28

```
1     Q.    What does "J" stand for?
2     A.    Telephone call.
3     Q.    And can you tell from Trans Union
4  153 through 157 if there were any other disputes
5  between August 2000 and November 2002?
6     A.    Just the November 6th dispute, 2002.
7     Q.    If you look at TU103 and 104, do
8  these two documents relate to the August 2000
9  dispute by Mr. Anderson concerning the Cross
10 Country Bank MasterCard account?
11    A.    Yes.
12    Q.    And does this indicate how Cross
13 Country Bank responded to communications from TU
14 in August of 2000?
15    A.    They did not respond.
16    Q.    And how do you know that?
17    A.    Because I reviewed the file.  Plus,
18 the response code "P" would tell me it's per
19 consumer.  So I know they would use that only if
20 we did not receive a response.
21    Q.    Oh, response "P" is right there on
22 page 103?
23    A.    Yes.
24    Q.    What does favorable "F" means?
```

Page 29

```
1     A.    Is the account being changed, is it
2  favorable?  "F" is favorable.
3     Q.    And it's favorable because the
4  deceased is coming off?
5     A.    Because the account is being
6  removed.
7     Q.    Oh, because the whole trade line is
8  being removed?
9     A.    Yes.
10    Q.    And that's favorable?
11    A.    Yes, for the consumer.
12    Q.    Why is that favorable?
13    A.    Because the account is being
14 removed.  Any time you per consumer it, we're
15 doing it based on the consumer, what the
16 consumer's dispute is.  So we would consider it
17 favorable to the consumer.
18    Q.    So, because the consumer was
19 disputing this trade line and it got removed,
20 that's considered favorable to the consumer,
21 correct?
22    A.    Yes, correct.
23    Q.    And what's status "CM"?
24    A.    Correction made.
```

Eileen Little

Page 30

1   Q.   Then, right above the DAVE portion
2   on page 103 -- there was no operator on this.
3   This happened automatically; is that correct?
4   A.   Yes.
5   Q.   Is Trans Union page 129 identical to
6   TU095?
7   A.   Yes.
8   Q.   And a duplicate?
9   A.   Yes.
10  Q.   And, if you look at Trans Union 137
11  through 139, is 137 and 138 identical to 103 and
12  104?
13  A.   Yes.
14  Q.   But 139 is the audit trail
15  concerning the August 2000 dispute; is that
16  correct?
17  A.   Yes.
18  Q.   So 139 is related to the August 2000
19  dispute, correct?
20  A.   Yes.
21  Q.   And 139 seems to indicate that
22  something was verified; is that correct?
23  A.   No.   At the bottom, it will say no
24  response within 30 days.

Page 31

1   Q.   But, up above, it says "V:
2   Verified." Do you see that?
3   A.   Well, they're just showing what
4   change was done.   As far as ending the
5   correction, you have to put the date you're
6   getting it.   What we're doing is cloaking it.
7   Q.   But that was nothing that Cross
8   Country Bank was --
9   A.   Nothing was verified.
10  Q.   Ms. Little, please let me finish my
11  question even if you already know the answer.
12  The court reporter can only take down one person
13  speaking at a time.
14  A.   I'm sorry.
15  Q.   So the 9/00 across from "Date
16  verified" doesn't mean the date that Cross
17  Country Bank verified anything, correct?
18  A.   Correct.
19  Q.   Now, according to history search
20  summary, when was the next time that Mr. Anderson
21  disputed anything with Trans Union -- actually,
22  Ms. Little, let's wait for one second.   I want to
23  show you a couple more documents before we move
24  on to the next area.

Page 32

1        MR. LYONS:  Let's mark 246 through
2   248 as Deposition Exhibit 7.
3              - - -
4        (Whereupon, Exhibit Trans Union-7
5   was marked for identification by the court
6   reporter.)
7              - - -
8   BY MR. LYONS:
9   Q.   I'm showing you what has been marked
10  as Deposition Exhibit 7.  Can you identify that
11  document for me please?
12  A.   Consumer disclosure dated November
13  13, 2002.
14  Q.   Now, that consumer disclosure, is
15  that a working copy internal for Trans Union?
16  A.   Could have been.  I mean there's no
17  way to tell by here.
18  Q.   So is it difficult or impossible to
19  tell whether or not this actually gets sent out
20  to the consumer or whether this is just an
21  internal working copy?
22  A.   Well, I'm not going to be able to
23  tell by looking at this document.  There's no
24  tran number on it.

Page 33

1   Q.   What number do you need to look for
2   to see if it would help you?
3   A.   A transaction number.  It's not on
4   here.
5   Q.   So you don't know if this got sent
6   to Mr. Anderson or not?
7   A.   I don't know.
8   Q.   This document still shows the Cross
9   Country Bank Visa showing as deceased, correct?
10  A.   Yes.
11       MR. LYONS:  We're going to mark as
12  Deposition Exhibit 8 TU052.
13             - - -
14       (Whereupon, Exhibit Trans Union-8
15  was marked for identification by the court
16  reporter.)
17             - - -
18  BY MR. LYONS:
19  Q.   Ms. Little, you would agree with me
20  that Exhibit 7 appears to be an incomplete
21  disclosure from 11/13/02, correct?
22  A.   Yes.
23       MR. LYONS:  Counsel, I would ask if
24  we could find the missing documents?

Eileen Little

Page 34

1      MR. CENTO:  We will do that.
2      MR. LYONS:  Thank you.
3  BY MR. LYONS:
4      Q.      Now, I am showing you what has been
5  marked as Deposition Exhibit 8.  Can you identify
6  this document for me?
7      A.      It's a copy of an ACDV that was sent
8  to Cross Country.
9      Q.      What was the date that it was sent
10  to Cross Country?
11     A.      November 14, 2002.
12     Q.      And when does Trans Union require a
13  response from Cross Country Bank by?
14     A.      11/25.
15     Q.      And that says right up there
16  "Subscriber response date 11/25"?
17     A.      Yes.
18     Q.      That's the date by which they need
19  to respond back to Trans Union, correct?
20     A.      Right.
21     Q.      If they don't respond back by that
22  day, then it gets coded as a did not respond,
23  right?
24     A.      Yes.

Page 35

1      Q.      And is there a procedure in place
2  that, even if they do respond after 11/25,
3  somehow Trans Union will consider it or not?
4      A.      We will not.
5      Q.      Now, right below that, it says "To
6  comply with FCRA" -- do you understand that to
7  mean the Fair Credit Reporting Act?
8      A.      Yes.
9      Q.      -- "a response is required by
10  11/20/02."  Do you see that?
11     A.      Yes.
12     Q.      What does that mean?
13     A.      I don't know what the difference is
14  between the two dates.
15     Q.      Other than five days?
16     A.      Right.
17     Q.      Do you know whether or not, if the
18  bank sends Trans Union a response on 11/21/02,
19  that will not comply with the FCRA?
20     A.      No.  As far as Trans Union, it would
21  have to be done by the 11/25 date.
22     Q.      So do you know why this gets put on
23  those ACDVs?
24     A.      No.

Page 36

1      Q.      Would you agree with me that it's
2  probably inaccurate?
3      MR. CENTO:  Object to the form.
4      THE WITNESS:  No.  Like I said, I
5  don't know why.  So I'm not going to agree
6  that it's inaccurate.
7  BY MR. LYONS:
8      Q.      Well, if Cross Country Bank doesn't
9  respond to TU by 11/20/02, they're not failing to
10  comply with the Fair Credit Reporting Act, are
11  they?
12     MR. CENTO:  Object to the form.
13     THE WITNESS:  As I said, I don't
14  know why that was on there.  So I'm not
15  going to agree with you.
16  BY MR. LYONS:
17     Q.      But you know what the Act says,
18  right?
19     A.      Yes.
20     Q.      So does the Act say anything about
21  them having to respond within six days of the
22  date that they get it?
23     MR. CENTO:  Object to the form; lack
24  of foundation.  You're also seeking expert

Page 37

1  testimony from a fact witness.  You can
2  answer if you can.
3      THE WITNESS:  No, the Act doesn't
4  say they have to respond in six days.
5  BY MR. LYONS:
6      Q.      Now, this ACDV is related to the
7  November 2002 dispute that we talked about before
8  that has been marked as Deposition Exhibit 5,
9  correct?
10     A.      Yes.
11     Q.      What date was the communication sent
12  from Trans Union to Cross Country Bank?
13     A.      11/14.
14     Q.      And, if we look down towards the
15  middle of the page, we see the Cross Country Bank
16  marked or responded to the ACDV by marking
17  "Verified as reported."  Do you see that?
18     A.      Yes, correct.
19     Q.      Then it appears that Cross Country
20  Bank also responded by updating the date of
21  reporting; is that correct?
22     MR. CENTO:  Objection to the form;
23  vague and ambiguous with respect to the term
24  "respond".

Eileen Little

Page 38

```
1           THE WITNESS:  Yes.
2  BY MR. LYONS:
3      Q.    And Cross Country Bank also seemed
4  to make some kind of a change to the ECOA
5  indicator.  Do you see that?
6      A.    Yes.
7      Q.    And what was that change?
8      A.    They put an asterisk there.
9      Q.    What does that mean?
10     A.    That they wanted that deleted.
11     Q.    Is that what the asterisk means?
12     A.    Yes.
13     Q.    Is that the appropriate response?
14         MR. CENTO:  Objection to the form.
15         THE WITNESS:  Well, the whole
16  response is inconsistent.  They put verified
17  as reported no matter what changes they
18  wanted.  They can't have both.  It's either
19  verified as reported or changed.  They chose
20  verified as reported.  So the changes would
21  not happen.
22  BY MR. LYONS:
23     Q.    So their response was inconsistent?
24         MR. CENTO:  Objection to the form of
```

Page 39

```
1  that question regarding the meaning of
2  "inconsistent".
3  BY MR. LYONS:
4      Q.    Now, there's also some asterisks
5  under the payment history.  Do you see that?
6      A.    Yes.
7      Q.    What does that mean?
8      A.    That there is -- the asterisk to me
9  means that they'll be deleted.
10     Q.    Now, is there some kind of a manual
11  or something that tells you what the asterisk
12  means and the specific field it's located?
13     A.    Well, for the CDB operators, I don't
14  know if there is a manual, but they would know
15  that that asterisk would be to take out whatever
16  field it's in.
17     Q.    And is this an ACDV that was
18  processed on the E-Oscar System?
19     A.    I don't know if it's E-Oscar at that
20  time.  E-Oscar had probably just started, but it
21  is in auto response.
22         MR. CENTO:  For the record, we're
23  going a little beyond the scope of this
24  witness's knowledge.  If you want details
```

Page 40

```
1  based on your line of questioning, you might
2  need to talk to somebody else.
3  BY MR. LYONS:
4      Q.    Then, under the special comments and
5  remarks section, it originally had been reported
6  as deceased, but Cross Country Bank was trying to
7  change it to something else.
8      A.    Well, they're stating it's not
9  deceased.  There was a joint account.
10     Q.    But, again, that change didn't get
11  made because they had marked the box verified as
12  reported?
13     A.    Correct.
14     Q.    No human being at Trans Union
15  reviewed Exhibit 8, correct?
16     A.    Correct.
17     Q.    Until after Plaintiff filed the
18  lawsuit.  Then this document got reviewed,
19  correct, by somebody at Trans Union?
20     A.    Yes.
21              -  -  -
22         (Whereupon, Exhibit Trans Union-9
23  was marked for identification by the court
24  reporter.)
```

Page 41

```
1              -  -  -
2  BY MR. LYONS:
3      Q.    Ms. Little, I'm now showing you what
4  has been marked as Deposition Exhibit 9.  That's
5  TU document 35 through 39.
6      A.    Yes.
7      Q.    Can you identify it for me?
8      A.    It's a corrected copy that was
9  generated to Mr. Russell on November 26, 2002.
10     Q.    A corrected copy of?
11     A.    His credit report based on his
12  November dispute.
13     Q.    And Trans Union's investigation
14  results were that they verified the deceased
15  information as accurate and made no change to his
16  report; is that correct?
17     A.    Yes.
18     Q.    Does Trans Union keep any
19  information in any system that you are aware of
20  that would alert Trans Union to the fact that Mr.
21  Anderson had been reported as deceased before
22  specifically by this same data furnisher and that
23  that information was determined to be inaccurate
24  and changed?  Is there any system like that at
```

11 (Pages 38 to 41)

Eileen Little

Page 42

1   Trans Union that would alert them?
2            MR. CENTO:  Objection; compound,
3       lack of foundation, mischaracterizes the
4       previous testimony.
5            THE WITNESS:  No.
6   BY MR. LYONS:
7       Q.    You hesitated for a minute.  Were
8   you thinking maybe there was or --
9       A.    No, there's definitely not.
10      Q.    And it is true that Cross Country
11  Bank previously reported Mr. Anderson as being
12  deceased, correct?
13      A.    On a different account.
14      Q.    I understand that, but same data
15  furnisher, correct?
16           MR. CENTO:  Same objection.
17           THE WITNESS:  Yes.
18  BY MR. LYONS:
19      Q.    And Trans Union recognized that that
20  was an error, correct?
21      A.    No, not at all.
22           MR. CENTO:  Objection;
23       mischaracterizes the previous testimony.
24  BY MR. LYONS:

Page 43

1       Q.    They didn't recognize it as an
2   error?
3       A.    No, we had no response.  The only
4   reason it was removed is because they didn't
5   respond.
6       Q.    Well, Trans Union wouldn't remove
7   something that they thought was accurate, would
8   they?
9            MR. CENTO:  Objection to the form.
10           THE WITNESS:  Well, it's the law.  I
11       mean, if it's not verified, it's removed.
12       Whether it's active or inactive, there was
13       no response.  That's the only reason it was
14       removed.
15  BY MR. LYONS:
16      Q.    Did Trans Union follow up in any
17  way, shape or form with Cross Country related to
18  the August 2000 dispute with Cross Country to
19  find out why they didn't respond?
20           MR. CENTO:  Objection; vague and
21       ambiguous.  Go ahead.
22           THE WITNESS:  No.
23  BY MR. LYONS:
24      Q.    And you can't tell me as we sit here

Page 44

1   today whether or not Cross Country continued to
2   report Mr. Anderson as deceased after August of
3   2000?
4            MR. CENTO:  Objection; vague and
5       ambiguous.  Which account?
6            THE WITNESS:  The MasterCard was
7       never rereported.  They started to report
8       the Visa as deceased.
9   BY MR. LYONS:
10      Q.    But do you know, as you sit here
11  today without the name scans, whether or not
12  Cross Country Bank rereported the MasterCard
13  after August of 2000?
14           MR. CENTO:  I'm going to object.
15       That's outside the scope of this witness's
16       knowledge.  That testimony can be given
17       later with Lynn Romanowski with the name
18       scans.
19           MR. LYONS:  Are you instructing her
20       not to answer?
21           MR. CENTO:  No; she can answer.
22           THE WITNESS:  I don't believe they
23       did, no.
24  BY MR. LYONS:

Page 45

1       Q.    Ms. Little, can you tell me
2   according to the history search summary what was
3   the next dispute initiated by Russell D.
4   Anderson, Sr.?
5       A.    After the November one?
6       Q.    Right.
7       A.    January 8, '03.
8       Q.    And, in looking at the history
9   search summary, what or how was the dispute
10  communicated with Trans Union?
11      A.    He initially called and then he
12  faxed over documentation.
13      Q.    And you're looking at page 157?
14      A.    Yes.
15      Q.    Where or on what line does the call
16  show up?
17      A.    The first line, the internal
18  disclosure.  They didn't take the dispute at that
19  time.  He just asked general questions and stated
20  he was going to fax over the information.
21      Q.    And is there a note somewhere else
22  in the documents that reduces what you just told
23  me into the system, that there was a call and
24  there was going to be a fax of some documents?

Eileen Little

Page 46

1    A.    I believe there is a comment screen.
2    Q.    And is that TU146?
3    A.    This is a comment screen, but this
4  is from January 20, '03.
5    Q.    You were thinking that there was an
6  earlier one?
7    A.    Right.
8    Q.    Do you see one?
9    A.    No.
10              - - -
11         (Whereupon, Exhibit Trans Union-10
12   was marked for identification by the court
13   reporter.)
14              - - -
15  BY MR. LYONS:
16   Q.    Ms. Little, I'm showing you now
17  what's been marked as Deposition Exhibit 10. Can
18  you identify this document for me?
19   A.    This is the dispute we received
20  January 8th.
21   Q.    And that's reflected in the received
22  stamp date appearing on Exhibit 10?
23   A.    Yes.
24   Q.    In fact, it is a letter though to

Page 47

1  Penny and Russell Anderson dated December 9,
2  2002, correct?
3    A.    Yes.
4    Q.    And you believe this document was
5  faxed to Trans Union by the Plaintiff in January
6  of 2003?
7    A.    Yes.
8    Q.    Was this Exhibit 10 treated like a
9  UDF by Trans Union or as a dispute?
10   A.    As a UDF.  We were going to make the
11  change based on this letter.
12   Q.    And was there any communication that
13  was sent out then on or about January 8, 2003 to
14  Cross Country Bank?
15   A.    No.
16   Q.    So there wasn't a question that this
17  might be fraud?
18   A.    No.
19   Q.    And handwritten down on the
20  right-hand corner is the Plaintiffs' names and
21  number 795 for Penny and 743 for Russell.  Can
22  you identify what those documents are?
23   A.    They are their consumer relations
24  file numbers.

Page 48

1    Q.    Is that their FIN numbers?
2    A.    Yes.
3    Q.    Now, do you know if this Exhibit 10
4  was ever given to anyone at Trans Union for
5  investigation into the reliability of Cross
6  Country Bank and their reporting?
7         MR. CENTO:  Object to the form.
8         THE WITNESS: No, it was not.
9  BY MR. LYONS:
10   Q.    And do you know why it was not?
11   A.    I don't know, no.
12   Q.    Now, if you would look back at
13  TU109, this document appears to be a trade set
14  detail related to the January 8, 2003 dispute,
15  correct?
16   A.    Yes.
17   Q.    And does it show that any change was
18  made to Russell Anderson's Cross Country Bank
19  trade line for the Visa?
20   A.    No.
21   Q.    What does it indicate?
22   A.    That they verified -- they're
23  stating that the deceased comment should be
24  removed and to remove the payment history.

Page 49

1    Q.    So was there communication between
2  Trans Union and Cross Country Bank in January of
3  2003?
4    A.    Yes.
5    Q.    And there was some -- was it an ACDV
6  or CDV or telephone call; what was it?
7    A.    ACDV.
8         MR. CENTO:  Off the record for a
9  second.
10              - - -
11         (Whereupon, a brief discussion was
12   held off the record.)
13              - - -
14  BY MR. LYONS:
15   Q.    Now, tell me again the changes that
16  were made by Trans Union -- well, let me back up
17  a minute here.  Strike that.
18         On January 8, 2003, is that the date
19  there was communication between Trans Union and
20  Cross Country Bank related to this file?
21   A.    Yes.
22   Q.    And is there a document that shows
23  that communication in your pile?
24   A.    TU145.

13 (Pages 46 to 49)

Eileen Little

Page 50

1    Q.    And what does TU145 show?
2    A.    That, when they went in to make the
3  change, they deleted the deceased comment,
4  changed the verification date and changed the
5  payment history.
6          Can I go back and say something?  I
7  think this was an ACDV.  I mean it was an ACDV
8  when we generated it, but then, based on the
9  information that he faxed over, they used that
10  document to make the change.  So this was an
11  operator that did that.  It wasn't an auto
12  process.
13   Q.    Just so I'm clear, Trans Union got
14  Exhibit 10 and did not generate an ACDV?
15   A.    It was already out there.  We had
16  already generated it to the subscriber, but then,
17  when we got this document, they figured we could
18  use this document rather than wait for the ACDV
19  to come back.  Then they went in to update it.
20   Q.    So was there ever a response from
21  Cross Country Bank to the ACDV?
22   A.    Not that I'm aware of.
23   Q.    So it's your testimony that Cross
24  Country Bank never responded to an ACDV that was

Page 51

1  sent to it by Trans Union on or about January
2  6th?
3          MR. CENTO:  Object to the form;
4    mischaracterizes the witness's previous
5    testimony.
6          THE WITNESS:  I'm not saying they
7    never responded.  I don't know if they
8    responded.  At that time, we had already
9    gone in and closed out the dispute based on
10    the document he provided us.
11  BY MR. LYONS:
12   Q.    Well, shouldn't there be some record
13  of what or how Cross Country Bank responded?
14   A.    Well, if they responded and the
15  dispute is already closed, then no, we don't keep
16  a record of those because we didn't use the
17  response.
18   Q.    Well, what if the response came back
19  with something different than what you had closed
20  out the file with?
21   A.    Well, we're using the bank's
22  document to make the change.
23   Q.    But you didn't get it from the bank,
24  did you?

Page 52

1    A.    No.  We got it from the consumer who
2  got it from the bank.  It's on their letterhead.
3    Q.    So you believed that this was a
4  document from Cross Country Bank?
5          MR. CENTO:  Objection; lack of
6    foundation.
7          THE WITNESS:  Yes.
8  BY MR. LYONS:
9    Q.    And nobody from Trans Union, to the
10  best of your knowledge, ever verified whether or
11  not this was a document from Cross Country Bank?
12          MR. CENTO:  Object to the form;
13    vague and ambiguous, lack of foundation.
14          THE WITNESS:  No.  I don't see any
15    need to.
16  BY MR. LYONS:
17    Q.    Would you look at 109, 110 and 111,
18  and tell me if they are the same as 143, 144 and
19  145?
20    A.    Yes, they are.
21    Q.    Now, if you would look back at TU140
22  please, that's the trade set detail for the
23  November 2002 dispute.  The response was "C",
24  correct?

Page 53

1    A.    Yes.
2    Q.    Which means what again?
3    A.    Change.
4    Q.    And the change that was made
5  concerned information other than what he was
6  disputing, correct?  There were changes made to
7  the file, but not what he was disputing, correct?
8    A.    Well, there's no change really made
9  because they put verified as reported.
10    Q.    So why is a "C" there?
11    A.    In order to close it out, you have
12  to have something in that field.  It's either
13  change or per consumer.  Per consumer would only
14  be used if there's no response.  So we got a
15  response and it was a change because we're
16  changing.
17    Q.    But nothing got changed?
18    A.    No.
19    Q.    And then favorable is marked "F".
20  What does that mean?
21    A.    That it was favorable to the
22  consumer.
23    Q.    But it really wasn't?
24    A.    There was no change made.

14 (Pages 50 to 53)

Eileen Little

Page 54

1    MR. CENTO:  Object to the form.
2  BY MR. LYONS:
3    Q.    Now, if you look at 130 through 136
4  -- we'll start with 130.  Do you have that in
5  front of you?
6    A.    Yes.
7    Q.    What is this screen?
8    A.    This is the personal information
9  screen where the operator goes in and she made a
10  change here.
11    Q.    When did she make that change?
12    A.    There's no date on here.  I don't
13  know.  During one of the disputes.
14    Q.    But you can't tell which one?
15    A.    No.
16    Q.    Would you be able to tell by looking
17  at the history search screen?
18    A.    No.
19    Q.    So we don't have any idea when this
20  change was made?
21    A.    No.
22    Q.    Let's go to 131.  What does this
23  signify?
24    A.    Again, this is audit trail

Page 55

1  information on as far as what maintenance was
2  performed on the credit report.
3    Q.    Does it indicate the date?
4    A.    No. I don't know what dispute, no.
5    Q.    132 is just a continuation, is it
6  not, of the audit trail of 131?
7    A.    Yes.
8    Q.    133, what is that?
9    A.    This is the employment information.
10  They deleted a duplicate.
11    Q.    But you don't know when that
12  occurred?
13    A.    No.
14    Q.    What about 134?
15    A.    That's a duplicate of 133.
16    Q.    And 135 and 136?
17    A.    Again, this is an audit trail.  I'm
18  showing you what maintenance was done on the
19  file.
20    Q.    And was that a duplicate of 131?
21    A.    Yes.
22    Q.    Then we get to 146, TU146.  What is
23  that?
24    A.    It's a consumer comment that was

Page 56

1  left in the system based on the telephone call.
2    Q.    Based on the call that was placed
3  earlier in January?
4    A.    No; on January 20th.
5    Q.    So this reflects that the consumer
6  called in?
7    A.    Yes.
8    Q.    And can you interpret the note for
9  me?
10    A.    "Consumer called regarding the CCB
11  account.  Sent fax over and rep removed the
12  deceased comment, but did not change the "X" in
13  the ECOA.  Updated account.  Removed remark in
14  ECOA."  That's what she's stating she did based
15  on the telephone call.
16    Q.    Did she do something wrong here?
17    A.    Not at all.
18    Q.    The TU rep removed the deceased
19  remark; is that correct?
20    A.    Right.
21    Q.    But failed to change the "X" in the
22  ECOA field?
23    A.    Right.  That would be the operator
24  who handled the January 8th dispute.

Page 57

1    Q.    So, in the meantime, between January
2  6th and January 20th, was Mr. Anderson sent a
3  Trans Union credit report that did not reflect
4  the removal of the deceased?
5    A.    I believe he was, and that generated
6  him to call.
7                - - -
8        (Whereupon, Exhibit Trans Union-11
9        was marked for identification by the court
10        reporter.)
11                - - -
12  BY MR. LYONS:
13    Q.    I'm showing you what's been marked
14  as Deposition Exhibit 11.  That's TU249 through
15  TU253, correct?
16    A.    Yes.
17    Q.    And what is this?
18    A.    This is a copy generated January 13,
19  2003.
20    Q.    And this is a disclosure?
21    A.    Yes.
22    Q.    But we don't know whether or not it
23  was sent to Mr. Anderson, correct?
24    A.    I don't know that.

15 (Pages 54 to 57)

Eileen Little

Page 58

1    Q.    It does still show the -- it has the
2  deceased comment?
3    A.    Yes.
4    Q.    And the deceased mark in the ECOA
5  indicator, correct?
6    A.    Yes.
7              - - -
8              (Whereupon, Exhibit Trans Union-12
9    was marked for identification by the court
10   reporter.)
11             - - -
12 BY MR. LYONS:
13   Q.    I'm showing you what's been marked
14 as Deposition Exhibit 12. Can you identify this
15 document for me that is bates number TU40 through
16 45?
17   A.    This is the revised copy that was
18 sent on January 13, 2003 with the results of the
19 investigation.
20   Q.    And this is reflective of the
21 failure of Trans Union to make the appropriate
22 change to get the deceased off, correct?
23   A.    Yes.
24   MR. CENTO: Objection to the form.

Page 59

1  BY MR. LYONS:
2    Q.    Now, this doesn't look like either
3  one of the changes were made, right? It still
4  says deceased under Cross Country Bank, and what
5  field is that right under the name of the bank?
6    A.    The comment field.
7    Q.    So that's comment, and then consumer
8  deceased under where it says "Credit card" is
9  ECOA field?
10   A.    Yes.
11   Q.    So, according to this document,
12 TU41, it doesn't look like either one of the
13 changes were made, correct?
14   A.    Well, it doesn't appear that way
15 because you would have to change both in order to
16 have the change. I mean the fact that it stayed
17 on there was because she didn't change the ECOA.
18   Q.    Because the ECOA drives the comment
19 code?
20   A.    Yes.
21   MR. CENTO: I'm going to object to
22   that question as being outside the scope of
23   this witness's knowledge.
24 BY MR. LYONS:

Page 60

1    Q.    If you would look back at TU44
2  please, it shows that there's special messages
3  there. Do you see those?
4    A.    Yes.
5    Q.    What does that mean? The first one
6  says "Input current address has been used three
7  times in the last 30 days on different
8  inquiries." What does that mean?
9    A.    He's applied for credit, and we've
10 had three inquiries within the last 30 days.
11   Q.    And, presumably, those inquiries in
12 the last 30 days would have seen Trans Union's
13 report showing up as Russell being deceased,
14 correct?
15   A.    Yes.
16   Q.    And that's not a good thing, is it?
17   MR. CENTO: Object to the form.
18   THE WITNESS: You'd have to check
19   with the companies he was applying to.
20 BY MR. LYONS:
21   Q.    I may have asked you this at a
22 previous deposition, but are you aware that
23 having deceased on your Trans Union credit report
24 prohibits you from having a score?

Page 61

1    MR. CENTO: Object to the question.
2  This is beyond the scope of the witness's
3  knowledge.
4    THE WITNESS: Yes.
5  BY MR. LYONS:
6    Q.    And that's not a good thing,
7  correct?
8    MR. CENTO: Object to the form;
9  seeking opinion testimony from a fact
10 witness. You can answer.
11   THE WITNESS: Well, it would depend
12 on the creditor.
13 BY MR. LYONS:
14   Q.    So the call on 1/20/03 by the
15 Plaintiff, that didn't cause another
16 investigation to be opened, did it?
17   A.    No; the operator just made the
18 change.
19   Q.    After Trans Union makes the change,
20 do they then send it out to the companies that
21 had requested a Trans Union report with deceased
22 on it?
23   A.    Only if the consumer requests that.
24 We can do that, yes.

16 (Pages 58 to 61)

CIVIL ACTION GROUP 763.576.8832

Eileen Little

Page 62

1   Q.    But he has to request that?
2   A.    Yes.
3   Q.    So that doesn't happen
4  automatically?
5   A.    No.
6              - - -
7         (Whereupon, Exhibit Trans Union-13
8  was marked for identification by the court
9  reporter.)
10             - - -
11 BY MR. LYONS:
12  Q.    I'm showing you what's been marked
13 as Deposition Exhibit 13.
14  A.    Yes.
15  Q.    Can you identify that document
16 please?
17  A.    It's a consumer disclosure dated
18 1/20/03.
19  Q.    And do you know whether or not this
20 document was, in fact, sent to Plaintiff Russell
21 Anderson?
22  A.    I believe it was.
23  Q.    But you don't know that for sure?
24  A.    No.

Page 63

1   Q.    And there's no records in Trans
2  Union's possession that would show this was sent
3  to him, correct?
4   A.    Well, in TU157, the history search,
5  after she made the change, she went in and pulled
6  the new disclosure and printed it and sent the
7  consumer that.
8   Q.    Where does it say that she sent it?
9   A.    Well, the status will say printed.
10  Q.    That's on 157?
11  A.    Yes.
12  Q.    And that's the top line where it
13 says "PR"?
14  A.    Yes, yes.
15  Q.    But you don't have personal
16 knowledge that that was ever sent, correct?
17         MR. CENTO:  Object to the form;
18  Mischaracterizes the witness's previous
19  testimony.
20         THE WITNESS:  Well, it's generated
21  through the system.  So it would have to
22  have been sent.
23 BY MR. LYONS:
24  Q.    Can you turn to Trans Union 150, 151

Page 64

1  and 152 please.  Are these three documents
2  related to the Trans Union action in January of
3  2003?
4   A.    Yes, they are.
5   Q.    And Trans Union 150 shows what?
6   A.    150 is how the trade line was on the
7  file at the time of the call.  151 is the same
8  thing, just the expanded trade set.  152 will
9  show the before and after as to what change she
10 made.
11  Q.    And was the whole trade line
12 deleted?
13  A.    No.
14  Q.    Just the deceased part?
15  A.    Right.
16  Q.    If you could turn back to Exhibit 10
17 just for a minute please.  This letter seems to
18 indicate that Trans Union would be receiving some
19 kind of an update from Cross Country Bank within
20 30-to-60 days from January 8, 2003.  Do you see
21 where it says that in the third paragraph?
22  A.    Right.
23  Q.    Do you know if Trans Union ever
24 received any update?

Page 65

1   A.    I don't know that we did.
2   Q.    If it would have been in UDF form,
3  would that be something that your department
4  handled?
5   A.    Not at all.  It would be handled by
6  the maintenance center.
7   Q.    Would you turn to TU147, 148 and 149
8  please.
9   A.    Okay.
10  Q.    147 seems to show some correction
11 being made on or about January 13, 2003; is that
12 correct?
13  A.    Yes.
14  Q.    What correction was that?
15  A.    They added the "Do not merge"
16 statement.
17  Q.    And why was that?
18  A.    So that the file didn't merge with
19 anyone else's.
20  Q.    Was there some concern that the file
21 might get merged with somebody else's?
22  A.    I don't know if there was a
23 secondary file out there or not.  I don't know
24 why they put that.

Page 66

```
1      Q.     Who would know the answer to that
2  question?
3      A.     The operator who put it in.
4      Q.     And who was that?
5      A.     I would say operator C6383.
6      Q.     And you don't know of any reason as
7  you sit here today why that would be done?
8      A.     Well, he's stating that he's a
9  senior, so it's possible that there was a junior
10 filed out there.  I don't know.
11     Q.     Did he notify Trans Union that he
12 was a senior and that he was concerned about
13 that?
14     A.     No, but he didn't dispute it when it
15 was reported on his report either.
16     Q.     He did or did not?
17     A.     He did not.
18     Q.     Okay.  You lost me.  So why is Trans
19 Union taking action on it?
20         MR. CENTO:  Objection; lack of
21     foundation, asked and answered.
22         THE WITNESS:  It's a precaution, if
23     there is another file out there, to prevent
24     it from getting combined or mixed.
```

Page 67

```
1  BY MR. LYONS:
2      Q.     But why now, why in January of '03?
3          MR. CENTO:  Asked and answered.
4  BY MR. LYONS:
5      Q.     You don't know?
6      A.     No, I don't.
7      Q.     Now, that preventative measure that
8  you just testified to, that's like a helpful
9  thing that Trans Union does for the consumer,
10 right?
11     A.     Yes.
12     Q.     Any other little helpful things that
13 Trans Union does for the consumer concerning him
14 not being dead?
15         MR. CENTO:  Vague and ambiguous;
16     objection.
17         THE WITNESS:  No.
18 BY MR. LYONS:
19     Q.     Were there any other disputes in the
20 history search summary after January of '03 for
21 Russell D. Anderson?
22     A.     No.
23     Q.     I'm going to show you a document
24 that hasn't been marked.  Here's Trans Union 051.
```

Page 68

```
1  Would you compare that to 052 and tell me if
2  there is a difference?
3      A.     One is Russell and one is Penny.
4              - - -
5          (Whereupon, Exhibit Trans Union-14
6      was marked for identification by the court
7      reporter.)
8              - - -
9  BY MR. LYONS:
10     Q.     I'm showing you TU254 through 258,
11 Ms. Little, which has been marked as Deposition
12 Exhibit 14.  Can you identify this document for
13 me please?
14     A.     It's a consumer disclosure dated
15 1/20/03 for Russell Anderson.
16     Q.     And do you know if this document was
17 sent to the Plaintiff?
18     A.     I don't know about this one or the
19 last one, but something was sent to him on
20 January 20th.  A disclosure was sent.
21     Q.     Well, if you look at this one on
22 page 255, it does show he's deceased?
23     A.     Well, then this would be the one
24 that they worked off of.  This would be the
```

Page 69

```
1  internal disclosure.
2      Q.     You hope that that's the case,
3  right?  You don't know that for sure, do you?
4      A.     Well, we know that the other one
5  didn't have the deceased comment, and I know she
6  changed it.
7      Q.     But can you say for sure which one
8  was actually sent?
9      A.     Yes.  The revised one had to be
10 sent.
11     Q.     Had to be because why?
12     A.     Because this was the initial
13 disclosure.  She went in, made the change, and
14 that's the result of the change.
15     Q.     And it's your testimony that you
16 believe, although you have no personal knowledge
17 of that, that that was the one that was sent?
18         MR. CENTO:  Objection;
19     mischaracterizes the witness's previous
20     testimony.
21         THE WITNESS:  I believe it was sent,
22     yes.
23              - - -
24          (Whereupon, Exhibit Trans Union-15
```

Eileen Little

Page 70

1  was marked for identification by the court
2  reporter.)
3          - - -
4  BY MR. LYONS:
5      Q.    I'm showing you what's been marked
6  as Deposition Exhibit 15. Can you identify this
7  document for me please?
8      A.    It's a corrected copy sent January
9  20, 2003 for Russell Anderson.
10     Q.    Same question for you. Is this the
11 one that was sent to Mr. Anderson?
12     A.    No, it is not.
13     Q.    So this one was not sent?
14     A.    This print was cancelled, and she
15 did a consumer disclosure and sent that one on
16 the same date.
17     Q.    So this one never got sent to Mr.
18 Anderson?
19     A.    That's correct.
20     Q.    Ms. Little, were you aware that,
21 after January 20, 2003, Plaintiff Russel Anderson
22 was again reported on a Trans Union credit report
23 as deceased?
24     A.    Yes.

Page 71

1      Q.    And how were you made aware of that?
2      A.    Yesterday when I was reviewing the
3  history.
4      Q.    What document were you reviewing?
5      A.    I thought there was a later
6  disclosure request that it was back on there.
7      Q.    Do you see a later disclosure
8  request in the history search summary?
9      A.    No, I don't see it on there.
10     Q.    Is that where it would be?
11     A.    If there was another disclosure,
12 yes.
13     Q.    And does this tell the date it was
14 printed?
15     A.    The history search?
16     Q.    Yes.
17     A.    No.
18     Q.    So where do you think you learned
19 that information that there was another request?
20         MR. CENTO: I'm going to object and
21 instruct her not to answer. I think I know
22 where she learned that. Attorney-client
23 privilege.
24 BY MR. LYONS:

Page 72

1      Q.    Do you believe you saw a document
2  that indicated that Mr. Anderson had been
3  reported by Trans Union again as deceased after
4  January of 2003?
5          MR. CENTO: Same objection, same
6  instruction. Don't answer.
7          MR. LYONS: Let's go off the record
8  for a minute.
9          - - -
10         (Whereupon, a brief discussion was
11 held off the record.)
12         - - -
13 BY MR. LYONS:
14     Q.    Do you know why Trans Union was
15 reporting Mr. Anderson as deceased after January
16 of 2002?
17     A.    Because that's how the creditor was
18 reporting it.
19     Q.    And do you know how Trans Union
20 received the information that Plaintiff Russell
21 Anderson was deceased?
22     A.    Do I know how Trans Union received
23 it?
24     Q.    Yes.

Page 73

1      A.    Through automated tape.
2      Q.    So it wasn't an update by UDF or a
3  letter from Cross Country Bank. Instead you
4  believe it was from the automated tape system?
5      A.    Yes.
6      Q.    And do you know whether or not
7  Plaintiff Russell Anderson disputed that with
8  Trans Union after January of 2003?
9      A.    I don't believe he did, no.
10     Q.    Is that currently the way it's
11 reporting right now as deceased?
12     A.    No. It was corrected in January of
13 '03.
14     Q.    Right. It was corrected in January
15 of '03 and then it came on subsequent to January
16 of '03 again, correct?
17         MR. CENTO: I'm going to object;
18 lack of foundation, beyond the scope of this
19 witness's knowledge.
20         THE WITNESS: I don't know because I
21 don't remember how I know that it was
22 rereported again. I don't know how it's
23 reporting as of today.
24 BY MR. LYONS:

Eileen Little

Page 74

1    Q.    But, as far as you know, was there
2  another dispute process after January of '03 to
3  attempt to correct the deceased being placed on
4  there after January of '03?
5    A.    No, there was not.
6    Q.    Do you know whether, as of today,
7  Russell Anderson is still being reported as
8  deceased on his Trans Union credit report?
9        MR. CENTO:  Same objection as my
10  previous objection.
11       THE WITNESS:  I have no idea what's
12  on his report as of today.
13              - - -
14       (Whereupon, Exhibit Trans Union-16
15  was marked for identification by the court
16  reporter.)
17              - - -
18  BY MR. LYONS:
19    Q.    Ms. Little, I'm showing you what's
20  been marked as Deposition Exhibit 16, TU272
21  through 278.  Can you identify this document for
22  me please?
23    A.    It's a consumer disclosure dated
24  3/30/04 on Russell Anderson.

Page 75

1    Q.    And it doesn't show that he is
2  deceased, correct?
3    A.    Correct.
4    Q.    If Trans Union changed the credit
5  report of Russell Anderson between January of '03
6  and March of '04, would that appear in any of the
7  documents that we've looked at already?
8        MR. CENTO:  Objection. I will
9  instruct the witness not to answer.
10  Attorney-client privilege and work product.
11  BY MR. LYONS:
12    Q.    Ms. Little, how does Trans Union
13  track changes made to a consumer's credit file
14  like Mr. Anderson?
15    A.    In the consumer relations
16  department, everything is tracked through the
17  consumer relations system.
18    Q.    And that's reported in the history
19  notes that we've looked at already?
20    A.    Yes.
21    Q.    So, if there had been a change made
22  between January of '03 and March of '04, it
23  should appear in that or that is where such a
24  change would occur?

Page 76

1        MR. CENTO:  Objection; vague and
2  ambiguous.  Change made by whom?
3        MR. LYONS:  Change made by Trans
4  Union.
5        MR. CENTO:  And I will instruct the
6  witness not to disclose any information that
7  she might know from her attorneys or that is
8  related to anything that happened after this
9  litigation was filed.
10       THE WITNESS:  The only change
11  consumer relations would have had would have
12  been up until the January of '03 dispute.
13  BY MR. LYONS:
14    Q.    And, if a change was made after
15  January of '03, then it wasn't made by consumer
16  relations.  Is that what you're telling me?
17    A.    Yes, yes.
18    Q.    Who else at Trans Union has the
19  ability to change a consumer credit file other
20  than consumer relations?
21    A.    Well, there would be the maintenance
22  center if they received a UDF, any kind of
23  update.  I mean they have the authority to make a
24  change.

Page 77

1    Q.    But that would be recorded in the
2  history notes, right?
3    A.    No, it would not.
4    Q.    Do they have their own set of notes?
5    A.    They have their own system, yes.
6    Q.    What is that system called?
7    A.    I don't know.  They're out in
8  Mississippi.
9    Q.    So that's one potential possibility.
10  Any others that you can think of?
11    A.    That's all I'm aware of.
12    Q.    Is it your understanding as you sit
13  here today that Russell Anderson was denied
14  credit in April of 2003?
15       MR. CENTO:  Objection; lack of
16  foundation.
17       THE WITNESS:  I have no idea if he
18  was denied credit in April of 2003.
19  BY MR. LYONS:
20    Q.    And you don't know how Trans Union
21  was reporting in April of 2003 about whether or
22  not Russell was alive or dead, correct?
23       MR. CENTO:  Asked and answered, lack
24  of foundation.

20 (Pages 74 to 77)

CIVIL ACTION GROUP 763.576.8832

Eileen Little

Page 78

```
 1          THE WITNESS:  Correct.
 2          MR. LYONS:  Those are all the
 3    questions I have on Russell.  We can take a
 4    break now.
 5                    -  -  -
 6          (Whereupon, a brief recess was held.
 7    Exhibit Trans Union-17 was marked for
 8    identification by the court reporter during
 9    the recess)
10                    -  -  -
11    BY MR. LYONS:
12          Q.    Ms. Little, we took a break.  I feel
13    comfortable moving on now from Russell to Penny,
14    so I'm going to shift your focus to Penny
15    Anderson and her disputes.
16          A.    Okay.
17          Q.    Ms. Little, I'm showing you what's
18    been marked as Deposition Exhibit 17.  That is
19    TU172 through 177.  Can you identify that
20    document for me?
21          A.    Consumer disclosure for Penny
22    Anderson dated 12/30/00.
23          Q.    And anywhere in Exhibit 17 does
24    Trans Union report that Penny Anderson is
```

Page 79

```
 1    deceased?
 2          MR. CENTO:  Objection to the form.
 3          THE WITNESS:  No.
 4    BY MR. LYONS:
 5          Q.    And the only Cross Country account
 6    that appears on Exhibit 17 is the Visa account?
 7          A.    Correct.
 8          Q.    And does it say when that account
 9    was opened?
10          A.    5/1998.
11          Q.    And do you know that to be accurate?
12          A.    I have no idea.
13          Q.    In your preparation for this
14    deposition, did you come to understand that the
15    Visa account that we see on TU174 was the same as
16    the MasterCard account that we looked at before
17    just with a different number?
18          A.    Yes.
19          Q.    So, when you look at TU174, do you
20    believe that the Cross Country Bank trade line,
21    where it says "Open 5 of 1998", probably refers
22    to the MasterCard account that was opened in 5 of
23    1998?
24          MR. CENTO:  Objection; asked and
```

Page 80

```
 1    answered, lack of foundation.
 2          THE WITNESS:  I don't believe it
 3    refers to it.  It's probably some of the
 4    same accounting history, but it's
 5    different.
 6    BY MR. LYONS:
 7          Q.    Different because of a different
 8    number?
 9          A.    Yes.
10          Q.    And by "number", you meant account
11    number, correct?
12          A.    Yes.
13                    -  -  -
14          (Whereupon, Exhibit Trans Union-18
15    was marked for identification by the court
16    reporter.)
17                    -  -  -
18    BY MR. LYONS:
19          Q.    Ms. Little, I'm showing you what's
20    been marked as Deposition Exhibit 18, which is
21    TU178 through TU183.  Can you identify this
22    document?
23          A.    Consumer disclosure 5/12/01 for
24    Penny Anderson.
```

Page 81

```
 1          Q.    Do you see the Cross Country Bank
 2    trade line?
 3          A.    Yes.
 4          Q.    For the Visa account, correct?
 5          A.    Yes.
 6          Q.    And it's not being reported as
 7    deceased?
 8          A.    No.
 9          Q.    Do you see any indication in the
10    Trans Union report that we've marked as
11    Deposition Exhibit 18 that would indicate that
12    Ms. Anderson was deceased?
13          A.    No, I don't.
14                    -  -  -
15          (Whereupon, Exhibit Trans Union-19
16    was marked for identification by the court
17    reporter.)
18                    -  -  -
19    BY MR. LYONS:
20          Q.    Ms. Little, I'm showing you what's
21    been marked as Deposition Exhibit 19, TU184
22    through 189.  Can you identify this document for
23    me please?
24          A.    This is TU190 through 195.
```

21 (Pages 78 to 81)

Eileen Little



Page 82

1    Q.    I'm glad that you were paying
2  attention to that.  Thank you very much.
3          Can you identify Exhibit 19 please?
4    A.    Consumer disclosure dated 11/15/01
5  for Penny Anderson.
6    Q.    Again, do you see any deceased
7  information contained within that Trans Union
8  report?
9    A.    No.
10                    - - -
11         (Whereupon, Exhibit Trans Union-20
12  was marked for identification by the court
13  reporter.)
14                    - - -
15  BY MR. LYONS:
16    Q.    I'm showing you now what has been
17  marked as Deposition Exhibit 20, TU196 through
18  TU201, correct?
19    A.    Yes.
20    Q.    Can you identify that document for
21  me?
22    A.    Consumer disclosure dated 2/28/02
23  for Penny Anderson.
24    Q.    And does that report indicate

Page 83

1  anywhere that Mrs. Anderson is deceased?
2    A.    No.
3                    - - -
4          (Whereupon, Exhibit Trans Union-21
5  was marked for identification by the court
6  reporter.)
7                    - - -
8  BY MR. LYONS:
9    Q.    Ms. Little, I'm showing you what's
10  been marked as Deposition Exhibit 21, which is
11  TU202 through 207, correct?
12    A.    Yes.
13    Q.    And can you identify that document
14  for me?
15    A.    Consumer disclosure dated 11/13/02
16  for Penny Anderson.
17    Q.    If you would look then inside of
18  Exhibit 21, do you see any reference to Trans
19  Union's report containing information on Penny
20  being deceased?
21          MR. CENTO:  Objection to form.
22          THE WITNESS:  Yes.
23  BY MR. LYONS:
24    Q.    On what page?

Page 84

1    A.    203.
2    Q.    And she's being reported as deceased
3  related to the Cross Country Visa account that we
4  talked about earlier?
5    A.    Yes.
6    Q.    Anywhere else on the report?
7    A.    No.
8    Q.    Now, if you would turn to page 204,
9  you would agree with me, would you not, that
10  there was another Cross Country Bank account in
11  that report?
12    A.    Yes.
13    Q.    And does it bear the same or a
14  different number?
15    A.    It's a different number.
16    Q.    And it also is a Visa account,
17  correct?
18    A.    Yes, it is.
19    Q.    And that account was closed,
20  correct?
21    A.    Yes.
22                    - - -
23         (Whereupon, Exhibit Trans Union-22
24  was marked for identification by the court

Page 85

1  reporter.)
2                    - - -
3  BY MR. LYONS:
4    Q.    I'm showing you what has been marked
5  as Deposition Exhibit 22, which should be TU53
6  through TU128, and then the very last page is
7  TU279; is that correct?
8    A.    That's correct.
9          MR. CENTO:  Let's go off the record
10  please.
11                    - - -
12         (Whereupon, a brief discussion was
13  held off the record.)
14                    - - -
15  BY MR. LYONS:
16    Q.    Now, we took a short break and
17  looked through Exhibit 22, and it was determined
18  that TU0075 is not contained within your Exhibit
19  22, nor do I believe it's ever been produced
20  because I don't have a copy of it either.
21          Now, Ms. Little, in reviewing
22  Exhibit 22, can you determine when was the first
23  time that Mrs. Anderson disputed anything with
24  Trans Union?

22 (Pages 82 to 85)

Eileen Little

Page 86

1    A.    November 15, 2001.
2    Q.    And what page are you looking at?
3    A.    TU91.
4    Q.    And can you tell from TU91 what the
5  purpose of the communication was?
6    A.    No.
7    Q.    Do you know whether or not it was a
8  dispute?
9    A.    It was a telephone call that
10  resulted in a dispute, yes.
11    Q.    And do any of the other documents
12  contained within Exhibit 22 assist you in
13  determining what kind of a dispute it was or what
14  was the subject matter of the dispute?
15    A.    No, there's nothing in these
16  documents on that.
17    Q.    Do the history search summary notes
18  ever get purged after a certain length of time?
19    A.    They are archived, but they're still
20  there. You could restore it.
21    Q.    But would they still be appearing as
22  we see them on page 91 if there was something
23  before November 2001?
24        Do you understand my question?

Page 87

1    A.    No.
2    Q.    You said that there are some notes
3  that may be archived, correct?
4    A.    No. You asked me the question do
5  they ever disappear? I said no, they're
6  archived.
7    Q.    But then are they still visible on
8  the history search summary?
9    A.    Yes. If the history search summary
10  is archived, then everything is there. It's not
11  like pieces of it would be archived. The whole
12  thing would be archived.
13    Q.    So is there any contact between
14  Penny Anderson and Trans Union before November of
15  2001 showing on TU91?
16    A.    No.
17    Q.    But was there contact between Penny
18  and Trans Union before November of 2001?
19    A.    Not that I'm aware of.
20    Q.    Would you look at Trans Union 060
21  through 065. Is there an indication that there
22  was communications between Penny and Trans Union
23  in 2001?
24    A.    In 2001, yes.

Page 88

1    Q.    And what kind of communication was
2  there between Penny and Trans Union in January of
3  2001?
4    A.    Well, there had to be a dispute
5  based on these screen prints.
6    Q.    And that's what I took from them as
7  well, but then, when I look back at 091, I don't
8  see that dispute reflected in the history search
9  summary.
10        MR. CENTO:  Could we be missing the
11  summary?
12        THE WITNESS:  You are because it's a
13  different file number here, 00550044.
14  That's what you don't have.
15  BY MR. LYONS:
16    Q.    What does that mean, that there is a
17  different file number?
18    A.    There is probably another history
19  search summary screen based on this file number.
20    Q.    And is that a fragmented file?
21    A.    No.
22    Q.    It's just another file?
23    A.    Yes.
24    Q.    So how about TU066, does that relate

Page 89

1  to the 044 file number?
2    A.    I don't know.
3    Q.    Did you see on TU191 where it says
4  "Redacted"?
5    A.    Yes.
6    Q.    Why is that there?
7    A.    I didn't put it there. You would
8  have to ask John.
9        MR. LYONS:  Off the record.
10        - - -
11        (Whereupon, a brief discussion was
12  held off the record.)
13        - - -
14  BY MR. LYONS:
15    Q.    Back to January 16, 2001, looking at
16  TU60 through 65, this appears to be some kind of
17  a dispute concerning a collection account that
18  Ms. Penny Anderson had?
19    A.    Yes.
20    Q.    And do you know whether or not --
21  well, do you know what the dispute was about from
22  looking at 60 through 65?
23    A.    I would think, based on the changes
24  that were made, she was disputing the balance,

Eileen Little

Page 90

```
1    stating it was paid.
2        Q.    And that change was made?
3        A.    Yes, it was.
4        Q.    And was that favorable to the
5    consumer?
6        A.    Yes.
7        Q.    And does it reflect that in TU60
8    through 61?
9        A.    No.
10       Q.    Why?
11       A.    Because they didn't send the
12   verification form.  They're using the
13   documentation she supplied to make that change.
14       Q.    What documentation was that?
15       A.    I don't know.  I would have to see
16   what she sent in in January.
17       Q.    But do you know something was sent
18   in?
19       A.    In the DAVE field, they have "Per
20   doc", so I'm sure she sent something in.
21       Q.    Where did you see that?
22       A.    In the DAVE field on 60.
23       Q.    Where it says "Per doc???"
24       A.    Yes.
```

Page 91

```
1        Q.    And then, if you look at 062, does
2    that show that the account then was changed to
3    paid?
4        A.    Yes.
5        Q.    Then, if you would go to 063, there
6    seems to be a comment.  I'm wondering if you
7    could help me with what that is?
8        A.    There had to be other documentation
9    that was sent in, and the operator went in and
10   put in why she would not accept the one piece of
11   documentation.  It had a different account number
12   on it.
13       Q.    And then, if you could look at 64
14   and 65, is this a separate dispute or the same
15   dispute?
16       A.    You mean the same time?
17       Q.    Yes.
18       A.    It's the same time.
19       Q.    But does it appear to be involved
20   with a different trade line?
21       A.    Yes.
22       Q.    And was there any change made
23   regarding the trade line that we see on 64?
24       A.    This was cloaked based on the
```

Page 92

```
1    creditor's instructions.
2        Q.    And, on 64, the operator ID was
3    what?
4        A.    This is an auto response.
5        Q.    And, if you could look at 066, is
6    this having to do with the same dispute?
7        A.    No.
8        Q.    This is different?
9        A.    It has the same account number, but
10   the subscriber name here is different.
11       Q.    It looks like, on 064, it's Arizona
12   Public Service Company, and on 066 it looks like
13   Arizona Public Service Company, right?
14       A.    I don't see where you're seeing the
15   Arizona.
16       Q.    Up at the top?
17       A.    Oh, okay, yes.
18       Q.    So do you think it's the same?
19       A.    Yes.
20       Q.    And the audit trail 066 related to
21   this January 16, 2001 dispute was that the
22   information that Penny Anderson was disputing was
23   cloaked or suppressed by the data furnisher?
24       A.    Yes.
```

Page 93

```
1        Q.    And that dispute concerning Arizona
2    Public Service Company, that was a more favorable
3    change, correct?
4             MR. CENTO:  Object to the form.
5             THE WITNESS:  Yes.
6    BY MR. LYONS:
7        Q.    And it was marked as such in the
8    trade set detail, correct?
9        A.    Yes.
10       Q.    So is it fair to say that both items
11   that Mrs. Anderson was disputing in January of
12   2001 were resolved the way she wanted them to be?
13       A.    Yes.
14       Q.    If you would refer to the history
15   search summary contained within Deposition
16   Exhibit 22 again please, on page 092, it also
17   appears that there is information redacted.  Do
18   you see that?
19       A.    Yes.
20       Q.    And do you have any idea why that
21   was redacted?
22       A.    No.
23       Q.    And, if you would look at 125
24   through 128, does that appear to be the same as
```

24 (Pages 90 to 93)

Eileen Little

Page 94

```
 1   91 through 94?
 2       A.    What was that again?
 3       Q.    91 through 94 and 125 through 128,
 4   are those the same?
 5       A.    Yes.
 6       Q.    Do you see, on page TU94, where it
 7   says "More" under the last line?
 8       A.    Yes.
 9       Q.    What does that mean?
10       A.    It means that there's additional
11   FINs under that consumer's information.
12       Q.    Additional file numbers?
13       A.    Right.
14       Q.    And we already talked about that
15   before.  There was an additional file number for
16   Penny Anderson?
17       A.    Yes.
18       Q.    Now, why would there be an
19   additional file number for Penny Anderson?
20       A.    It's possible that some of her other
21   files may have been archived, and they created a
22   new FIN rather than restore the old one.
23       Q.    And is it also possible that there
24   is a fragmented file?
```

Page 95

```
 1       A.    No. Fragmented files refers to files
 2   within a different database, not the consumer
 3   relations system.
 4            MR. LYONS:  Let's take a short
 5   break.
 6                  - - -
 7            (Whereupon, a lunch recess was
 8   held.)
 9                  - - -
10   BY MR. LYONS:
11       Q.    Ms. Little, in looking back on the
12   history search summary, the first indication of a
13   dispute according to this document is in November
14   of 2001; is that correct?
15       A.    Yes.
16       Q.    And, in looking through any of the
17   documents contained in Deposition Exhibit 22, did
18   you find any related to a November 2001 dispute?
19       A.    No.
20       Q.    And that may be because it may
21   belong to a different FIN number, or why do we
22   not see any in here?
23       A.    I don't know.
24       Q.    So potentially that dispute in --
```

Page 96

```
 1       A.    Well, actually TU067, that's the
 2   same FIN number.
 3       Q.    The FIN number on 067 matches the
 4   FIN number found on TU91, correct?
 5       A.    Yes.
 6       Q.    But does that show what the dispute
 7   was related to?
 8       A.    No.
 9       Q.    What does TU067 show?
10       A.    It just shows you that they had
11   typed over the last name. That's all.
12       Q.    Do you see anything else related to
13   that November 15, 2001 dispute?
14       A.    No.
15       Q.    So it's potentially possible that
16   Mrs. Anderson may have been disputing something
17   about Cross Country Bank at that time; is that
18   correct?
19       A.    I don't know without seeing the
20   documents or her letter of dispute or something.
21       Q.    The next contact between Penny
22   Anderson and Trans Union is when according to the
23   history search summary?
24       A.    February of '02.  She got a copy of
```

Page 97

```
 1   her credit report. Then the next dispute would
 2   have been November 6, 2002.
 3       Q.    And the November 6 dispute is the
 4   dispute that we discussed previously in Trans
 5   Union Deposition Exhibit 5, correct?
 6       A.    Yes.
 7       Q.    Would you turn to TU73 and TU74
 8   please.  Tell me if those two documents are
 9   related to the November 2002 dispute?
10       A.    Yes.
11       Q.    And TU0073 indicates what?
12       A.    How the account was originally being
13   reported and then what correction was going to be
14   made.
15       Q.    And were there any corrections made?
16       A.    Just the payment history.
17       Q.    And what change to the payment
18   history was made?
19       A.    They were going to remove that.
20       Q.    They deleted the payment history,
21   correct?
22       A.    Yes.
23       Q.    But the deceased information was
24   verified as accurate; is that correct?
```

25 (Pages 94 to 97)

Eileen Little

Page 98

1    A.    Yes.
2    Q.    And was that an automated response
3  from Cross Country Bank to Trans Union?
4    A.    Yes.
5                      - - -
6          (Whereupon, Exhibit Trans Union-23
7    was marked for identification by the court
8    reporter.)
9                      - - -
10  BY MR. LYONS:
11    Q.    Ms. Little, I'm showing you what's
12  been marked as Exhibit 23.  This is TU0051.  Can
13  you identify this document for me?
14    A.    It's a copy of an ACDV that was sent
15  to Cross Country.
16    Q.    By Trans Union, correct?
17    A.    Yes.
18    Q.    And this is similar, is it not, to
19  the ACDV related to Russell Anderson that we
20  previously marked as Deposition Exhibit 8?
21          MR. CENTO:  Object to the form.
22          THE WITNESS:  It's similar, yes.
23  BY MR. LYONS:
24    Q.    And the only difference is that --

Page 99

1  well, you tell me what the differences are
2  please?
3    A.    On TU051, they don't have the
4  asterisk under the ECOA.  Their remarks are
5  different.  On Penny's, it says "Deceased, not
6  deceased.  Account open."  Then on Russell's, it
7  says "Deceased, not deceased.  Joint consumer."
8    Q.    And does it appear that it was the
9  same Cross Country Bank employee that verified or
10  authorized the changes?
11    A.    Yes.
12    Q.    Anything else similar or is there
13  anything else different from the two ACDVs?
14    A.    No.
15                      - - -
16          (Whereupon, Exhibit Trans Union-24
17    was marked for identification by the court
18    reporter.)
19                      - - -
20  BY MR. LYONS:
21    Q.    I'm showing you what has been marked
22  as Deposition Exhibit 24.  Does it bear bates
23  labels TU7 through 13?
24    A.    Yes.

Page 100

1    Q.    And can you identify that document
2  for me please?
3    A.    It's the revised copy of our
4  November dispute dated 11/26/02.
5    Q.    And the results of the investigation
6  were what?
7    A.    It was verified no change.
8    Q.    Now, did anyone from Trans Union
9  call Mr. or Mrs. Anderson in November of 2002 to
10  the best of your recollection?
11    A.    Not that I'm aware of, no.
12    Q.    And you would agree with me, would
13  you not, that Deposition Exhibit 5, the November
14  2002 dispute letter, has a daytime telephone
15  number for Penny and Russell Anderson, correct?
16    A.    Yes, it does.
17    Q.    And is it fair to say that it's not
18  Trans Union's policy or procedure in
19  investigating a dispute to call the consumer?
20    A.    That's correct.
21    Q.    And Trans Union wasn't seeking any
22  additional information from the Andersons in
23  November of 2002 to investigate the Andersons'
24  dispute, were they?

Page 101

1    A.    No.
2    Q.    Was there any additional information
3  that the Andersons could have provided to Trans
4  Union in November of 2002 to prove that they were
5  alive?
6    A.    No.
7    Q.    And is it fair to say that Trans
8  Union believed that they were alive?
9    A.    Yes.
10    Q.    And is it fair to say that,
11  regardless of what Trans Union believed, as long
12  as Cross Country Bank told Trans Union that the
13  Andersons were dead, then that's how Trans Union
14  was going to report the Cross Country Bank trade
15  line on the Trans Union report?
16    A.    Again, the deceased comment is
17  referring to part of the account history.  So, if
18  it's part of the history and they're reporting
19  that, then yes, it would stay on the report.
20    Q.    Regardless of what the Andersons
21  tell Trans Union, correct?
22          MR. CENTO:  Object to form.
23          THE WITNESS:  Well, they can put a
24  statement on their file based on the

Eileen Little

Page 102

1  documentation. Even though the bank
2  reverified it as verified as reported, based
3  on the documentation they provided, it was
4  changed.
5  BY MR. LYONS:
6  Q.   Based on the documentation that the
7  Andersons provided in November of 2002?
8  A.   No; at the later date when we get
9  that January 8th letter.
10  Q.   But in November of 2002 --
11  A.   We relied on the creditor's
12  response, yes.
13  Q.   Exclusively, correct?
14  A.   Yes.
15  Q.   After November of 2002, when is the
16  next time that Trans Union is contacted by Penny
17  Anderson?
18  A.   January of '03.
19  Q.   And do you know the exact date?
20  A.   January 7th.
21  Q.   And you're referring to TU093?
22  A.   Yes.
23  Q.   And, if you will look at Deposition
24  Exhibit 22, specifically page 76, can you

Page 103

1  identify what this comment means?
2  A.   We received a call from Mr.
3  Anderson. He was going to fax over a letter from
4  the bank regarding the deceased comment. It
5  should cover him and his spouse, and they'll put
6  the file number on the letter. They gave out
7  4606 as our fax number.
8  Q.   Is that the fax number?
9  A.   Yes.
10  Q.   And then, if you would turn to page
11  77 please, can you identify or explain to me what
12  this comment means?
13  A.   "Last F4 forwarded to priority for
14  mortgage pending." The F is the key that we
15  would hit to get to the comment screen. So she's
16  saying the last F4 comment was forwarded to
17  priority for mortgage pending.
18  Q.   And do you believe that's related to
19  some mortgage they were trying to get in January
20  of '03?
21  A.   Yes.
22  Q.   And do you know who Operator C5846
23  is?
24  A.   No.

Page 104

1  Q.   And then did the file go to priority
2  processing?
3  A.   I believe it did, yes. Yes, the
4  next screen, page 78, says "Received PP." That
5  means received by priority processing.
6  Q.   And the next page on 79?
7  A.   Just stating that they received a
8  one-page fax 1/8/03.
9  Q.   Can you turn back to 78 just for a
10  minute. This looks like a different operator
11  entering the comment on page 78; is that correct?
12  A.   Yes, I believe it was.
13  Q.   Now, why would a different operator
14  be assigned or be entering comments?
15  A.   Because they forwarded it to
16  priority processing. When priority gets it, this
17  is the operator going in and making that comment.
18  Q.   And then, if you look on 79, it has
19  a different operator ID number on page 79,
20  correct?
21  A.   Right.
22  Q.   And that would have been the
23  operator that received the fax?
24  A.   Yes.

Page 105

1  Q.   And the fax that is being discussed
2  and commented on by Trans Union is what we've
3  previously marked as Deposition Exhibit 10?
4  A.   Yes.
5  Q.   Now, if you turn to TU080, can you
6  identify for me what this comment means?
7  A.   Based on the fact that it was
8  outsourced to priority as a mortgage pending,
9  they attempted to do a phone verification and the
10  bank would not verify over the phone.
11  Q.   And is that typical or not typical
12  that a data furnisher would not verify something
13  with TU over the phone?
14  MR. CENTO: Object to the form.
15  THE WITNESS: There are many
16  subscribers that will not release any
17  information over the phone.
18  BY MR. LYONS:
19  Q.   But Trans Union has some kind of a
20  relationship with these data furnishers, do they
21  not?
22  MR. CENTO: Object to the form.
23  THE WITNESS: Yes.
24  BY MR. LYONS:

27 (Pages 102 to 105)

Eileen Little

Page 106

1   Q.   And are they supposed to release
2 information to you over the phone?
3   A.   No. They have to respond when we
4 send the verification forms out, but they don't
5 have to release any information over the phone.
6   Q.   And we may have talked about this
7 before, but is it your understanding that a CDV
8 was sent to Cross Country Bank at this time?
9   A.   I believe it was.
10   Q.   So, in addition to doing the phone
11 verification, they also sent a CDV?
12   A.   Yes.
13   Q.   And the CDV turned out how?
14   A.   Well, I don't know that we got that
15 CDV back.  This is where they used to document to
16 change it.
17   Q.   And your' re looking at 81?
18   A.   81, 82 and 83.
19   Q.   And 81 shows what?
20   A.   The operator went in and removed the
21 deceased remark.
22   Q.   But failed to change the?
23   A.   ECOA.
24   Q.   And do you know which operator that

Page 107

1 is?
2   A.   5383.  I don't know who it is.
3   Q.   And, when a Trans Union operator
4 fails to make the proper change, is there any
5 disciplinary action taken against that operator?
6       MR. CENTO:  Object to the form.
7       THE WITNESS:  If we're aware of it,
8   then it would count against your quality
9   control stats, yes.
10 BY MR. LYONS:
11   Q.   And do you know if that operator was
12 ever reprimanded for failing to properly notate
13 the Trans Union file?
14   A.   I don't know that this file ever had
15 any QAs done on it prior to us receiving the
16 complaint.
17   Q.   If you would turn to page 82 please.
18   A.   Okay.
19   Q.   There is a comment or a claim or a
20 dispute code entered of B7.  That was the same
21 code we saw before when we talked about Russell
22 Anderson's case.  Do you remember that?
23   A.   Yes.
24   Q.   But now there is an additional A4

Page 108

1 code there.  Do you see that?
2   A.   Yes.
3   Q.   And the A4 code means what?
4   A.   A4 is consumer not liable for
5 account, verified ECOA code, provide complete ID.
6   Q.   So is that dispute relevant to the
7 dispute that Penny Anderson tried to initiate?
8   A.   I believe it is, yes.
9   Q.   But she wasn't claiming that she
10 wasn't liable for the account, was she?
11   A.   No, but she's disputing the remarks
12 comment, and that's being generated by the ECOA.
13 So we're asking for a vote.
14   Q.   If a consumer is worried about or is
15 disputing the deceased code or -- let me start
16 over.  Strike that.
17       If a consumer is disputing with
18 Trans Union saying that they're not deceased,
19 what code or codes should be entered?
20   A.   I believe it should be A4 and B7.
21   Q.   Should be both?
22   A.   I would think so, yes.
23   Q.   So one code is not necessarily
24 enough; is that fair to say?

Page 109

1   A.   Well, no, because it is enough.
2 You'll see on the other ACDVs that we had, the
3 creditor addressed those issues, but their
4 request was overrode by the fact that they put
5 verified as reported. So the fact that didn't
6 have an A4 didn't change that response.  It's
7 still addressed to ECOA code.
8   Q.   But would you agree with me that, by
9 putting down both codes as opposed to just one
10 code, then there would be protection in the
11 future.  If the same account comes on again as a
12 deceased and the consumer wanted to dispute it,
13 there would at least be record that that code had
14 been used, correct?
15       MR. CENTO:  Objection; asked and
16   answered.
17 BY MR. LYONS:
18   Q.   Do you follow what I'm saying?
19   A.   No, I don't.  It's not going to
20 prevent it from being reported.
21   Q.   No, but, if I understand some of the
22 testimony that I received yesterday from Trans
23 Union employees, if a B7 code is entered, and six
24 months later there's another dispute concerning

28 (Pages 106 to 109)

Eileen Little

Page 110

1 the same trade line and the B7 code is entered
2 again, that will cause the system to alert the
3 operator; is that correct?
4         MR. CENTO: Objection; lacking
5 foundation, calls for speculation and
6 mischaracterizes testimony given yesterday
7 in another non-related case. You can answer
8 if you can.
9         THE WITNESS: If they use the same
10 claim code and it's the same trade line, and
11 we previously investigate within a
12 certain -- I think it's 59 days. They'll
13 say that this was previously investigated,
14 and the system will generate a letter saying
15 it's already been previously verified. If
16 they use a different claim code, then the
17 verification is going to go out.
18 BY MR. LYONS:
19     Q.    I appreciate that clarification.
20         So the notice about the 50 days or
21 the time limit on the 59 days, that doesn't alert
22 the operator, does it? That just sends out an
23 automatic letter, correct?
24     A.    The operator does see something that

Page 111

1 they will be able to override it.
2     Q.    The operator will be able to
3 override the letter that would be sent out?
4     A.    Yes, yes.
5     Q.    But that cue or that timeframe is
6 only 59 days?
7     A.    I believe it's 59 days and maybe 120
8 for ownership if they're disputing it's not my
9 account.
10     Q.    Would it be in compliance with Trans
11 Union's policies and procedures to just state one
12 code as opposed to the two that we see here on
13 TU82?
14         MR. CENTO: Objection; vague and
15 ambiguous, asked and answered.
16         THE WITNESS: Yes, I think they
17 could use just the one code.
18 BY MR. LYONS:
19     Q.    Let me rephrase that because I don't
20 think you understood my question.
21         If you use both dispute codes, is
22 that what Trans Union would prefer that the
23 operators do?
24         MR. CENTO: Objection; vague and

Page 112

1 ambiguous, asked and answered.
2         THE WITNESS: It provides additional
3 information, yes. Both codes can be used.
4 In my case, I think they both should be
5 used.
6 BY MR. LYONS:
7     Q.    They both should be used?
8     A.    I think so, yes.
9     Q.    Then, if you turn to TU83, is that
10 the audit trail for this January 2003 dispute?
11     A.    Yes, yes.
12     Q.    Showing what?
13     A.    They deleted the deceased comment as
14 of January 2003, but they did not change the
15 ECOA.
16     Q.    And TU00085, that appears to be a
17 change that was also made on Penny Anderson's
18 account on January 7, 2003; is that correct?
19     A.    Yes.
20     Q.    And that change was what?
21     A.    They added the "Do not merge"
22 statement.
23     Q.    And we talked about that before with
24 Russell, and you're not sure why that change was

Page 113

1 made; is that correct?
2     A.    Yes, yes.
3     Q.    What do TU86 and 87 represent?
4     A.    This is again audit trail of
5 maintenance information, and the only thing that
6 will show you is that, on 86, there was nothing
7 done in those fields. On 87, it will show you
8 the "Do not merge" was added.
9     Q.    Thank you.
10         Would you agree with me that 112
11 through 117 appear to be duplicates of 81 through
12 85?
13     A.    Yes, these are all duplicates.
14     Q.    Is 119, 120 and 121 a duplicate as
15 well?
16     A.    Yes, 119, 120 and 121 are
17 duplicates.
18     Q.    Now, focusing on TU88, it appears
19 that, on or about January 20, 2003, an additional
20 dispute was received by Trans Union; is that
21 correct?
22     A.    This is dated 1/20/03, right. This
23 is based on the telephone call we received.
24     Q.    And the phone call is referenced in

29 (Pages 110 to 113)

Page 114

1 TU118; is that correct?
2    A.   Yes.
3    Q.   And that 118 indicates what comment?
4    A.   "Consumer called regarding the CBC
5 account reporting consumers deceased.  CBC
6 removed DEC remark, but did not change ECOA.
7 Updated remark in ECOA."
8    Q.   And TU88 and 89 and 90 show that
9 change that should have been made the first time
10 but is now being made on January 20, 2003,
11 correct?
12   A.   Yes.
13   Q.   122, 123 and 124, do those go
14 together related to the January 20, 2003 dispute?
15   A.   Yes.
16   Q.   And do those appear to be
17 duplicates?
18   A.   Yes.
19          - - -
20       (Whereupon, Exhibit Trans Union-25
21 was marked for identification by the court
22 reporter.)
23          - - -
24 BY MR. LYONS:

Page 115

1    Q.   Ms. Little, I'm showing you what's
2 been marked as Deposition Exhibit 25.  That
3 should be TU208 through TU213; is that correct?
4    A.   No.  It's 14 through 20.
5    Q.   TU14 through 20?
6    A.   Yes.
7       MR. LYONS:  For the record, TU14
8 through 20 is Deposition Exhibit 25, and
9 TU208 through 213 is Exhibit 26.  Let's go
10 ahead and mark that.
11          - - -
12       (Whereupon, Exhibit Trans Union-26
13 was marked for identification by the court
14 reporter.)
15          - - -
16 BY MR. LYONS:
17   Q.   Let's look at 26 first.  Can you
18 identify that document for us please?
19   A.   It's a consumer disclosure that was
20 sent January 7, 2003.
21   Q.   And that continues to have the
22 consumer deceased information in the TU report
23 related to Cross Country Bank account number
24 6736, correct?

Page 116

1    A.   Yes.
2    Q.   And 25 is what?
3    A.   The results of the changes made on
4 1/13.
5    Q.   Which again show that the Cross
6 Country Bank trade line ending 6736 is still
7 being reported as deceased, correct?
8    A.   Yes.
9    Q.   Do the operators look at the
10 disclosures before they get sent out?
11   A.   No.
12   Q.   Does any human being ever look at a
13 disclosure at Trans Union before it gets sent
14 out?
15   A.   No.
16          - - -
17       (Whereupon, Exhibit Trans Union-27
18 was marked for identification by the court
19 reporter.)
20          - - -
21 BY MR. LYONS:
22   Q.   I'm showing you what has been marked
23 as Deposition Exhibit 27.  Can you identify this
24 document for us please?

Page 117

1    A.   It's a consumer disclosure dated
2 January 20, 2003.
3    Q.   And the deceased information that
4 was previously being reported as inaccurate has
5 now been corrected; is that your testimony?
6    A.   Yes.
7          - - -
8       (Whereupon, Exhibit Trans Union-28
9 was marked for identification by the court
10 reporter.)
11          - - -
12 BY MR. LYONS:
13   Q.   I'm showing you what has been marked
14 as Deposition Exhibit 28.  Can you identify this
15 document for me, Ms. Little?
16   A.   This is, I would say, an internal
17 disclosure that was pulled January 20, 2003.
18   Q.   But this disclosure shows the Cross
19 Country Bank ending at 9285 as being -- strike
20 that.
21       This disclosure shows Cross Country
22 Bank account number 6736 reported as deceased; is
23 that right?
24   A.   That's correct.

30 (Pages 114 to 117)

Eileen Little

Page 118

1           - - -
2           (Whereupon, Exhibit Trans Union-29
3     was marked for identification by the court
4     reporter.)
5           - - -
6   BY MR. LYONS:
7     Q.    Can you identify Exhibit 29 please?
8     A.    This is the revised copy after the
9   change was made on January 20, 2003.
10    Q.    And there is no deceased reporting
11  contained within Exhibit 29, correct?
12    A.    Correct.
13          - - -
14          (Whereupon, Exhibit Trans Union-30
15    was marked for identification by the court
16    reporter.)
17          - - -
18  BY MR. LYONS:
19    Q.    Ms. Little, I'm showing you what has
20  been marked as Deposition Exhibit 30. It should
21  be TU227 through TU234. Do you have that
22  document in front of you?
23    A.    Yes.
24    Q.    Can you identify this document?

Page 119

1     A.    It's a consumer disclosure for Penny
2   Anderson dated June 17, 2003.
3     Q.    And, if you would look at TU94, does
4   it show that this disclosure was requested by
5   Mrs. Anderson?
6     A.    Yes.
7     Q.    On or about June 17th?
8     A.    Right.
9     Q.    It was requested by phone or in
10  writing?
11    A.    I believe she called our automated
12  disclosure number.
13    Q.    Does anybody at Trans Union -- I
14  think I already asked you this before. Nobody at
15  Trans Union looks over the disclosures before
16  they go out, correct?
17    A.    Correct.
18    Q.    In Deposition Exhibit 30, again,
19  Penny L. Anderson is being reported as deceased;
20  is that correct?
21          MR. CENTO: Object to the form.
22          THE WITNESS: Yes.
23  BY MR. LYONS:
24    Q.    Related to Cross Country Bank

Page 120

1   account 6736, correct?
2     A.    Yes.
3     Q.    Do you know why this inaccurate
4   information is back on Penny Anderson's credit
5   report?
6     A.    Just that it was rereported in June
7   of 2003 by the bank.
8     Q.    And do you believe that is the month
9   that it was first reported back by the bank?
10    A.    I don't know when it was first
11  reported. I mean our last activity was January.
12  The next activity is June.
13    Q.    Are you aware of any communication
14  between Trans Union and Cross Country Bank after,
15  or at any time for that matter, related to the
16  Andersons about why they keep reporting the
17  Plaintiffs as deceased?
18    A.    I'm not aware of anything.
19    Q.    Would that be something that your
20  department would handle, or who would handle
21  communications like that to find out why they
22  keep reporting inaccurate information?
23    A.    I don't know what area would handle
24  that.

Page 121

1     Q.    But you know it's not yours?
2     A.    Right.
3     Q.    Do you think this type of
4   rereporting of obviously inaccurate information
5   makes Cross Country Bank an unreliable source of
6   information?
7           MR. CENTO: Objection; calls for
8     speculation. It calls for the witness, who
9     is a fact witness, to give his opinion. You
10    can answer if you can.
11          THE WITNESS: I don't know that my
12    opinion would matter. I mean they're a
13    subscriber.
14  BY MR. LYONS:
15    Q.    Well, do you think this is an
16  indication of unreliability by the data
17  furnisher?
18          MR. CENTO: Same objection, also
19    lack of foundation. You can answer.
20          THE WITNESS: In this case, yes.
21  BY MR. LYONS:
22    Q.    If you could look back at Deposition
23  Exhibit 29 -- I'm sorry. Deposition Exhibit 28
24  please.

31 (Pages 118 to 121)

Eileen Little

Page 122

1    A.    Yes.
2    Q.    Neither 28 nor 29 actually provide
3  an indication in the trade line of Cross Country
4  Bank 6736 -- trade line that shows that the
5  consumer had disputed that trade line; is that
6  correct?
7    A.    Correct.
8          - - -
9          (Whereupon, Exhibit Trans Union-31
10   was marked for identification by the court
11   reporter.)
12         - - -
13 BY MR. LYONS:
14   Q.    I'm showing you what's been marked
15 as Deposition Exhibit 31, TU265 through 261,
16 correct?
17   A.    Yes.
18   Q.    And what is Exhibit 31?
19   A.    It's a disclosure dated 3/30/04 for
20 Penny Anderson.
21   Q.    And is there any indication in this
22 report that Penny was deceased?
23   A.    No.
24   Q.    How does Trans Union stop Cross

Page 123

1  Country Bank from reporting inaccurate
2  information about Penny being dead when she's
3  not?
4          MR. CENTO:  Objection; vague and
5    ambiguous, calls for speculation, improper
6    foundation.  Go ahead.
7          THE WITNESS:  The only way to
8    prevent it is to cloak the entire account.
9  BY MR. LYONS:
10   Q.    That's the only way to do it; that
11 would be the only way to stop them?  Well, that's
12 not really stopping them.  That's just Trans
13 Union taking a precaution against them doing it
14 again, right?
15   A.    Right.
16   Q.    Has that been done?
17   A.    I don't know.
18   Q.    If Trans Union had done that, would
19 it should up in the history search summary?
20   A.    Another department or another
21 division of Trans Union could have done it, but
22 consumer relations did not do it.
23   Q.    Who is your equivalent, if you know,
24 in the maintenance department?

Page 124

1    A.    Probably Gwen Bower.
2    Q.    So Gwen Bower in maintenance, and
3  you said they were in Alabama?
4    A.    Mississippi.
5    Q.    And does Trans Union have an
6  internal legal department as well?
7    A.    Yes.
8    Q.    And where are they located at?
9    A.    Chicago.
10   Q.    And who is your contact person
11 there?
12   A.    At corporate?
13   Q.    At corporate legal.
14   A.    Dan Halverson or Pat Norris.
15   Q.    If you could look at page 279
16 please, which was part of Deposition Exhibit 22,
17 can you tell me what this document is please?
18   A.    This is a comment screen from
19 9/29/99 where the consumer had called our
20 disclosure automation line.  "DAP item deleted.
21 Ident code entered D. Item entered 9/27/99 with
22 subscriber code name."
23   Q.    And what does all that mean?
24   A.    She went through the audited cue.

Page 125

1  There probably had to be already a disclosure
2  there, where she went to our main cue, and that
3  item was deleted on 9/27/99, just her request.
4    Q.    Her request for a disclosure?
5    A.    Right, because it was probably
6  already sent.
7    Q.    Do you know right now as you sit
8  here today how or whether Trans Union's report
9  for Penny Anderson shows her as being deceased?
10         MR. CENTO:  Object to the form.
11         THE WITNESS:  I don't know how her
12   report shows as of today.
13 BY MR. LYONS:
14   Q.    And, if you would look back at
15 Deposition Exhibit 1 please, you testified that
16 you never saw Exhibit 1; is that correct?
17   A.    Yes.
18   Q.    If you turn to page 4, we had asked
19 for a current copy of the Plaintiffs' credit
20 reports.  You didn't bring those with you, did
21 you?
22   A.    No.
23   Q.    Did you bring any documents to
24 today's deposition?

Eileen Little

Page 126

1    A.    No.
2    Q.    Would you agree with me that it is
3    possible that a Trans Union credit report may
4    show that Cross Country Bank has reported the
5    Plaintiffs again as deceased, that that is a
6    possibility?
7    A.    Sure, it's a possibility. I don't
8    know that to be a fact.
9    Q.    But it could be happening right now
10   and it could happen in a month from now, correct?
11   A.    It could, yes.
12   Q.    And the only way to stop that is the
13   way that you described, for Trans Union to take
14   the initiative and cloak that account, correct?
15   A.    Well, I mean the bank could also
16   change their tape that they're sending in every
17   month. For Trans Union, the only way to prevent
18   it is to cloak it.
19   Q.    Right. The only way for Trans Union
20   to proactively make sure that this inaccurate
21   information doesn't get back on again is for
22   Trans Union to cloak it, correct?
23   A.    Yes.
24   Q.    Does your department ever pick up

Page 127

1    the phone and contact a data furnisher and say to
2    them, listen, we got too much inaccurate stuff
3    going on here regarding this single individual
4    plaintiff or plaintiffs, consumers, you gotta
5    stop reporting it this way?
6          MR. CENTO:  Objection; vague and
7    ambiguous.
8          THE WITNESS:  We can if they're aware
9    of a problem. The investigator brings it to
10   the team leader. Yes, we could definitely
11   call a subscriber and tell them that.
12   BY MR. LYONS:
13   Q.    Do you know of that ever happening
14   before?
15   A.    There's been times I've done it.
16   I've called subscribers and stated how they need
17   to fix it, what they need to do on their end,
18   yes.
19   Q.    And how many times does it have to
20   happen before you take that initiative?
21   A.    Well, I just have to be made aware
22   of it and then I will make the phone call, but I
23   mean there is no set thing like, if it happens
24   three times, then you have to pull it out and

Page 128

1    give it to someone else. I mean that doesn't
2    happen.
3    Q.    How does it come to your attention?
4    Does the consumer or somebody internally at TU
5    bring it to your attention?
6    A.    It could be the consumer or an
7    internal associate who brings it to me.
8    Q.    We talked a little bit about some of
9    the topic areas that you were designated for
10   today. Topic area D said Trans Union's policies
11   and procedures for responding to Plaintiffs'
12   consumer disputes. We talked about those.
13         Are you aware of any other dispute
14   the Plaintiffs have made regarding not being
15   deceased? Are you aware of any others that we
16   haven't talked about today?
17   A.    No.
18   Q.    If you skip down to topic item G, it
19   says "Trans Union's policies and procedures for
20   compliance with 1681E." Do you know what that
21   section of the FCRA is?
22   A.    I believe it's a disclosure piece.
23   Q.    Did Trans Union make sure that their
24   disclosures are accurate by -- well, how do they

Page 129

1    make sure it's accurate?
2          MR. CENTO:  Objection; vague and
3    ambiguous. That question can't even be
4    answered. Go ahead.
5          THE WITNESS:  Well, we're not
6    reviewing the credit history. What we're
7    doing is verifying the identifying
8    information, make sure it's the right
9    consumer.
10   BY MR. LYONS:
11   Q.    I follow that, but what about the
12   trade line information, how do you make sure that
13   that is accurate?
14         MR. CENTO:  Same objection.
15         THE WITNESS:  Well, we wouldn't have
16   any idea even what's on the report. I mean
17   we don't know who has credit with what
18   company. The consumer has to review it and
19   then notify us if he disagrees with it.
20         MR. CENTO:  This is also beyond the
21   scope of this witness's designation. I told
22   you this is Bill Stockdale and Eileen
23   Little, and the questions you're asking are
24   more in the area of Bill Stockdale. They

33 (Pages 126 to 129)

Eileen Little

Page 130

1   also call for a narrative, an explanation
2   that can't possibly be given in response to
3   the question you've asked.
4   BY MR. LYONS:
5       Q.    Under H, topic area H, it says
6   "Trans Union policies and procedures for
7   reporting consumer deceased." We talked a little
8   bit about that today, where, if a data furnisher,
9   one of Trans Union's subscribers, tells Trans
10  Union that that's how they want that information
11  reported, then that's how Trans Union is going to
12  report it, correct?
13      A.    Yes.
14      Q.    Regardless of what the consumer says
15  about that; is that right?
16          MR. CENTO:  Objection; vague and
17  ambiguous, calls for speculation, lacking
18  foundation.  You can answer.
19          THE WITNESS:  No, I don't believe
20  that.  I mean, in this case, the consumer
21  provided documentation and we used the
22  documentation.  We didn't even wait for the
23  creditor to respond.  We just used the
24  consumer's documentation.

Page 131

1   BY MR. LYONS:
2       Q.    Well, the consumer's documentation
3   you testified earlier was information that you
4   believed was from the bank and that's why you
5   changed it, right?
6       A.    Yes.
7       Q.    So that wasn't anything that the
8   consumer had said to you based on what the
9   consumer thought.  That was information from the
10  bank or so Trans Union believed, correct?
11          MR. CENTO:  Objection;
12  mischaracterizes the witness's testimony.
13          THE WITNESS:  We did believe it.  I
14  mean it was a document from the bank to the
15  consumer.  The consumer provided it to us
16  and we used that document to make the
17  change.
18  BY MR. LYONS:
19      Q.    Based on that, Trans Union believed
20  that the documentation to the consumer provided
21  to them was from their data furnisher, correct?
22      A.    Yes.
23      Q.    But, when the consumer in this case,
24  either Mr. Anderson or Mrs. Anderson, told Trans

Page 132

1   Union they weren't dead, Trans Union didn't
2   change the report, correct?
3       A.    Correct.
4       Q.    Now, if you look down at topic area
5   K, that's documents and communications between
6   Trans Union and any resellers.  Are you aware of
7   any communications between Trans Union and any
8   resellers in this case?
9       A.    Not that I'm aware of.
10      Q.    Do you know whether or not Trans
11  Union provides resellers with Trans Union credit
12  information?
13      A.    I'm not sure I understand your
14  question.
15      Q.    Does Trans Union provide Trans Union
16  credit information to resellers of credit
17  information?
18      A.    Yes.  We have a reseller as a
19  subscriber.
20      Q.    Now, topic area L at the top of page
21  3 of Deposition Exhibit 1, I want to know what
22  you know about the reporting of Cross Country
23  Bank about the Plaintiffs being deceased,
24  including now.

Page 133

1           You're not sure about that?  You
2   don't know if they are currently reporting them
3   as deceased?
4       A.    I don't know that.
5           MR. CENTO:  You know, as I read that
6   again, that might be Lynne.
7           MR. LYONS:  You think there's a
8   witness that's --
9           MR. CENTO:  Lynne Romanowski may be
10  more appropriate for that.  You might have
11  to explain to me what you mean there off the
12  record, but we'll address it.
13  BY MR. LYONS:
14      Q.    Does Trans Union ever issue
15  apologies to consumers for their error in
16  misreporting information?
17      A.    I mean there's cases where they'll
18  send you "and we apologize for any inconvenience
19  this may have caused you", but that's just based
20  on the investigator who is sending out the
21  letter.
22      Q.    I was kind of thinking along the
23  lines that Trans Union recognizes the fact that
24  they made a mistake or an error in their

Eileen Little

Page 134

1 reporting.  Do they ever send out a letter of
2 apology to the consumer?
3      A.    Not that I'm aware of.
4      Q.    Is that something that you have ever
5 suggested to Trans Union that they do?
6      A.    No.
7      Q.    Do you think that would be a good
8 idea to suggest to Trans Union?
9           MR. CENTO:  Objection; asks for this
10 witness's opinion, which is not admissible.
11 She's a fact witness.  You can answer if you
12 can.
13           THE WITNESS:  I don't know if I
14 would ever suggest that.
15           MR. LYONS:  I don't have anything
16 further.  Thank you, Ms. Little.
17           - - -
18           (Whereupon, the deposition concluded
19 at 2:44 p.m.)
20           - - -
21
22
23
24

Page 135

1           - - -
2      C E R T I F I C A T I O N
3           - - -
4
5      I hereby certify that the
6 proceedings and the evidence noted are
7 contained fully and accurately in the notes
8 taken by me in the above matter, and that
9 this is a correct transcript of the same.
10
11
12      _____
13      Michelle T. Cascio
14      Court Reporter
15      New Jersey Notary Public
16      Pennsylvania Commissioner of Deeds
17
18
19      (The foregoing certification of
20 this transcript does not apply to any
21 reproduction of the same by any means,
22 unless under the direct control and/or
23 supervision of the certifying shorthand
24 reporter.)

Page 136

1           - - -
2      INSTRUCTIONS TO WITNESS
3           - - -
4
5      Please read your deposition over
6 carefully and make any necessary
7 corrections.  You should state the reason in
8 the appropriate space on the Errata Sheet
9 for any correction that is made.
10      After doing so, please sign the
11 Errata Sheet and date it.  You are signing
12 same subject to the changes you have noted
13 on the Errata Sheet, which will be attached
14 to your deposition.
15      It is imperative that you return the
16 original Errata Sheet to the deposing
17 attorney within thirty (30) days of receipt
18 of the deposition transcript by you.  If you
19 fail to do so, the deposition transcript may
20 be deemed to be accurate and may be used in
21 court.
22
23           - - -
24

Page 137

1           - - -
2      E R R A T A
3           - - -
4
5 PAGE   LINE      CHANGE
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Eileen Little

Page 138

```
1           - - -
2      ACKNOWLEDGMENT OF DEPONENT
3           - - -
4
5      I, _____, do hereby
6  certify that I have read the foregoing pages, and
7  that the same is a correct transcription of the
8  answers given by me to the questions therein
9  propounded, except for the corrections or changes
10 in form or substance, if any, noted in the
11 attached Errata Sheet.
12
13
14
15
16
17     _____
18     (Signature)
19
20
21     _____
22     (Date)
23
24
```

CIVIL ACTION GROUP 763.576.8832

1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
COURT FILE NO.:  03-C-0510 C

PENNY LEE ANDERSON and        )
RUSSELL D. ANDERSON, SR.,     )
                              )
        Plaintiffs,           )
                              )
        vs.                   )  TELEPHONIC
                              )  DEPOSITION OF
TRANS UNION, L.L.C.;          )
EXPERIAN INFORMATION          )  EMILY MEATTE
SOLUTIONS INC.; CSC CREDIT    )
SERVICES, INC.; and           )
EQUIFAX, INC. d/b/a EQUIFAX   )
INFORMATION SERVICES LLC,     )
                              )
        Defendants.           )
---------------------------)


THE TELEPHONIC DEPOSITION OF

EMILY MEATTE, taken before Nancy S. Warren,

Certified Shorthand Reporter and Notary Public

of the State of Iowa, commencing at 9:45 a.m.,

September 14, 2004, at Wells Fargo Home

Mortgage, 1963 Bell Avenue, Des Moines, Iowa.




Reported by:  Nancy S. Warren, C.S.R.


Exhibit J

**Page 2**

```
 1           A P P E A R A N C E S
 2   Plaintiffs by:      THOMAS J. LYONS
     (Telephonically)    Attorney at Law
 3                       Consumer Justice Center, P.A.
                         342 East County Road D
 4                       Little Canada, MN 55117

 5   Defendant Trans
     Union by:           CHRISTOPHER LANE
 6   (Telephonically)    Attorney at Law
                         Katz & Korin
 7                       334 North Senate Avenue
                         Indianapolis, IN 46204
 8
     Defendant
 9   Experian by:        JEFFREY MANGHILLIS
     (Telephonically)    Attorney at Law
10                       Jones Day
                         901 Lakeside Avenue
11                       Cleveland, OH 44114

12   Defendant
     Equifax by:         LEWIS F. PERLING
13   (Telephonically)    Attorney at Law
                         Kilpatrick Stockton
14                       1100 Peachtree Street
                         Suite 2800
15                       Atlanta, GA 30309

16   Defendant CSC Credit
     Services by:        ERIK J. GIRVAN
17   (Telephonically)    Attorney at Law
                         Faegre & Benson
18                       2200 Wells Fargo Center
                         90 South Seventh Street
19                       Minneapolis, MN 55402

20

21

22

23      Reported by:  Nancy S. Warren, C.S.R.

24

25
```

**Page 3**

```
 1              I N D E X
 2
 3   Examination by:    Page
 4   Mr. Lyons          4, 84
     Mr. Perling        46
 5   Mr. Girvan         50
     Mr. Lane           57, 86
 6   Mr. Manghillis     79
 7
 8   Exhibit         Marked
     1               5
 9   2               7
     3               8
10   4               10
     5               19
11   6               24
     7               31
12   8               41
     9               43
13
14
```

**Page 4**

1              EMILY MEATTE,
2 called as a witness, having been first duly
3 sworn, testified as follows:
4              DIRECT EXAMINATION
5 BY MR. LYONS:
6    Q. Can you state your name for the record,
7 ma'am, spelling your last?
8    A. Meatte, M-e-a-t-t-e.
9    Q. And your first name?
10   A. Is Emily.
11   Q. And your home address?
12   A. Is 7141 Pommel, P-o-m-m-e-l, Place in
13 West Des Moines, Iowa 50266.
14   Q. And your date of birth?
15   A. 3-15-67.
16   Q. And your title, your current title for
17 Wells Fargo is what?
18   A. SDC site manager.
19   Q. And what site do you manage?
20   A. The SDC Bell Avenue.
21   Q. And that's located in Des Moines, Iowa?
22   A. Yes.
23   Q. All right. Emily, do you have a copy
24 of the deposition notice there with you?
25   A. Yes.

**Page 5**

1              MR. LYONS: Let's mark that as
2 Deposition Exhibit Number 1.
3              (Exhibit No. 1 was marked for
4              identification by the reporter.)
5    Q. Emily, I'm showing you what's been
6 marked as Deposition Exhibit Number 1. Can you
7 identify the document for me?
8    A. Yes.
9    Q. What is it?
10   A. I'm looking for a title. United States
11 District Court, Western District of Wisconsin,
12 Court File No. 03-C-0510 C.
13   Q. All right. And this is the Plaintiff's
14 Amended Notice of Taking Telephonic Deposition
15 of Wells Fargo Home Mortgage; correct?
16   A. Correct.
17   Q. And you have been designated as their
18 representative today. Is that your
19 understanding?
20   A. Yes.
21   Q. All right. In preparation for your
22 deposition, did you review any documents?
23   A. Yes.
24   Q. And what documents were those?
25   A. The -- it was basically the loan file

Page 6

1  documents.
2     Q. For the Andersons?
3     A. Yes.
4     Q. All right. And did you speak with
5  anyone in preparation for your deposition?
6     A. Yes.
7     Q. Who did you speak with?
8     A. Sue Woolsfeld.
9     Q. Okay. From my office?
10    A. Yes.
11    Q. All right. Anybody else?
12    A. Anna Rockwell.
13    Q. And who is Anna?
14    A. She is a subpoena processing -- she's a
15  subpoena processor for Wells Fargo.
16    Q. All right. And when did you speak with
17  her?
18    A. We communicated via E-mail.
19    Q. About how long ago?
20    A. Yesterday.
21    Q. All right. And what was the substance
22  of the communication electronically that you had
23  with Ms. Rockwell?
24    A. Advising me she was there to help. She
25  provided me a -- I'm trying to think of the

Page 7

1  title. Just tips for the deposition.
2     Q. All right. What tips did she provide
3  you?
4     A. To show up early, answer questions as
5  directed, answering yes or no, that type of
6  thing.
7     Q. Okay. In your review of the Anderson
8  Wells Fargo Home Mortgage file, can you identify
9  when it was that the Andersons first applied to
10  Wells Fargo?
11    A. Yes. Give me one moment, and I'll get
12  you the date. November 11th, 2002.
13       MR. LYONS: All right. There is
14  a document that looks like some screen notes or
15  some notes that were entered into a computer
16  system that begin on Wells Fargo Home Mortgage
17  Document Number 237 --
18       THE WITNESS: Yes.
19       MR. LYONS: -- which go
20  through 265. Can you pull that aside, and let's
21  mark that as Exhibit Number 2.
22       THE WITNESS: Yes.
23       (Exhibit No. 2 was marked for
24       identification by the reporter.)
25    Q. Emily, I'm showing you what's marked as

Page 8

1  Deposition Exhibit Number 2. How do you refer
2  to this group of notes or entries into this
3  system?
4     A. We refer to these as DOCCTLs.
5     Q. Say that one more time.
6     A. DOCCTLs, D-O-C-C-T-L.
7     Q. And is that an acronym for something?
8     A. I am sure it is, but I couldn't tell
9  you what it is. I have no idea. We just call
10  it DOCCTL.
11    Q. All right. And was it on page 237 of
12  the DOCCTL that you identified November 11th,
13  2002, as the initial application date?
14    A. Yes.
15       MR. LYONS: All right. And if
16  we could mark as Deposition Exhibit Number 3
17  Wells Fargo Home Mortgage Document Number 156
18  through 161.
19       (Exhibit No. 3 was marked for
20       identification by the reporter.)
21    Q. Emily, I'm showing you what's been
22  marked as Deposition Exhibit Number 3. Can you
23  identify what this document is?
24    A. The Uniform Residential Loan
25  Application.

Page 9

1     Q. Okay. And this document is dated what?
2     A. November 12th.
3     Q. 2002?
4     A. Yes.
5     Q. And it's signed by Russell and Penny
6  Anderson?
7     A. Yes.
8     Q. All right. And is it this document,
9  Exhibit 3, that begins the loan application
10  process?
11    A. Yes.
12    Q. And is it this document that allows or
13  authorizes Wells Fargo Home Mortgage to pull a
14  credit report on the plaintiffs -- or on the
15  applicants?
16    A. Could you repeat the question?
17    Q. Yeah. Is it this -- is it the signing
18  of this document, Exhibit 3, that allows the
19  Wells Fargo Home Mortgage representative to pull
20  credit reports on the applicants?
21    A. No.
22    Q. Is there another document that provides
23  Wells Fargo Home Mortgage authority to do that?
24    A. No. It's the verbal request after the
25  application is taken. It's the verbal request

Page 10

1  from the borrowers.
2     Q. Okay. And is it your understanding
3  that after this Exhibit 3 loan application
4  document was signed in November of 2002 that
5  Wells Fargo Home Mortgage pulled a credit report
6  on the applicants, Russell and Penny Anderson?
7     A. Say that one more time.
8     Q. Is it your testimony that Wells Fargo
9  Home Mortgage pulled a credit report on the
10  applicants, Penny and Russell Anderson, in
11  November of 2002?
12    A. Yes.
13    Q. All right. And the purpose of pulling
14  the credit report was in further processing
15  their request for credit from Wells Fargo Home
16  Mortgage; correct?
17    A. Correct.
18       MR. LYONS: If we could mark as
19  Deposition Exhibit Number 4 Wells Fargo Document
20  Number 173 through 178.
21       (Exhibit No. 4 was marked for
22       identification by the reporter.)
23    Q. Emily, I'm showing you what's been
24  marked as Deposition Exhibit Number 4. Can you
25  identify this document for me?

Page 11

1     A. Yes. It is an Infile Mortgage Credit
2  Report.
3     Q. All right. And the date that Wells
4  Fargo requested it was what?
5     A. November 11th, 2002.
6     Q. And in the upper right-hand corner it
7  says, "Team Leader: EC1," I think that is. Do
8  you know what that means?
9     A. Yes.
10    Q. What does that mean?
11    A. Earth City Team 1. It's where the team
12  was located.
13    Q. Okay. And down below that there in the
14  first box where it says "Lender Information," it
15  says "TRW Case Number 116937." Do you see that?
16    A. TRW --
17    Q. See the box that says "Lender
18  Information"?
19    A. Yes.
20    Q. Okay. Look to the column on the right
21  of that where it says "Lender Information." It
22  says "Date Requested," "Date Completed," and
23  then it says "TRW Case Number." Do you see
24  that?
25    A. Yes.

Page 12

1     Q. Do you know what that stands for?
2     A. No. It's a TRW reference number.
3     Q. All right. TRW is another name for
4  Experian; is that your understanding?
5     A. Yes.
6     Q. Now, is this credit report that we're
7  looking at that we've marked as Exhibit 4, is
8  this an Experian or TRW credit report?
9     A. Yes.
10    Q. And is it only an Experian/TRW credit
11  report, or does it pull or draw from any other
12  credit reporting agency?
13    A. It draws from other credit reporting
14  agencies.
15    Q. Okay. And do you know which other
16  credit reporting agency it draws from?
17    A. Trans Union.
18    Q. All right. And if we look on the last
19  page of Exhibit 4, 0178, on the very last line
20  it says, "Repositories Checked Covering," it
21  says TU and Experian. Do you see that?
22    A. Yes.
23    Q. All right. And is that where you base
24  your information that this credit report is
25  based on Trans Union and Experian?

Page 13

1     A. Yes.
2     Q. Okay. And specifically, it's not based
3  on any information that was received from
4  Equifax?
5     A. Correct.
6     Q. All right. On page 2 of the
7  November 11, 2002 report there are two notations
8  related to Cross Country Bank. Do you see those
9  on the bottom of the page?
10    A. Yes.
11    Q. All right. Which -- well, let me start
12  over.
13       The first trade line begins with
14  Account Number 5414 related to Cross Country
15  Bank. Do you see that?
16    A. Yes.
17    Q. All right. And below that it says
18  "Borrower Deceased." Do you see that?
19    A. Yes.
20    Q. Do you know or can you tell from
21  reading this document which of the borrowers,
22  Penny or Russell, is that trade line referring
23  to?
24    A. No.
25    Q. How would you find that information

Page 14

1 out, if you wanted to know that?
2   A. Calling the client.
3   Q. "Calling the client" being who?
4   A. Russell or Penny Anderson.
5   Q. Okay. Finding out which one of them is
6 dead?
7   A. Yes.
8   Q. All right. Tell me, if you know, how
9 the Infile Mortgage Credit Report is received by
10 Wells Fargo Home Mortgage. Is it received as
11 the form that we see it in in Exhibit 4?
12   A. Yes.
13   Q. Okay. And it doesn't give any
14 indication, does it, which reporting source
15 provided the information that we see on the
16 second page of Deposition Exhibit Number 4?
17   A. Say it one more time.
18   Q. Sure. I can ask it in another way.
19      If you look at the second page
20 where we're looking at that first Cross Country
21 Bank trade line, the 5414, is there any way to
22 find out which credit reporting agency provided
23 that information concerning the borrower being
24 deceased to Wells Fargo Home Mortgage?
25   A. With just looking at the credit report,

Page 15

1 no.
2   Q. Okay. Where else would you need to
3 look?
4   A. Calling the credit agency.
5   Q. To find out the source of the
6 information?
7   A. Yes.
8   Q. Okay. Well, let's, then, do this one
9 step at a time. With regard to the first Cross
10 Country Bank trade line that we see, the 5414,
11 looking back at Exhibit Number 2, is there any
12 indication that Wells Fargo Home Mortgage
13 contacted or attempted to discern which credit
14 reporting agency had reported the information
15 about the borrower deceased on 5414?
16   A. Yes.
17   Q. Okay. So somewhere in Exhibit 2 it
18 explains that?
19   A. Yes.
20   Q. All right. Can you direct me to the
21 page?
22   A. 0238.
23   Q. All right.
24   A. Item 4.
25   Q. All right. On November 11, 2002,

Page 16

1 there's an entry there?
2   A. Yes.
3   Q. All right. And how do you interpret
4 that entry to determine which credit reporting
5 agency --
6   A. Oh, I beg your pardon. I'm sorry.
7 Page 0242.
8   Q. Okay.
9   A. Item 27.
10   Q. All right. Which is entered on 12-31
11 of '02?
12   A. Yes.
13   Q. All right.
14   A. Indicated that the client had a letter
15 from Experian.
16   Q. All right. So based on this entry, you
17 believed it was Experian that was reporting the
18 information that we see on Wells Fargo Home
19 Mortgage 0174 related to the 5414 Cross Country
20 Bank account?
21   A. Yes.
22   Q. All right. And what about the Cross
23 Country Bank account entry below it that begins
24 with 4227? Do you see that trade line?
25   A. Yes.

Page 17

1   Q. First of all, does that indicate which
2 applicant was being reported as deceased, Penny
3 or Russell?
4   A. Does the credit report indicate that?
5   Q. Correct.
6   A. The credit -- no, it does not.
7   Q. All right. And then same question for
8 Cross Country Bank trade line 4227. Does that
9 trade line indicate which credit reporting
10 agency provided that information to Wells Fargo
11 Home Mortgage?
12   A. No.
13   Q. Were you going to say something else?
14   A. Yeah. The notes do not refer to this
15 specific trade line with Cross Country.
16   Q. And by "the notes," you are saying the
17 note on 2102?
18   A. Yes.
19   Q. But do you believe that is the trade
20 line or the only trade line that was reporting
21 the applicants, my clients, as deceased?
22   A. Yes.
23   Q. Okay. And if you look back on
24 Deposition Exhibit Number 4, do you see anywhere
25 else there being a reference to Penny or Russell

Page 18

1  Anderson being --
2      A. Being deceased?
3      Q. Correct.
4      A. I do not.
5      Q. Okay, thank you.
6          Now, back on Exhibit Number 2,
7  the second page, 238, we see an entry for
8  11-11-02 -- I think you said it was entry
9  number 4 -- where it says, "Credit report has
10 them listed as dead." Do you see that?
11     A. Yes.
12     Q. All right. Is that significant in the
13 application process?
14     A. Yes.
15     Q. Why?
16     A. We only lend to clients who are living.
17     Q. And then after that entry on 11-11, it
18 says, "B2 sent in the paperwork to correct the
19 error on the report before 11/3/02." Do you see
20 that? It's the sentence following the one we
21 just read.
22     A. I'm not --
23     Q. Do you see that sentence after the --
24     A. Oh, yes, yes, yes. I'm sorry.
25     Q. Okay, yeah. Same entry on 004. It

Page 19

1  looks like somebody from Wells Fargo entered
2  that "B2 sent in the paperwork." Do you know
3  who B2 is?
4      A. That would be Penny Anderson.
5      Q. Okay. Now, am I correct that if
6  someone is reported as dead, one of the
7  applicants is reported as dead, that Wells Fargo
8  Home Mortgage will not lend them money; is that
9  correct?
10     A. Repeat the question.
11     Q. Sure. If the credit report that's
12 pulled during the application process reports
13 one of the borrowers or the applicants as being
14 deceased, that will stall or stop the
15 application process; is that correct?
16     A. That is correct.
17         MR. LYONS: Okay. If we could
18 mark as Deposition Exhibit Number 5 Wells Fargo
19 Home Mortgage Document Number 220 and 221.
20         (Exhibit No. 5 was marked for
21         identification by the reporter.)
22     Q. Emily, I'm showing you what's been
23 marked as Deposition Exhibit Number 5. Can you
24 identify this two-page document for me?
25     A. Yes. It is the Rate Lock-in

Page 20

1  Confirmation.
2      Q. It's dated November 12th, 2002; is that
3  right?
4      A. That's correct.
5      Q. All right. The lock-in rate for the
6  Andersons was what?
7      A. 5.75.
8      Q. All right. And that was a 20-year
9  fixed rate; correct?
10     A. Yes.
11     Q. And the rate lock-in confirmation
12 letter is really only a -- well, why don't you
13 tell me what it is. What is the rate lock-in
14 confirmation letter used for?
15     A. It advises -- it's a disclosure to the
16 client advising them that their rate has been
17 locked and is secured for a period of time.
18     Q. All right. And when does this lock-in
19 expire?
20     A. January 10th, 2003.
21     Q. All right. Now, in between
22 November 12th and January 10th, 2003, certain
23 conditions must be satisfied by the applicants
24 in order to secure credit from Wells Fargo; is
25 that correct?

Page 21

1      A. That is correct.
2      Q. All right. And am I correct in stating
3  that one of the conditions that would have to be
4  met in the Andersons' case is that they would
5  need to get a credit report that would show that
6  both applicants were alive?
7      A. Yes.
8      Q. All right. If you would turn back to
9  Deposition Exhibit Number 2 and go to entry 22,
10 which is on page 240, there's an entry on
11 12-18-02. Do you see that entry?
12     A. Yes.
13     Q. All right. On the next page, on 241 it
14 says, "Left message with B's to call to verify
15 Social Security Numbers, address, and ZIP code";
16 is that right?
17     A. Yes.
18     Q. All right. Do you know what the
19 purpose was of calling the B's on -- I'm
20 assuming that means borrowers; is that correct?
21     A. That's correct.
22     Q. All right. Do you know what the
23 purpose of calling to verify the Social Security
24 Number, the address and the ZIP code was?
25     A. To confirm we had the correct

Page 22

1  information to pull the credit report.
2     Q. Okay. And so was there some concern in
3  or about December of 2002 that maybe you didn't
4  have the -- Wells Fargo didn't have the right
5  information on the applicants that was resulting
6  in the credit report showing up as deceased?
7     A. Yes.
8     Q. All right. And then if you'd skip down
9  to entry number 026 on December 29th of '02,
10 there's an entry that I'd like you to read for
11 me and interpret for me.
12    A. "E-mailed Roxanne Huffman for
13 assistance in generating the FICO score. It
14 appears that the names, addresses, and Social
15 Security Numbers are correct, but the system
16 will not generate a FICO score. Status changed
17 back to B46."
18    Q. All right. Let's break that down a
19 little bit. First of all, what is a FICO score?
20    A. That's a credit score.
21    Q. All right. And would that have
22 appeared on Deposition Exhibit Number 4
23 somewhere?
24    A. No.
25    Q. Okay. Where would that score have been

Page 23

1  generated or reflected, in what document?
2     A. Oh, it would have pulled to our
3  underwriting documents.
4     Q. Underwriting work sheet?
5     A. Yeah. Give me a moment just to review.
6        MR. PERLING: Tommy, this is
7  Lewis. When you get to a chance, a breaking
8  point, I'd like to take a bathroom break.
9        MR. LYONS: Oh, sure.
10    A. Am I able to go speak with one of my
11 underwriters?
12    Q. I beg your pardon?
13    A. Can I go speak with one of my
14 underwriters?
15       MR. LYONS: Sure. Why don't we
16 take a break. You go speak with one of your
17 underwriters, and then we'll resume here in a
18 minute.
19       (A recess was taken from 10:15 a.m.
20          until 10:25 a.m.)
21       MR. LYONS: Okay. Back on the
22 record.
23    Q. Emily, we were talking about a FICO
24 score, and you were going to go talk to somebody
25 in underwriting to find out if it's on the

Page 24

1  underwriting work sheet. Is that what you were
2  going to do?
3     A. Yes.
4     Q. And does it appear on an underwriting
5  work sheet, or should it?
6     A. It should.
7        MR. LYONS: Okay. Let's go off
8  the record for a minute.
9        (An off-the-record discussion
10          was held.)
11       (Exhibit No. 6 was marked for
12          identification by the reporter.)
13    Q. Emily, I'm showing you what's been
14 marked as Deposition Exhibit Number 6. Can you
15 identify for me what we have marked?
16    A. Yes, the underwriting work sheets.
17    Q. And are they kind of an ongoing work
18 sheet?
19    A. Yes.
20    Q. From the beginning of the application
21 process to the end?
22    A. Yes.
23    Q. All right. Now, on the first page of
24 Deposition Exhibit Number 6, there's a note on
25 12-29 of '02 that appears to be the same note

Page 25

1  that we just looked at in Deposition Exhibit
2  Number 2. Do you see that?
3     A. Yes.
4     Q. Okay. About the system not being able
5  to generate a FICO score; right?
6     A. Yes.
7     Q. All right. Where on the underwriting
8  work sheet in Deposition Exhibit Number 6 would
9  the score post, or be shown?
10    A. In the upper right-hand corner. In the
11 first set of information, you see "Loan Number,"
12 "Loan Type," and then "Doctype"?
13    Q. Yeah, "Doctype 1"?
14    A. Right. To the right of "Doctype," that
15 is where the FICO score would populate.
16    Q. Okay. Now, can an applicant get
17 approved for a Wells Fargo Home Mortgage without
18 a FICO score?
19    A. Yes.
20    Q. All right. And what would have to
21 occur in order for that to happen?
22    A. We need to establish nontraditional
23 credit.
24    Q. And what is nontraditional credit?
25    A. Copies of -- I mean, it would be -- if

Page 26

1 someone has not established their credit, it
2 would be copies of, for instance, their utility
3 bills or insurance payments.
4    Q. Okay.  And did the Andersons have to go
5 down the nontraditional credit route in order to
6 secure their mortgage with Wells Fargo?
7    A. No.
8    Q. Okay.  So at some time, eventually, a
9 FICO score was obtained?
10   A. Bear with me.  I'm going through notes.
11       I do not see that one was
12 obtained for the Andersons.
13   Q. Okay.  And so, then, does that mean
14 that they would have had to follow the
15 nontraditional credit path?
16   A. No.
17   Q. Okay.  What path did they follow?
18   A. We -- they had traditional credit
19 established, so we had to continue -- we worked
20 with the credit reports to verify -- I don't
21 know.  Give me one second.
22   Q. Sure, take your time.
23   A. Okay.  A credit report -- or a credit
24 score was not obtained, and I'm referring to the
25 notes from February 10th.

Page 27

1    Q. All right.  Which appear on -- which
2 exhibit are you looking at?
3    A. Exhibit 6.
4    Q. Okay.
5    A. 0151.  The underwriter manually
6 underwrote the file.
7    Q. And which entry is that, on which date?
8    A. February 10th, 2003.
9    Q. Is it the second one or the first one?
10   A. It is the second one at 1614.
11   Q. Okay.  And can you decipher that note
12 for me?
13   A. Yes.  The issue with the borrower being
14 deceased was being addressed.  "Manually
15 reviewed the credit transaction: Rate and term
16 finance with second to be subordinate.  Reduced
17 loan amount to reduce cash out," because this
18 was a rate and term refinance.  CLTV ratios were
19 acceptable.  The employment was acceptable,
20 salary was acceptable.
21   Q. So there had to be basically a manual
22 override, essentially?
23   A. Yes.
24   Q. Okay.  Because a FICO score could not
25 be obtained; correct?

Page 28

1    A. Correct.
2    Q. All right.  So is it fair to say that
3 between November of 2002 and February, the
4 beginning of February of 2003, the issue with
5 the credit report related to the Andersons
6 served to stall or hold the Andersons back from
7 obtaining the mortgage?
8       MR. LANE: This is Chris Lane for
9 Trans Union.
10       I want to pose a foundation and a
11 form objection.
12   Q. Go ahead, ma'am.  Go ahead, Emily.
13   A. Oh, yes.
14   Q. Okay.  And then Wells Fargo, somebody
15 at Wells Fargo had to do a manual override, and
16 that was accomplished in or about early February
17 2003?
18   A. Yes.
19   Q. Okay.  If you look back on Exhibit
20 Number 2 to that note or that entry 026 on
21 December 29th of '02, it says the status was
22 changed back to B46.  What does that status
23 mean?
24   A. That the loan was suspended.
25   Q. Okay.  So B46 is a code for suspension?

Page 29

1    A. Yes.
2    Q. All right.  And that also appears on
3 Exhibit 6, correct, in the 12-29-02 note?
4    A. Yes.
5    Q. All right.  Now, if you would look back
6 at entry 27 on Exhibit 2 on page 241, there
7 looks to be a note on December 31st of 2002, and
8 I'm wondering if you could help me decipher that
9 note.  It continues on to the next page.
10   A. The borrower called in.  The agent
11 reviewed DOCCTLs.  The representative asked the
12 same -- looks like clarifying questions on the
13 Social Security Number.  From Cross Country Bank
14 they got an apology.  Cross Country Bank
15 apparently sent out letters advising of the
16 error and apologizing to all credit reports,
17 advising they're not deceased.
18       A letter was sent from Experian
19 on September 3rd indicating that this was
20 deleted.  The agent assumed that that was the
21 problem for pulling the credit report.  Also
22 advised that they send in by fax all papers and
23 letters to us with their loan number so that the
24 processor can receive it, and underwriting will
25 review it to determine if this would help

Page 30

1 getting the credit scores.
2   Q.  Okay.  And then am I right that
3 subsequent to these notes, another credit report
4 was pulled by Wells Fargo Home Mortgage?  Would
5 that show in the notes, I guess is what I'm
6 saying?
7   A.  Let me go through and see.  I know
8 that there were attempts.  Just let me find it
9 in the notes.
10        I'm on page -- Exhibit 2.
11   Q.  Yes.
12   A.  The number 0246.
13   Q.  Right.
14   A.  Item 46, the underwriter tried to pull
15 the credit report and still was unable to obtain
16 a credit score.
17   Q.  Okay.  Does it say which credit report
18 or which credit reporting agency he tried to
19 pull from?
20   A.  No.
21        MR. LYONS:  Okay.  Let's mark as
22 Deposition Exhibit Number 7 Wells Fargo Document
23 Number 266 through -71, and let's go off the
24 record for a minute.
25

Page 31

1        (An off-the-record discussion
2         was held.)
3        (Exhibit No. 7 was marked for
4         identification by the reporter.)
5   Q.  Emily, I'm showing you what has been
6 marked as Exhibit Number 7.  Can you identify
7 for me what we have marked?
8   A.  Yes, Infile Mortgage Credit Report,
9 number 266.
10   Q.  All right.  And it's a multipage
11 document; correct?
12   A.  Yes.
13   Q.  And it's from January 10th, 2003?
14   A.  Yes.
15   Q.  January 10th, 2003, was the lock-in
16 expiration date, right, that we looked at back
17 on Exhibit Number 5?  Do you remember that?
18   A.  Yes, January 10th was the lock-in date.
19   Q.  Was the lock-in expiration date?
20   A.  Lock-in expiration date, yes.
21   Q.  All right.  First question is why
22 doesn't the requesting or the pulling of the
23 report show up in the notes that we've marked as
24 Deposition Exhibit Number 2, if you know?
25   A.  The DOCCTL notes are typically only

Page 32

1 processor notes.
2   Q.  All right.  Would there be some other
3 system, some other set of notes that would show
4 the times that Wells Fargo obtained or attempted
5 to obtain credit reports?
6   A.  Bear with me.  There would typically be
7 an underwriting note on the work sheet.
8   Q.  Okay.  So that would be looking back at
9 Deposition Exhibit Number 6?
10   A.  Yes.
11   Q.  And do you see any such notes related
12 to Wells Fargo Home Mortgage accessing or
13 attempting to access credit reports on the
14 Andersons?
15   A.  No.
16   Q.  All right.  If you look at the last
17 page of Deposition Exhibit Number 7, under the
18 inquiries section -- actually, you know what,
19 let's go back to 270, which is the
20 second-to-the-last page of Exhibit 7.  I think
21 I'm reading this right, but I'd like your
22 assistance or confirmation of that.
23        On November 11, 2002, under the
24 inquiries section it shows the Wells Fargo Home
25 Mortgage --

Page 33

1   A.  Yes.
2   Q.  -- pull; right?
3   A.  Yes.
4   Q.  Okay.  And then on 12-3 of '02, am I
5 right that that's another pull?
6   A.  That is correct.
7   Q.  Okay.  Now, we haven't looked at that
8 credit report, have we?
9   A.  12-3.
10   Q.  We haven't looked at a 12-3-02 credit
11 report, have we?
12   A.  No.
13   Q.  Do you know, have you ever seen one?
14   A.  No.
15   Q.  Would that be maintained in the loan
16 file typically?
17   A.  Yes.
18   Q.  All right.  And you don't know the
19 explanation for why that hasn't been produced
20 along with the rest of the loan file?
21   A.  No.
22   Q.  All right.  And then again on 12-9 of
23 '02, it looks like another report was pulled by
24 Wells Fargo?
25   A.  Yes.

Page 34

1   Q. All right. And had you seen a
2 December 9th, 2002 credit report on the
3 Andersons?
4   A. No.
5   Q. And have you seen one contained within
6 the loan file?
7   A. No.
8   Q. Now, when Wells Fargo pulled these
9 credit reports, does that cost the Andersons
10 money in terms of their -- oh, any type of fee
11 that they're paying Wells Fargo in the
12 application process? Do you understand my
13 question?
14   A. Yes. We disclose a credit report fee.
15   Q. Okay. And so whether you pull
16 one or 100, the fee doesn't change?
17   A. Correct.
18   Q. Okay. Would you agree with me, though,
19 that additional inquiries on the credit report
20 have an impact on their FICO score?
21   A. Yes.
22       MR. LANE: Chris Lane for Trans
23 Union. Objection --
24       MR. MANGHILLIS: This is Jeff
25 Manghillis for Experian.

Page 35

1       I object to the form and
2 foundation.
3       MR. GIRVAN: This is Erik Girvan
4 for CSC. You can add my name to that objection.
5       MR. LANE: Chris Lane also, Trans
6 Union.
7   Q. Go ahead, Emily. You can answer the
8 question.
9   A. Would you repeat the question, please?
10   Q. Yeah. Does repeated pulling of the
11 credit report by Wells Fargo Home Mortgage have
12 an impact on the FICO score of the Andersons?
13       MR. MANGHILLIS: Again,
14 objection. Jeff Manghillis.
15   A. Yes.
16   Q. And does it increase the FICO score or
17 does it decrease the FICO score?
18   A. Decrease.
19   Q. Did you say "decrease"?
20   A. Yes.
21   Q. Okay. And do you believe that the
22 pulls in December of '02 were additional pulls
23 to see if the FICO score was available?
24   A. Yes.
25   Q. All right. If you flip over to the

Page 36

1 next page, the 271 page, it looks like there was
2 a second credit pull on December 9th of '02. Do
3 you see that?
4   A. Yes.
5   Q. And you haven't seen that second credit
6 report, have you?
7   A. No.
8   Q. And one is not contained within the
9 file; correct?
10   A. Correct.
11   Q. Looks like there was then another one
12 on January 6th of '03. Do you see that?
13   A. Yes.
14   Q. All right. And you haven't seen one in
15 the file?
16   A. Correct.
17   Q. All right. Is that unusual that Wells
18 Fargo wouldn't maintain those reports?
19   A. Yes.
20   Q. Credit reports?
21   A. Yes.
22   Q. Is it possible that they have been
23 maintained, but you just haven't been provided
24 with them?
25   A. Yes.

Page 37

1   Q. Okay. Who would you speak with about
2 their existence and whether or not you could get
3 a copy of those?
4   A. Who would I -- within Wells Fargo?
5   Q. Yes.
6   A. I would request the file from our
7 post-closing department to review all the
8 documents in the file.
9   Q. And specifically request any additional
10 credit reports?
11   A. Yes. I would actually request the
12 entire file.
13   Q. Okay. Do you think that was not done
14 originally?
15   A. I believe it was done.
16   Q. Okay. But you'd just do it again?
17   A. Correct.
18   Q. All right. Is there any other source
19 that you would go to to attempt to get the
20 credit reports other than -- I guess outside of
21 Wells Fargo?
22   A. No.
23   Q. Okay, all right. And then lastly, you
24 see the Wells Fargo Home Mortgage pull on
25 January 10th, 2003, which I believe is the --

Multi-Page™

EMILY MEATTE
SEPTEMBER 14, 2004

Page 38

1  which is Exhibit 7 that we're looking at.  Is
2  that your understanding?
3      A.  Yes.
4      Q.  All right.  Now, do you have any idea
5  what the "F" and "FR" references are to the
6  numbers next to the inquiries?
7      A.  No.
8      Q.  And do you have any idea what the
9  "Rels" Reporting Service is?
10     A.  Where is that?  "Rels"?
11     Q.  Inquiries section, right kind of in
12  between the Wells Fargo Home Mortgage pulls.
13     A.  I do not.
14     Q.  Okay.  And it looks like this
15  January 10th, 2003 report contains information
16  obtained from TU, Trans Union, and Experian
17  again, if you look at the last page, the last
18  line.
19     A.  Yes.
20     Q.  All right.  Now, turn back to the
21  second page of this January 10, 2003 report.  It
22  does show the two Cross Country Bank trade lines
23  that we had discussed earlier.  Do you see
24  those?
25     A.  Yes.

Page 39

1      Q.  And that's on page 267?
2      A.  Yes.
3      Q.  The 4227 trade line for Cross Country
4  Bank is still being reported as deceased.  Do
5  you see that?
6      A.  Yes.
7      Q.  All right.  And you don't know which
8  credit reporting agency was supplying that
9  information to Wells Fargo; correct?
10     A.  Correct.
11     Q.  And then on the second Cross Country
12  Bank account that's listed, 4227 ending in 010,
13  that one is not reporting as deceased; is that
14  correct?
15     A.  Correct.
16     Q.  Going back to Deposition Exhibit
17  Number 2, it looks like there's an entry on 049
18  for January 21st, 2003, which continues on to
19  the next page, page 247, and if you look, it
20  says that the account was put into A15 status.
21  What does that mean?
22     A.  A15 is ready to be decision status or
23  needs to be -- it's a new application status
24  needing a decision.
25     Q.  Okay.  And in that entry, 049, it says

Page 40

1  that there's still no FICO score; is that
2  correct?
3      A.  Correct.
4      Q.  All right.  On February 3rd, 2003, at
5  entry number 51, it says, "BR called on split."
6  What's "split"?
7      A.  Our phone system, our call routing.
8      Q.  Okay.  And wanted to know about the
9  status, and the Wells Fargo representative told
10  them that there was a problem with the FICO
11  score.  Do you see that?
12     A.  Yes.
13     Q.  All right.  And then you previously
14  testified that it was then in February of '03
15  that there was a decision to do a manual
16  override, and the loan was then approved in
17  February of '03, the Andersons' loan?
18     A.  Yes.
19     Q.  All right.  And do you know when that
20  loan finally closed?
21     A.  Bear with me, and I can get you the
22  date.  I'm looking at Wells Fargo 0137, the loan
23  closing instructions.  Close date was
24  March 20th.
25         Bear with me.  The loan actually

Page 41

1  closed on April 22nd.  I'm looking at The Final
2  Step Closing Request Form, document number 0086.
3         MR. LYONS:  All right.  0086
4  through 0088, can we mark that as Deposition
5  Exhibit Number 8?
6         (Exhibit No. 8 was marked for
7          identification by the reporter.)
8      Q.  Emily, I'm showing you what's been
9  marked as Deposition Exhibit Number 8.  Can you
10  identify what this three-page document is?
11     A.  Yes.  It is a closing request form
12  detailing the closing location and the
13  client-required information.
14     Q.  Okay.  And was there some benefit to
15  the Andersons to close at the end of April
16  instead of the end of March?
17     A.  Yes.
18     Q.  What was that?
19     A.  The original loan was an FHA loan, and
20  this is referenced in the DOCCTL notes and I'll
21  find the step in just a moment.  There's a
22  benefit for FHA loans to close at the end of the
23  month.
24     Q.  Is it like a monetary benefit?
25     A.  Yes.

Page 42

1    Q. What is that?
2    A. If -- with FHA loans, if you close the
3 beginning of the month, the client or the
4 borrower is responsible for all of the interest
5 for that entire month, regardless of when the
6 payoff is received.
7    Q. Okay.
8    A. A conventional loans, the interest, the
9 client pays interest through the date that the
10 payoff is received.
11    Q. And can you tell why this wasn't done
12 at the end of March as opposed to the end of
13 April?
14    A. I'm reviewing notes, so bear with me
15 for a moment.
16    Q. Sure.
17    A. We were obtaining a subordination
18 agreement.
19    Q. And that wasn't completed until the end
20 of March or the beginning of April?
21    A. Correct.
22    Q. Okay. Now, other than the time and
23 hassle that the Andersons had to deal with in
24 terms of trying to prove to Wells Fargo Home
25 Mortgage with the credit report showing them as

Page 43

1 deceased, did the interest rate on the loan or
2 the terms of the loan change from November to
3 April? Do you know?
4    A. Let me check my documents real quick.
5    Q. Sure.
6    A. The interest rate remained the same, as
7 well as origination points on the lock-in
8 letter, the lock-in confirmation letter.
9    Q. So those rates were just -- they kept
10 being extended; is that what happened?
11    A. Yes.
12        MR. LYONS: And if you could mark
13 for me as Exhibit No. 9 0002 through 0007.
14        (Exhibit No. 9 was marked for
15        identification by the reporter.)
16    Q. Emily, I'm showing you what's been
17 marked as Deposition Exhibit Number 9. Can you
18 identify this document for me?
19    A. Yes. It is a Uniform Residential Loan
20 Application dated April 3rd, 2003.
21    Q. All right. And did this additional
22 application that the Andersons completed for
23 Wells Fargo cost them an additional application
24 fee at the closing?
25        MR. LANE: This is Chris Lane for

Page 44

1 Trans Union.
2        I'm going to object to the form
3 and foundation.
4    A. The answer is no.
5    Q. And do you know, Emily, whether or not
6 the Andersons' credit report was pulled again
7 after January 10th of 2003 by Wells Fargo Home
8 Mortgage?
9    A. No.
10    Q. There's a note in Deposition Exhibit    6
11 on page 0085 for April 1st, 2003, that shows
12 that the loan amount was increased from 168500
13 to 169,750.
14    A. Would you mind referring -- giving me
15 the -- I have Exhibit 6.
16    Q. Yes. It's the Wells Fargo document
17 number 0085.
18    A. Wells Fargo 0085.
19    Q. The top of that page has a note on it
20 from April 1st, 2003.
21    A. Oh, thank you.
22    Q. That note shows that the loan amount
23 was increased from 168,500 to 169,750 to
24 accommodate closing costs. Do you see that?
25    A. Yes.

Page 45

1    Q. And was that increase calculated or
2 contemplated in the very first loan that they
3 applied for, or was that like an afterthought,
4 if you know?
5    A. Would you mind repeating the question?
6    Q. Sure. It looks like the amount of the
7 loan increased from 168,500 to 169,750, and it
8 says in the note "to accommodate closing costs."
9 And I'm wondering if that was something that was
10 calculated into the first loan that the
11 Andersons applied for with Wells Fargo Home
12 Mortgage or if this was like an afterthought and
13 somebody just recalculated and said, "Hey, we're
14 going to roll these closing costs into it"?
15    A. Bear with me.
16        I do not know.
17    Q. Okay.
18    A. Actually, it was -- they had hoped to
19 include that in the loan amount.
20    Q. Originally?
21    A. Yes. And I'm looking at Exhibit 2, the
22 loan amount calculation in item 2.
23    Q. All right. Before you testified that
24 you could put in another request for the loan
25 file to see if we could find those additional

Page 46

1 credit reports. How long would that request
2 take to be processed, do you think?
3    A. It could take up to two weeks.
4        MR. LYONS: Okay. Subject to
5 that additional information being produced, I
6 don't have any further questions, Emily.
7        Thank you for your testimony
8 today. I think some of these other lawyers may
9 have questions for you.
10        THE WITNESS: Okay.
11        MR. LYONS: I pass the witness.
12        MR. PERLING: Well, don't
13 everybody jump at once. This is Lewis Perling.
14 I'll be happy to go next.
15        Emily, do you need to take a
16 break, or can we go on?
17        THE WITNESS: No, let's go on.
18        CROSS-EXAMINATION
19 BY MR. PERLING:
20    Q. Did your company ever receive a credit
21 report from Equifax that showed either borrower
22 as deceased?
23    A. Could you repeat that question?
24    Q. Yes. Did your company ever receive a
25 credit report from Equifax that showed either

Page 47

1 borrower as deceased?
2    A. No.
3    Q. So, then -- or further, there was no
4 adverse action taken by your company on this
5 application for credit with the Andersons, was
6 there?
7    A. What do you mean by "adverse action"?
8    Q. Well, they were never denied a loan
9 with your company; correct?
10    A. Not that I am aware of.
11    Q. Okay. And their interest rate was
12 never increased as a result of any delay;
13 correct?
14    A. Correct.
15    Q. And the fact that the underwriting had
16 to go to manual underwriting didn't cost them
17 anything, did it?
18        MR. LYONS: Objection.
19 Mischaracterizes her testimony.
20    Q. All right. Well, let me back up. Did
21 this loan go through manual underwriting?
22    A. Yes.
23    Q. Did the fact that it went through
24 manual underwriting cost the consumers or the
25 borrowers anything?

Page 48

1        MR. LYONS: Objection. Asked and
2 answered.
3    Q. You can answer, ma'am.
4    A. I'm not -- directly out of their
5 pocket?
6    Q. In any manner.
7    A. I am only assuming that they were
8 getting a better interest rate, so the length of
9 time that it took to close prevented them from
10 paying -- getting the benefit of the lower
11 interest rate.
12    Q. Okay. And that length of time that it
13 took them to close was not caused in any way by
14 Equifax, was it?
15    A. I don't know.
16    Q. Well, did your company ever use an
17 Equifax credit report in making their decision
18 on whether or not to grant this loan?
19    A. No.
20    Q. Therefore, there was no effect that
21 Equifax caused on this loan whatsoever; correct?
22    A. Correct.
23    Q. You said you had some communications
24 with Sue Woolsfeld from the plaintiffs'
25 attorney's office?

Page 49

1    A. Yes.
2    Q. When was that?
3    A. Yesterday.
4    Q. Okay. And was that the only
5 communication you've had with Ms. Woolsfeld?
6    A. Initially she contacted me to let me
7 know that she'll be sending me the documents.
8    Q. Okay. So you've had -- it was -- was
9 that two telephone communications you had with
10 her?
11    A. Yes.
12    Q. And the first one was just to say that
13 she was sending you documents; correct?
14    A. Correct.
15    Q. And the conversation you had with her
16 yesterday, what was the conversation about?
17    A. I was seeking the time for the
18 subpoena.
19    Q. Okay. Anything else?
20    A. No. She provided me an E-mail with all
21 of the document numbers that would be used.
22    Q. Okay. Have you ever discussed the
23 facts of the case with Ms. Woolsfeld or anyone
24 from the plaintiffs' attorney's office?
25    A. No.

Page 50

1    MR. PERLING: Hold on just a
2 moment. I'm going to flip through a couple of
3 documents, see if I have any other questions.
4        I have no further questions.
5 Thank you, ma'am.
6        Subject to recross, I'll pass the
7 witness.
8        MR. GIRVAN: This is Erik Girvan.
9 Does anybody mind if I go next?
10       CROSS-EXAMINATION
11 BY MR. GIRVAN:
12    Q. All right. Emily, this is Erik Girvan.
13 I represent CSC Credit Services. Can you hear
14 me okay?
15    A. Yes.
16    Q. Okay. I just have a few questions for
17 you today.
18        First of all, have you ever heard
19 of CSC Credit Services?
20    A. What does "CSC" stand for?
21    Q. Computer Sciences Corporation is the
22 name of the parent company, but the name of the
23 actual company is CSC Credit Services.
24    A. I have not.
25    Q. Okay. A moment ago Mr. Perling just

Page 51

1 asked you whether or not Wells Fargo Home
2 Mortgage reviewed or relied upon an Equifax
3 credit report in making a credit decision
4 regarding the Andersons.
5    A. Yes.
6    Q. I'm going to ask you the same question
7 about CSC. Did Wells Fargo Home Mortgage ever
8 review or rely upon a CSC credit report in
9 making any determination or credit decision for
10 the Andersons?
11    A. No, not that I'm aware of.
12    Q. You testified earlier that -- I believe
13 it was on February 10th Wells Fargo Home
14 Mortgage decided to conduct -- I think what you
15 said was a sort of manual underwriting override
16 of the system in order to approve the Andersons
17 for their loan; is that correct?
18    A. Yes.
19    Q. Okay. Is there any reason that
20 override cannot have been done earlier?
21    A. I can't answer that. I don't know the
22 answer.
23    Q. Are there any set criteria for doing
24 those overrides that you know of?
25    A. Are there any set criteria for doing

Page 52

1 the overrides?
2    Q. I can rephrase that. Is there a policy
3 that Wells Fargo Home Mortgage has about when
4 they conduct those or --
5    A. Not that I'm aware of. It's extremely
6 rare.
7    Q. So is it discretionary, would you say?
8    A. Yes.
9    Q. I think you also testified earlier that
10 one of the reasons that the loan did not close
11 in March -- I think you said it was pushed up to
12 April because there was some documentation
13 missing; is that correct?
14    A. Yes.
15    Q. Can you tell me what that is?
16    A. It was a subordination agreement.
17    Q. Can I assume the subordination
18 agreement is another requirement for the
19 closing? Is that correct?
20    A. Correct.
21    Q. Are there any other requirements for a
22 closing that weren't satisfied in this case at
23 the time that they were due?
24    A. This will take me a minute.
25    Q. Please take your time.

Page 53

1    A. Yes.
2    Q. What are those?
3    A. A satisfactory appraisal, copies of the
4 two most recent year-to-date pay stubs, complete
5 copy of most recent one month's bank statement,
6 and lender to receive a copy of the fully
7 executed second mortgage note and security
8 instrument from Northwest Airlines, and I'm
9 referring to Exhibit 6.
10    Q. Which Bates label page is that?
11    A. I read from page 152.
12    Q. Did the lack of any of these documents
13 cause any delay in the closing of the Andersons'
14 loan?
15    A. No.
16    Q. They were just documents that they
17 didn't have at this time; is that correct?
18    A. That they did not have at the time of
19 application.
20    Q. So it's your testimony that the only
21 document that actually pushed off the closing
22 date was the subordination agreement?
23    A. Say that again.
24    Q. I'm sorry. Is it your testimony, then,
25 that the only document that actually pushed off

Page 54

1 a set closing date -- or excuse me -- a lack of
2 a document that pushed off or caused a delay in
3 a set closing date was the subordination
4 agreement?
5    A. After the loan was approved, yes.
6    Q. Right.
7       If you could turn to Exhibit 2
8 for me, please.
9    A. Exhibit what? I'm sorry.
10    Q. Exhibit 2.
11    A. Yes.
12    Q. I'm looking at line number 23.
13    A. Yes.
14    Q. In the comments that are designated by
15 the number 23.
16    A. Yes.
17    Q. Would you mind interpreting those for
18 me?
19    A. The client called in and confirmed that
20 the Social Security Number, address, and ZIP
21 code are the same that was entered into our
22 computer, and the address -- the street name
23 changed for fire identification about a year
24 ago.
25    Q. Okay. What is the "Emailed proc"

Page 55

1 portion?
2    A. Where do you see that?
3    Q. It's the last -- after the "for fire
4 ID."
5    A. Oh, E-mailed processor.
6    Q. Okay. Is that the person that's sort
7 of guiding the loan through the process?
8    A. Yes.
9    Q. Do you know if the Andersons ever
10 attempted to provide a copy of their credit
11 reports to Wells Fargo Home Mortgage independent
12 of Wells Fargo's own credit pulls?
13    A. I do not.
14    Q. Would the notes indicate something like
15 that?
16    A. Yes.
17    Q. So I guess, assuming the notes are
18 accurate then, do you believe that they ever
19 tried to provide any credit report to Wells
20 Fargo Home Mortgage of their own accord?
21       MR. LYONS: Objection. Calls for
22 speculation.
23       That's Tommy Lyons.
24    Q. You can answer. If you need to review
25 them, that's fine.

Page 56

1    A. Would you repeat the question?
2    Q. Yes. I was wondering, assuming that
3 the notes are accurate -- let me go back.
4       You testified that if the
5 Andersons tried to provide their own credit
6 report to Wells Fargo Home Mortgage, that's
7 something that would appear in the notes which I
8 think we've marked as Exhibit 2, and so I'm
9 asking you, then, that, assuming that those
10 notes are correct, whether or not it would be
11 your testimony that the Andersons ever did,
12 indeed, try to proffer their own credit reports
13 or a copy of their credit report to Wells Fargo
14 Home Mortgage?
15    A. I don't know the answer to that.
16    Q. You cannot tell from looking at
17 Exhibit 2; is that correct?
18    A. Correct.
19    Q. I guess I just want to be clear on
20 that. You said a moment ago that -- you
21 testified that that was something that would be
22 reflected in Exhibit 2; is that correct?
23    A. It would typically be reflected, yes.
24    Q. Okay. Is anything like that reflected
25 in Exhibit 2?

Page 57

1    A. Not that I saw.
2       MR. GIRVAN: Okay. Those are all
3 the questions I have. Thank you very much.
4       MR. LYONS: Chris Lane, do you
5 want to go next?
6       MR. LANE: Yeah, I'll go ahead
7 and go next.
8       CROSS-EXAMINATION
9 BY MR. LANE:
10    Q. Ms. Meatte, my name is Christopher
11 Lane, as you know, and I represent Trans Union.
12       Earlier Mr. Lyons asked the
13 question, does the reporting of deceased stall
14 or stop the application process, and your answer
15 was yes. Which is it? Does it stall the
16 process or does it stop the process?
17    A. It was -- it was stalled.
18    Q. I believe you testified earlier that
19 there was a manual override in the underwriting
20 process to override the lack of a FICO score; is
21 that right?
22    A. Yes.
23    Q. And I believe Mr. Girvan asked you
24 why couldn't the override have taken place
25 earlier, and I believe you said -- I believe you

Page 58

1 don't know the answer to that question. Do you
2 know who there at Wells Fargo would know the
3 answer to that question?
4    A. No, I don't.
5    Q. Do you know if there's a set policy
6 that says, if you can't get a score for a
7 certain period of time, thereafter you can
8 manually override if you have enough additional
9 information, or is it sort of up to the
10 individual underwriter's discretion?
11       MR. LYONS: Objection. Lack of
12 personal knowledge. Asked and answered.
13       That was Tommy Lyons.
14    A. Would you repeat the question.
15    Q. Does Wells Fargo have a policy on how
16 many times or for what period of time they try
17 to get a FICO score before they move on to other
18 options, such as overriding?
19    A. Not that I'm aware of.
20    Q. Okay. Do you know who made the
21 ultimate decision in this case to do the manual
22 override?
23    A. Yes.
24    Q. Okay. Who was that?
25    A. Jeannie Wehrmeyer.

Page 59

1    Q. How do you spell her name?
2    A. It's in Exhibit 6.
3    Q. Okay.
4    A. It's W-e-h-r-m-e-y-e-r.
5    Q. Okay. And what is her position?
6    A. She was a contract underwriter.
7    Q. Do you know from the notes at all there
8 whether she worked on this application from its
9 inception back in November of 2002?
10    A. Say it again. Can I tell if she worked
11 on this file from November?
12    Q. Of 2002, yes, ma'am.
13    A. I cannot tell if she was the initial --
14 well, it does not indicate that she was the
15 initial underwriter.
16    Q. Okay. Do you know how -- when we see
17 the first indication of her working on the file?
18    A. Yes.
19    Q. Okay. From the notes, where do we see
20 her first appearance?
21    A. On Exhibit 6, it's February 10th.
22    Q. Of '03?
23    A. Yes.
24    Q. And how soon thereafter did she make
25 the decision to override?

Page 60

1    A. That is when she got involved. It was
2 on that day.
3    Q. She made the override decision that
4 day?
5    A. Yes.
6    Q. Does the file or does your personal
7 knowledge indicate to you what caused her to
8 come on board that day?
9    A. She is a higher level underwriter.
10    Q. Okay. Tell me a little bit about this
11 subordination agreement. What is that?
12    A. Subordination agreement. The client
13 had two mortgages on the property, one with
14 Wells -- I don't know if the initial one was
15 with Wells Fargo or not, but we're paying off
16 the first mortgage.
17       They had a second mortgage with
18 another lender that I wanted to remain open. If
19 we would not have subordinated that loan, the
20 second mortgage holder would have become the
21 first mortgage holder, and we only -- in this
22 platform only originate first mortgage loans.
23    Q. Why did it take so long for that to get
24 worked out?
25    A. It's dependent on a third party.

Page 61

1    Q. So if you had a score back in November
2 of 2002, yet you didn't get this agreement
3 worked out until April of 2003, would the
4 approval have been delayed until then?
5    A. Repeat the question.
6    Q. Okay. Let's say you had a score back
7 in November '02 --
8    A. Yes.
9    Q. -- yet you weren't able to work out the
10 subordination agreement until let's say April
11 '03. Would the closing have been delayed until
12 you worked the subordination agreement out?
13    A. Subordination agreement would have
14 needed to be completed before we closed the
15 loan.
16    Q. Why do we see multiple applications in
17 this file?
18    A. The first application is the initial
19 application. The last application is the
20 application after the underwriter has verified
21 all the information. It is not uncommon for
22 information to change, such as balances in
23 credit report -- or I'm sorry -- balances on
24 assets or lines of credit.
25    Q. Ms. Meatte, I'm going to direct your

Page 62

1 attention to Exhibit 2, page 260 of that
2 document.
3    A. Okay.
4    Q. That suggests pushing closing off until
5 the end of the month. Even though that's March,
6 that means the end of April and not the end of
7 March; is that right?
8    A. Which note are you referring to?
9    Q. 106.
10    A. That is correct.
11    Q. Okay.
12    A. If the loan would have closed
13 on -- they have a rescission period, so it would
14 have gone into the beginning -- the loan would
15 not have funded until the beginning of April.
16    Q. Okay. I'm going to direct your
17 attention to page 240 of that same document,
18 entry 017, of 12-02-02.
19    A. Bear with me a moment. Let me get
20 there.
21       And you said 017?
22    Q. Yes, ma'am.
23    A. Yes.
24    Q. Okay. Can you read that section to me
25 in common language?

Page 63

1    A. Yes. The borrower called in wanting to
2 know the status of his loan. The loan was still
3 in underwriting, and she'd be contacted within
4 two to three weeks.
5    Q. Okay. Does, typically, underwriting
6 take some period of time from the application
7 process until the time it is either approved or
8 denied?
9    A. Yes.
10    Q. Okay. How long does that typically
11 take?
12    A. Depending on the rate environment.
13    Q. Is there a range?
14    A. At that time, it was two to three
15 weeks.
16    Q. Well, even if you had a score for the
17 Andersons when they filled out their initial
18 application, it still would have been some lag
19 time, perhaps two to three weeks before it would
20 have been approved even if everything was as it
21 should have been?
22    A. That I do not know.
23    Q. Do you know loans that close the same
24 day?
25    A. Do I know of loans that close the same

Page 64

1 day?
2    Q. Mortgages, yes.
3    A. I do not.
4    Q. Okay. So you would agree there's some
5 lag time on all mortgage applications?
6    A. From the loan application to decision,
7 yes.
8    Q. Okay.
9    A. On most.
10    Q. But you're not prepared to say that
11 averages about two to three weeks?
12    A. Repeat the question.
13    Q. But you're not prepared to say that
14 averages about two to three weeks, on average?
15    A. No, I am not.
16    Q. What is the average?
17    A. I don't have an average. It depends on
18 the rate environment.
19    Q. Have you ever seen one close within a
20 week?
21    A. Yes.
22    Q. Is there any correlation between how
23 good the rate is how quickly it can close?
24    A. A direct correlation, it's -- the
25 entire loan would have to be taken into

Page 65

1 consideration.
2    Q. At some point I believe Mr. Anderson or
3 Mrs. Anderson maybe were required to send in
4 some additional documentation that they had to
5 fax several times that never made it there. Did
6 you see that in the log for the note somewhere?
7    A. Give me a moment to read.
8    Q. Why don't you take a look at Exhibit 2,
9 entry 081 on page 252.
10    A. Yes.
11    Q. Do you know what documentation they're
12 requesting there?
13    A. According to the notes, the client
14 wanted to know if the processor received the fax
15 of his W-2's and pay stubs.
16    Q. Okay. Do you know when that was
17 finally received, or if it was finally received?
18    A. I'm referring to note 085, "Received
19 W-2 tax return info. Will submit to
20 underwriting."
21    Q. Okay. And that's on March 10th of '03?
22    A. Yes.
23    Q. Now, was that mandatory for closing,
24 the receipt of those documents?
25    A. I'm going to -- referring to Exhibit 6,

Page 66

1  page 0152, wanted to receive copies of two most
2  recent year-to-date pay stubs and W-2's for
3  borrowers verifying a monthly base salary.
4      Q. So what is that telling you?  Is that
5  telling you --
6      A. It is required, yes.
7      Q. So even with a score, they couldn't
8  have closed until they got those documents in?
9      A. Even with a score.  Depending on what
10  the score was, correct.
11      Q. Is there a set score above which they
12  would not have needed that documentation?
13      A. We have a decisioning solution or a
14  decisioning matrix that if a loan -- if the loan
15  is -- I shouldn't say structured, but the loan
16  scores a certain way, ratios are a certain way,
17  loan dividers are a certain way, credit history,
18  the entire credit portfolio, if you will, is
19  taken into consideration.
20          If it falls into that and a score
21  is a part of that component, we would not
22  require any verification of income.
23      Q. Do you know -- well, you don't know if
24  that situation was present here?
25      A. Correct.

Page 67

1      Q. Can't the underwriter who overrode the
2  lack of a score also have overridden the need
3  for that initial documentation?
4      A. No.
5      Q. Do all of the underwriting work sheets
6  inform the borrowers that that information is
7  going to be needed?
8      A. The document that the client would
9  receive is the commitment letter with the
10  conditions.
11      Q. It would have told them that that
12  information, the W-2's, would have been
13  necessary?
14      A. Yes.
15      Q. When would they have first gotten that
16  information in this instance?
17      A. A commitment letter was issued on
18  April 3rd, 2003.  Wait a minute.
19          A commitment letter -- repeat the
20  question, please.
21          MR. LANE: Ms. Warren, can you
22  help me out, please?
23          (Requested portion of the record
24          was read.)
25      A. I do not know the date.

Page 68

1      Q. Is that something borrowers are
2  typically told at the time of their initial
3  application?
4      A. At the time of initial application,
5  they are told generally what they anticipate the
6  documents to be.  Once the loan is approved, a
7  commitment letter is issued which would contain
8  the conditions for closing or for full loan
9  approval.
10      Q. But in this instance we don't know when
11  they were first advised that they were going to
12  need these W-2 forms?
13      A. The reference that I have -- I'm
14  looking at Exhibit 2, page 0249, notes on
15  February 17th.
16      Q. Of what year?
17      A. 2003.
18      Q. Okay.
19      A. And it's item 062.
20      Q. And that's the only record we can find
21  so far?
22      A. Yes.
23      Q. But that's not to say that they weren't
24  advised of that fact at some earlier point?
25      A. Yes.

Page 69

1          MR. LYONS: Objection.  Calls for
2  speculation.
3          That was Tommy Lyons.
4      A. I don't know the answer to that.
5      Q. Earlier, Ms. Meatte, Mr. Lyons went
6  over the credit reports with you, Exhibits 4
7  and 7, and he went over the inquiries there, and
8  you testified that the additional inquiries were
9  to see if a FICO score was available.  How did
10  you know that?
11      A. I'm going through notes.  Bear with me.
12          Exhibit 2, page 240, item 20
13  dated December 11th, '02.
14      Q. Okay.
15      A. Branch change to 02 from 01.  When we
16  pull credit, we can -- we cannot -- the loan was
17  in a -- from that site, we could not pull any
18  credit information, from branch 01.  The loan
19  needed to indicate branch 02.
20      Q. And what is that telling us?
21      A. That they changed it to pull credit.
22      Q. What's a branch?
23      A. It's a system code.  "BRCH" was
24  reference to branch.
25      Q. So it's your testimony that line 020 of

Page 70

1 page 240 of Exhibit 2 is what tells you that all
2 the inquiries that you discussed with Mr. Lyons
3 was in an effort to find a FICO score?
4     A. Oh, no, I beg your pardon. I'm sorry,
5 no.
6         On item -- still Exhibit 2,
7 page 0240, item 018, on 12-9.
8     Q. Okay.
9     A. That -- the changing of the branch
10 code --
11    Q. Uh-huh.
12    A. -- corresponds with the inquiry on the
13 credit report.
14    Q. Meaning the date is the same?
15    A. Yes. So that would tell me that that
16 was -- that would be an indication to me that
17 credit was pulled that day.
18    Q. The notation there or just the fact
19 that the dates are the same?
20    A. The notation, the branch change from 01
21 to 02.
22    Q. So does the similar indication in
23 line 020 tell you that again?
24    A. 12-11, I -- no.
25    Q. Well, how do you know that means credit

Page 71

1 was reviewed in 018?
2     A. Because it corresponds with the credit
3 report the same date. A credit report in that
4 team could not be pulled unless the branch code
5 was 01.
6     Q. But it says in 018 it was changed to 01
7 from 02?
8     A. Right.
9     Q. That means it was pulled on 12-9. In
10 order to pull credit, the branch code must say
11 "01"?
12    A. Correct.
13    Q. Okay. What else did you use to
14 formulate the basis of that testimony that all
15 the inquiries were to see if a FICO score was
16 correct? That explains 12-9-02.
17    A. I'm going to read through some other
18 notes. Bear with me.
19    Q. Okay.
20    A. That's all that I have at this time.
21    Q. So just that indication on 12-9-02
22 tells you that all of the inquiries that we
23 see --
24    A. Specific to the 12-9-02 inquiry, yes.
25    Q. But you testified earlier that all of

Page 72

1 the additional inquiries from Wells Fargo Home
2 Mortgage were to see if the FICO score was
3 available.
4     A. Yes.
5     Q. And my question is how do you know
6 that, and you referred me to something that
7 refers to December 9th, '02 only.
8     A. There would not be -- the credit
9 report, the initial credit report would have
10 still been useful from the date pulled. We
11 wouldn't -- there would not be another reason
12 for us to pull another credit report.
13    Q. As you look at 018, what about that --
14 what about that entry, 018 on page 240 of
15 Exhibit 2, tells you that the basis of that
16 credit check was to check for the FICO score?
17    A. It does not.
18    Q. How do you know that?
19    A. How do I know what?
20         MR. LYONS: Objection. Asked and
21 answered. It's harassing.
22         This is Mr. Lyons.
23    Q. Mr. Lyons asked you if the additional
24 inquiries that we see on Exhibits 4 and 7 were
25 to check and see if there was a FICO score, and

Page 73

1 you said yes, and my question is, how do you
2 know that?
3     A. There is not another reason that we
4 would need to pull a credit report.
5     Q. And how did you know that this was --
6 so it's a deduction. You have deduced that?
7     A. Yes.
8     Q. Okay. Now, how were you involved with
9 this application process?
10    A. I was the manager.
11    Q. Okay. Do you recall having pulled
12 credit only to look for FICO scores yourself?
13    A. No.
14    Q. And the only documentation you're going
15 to point me to in support of that opinion is
16 what we've talked about before?
17    A. Yes.
18    Q. I'm sorry?
19    A. Yes.
20         MR. LANE: Can we go off the
21 record really quick?
22         (An off-the-record discussion
23         was held.)
24    Q. Again, Ms. Meatte, briefly, I want to
25 go over that line 018 of page 240 of Deposition

Page 74

1 Exhibit 2.
2    A. Yeah.
3    Q. I want to go through that -- I want to
4 go through that line there.
5    A. Line 18?
6    Q. 018.
7    A. Great.
8    Q. Okay. Looks like the "12-9-02," that's
9 the date?
10    A. Correct.
11    Q. Then in the parentheses we have
12 "10:58." Is that the time?
13    A. That's correct.
14    Q. What's that next indication there? It
15 looks like "N878283"?
16    A. That's the employee's number who
17 entered the note.
18    Q. Okay. And what about "BRCH"?
19    A. Branch.
20    Q. And what about "CHG"?
21    A. Change.
22    Q. "To" is like the word "to"; right?
23    A. Yes.
24    Q. Okay. "To 01 from 02"?
25    A. "To 01 from 02," correct.

Page 75

1    Q. Did that tell you that credit was
2 pulled that day?
3    A. That's telling me that the branch code
4 was changed to 01 from 02.
5    Q. And you know that it needs to be 01 in
6 order to pull credit?
7    A. That's correct.
8    Q. Okay. So you don't know even for a
9 fact that credit was pulled that day?
10    A. Correct.
11    Q. And you see in the entry 020, that same
12 document, that it was changed back to 02 on
13 December 11th, '02?
14    A. Correct.
15    Q. And when it's an 02, you can't pull
16 credit?
17    A. Correct.
18    Q. Is Wells Fargo Home Mortgage what we
19 would call a subscriber to Trans Union, meaning
20 can you access Trans Union's credit reports
21 directly, or do you have to go through a
22 reseller?
23    A. You know, I'm not sure.
24    Q. Is Wells Fargo Home Mortgage distinct
25 from Wells Fargo Financial?

Page 76

1    A. We are two separate companies, yes.
2    Q. So if I have inquiries that show Wells
3 Fargo Financial, that would not have been an
4 inquiry associated with this mortgage
5 application?
6    A. That is my understanding.
7    Q. Give me a couple of minutes to check my
8 notes, and I may be close to finished with you.
9          Let's go back to Exhibits 4
10 and 7.
11    A. Exhibits 4 and 7, you say?
12    Q. Yes, ma'am. Those are the credit
13 reports.
14    A. Yes.
15    Q. Okay. And I believe we've already
16 established that that information appears to
17 have come from Trans Union and Experian.
18    A. I'm going to double-check.
19    Q. Okay.
20    A. Correct.
21    Q. Okay. And there's no way to
22 determine -- I believe you testified earlier
23 that you were able to ascertain that the 5414
24 Cross Country Bank account on page 174 of
25 Exhibit 4 was from Experian.

Page 77

1    A. Yes, according to the DOCCTL notes.
2    Q. But yet you were unable to ascertain
3 who generated the Cross Country Bank 4227
4 information on that same report?
5    A. Correct.
6    Q. I believe you're going to try to locate
7 the additional credit reports that were pulled;
8 is that right?
9    A. I will request the file from
10 post-closing to determine if there are any
11 additional credit reports in the file.
12    Q. Are the credit reports that you access
13 there at Wells Fargo Home Mortgage typically in
14 this format as we see in Exhibits 4 and 7?
15    A. Yes.
16    Q. When Wells Fargo obtains a credit
17 report in the fashion of Exhibits 4 and 7 from
18 multiple credit reporting agencies, it's
19 impossible for them to ascertain simply based on
20 the four corners of that report which agency
21 reported which item of information?
22    A. Say it again, please.
23    Q. Is that accurate; that when Wells Fargo
24 Home Mortgage gets their credit reports in the
25 fashion we see in Exhibits 4 and 7, when they

Page 78

1 come from multiple reporting agencies, that the
2 report itself does not distinguish what agency
3 report it was?
4   A. Correct.
5   Q. Does Wells Fargo obtain sort of an
6 electronic version of this that only a computer
7 can read, or does everything come out in a hard
8 copy like this?
9   A. We also do electronic.
10   Q. I'm sorry?
11   A. Electronic.
12   Q. What does that mean?
13   A. Computer.
14   Q. A computer version that's pretty much
15 gibberish to the naked eye that's been
16 translated into what we see in Exhibits 4 and 7?
17   A. I don't know what you mean by
18 "gibberish."
19   Q. Quite often credit reports come in
20 what's called raw data, meaning computer data
21 that's then translated into something we can
22 read like we see in Exhibits 4 and 7.
23   A. Yes.
24   Q. Do you know if that's how the
25 information is transmitted to Wells Fargo Home

Page 79

1 Mortgage?
2   A. The information is transmitted, and it
3 is legible and interpretable.
4   Q. Okay. Just like in Exhibits 4 and 7?
5   A. "Just like," exact format?
6   Q. Yes.
7   A. That I don't believe is the exact
8 format.
9        MR. LANE: Okay. I don't have
10 any further questions. Thank you.
11        CROSS-EXAMINATION
12 BY MR. MANGHILLIS:
13   Q. This is Jeff Manghillis from Experian.
14 I just have a couple of questions.
15        First of all, I want to put on
16 the record that I have not received the
17 documents for this deposition, and therefore,
18 I'm going to keep it open until we do receive
19 the documents, and I may ask you for further
20 questioning sometime down the road.
21   A. Okay.
22   Q. But in the sense of trying to get this
23 taken care of today, a couple of quick
24 questions.
25        First of all, were the Andersons

Page 80

1 denied mortgage or denied credit from Wells
2 Fargo?
3   A. No, not that I'm aware of.
4   Q. Okay. So they got credit from Wells
5 Fargo at the rate that they wanted?
6   A. Yes.
7   Q. And they got credit from Wells Fargo at
8 the terms that they wanted?
9   A. Yes.
10   Q. Did they get the credit for the home
11 they wanted to purchase?
12        MR. LYONS: Objection. Calls for
13 speculation.
14        That's Tommy Lyons.
15   A. Would you mind repeating the question?
16   Q. To your knowledge, did Wells Fargo give
17 the Andersons credit for the home that they were
18 originally planning to purchase?
19   A. That I don't know.
20   Q. Okay. It's my understanding that Wells
21 Fargo did its own separate investigation. You
22 mentioned that earlier; is that correct?
23        MR. LYONS: Objection, vague.
24        Tommy Lyons.
25   A. Would you mind repeating the question?

Page 81

1   Q. Yes. You mentioned earlier that Wells
2 Fargo did its own investigation when it checked
3 into the Andersons' Social Security Numbers;
4 correct?
5   A. I'm not sure I understand the question.
6 Did its own investigation on the Social
7 Security?
8   Q. You mentioned that Wells Fargo
9 contacted the Andersons and did a Social
10 Security check, number check?
11   A. Yes.
12   Q. And what was the term you used for
13 that?
14   A. Let me get -- I'm just going to get it
15 from Exhibit 2. Bear with me.
16        On Exhibit 2, page 0241,
17 item 023, Social Security, address and ZIP code
18 "Same as entered in driver." Is that what
19 you're referring to perhaps?
20   Q. You mentioned that Wells Fargo affirmed
21 that the Andersons were not deceased; correct?
22   A. Yes.
23   Q. Okay. And is that what you're
24 referring to there on Exhibit Number 2?
25   A. We were confirming that we had the

Page 82

1 correct Social Security Numbers.
2    Q. Okay. And what was the term you used
3 for that?
4    A. I don't remember. I'm sorry. Let me
5 see if there's something in the notes that --
6 maybe Social Security verification. I don't
7 recall a term that I used for that. I'm sorry.
8    Q. Now, during this verification, you
9 confirmed the information concerning the
10 Andersons; correct?
11    A. We confirmed their Social Security
12 Number, their address, and ZIP code.
13    Q. And you relied upon that information
14 when granting the Andersons' request for credit;
15 correct?
16    A. We relied on that --
17       MR. LYONS: Objection. Vague and
18 confusing.
19       That's Mr. Lyons.
20    A. We used that information to confirm
21 that what we had in our system was correct.
22    Q. Okay. So that when you granted the
23 Andersons credit concerning that information,
24 you did not rely on the Experian report;
25 correct?

Page 83

1    A. We relied on the reporting of the
2 credit lines, but not the credit score.
3    Q. Okay. And you didn't rely upon any
4 report that the Andersons were deceased;
5 correct?
6    A. We did not confirm that the Andersons
7 were deceased; correct?
8    Q. Did you rely upon that?
9    A. Right. We omitted that as a factor.
10    Q. Okay. Do you know if any delay or any
11 possible delay in the Andersons getting credit
12 caused the Andersons not to close on any
13 particular real estate?
14    A. Any new real estate or the existing --
15 the real estate that they're refinancing?
16    Q. The real estate that they were
17 refinancing. Did it prohibit them from doing
18 that at all?
19    A. In the end, no.
20       MR. MANGHILLIS: Subject to
21 further questions when Experian gets the
22 relevant documents, I have no further questions
23 at this time.
24       THE WITNESS: Okay.
25

Page 84

1       REDIRECT EXAMINATION
2 BY MR. LYONS:
3    Q. Emily, that brings us back to me, Tommy
4 Lyons. I've just got a couple of follow-up
5 questions for you, and then I think we're done.
6    A. Okay.
7    Q. You talked about the subrogation
8 agreement -- or the subordination agreement. Is
9 it true that the subordination agreement isn't
10 necessary unless underwriting approves the loan?
11    A. Correct.
12    Q. That's the first step; right?
13 Underwriting has to approve the loan, and then
14 will continue on with the other conditions that
15 need to be met; correct?
16    A. The loan has to be approved before we
17 get the subordination agreement.
18    Q. Got it. And so based on the notes and
19 on the documents that you have reviewed,
20 underwriting didn't approve the loan until, at
21 the very earliest, February 10th of '03;
22 correct?
23    A. Correct.
24    Q. And that's when the manual override
25 happened due to the lack of a FICO score;

Page 85

1 correct?
2    A. Correct.
3    Q. And it's your testimony today that the
4 lack of the FICO score was caused by the
5 consumers being reported as deceased; correct?
6       MR. LANE: This is Chris Lane for
7 Trans Union. I'm going to object to the form
8 and make a foundational objection.
9    Q. Go ahead, ma'am.
10    A. Correct.
11    Q. All right. Did you personally, Emily,
12 have any direct communication with the
13 Andersons?
14    A. No.
15    Q. Did you have any direct communication
16 at any time with any of the Wells Fargo agents
17 that were attempting to assist the Andersons?
18    A. Not that I am aware of.
19       MR. LYONS: All right. I have
20 nothing further, and I do appreciate your
21 patience and your testimony today.
22       THE WITNESS: Thank you.
23       MR. PERLING: Nothing further
24 from Equifax. This is Lewis Perling.
25       MR. GIRVAN: Nothing further from

Page 86

1  CSC. Thank you, Emily.
2          RECROSS-EXAMINATION
3  BY MR. LANE:
4    Q. Just briefly for Trans Union.
5          Do you know what credit report
6  the overriding underwriter relied on when she
7  made the overriding decision?
8    A. She would have used Exhibit 4 and
9  Exhibit 7.
10   Q. And, again, what was the date that she
11 manually overrode the lack of a score?
12   A. It was February 10th, 2003.
13   Q. And Exhibit 4 was provided to Wells
14 Fargo in November of '02?
15   A. Yes.
16   Q. And Exhibit 7 in January of '03?
17   A. Yes, it was January 10, 2003.  I'm
18 sorry.  Yeah, January 10th, 2003.
19   Q. Again, we might have gone over this,
20 and if so, I apologize.  The override
21 decision -- I know you probably said this --
22 that was discretionary on her part, right, not a
23 matter of Wells Fargo doesn't have a set policy?
24   A. Not that I'm aware of.
25        MR. LANE:  Okay.  No further

Page 87

1  questions.  Thank you.
2          MR. MANGHILLIS:  No further
3  questions from Experian.
4          MR. LYONS:  Emily, I'm not your
5  lawyer -- this is Tommy Lyons -- but you have
6  the right to read and sign your deposition, or
7  you can waive that right.
8          And I'm not telling you what to
9  do.  I'm just telling you that those are your
10 two options.  You have the right to review it,
11 look it over, and make any changes that you feel
12 are necessary, or you can waive that right to do
13 that, but once -- you have to make a decision
14 one way or the other now and let the court
15 reporter know what you decide, and then it's
16 kind of then you go down either path, but I'm
17 not giving you any advice as to what to do.  I
18 just want you to know that you've got that
19 option.
20        THE WITNESS:  Just so I
21 understand, review and sign it, if there's
22 anything that I -- that came -- that is not
23 accurate or was misunderstood by the court
24 reporter, I can clarify that?
25        And if I waive it --

Page 88

1          MR. LYONS:  Then you waive it.
2          THE WITNESS:  Okay.
3          MR. LYONS:  You can tell the
4  court reporter whether or not you'll want to
5  review it or whether you say, "You know what, I
6  waive it."
7          THE WITNESS:  Yeah, I will want
8  to review it.
9          MR. LYONS:  Okay.  Then you have
10 to make arrangements with the court reporter for
11 her to get the copy to you for you to review it,
12 and you can do that with her.
13          Right, Madame Court Reporter?
14          THE COURT REPORTER:  Right.
15          MR. LYONS:  All right.  Thanks,
16 everybody.  We're off the record.
17          THE REPORTER:  The deposition of
18 Emily Meatte is now complete.  When transcribed,
19 the original of the deposition and the original
20 exhibits shall be given to Mr. Lyons.
21          (Deposition concluded at 12:26 p.m.)
22          (UNLESS OTHERWISE DIRECTED BY
23 COUNSEL OR THE PARTIES HERETO, THE STENOGRAPHIC
   NOTES FOR THE FOREGOING DEPOSITION SHALL BE
24 DESTROYED AFTER A PERIOD OF 3 YEARS FROM THE
   DATE OF TAKING OF SAID DEPOSITION.)
25

Page 89

1          SIGNATURE PAGE
2          I, EMILY MEATTE, the witness in
3  the foregoing deposition, do hereby certify that
4  I have read the foregoing 88 pages of
5  typewritten material and that the same is, with
6  the corrections noted on the attached page, if
7  any, a true and correct transcription of my
8  deposition upon oral examination given at the
9  time and place herein stated.
10
11
12        EMILY MEATTE
13
14
15    Subscribed and sworn to before me this
16 ____ day of _____, 2004.
17
18
19
20
21          _____
                  Notary Public
22
23
24
25

1

UNITED STATES DISTRICT COURT
WESTERN DIVISION OF WISCONSIN
COURT FILE NO. 03-C-0510 C

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Penny Lee Anderson and
Russell D. Anderson, Sr.,

                        Plaintiffs,

     vs.

Trans Union, L.L.C.;
Experian Information Solutions, Inc.;
CSC Credit Services, Inc.; and
Equifax, Inc. d/b/a Equifax Information
Services, LLC,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


DEPOSITION OF

BRIAN C. BARTON

JUNE 17, 2004


COPY


Lynda L. Sandy, Court Reporter
APS INTERNATIONAL, LTD.
APS International Plaza
7800 Glenroy Road
Minneapolis, Minnesota 55439-3122
PHONE (952)831-7776 * FAX (952)831-8150

Page 4

1         BRIAN C. BARTON,
2       having been first duly sworn,
3     was examined and testified as follows:
4
5         EXAMINATION
6 BY MR. LYONS:
7    Q.  State your full name, sir.
8    A.  Brian Christopher Barton.
9    Q.  And Brian Christopher Barton, where do you
10 live?
11    A.  I live at 20683 Hampshire Way, that's
12 Lakeville, Minnesota  55044.
13    Q.  And you are here today pursuant to directions
14 from your employer, Ameriquest Mortgage, is that it?
15    A.  That is correct.
16    Q.  And Ameriquest Mortgage has been subpoenaed
17 and a Notice of Deposition has also been served on them,
18 and so I'm showing you what has been marked as Exhibit
19 1.
20         MR. LYONS:  And for those of you not
21 present, Exhibit 1 is the Notice of Taking Deposition
22 with its attachment, Exhibit A, a letter dated September
23 11, 2003, from Ameriquest Mortgage Company to Penny
24 Anderson.
25

Page 5

1 BY MR. LYONS:
2    Q.  Have you seen this document before, sir,
3 Exhibit 1?
4    A.  Yes, I have.
5    Q.  And how have you informed yourself to answer
6 questions today on behalf of Ameriquest?
7    A.  I have read through this exhibit, Exhibit
8 Number 1.
9    Q.  All right.  And have you looked at any other
10 documents with respect to the claims of -- or the file
11 of Penny and Russell Anderson?
12    A.  Yes, I have.
13    Q.  And what documents would those be, sir?
14    A.  That would be Exhibit Number 2, which is the
15 credit report, and I believe the 1003, the application
16 for the mortgage.
17    Q.  All right.  And why don't you take a look at
18 Exhibit 2.
19         MR. LYONS:  And Everybody, Exhibit 2 has
20 got a cover sheet on it of the Dierdre Turner affidavit.
21 The second page up in the upper right-hand corner has
22 got -- it's a fax from Ameriquest, it's got the
23 Ameriquest fax line on it and it starts with P 002/020,
24 which is the November 4, 2003, letter from Penny
25 Anderson to Ameriquest asking for records.  And then it

Page 6

1 goes on from there 03/020 all the way through 020/020,
2 so there are 19 pages.  And what I believe is missing is
3 the fax cover sheet and I've looked for it and I can't
4 find it here today.  And then the first --
5         MR. GIRVAN:  The copies I have from you
6 don't have fax numbers on them.
7         MR. LYONS:  They don't?  Okay, we'll
8 have to --
9         MR. CENTO:  This is John Cento, mine
10 don't either.
11         MR. LYONS:  All right.  Then we'll
12 describe them sheet by sheet, but they are all part of
13 Exhibit 20.  And generally what they consist of,
14 there's --
15         MR. CENTO:  Did you say Exhibit 20 or
16 Exhibit 2?
17         MR. LYONS:  Excuse me.  Exhibit 2 is a
18 20-page exhibit, and we'll describe each of the 20 pages
19 as we go through it, okay?
20         MR. CENTO:  Okay.
21         MR. LYONS:  And these are records, I
22 represent to all of you right now, and Mr. Barton will
23 correct me as we go through the course of the deposition
24 as to whether these are all of the records regarding the
25 loan application, mortgage application that Penny

Page 7

1 Anderson and Russell Anderson put to Ameriquest in
2 approximately September of 2003 and related documents,
3 the application and the related documents.  So I'm going
4 to proceed with Mr. Barton now under the understanding
5 that I'll identify each of the pages in Exhibit 2 when
6 we get to it.
7 BY MR. LYONS:
8    Q.  Now, you have familiarized yourself with the
9 Anderson application so that you can testify on behalf
10 of Ameriquest Mortgage, Mr. Barton.  Do you have any
11 personnel knowledge of either Mr. Anderson or Mrs.
12 Anderson or this specific application itself?
13    A.  What I remember is vaguely taking the
14 application from the beginning; and the reason why I
15 remember is that we had to deny them credit because it
16 showed on the correct report that they were deceased,
17 therefore, we could not give them a loan.
18    Q.  All right.  So were you in their presence or
19 did you do this over the phone or how do you remember
20 this transaction?
21    A.  This was all over the telephone.
22    Q.  And from looking at Exhibit 2 -- or Exhibit 1,
23 which has a copy of the denial letter attached to it as
24 Exhibit A, can you tell why the Andersons were seeking a
25 mortgage from Ameriquest; was it in response to some

Brian C. Barton
6/17/04

Multi-Page™

Anderson v. Trans Union, et al

Page 20

1 have been looking for six total credit scores; is that
2 it?
3    A.  That is correct.
4    Q.  And when you looked at this exhibit and as you
5 look at it again today, Exhibit 2, this page one of the
6 credit report from Equifax Mortgage Services --
7    A.  Uh-huh.
8    Q.  -- how many out of the six were reported?
9    A.  There's one score, it shows two scores, it
10 looks like 9001, I mean, that's -- I don't think that is
11 an accurate score, there is no such score as 9001, the
12 9 0 0 1 right here on the second and third lines down.
13    Q.  And you're pointing to the Fair Isaac model
14 score for --
15    A.  Yes, and then it says deceased, correct.
16    Q.  And then the other one below it is --
17    A.  The rest of -- the next one, two, three, four,
18 I think there's only four more, all say deceased for
19 Penny and Russell.
20    Q.  All right.  So out of the six, there were five
21 no scores or scores that indicated deceased?
22    A.  Here I only see four; one, two, three, four.
23    Q.  Let me just take a quick look.
24    A.  Okay, up on the top, I didn't see that one so
25 there is five that say deceased.

Page 21

1    Q.  And of the five that say deceased, how many
2 are for Penny and how many are for Russell?
3    A.  Three say deceased for Penny and two say
4 deceased for Russell.
5    Q.  All right.  Now, when you went to the manager,
6 what were you seeking from your manager, Mike I think
7 you said, Mike Sampson when you went and took this
8 application to him?
9    A.  I just had no idea what to do; I mean, I was
10 talking on the phone with someone who is alive that on
11 the credit report says they're deceased, so I didn't
12 know if there was some way -- if I was supposed to
13 contact the credit bureau, I wasn't sure how that
14 worked, and he said I wasn't supposed to do that, the
15 customer had to make that next step.  Because I wanted
16 to do everything I could for the customer to get a loan
17 in process for them.
18    Q.  So whose responsibility at Ameriquest Mortgage
19 was it to communicate this back to Penny and Russell,
20 that their loan application had not gone through?
21    A.  That was my job.
22    Q.  And in what fashion did you make that
23 communication; did you do it by phone or by mail?
24    A.  I did it -- I personally gave her, if I
25 remember, gave her a call before the Exhibit 1-A -- or

Page 22

1 Exhibit A --
2    Q.  Of Exhibit 1?
3    A.  -- of Exhibit 1 was sent out, I had contacted
4 her and told her that there was -- that they would have
5 to make that next step and call the credit bureaus, and
6 once it was all taken care of we could reevaluate that
7 situation.
8    Q.  All right.  Now, does this letter, Exhibit A
9 that we see attached to Exhibit 1 of your deposition, is
10 that something that goes from your local office in
11 St. Paul or does it come from some other mail center for
12 Ameriquest?
13    A.  I believe it comes from our corporate office
14 in California.
15    Q.  How then does the corporate office in
16 California know that Mr. Sampson and you were not able
17 to process this loan application?
18    A.  We basically -- into the computer we put that
19 the credit was denied.
20    Q.  All right.  And the denial, are you the one
21 that puts the X in the box that we see here on Exhibit
22 A?
23    A.  No, I am not.
24    Q.  Do you send a code to the headquarters or how
25 does that get done?

Page 23

1    A.  I really don't know.
2    Q.  This box says that, we do not grant credit on
3 any -- let's see, excuse me, it says, "We do not grant
4 credit to any applicant on the terms and conditions you
5 have requested."  Have you used that type of coding
6 yourself in any part of your job at Ameriquest?
7    A.  No.
8    Q.  And what do you believe you communicated to
9 California or wherever the headquarters were that issued
10 this Exhibit A credit denial?
11    A.  In the computer we just put -- it says "credit
12 denied," so that's all, we just click on that and then
13 these forms are generated, I believe, from our corporate
14 office.
15    Q.  And as far as you know the process at
16 Ameriquest, can headquarters override what you tell
17 them; in other words, you tell them, we denied credit
18 here locally for whatever reason, can they then alter
19 the reason or grant credit?
20    A.  I'm really not sure.
21    Q.  Okay.  And in this case you coded in "credit
22 denied," and what was the reason for credit being denied
23 at your local office between you and the branch manager
24 Mr. Sampson?
25    A.  That the credit bureaus were reporting that

Page 24

1 the customers were deceased.
2    Q. All right. When you were taking this
3 application, the first application that you had where
4 someone was asking for a loan and they were being
5 reported as deceased by the credit bureau, do you look
6 through the credit report that you have downloaded and
7 attempt to analyze it in any way or make any
8 determination or do you stop with the fact that they
9 were reported deceased on the first page?
10   A. No, if I remember right, I still -- I made a
11 call to Penny and I told her what was showing on the
12 credit report, that her and Russell were deceased. I
13 still went through the whole credit report to see if
14 this stuff on there that was reporting was accurate; and
15 if I remember right, all the stuff on here was theirs,
16 all these accounts were correct.
17   Q. Except the part about --
18   A. Being deceased.
19   Q. Okay. And do you recall if Ms. Anderson had
20 any reaction to you telling her that she was denied
21 because she was deceased?
22   A. I really cannot remember.
23   Q. All right. And did you have any further
24 contact with Ms. Anderson after that phone call early in
25 September on the day that she applied for the loan?

Page 25

1    A. After that I don't think we had anymore
2 contact until she had mailed me this request for the
3 denial letter. I actually gave -- the second I got this
4 I actually gave her a call and told her I would, you
5 know, get all the necessary paper or documents together
6 and I would next day Fed-Ex them to her.
7    Q. And did you sense any emotion or lack of
8 emotion at her end of that phone conversation when you
9 responded to the handwritten letter we see as part of
10 Exhibit 2? And that handwritten letter, by the way, is
11 dated November 4, 2003.
12       MR. RAWLIN: This is Dustin Rawlin. I'm
13 going to object for lack of foundation, calls for
14 speculation.
15       MR. LYONS: All right.
16 BY MR. LYONS:
17   Q. You can answer, he's just objecting.
18   A. Okay. I remember Penny Anderson, she was
19 always very nice to me, she just seemed, you know,
20 really frustrated with the fact that this -- she was
21 having a hard time getting this taken care of because
22 she was being turned down for everything; credit cards,
23 if I remember right, any kind of -- anything she
24 applied for with credit she was being turned down and
25 she just really wanted to get this taken care of, but

Page 26

1 she was always very nice to me.
2        MR. LYONS: All right. I don't have any
3 further questions.
4        MR. PERLING: This is Lewis Perling, who
5 wants to go next? Shall it be me?
6        MR. LYONS: Go ahead, you spoke up.
7        MR. CENTO: Who's going to go after
8 that? I'll take next, if that's okay. This is John
9 Cento.
10       MR. RAWLIN: That's fine, John, I can go
11 whenever.
12       MR. CENTO: Okay.
13       EXAMINATION
14 BY MR. PERLING:
15   Q. This is Lewis Perling, I represent Equifax.
16 How are you today, Mr. Barton?
17   A. I'm doing pretty good. How about yourself?
18   Q. Doing fine. Doing fine.
19   A. Good.
20   Q. Did you have an opportunity to talk to the
21 plaintiff's attorney, Mr. Lyons, prior to giving your
22 deposition today?
23   A. Just when I walked in the door.
24   Q. What did you all talk about when you came in
25 the door today?

Page 27

1    A. He just basically told me that we would be
2 coming in this room and we'd be getting on a conference
3 call and I'd be getting asked some questions.
4    Q. Okay. Did you discuss the questions that you
5 might be asked with Mr. Lyons prior to the deposition?
6    A. No, I was not. No, I did not.
7    Q. How about with any of the attorneys for your
8 company?
9    A. No, I have not.
10   Q. Have you ever given a deposition other than
11 today?
12   A. No, I have not.
13   Q. Now, you said that Ms. Anderson contacted your
14 company via the Internet, correct?
15   A. That is correct.
16   Q. Did she fill out an application via the
17 Internet?
18   A. To the best of my knowledge.
19   Q. We don't have that application that she filled
20 out via the Internet here in front of us, do we?
21   A. Probably not.
22       MR. LYONS: He's looking through Exhibit
23 2 right now, and do you see it in there, sir?
24       THE WITNESS: No, no, I do not.
25

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

STEPHEN OLWELL,

Civil No. 01-1481 (JRT/FLN)

Plaintiff,

v.

MEDICAL INFORMATION
BUREAU, a/k/a MIB Group, Inc.;
LINCOLN BENEFIT LIFE
COMPANY, a/k/a Allstate Financial
Corporation,

**MEMORANDUM OPINION AND
ORDER ON DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT**

Defendants.

Thomas J. Lyons, Sr., THOMAS J. LYONS & ASSOCIATES, P.A., 342
County Road D, Little Canada, MN 55117.

Patrick J. Rooney and Patrick Alan Reinken, RIDER BENNET EGAN &
ARUNDEL, 2000 Metro Center, 333 South 7th Street, Minneapolis, MN
55402, for defendant Medical Information Bureau.

Laura L. Myslis, GISLASON & HUNTER, P.O. Box 5297, Hopkins, MN
55343-2297, for defendant Lincoln Benefit Life Company.


Plaintiff filed this action against defendants Medical Information Bureau ("MIB")

and Lincoln Benefit Life Company ("Lincoln Benefit") under the Fair Credit Reporting

Act ("FCRA") alleging that they falsely reported that he is a smoker. Plaintiff claims this

false report caused him to be denied a most-favorable 20-year renewable life insurance

FILED _____
          RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD. _____
DEPUTY CLERK _____

Exhibit L

policy.  Plaintiff also asserts claims for defamation and invasion of privacy ("common law claims").  Defendants have each moved for summary judgment on plaintiff's FCRA claims and common law claims.  For the reasons discussed below, the Court grants defendant MIB's motion for summary judgment on the FCRA § 1681e(b) claim, and grants both defendants' summary judgment motions on plaintiff's common law claims. In all other respects, defendants' motions are denied.

## BACKGROUND

Plaintiff applied for a life insurance policy from Lincoln Benefit in October 1999. As part of the application, plaintiff submitted blood and urine samples.  Those samples were sent to a testing lab, Osborn Laboratories ("Osborn").  Osborn tested the samples for various substances, including cotinine.  Plaintiff's urine tested positive for cotinine, which indicates that he had experienced nicotine use within a certain time prior to the test.  Osborn retested the sample, and again it was positive.  Osborn then informed Lincoln Benefit of the positive result, and Lincoln Benefit reported the results to MIB.

Defendant MIB is a not-for-profit association of life insurance companies of which Lincoln Benefit is a member.  MIB collects information from member companies and, when authorized, provides that information to other life insurance member companies.  MIB thus prevents potential fraud from insurance applicants who might attempt to conceal or omit information relevant to insurance underwriting.  For this summary judgment motion, MIB concedes that it is a "consumer reporting agency" ("CRA") as defined by the FCRA.

Shortly after obtaining the positive test results, in January of 2000, Lincoln Benefit offered plaintiff a "smoker" policy for $250,000 coverage at a cost of around $1,000 per year.[1]  Plaintiff did not purchase the policy.  Lincoln Benefit also informed plaintiff about his rights under the FCRA.

Almost a year after turning down the Lincoln Benefit policy, in December 2000, plaintiff applied for a life insurance policy through AIG[2] and again submitted a urine sample.  Although the urine sample plaintiff provided in 2000 tested negative for cotinine, his 1999 result influenced the policy that AIG offered plaintiff.  In January of 2001, AIG offered plaintiff a "standard plus" non-smoker's policy, at a rate of $450 per year for $250,000 coverage.  The comparable Lincoln Benefit policy was $470 per year for the same amount of coverage, however, the AIG policy was guaranteed for only ten years, while the Lincoln Benefit policy would have been guaranteed for twenty years.

After realizing the 1999 test resulted impacted his insurability, plaintiff began to inquire about his consumer medical file.  He wrote to MIB requesting information, and MIB responding by disclosing the report to plaintiff and informing him that he could seek a correction if he believed the information was incorrect.  Upon reviewing the report, plaintiff believed that it contained an error.  He then wrote to MIB requesting that MIB contact Lincoln Benefit to find out how to correct the mistake and restore his record.  In March 2001, MIB forwarded plaintiff's letter to Lincoln Benefit.  At that time MIB also

---

[1] Plaintiff testified that the policy was offered at $1,095 per year, while the insurance broker remembers that the policy was offered at $985.50.  *See* Plaintiff's brief at 4 and MIB's brief at 6.  This slight difference does not impact the Court's summary judgment decision.

[2] AIG is not a party to this action.

provided plaintiff a "Request for Reinvestigation" form and asked that he return it. MIB requested that Lincoln Benefit initiate a reinvestigation according to "MIB Policy and Procedures." MIB also provided plaintiff's record and a "Guide to Reinvestigation" to Lincoln Benefit.

In April Lincoln Benefit advised plaintiff that it had confirmed the results of the test with the testing facility and noted that the testing facility verified that the chain of custody was intact. Lincoln Benefit told plaintiff that it was their practice not to retest urinalysis when the chain of custody was intact. MIB then informed plaintiff that he could contest the accuracy of the MIB report, but plaintiff did not do so. MIB also informed plaintiff that he could submit a concise statement setting forth what he believed was the correct relevant or fair information, and stating the reasons why he disagreed with MIB's refusal to correct, amend, or delete recorded personal information. Plaintiff did not submit such a statement.

## ANALYSIS

### I.      The Fair Credit Reporting Act[3]

The crux of plaintiff's complaint under the FCRA is that defendant MIB failed to take reasonable steps to ensure the accuracy of the initial report (a violation of § 1681e(b)), and that both defendants subsequently failed to reinvestigate after he notified them of the alleged inaccuracy (a violation of § 1681i(a)(1)(A) and § 1681s-2(b)).

---

[3] 15 U.S.C. §§ 1681 *et seq.*

The FCRA gives consumers certain rights with respect to the credit information that is maintained and distributed about them, including the ability to receive a notice of an adverse action based on the credit information, to obtain a copy of the information, and to dispute the accuracy of that information. Consumer reporting agencies ("CRAs") must follow reasonable procedures to assure the maximum possible accuracy of the information concerning the individual whose consumer history is stored on their database. 15 U.S.C. § 1681e(b).[4] In addition, CRAs are required to reinvestigate if a consumer notifies the agency of a dispute regarding the completeness or accuracy of information contained in a consumer's credit report. 15 U.S.C. § 1681i(a)(1)(A).[5] During the reinvestigation, the CRA is required to review and consider all relevant information submitted by the consumer within 30 days. *Id.* After the reinvestigation, the CRA must either correct the file, or if it finds no errors, allow the consumer to file a brief statement of the dispute, which must be included in subsequent consumer reports. 15 U.S.C. § 1681i(b), (c).

Agencies that furnish information to CRAs, such as defendant Lincoln Benefit, also have responsibilities under the FCRA. Such agencies are required to conduct

---

[4] 15 U.S.C. § 1681e(b) states: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

[5] Section 1681i(a)(1)(A) states:

> If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5),

investigations pursuant to the requirements of § 1681i when the agencies receive notice that the information provided to the CRA has been disputed. 15 U.S.C. § 1681s-2(b)(1); *see also Bruce v. First U.S.A. Bank, Nat'l Ass'n*, 103 F. Supp. 2d 1135, 1142-43 (E.D. Mo. 2000) (discussing duties under § 1681s-2(b)(1) and the level of investigation required under § 1681s-2(b) and holding that the level of investigation required under § 1691s-2(b)(1) is equivalent to that required by § 1681i(a)).

The FCRA provides consumers with a cause of action for negligent noncompliance with §§ 1681e and 1681s-2(b), and permits the recovery of actual damages, costs, and attorney fees. 15 U.S.C. § 1681o; *see also Bruce*, 103 F. Supp. 2d at 1143 (holding consumers have private causes of action against furnishers of credit information who violate § 1681s-2(b)); *Campbell v. Baldwin*, 90 F. Supp. 2d 754, 756 (E.D. Tex. 2000) (same). *But see Carney v. Experian Info. Solutions, Inc.*, 57 F. Supp. 2d 496, 502 (W.D. Tenn.1999) (consumers do not have a private cause of action under §1681s-2(b)). Where the violation of the FCRA is willful, consumers are entitled to recover punitive damages in addition to the damages available for negligent noncompliance. 15 U.S.C. § 1681n; *see also Bruce*, 103 F. Supp. 2d at 1143.

## II.    Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer."

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not merely rest upon allegations or denials in its pleadings, instead it must set forth specific facts by affidavits or otherwise show that there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

**III.     Reasonableness of Initial Procedures**

CRAs must follow reasonable procedures to assure the maximum possible accuracy of the information concerning the individual whose consumer history is stored on their database. 15 U.S.C. § 1681e(b). Plaintiff suggests that it is not reasonable for defendant MIB to rely on information from its members when compiling reports on

- 7 -

consumers. He complains that MIB fails to supervise its members, and has no safeguards to ensure the reliability of information.

The reasonableness of procedures is usually a jury question. *See Crabill v. Trans Union*, 259 F.3d 662, 664 (7th Cir. 2001). However, section 1681e(b) does not impose strict liability on credit reporting agencies. *Spence v. TRW, Inc.*, 92 F.3d 380, 383 (6th Cir. 1996); *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151 (11th Cir. 1991); *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982). Therefore to survive a motion for summary judgment, a plaintiff must do more than allege that a report contained inaccuracies or that a defendant relied on inaccurate sources when compiling their reports. The plaintiff must offer specific facts that could allow a reasonable fact-finder to determine that defendant's procedures were not reasonable. In this case, plaintiff has not set forth specific facts that would allow a reasonable jury to find that defendant MIB's procedures were unreasonable.

Plaintiff's central complaint is that the cotinine test was inaccurate, and that MIB and Lincoln Benefit relied on that inaccurate test result in compiling his consumer medical report. Plaintiff does not, however, assert that the testing lab, Osborn, is an unreliable source. He puts forth no evidence that defendants had reason to question the veracity of the continine test result. In fact, the evidence before the Court shows that Osborn is an unusually reliable source. The error rate at the testing facility is exceptionally low; plaintiff does not dispute that the error rate was .000001% in 2001. Further, plaintiff does not dispute that the testing lab followed careful procedures to

- 8 -

ensure the chain of custody of the urine sample was intact, or that Osborn retested the sample after the initial positive result.

Where, as here, the reporting agencies have no reason to suspect their initial source was inaccurate, it would be unduly burdensome to require the agency to take additional steps to verify the accuracy of its initial source of information. *See, e.g., Henson v. CSC Credit Services,* 29 F.3d 280, 285 (7th Cir. 1994) (holding that it was reasonable, as a matter of law, for credit reporting agency to rely on information obtained from state court's judgment docket); *cf. Cushman v. Trans Union Corp.,* 115 F.3d 220, 224-26 (3rd Cir. 1997) (holding that where a consumer reporting agency relies on a reliable source, it does not have a duty to go beyond its original source unless a consumer alerts a consumer reporting agency to an alleged error).

Several circuits have reasoned that, as an initial matter, a CRA does not have a duty to investigate its sources of information, at least where those sources are reasonably reliable. *See Cushman,* 115 F.3d at 225; *Henson,* 29 F.3d at 286 (holding CRA not liable under § 1681e, as a matter of law, for reporting incorrect information obtained from a court's judgment docket). This Court concurs that absent any indication that the information in the consumer's report is inaccurate, § 1681e(b) does not mandate that the CRA go beyond the initial reported information when compiling the report.

In addition, plaintiff's argument improperly conflates the requirements of § 1681e(b) in preparing the initial consumer report, with those of § 1681i in reinvestigating disputed information. *See Cushman,* 115 F.3d at 225 (reasoning that § 1681e(b) and § 1681i(a) should not be read as to render the two sections duplicative of

- 9 -

each other).   The reasonable procedures required under section 1681e(b) are not identical to the reinvestigation procedures mandated by § 1681i(a). *See Cushman*, 115 F.3d at 225 (affirming the grant of judgment as a matter of law as to § 1681e(b), but finding judgment as a matter of law not warranted as to § 1681i). Accepting plaintiff's argument would require that consumers be alerted to information **before** it is entered on their reports and that consumers further be given a chance to dispute the information **before** it reaches the report. Not only are these requirements unduly burdensome, but also the plain language of § 1681e(b) imposes no such duties. Instead, § 1681i grants consumers the right to voice disputes once the report has been issued. Section 1681i imposes on CRAs the responsibility to investigate and correct information once it has been disputed. Plaintiff's reading of the statute would, in effect, impose strict liability on reporting agencies, an imposition that is not supported by the plain language of the statute, and has been repeatedly rejected by courts. *Spence*, 92 F.3d at 383; *Cahlin*, 936 F.2d 1151; *Thompson*, 682 F.2d at 513. The initial reporting of a test result, when the reliability of the source is not in question, is not unreasonable even if the consumer did not have an opportunity to challenge it. Therefore, plaintiff's § 1681e(b) claim against defendant MIB does not survive summary judgment.

## IV.     Reasonableness of the Reinvestigations

Because §§ 1681i and 1681s-2(b)(1) impose different burdens than § 1681e(b), summary judgment, even if appropriate on a § 1681e(b) claim, may not be warranted on a § 1681i or § 1681s-2(b)(1) claim. *Cushman,* 115 F.3d at 225. Sections 1681i and 1681s-2(b)(1) require CRAs, and the agencies that furnish information to them, to reinvestigate

if a consumer notifies the agency of a dispute regarding the completeness or accuracy of information contained in a consumer's credit report. 15 U.S.C. §§ 1681i(a)(1)(A) and 1681s-2(b)(1). In this case, plaintiff sent a letter to MIB on March 21, 2001 stating that he believed that he had been inaccurately characterized as a smoker. MIB then forwarded the letter to Lincoln Benefit, with instructions to investigate. Included in MIB's correspondence to Lincoln Benefit was a "guide to reinvestigation" that specified that Lincoln Benefit was to contact sources identified by the consumer who reasonably may be expected to have information directly relevant to the disputed item. Although plaintiff provided names of sources, including his personal physician, neither defendant contacted any outside sources. Instead, the extent of the reinvestigation was to contact the testing company, and verify that the chain of custody was intact and that the sample had been tested twice.

Plaintiff argues that the failure to contact outside sources illustrates the unreasonableness of the reinvestigation, and shows defendants willfully failed to comply with their own policies. Defendants assert that the sources plaintiff cited were not "reasonably expected to have information directly relevant to the disputed item." In essence, the parties each characterize the information in the file differently. Plaintiff offered information about his status as a nonsmoker, while defendants focused on the more narrow issue of the results of the cotinine test. It is clear, however, that the import of a positive test for cotinine is to assume that the applicant is a smoker.

The FCRA does not impose strict liability for all errors on reports. *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995). In addition, most of

- 11 -

the cases interpreting FCRA involve inaccurate credit information.  Such information is both more likely to be incorrect than a medical test, and it is more amenable to verification once the consumer disputes it.  Nonetheless, a reasonable jury could find that the procedures followed by MIB and Lincoln Benefit — specifically, the failure to contact outside sources — were unreasonable.  As a result, summary judgment must be denied on this claim against both defendants.

## COMMON LAW CLAIMS

### I.   Preemption

State-law privacy causes of action, such as defamation and invasion of privacy, are preempted by the FCRA unless plaintiff shows that the disclosures were made with "malice or willful intent to injure." 15 U.S.C. § 1681h(e).[6]  Summary judgment is appropriate on such claims where the record shows no malice or willful intent to injure. *Rhodes v. Ford Motor Credit Co.*, 951 F.2d 905, 906 (8th Cir. 1991).  The "malice" or "willful intent to injure" standard is equivalent to the *New York Times* standard that a statement be made with "knowledge that it was false or with reckless disregard of whether it was false or not." *Thornton v. Equifax, Inc.*, 619 F.2d 700, 703 (8th Cir. 1980) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)).  The showing of malice or willful intent to injure under § 1681h(e) is a higher standard of proof than the willfulness required for punitive damages under § 1681n. *Bruce v. First U.S.A. Bank,*

---

[6] In pertinent part, this section states, "no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence . . . except as to false information furnished with malice or willful intent to injury such consumer."

*Nat'l Ass'n*, 103 F. Supp. 2d 1135, 1145 (E.D. Mo. 2000) (citing *Thornton v. Equifax, Inc.,* 619 F.2d 700, 703 (8th Cir. 1980)).

Plaintiff has put forth no evidence that MIB or Lincoln Benefit acted with malice or willful intent to injure. The undisputed evidence is that MIB and Lincoln Benefit concluded, whether erroneously or not, that the information about plaintiff's cotinine test result was accurate. Nothing plaintiff has offered indicates that MIB or Lincoln Benefit knew either that the test itself was wrong, or that either entity entertained any doubt about the veracity of the test, yet reported it anyway. In fact, plaintiff did not inform defendants that he disputed the test result until after the information was reported. There are no genuine disputes of fact that could lead a reasonable jury to determine that defendants willfully or maliciously intended to injure plaintiff. Therefore plaintiff's common law claims are preempted by the FCRA.

## II.    Defamation

Moreover, even if the defamation claim were not preempted, plaintiff has not demonstrated its elements. To successfully state a cause of action for defamation, a plaintiff must show (1) that the statement was false; (2) that it was communicated to someone besides the plaintiff; and (3) that it tended to harm the plaintiff's reputation and lower him in the estimation of the community or expose him to public hatred, contempt, ridicule, or degradation. *Rouse v. Dunkley & Bennett, P.A.,* 520 N.W.2d 406, 410 (Minn. 1994); *Phipps v. Clark Oil & Ref. Corp.*, 408 N.W.2d 569, 573 (Minn. 1987). Plaintiff

- 13 -

has not shown that the statement that he tested positive for cotinine injured his reputation or exposed him to public hatred, contempt, ridicule, or degradation.

In addition, Minnesota law exempts from liability those who "merely deliver or transmit defamatory material previously published by another" unless they "knew, or had reason to know, that the material was false." *Church of Scientology of Minnesota v. Minnesota State Med. Ass'n Found.,* 264 N.W.2d 152, 156 (Minn. 1978) (citing the Restatement (Second) of Torts § 581 (1977)); *see also Cole v. Star Tribune,* 581 N.W.2d 364, (Minn. Ct. App. 1998) (relying on *Church of Scientology* to recognize a "wire service" defense). A reasonable jury could not find that MIB or Lincoln Benefit knew, or had reason to know, that the information was false when it was reported. Therefore, even if the claims were not preempted, summary judgment would be appropriate on the defamation claim.

## III.   Invasion of privacy

Finally, plaintiff claims "invasion of privacy." Again, even if preemption were inappropriate, plaintiff cannot demonstrate the elements to support such claims. Invasion of privacy claims have only recently been recognized in Minnesota. *See Lake v. Wal-Mart Stores, Inc.,* 582 N.W.2d 231 (Minn. 1998) ("Whether Minnesota should recognize any or all of the invasion of privacy causes of action is a question of first impression."). In *Lake,* the court referenced the Restatement (Second) of Torts for definitions of each of the four traditional invasion of privacy torts. The *Lake* court recognized a right to privacy, including causes of action in tort for intrusion upon seclusion, appropriation, and

- 14 -

publication of private facts. *Lake*, 582 N.W.2d at 236. Plaintiff's invasion of privacy claim could be construed as a claim for intrusion upon seclusion or publication of private facts.

## A.     Intrusion upon seclusion

"Intrusion upon seclusion occurs when one 'intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person.'" *Lake*, 582 N.W.2d at 233 (citing Restatement (Second) of Torts, § 652B (1977)). Further, the plaintiff must have a reasonable expectation of seclusion or solitude in the data source. *Swarthout v. Mutual Service Life Ins. Co.,* 632 N.W.2d 741, 744-45 (Minn. Ct. App. 2001). In this case, plaintiff knew that the results of the cotinine test would be disclosed. In fact, he authorized the disclosure. Plaintiff does not complain that the data was disclosed beyond the insurance companies. The reasonableness of plaintiff's expectation of privacy is often a jury question, but in this case, a reasonable jury could not find that plaintiff had a reasonable expectation of privacy in the data because he explicitly authorized its disclosure. *See Swarthout,* 632 N.W.2d at 745 (citations omitted) (noting that questions of reasonableness are frequently left to the jury, but they become questions of law when reasonable persons can draw only one conclusion from the evidence).

## B.     Publication of private facts

Plaintiff's invasion of privacy claim also could be construed as a claim for publication of private facts. The *Lake* court incorporated the Restatement (Second)

definition of this tort. 582 N.W.2d at 233. "'Publication of private facts' is an invasion of privacy when one gives publicity to a matter concerning the private life of another if the matter publicized is of a kind that: (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Id.* (quoting Restatement (Second) of Torts § 652D (1977)). Comment "a" to the Restatement addresses the issue of publicity, but the Minnesota Supreme Court has yet to delineate what facts an invasion of privacy tort claimant must allege in order to satisfy the burden of showing that "publicity" or "publication" of private information has occurred. The comment notes that to prove such a claim, plaintiff must show that defendants disclosed facts about his private life, in a communication to "the public at large, or to so many people it is substantially certain to become public knowledge." Restatement (Second) of Torts § 652D, comment a.

In *C.L.D. v. Wal-Mart Stores Inc.*, 79 F. Supp. 2d 1080, (D. Minn. 1999), this Court predicted that Minnesota courts would incorporate the more narrow interpretation of "publicity" found in comment a, and granted summary judgment to defendant where the private facts were disclosed to only a few fellow employees. The Court noted that plaintiff "does not allege that defendant disclosed [the private facts] in the media or in any other form accessible to the population at large." *C.L.D.*, 79 F. Supp. 2d at 1084. This limited disclosure did not constitute "publication." *Id.*

In the only Minnesota case to address the issue expressly, the court held that plaintiffs met the "publication" or "publicity" prong by showing that "respondent faxed the [private facts] . . . to 16 terminals in six states." *Bodah v. Lakeville Motor Express,*

*Inc.,* 649 N.W.2d 859, 865 (Minn. Ct. App. 2002). The *Bodah* court referenced the Restatement comment, but did not explicitly adopt the standard put forth in it. *Bodah,* 649 N.W.2d at 863-64 (noting that "it is important to look to the Restatement" but allowing a claim where publication was not to the public at large).

Although the exact contours of what constitutes "publication" are yet to be defined, plaintiff does not assert that the information was disclosed to anyone beyond three insurance companies. Even under the *Bodah* court's more expansive interpretation of "publication," plaintiff has not shown that defendants published the information. A reasonable jury could not find that MIB or Lincoln Benefit disclosed facts to the public, or to such a large number of people as to become public knowledge. Therefore, plaintiff cannot maintain a cause of action for publication of private facts.

## ORDER

Based on the foregoing, the submissions of the parties, and all of the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' motions for summary judgment [Docket Nos. 40, 45] are **GRANTED in part** and **DENIED in part** as follows:

1.     Defendant MIB's motion is **GRANTED** with respect to that portion of Count II relating to FCRA, 15 U.S.C. § 1681e(b); both defendants' motions are **GRANTED** as to Count IV (defamation claims), and Count V (invasion of privacy claims). Accordingly, that portion of Count II relating to FCRA, 15 U.S.C. § 1681e(b)

and Counts IV and V of plaintiff's amended complaint [Docket No. 55] are **DISMISSED**

**WITH PREJUDICE.**

    2.    Defendants' motions are **DENIED** in all other respects.


DATED:  January 7, 2003
at Minneapolis, Minnesota.

                                           JOHN R. TUNHEIM
                                   United States District Judge

- 18 -

## LOIS Federal District Court Opinions

CURTIS v. TRANS UNION, LLC, (N.D.Ill. 2002)

THOMAS CURTIS and KIMBERLY CURTIS, Plaintiffs, v. TRANS UNION, LLC and

FORD MOTOR CREDIT COMPANY, Defendants.

No. 02 C 207, No. 02 C 208

United States District Court, N.D. Illinois, Eastern Division

December 6, 2002

### MEMORANDUM OPINION AND ORDER

DAVID H. COAR, United States District Judge

Plaintiffs Thomas Curtis and Kimberly Curtis ("Plaintiffs") bring essentially identical complaints against Defendants Trans Union, LLC ("Trans Union") and Ford Motor Credit Company ("Ford Credit") alleging these defendants have violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"). The cases originally were assigned to two different judges, but on April 18, 2002, they were deemed related and both cases were assigned to this Court. Trans Union and Ford Credit have filed a Joint Motion for Summary Judgment as to both cases. As both complaints allege identical claims with identical facts, for efficiency purposes, this Court will dispose of both motions in this opinion. For the following reasons, Defendants' Joint Motion for Summary Judgment is GRANTED in part and DENIED in part.

### I. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Kamler v. H/N Telecom. Servs., Inc., 305 F.3d 672, 677 (7th Cir. 2002). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986); Fritcher v. Health Care Servs. Corp., 301 F.3d 811, 815 (7th Cir. 2002).

The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928, 931 (7th Cir. 1995). If the movant meets this burden, the non-movant must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule 56(e); Celotex, 477 U.S. at 324. A scintilla of evidence in support of the non-movant's position is insufficient, and the non-movant "must do more than simply show that there is some metaphysical doubt as to the material fact." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 250. Weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for

Exhibit M

summary judgment. <u>Anderson,</u> 477 U.S. at 255.

## II. Background

   The following facts are taken from the parties Local
Rule 56.1 materials. Plaintiffs are individuals who reside in the Northern District
of Illinois. Defendant Trans Union is a limited liability corporation
under Delaware law and is authorized to do business in Illinois. Trans
Union is a "consumer reporting agency" as defined by
15 U.S.C. § 1681a(f). Defendant Ford Credit also is a Delaware
corporation authorized to do business in Illinois. Its business consists
of, among other things, purchasing retail lease contracts from automobile
dealers.

   On September 4, 1997, Plaintiffs entered into a Motor Vehicle Lease
Agreement (the "Contract") with Hawkinson Ford Company ("Hawkinson" or
the "Dealership") for the lease of a used 1995 Ford Windstar. Hawkinson
subsequently assigned the Contract to Ford Credit. The Contract required
the Plaintiffs to make 24 monthly payments in the amount of $384.79
beginning on September 4, 1997. The Plaintiffs made 22 of the 24 required
payments before they discovered that the Dealership had misrepresented the
true condition of the Subject Vehicle; namely, they did not disclose that
it had sustained accident damage prior to the Plaintiffs' lease. As a
result, Plaintiffs ceased making payments on the Subject Vehicle and
returned it to the Dealership.

   On September 13, 1999, Thomas Curtis filed a complaint against
Hawkinson and Ford Credit in the Circuit Court of Cook County, Illinois,
and Ford Credit filed a counterclaim (Case No 99 L 010204). On December
29, 2000, the state court matter went to arbitration. An arbitration
order was entered on September 18, 2001, *nunc pro tunc* March 19, 2001 in
favor of Thomas Curtis and against the Dealership on the counts in the
complaint. As to Ford Credit, the arbitration order was in favor of Ford
Credit on the counts in the complaint but in favor of Thomas Curtis on
Ford Credit's counterclaim. On June 17, 2002, the Appellate Court of
Illinois, First Judicial District, entered an order remanding the state
court matters to the trial court. At this point, no further determination
has been made as to the state court action.

   While the parties did not include the following remaining pertinent
facts in their Local Rule 56.1 Statement of Facts, the Court includes
them here because the parties raised and relied on these facts in their
briefs. Sometime after the Plaintiffs voluntarily returned the Subject
Vehicle to the Dealership, Ford Credit reported that the Subject Vehicle
was repossessed and that Plaintiffs owed a sum of $2,487.38. Trans
Union, a consumer reporting agency that publishes individual credit
reports, included Ford Credit's report on the Plaintiffs' individual
credit reports. The Plaintiffs disputed this information in writing to
Trans Union on the basis of the facts surrounding their state court
action. For example, in one letter dated September 28, 2001 to Trans
Union, Plaintiffs wrote:

   — On Ford Motor Cr AHN164JWN5 Auto Lease

   **I have previously disputed that entry for the**
   **following reasons:**

   Auto Was NEVER Repossessed — Auto was
   voluntarily returned at lease end.

Unpaid Balance was $768.00

I won litigation for FRAUD on 1/6/01 and was awarded
$10126.00 which is due to me from Hawkinson Ford and
Ford Motor Credit. My lease contract was nullified on
1/6/01 in Cook County Court.

Per my phone conversation with your office Ford has
refused to correct or update my file therefore:

I DEMAND THAT THE ADVERSE INFORMATION REPORTED ON
KIMBERLY J CURTIS [] AND THOMAS K CURTIS [] CREDIT
FILES BE REMOVED IMMEDIATELY. I DEMAND THAT ALL
PARTIES WHO HAVE RECEIVED MY CREDIT REPORT BE SENT A
CORRECTED REPORT.

Trans Union investigated Plaintiffs' disputes by asking Ford Credit to
verify the information raised by Plaintiffs. Trans Union submitted this
request to Ford Credit by including in the "Customer States" section of
its Automated Consumer Dispute Verification ("ACDV") Response forms
comments such as: "Disputes current balance — please update;
Disputes MOP — Payment pattern — Hist & Max Delinq;
Consumer states Auto Ret'd Judgment Awarded to him" and "Disputes MOP
— Payment pattern — Hist & Max Delinq; Account in
Litigation-provide current status." On each occasion, Ford Credit
responded that the reports were accurate by checking the box labeled
"Verified as Reported." After receiving verification from Ford Credit
that the information the Plaintiffs disputed was correct, Trans Union
sent Kimberly Curtis a letter informing her that, if she so wished, she
could add a consumer statement to her credit file that consisted of 100
words or less.

### III. Discussion

Plaintiffs' allege that Trans Union and Ford Credit have
"deliberately, willfully, intentionally, recklessly and negligently
repeatedly failed to perform reasonable reinvestigations of the above
disputes as required by the FCRA, have failed to remove the inaccurate
information, have failed to note the disputed status of the inaccurate
information and have continued to report the derogatory inaccurate
information about the plaintiff[s]." Defendants move for summary judgment
arguing that they fulfilled their obligations under FCRA and cannot be in
violation of the statute because the information they reported is
accurate, true, and correct. Plaintiffs counter that, even if the
information is technically correct, Defendants still violated the FCRA
because the information they reported was misleading and incomplete since
Plaintiffs had a judgment in favor of them and against the Dealership at
the time of the disputes. This Court addresses these arguments as to each
defendant and as to each of the alleged violations of the Act.

#### A. Trans Union

##### 1. Initial Report — Violation of 15 U.S.C. § 1681 e(b)

In Count 1 of the Complaint, Plaintiffs allege Trans Union violated
15 U.S.C. § 1681e(b). Under the FCRA, a consumer reporting agency is
required to follow "reasonable procedures to assure maximum possible
accuracy" when preparing a consumer's credit report.
15 U.S.C. § 1681e(b). A credit reporting agency that negligently
violates the provisions of the FCRA is potentially liable for actual

damages, costs, and attorney fees, 15 U.S.C. § 1681o, and a credit reporting agency that willfully violates the Act may be liable for punitive damages as well, 15 U.S.C. § 1681n. To state a claim under § 1681e(b), plaintiffs must show "(that a credit reporting agency prepared a report containing `inaccurate' information." Henson v. CSC Credit Servs., 29 F.3d 280, 284 (7th Cir. 1994) citing Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1156 (11th Cir. 1991). The Act, however, does not make reporting agencies strictly liable, and such agencies will not be liable if they reported inaccurate information in the consumer's credit report but followed "reasonable procedures to assure maximum possible accuracy." Henson, 29 F.3d at 284.

Here, Plaintiffs concede that Trans Union reported technically accurate information regarding the repossession of their vehicle. Nonetheless they argue that Trans Union's report was misleading and thus inaccurate under the statute because Plaintiffs had a judgment in their favor regarding the lease of this vehicle at the time of their *disputes*. Plaintiffs' reliance on the mere fact that the report was inaccurate does not apply to this particular alleged § 1681e(b) violation because, for the initial credit report, absent some prior indication that the information Trans Union gathered was gathered through negligence, it was reasonable and cost efficient for Trans Union to report information without independent verification. See Henson, 29 F.3d at 285. As Plaintiffs have submitted no evidence showing that Trans Union had prior notice of potential inaccuracies in Plaintiffs' credit reports or that it had reason to doubt Ford Credit's credibility, summary judgment is granted as a matter of law in favor of Trans Union as to Plaintiffs' section 1681 e(b) claims.

2. Reinvestigation - Violation of 15 U.S.C. § 1681i

Plaintiffs also allege that Trans Union violated provisions of Section 1681 i by not conducting a thorough reinvestigation in response to their many disputes regarding the negative credit information on the Subject Vehicle. Section 1681i governs the procedure in case of disputed accuracy of a consumer's credit report. Section 1681(a)(1)(A) requires Trans Union to reinvestigate any item disputed by the consumer, stating:

(1) Reinvestigation required.

(A) In general. If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30 day period beginning on the date on which the agency receives the notice of the dispute from the consumer.

Trans Union argues that it did not violate this section of the Act because it reinvestigated the information from Ford Credit and verified its accuracy. Plaintiffs, however, argue that [actually correct information that is misleading and/or incomplete can be considered inaccurate for FCRA purposes, and for support they cite Koropoulos v. Credit Bureau, Inc., 734 F.2d 37, 40-42 (D.C. Cir. 1984). In Koropoulos, the District of Columbia Circuit held that if a credit reporting agency reports factually correct information that also could he interpreted as

being misleading or incomplete, a factual question exists regarding
whether the credit reporting agency's report is so misleading as to be
"inaccurate" within the meaning of the FCRA. Id.; see also Sepulvado v.
CSC Credit Servs, Inc., 158 F.3d 890, 895-96 (5th Cir. 1998) ("A credit
entry may be `inaccurate' within the meaning of the statute either
because it is patently incorrect, or because it is misleading in such a
way and to such an extent that it can be expected to adversely affect
credit decisions.").[fn1]

   Defendants argue that Koropoulos does not apply in this case because
Plaintiffs cannot point to any information regarding their performance on
the Ford Credit obligation that, had it been reported, would have made it
more complete. Thus, Defendants argue that Trans Union's reports were not
misleading and they did not omit facts that would have made them more
complete. The Court finds these arguments disingenuous. Trans Union could
have included information about Plaintiffs pending state lawsuit, as
Plaintiffs suggested, rather than merely include the information about
the repossession and unpaid balance, which is information that clearly
can be expected to adversely affect credit decisions. Thus, this Court
finds that a genuine issue of fact exists as to whether Trans Union's
failure to include more information regarding Plaintiffs' performance on
the Ford Credit obligation is so misleading as to be "inaccurate" within
the meaning of the FCRA,

   Plaintiffs also argue that, by simply attempting to verify the
information Plaintiffs had disputed with the original source — Ford
Credit — even after Trans Union received notice from Plaintiffs
about judgment in their favor regarding this transaction, Trans Union
failed to accurately and reasonably reinvestigate Plaintiffs' disputes as
required by § 1681i. Trans Union's position is that they complied
with the statutory requirements by identifying the claims Plaintiffs made
in their disputes and submitting them to Ford Credit for verification.
The Seventh Circuit has held, however, that in order to fulfill its
obligation under § 1681i(a), "a credit reporting agency may be
required, in certain circumstances, to verify the accuracy of its initial
source of information." Henson, 29 F.3d at 287. Whether the credit
reporting agency has a duty to go beyond the original source depends on
(1) whether the consumer has alerted the reporting agency to the
possibility that the source may be unreliable or the reporting agency
itself knows or should know that the source is unreliable; and (2) the
cost of verifying the accuracy of the source versus the potential harm to
the consumer. Id. Whatever considerations exist, it is for "the trier of
fact [to] weigh the[se] factors in deciding whether [the defendant]
violated the provisions of section 1681i" Id. Thus, summary judgment is
DENIED as to Plaintiffs' § 1681i claims.

B. Ford Credit

   Plaintiffs allege that Ford Credit violated Section 1681 s-2(b), which
sets forth investigation requirements for entities, such as Ford Credit,
that furnish information to credit bureaus. This section requires that a
creditor, once it receives notice of a dispute from a credit reporting
agency, take the following actions:

   (A) conduct an investigation with respect to the
   disputed information;

   (B) review all relevant information provided by the
   consumer reporting agency pursuant to section 1681a(2)
   [of the FCRA];

(C) report the results of the investigation to the
consumer reporting agency; and

(D) if the investigation finds that the information is
incomplete or inaccurate, report those results to all
other consumer reporting agencies to which the person
furnished the information and that compile and
maintain files on consumers on a nationwide basis.

15 U.S.C. § 1681s-2 (b); Dornhecker v. Ameritech Corp.,
99 F. Supp.2d 918, 925 (N.D Ill. 2000). Ford Credit argues that, just as
in the case of a credit reporting agency's reinvestigation under §
1681i, Ford Credit cannot be held liable under 1681 s-2(b) when the
information complained of is in fact correct. For the reasons set forth
above see supra II.A. a genuine issue of fact exists regarding whether
the information Ford Credit continued to verify as correct was accurate
under the FCRA. Thus, this Court denies summary judgment as to the
section 1681 s-2(b) claims against Ford Credit.

**IV. Conclusion**

  For the foregoing reasons, Defendants Trans Union's and Ford Credit's
Joint Motion for Summary Judgment is GRANTED as to the § 1681e(b)
claims against Trans Union and DENIED as to the remaining claims,

[fn1] The Seventh Circuit has left open the question whether the
statutory term "inaccurate" reaches cases in which information in a
credit report is technically accurate but misleading and/or incomplete.
See Crabill v. Trans Union, LLC, 259 F.3d 662, 664 (7th Cir. 2001);
Henson, 29 F.3d at 285 n. 4 (7th Cir. 1994).

Copyright © 2004 Loislaw.com, Inc. All Rights Reserved

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JAMES McKEOWN,

OPINION AND
ORDER

Plaintiff,

03-C-528-C

v.

SEARS ROEBUCK & CO.,
TRANS UNION LLC,
FACTUAL DATA, INC,
EQUIFAX INC. d/b/a EQUIFAX
INFORMATION SERVICES, LLC
and CSC CREDIT SERVICES, INC.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is a civil action for monetary and injunctive relief.  Plaintiff James McKeown contends that defendants Trans Union LLC, Factual Data, Inc., Equifax Inc. d/b/a Equifax Information Services, LLC, CSC Credit Services, Inc. and Sears Roebuck & Co. are liable to him for (1) violation of the Fair Credit Reporting Act; (2) credit defamation; and (3) tortious interference with credit expectancy.  In addition plaintiff asserts that defendant Sears is liable for invading his privacy.  Now before the court are four separate motions for summary judgment filed by defendants Trans Union, Equifax, CSC and Sears.  (Defendant

1

Copy of this document has been
provided to: _All Counsel_

this _29th_ day of _July_ 20 _04_
by _C. A. Korth_
C.A. Korth, Secretary to
Magistrate Judge Crocker

Exhibit N

Factual Data has not moved for summary judgment.) Jurisdiction is present. 28 U.S.C. §§ 1331 and 1367.

None of the motions will be granted with respect to plaintiff's claims under the Fair Credit Reporting Act although plaintiff will not be allowed to seek: (1) damages for any differences in the terms between the mortgage he was able to secure and the terms he might have received had it not been for an error in his credit history; (2) recovery for any credit denial after July 7, 2003; (3) punitive damages against either defendant CSC or defendant Equifax; or (4) any actual damages against defendant Sears for its handling of the consumer dispute that plaintiff submitted to defendants CSC and Equifax in April 2003. Defendant Trans Union's motion will be granted with respect to plaintiff's state law claims of credit defamation and tortious interference with credit expectancy because these claims are preempted under the Fair Credit Reporting Act. Defendants CSC's and Equifax's motions will be denied with respect to plaintiff's credit defamation and tortious interference claims; neither defendant made a disclosure to plaintiff that would trigger the Fair Credit Act's preemption provision. Finally, defendant Sears's motion will be granted with respect to plaintiff's invasion of privacy and tortious interference with credit expectancy claims. By failing to respond to defendant Sears's motion for judgment with respect to these claims, plaintiff has forfeited them.

Defendant Equifax has argued that plaintiff sued the wrong party. In its briefs,

defendant Equifax asserts that it is merely a holding company and that plaintiff should have brought his claim directly against its subsidiary Equifax Information Services. However, there is no evidence to support this assertion of corporate structure. I will reserve judgment on this issue until there is sufficient evidence on which to reach a conclusion. Although arguing that it is a separate legal entity, defendant Equifax has moved for summary judgment apparently on behalf of Equifax Information Services on the merits of plaintiff's claims. In the event that defendant Equifax is dismissed from this action on the ground that it is found to be a separate legal entity, this summary judgment opinion will have no effect on any claim plaintiff may bring against Equifax Information Services either by obtaining leave from the court to amend his complaint in this case or by filing a separate suit.

 From the parties' combined proposed findings of fact, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

 Plaintiff James McKeown is an individual residing in Grantsburg, Wisconsin. Defendants CSC Credit Services, Inc., Trans Union LLC and Equifax Information Services (Equifax) are consumer reporting agencies as that term is defined in the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f). Each collects credit information from a variety of creditors and distributes consumer profile reports to potential future creditors. Defendant

3

Sears Roebuck & Co. is an Illinois corporation that extends credit lines to consumers and reports account information to a variety of consumer reporting agencies, including defendants CSC and Trans Union, which maintain consumer profile reports of plaintiff. Defendant Equifax operates nationally. However, in many geographical areas, it contracts with smaller credit reporting agencies for the files they own on residents of those areas. Defendant Equifax does not own a file for plaintiff or any other consumer living in Wisconsin. Instead, it contracts with defendant CSC for its files on Wisconsin consumers.

### A.  Sears Account

In April 1998, defendant Sears issued a credit card and assigned an account number 0177540397789 to someone. Defendant Sears's internal records for this account bear the name "JAMES N. MC OWEN." On April 29, 2002, defendant Sears received a written notice that the account holder was deceased. The letter was unsigned and did not give a date or location of death. Defendant Sears's computer system does not indicate that the letter included a social security number. Shortly thereafter, defendant Sears closed the account, entered a "deceased" code in its computer system and reported to various credit bureaus that the card holder was deceased. Defendant Sears did not retain a copy of the unsigned letter it had received.

4

In May 2002, defendant Sears reported electronically to defendants CSC and Trans Union in conjunction with plaintiff's account that the consumer was deceased. Defendants updated their records to reflect this information. Defendants CSC and Trans Union each published the notation of deceased on a Sears tradeline for plaintiff. (A tradeline is a summary of information reported by a particular creditor about a single consumer line of credit.) After posting the notation, defendants Trans Union, CSC and Equifax each reported activity in some of plaintiff's other joint accounts and defendant Trans Union received inquiries for plaintiff's credit report. There is no evidence that defendant Trans Union, CSC or Equifax ever received notification from the Social Security Administration that plaintiff was deceased.

## B. Mortgage and Credit History

In early April 2003, plaintiff contacted Thomas Duffy, a mortgage broker at Provident Mortgage, seeking a conventional thirty-year fixed rate mortgage for $440,000 to purchase a lake house in Webster, Wisconsin. On April 7, 2003, plaintiff applied for a loan and authorized Provident to obtain his merged credit history from defendant Factual Data. The merged history comprised three reports from different credit reporting agencies, including defendants Trans Union and Equifax. The Factual Data report showed that both defendants Trans Union and Equifax had reported the deceased notation. Later, this was

5

shown to be an error; defendant Equifax did not report the deceased notation on the Sears tradeline but instead reported that the account was closed. However, defendant Equifax did not score plaintiff's credit report on the ground that he was deceased. Defendant Factual Data stated on its merged report that defendant Equifax had not provided a score but instead had shown that plaintiff was deceased.

1. CSC dispute

Duffy, the Provident mortgage broker, provided plaintiff with a telephone number that he said was for defendant Equifax. Plaintiff called the number to dispute the deceased notation on his credit report. Because plaintiff was a Wisconsin resident, his call was routed to a representative of defendant CSC. In response to his call, defendant CSC sent defendant Sears an automated consumer dispute verification form, stating "PRESENT STATUS INCORRECT. PLEASE VERIFY. CONSUMER STATES NOT DECEASED / PLEASE PROVIDE STATUS." Defendant Sears replied by instructing defendant CSC to delete the account entirely and defendant CSC did so. On April 22, 2003, defendant CSC wrote plaintiff to inform him that the Sears account tradeline had been deleted. Defendant CSC attached a copy of plaintiff's credit report reflecting the deletion. Plaintiff never asked either defendant CSC or Equifax to reinsert the Sears tradeline into his credit history. When defendant Sears sends a delete message in response to an automated consumer dispute

6

verification request, its computer system is programed to send the delete message to the other credit reporting agencies to which it provides credit information, in this case, defendant Trans Union and Experian.

## 2. Trans Union dispute

On April 7, 2003, plaintiff sought his credit report and score from defendant Trans Union. Defendant Trans Union sent him its report, which included the notation of deceased next to the Sears account information. The report indicated that plaintiff also went by the name James N. McOwen; the account information that defendant Sears had been providing defendant Trans Union included the name James N. McOwen. Plaintiff was not provided with a credit score; instead the report stated "Not scored: deceased."

On April 16, 2003, plaintiff emailed defendant Trans Union, disputing the address it had listed for him, the alias James N. McOwen, the deceased notation on the Sears account and the indicator of deceased in place of a credit rating. Defendant Trans Union sent plaintiff an email advising him of its dispute procedures, telling him that he could place a one-hundred word statement in his file, which it would assist him in writing, and that he should not apply for credit while his dispute was pending. Defendant Trans Union removed the disputed previous address and the alias the same day that it received plaintiff's dispute.

7

To communicate plaintiff's dispute with defendant Sears, defendant Trans Union sent an automated consumer dispute verification form by entering a two-character code ("A-4"). This code produced an automatic written message stating "special comment, compliance condition and/or remarks message disputed. Consumer not liable for acct. (ie, ex-spouse, business). If liable provide complete ID and ECOA [Equal Credit Opportunity Act] code." In addition, the form indicated that the word "deceased" appeared in the remark field and that the ECOA code contained an "x," which stood for deceased. Defendant Trans Union did not report to defendant Sears that plaintiff had disputed the alias James N. McOwen or the former address that defendant Trans Union had been reporting for him. Its computer system does not enable dispute processors to discover the reporting source of aliases or former addresses.

On April 28, 2003, defendant Sears replied, stating that the account was "verified as reported" and affirming the accuracy of plaintiff's social security number, address, and the indicators of deceased in the remark and ECOA code fields as of the date reported. In the name field at the top of the page, defendant Sears entered an "S" for "same" to show that the name it had on file matched the name defendant Trans Union had on file, James M. McKeown, but at the bottom of the page, it placed a "D" for different to indicate that it had a different middle and last name. Nowhere on this response did defendant Sears state that the name it had on file for the account was James N. McOwen.

8

On April 29, 2003, defendant Trans Union's computer system processed defendant Sears's response and wrote plaintiff to inform him that it had verified the account information, including the deceased status. Also, defendant Trans Union provided plaintiff with a consumer disclosure report dated April 29, 2003. Defendant Trans Union never called defendant Sears regarding the apparent inconsistency between defendant Sears's verification that the whole name was the same but that the middle initial and the last name were different. Defendant Trans Union knew that plaintiff would not be likely to secure credit with the deceased status on his credit report.

### 3. Plaintiff's wife's efforts

On May 4, 2003, plaintiff left his home to go on a business trip to Europe. While he was gone, his wife received the letter that defendant Trans Union had sent, stating that defendant Sears had confirmed the notation of deceased. Upon receiving this letter, plaintiff's wife called defendant Sears directly. The representative with whom she spoke apologized for the inconvenience but explained that plaintiff would have to make the call himself to confirm his identity.

Also during that month, plaintiff's wife contacted the "I-Team," a consumer reporting team for the local news program for a CBS affiliate in Minneapolis, Minnesota, complaining about the credit reporting mix-up. Later that summer, the I-Team produced a television

9

report about how plaintiff's credit report falsely indicated that he was deceased.

4. Finalizing financing

Because of the deceased notations, plaintiff did not apply for a thirty-year fixed rate mortgage. Instead, he obtained an adjustable rate mortgage under which interest rates are assured for only five years. For the adjustable rate mortgage, plaintiff did not have to submit a tri-merge credit report to obtain the adjustable rate loan, as he would have for a thirty-year fixed rate mortgage. Accordingly, Duffy submitted only the credit report from Experian only with plaintiff's application. On May 2, 2003, plaintiff closed on the mortgage.

On June 27, 2003, plaintiff applied for additional loans from Community Bank of Cameron-Grantsburg and US Bank, both of which obtained a plaintiff's credit report from defendant Trans Union. Both banks denied plaintiff's loan request. Community Bank denied the application because defendant Trans Union's report did not contain a credit score; instead the report indicated that plaintiff was deceased. (It is disputed whether US Bank's reason for denying this loan was the "deceased" notation on the Trans Union report or because plaintiff had too many other obligations. In the letter that US Bank sent plaintiff, the bank stated that the principal reason for denial of the loan was excessive obligations, Yu Aff., dkt. # 45, ex. A, McKeown Dep., at 38, but a representative of US Bank has testified that the notation was the reason for the denial. Beckholm Aff., dkt. #58,

10

¶ 8.)

### E. Post-Mortgage Inquiries

On June 27, 2003, plaintiff's wife faxed a letter to defendant Sears's probate office, asking it to remove the notation of deceased from plaintiff's report.  On July 2, 2003, defendant Sears removed the notation and faxed plaintiff's wife a letter, advising her that all deceased codes had been removed from the account.

On July 7, 2003, plaintiff contacted defendant Trans Union's consumer contact department to dispute the accuracy of the Sears account information, specifically the two notations of deceased on the account tradeline.  Upon learning of the dispute, defendant Trans Union generated a consumer disclosure form for plaintiff and sent defendant Sears a second automated consumer dispute form to investigate the accuracy of the account information. On July 13, 2003, defendant Sears responded by verifying much of the account information but instructing defendant Trans Union to change the remark field from "deceased" to "closed." (Again, defendant Sears reported that its records matched defendant Trans Union's with respect to plaintiff's name as a whole but that the middle initial and last name were different.)

Defendant Trans Union's automated system made no changes to plaintiff's file because defendant Sears's response indicated that the deceased notation should be removed

11

from the remark field but not from the ECOA code field.  On July 15, 2003, defendant Trans Union mailed plaintiff a report of the reinvestigation.  Defendant Sears changed the ECOA code it provided to defendants Trans Union and Equifax from "consumer deceased" to "individual account" in two universal data forms that it sent on July 14 and 17, 2003.  According to its records, defendant Trans Union provided plaintiff's credit report to only two of its subscribers between April 29 and July 31, 2003:  Community Bank of Cameron-Grantsburg and US Bank.

On July 22, 2003, plaintiff attorney wrote defendant CSC to dispute the information in the Sears account.  In the letter, plaintiff's attorney stated that plaintiff had been denied a mortgage because of a credit report issued by defendant CSC that included the "consumer deceased" notation on the Sears tradeline.  He asked defendant CSC to investigate the error.  Defendant CSC started an investigation only to discover that the disputed information had already been deleted.  On September 4, 2003, it sent plaintiff a letter apprising him of this fact.

### F.  Defendants' Standard Practices

#### 1.  Trans Union

Defendant Trans Union has two systems for handling consumer disputes:  a consumer dispute verification system and an automated consumer dispute verification process.

12

Through the automated process, defendant Trans Union contacts the creditor reporting the disputed information to request verification that the information provided by the consumer matches the information in the reporting creditors' records. In addition, defendant asks the reporting creditor to verify the accuracy of the remainder of the account information. If the information is verified, defendant Trans Union updates the consumer's file accordingly and notifies the consumer of that fact. If the creditor reports that the information is inaccurate or cannot be verified or it does not report in a given period, it is defendant Trans Union's general practice to delete the information from the consumer's file and notify the consumer. Defendant Trans Union permits consumers with disputes to place a one-hundred word statement into their file and advises them not to apply for credit during the investigation of the dispute.

2. Defendant CSC

Generally, defendant CSC investigates consumer disputes by sending an automated consumer dispute verification form to the creditors reporting the information in question. The form advises the creditor of the dispute and the requests for confirmation of the information in its file. In order to comply with Fair Credit Reporting Act guidelines, defendant CSC requires creditors to respond within a specified time frame. If the creditor verifies the information, defendant CSC considers any other information the consumer

13

provides and determines whether a change is warranted. If the creditor reports that the information is incorrect, defendant CSC deletes or modifies the consumer's file as the circumstances dictate. If the creditor does not respond within the given time frame, defendant CSC deletes the information from the consumer's file. Defendant CSC notifies the consumer of the results of the investigation, any changes made to the account and of the right to make a statement regarding the dispute to be placed in the consumer's credit file.

## OPINION

### A. Fair Credit Reporting Act

The Fair Credit Reporting Act creates a private right of action against consumer reporting agencies for the negligent or willful violation of any duty imposed under the statute. 15 U.S.C. §§ 1681o (negligent violations) and 1681n (willful violations); Henson v. CSC Credit Services, 29 F.3d 280, 284 (7th Cir. 1994). A consumer reporting agency that violates the provisions of the act negligently may be liable to the consumer for actual damages, costs and attorney fees. 15 U.S.C. § 1681o. Punitive damages may be available when a consumer reporting agency violates the statute willfully. 15 U.S.C. § 1681n.

Under the act, a consumer reporting agency is required to follow "reasonable procedures to assure maximum possible accuracy" of the information contained in a consumer's credit report. 15 U.S.C. § 1681e(b). However, the act "'does not make

14

reporting agencies strictly liable for all inaccuracies.'" <u>Henson</u>, 29 F.3d at 284 (quoting <u>Cahlin v. General Motors Acceptance Corp.</u>, 936 F.2d 1151, 1156 (11th Cir. 1991)). Thus, a consumer reporting agency will not be liable under § 1681e(b) if it reported inaccurate information on a consumer's credit report, so long as the agency followed "reasonable procedures to assure maximum possible accuracy." <u>Id.</u> at 284.

1. <u>Pre-dispute procedures</u>

a. Reasonableness

Plaintiff contends that defendants Trans Union, CSC and Equifax violated section 1681e(b) by reporting the two inaccurate notations of deceased on the Sears tradeline on his credit report. Defendants contend that even though they reported this inaccurate information, they are not liable under the act because they maintained "reasonable standards to assure maximum possible accuracy." Generally, the question of the reasonableness of the procedures is a jury question, though there are exceptions when the reasonableness or unreasonableness of the procedures is beyond question. <u>Crabill v. Trans Union, L.L.C.</u>, 259 F.3d 662, 664 (7th Cir.2001); <u>Kronstedt v. Equifax</u>, 01-C-0052-C, 2001 WL 34124783, at *8 (W.D. Wis. 2001). In these exceptional cases, the reasonableness issue may be decided as a matter of law.

Defendants Trans Union, CSC and Equifax argue that it was reasonable for them to

15

accept information from defendant Sears unless and until they had notice that the accuracy of the information was in question. Underpinning this argument is their assumption that defendant Sears is a presumptively reliable source of credit information. They cite the holding of the Court of Appeals for the Seventh Circuit in <u>Henson</u>, 29 F.3d 280, as support for their position. In <u>Henson</u>, the court held that consumer reporting agencies are not liable for reporting information from a judgment docket as a matter of law unless the agency has prior notice that the information might be inaccurate. <u>Id</u>. at 285. Plaintiff does not address this argument specifically but his responses to a number of proposed finding of fact suggest that he disputes defendant Sears's reliability as a source of information.

For the same reasons the court found it reasonable as a matter of law to report information found on a court docket in <u>Henson</u>, I conclude that it was not unreasonable for defendants CSC and Equifax to report information provided by defendant Sears. In <u>Henson</u>, the court noted that "reliance on official court records is unlikely to lead to inaccurate information except in isolated instances." <u>Id</u>. at 285. In support of his position, plaintiff cites an internet article about a woman whom defendant Sears reported as deceased to credit reporting agencies and four other cases involving false reporting by defendant Sears. The internet article is inadmissible hearsay for plaintiff's purposes. Even if it were not, plaintiff's evidence amounts to nothing more than isolated incidents. Plaintiff has not shown that the five incidents to which he refers were related. Moreover, these five incidents

16

appear marginal when contrasted with the millions of pieces of credit information that defendant Sears provides to credit reporting agencies. In <u>Henson</u>, the court recognized that there would be isolated incidents of misreporting by credit information furnishers. <u>Id</u>. at 285 ("reliance on official court records in unlikely to lead to inaccurate credit reporting except in isolated instances.") On this record, no jury could conclude that defendants Trans Union, CSC and Equifax acted unreasonably by reporting information simply because it came from defendant Sears.

However, there are other reasons why it may not have been unreasonable to report the notation of deceased in this case despite the fact that it came from a presumptively reliable source. <u>Quinn v. Experian Solutions</u>, 2004 WL 609357, *3 (N.D. Ill. 2004) ("[c]ourts have found that the <u>Henson</u> reasoning excuses credit agencies from independently verifying information provided by credit grantors *unless the credit agency knew or had reason to know that the credit grantor was . . . reporting inaccurate information.*") (emphasis added and additional citations omitted). In <u>Henson</u>, 29 F.3d at 285, the court noted that a reporting agency is entitled to obtain information from a reliable information absent prior notice of the possible inaccuracy. Plaintiff argues that defendants Trans Union, CSC and Equifax ought to have noticed discrepancies between the notation of deceased and other information in his credit report.

In a similar case, <u>Sheffer v. Experian Information Solutions, Inc.</u>, 2003 WL

17

21710573 (E.D. Pa. July 24, 2003), the court denied a motion for summary judgment brought by a credit reporting agency that had posted an inaccurate notation of deceased on a Sears tradeline. The court found no basis for assuming that defendant Sears was a suspect source of information. Instead, it reasoned that reporting the tradeline was arguably unreasonable because it indicated that the account had been opened four years before the plaintiff was born and because it was the only account among approximately two dozen reporting that the plaintiff was deceased.

Other courts have recognized that receiving inconsistent information may trigger a duty on the part of the credit reporting agency to investigate. In Bryant v. TRW, Inc., 487 F. Supp. 1234, 1242 (E.D. Mich. 1980) aff'd, 689 F.2d 72 (6th Cir.1982), the court concluded that receiving apparently inconsistent credit reports may trigger an obligation to investigate on the part of the credit reporting agency. The court reasoned that allowing credit reporting agencies to act as nothing more than mere conduits of information would eviscerate the act's emphasis on reasonable compilation procedures. Id.

Similarly, in Stewart v. Credit Bureau, Inc., 734 F.2d 47, 52 (D.C. Cir. 1984), the court found that an inference of negligent reporting could be drawn where a credit reporting agency falsely indicated that the plaintiff had filed for bankruptcy under a wage earner plan when the notation was facially inconsistent with the remainder of the plaintiff's credit history showing minimal debt obligation and no substantial delinquency. The court stated

18

expressly that

> [i]nconsistencies within a single file or report involving an inaccuracy as fundamental as a falsely reported wage earner plan, as well as inconsistencies between two files or reports involving less fundamental inaccuracies, can provide sufficient grounds for inferring that an agency acted negligently in failing to verify information.

Id. at 52-53; see also Smith v. Auto Mashers, Inc., 85 F. Supp. 2d 638, 641 (W.D. Va. 2000) (information not presumptively reliable where "inherently implausible or internally inconsistent").

Discrepancies similar to those in Sheffer exist in this case. Defendant Sears reported plaintiff as deceased to defendants CSC and Equifax in May 2002. Defendants Trans Union and CSC issued plaintiff's credit history with this notation eleven months later; during the interim, neither the Social Security Administration nor any other creditor indicated that plaintiff was deceased and activity was reported on a number of other tradelines. Defendants attempt to explain away these discrepancies. Defendant Equifax notes that it has no way of cross-referencing the Sears tradeline that reported plaintiff as deceased to other tradelines because "the information for a 'credit report' is not combined until a creditor makes a request for it and then the information is culled from the database." Dft. Equifax's Br., dkt #27, at 5. First, § 1681e(b)'s reasonable procedures mandate applies "whenever a consumer reporting agency prepares a consumer report"; it does not dictate the

19

particular procedural mechanisms a reporting agency must use prior to that time. Moreover, the argument misses the point. Defendant Equifax's argument is that in light of the procedures it uses, it is not surprising that the inconsistency went unnoticed. This is hardly a compelling argument. The relevant issue is whether it is reasonable for defendant Equifax to rely on procedures that do not detect this kind of inconsistency.

In addition, defendants note that plaintiff's wife may have been responsible for the activity in plaintiff's other account, as these other accounts were held jointly. Although there may have been a reasonable explanation for the other activity, it is not clear whether it was reasonable for defendants to have *assumed* that plaintiff's wife was responsible, particularly in light of the fact that no other creditor had reported plaintiff as deceased. In determining what is reasonable under the circumstances, the jury must weigh the burden on the credit reporting agencies against the cost to the plaintiff of the potential error. Crabill, 259 F.3d at 664; see also Stewart v. Credit Bureau, Inc., 734 F.2d 47, 51 (D.C. Cir. 1984) ("Judging the reasonableness of an agency's procedures involves weighing the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy."); Philbin v. Trans Union Corp., 101 F.3d 957, 963 (3d Cir. 1996) (same). This is not one of those cases in which summary judgment is appropriate on the ground that the reasonableness of defendants' reporting practices is beyond dispute.

20

b. Causation

Defendants CSC and Equifax argue alternatively that they are entitled to summary judgment because plaintiff has failed to show that he suffered any actual damages as a result of any credit history report either defendant issued.   Actual damages for Fair Credit Reporting Act violations may include out-of-pocket losses, damages for injury to reputation and creditworthiness and for humiliation or mental distress.  Cousin v. Trans Union Corp., 246 F.3d 359, 376 (5th Cir. 2001).  In order to obtain an award of "actual damages," a plaintiff must present evidence showing a "causal relation between the violation of the statute and the loss of credit, or some other harm . . . ."  Crabill, 259 F.3d at 664. Defendants CSC and Equifax argue that plaintiff was able to secure a mortgage for the property he sought to purchase and that the lender never saw a credit report that either had issued.

Plaintiff argues that he was forced to accept a five-year adjustable-rate loan rather than the thirty-year fixed-rate mortgage that he sought because the five-year loan could be obtained by using the single credit history from Experian, the single credit reporting agency that had not reported plaintiff to be deceased in the information it provided Factual Data. (The notation of deceased on the Sears tradeline on the merged credit report from Factual Data came from defendant Trans Union and not from defendants CSC or Equifax. However, defendant Equifax did report to defendant Factual Data that plaintiff was deceased

21

in place of providing a credit score for him.  Factual Data noted this on its report.)

Plaintiff maintains that he had no choice but to accept the five-year mortgage; however, his evidence belies this assertion. According to plaintiff's wife, "the best thirty-year rate that was available to us was at 5.625%. [Plaintiff] declined that option."  Joan McKeown Aff., dkt. #65, ¶ 22.  In addition, she testified that the rates for the loan plaintiff accepted instead were 4.125% for five years, followed by then current interest rates not to exceed 9.125%. Plaintiff has not pointed to any evidence showing what kind of interest rate he might have obtained had it not been for the notation of deceased.  In support of his proposed finding of fact that he was "forced to close his mortgage on less favorable terms because he was limited to those types of loans that could be obtained with a credit report from only Experian," plaintiff cites the affidavit of his mortgage broker, Thomas Duffy, in which Duffy states only that the terms of the adjustable rates loan were "quite different" from those of a traditional thirty-year loan.  PPFOF, dkt. #55, at 7, ¶ 58 (citing Duffy Aff., dkt. #57, ¶¶ 17-19.  Plaintiff has not adduced any evidence from which a jury could approximate the value of the risk.  It is only speculation that market rates may be less favorable in five years.  Because plaintiff has failed to show that he could support his assertion that his mortgage terms are less favorable than those he would have been able to obtain had it not been for the deceased notations, he will not be allowed to seek damages on this basis.

Plaintiff contends that even if he cannot prove that he obtained less favorable loan terms, he should be able to recover actual damages for his mental distress, loss of sleep, nervousness and injury to reputation, work, family and sense of well being. "[A] denial of credit is not a necessary prerequisite for a § 1681e(b) claim"; damages for emotional distress may also be compensable. Kronstedt v. Equifax, CSC, 2001 WL 34214783, at *11 (W.D. Wis. 2001). See also Cousin, 246 F.3d at 369 n. 15; Guimon v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995).

First, defendant CSC contends that plaintiff's evidence of emotional distress is conclusory and therefore, insufficient. I disagree. In order to survive summary judgment on an emotional distress claim, a plaintiff must submit evidence that "'reasonably and sufficiently explains the circumstance of his injury and does not resort to mere conclusory statements.'" Kronstedt, 2001 WL 34214783, at *12 (quoting United States v. Balisteri, 981 F.2d 916, 932 (7th Cir. 1992)). Plaintiff has submitted an affidavit from his wife, chronicling a change in plaintiff's behavior (subdued, stunned and distracted behavior), physical manifestations (flushing), restless sleeping between the time he learned of the notation of deceased until the mortgage closed and anxiety about the possibility of other credit errors, such as having a credit card denied in front of a business associate. PPFOF, dkt. #55, at 10, ¶ 78 (citing Joan McKeown Aff., dkt. #64, ¶¶ 11-18, 19-26, 45-50 and 63-75). This evidence is far more specific than the testimony that other courts have held to be

23

too conclusory, e.g., Cousin, 246 F.3d at 370-71 (plaintiff testified that he felt "very upset [and] angry"); Schmidt v. Trans Union LLC, 2004 WL 785098, at *4 (N.D. Ill. April 12, 2004) (blank assertion of emotional distress and no evidence linking it to erroneous report), and in fact, is more specific than evidence found to be sufficiently particular, e.g., Kronstedt, 2001 WL 34124783, at *12 (description of depth of frustration). In making its argument, defendant CSC relies on case law setting out standards for evaluating evidence "'when the injured party provides the sole evidence of mental distress.'" Dft. CSC's Br., dkt. #36, at 12-14 (quoting Biggs v. Village of Dupo, 892 F.2d 1298, 1394 (7th Cir. 1990)). Notably, defendant CSC does not address the testimony of plaintiff's wife to which plaintiff referred in his proposed findings of fact relating to his alleged mental distress.

Next, defendant CSC argues that damages for emotional distress under the act "'must result from the publication of the inaccurate information to a third party.'" Id. at 10 (quoting Sarver v. Experian Information Solutions, Inc., 299 F. Supp. 2d 875, 877 (N.D. Ill. 2004)). Defendant relies on the holding in Casella v. Equifax Credit Information Services, 56 F.3d 469 (2d Cir. 1995). In rejecting the testimony of the plaintiff and his companion regarding the apprehension and anxiety that the plaintiff felt over the prospect of dealing with the erroneous report, the court held that "a plaintiff can [not] recover for pain and suffering when he has failed to show that any creditor or other person ever learned of the derogatory information from a credit reporting agency." Id. at 475. The court derived

24

its rule from the requirement that a plaintiff show that the defendant's actions caused the injury.   To the extent that this rule relates to emotional distress caused by the embarrassment, I agree with it.  A defendant cannot be held liable for the embarrassment a party suffers as a result of others learning of the derogatory information unless that defendant is responsible for their finding out.  (For example, plaintiff cannot recover for the embarrassment he alleges to have suffered because a number of people in his community knew about the situation; they learned of the deceased notation from a television story that plaintiff's wife instigated and not from any defendant.)

However, it makes no sense to apply this requirement to other types of emotional distress.  A consumer may suffer distress if he has difficulty in correcting his credit history or trouble managing his finances until his history is corrected; this is true regardless whether his erroneous information was actually published to a third party.  The holding in Casella implies that recoverable emotional distress is limited to that caused by embarrassment or humiliation, id. at 475 (party cannot recover emotional distress damages "simply because he knew of an inaccurate and potentially damaging item in his credit report"; rejecting testimony about depression and anxiety suffered as a result of dealing with error), but the court provided no explanation for such a limitation.  Other courts have routinely assumed or suggested that emotional distress damages are available when a party experiences a significant frustration and anxiety brought on by failed attempts to have the errors corrected.

25

See, e.g., Cousin, 246 F.3d at 369 n.15 (suggesting that recovery is available for mental distress other than embarrassment); Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1332 (9th Cir. 1995) (emotional distress "resulting from the incorrect information in her credit report"; no indication of publication to third party); Stevenson v. TRW, Inc., 987 F.2d 288, 297 (5th Cir. 1993) (emotional distress resulting from shock of learning of bad credit record); Kronstedt, 2001 WL 34124783, at *12 (frustration over repeated failed attempts to have error corrected). I can think of no reason for allowing consumers to recover for the humiliation and embarrassment of having bankers and mortgage brokers learn of the derogatory credit information while barring them from recovering for the anxiety and stress they may encounter in coping with the error.

In this case, plaintiff relies on the testimony of his wife regarding the frustration and anxiety he suffered for fear that he would lose the property he wished to purchase and that the error might cause other credit related problems. Although it is difficult to imagine that plaintiff suffered much emotional distress as a result of the notation of deceased reported by defendants CSC and Equifax when only a week elapsed between the time that plaintiff learned that he had been reported as deceased and defendant CSC informed him that it had deleted the Sears tradeline, "evaluation of plaintiff's emotional distress claim is a task best left to the jury." Kronstedt, 2001 WL 34124783, at *13.

(Of course, in this case, the deceased notation was published to a third party: Duffy.

26

This third party publication exemplifies the absurdity of applying the rule that the erroneous information must be published to a third party on claims of mental distress not arising out of embarrassment. None of plaintiff's stress is derived from the fact that Duffy knew of the notation; if anything, Duffy alleviated the stress by quickly finding an alternative loan to finance plaintiff's purchase. Even if the erroneous notation had been published broadly, it is difficult to conceive how this would have lead to emotional distress; anyone plaintiff may have encountered would have known that he was not deceased and therefore, that the notation was in error.)

## 2.  Reinvestigation procedures

### a.  Reasonableness

Once a consumer notifies the consumer reporting agency of an error on his credit report, § 1681i obligates the agency to conduct a more thorough investigation. § 1681i(a) states in relevant part:

> If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer.

Defendant CSC explained why its response to plaintiff's complaint was reasonable without appearing to notice that plaintiff had not brought a claim against it or defendant Equifax under § 1681i. Although plaintiff alleged that these defendants violated § 1681e(b) by "allowing the error to remain as part of plaintiff's credit file despite plaintiff having disputed the accuracy of the tradelines," id. at ¶¶ 108 and 109, it is undisputed that defendant CSC deleted the tradeline shortly after plaintiff disputed it.  Plaintiff does not argue that defendants CSC and Equifax acted unreasonably in handling his complaint. Plt.'s Br., dkt. #50, at 8. Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Express, Inc., 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in any meaningful way are waived.").  To the extent that plaintiff may have intended to charge defendants CSC and Equifax with responding to his dispute unreasonably, he has waived that claim by failing to develop it or to proffer evidence to support it.

Plaintiff's claim that defendant Trans Union acted unreasonably in responding to his dispute is complicated by the arguable overlap between § 1681e(b), which by its terms applies "whenever a consumer reporting agency prepares a consumer report" and § 1681i, which dictates a reporting agency's obligations upon receiving a consumer dispute.  In Kronstedt, I noted that "because § 1681i provides its own set of procedures for reinvestigating disputed information, it is debatable whether § 1681e(b)'s 'maximum

28

possible accuracy' standard apples to reinvestigation procedures." 2004 WL 34124783, at *8. However, it was unnecessary to resolve this question in Kronstedt because both parties assumed that § 1681e's standard applied. The same is true in this case. In addition, both parties appear to assume that § 1681i's standards are more stringent than those governing § 1681e(b). Dft. Trans Union's Br., dkt #31, at 9 (meeting § 1681i standard is per se compliance with § 1681e(b)); Plt.'s Br., dkt. #50, at 5 (upon receiving consumer dispute, "a credit reporting agency has the added and more specific duties of 15 U.S.C. § 1681i"). Thus, for the purpose of deciding this motion, I will assume that compliance with § 1681i satisfies § 1681e(b). See Quinn, 2004 WL 609357, at *3 ("because [defendant] satisfied its reinvestigation obligation under § 1681i(a), its procedures were reasonable to assure maximum possible accuracy under § 1681e(b)").

In essence, defendant Trans Union's argument is that its reinvestigation was reasonable because it submitted an automated consumer dispute verification to defendant Sears, which confirmed the disputed information in its reply. First, in making this argument, defendant Trans Union's ignores one of the bases for plaintiff's claim: that defendant Trans Union failed to investigate his dispute regarding the alias "James N. McOwen" or the former address that it had listed for plaintiff. Although it appears that defendant Trans Union may not have reinvestigated this information because its computer system does not allow a complaint examiner to determine the source of aliases or former address, defendant Trans

29

Union may be violating § 1681e(b)'s maximum possible accuracy standard by adhering to a system that does not provide this capability. In any event, defendant Trans Union has not explained why its failure to conduct a reinvestigation of these two disputes was not a violation of the act. Denial of its motion is warranted on this ground alone.

Second, depending on the circumstances, a credit reporting agency that receives notice of a dispute may be required to go beyond the original source of the disputed information to verify its accuracy. Henson, 29 F.3d at 287; see also Cahlin, 936 F.2d at 1160 ("A [§ 1681i(a)] claim is properly raised when a particular credit report contains a factual deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entry."). The two relevant factors are "whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency itself knows or should know that the source is unreliable" and "the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer." Id. Generally, "the trier of fact must weigh the above mentioned factors in deciding whether [the defendant] violated the provisions of section 1681i." Henson, 29 F.3d at 287.

According to defendant Trans Union, it had no obligation as a matter of law to do more than rely on the information it received from defendant Sears because none of the record evidence suggests that it knew or should have known that defendant Sears's

30

information was not trustworthy. But as plaintiff suggests, defendant Trans Union had at least one reason to know: defendant Sears's response to the automated consumer dispute verification contained an internal inconsistency. Defendant Sears verified plaintiff's name as a whole but reported that the middle initial and last name that defendant Trans Union submitted did not match the one on the account. Cf. Stewart, 734 F.2d at 52-53 (failing to verify inconsistent information as basis for inferring negligence). Again, it is for the trier of fact to balance the weight of this reason to know in light of the cost to defendant Trans Union of further investigation and the harm to plaintiff of having the error remain on his credit history. Henson v. CSC Credit Services, 29 F.3d 280, 287 (7th Cir. 1994).

b. Causation

Alternatively, defendant Trans Union argues that it cannot be held liable for its handling of plaintiff's second dispute, which he submitted on July 7, 2003, because plaintiff suffered no damages as a result of it. I agree that plaintiff cannot recover for any denial of credit or credit obtained at a less favorable rate because there is no evidence that he applied for credit between the time he lodged his complaint and the time that defendant Trans Union removed the Sears tradeline. However, plaintiff may be able to recover for emotional distress, see McKeown Aff., dkt #64 at ¶¶ 62-65 (plaintiff experienced emotional distress throughout summer) and for the reasons explained below, defendant Trans Union may be

31

liable for punitive damages for failing to delete the deceased notation in the remark field after defendant Sears instructed it explicitly to do so.

## 3. Credit information furnisher obligations

In 1996, Congress amended the Fair Credit Reporting Act to impose duties upon persons, such as defendant Sears, who furnish information to credit reporting agencies. 15 U.S.C. § 1681s-2. Upon notice of a dispute from a credit reporting agency, § 1681s-2(b)(1) requires the entity furnishing the information to conduct an investigation regarding the dispute and to report its findings accordingly:

> After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall -
>
> (A) conduct an investigation with respect to disputed information;
>
> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2);
>
> (C) report the results of the investigation to the consumer reporting agency; and
>
> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

32

15 U.S.C. § 1681s-2(b)(1). The duties imposed on providers of information under § 1681s-2(b) arise only after the entity furnishing the information receives notice from a consumer reporting agency that a consumer is disputing credit information. Kronstedt, 2001 WL 34214783, at *16. A consumer may bring a cause of action against an entity furnishing information for a violation of this subsection. Id; Dornhecker v. Ameritech Corp., 99 F. Supp. 2d 918, 926-27 (N.D. Ill. 2000).

Although the statute does not say so expressly, I concluded in another case that § 1681s-2(b)(1) implies a reasonableness standard for conducting investigations. Kronstedt, 2001 WL 34124783, at *16. Although the Court of Appeals for the Seventh Circuit has not yet addressed the issue, a number of other courts that have done so have reached the same conclusion. Johnson v. MBNA America Bank NA, 357 F.3d 426, 430-31 (4th Cir. 2004); Agosta v. Inovision, Inc., 2003 WL 22999213, at *5 (E.D. Pa. Dec.16, 2003); Buxton v. Equifax Credit Info. Servs., Inc., 2003 WL 22844245, at *2 (N.D. Ill. Dec.1, 2003); Wade v. Equifax, 2003 WL 22089694, at *2-3 (N.D. Ill. Sept.8, 2003); Betts v. Equifax Credit Information Services, Inc., 245 F. Supp. 2d 1130, 1135 (W.D.Wash.2003); Olwell v. Medical Information Bureau, 2003 WL 79035, at *5 (D. Minn. Jan. 7, 2003). Defendant Sears does not dispute the applicability of a reasonableness standard but argues that it is entitled to judgment nevertheless because no reasonable jury could find its investigation and

33

response to plaintiff's disputes to be "unreasonable."

a. April 2003: Trans Union dispute

In its brief in support of its motion for summary judgment, defendant Sears does not address its investigation and response to the dispute notification that defendant Trans Union sent in April 2003. Plaintiff's claim was clearly based on his April dispute with defendant Trans Union, Cpt., dkt. #2, at 8-9, , ¶¶ 39, 40, 117. He discussed defendant Sears's treatment of this dispute at length in his brief opposing defendant Sears's motion for summary judgment, Plt.'s Br., dkt #50, at 10. In its reply brief, defendant Sears discusses its response to this dispute in a footnote. James v. Sheahan, 137 F.3d 1003, 1008 (7th Cir. 1998) (arguments raised for first time in reply brief are waived). It concedes that its operator handling the dispute should have removed the deceased code and directed the deletion of the account but does not know why the operator failed to do so. Despite this concession, defendant Sears argues that it had reasonable procedures in place that should have resulted in the removal of the code.

First, § 1681s-2(b) requires credit information furnishers to conduct reasonable investigations. Defendant Sears does not point to any authority supporting its assumption that simply having reasonable procedures for conducting investigations satisfies § 1681s-2(b)(1). If Congress had intended to create a "reasonable procedures" standard for credit

34

information furnishers under § 1681s-2(b)(1), it knew how to do so.  Cf. 15 U.S.C. §§ 1681e(b).  However, the parties have not briefed this issue and I need not decide it.  Even if I were to accept defendant Sears's assumption, defendant has neither explained what its normal procedures are and why they are reasonable as a matter of law nor made its normal procedures a subject of its proposed findings of fact.  See Procedure to be Followed on Motions for Summary Judgment, I.B.3, attached to Preliminary Pretrial Conference Order, dkt. #21 (statements of proposed findings of fact must include all propositions a party deems necessary to show entitlement to judgment in its favor).

b.  April 2003: defendants CSC's and Equifax's dispute

Defendant Sears argues with respect to its investigation and response to the April dispute notification from defendants CSC and Equifax that it acted reasonably in light of its history of communications with plaintiff's wife.  It fails to note that the only communication it had with plaintiff's wife, as described in the proposed findings of fact, took place after April 2003.  In addition, defendant Sears suggests that the reasonableness of its actions is shown by its advice to defendants CSC and Equifax to delete the tradeline.  § 1681s-2(b) creates an obligation to conduct a reasonable *investigation* and to report the results thereof.  The fact that defendant Sears directed the deletion of the account says nothing about the steps it took in investigating plaintiff's dispute.  Moreover, it is not clear

35

that directing deletion constitutes "report[ing] the results of the investigation." 15 U.S.C. § 1681s-2(b)(1)(C). In its reply brief, defendant Sears provides a number of reasons why it was reasonable for it to direct defendants CSC and Equifax to delete the account: both the information defendants CSC and Equifax provided and the information defendant Sears had for the account indicated "paid account/zero balance/closed" and its account notes indicated that it had received a notice stating that the account holder was deceased. Again, defendant Sears failed to make this information the subject of proposed findings of fact. Even if it had, this evidence does not show that defendant Sears actually did conduct an investigation, that it discovered these facts as a result of that investigation and that this information was the reason it directed defendants CSC and Equifax to delete the account.

Defendant Sears asserts that in directing deletion, it was "exercis[ing] its right not to report on the account." To the extent that defendant Sears suggests that directing deletion pursuant to a right not to report information is in and of itself an adequate response to a notice of dispute under § 1681s-2(b)(1), I disagree. The act's purpose is to protect *both* consumers *and* the consumer credit industry. 15 U.S.C. § 1681(b). If credit information furnishers simply resorted to a "right not to report" as a means of avoiding the cost of conducting an investigation and potential liability to the consumer for failing to do so reasonably, consumers could too easily manipulate their credit histories by disputing bad but accurate credit information. Once an information furnisher supplies information and

<div align="center">36</div>

receives notification of a consumer dispute, it may not avoid § 1681e-2(b)(1)(a)'s clear directive to conduct an investigation of the disputed information by opting not to report the information at that time. This is not to say that the creditor must continue reporting the account; it is to say only that discontinuing its reporting is not an alternative to the act's investigation requirement.

c. July 2003: Trans Union dispute

Defendant Sears's arguments with respect to plaintiff's July 2003 dispute to defendant Trans Union fail for similar reasons. Again, defendant Sears assumes that the reasonableness of its investigation (assuming that there was one) is beyond dispute because it removed the deceased notation from the comment field. But again, defendant Sears's proposed findings of fact do not shed light on what if any steps it took *investigating* plaintiff's disputes. Cf. Betts, 245 F. Supp. 2d at 1135 (summary judgment inappropriate where there is a genuine issue whether information furnisher conducted any investigation at all).

d. Damages

In its reply brief, defendant Sears argues that none of plaintiff's damages were based on its responses to the April 2003 dispute from defendants CSC and Equifax or its handling of his dispute to defendant Trans Union in July 2003. Ordinarily, arguments raised for the

37

first time in a reply brief are waived. James, 137 F.3d at 1008. However, the purpose of this rule is to insure that the opposing party has an opportunity to respond to the argument. In this case, plaintiff was afforded that opportunity; other defendants challenged his ability to prove that he had suffered damages as a result of the deceased notation. Plt.'s Br., dkt. #50, at 11-14. In fact, plaintiff addressed defendant Sears's potential damage liability expressly. Id. at 13. Because the issue is fully briefed, I will make an exception in this instance and address these arguments.

Plaintiff will not be able to recover damages for the difference in interest rate he might have obtained had it not been for the notation of deceased and the rate on the loan he actually obtained; plaintiff failed to proffer evidence showing that the loan he accepted was not as favorable as what he would have obtained otherwise. Plaintiff will not be able to recover emotional distress damages for defendant Sears's handling of the April 2003 dispute it received from defendants CSC and Equifax. There is no evidence that plaintiff knew anything about the manner in which defendant Sears handled the dispute. Further, defendant Sears directed defendants CSC and Equifax to delete the tradeline; they did so; and plaintiff was notified accordingly.

Defendant Sears may be liable for emotional distress caused by defendant Sears's handling of the disputes plaintiff submitted through defendant Trans Union in April and July 2003. In response to both disputes, plaintiff received letters stating that defendant

38

Sears had confirmed him to be deceased. Plaintiff has submitted sufficiently specific evidence demonstrating that he was agitated and embarrassed because he had not been able to have the error corrected. McKeown Aff., dkt. #64, at ¶¶ 15-16. In addition, defendant Sears may potentially be liable for punitive damages for the reasons explained below.

### 4. Punitive damages

Plaintiff brought all of his fair credit reporting act claims under both 15 U.S.C. §§ 1681o and 1681n. As noted above, when a consumer reporting agency violates the act negligently, it may be liable to the consumer for actual damages, costs and attorney fees under § 1681o. § 1681n provides for statutory damages of not less than $100 and not more than $1,000 when the violation is willful. To show willful noncompliance, a plaintiff must show that the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others." Pinner v. Schmidt, 805 F.2d 1258, 1263 (5th Cir. 1986), quoted with approval in Dalton v. Capital Associated Industries, Inc., 257 F.3d 409 (4th Cir. 2001); Philbin, 101 F.3d at 970. A showing of malice or evil motive is not required to prove willfulness under the act. Cushman v. Trans Union Corp., 115 F.3d 220, 226-27 (3rd Cir. 1997); Stevenson v. TRW, Inc., 987 F.2d 288, 294 (5th Cir. 1993).

### a. Defendants CSC and Equifax

39

In his complaint, plaintiff alleged that defendants CSC and Equifax willfully violated § 1681e(b) in failing to follow reasonable procedures to assure maximum possible accuracy. Cpt., dkt. #2. at 20, ¶ 108. However, in his combined brief opposing all four motions for summary judgment, he argues that a jury could conclude that the acts of defendants Trans Union and Sears were willful. Plaintiff does not suggest that punitive damages would be available against defendants CSC and Equifax. Id. Defendant Equifax challenged plaintiff's punitive damages claims expressly, Dft. Equifax's Br., dkt.# 27, at 8-9, and defendant CSC did so impliedly by arguing that summary judgment was warranted on the grounds that plaintiff could not recover damages, Dft. CSC Br., dkt. #36, at 7-14. By failing to respond to these challenges or develop an argument that would support his allegation, plaintiff has waived his § 1681n claims against defendants CSC and Equifax.

b. Defendant Trans Union

Plaintiff advances two grounds for his punitive damages claim against defendant Trans Union: (1) its failure to transmit plaintiff's dispute regarding the listed alias and former address to defendant Sears; and (2) its failure to remove the notation of deceased after defendant Sears instructed it expressly to do so. Defendant Trans Union argues that plaintiff's claim under § 1681n against it must fail because plaintiff has admitted that to his knowledge defendant Trans Union has never concealed any information from him or

40

misrepresented anything to him. The Court of Appeals for the Fifth Circuit has said that "[o]nly defendants who have engaged in 'willful misrepresentations or concealments' have committed a willful violation and are subject to punitive damages under § 1681n." Stevenson, 987 F.2d at 294 (quoting Pinner, 805 F.2d at 1263). Other courts have allowed punitive damages claims without adopting this limitation. Cushman v. Trans Union Corp., 115 F.3d 220, 226-27 (3d Cir. 1997) (citing Millstone v. O'Hanlon Reports, Inc., 528 F.2d 829, 834 (8th Cir. 1976); Collins v. Retail Credit Co., 410 F. Supp. 924, 931-32 (E.D. Mich. 1976)); see also Cousin, 246 F.3d at 372 (noting that punitive damages claims "typically" involve misrepresentations or concealments but not adopting such a limitation). The Court of Appeals for the Third Circuit declined to adopt this limitation expressly, but held that "a defendant's actions must be on the same order as willful concealments or misrepresentations." Cushman, 115 F.3d at 227.

The Court of Appeals for the Seventh Circuit has noted only that punitive damages are available when a credit reporting agency violates the act willfully. Henson, 29 F.3d at 284. It has not addressed the possibility that § 1681n is limited to claims of willful concealment or misrepresentations. I agree with those courts holding that willful acts need be only on the order of intentional concealments or misrepresentations. See Kronstedt, 2001 WL 34124783, at *14. The Fifth Circuit's limitation appears to have been derived from the simple observation that early cases under the act allowing punitive damages

41

happened to involve concealments or misrepresentations.   Stevenson, 987 F.2d at 294 (citing Pinner, 805 F.2d at 1263 for limitation); Pinner, 805 F.2d at 1263 (noting that "[i]n each case where punitive damages have been allowed the defendant's conduct involved willful misrepresentations or concealments.").

With respect to plaintiff's argument that defendant Trans Union violated the act willfully by failing to transmit plaintiff's dispute regarding the listed alias and former address to defendant Sears, the evidence shows that these two disputes were not communicated to defendant Sears because defendant Trans Union's computer system does not keep track of the source of this information.  Plaintiff contends that defendant Trans Union may be held liable for willfully choosing a system that did not permit this capability, but all procedures are willfully implemented; under plaintiff's theory, every violation of § 1681e(b) would result in punitive damages liability.  Punitive damages are available for willful violations, not simply willful actions.  Phillips v. Grendahl, 312 F.3d 357, 368 (8th Cir. 2002) (statute's language imports requirement that defendant know conduct is unlawful); Dalton v. Capital Assn. Indus., Inc., 257 F.3d 409, 418 (4th Cir. 2001) ("knowingly and intentionally committed an action in conscious disregard for the rights" of consumer).

Nonetheless, there is at least an issue of fact whether defendant Trans Union's implementation of this system involved a willful violation.  In a nearly identical case, the United States District Court for the District of Minnesota held that a credit reporting agency

42

made a policy decision not to record the source of the address and that "[t]he decision to design such a system may constitute an intentional act that [the defendant] *knew was in violation of the FCRA's requirement that it follow reasonable procedures to assure maximum possible accuracy of the information . . . .*" Graham v. CSC Credit Services, Inc., 306 F. Supp. 2d 873, 881 (D. Minn. 2004) (emphasis added).  Of course, a reporting agency cannot be said to knowingly violate a provision mandating reasonable procedures unless the unreasonableness is sufficiently obvious.  As noted above, determining reasonableness involves a fact-specific balancing of a number of factors, including the cost to the credit reporting agency.

On this record, there is no evidence of what it might cost defendant Trans Union to track the sources of former addresses and aliases.  Such recordation would benefit consumers by making possible more thorough investigations of their disputes.  In this case, the challenged alias may have come from defendant Sears.  If it had, defendant Trans Union presumptively would have transmitted plaintiff's dispute regarding the alias to defendant Sears, alerting the operator that confirmed that "James N. McOwen" and "James M. McKeown" were one and the same.  Viewing this evidence in the light most favorable to plaintiff, a jury could conclude that defendant Trans Union knew that it was unreasonable to implement a system that failed to record the source of addresses and aliases.

Additionally, plaintiff may be entitled to punitive damages on the grounds that defendant Trans Union did not remove the notation of deceased even after defendant Sears

43

instructed it to do so. Defendant Trans Union's explanation is that its computer system processed defendant Sears's response and because the ECOA code indicated that plaintiff was deceased, the system apparently ignored or overrode the direction that the remark field be changed from "deceased" to "closed." Dft. CSC's Br., dkt. #31, at 10-11. § 1681i(5)(A) provides

> If, after any reinvestigation . . . of any information disputed by a consumer, an item of the information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall promptly delete that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation.

The facts on this record suggest that defendant Trans Union's computer system automatically resolves conflicting information in favor of finding confirmation; there is no indication that the system flags conflicting information for review. Dft. CSC's PFOF, dkt. # 32, ¶¶ 47-48; Hickman Aff., dkt. #33, ¶¶ 41-42. Plaintiff disputed the deceased notation in the remarks field; defendant Sears did not verify this remark but instead instructed it to be changed to "closed"; and defendant Trans Union's system was programmed in such a way that this direction was ignored. § 1681i(5)(A) provides that credit reporting agencies must delete information disputed by a customer that is found to be inaccurate or cannot be verified. Again, a jury could conclude that by adopting a system that ignored an express direction from a credit information furnisher to change information that a consumer had

44

disputed, defendant Trans Union knowingly violated the act's reasonable procedures standard.

c. Defendant Sears

On the present record, I must allow plaintiff to go forward with his punitive damages claim against defendant Sears. As discussed above, defendant Sears did not propose as fact that it conducted any investigation at all in response to any of the three disputes plaintiff raised. In deciding motions for summary judgment, all inferences must be drawn in the manner most favorable to the non-moving party. Without any evidence of an investigation, I must assume that none was made. It may well be that this lack of evidence is attributable merely to oversight. However, it would be improper to assume that it was. In the event that defendant Sears did not investigate any of plaintiff's disputes, it may be liable for punitive damages. Accordingly, plaintiff may be entitled to punitive damages against defendant Sears, but only if he convinces the jury that defendant Sears conducted no investigation or that it conducted an investigation knowing it to be inadequate. Cf. Bryant v. TRW, Inc., 487 F. Supp. 1234, 1239 (D.C. Mich. 1980) (failure to conduct reinvestigation is ground to send punitive damages question to jury in § 1681e(b) context); Stevenson, 987 F.2d at 294 (plaintiff not entitled to punitive damages where defendant investigated dispute among other things).

45

In addition, plaintiff argues that defendant Sears may be liable for punitive damages for responding differently to the two April 2003 dispute notices. Although the inconsistency may be grounds for inferring negligence, there is no evidence indicating that there was any willfulness in responding to defendant Trans Union differently. Accordingly, plaintiff will not be able to seek punitive damages by arguing that defendant Sears violated the act willfully by responding differently to different dispute notices.

## B.  State Law Claims

Plaintiff contends that each defendant is liable under state law for credit defamation and tortious interference with credit expectancy. In addition, plaintiff has asserted a claim against defendant Sears for intentional invasion of privacy. Defendants Trans Union, CSC and Equifax argue that plaintiff's state law claims against them are preempted by 15 U.S.C. § 1681h(e). Defendant Sears has argued that plaintiff has proffered insufficient evidence to support his tortious interference and invasion of privacy claims.

## 1.  Preemption under § 1681h(e)

The Fair Credit Reporting Act preempts state law defamation and negligent reporting claims unless a plaintiff proves "malice of willful intent to injure such consumer." 15 U.S.C. § 1681h(e). Specifically, the act provides as follows:

46

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report  except as to false information furnished with malice or willful intent to injure such consumer.

Id.  In arguing that § 1681h(e) does not preempt his state law claims, plaintiff asserts that his claims are not based on a disclosure made "pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report."  Sections 1681g and 1681h require credit reporting agencies to disclose credit information *to consumers* upon consumers' request, whereas section 1681m requires users of consumer reports to disclose information to consumers against whom they have taken adverse actions.  Under plaintiff's interpretation, the provision bars defamation claims only when they arise out of disclosures to the plaintiff.  Plaintiff asserts that his claims are based on disclosures to third parties.

As defendant CSC aptly notes, plaintiff's construction would render § 1681h(e) essentially meaningless.  All defamation claims arise out of disclosures to third parties; it is

47

a prima facie element of the claim. Hart v. Bennet, 2003 WI App 231, ¶21, 267 Wis. 2d 919, 672 N.W.2d 306; Restatement (Second) of Torts § 558 (1977). Under plaintiff's construction, the provision would bar only those defamation claims that would fail as a matter of law. Moreover, plaintiff's construction is not supported by the language of the provision, which bars claims based on *information* disclosed pursuant to section 1681g, 1681h, or 1681m" and not claims based on the disclosure itself.

Defendant Trans Union was acting pursuant to § 1681g when it disclosed the erroneous information on which plaintiff's claims are based. This section requires that upon request, a reporting agency must disclose to a consumer the information in that consumer's file. On April 7, 2003, plaintiff sought his credit report and score from defendant Trans Union. Defendant Trans Union sent him its report, which included the deceased notation next to the Sears account information. Plaintiff contends that even if § 1681h(e) applies, his claims are not barred because a jury could find that defendant Trans Union exhibited a reckless disregard for the truth. But the statute imposes an even higher burden of malice or willful intent to injure; plaintiff's evidence does not support such a finding.

Conversely, there is no evidence that either defendant CSC or defendant Equifax ever made a disclosure pursuant to one of these sections. The only disclosure either of these defendants made to plaintiff was on April 22, 2003. Defendant CSC wrote plaintiff a letter stating that the deceased notation had been deleted and attached a copy of his credit report,

48

but it made this disclosure pursuant to § 1681i(a)(6)(B)(ii), which provides that a consumer reporting agency must provide a consumer with a report "based upon the consumer's file as that file is revised as a result of the reinvestigation" within five days after the reinvestigation has been completed. Because there is no indication that either defendant CSC or Equifax ever made a disclosure to plaintiff under §§ 1681g, 1681h, or 1681m, I cannot conclude that plaintiff's state law claims against them are preempted by § 1681h(e). Neither defendant argued any other reason why it is entitled to summary judgment on these claims. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (defendant has initial burden to explain basis for entitlement to judgment as a matter of law).

2. Invasion of privacy and tortious interference with credit expectancy claims against defendant Sears

Unlike the other defendants, defendant Sears argued that it was entitled to judgment on the merits for plaintiff's invasion of privacy and tortious interference with credit expectancy claims. Plaintiff failed to respond to these arguments in opposing defendant Sears's motion. In failing to do so, he waived the invasion of privacy and tortious interference with credit expectancy claims he brought against defendant Sears. These claims will be dismissed. (Plaintiff brought a state law claim of credit defamation against defendant Sears. Although defendant Sears formally moved for summary judgment with respect to this

49

claim, Dft. Sears's Mot. Summ. J., dkt. # 41, at 1, it failed to explain why it is entitled to judgment. Dft. Sears's Br., dkt. #42. <u>Celotex</u>, 477 U.S. at 325 (defendant has initial burden to explain basis for entitlement to summary judgment).)

## ORDER

IT IS ORDERED that

1. Defendant Trans Union LLC's motion for summary judgment is DENIED with respect to plaintiff's Fair Credit Reporting Act claim and GRANTED with respect to plaintiff's claims of credit defamation and tortious interference with credit expectancy;

2. Defendant Equifax Inc. d/b/a Equifax Information Services, LLC's motion for summary judgment is DENIED with respect to plaintiff's Fair Credit Reporting Act claim arising under 15 U.S.C. § 1681o, credit defamation claim and tortious interference with credit expectancy claim and GRANTED with respect to plaintiff's Fair Credit Reporting Act claim arising under 15 U.S.C. § 1681n;

3. Defendant CSC Credit Services, Inc.'s motion for summary judgment is DENIED with respect to plaintiff's Fair Credit Reporting Act claim arising under 15 U.S.C. § 1681o, credit defamation claim and tortious interference with credit expectancy claim and GRANTED with respect to plaintiff's Fair Credit Reporting Act claim arising under 15 U.S.C. § 1681n; and

50

4. Defendant Sears Roebuck & Co.'s motion for summary judgment is DENIED with respect to plaintiff's Fair Credit Reporting Act credit defamation claims and GRANTED with respect to plaintiff's claims of invasion of privacy and tortious interference with credit expectancy.

Entered this _____28th_____ day of July, 2004.

BY THE COURT:

*Barbara B. Crabb*

BARBARA B. CRABB
District Judge

51

Loislaw Federal District Court Opinions

--------------------------------------------------------------------------------

KRONSTEDT v. EQUIFAX, (W.D.Wis. 2001)

KIMBERLY FRAEDRICH KRONSTEDT, Plaintiff, v. EQUIFAX, CSC OF
WISCONSIN
and FIRST TENNESSEE BANK NATIONAL ASSOCIATION, Defendants.
01-C-0052-C
United States District Court, W.D. Wisconsin
December 14, 2001

OPINION AND ORDER

BARBARA B. CRABB, United States District Judge.

This is a civil action for damages brought pursuant to the Fair Credit
Reporting Act, 15 U.S.C. § 1681-1681u, and state common law.
Jurisdiction is present pursuant to 18 U.S.C. § 1331 and 1367. This
case arises indirectly out of the criminal conduct of an individual who
obtained plaintiff Kimberly Kronstedt's name, social security number and
other identifying information and used the information in 1998 to obtain
loans in plaintiff's name at various banks in the Tennessee area,
including defendant First Tennessee Bank National Association.[fn1] When
the imposter defaulted on the loans, the banks reported this to the
various credit reporting agencies, who included the negative information
on plaintiff's credit history. Plaintiff discovered that she had been the
victim of identity theft when her application for a construction loan was
denied in May 1999.

Plaintiff has sued because of alleged difficulties she encountered in
the six months she spent attempting to correct her credit information.
Plaintiff contends that defendants First Tennessee Bank National
Association and CSC of Wisconsin, a credit reporting agency, willfully
and negligently violated the Fair Credit Reporting Act by failing to take
appropriate steps to report her credit history accurately and that they
defamed her by publishing negative credit information they knew to be
false. Plaintiff contends that she suffered out-of-pocket losses,
emotional distress and damage to her reputation as a result of
defendants' actions.

Before the court are motions for summary judgment brought by defendants
CSC and First Tennessee. Both defendants contend that plaintiff has
failed to adduce evidence from which a finder of fact could conclude that
defendants violated the duties prescribed by the Fair Credit Reporting

Exhibit O

Act. Alternatively, defendants contend that plaintiff has failed to establish sufficient evidence of actual damages. As for plaintiff's state law defamation claims, defendants contend that plaintiff has failed to make the showing of malice that is required by the act's qualified immunity provision, 18 U.S.C. § 1681h(e).

The motion of defendant CSC will be granted in part and denied in part. Plaintiff has failed to adduce any evidence to show that CSC's investigation of her dispute regarding the fraudulent First Tennessee account was unreasonable or that CSC defamed her when it reported the account as in dispute. However, a genuine dispute of fact exists regarding whether CSC was responsible for the derogatory First Tennessee account information that reappeared on plaintiff's credit report in October 1999. Plaintiff has adduced sufficient evidence of actual damages to survive summary judgment. Accordingly, plaintiff will be allowed to go forward on her Fair Credit Reporting Act and defamation claims with respect to this issue.

The motion of defendant First Tennessee will be granted in part and denied in part. Summary judgment will be granted on plaintiff's claim that First Tennessee defamed her when it reported the fraudulent account as belonging to her from February to July 1999 and on her claim that the bank violated the Fair Credit Reporting Act when it reported in July 1999 that the account was under investigation for fraud. However, a genuine dispute of fact exists regarding whether defendant First Tennessee conducted a reasonable investigation under § 1681s-2 of the act when it learned in June 1999 that plaintiff was disputing that the fraudulent account was hers. Further, a genuine dispute of fact exists regarding whether First Tennessee was responsible for the derogatory account information reappearing on plaintiff's credit record in October 1999. Because I conclude that § 1681h(e)'s malice requirement does not apply to this claim, plaintiff may go to trial on her defamation claim with respect to the October 1999 communication.

Two preliminary matters deserve mention before I set out the facts. On November 16, 2001, attorneys for defendant First Tennessee submitted a letter in which they objected to plaintiff's Amended Proposed Findings of Fact on the ground that plaintiff had failed to comply with this court's procedures to be followed on summary judgment. First Tennessee's attorneys attached additional evidence to their letter, asserting that plaintiff had included in her amended proposed findings "new" facts to which defendant First Tennessee had not had the opportunity to respond. Because there is no substance to the allegations made by First Tennessee in its letter, I have disregarded the letter and the additional evidence attached thereto. Plaintiff's amended proposed findings of fact comply with this court's rules on summary judgment. Contrary to First

2

Tennessee's assertion, plaintiff's amended proposals do not contain any "new" facts that were not in her original proposed findings; the amended findings do nothing more than correct an error in the paragraph numbering on the original. Defendant First Tennessee's portrayal of the plaintiff's amended proposed findings of fact as somehow confusing the issues for trial is a poorly disguised attempt to reargue its case. Even worse, it demonstrates a remarkable lack of candor with this court.

  Second, rather ironically, defendant First Tennessee has violated this court's procedures on summary judgment by referring to facts in its brief that are not the subject of any proposed finding of fact. Specifically, defendant First Tennessee refers in its briefs to an affidavit from Richard Dean, an individual named as an expert for First Tennessee with respect to whether it complied with the requirements of the Fair Credit Reporting Act, although Deans's testimony was never the subject of a proposed finding of fact or response to a proposed finding of fact. Accordingly, the testimony will be disregarded.

  From the parties' proposed findings of fact and the record, I find the following facts to be undisputed for the purposes of summary judgment.

## FACTS

### I. THE PARTIES

  Plaintiff is a resident of Wisconsin. Defendant CSC Credit Services, Inc. is a Texas corporation registered to do business in Wisconsin. (The named defendant in this case, CSC of Wisconsin, is a trade name of CSC Credit Services, Inc. and is not a separate entity.) Defendant CSC is a consumer credit reporting agency, as that term is defined in the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f). As a consumer credit reporting agency, CSC makes credit information available to parties engaged in credit-related transactions. CSC functions as a conduit: it does not originate or create any credit information and it does not make loans or credit decisions.

  Defendant First Tennessee Bank National Association is a foreign corporation that is not incorporated under the laws of the state of Wisconsin and does not maintain a principal place of business in Wisconsin. Defendant First Tennessee furnishes credit information to credit reporting agencies.

  CSC has a contractual relationship with defendant Equifax that allows it to have access to a shared credit reporting database that Equifax possesses and maintains. (Defendant Equifax, like CSC, is a consumer reporting agency. The allegedly unlawful actions taken by Equifax are not

a subject of this motion.) CSC owns the credit reports relating to consumers in certain areas of the country, including Wisconsin, and is responsible for compiling such reports and investigating disputes with respect to such reports. Equifax owns the credit reports relating to consumers in certain other areas of the country and is responsible for compiling such reports and investigating disputes with respect to such reports.

Through its relationship with Equifax, CSC has access to a storehouse of credit information. This information consists of credit information reported by credit grantors called "tradelines." A tradeline will include information such as account number, account status and balance information. When reporting a tradeline, credit grantors will also provide information that identifies the consumer associated with the tradeline.

## II. CSC'S DISPUTE RESOLUTION PROCEDURES

CSC has procedures that it follows when a consumer disputes information that CSC provides on a report. When CSC receives a dispute from a consumer, it will investigate the dispute by contacting the creditor who is reporting the disputed information. CSC contacts the creditor via a Consumer Dispute Verification or Automated Consumer Dispute Verification form. If the creditor verifies that the reported information is correct, CSC updates the information on the consumer's credit report and notifies the consumer of that fact. If the creditor reports that the information is inaccurate or can no longer be verified or if the creditor does not respond to the Consumer Dispute Verification form within the required time, CSC deletes the information from the consumer's credit report and notifies the consumer of that fact. CSC always provides the consumer with the opportunity to have a statement regarding the information inserted into the credit report in accordance with 15 U.S.C. § 1681i(b). CSC may also use additional procedures depending on the precise dispute involved and the circumstances of the case.

When CSC learns from a creditor that the creditor is investigating an account for fraud, CSC does one of three things to the consumer's credit report: deletes the tradeline in its entirety; leaves the tradeline on the account but deletes the derogatory information and adds the form response "dispute-resolution pending;" or leaves the tradeline including all the derogatory information on the report and notes that the consumer is disputing the account. CSC may delete the tradeline in its entirety even though the creditor did not instruct it to do so.

## III. PLAINTIFF'S DISCOVERY OF IDENTITY THEFT

4

In February 1999, FBI Special Agent Timothy Reece began investigating an individual named Jodi Lehman. The FBI suspected that Lehman had been responsible for submitting fraudulent loan applications in plaintiff's name to various banks in the Nashville area, including First Tennessee National Bank. As part of his investigation, Reece contacted Ashlea Webb, an employee at First Tennessee, in February and March 1999, and obtained from her the loan application and other documents regarding a December 1998 loan that the bank had issued in plaintiff's name.

First Tennessee began its own investigation of the account in March 1999. Notes from First Tennessee's collection department include the following:

3/17/99  [loan officer] called back said this is fraud
         was a loan by phone [maker] is in jail also
         has another loan told me to call Ashley
         . . . to get more info

3/18/99  Ashley [called] back and said that maker has
         3 assumed names, had ID, pay stubs and
         everything to get the loan, she was a school
         teacher in Ohio but is in custody now, she
         has done this with several banks . . .

3/18/99  Putting out this is fraud

3/18/99  Kick out, is a fraud

4/29/99  fraud

5/17/99  Account is being checked for fraud

6/3/99   Passing and putting out fraud can't work

7/14/99  Mike [called] from [credit]ing about fraud on
         account per notes being checked for fraud

In May 1999, plaintiff discovered that she had been the victim of identity theft when she and her then fiancé, Keith Kronstedt, applied for a loan at River Cities Bank to finance the construction of their new home. Associated Mortgage, Inc., the company underwriting the loan, obtained a credit report showing information reported from three credit reporting agencies: Trans Union, Experian and Equifax. The merged credit report listed seven delinquent accounts as belonging to plaintiff, including one being reported by defendant First Tennessee. As a result of the derogatory credit information — the most damaging of

5

which was the delinquency reported by First Tennessee — Associated Mortgage would not approve plaintiff as a co-borrower on the construction loan. However, Keith Kronstedt was able to obtain the construction loan in his name on the terms the couple had been seeking.

   After her loan application was denied, plaintiff tried to uncover what had happened to her and to correct the problems on her credit report. Eventually plaintiff tracked down Special Agent Reece, who informed her that she had been the victim of identity theft by Lehman. Plaintiff also contacted the three major credit reporting agencies, Trans Union, Equifax and Experian, and requested copies of her credit reports.

## IV. DEFENDANTS' RESPONSES TO PLAINTIFF'S DISPUTE ABOUT CREDIT REPORT

   On June 3, 1999, defendant First Tennessee received an Automated Consumer Dispute Verification from Experian. The form stated that Kronstedt "states that this account is mixed up with someone else" and asked First Tennessee to "provide complete ID." First Tennessee responded by looking up the account information maintained internally on its computers. After seeing that the name and social security number on the account matched the information provided by Experian, First Tennessee verified that the account belonged to plaintiff and sent that information to Trans Union, Experian and Equifax.

   Equifax sent plaintiff a copy of her credit report dated June 16, 1999. The report indicated that it had been produced by CSC. The credit report listed five bank accounts that Lehman had obtained in plaintiff's name, including First Tennessee Bank.

   Sometime in June 1999, plaintiff contacted First Tennessee about the information that was being reported on her credit report. Also, on July 2, 1999, plaintiff's attorney sent a letter to CSC about plaintiff's credit report. The letter included an affidavit from plaintiff in which she averred that loan accounts at five banks had been opened fraudulently by another person. This was the first time that either plaintiff or her attorney had communicated with CSC.

   In the July 2, 1999 letter, plaintiff's attorney informed CSC that plaintiff had been the victim of fraud and asked that the following bank accounts be deleted from plaintiff's credit history: Nationsbank Tennessee, First Tennessee Bank, Regions Bank, Suntrust Bank Nashville and Amsouth Bank. Before receiving the letter, CSC had no reason to suspect that these accounts had been opened fraudulently in plaintiff's name. Plaintiff's attorney mailed a copy of the letter and the affidavit to First Tennessee Bank.

After receiving the letter from plaintiff's attorney, CSC added a fraud alert statement to plaintiff's credit report. The fraud alert included plaintiff's phone number and read in part as follows:

* * * Fraud alert * * * Fraudulent applications may be submitted in my name using correct personal information//If you access this file, please verify with me, personally, that it is legitimate

Dep. of Janice Fogelman, dkt. #71, ex. 7. CSC also began investigating the accounts about which plaintiff had complained. CSC sent Consumer Dispute Verification forms to Amsouth Bank, Regions Bank, Suntrust Bank Nashville and First Tennessee. It sent an Automated Consumer Dispute Verification form to First Tennessee Bank, which First Tennessee received on July 14, 1999. CSC did not address the Nationsbank Tennessee account because it did not appear on plaintiff's CSC credit report.

CSC did not receive responses from Regions Bank or Suntrust Bank Nashville. Pursuant to its dispute resolution procedures, CSC deleted these accounts from plaintiff's credit report. Amsouth Bank responded to CSC's Consumer Dispute Verification form by verifying the account as fraudulent and directing CSC to delete the tradeline. CSC complied with Amsouth's request and deleted the tradeline from plaintiff's credit report.

First Tennessee received the Automated Consumer Dispute Verification form from CSC on July 14, 1999. In response to the form, an employee from First Tennessee Bank's credit inquiry department called the bank's collection department, which informed the employee that plaintiff's account was being investigated for fraud. On its response to the dispute verification form, defendant First Tennessee's credit department informed CSC that it had verified that it had an account with the same name as plaintiff and the same former address and social security number. First Tennessee indicated that the account was being investigated for fraud.

CSC interpreted this response to mean that First Tennessee's investigation was not complete and that the bank did not know whether the account was fraudulent. Pursuant to its policies, CSC left the name "First Tennessee Bank" on plaintiff's credit report, but deleted all other information about the account, including information that the account was delinquent, the outstanding balance of the account and the rating of the account. CSC also added the notation "dispute-resolution pending" to the account.

On or about November 11, 1999, plaintiff and Kronstedt sought to

7

convert Kronstedt's construction loan into a home mortgage. As they had done with the construction loan, plaintiff and Kronstedt applied for a mortgage through Susan Ruesch at River Cities Bank. Ruesch contacted Associated Mortgage, Inc. to underwrite the loan application. Associated Mortgage obtained a merged credit report that it showed to Ruesch that contained information from the combined credit reports of Trans Union, Experian and Equifax. The report included the complete tradeline information about the First Tennessee account, including the outstanding balance and a history of delinquent payments, but omitted any indication that the account was in dispute or under investigation for fraud. The First Tennessee tradeline indicated that report indicated that the First Tennessee Bank information had been reported by Equifax in October 1999. Although this information reflected negatively on plaintiff's creditworthiness, Associated Mortgaged approved a loan in plaintiff's and Kronstedt's names. However, plaintiff chose to have her name taken off the loan application.

   On November 18, 1999, plaintiff called CSC and talked to Carolyn Johnson in the legal department regarding the First Tennessee Bank information on her credit report. In response to plaintiff's phone call, Johnson directed staff to remove the entire First Tennessee Bank notation from plaintiff's credit report. CSC staff complied with Johnson's request and the First Tennessee Bank tradeline was deleted from plaintiff's credit report on November 19, 1999.

## DISPUTED FACTS

   A material dispute of fact exists regarding which of the defendants, CSC or First Tennessee, was responsible for the First Tennessee Bank information reappearing on plaintiff's CSC credit report in October 1999.

## OPINION

## I. SUMMARY JUDGMENT STANDARD

   To prevail on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Indiana Grocery, Inc. v. Super Valu Stores, Inc., 864 F.2d 1409, 1412 (7th Cir. 1989). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991). The

8

opposing party cannot rest on the pleadings alone, but must designate
specific facts in affidavits, depositions, answers to interrogatories or
admissions that establish that there is a genuine issue for trial.
Celotex, 477 U.S. at 324.

## II. FAIR CREDIT REPORTING ACT CLAIMS

### A. Claims Against CSC

The Fair Credit Reporting Act creates a private right of action against
consumer reporting agencies for the negligent or willful violation of any
duty imposed under the statute. See 15 U.S.C. § 1681o (negligent
violations) and 1681n (willful violations); Henson v. CSC Credit
Services, 29 F.3d 280, 284 (7th Cir. 1994). A consumer reporting agency
that violates the provisions of the act negligently may be liable to the
consumer for actual damages, costs and attorney's fees.
15 U.S.C. § 1681o. A consumer reporting agency that violates the
statute willfully may be liable for punitive damages as well.
15 U.S.C. § 1681n.

Under the act, a consumer reporting agency is required to follow
"reasonable procedures to assure maximum possible accuracy" of the
information contained in a consumer's credit report.
15 U.S.C. § 1681e(b). Thus, a consumer reporting agency will not be
liable under the Fair Credit Reporting Act if it reported inaccurate
information on a consumer's credit report, so long as the agency followed
reasonable procedures to assure the "maximum possible accuracy" of its
reports. See Henson, 29 F.3d at 284. Under this provision, a credit
reporting agency is not liable for reporting inaccurate information
obtained from a presumptively reliable source, such as a court's Judgment
Docket, absent notice from the consumer that the information is
inaccurate. Id., 29 F.3d at 285.

However, once a consumer notifies the consumer reporting agency that
there is an error on her credit report, the agency is obligated under
§ 1681i to conduct a more thorough investigation. Section 1681i
states in relevant part:

If the completeness or accuracy of any item of
information contained in a consumer's file at a
consumer reporting agency is disputed by the consumer
and the consumer notifies the agency directly of such
dispute, the agency shall reinvestigate free of charge
and record the current status of the disputed
information, or delete the item from the file in
accordance with paragraph (5), before the end of the

9

30-day period beginning on the date on which the
agency receives the notice of the dispute from the
consumer.

15 U.S.C. § 1681i(a).

Depending on the circumstances, a credit reporting agency that receives
notice of a dispute may be required to verify the accuracy of its initial
source of information. Henson, 29 F.3d at 287; see also Cahlin v. General
Motors Acceptance Corp., 936 F.2d 1151, 1160 (11th Cir. 1991) ("A [§
1681i(a)] claim is properly raised when a particular credit report
contains a factual deficiency or error that could have been remedied by
uncovering additional facts that provide a more accurate representation
about a particular entry."). Two relevant factors are "whether the
consumer has alerted the reporting agency to the possibility that the
source may be unreliable or the reporting agency itself knows or should
know that the source is unreliable" and "the cost of verifying the
accuracy of the source versus the possible harm inaccurately reported
information may cause the consumer." Id. Whatever considerations exist,
it is for "the trier of fact [to] weigh the[se] factors in deciding
whether [the defendant] violated the provisions of section 1681i." Id.

Plaintiff contends that two actions taken by CSC violated the Fair
Credit Reporting Act. First, plaintiff contends that CSC acted
unreasonably when it reported the First Tennessee account as
"dispute-resolution pending" instead of deleting the First Tennessee Bank
tradeline in its entirety after she informed CSC that she was disputing
the account. Second, she contends that CSC should have prevented the
derogatory information associated with the tradeline from reappearing on
her report in October 1999. (Plaintiff does not seem to be challenging
CSC's reporting of the First Tennessee Bank account information before
she notified it in July 1999 that she was disputing the information. In
any case, because plaintiff has not adduced any evidence to suggest that
CSC had any reason to question the accuracy of First Tennessee's credit
information before July 1999, CSC would be entitled to summary judgment
on this claim. See Henson, 29 F.3d at 286 (absent notice from consumer of
error in consumer's credit report, credit reporting agency that relies on
accuracy of public court documents in preparing credit report not liable
under § 1681e(b)).)

1. CSC's reporting of disputed account

Plaintiff contends that in light of all the information CSC had,
including the letter from her attorney, her affidavit and the fact that
one of the other banks had verified the account opened in her name as
fraudulent, it should have deleted the First Tennessee account

10

information in its entirety instead of merely suppressing the derogatory information and adding a notation stating "dispute-resolution pending." Plaintiff contends that by simply "parrot[ing] the creditor's response" and "refusing to acknowledge [her] sworn testimony that the account was fraudulent," CSC abdicated its duty under § 1681e(b) to follow reasonable procedures to maintain maximum possible accuracy. Although plaintiff has not alleged a separate claim under § 1681i(a), she contends as part of her § 1681e(b) claim that CSC violated § 1681i(a)(4), which requires the consumer reporting agency to "review and consider all relevant information submitted by the consumer" in investigating a consumer dispute.

   As an initial matter, I note that because plaintiff's claim involves the steps taken by CSC after she informed it that she disputed the accuracy of the First Tennessee Bank account information, it actually states a claim arising under § 1681i(a) rather than under § 1681e(b). See Henson, 29 F.3d at 286; Cahlin, 936 F.2d at 1160 (distinguishing between duties imposed by § 1681e(b) and § 1681i). Because § 1681i provides its own set of procedures for reinvestigating disputed information, it is debatable whether § 1681e(b)'s "maximum possible accuracy" standard applies to reinvestigation procedures. See Swoager v. Credit Bureau of Greater St. Petersburg, 608 F. Supp. 972, 975 (M.D. Fla. 1985) (because "the functions of § 1681e(b) and § 1681i are dissimilar . . . it would be incongruous to engraft the maximum accuracy dictates of the former into the context of reinvestigation and grievance procedures governed by the latter"); Grenier v. Equifax Credit Information Services, 892 F. Supp. 57, 59 (D. Conn. 1995) (same). But see Cahlin, 936 F.2d at 1160 (Section 1681i claim properly raised when credit report contains factual deficiency or error that could have been remedied by uncovering additional facts that provide "a more accurate representation about a particular entry") (emphasis added). However, because defendant has not challenged the propriety of applying § 1681e(b)'s standard to plaintiff's allegations, I will assume that § 1681e(b)'s "maximum possible accuracy" standard applies.

   Even with the benefit of the maximum possible accuracy standard, plaintiff's first claim cannot survive defendant CSC's motion for summary judgment. Although the "reasonableness" of a defendant's procedures is typically a fact question that must be resolved by the jury, summary judgment is proper if the reasonableness of the defendant's procedures is "beyond question." Crabill v. Trans Union, L.L.C., 259 F.3d 662, 664 (7th Cir. 2001). This is such a case. Plaintiff does not contend that there were any additional facts that CSC could have uncovered, that the means it used to investigate her complaint were unreasonable or that she notified CSC that First Tennessee was an unreliable source. Plaintiff

11

asserts that CSC failed to review and consider all the information she submitted, but she offers no facts to support that assertion. What plaintiff really challenges is CSC's response to her dispute in light of the information it had. She is arguing that it was unreasonable for CSC to have left the First Tennessee tradeline on her credit report at all given the information she had provided. Plaintiff argues that whether it is was reasonable for CSC to have left the tradeline on the credit report rather than deleting it completely is a question for the jury.

  I disagree. The Fair Credit Reporting Act does not go that far. As the court explained in Cahlin, 936 F.2d at 1158,

> Although a credit reporting agency has a duty to make a reasonable effort to report "accurate" information on a consumer's credit history, it has no duty to report only that information which is favorable or beneficial to the consumer. Congress enacted Fair Credit Reporting Act with the goals of ensuring that such agencies imposed procedures that were not only "fair and equitable to the consumer," but that also met the "needs of commerce" for accurate credit reporting. Indeed, the very economic purpose for credit reporting companies would be significantly vitiated if they shaded every credit history in their files in the best possible light for the consumer. Thus, the standard of accuracy embodied in section [15 U.S.C. § 1681e(b)] is an objective measure that should be interpreted in an evenhanded manner toward the interests of both consumers and potential creditors in fair and accurate credit reporting.

(Footnote omitted).

  With respect to disputed accounts, the court noted that consumers who dispute how a particular dispute is characterized or interpreted on their credit report are not without a remedy: under § 1681i(b), they may file a statement as to their version of the dispute. Id. at n. 23. "In this way, potential creditors have both sides of the story and can reach an independent determination of how to treat a specific, disputed account." Id. (citation omitted).

  Aside from her own assertion that CSC should have simply taken her at her word and ignored First Tennessee's response regarding the First Tennessee account, plaintiff has adduced no evidence from which a trier of fact could conclude that it was unreasonable for CSC to respond as it did to her dispute regarding the First Tennessee account. CSC complied

12

with its duty to reinvestigate and notified First Tennessee of the dispute. First Tennessee reported back to CSC that plaintiff's account was being investigated for fraud. CSC interpreted First Tennessee's response as meaning that it could not verify the derogatory account information, so it suppressed that information from plaintiff's credit report and added a notation that the account was in dispute. CSC also placed plaintiff's statement regarding the dispute on file. The Fair Credit Reporting Act did not require CSC to do more. Summary judgment will be granted to CSC on this claim.

2. Reappearance of derogatory information on credit report

  Plaintiff also contends that defendant CSC violated the Fair Credit Reporting Act when it allowed the derogatory information concerning the First Tennessee Bank account to reappear on her credit report from mid-October 1999 until it was deleted on November 19, 1999. At least one court has found that "[a]llowing inaccurate information back onto a credit report after deleting it because it is inaccurate is negligent." Stevenson v. TRW Inc., 987 F.2d 288, 293 (5th Cir. 1993). See also Philbin v. Trans Union Corp., 101 F.3d 957, 965-66 (3d Cir. 1996) (plaintiff produced sufficient evidence to survive summary judgment on issue of reasonable procedures merely by demonstrating that there were inaccuracies in credit report). In its brief in support of its motion for summary judgment, defendant CSC does not attempt to deny that the information was inaccurate or that it may have been responsible for its reappearance on plaintiff's credit history, but contends that it is entitled to judgment as a matter of law because plaintiff has insufficient evidence of actual damages.

3. Actual damages

  Actual damages for Fair Credit Reporting Act violations may include out-of-pocket losses, damages for injury to reputation and creditworthiness and for humiliation or mental distress. Cousin v. Trans Union Corp., 246 F.3d 359, 376 (5th Cir. 2001). In order to obtain an award of "actual damages," a plaintiff must present evidence showing a "causal relation between the violation of the statute and the loss of credit, or some other harm . . .". Crabill, 259 F.3d at 664. Defendant CSC contends that plaintiff cannot recover actual damages absent a showing that she was denied credit as a result of any conduct by CSC.

  I agree with defendant CSC that plaintiff has adduced no evidence to show that she was denied credit as result of credit information provided by CSC. The evidence indicates that the only time plaintiff was denied credit on the basis of information that might have come from CSC was in May 1999, before plaintiff notified CSC that she had been the victim of

13

identity theft. As noted previously, CSC is not liable for the May 1999 denial because it had no notice that the First Tennessee loan was disputed at that time. Plaintiff alleges that, as a result of information reported by CSC, she was denied credit a second time by Associated Mortgage in November 1999 when she and her fiancé attempted to convert his construction loan into a joint mortgage. However, plaintiff's own witness averred that this was not the case: Associated Mortgage approved plaintiff's loan application. See Aff. of Kay Bader, dkt. # 67, ¶ 30. Further, there is no evidence to support plaintiff's assertion that she was approved at a less favorable rate of interest. In short, there is simply no evidence to show that plaintiff was denied credit or suffered a negative credit action because of an inaccurate credit report prepared by CSC.

That said, courts interpreting the Fair Credit Reporting Act have held that a plaintiff may recover actual damages for emotional distress and loss of reputation even absent the denial of credit. See Cousin v. Trans Union Corp., 246 F.3d 359, 369 n. 15 (5th Cir. 2001); Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995). Although defendant CSC maintains that the Seventh Circuit repudiated this view in Crabill, I cannot find support for defendant's assertion in the court's opinion. The court did not limit recovery to those cases involving a denial of credit, but included those in which the plaintiff could show a causal relation between the violation of the statute and "some other harm," leaving open the possibility that the phrase "some other harm" could encompass emotional distress. Although the court declared in Crabill that plaintiff had "no compensatory damages," there is no indication that Crabill had asserted a claim of emotional distress. See Crabill, 259 F.3d at 664. Thus, it appears to be an open question in this circuit whether a plaintiff may recover actual damages for emotional distress in the absence of a denial of credit.

I agree with those courts that have concluded that a denial of credit is not a necessary prerequisite for a § 1681e(b) claim. Defendant CSC argues that even so, plaintiff's evidence of emotional distress is plainly insufficient to support an award of damages. Defendant points out that even though plaintiff contends that she sought counseling to deal with emotions resulting from her efforts to clear her credit report, she has not offered any testimony from her counselors to support her claims and she admitted that she did not tell them about CSC or credit reporting agencies generally. Defendant argues that in the absence of such testimony or medical evidence, plaintiff's uncorroborated testimony regarding her emotional distress is insufficient to support her claim.

Defendant CSC compares this case to Cousin, in which the Court of Appeals for the Fifth Circuit vacated the jury's award of $50,000 in

14

compensatory damages on the ground that plaintiff's testimony of mental distress was insufficient. In that Fair Credit Reporting Act case, plaintiff's brother used plaintiff's personal identifying information to obtain two car loans on which he subsequently defaulted, causing damage to plaintiff's credit history. After concluding that plaintiff could not recover for emotional distress resulting from a credit denial absent evidence that the denial was based upon a Trans Union credit report, the court found that the only distress for which plaintiff could recover related to his reaction when he saw his inaccurate Trans Union credit reports on two separate occasions. With respect to the first occasion, plaintiff testified that he felt "very upset, angry" and as if the company had not listened to him. Cousin, 246 F.3d at 371. As for the second occasion, plaintiff testified that he felt

> real frustrated, real irritated to know that this information was continuing to be reported over and over again. I already told them that it was not me. I wanted to say that it was a feeling of like being in jail knowing that I — I mean, I didn't do this. I'm not guilty, but I was continuing to be punished for it.

Id. at n. 17.

   In concluding that this testimony was insufficient to sustain the jury's award of actual damages, the court referred to Carey v. Piphus, 435 U.S. 247 (1978), in which the Supreme Court held that a jury's award for emotional distress in a case brought under 42 U.S.C. § 1983 must be supported by evidence of genuine injury, such as evidence of the injured party's conduct and observations of others. See Cousin, 246 F.3d at 371 (citing Carey, 435 U.S. at 264 n. 20). Applying Carey's holding in Cousin, the court noted that a plaintiff bringing a federal claim for emotional distress must prove damages with "a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award." Cousin, 246 F.3d at 371 (quoting Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 938 (5th Cir. 1996)).

   In the instant case, plaintiff testified at her deposition as follows regarding the emotional distress she experienced when she learned that the derogatory First Tennessee Bank account information had been re-reported:

> [T]he fact that CSC was contacted several times and requested, you know, that that derogatory information be removed and still in November of '99 is reporting that information, you know. Like I said before, at

15

that time how many more credit reports do you have to
request? How many more phone calls do you have to
make? How many more documents from an attorney do you
have to send to get this cleared up?

  I can't even explain in words how it feels. Unless
it happens to you, you just don't understand the
frustration. It's like somebody throwing you in jail
and telling you you committed a crime that you didn't
commit, and even though there is proof that it's not
you.

  The FBI agent knows it's not you, all the banks know
it's not you, yet they don't care. They won't remove
it. They will leave you sit there. They don't care
that you can't move on with your life or afraid to go
apply for a loan.

  The fact that it carried out as long as it did
through December, in my opinion it shouldn't have gone
that far, it should have been taken care of at the end
of July.

Dep. of Pltf., July 25, 2001, dkt. #56 at 135-36.

  Although I agree with defendant CSC that the evidence of plaintiff's
emotional distress is not significantly greater than that provided by the
plaintiff in Cousin, I nonetheless conclude that it is sufficient to
survive defendant's motion for summary judgment. Although the Court of
Appeals for the Seventh Circuit has extended Carey's "genuine injury"
requirement beyond the procedural due process context, it has rejected
the proposition that "an injured person's testimony can never be
sufficient by itself, or in conjunction with the circumstances of the
particular case, to establish damages for emotional distress." United
States v. Balistreri, 981 F.2d 916, 932 (7th Cir. 1992) (citations
omitted). Rather, the court has held that the injured party's testimony
alone may be sufficient to establish emotional distress, so long as the
injured party "reasonably and sufficiently explain[s] the circumstances
of his injury and [does] not resort to mere conclusory statements." Id.
at 931-23 (quoting Biggs v. Village of Dupo, 892 F.2d 1298, 1304 (7th
Cir. 1990) (in turn quoting Rakovich v. Wade, 819 F.2d 1393, 1399 n. 6
(7th Cir. 1987), vacated on other grounds, 850 F.2d 1180 (1988))).
Whether the evidence of emotional distress is sufficient to support an
award of damages will also depend on the circumstances of the act that
allegedly caused that distress: "[t]he more inherently degrading or
humiliating the defendant's action is, the more reasonable it is to infer

16

that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional distress." Id. at 932.

In Balistreri, 981 F.2d 916, the court declined to overturn the jury's award of $2,000 to each plaintiff for emotional distress. The plaintiffs were testers who assisted the government in building a case of housing discrimination against the defendant. The only evidence of emotional distress came from the testers themselves, who testified generally about being upset, humiliated, embarrassed or shamed. Although the court acknowledged that this evidence was not strong, it upheld the jury's award, reasoning that the jury was "in the best position to evaluate both the humiliation inherent in the circumstances and the witness's explanation of his injury. Moreover, the jury is able to examine the witness personally; a jury may glean as much if not more about a witness's emotional state from the witness's demeanor than from his attempts to explain the nature of his injury in words." Id. at 933.

Although it is difficult to conceive how having inaccurate and derogatory credit information on one's credit report could be as degrading or humiliating as being the victim of race or sex discrimination, I share the view that evaluation of plaintiff's emotional distress claim is a task best left for the jury. In addition to the testimony quoted above, plaintiff testified that the difficulties she encountered in restoring her credit report exacerbated the distress she felt as a result of the identity theft, made her reluctant to apply for credit and made her less trusting of people. Although it is not clear how much of this distress was related specifically to the re-publication of the derogatory information on her credit report in October 1999, when the evidence is viewed in the light most favorable to plaintiff, it is sufficient to overcome defendant CSC's motion for summary judgment.

Furthermore, plaintiff has alleged other actual damages in addition to emotional distress. Specifically, plaintiff contends that she took four days off work in order to meet with lawyers and make telephone calls in order to clear up her credit history. These damages are compensable. However, plaintiff will have to prove that any damages claimed for time off work resulted specifically from the reappearance of the derogatory First Tennessee Bank information on her credit report.

Plaintiff also claims damages for prelitigation attorneys fees that are owed to the lawyer who contacted CSC when she learned of her negative credit history, but these are not compensable. "Actual damages" may include out-of-pocket expenses for attorney fees incurred by a plaintiff prior to litigation of his Fair Credit Reporting Act claims so long as the

17

lawyer's services were employed to remedy a violation of the law. Casella v. Equifax Credit Information Services, 56 F.3d 469, 475 (2d Cir. 1995). Here, the fees that plaintiff contends she owes her previous attorney are for drafting a letter and an affidavit that he mailed to CSC to inform it of the inaccurate information on plaintiff's credit report. As noted previously, CSC was not violating the law at the time. Accordingly, plaintiff cannot recover her prelitigation attorney fees. Moreover, any statutory attorney fees that plaintiff may be awarded if she succeeds at trial are not actual damages. See Crabill, 259 F.3d at 664-66.

One final word on damages. CSC contends that it is not responsible for any damages resulting from the derogatory information that appeared on plaintiff's November 1999 credit report because the merged report obtained by Associated Mortgage from Informative Research cited Equifax as the source of the First Tennessee Bank information. However, defendant CSC does not dispute that it exchanges information with Equifax and that it is responsible for compiling reports about Wisconsin consumers. Furthermore, plaintiff testified in her deposition that when she would request a credit report from Equifax, she would receive a report from CSC instead. Finally, it is undisputed that CSC was reporting the derogatory information on its data systems when plaintiff contacted it on November 18, 1999. Viewing this evidence in the light most favorable to plaintiff, it supports an inference that CSC provided the information that Equifax subsequently reported to Informative Research. However, plaintiff will bear the burden at trial to present facts showing that CSC was the source of information attributed to Equifax.

4. Punitive and statutory damages

Even if plaintiff is not entitled to any "actual damages," she may be entitled to punitive damages if she can show that CSC willfully failed to comply with the Fair Credit Reporting Act. See Casella, 56 F.3d at 476; 15 U.S.C. § 1681n(2). The act provides that a consumer who can show willful noncompliance can recover statutory damages of not less than $100 and not more than $1,000. § 1681n(a)(1)(A). To show willful noncompliance, a plaintiff must show that the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others." Pinner v. Schmidt, 805 F.2d 1258, 1263 (5th Cir. 1986); Dalton, 257 F.3d 409; Philbin, 101 F.3d at 970. Although a showing of malice or evil motive is not required to prove willfulness under the act, courts have held that to justify an award of punitive damages, a defendant's actions must be on the same order as willful concealments or misrepresentations. Cushman v. Trans Union Corp., 115 F.3d 220, 226-27 (3rd Cir. 1997); Stevenson v. TRW, Inc., 987 F.2d 288, 294 (5th Cir. 1993).

Assuming for the purposes of deciding CSC's motion for summary judgment that CSC was responsible for the derogatory information reappearing on plaintiff's credit report in October 1999, plaintiff has adduced no evidence from which a jury could conclude that CSC's actions were willful. As proof of CSC's culpability, plaintiff has adduced nothing more than the fact that the derogatory information reappeared on her credit report. Although this may be sufficient to establish negligence under a res ipsa loquitur theory, see Philbin, 101 F.3d at 965, it falls far short of the showing plaintiff must make to establish that CSC acted in conscious disregard for her rights. Further, when plaintiff contacted CSC about the reappearance of the information, CSC remedied the error immediately. There is simply no evidence of any willful misrepresentation, concealment or intentional disregard for plaintiff's rights on the part of CSC. Accordingly, summary judgment on plaintiff's punitive and statutory damages claim is appropriate.

### B. Claims Against First Tennessee

Plaintiff contends that two actions taken by First Tennessee violated the Fair Credit Reporting Act. First, plaintiff contends that First Tennessee failed to conduct a reasonable investigation of the disputed account when it received the Consumer Dispute Verification form from Experian in June 1999. Second, she contends that First Tennessee acted unreasonably in July 1999 when it informed CSC that the account that had been opened in her name was under investigation for fraud without instructing CSC to delete the tradeline entirely.

Before addressing the merits of plaintiff's claims against First Tennessee, I will address First Tennessee's contention that plaintiff's claims against it must be dismissed for lack of personal jurisdiction and improper venue. I agree with plaintiff that defendant has waived its right to assert these defenses by failing to include them in its answer. See Fed.R.Civ.P. 12(h)(1) ("A defense of lack of jurisdiction over the person [or] improper venue . . . is waived . . . if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of course.").

Defendant First Tennessee points to its fourth affirmative defense in its amended answer as proof that it asserted the defense of lack of personal jurisdiction. In that paragraph, defendant asserted: "Service of process upon these answering defendants may have been legally insufficient, such as to deprive this court of jurisdiction." Def. First Tennessee's Amended Answer, dkt. #34, at 2, ¶ 4. It is disingenuous for First Tennessee to contend that this statement raises a lack of personal jurisdiction defense. The plain reading of this statement is that

19

defendant was asserting the defense of insufficiency of service of process. Although improper service may result in the court's lacking jurisdiction over the person, that defense is different from First Tennessee's contention in its brief that personal jurisdiction over it does not exist under Wisconsin's long-arm statute. Fed.R.Civ.P. 12(b) contemplates that the defenses of insufficiency of service of process and lack of jurisdiction over the person are different defenses that should be pleaded separately. See also Fed.R.Civ.P. 10(b) ("each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth"). First Tennessee either ignored these rules, or, more likely, did not intend to raise the defenses of lack of personal jurisdiction and improper venue. In either case, defendant has waived its right to assert these defenses now.

   Defendant also contends that I should apply the holding of the federal district courts in Tennessee and find that plaintiff may not bring a private cause of action to enforce 15 U.S.C. § 1681s-2 (b). See Carney v. Experian Info. Solutions, Inc., 57 F. Supp.2d 496 (W.D. Tenn. 1999). This contention is frivolous. This court is not bound by another federal district court's interpretation of federal law on a claim arising under this court's federal question jurisdiction. Further, there is not a shred of support in the record for defendant's contention that plaintiff has conceded that Tennessee law should apply.

1. First Tennessee's investigation on June 3, 1999

   In 1996, Congress amended the Fair Credit Reporting Act to impose duties upon persons, like defendant First Tennessee, who furnish information to credit reporting agencies. See 15 U.S.C. § 1681s-2. Upon notice of a dispute from a credit reporting agency, § 1681s-2(b)(1) of the act requires the entity furnishing the information to conduct an investigation regarding the dispute and to report its findings accordingly:

   After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall —

   (A) conduct an investigation with respect to disputed information;

   (B) review all relevant information provided by the consumer reporting agency pursuant to section

20

1681i(a)(2);

(C) report the results of the investigation to the
consumer reporting agency; and

(D) if the investigation finds that the information is
incomplete or inaccurate, report those results to all
other consumer reporting agencies to which the person
furnished the information . . . .

15 U.S.C. § 1681s-2 (b)(1). The duties imposed on providers of
information under § 1681s-2(b) arise only after the entity furnishing
the information receives notice from a consumer reporting agency that a
consumer is disputing credit information. Aside from the Carney
decision, discussed above, nearly all courts considering this provision
have concluded that a consumer may bring a cause of action against an
entity furnishing information for a violation of this subsection. See,
e.g., Thomasson v. Bank One, Louisiana, N.A., 137 F. Supp.2d 721, 723
(E.D. La. 2001); Whitesides v. Equifax Credit Info. Serv., Inc.,
125 F. Supp.2d 807, 812 (W.D. La. 2000); Dornhecker v. Ameritech Corp.,
99 F. Supp.2d 918, 926-27 (N.D. Ill. 2000) and cases cited in plaintiff's
brief, dkt. #61, at 6-7.

  The parties dispute whether the investigation under § 1681s-2(b)(1)
must satisfy any particular standard or whether it is enough that the
entity simply conduct some sort of investigation, no matter how minimal.
Apparently, only one other court has considered this question. In Bruce
v. First U.S.A. Bank, 103 F. Supp.2d 1135 (E.D. Mo. 2000), the court
concluded that the investigation under § 1681s-2(b) must be
reasonable. In reaching this conclusion, the court noted that §
1681s-2(b)'s investigation requirement for entities furnishing credit
information is analogous to the reinvestigation requirement imposed upon
credit reporting agencies under § 1681i(a), which courts have
interpreted as imposing a duty to conduct a reasonable reinvestigation.
Id. at 1143.

  I agree that § 1681s-2(b)(1) imposes a duty upon entities that
furnish information to conduct a reasonable investigation after receiving
notice from a credit reporting agency that a consumer disputes the
completeness or accuracy of an item on her credit report. Although
defendant First Tennessee argues that such a conclusion is inconsistent
with the plain language of the statute, defendant does not disagree with
the court's conclusion in Bruce that § 1681s-2(b) is analogous to
§ 1681i(a), which courts have interpreted as imposing a
reasonableness requirement despite the lack of such language in that
provision. Indeed, the conclusion that an investigation under §

21

1681s-2(b)(1) must be reasonable seems manifest in light of § 1681o, which allows a consumer to recover damages from "[a]ny person who is negligent in failing to comply with any requirement imposed under this subchapter." 15 U.S.C. § 1681o(a).

Applying the reasonable investigation standard, I conclude that genuine issues of material fact exist as to whether defendant First Tennessee conducted a reasonable investigation into plaintiff's dispute as required by § 1681s-2(b)(1). It is undisputed that, by the time First Tennessee received the first Consumer Dispute Verification form on June 3, 1999, it had knowledge that the account in plaintiff's name might be fraudulent. In February and March 1999, FBI Special Agent Reece had spoken to Ashlea Webb in First Tennessee's credit department and had obtained documents from her pertaining to the account in plaintiff's name. Even though Agent Reece's affidavit provides no information about the substance of the conversations he had with Webb, when the evidence is viewed in the light most favorable to plaintiff it supports an inference that, at a minimum, he told her who he was and that he was investigating the account for suspected fraud. (Reece's affidavit does not support plaintiff's contention that he informed Webb that the account was in fact fraudulent. See dkt. #66, ¶¶ 12-16.) Furthermore, the notes from First Tennessee's collection department indicate that, as of March 1999, it had information indicating that the account was fraudulent. Also undisputed is the fact that First Tennessee's credit inquiry department interpreted the June 3, 1999 Consumer Dispute Verification form from Experian as a request for confirmation of account information to which it responded by verifying that the name and social security number on the account matched the information provided by Experian. The credit department retrieved its account information from an internal database that did not include any of the notes entered by the collection department or any other indication that the account might be fraudulent.

First Tennessee argues that its investigation in response to the June 3, 1999 Consumer Dispute Verification form could not have been unreasonable because it was simply doing what Experian had asked it to do, which was to confirm that its identifying information about the maker of the account matched the information that Experian had. However, a rational jury could conclude that First Tennessee's failure to inquire further about the status of the account was unreasonable in light of the fact that Experian stated on the Consumer Dispute Verification form that plaintiff was claiming that the account was not hers and had been mixed up with another person's. In addition, a rational jury could conclude that it was unreasonable for First Tennessee to have maintained a system in which there was no cross-communication between the collection department and the credit inquiry department, and in which information obtained by the collection department indicating that an account was suspected of

22

being fraudulent was maintained separately from the data available to the credit department when responding to a Consumer Dispute Verification form. Therefore, it would be inappropriate to grant summary judgment against plaintiff on her claim that defendant First Tennessee did not conduct a reasonable investigation in response to the Consumer Dispute Verification form on June 3, 1999.

2. First Tennessee's investigation on July 14, 1999

  I will grant summary judgment against plaintiff on her claim that First Tennessee conducted an unreasonable second investigation, after it received the Consumer Dispute Verification form from CSC on July 14, 1999. As with her claim against CSC, plaintiff contends that it was unreasonable for defendant First Tennessee to report anything more than that the tradeline for the fraudulent account should be deleted in light of the information it had, which included the phone calls from Special Agent Reece, the letter from plaintiff's attorney and plaintiff's affidavit. As "evidence" that this was unreasonable, plaintiff points out that one of the other banks that responded to the Consumer Dispute Verification form verified that the account opened in plaintiff's name was fraudulent and instructed CSC to delete the entire tradeline.

  Like her reinvestigation claim against CSC, plaintiff's claim that First Tennessee should have instructed CSC to delete the entire account tradeline pushes the Fair Credit Reporting Act too far. Notably, plaintiff presents no evidence to show that First Tennessee was not investigating the account for fraud on July 14, 1999. In fact, although plaintiff contends that First Tennessee's investigation was unreasonable, she presents no evidence regarding what steps First Tennessee was or was not taking to investigate the account. The essence of her claim is that First Tennessee's investigation should have been complete in light of the information it had. But there is nothing in the Fair Credit Reporting Act that specifies a time frame within which a creditor must complete its internal fraud investigations or that tells a creditor how to conduct its internal fraud investigations. The act merely requires entities furnishing information to conduct a reasonable investigation when notified by a consumer reporting agency of a consumer dispute and to notify the consumer reporting agencies if they determine from their investigation that the information they had previously reported was incomplete or inaccurate. First Tennessee reported that it was in the process of investigating the account for fraud, or in other words, that it had not yet completed its investigation of the account. The fact that another bank may have had different internal policies that allowed it to reach a different conclusion about the account opened in plaintiff's name is irrelevant. In the absence of any evidence that First Tennessee was not investigating the account or that the steps it was taking were

unreasonable, summary judgment must be granted to First Tennessee on this
claim.

3. Actual damages

   Defendant First Tennessee contends that even if plaintiff is allowed to
proceed on all or part of her claims, summary judgment is proper because
she has not suffered damages as a result of any conduct by First
Tennessee. Like CSC, defendant First Tennessee contends that plaintiff
suffered no financial loss, her claim of emotional distress is
unsubstantiated and her claim of lost time from work is de minimis.

   For the reasons discussed above with respect to plaintiff's claims
against CSC, I conclude that plaintiff has adduced sufficient evidence of
actual damages to survive First Tennessee's motion for summary judgment.
I agree with defendant that even if liability is found, plaintiff's
damages are likely to be minimal: plaintiff can recover only those
damages that were caused by First Tennessee's failure to conduct a
reasonable investigation with respect to the June 3, 1999 Consumer
Dispute Verification form from Experian. This limits damages to those
that were incurred during the time period between June 3 and July 14,
1999. Although defendant First Tennessee contends that such damages are
de minimis and therefore not compensable, it does not cite any case to
support its proposition that actual damages must meet some minimum
threshold in order to be recoverable and my independent research has
discovered none.

4. Punitive damages

   Summary judgment will be granted with respect to plaintiff's claim for
punitive damages against First Tennessee. Plaintiff has adduced
insufficient evidence from which a jury could infer that in responding to
the Consumer Dispute Verification form from Experian, First Tennessee
knowingly and intentionally committed an act in conscious disregard for
plaintiff's rights. At most, plaintiff has produced evidence showing that
First Tennessee had inadequate procedures in place to ensure that its
credit inquiry department was informed that an account was under
investigation by another department. Because there is no evidence in the
record to suggest that anyone at First Tennessee intentionally
misrepresented the status of the disputed account, plaintiff's punitive
damages claim must be dismissed.

                      III. DEFAMATION CLAIMS

   Plaintiff's complaint alleges common law claims of defamation by both
defendants. Defendants contend that plaintiff's state law defamation

claims are preempted by § 1681h(e). Plaintiff contends that defendant
CSC waived its right to challenge the defamation claim by failing to
raise the issue until its reply brief. I agree. It is well-settled that
failure to raise an issue until the reply constitutes a waiver. See
Holman v. Indiana, 211 F.3d 399, 405 n. 5 (7th Cir. 2000). However,
because it is clear from the evidence adduced by the parties that
plaintiff cannot prevail at trial on her claim that defendant CSC defamed
her when it reported the First Tennessee account as "disputed" in July
1999, I will grant summary judgment to defendant CSC on this issue on my
own motion. This is not unfair to plaintiff: plaintiff addressed the
issue on the merits in her brief in response to defendant First Tennessee
and in her objection to defendant CSC's failure to raise the issue until
its reply.

   Plaintiff contends that defendant First Tennessee defamed her when it
reported to the credit reporting agencies from February to July 1999 that
plaintiff had opened an account with the bank. She also contends that the
bank defamed her when it reported again in October 1999 that the disputed
account belonged to her. As for defendant CSC, I presume that plaintiff's
defamation claims are based upon the same conduct as the Fair Credit
Reporting Act claims, namely, that CSC defamed her by reporting the First
Tennessee account as "disputed" in July 1999 and by re-publishing the
derogatory account information in October 1999.

   Section 1681h(e) of the Fair Credit Reporting Act states as follows:

   Except as provided in sections 1681n and 1681o of this
   title, no consumer may bring any action or proceeding
   in the nature of defamation, invasion of privacy, or
   negligence with respect to the reporting of
   information against any consumer reporting agency, any
   user of information, or any person who furnishes
   information to a consumer reporting agency, based on
   information disclosed pursuant to section 1681g,
   1681h, or 1681m of this title, or based on information
   disclosed by a user of a consumer report to or for a
   consumer against who the user has taken adverse
   action, based in whole or in part on the report except
   as to false information furnished with malice or
   willful intent to injure such consumer.

   Courts have interpreted this section as providing consumer reporting
agencies and entities furnishing information with immunity from common
law defamation actions unless the defendant furnished false information
with malice or willful intent to injure. See, e.g., Cushman v. Trans
Union Corp., 115 F.3d 220, 229 (3rd Cir. 1997); Bloom v. I.C. Sys.,

Inc., 972 F.2d 1067, 1069 (9th Cir. 1992); Thornton v. Equifax, Inc., 619 F.2d 700, 703 (8th Cir. 1980); Bruce, 103 F. Supp.2d at 1145. However, the immunity provision, which Congress intended to provide a "quid pro quo" for statutorily required disclosures, applies only to claims "based on information disclosed pursuant to 1681g, 1681h or 1681m." Whitesides v. Equifax Credit Information Services, Inc., 125 F. Supp.2d 807, 811 (W.D. La. 2000); McAnly v. Middleton and Reutlinger, P.S.C., 77 F. Supp.2d 810, 814 (W.D. Ky. 1999); Retail Credit Co. v. Dade County, 393 F. Supp. 577 (D.C. Fla. 1975) (quoting Sen. Proxmire in colloquy with Sen. Javits, 115 Cong. Rec. 13908 (November 6, 1969)). Section 1681g describes the nature of the information that a consumer reporting agency must provide to a consumer upon request; § 1681h specifies the conditions under which the disclosures must be made; and § 1681m requires a person who uses a credit report or other credit information as a basis for taking adverse action against a consumer to disclose to the consumer the source of the adverse credit information.

  Thus, whether § 1681h(e) applies depends upon how the plaintiff obtained the purportedly defamatory information. See Hood v. Dun & Bradstreet, Inc., 486 F.2d 25, 32 (5th Cir. 1973) ("(T)he Act does not preclude an action at common law except where information that would give rise to a cause of action is obtained by the complainant pursuant to the provisions of the Act."); 16 C.F.R. App. to Pt. 600 — FTC Commentary on the Fair Credit Reporting Act, § 610 — Conditions of Disclosure, ¶ 6 ("The privilege extended by subsection [1681h(e)] does not apply to an action brought by a consumer if the action is based on information not disclosed pursuant to sections [1681g, 1681h or 1681m].") If a consumer obtains information independently of agency or user disclosures, the qualified immunity provision does not apply.

### A. Claims Against First Tennessee

1. First Tennessee's reporting of fraudulent account from February to
  July 1994

  Applying this understanding of the immunity provision to plaintiff's defamation claims against First Tennessee, I conclude that the provision applies only to plaintiff's claim regarding First Tennessee's reporting of the fraudulent account to the credit reporting agencies from February to mid-July 1999. Plaintiff learned that First Tennessee was reporting the fraudulent account when her lender disclosed a copy of her credit report in connection with the denial of credit in May 1999. Because this was a disclosure under § 1681m(a), the immunity provision applies. See § 1681m(a) (person taking adverse action against consumer because of information contained in consumer report must inform consumer of adverse

action, source of information and right to obtain copy of credit report from consumer reporting agency).

  Citing Whitesides, plaintiff contends that the immunity provision does not apply to communications between entities furnishing credit information and credit reporting agencies. See Whitesides, 125 F. Supp.2d at 811 (finding that bank was not covered by § 1681h(e) because it was not consumer reporting agency and did not take adverse action against plaintiff on basis of her consumer report). However, § 1681h(e) states explicitly that it protects "any person who furnishes information to a consumer reporting agency" from defamation actions based on information disclosed pursuant to the act absent a showing of malice or willful intent. Having reviewed the court's opinion in Whitesides, I conclude that the court's interpretation of the statute in that case is inconsistent with the statute's plain reading and would deny those who furnish information to consumer reporting agencies the protection that Congress intended. Accordingly, I decline to follow it.

  In order to prove her defamation claim, plaintiff will have to prove that First Tennessee reported the information with malice or willful intent to injure. Plaintiff cannot make this showing. Although the Fair Credit Reporting Act does not define the terms "malice or willful intent," courts considering the issue have adopted the definitions that apply to these terms in libel law. Thornton, 619 F.2d at 705. A statement will be deemed to have been made with malice if made "with knowledge that it was false or with reckless disregard of whether it was false or not." Id. I have already found that plaintiff has adduced insufficient evidence of willfulness to survive First Tennessee's motion for summary judgment on the issue of punitive damages. Because the showing of malice or willful intent to injure under § 1681h(e) is a higher standard of proof than the willfulness required for punitive damages under § 1681n, see id. at 706, plaintiff's defamation claim with respect to First Tennessee's reporting of the fraudulent account from February to July 1999 must fail.

2. First Tennessee's re-reporting of account information in October 1999

  Plaintiff contends that First Tennessee defamed her when it re-reported the derogatory information to CSC in connection with the account in plaintiff's name.[fn2] Before addressing the merits of this claim, I must address First Tennessee's contention that the evidence propounded by plaintiff does not create a genuine dispute of fact regarding whether First Tennessee re-reported the information. As support for her contention that First Tennessee may have been responsible, plaintiff cites the deposition of Janice Fogelman, who testified as a witness on behalf of CSC with respect to its policies and procedures regarding

27

entering data and updates on investigations of fraudulent accounts. From her review of printed copies of electronic data maintained on CSC's database, Fogelman concluded that the reason the derogatory account information reappeared on plaintiff's credit report in October 1999 was because someone at one of Equifax's affiliates had entered the information manually at the direction of First Tennessee Bank.

Defendant First Tennessee labels Fogelman's testimony "sheer speculation" and denies that a material dispute of fact exists with respect to whether it re-reported the derogatory account information. As proof that it could not have re-reported the information, defendant First Tennessee cites an affidavit from Arthur J. Barnett, who is the vice president of information systems and investment banking for First Tennessee and is one of defendant's named experts in this case. In his affidavit, Barnett avers that "zero electronic information was sent via metrotape by First Tennessee Bank National Association to any credit reporting agency" after June of 1999 regarding the loan identified as belonging to plaintiff. Aff. of Arthur Barnett, dkt. #40 at ¶ 4.

Although I agree that plaintiff's evidence is not overwhelming, it is sufficient to allow a jury to conclude that First Tennessee re-reported the information. Fogelman drew her conclusion about how the information had reappeared by looking at various codes on plaintiff's credit data and from her knowledge of credit information reporting procedures. See Dep. of Janice Fogelman, Oct. 11, 2001, dkt. #71, at 122-129. This evidence would be admissible at trial. Further, Barnett's affidavit does not refute Fogelman's testimony because Fogelman testified that the derogatory information had not been submitted by electronic tape but appeared to have been entered manually. Accordingly, a triable issue of fact exists on this issue.

Section § 1681h(e) does not apply to plaintiff's defamation claim based on First Tennessee's alleged re-reporting of the derogatory account information in October 1999. Plaintiff learned that the derogatory information was being re-reported when her mortgage company showed her a copy of her credit report when she applied for a loan in November 1999. Because plaintiff did not request a copy of her credit report on her own, this was not a disclosure pursuant to § 1681g or § 1681h. Further, this was not a disclosure under § 1681m because the mortgage company did not take any adverse action against plaintiff; as noted previously, Associated Mortgage approved her loan application. Therefore, because the disclosure of plaintiff's credit report was not made pursuant to the Fair Credit Reporting Act's mandatory disclosure provisions, § 1681h(e) does not apply and plaintiff may bring her defamation claim without proving malice.

28

In Wisconsin, the elements of a defamatory communication are: (1) a false statement; (2) communicated by speech, conduct, or in writing to a third person; (3) that is unprivileged and tends to harm one's reputation so as to lower that person in the estimation of the community or deters others from associating or dealing with the person. Torgerson v. Journal Sentinel, Inc., 210 Wis.2d 524, 534, 563 N.W.2d 472, 477 (1997)); Wis. JI-Civil 2500 at 1 (1993) and 2501 at 1 (1991). Whether a communication is capable of a defamatory meaning is a question of law for the court. Lathan v. Journal Co., 30 Wis.2d 146, 153, 140 N.W.2d 417 (1966); Wis. JI-Civil 2500 at 4. The legal standard for determining whether a statement is capable of conveying a defamatory meaning is whether the language is reasonably capable of conveying a defamatory meaning to the ordinary mind and whether the meaning ascribed by the plaintiff is a natural and proper one. Wis. JI-Civil 2500 at 5. "[T]he words must be reasonably interpreted and must be construed in the plain and popular sense in which they would naturally be understood in the context in which they were used and under the circumstances they were uttered." Frinzi v. Hanson, 30 Wis.2d 271, 276, 140 N.W.2d 259 (1966).

If the court rules that the communication is capable of a defamatory meaning, the case goes to the jury "to determine whether [the] communication . . . was so understood by its recipient." Bauer v. Murphy, 191 Wis.2d 517, 523, 530 N.W.2d 1, 3 (Ct. App. 1995) (quoting Hoan v. Journal Co., 238 Wis. 311, 329, 298 N.W. 228, 236 (1941)). This is so even if the plaintiff has not alleged or proved special damages. Martin v. Outboard Marine Corp., 15 Wis.2d 452, 460-461, 113 N.W.2d 135, 139 (1962) (adopting Restatement of Torts on Defamation, § 569)); Wis. JI-Civil 2500 at 15.

I conclude that plaintiff has adduced enough evidence to survive defendant's motion for summary judgment on this defamation claim. Defendant First Tennessee has not disputed that the derogatory account information attributed to plaintiff was false. Furthermore, the information was published to a third party, CSC, who in turn provided it to Associated Mortgage. Finally, the information was capable of conveying a defamatory meaning and could tend to harm plaintiff's reputation, especially in the credit-granting community. Although there is little evidence in the record to suggest that plaintiff's reputation was actually harmed as a result of the re-reporting of the derogatory First Tennessee tradeline information on her credit report, (according to plaintiff, Ruesch at River Cities Bank believed that the delinquent bank accounts on plaintiff's credit report were not plaintiff's, see dkt. #56 at 95, 120-122), Wisconsin law provides that this is a matter to be determined by the jury. Accordingly, defendant First Tennessee's motion for summary judgment on this claim will be denied.

### B. Claims Against CSC

1. Characterization of First Tennessee account from July —
   October 1999

   Plaintiff contends that CSC defamed her by designating the First
Tennessee account as disputed instead of deleting it in its entirety.
Plaintiff learned of CSC's characterization of the account when CSC
provided her with the results of its reinvestigation, as required by
§ 1681i(a)(6)(B). Because this was not a disclosure pursuant to
§ 1681g, § 1681h or § 1681m, the qualified immunity provision
does not apply.

   Nonetheless, even if she is not required to prove malice, plaintiff
cannot prevail on her defamation claim because there is no evidence that
CSC ever published the information to a third party. Without evidence
that any third party ever saw her credit report with the
"dispute-resolution pending" notation on it, plaintiff cannot establish
an essential element of her defamation claim.

2. CSC's re-publication of derogatory account information in October
   1999

   Finally, plaintiff contends CSC defamed her by re-publishing the
derogatory information about the First Tennessee account with no mention
of the fraud. As found previously with respect to plaintiff's claim
against First Tennessee, plaintiff need not make the showing of malice
required by § 1681h(e) with respect to this claim because it does not
involve a disclosure covered by that subsection. Further, for the reasons
stated with respect to plaintiff's defamation claim against First
Tennessee, defendant CSC is not entitled to summary judgment on this
portion of plaintiff's defamation claim.

### ORDER

   IT IS ORDERED that the motion of defendant CSC of Wisconsin for summary
judgment is GRANTED IN PART and DENIED IN PART and the motion of
defendant First Tennessee Bank National Association for summary judgment
is GRANTED IN PART and DENIED IN PART. The following claims of plaintiff
are DISMISSED:

   1. Fair Credit Reporting Act claim against defendant
      CSC for reporting the fraudulent account as
      "dispute-resolution pending";

   2. Fair Credit Reporting Act claim against defendant

First Tennessee for reporting the fraudulent
account as being investigated for fraud;

3. State common law claim for defamation against
   defendant CSC for reporting account as
   "dispute-resolution pending"; and

4. State common law claim for defamation against
   defendant First Tennessee for reporting the
   fraudulent account as belonging to plaintiff from
   February to July 1999.

Plaintiff is allowed to go forward on the following claims:

1. Fair Credit Reporting Act claim against defendant
   CSC for re-publication of derogatory account
   information in October 1999;

2. Fair Credit Reporting Act claim against defendant
   First Tennessee for reporting the fraudulent
   account as belonging to plaintiff from February to
   July 1999;

3. State law defamation claim against defendant CSC
   for re-publication of the derogatory account
   information in October 1999; and

4. State law defamation claim against defendant First
   Tennessee for re-reporting the derogatory account
   information in October 1999.

[fn1] Defendant First Tennessee Bank National Association asserts that it
has been improperly named in this lawsuit as First Tennessee Bank. I have
construed this assertion as a motion to amend the caption, which I have
granted.

[fn2] Although this claim would also appear to state a claim under §
1681s-2(a) of the Fair Credit Reporting Act, which requires entities
furnishing information to provide accurate information to consumer
reporting agencies, private individuals may not bring a cause of action
for an alleged violation of this subsection. See § 1681s-2(d)
(granting federal and state officials exclusive authority to enforce
§ 1681s-2(a)). Presumably, this is why plaintiff did not include this
claim among her Fair Credit Reporting Act claims.

-------------------------------------------------------------------------------

Copyright © 2004 Loislaw.com, Inc. All Rights Reserved

-------------------------------------------------------------------------------

# UNITED STATES DISTRICT COURT
## District of Minnesota

_____
____

DOMINIC JOSEPH WHARRAM,

                Plaintiff,

vs,                                 **ORDER**
                                 Civil File No. 02-CV-4853 (MJD/JGL)

CREDIT SERVICES INC.,
EQUIFAX d/b/a EQUIFAX CREDIT
INFORMATION SERVICES, INC.,
TRANS UNION LLC., EXPERIAN
INFORMATION SOLUTIONS, INC.,
CSC CREDIT SERVICES INC., AND
WELLS FARGO BANK, NA.

                Defendants.

_____
____

John H. Goolsby, Thomas Lyons & Associates P.A., for, and on behalf of, the Plaintiff.
Van H. Beckwith, Baker Botts,LLP, for, and on behalf of, the Defendant CSC.
Andi Kendrick Wang, Jones Day, for, and on behalf of, the Defendant Experian.
Lewis P. Perling, Kilpatrick Stockton LLP, for, and on behalf of, the Defendant Equifax.
Michael T. Browne, Meagher & Geer, P.L.L.P, for, and on behalf of, the Defendant Trans
Union.

_____
____

## I.  INTRODUCTION

    This matter comes before the Court on defendant's, CSC Credit Services, Inc.,[1]

_____

[1] CSC credit services is an affiliate of Equifax Information Services.

Exhibit P

("CSC"), Motion for Summary Judgment. Defendants Experian Information Solutions, Trans Union LLC and Equifax Information Services have joined in CSC's Motion for Summary Judgment. Wharram's complaint alleges that the defendants violated the Fair Credit Reporting Act when they deleted a loan from his consumer report. The Court heard oral arguments on January 7, 2004.

## II. BACKGROUND

On January 5, 1999, Wharram borrowed money from Wells Fargo Bank to purchase a vehicle. On January 23, 2002, Wharram made an eight thousand dollar ($8,000.00) payment to Wells Fargo. In Wharram's estimation, this lump payment was an early pay off of the loan for the vehicle. Wells Fargo, however, believed that the eight thousand dollar payment did not satisfy the debt and that Wharram owed additional monies on the loan.

On July 1, 2002, Wells Fargo Bank and Wharram entered into a Settlement & Release. The pertinent portion of the release stated,

> I, Dominic J. Wharram, in consideration of a payment in the sum of $246.69, to Wells Fargo Bank, MN . . . hereby release and forever discharge Wells Fargo & Company . . . from any and all manner of action or actions, suits, claims . . . which I ever had . . . against Wells Fargo up to and including the date of this Release.

(Decl. of Chad M. Pinson at Ex. 2(B)). In turn, Wells Fargo "acknowledge[d] that the loan account . . . will be reported at all credit bureaus as paid in full, with no adverse credit marks and in good standing." Id. According to Wharram, on May 22, 2002, he mailed a check for the amount of $246.69 to Wells Fargo. It is not clear whether Wells Fargo ever

received Wharram's check.

On August 14, 2002, Wharram learned that the Wells Fargo account was adversely reported on his credit report by the various credit reporting agencies ("CRA"). Experian reported the account as 90 days late and as an "[u]npaid balance reported as a loss by the credit grantor." Likewise, Equifax reported the account as 90 days late and as a "[c]harged off account." Trans Union noted the account was "[c]harged off as bad debt [p]rofit and loss write-off." On September 11, 2002, Wharram disputed the status of the accounts by sending a letter to Equifax and CSC. The letter stated, " I dispute the Norwest/Wells Fargo account # 7520[**********] as a charge-off and as being delinquent . . . I adamantly insist it is [sic] should never have been sent to Wells Fargo's loss recovery department; it is not a charge-off and never was delinquent."

In response to Wharram's letter, CSC sent Norwest Bank an automated dispute verification form ("ACDV") stating, [s]ubscriber [c]omment/[r]emark [m]essage [d]isputed. Present [s]tatus [i]ncorrect. Please [v]erify." On September 30, 2002, Norwest responded to the ACDV by stating, "[t]his was a misdirected ACDV-[p]lease [r]eroute. Belongs to Wells Fargo Auto Finance." CSC concluded that the status of the Wells Fargo account was no longer verifiable and, in accordance with CSC policy, deleted the disputed Wells Fargo notation from Wharram's credit report. CSC informed Wharram, by a letter dated October 3, 2002, that "[the contested Norwest/Wells Fargo account] has been deleted from the credit file." CSC had no further contact with Wharram until Wharram

served CSC with this law suit on December 20, 2002.

## III.  DISCUSSION

Wharram's complaint alleges that CSC "failed to follow reasonable procedures to assure the maximum possible accuracy of a consumer report regarding [Wharram]. . . . [and] knowingly and intentionally committed an act in conscious disregard for [Wharram's] rights to the [sic] have an accurate credit report available . . . . "  (Compl. at 8, ¶¶ 50-51).

CSC argues for summary judgment on several grounds.  First, CSC argues that the Wells Fargo loan was properly reported as delinquent because Wells Fargo never cashed Wharram's check.  Minnesota law, however, suspends the obligations of the debtor when the debtor tenders a check as payment.  Minn. Stat. § 336.3-310(b)(1).  The relevant portion of the statute states, "[u]nless otherwise agreed . . . if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken . . . ."  Id.  The debt is suspended until the check is dishonored or until it is paid or certified. Minn. Stat. § 336.3-310(b)(2).  There are unresolved questions of fact as to whether Wells Fargo received the Wharram's check.  If Wells Fargo received Wharram's check, then it cannot be said, under Minnesota law, that the loan was delinquent.  Therefore, summary judgment is inappropriate.

Next CSC argues that it is entitled to summary judgment because it "complied with

Wharram's request to 'remove' the Wells Fargo tradeline from his consumer report." (Def.'s Mot. for Summ. J. at 10). At the outset the Court notes, that the burden of assuring accuracy in the consumer's credit report falls to the consumer reporting agency and not with the consumer. <u>See</u> 15 U.S.C. § 1681e(b). CSC is referring to the letter that Wharram sent to dispute the unfavorable notation. In that letter, Wharram stated, "please investigate the reason or reasons why this error is on my credit report." According to CSC, removing the tradeline all together complied with Wharram's request. According to Wharram, however, this letter was never intended to result in the removal of the entire tradeline, just the errors within that tradeline. What Wharram intended by the letter is a question of fact that must be resolved by a trier of fact.

CSC also argues that Wharram may not complain about information not appearing on his consumer report. The plain language of the statute suggests otherwise. The statute states, "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure *maximum possible accuracy* of information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b) (emphasis added). Deleting the entire tradeline did not assure the maximum possible accuracy of information relating to Wharram because it failed to convey the positive credit history Wharram established with Wells Fargo prior to the instant dispute. Maximum accuracy, under the statute, applies equally to favorable information as it does to unfavorable information. The Congressional mandate and intent underlying 15 U.S.C. § 1681e(b) is clear, which is to

"require consumer reporting agencies to adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner *which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy,* and proper utilization of such information . . . ." 15 U.S.C. § 1681(b) (emphasis added).

Next CSC argues that is it entitled to judgment as a matter of law because it complied with 15 U.S.C. § 1681i(a)(5).  That statute states,

> If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall promptly delete that item of information from the consumer's file or modify that item of information, as appropriate, based on the results of the reinvestigation

15 U.S.C. § 1681i(a)(5).  This argument is not persuasive because Wharram's request for the investigation could reasonably be interpreted two ways.  From Wharram's view it is a request to investigate what he perceived as an error.  In that case, the only portion of Wharram's loan history that should have been deleted or modified was the portion that listed the loan status as delinquent.   From CSC's view it is a request to remove "the Wells Fargo tradeline from his consumer report."  (Def.'s Mot. for Summ. J. at 10).  In that case, the deletion of the entire tradeline may have been appropriate.  The resolution of this fact question is within the purview of the proper trier of fact.  Accordingly, summary judgment is not appropriate.

CSC's final argument is that Wharram suffered no damages and therefore summary judgment is appropriate. The Court disagrees. At the least, Wharram may be entitled to punitive damages because CSC admits that it was its policy "to suppress the disputed tradeline from the consumer's report." (Def.'s Mot. for Summ. J. at 5). A trier of fact could reasonably find that CSC intentionally suppressed the tradeline and that CSC was conscious that its act impinged on the rights of Wharram. Punitive damages are permitted in the absence of actual damages and therefore summary judgment based on the damages argument is not proper. <u>Bakker v. McKinnon</u>, 152 F.3d 1007, 1013 (8th Cir. 1998) (citations omitted).

**IT IS HEREBY ORDERED that**:

1.      Defendants Motion for Summary Judgment [Dock. No. 46] is **DENIED**.

Dated: <u>March 12, 2004</u>                              <u>/s/ Judge Michael J. Davis</u>
                                                                         ____
                                                                         Judge Michael J. Davis
                                                                         United States District Court

Wharram v. Equifax, et. al.,
Civil File No. 02-CV-4853 (MJD/JGL)                    7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICHARD L. SHEFFER,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EXPERIAN INFORMATION** | : | |
| **SOLUTIONS, INC., et al.,** | : | **No. 02-7407** |
| **Defendants.** | : | |

<u>**MEMORANDUM AND ORDER**</u>

**Schiller, J.**                                                                               **July 24, 2003**

Plaintiff Richard L. Sheffer commenced this action against Defendants Experian Information Solutions, Inc., Equifax Information Services, LLC ("Equifax"), Trans Union, LLC ("Trans Union"), and Sears Roebuck & Co. ("Sears").[1]  Presently before the Court are Trans Union's Motion for Summary Judgment, Equifax's Motion for Partial Summary Judgment, and Sears's Joinder to the Motions for Summary Judgment.  For the reasons set forth below, Defendants' motions are denied.

## I.    BACKGROUND

Many of the pertinent facts for purposes of ruling on the summary judgment motions are not in dispute.  Mr. Sheffer opened a Sears charge account in January 1993.  Subsequently, without Plaintiff's consent and unbeknownst to him, Plaintiff's account was merged with that of a former Sears account holder who was deceased.  In November 2000, a bank declined to increase Mr. Sheffer's credit line, and he requested a copy of his credit report from Equifax.  (Compl., Ex. 1.) He received a report which stated, in connection with the Sears account, "CONSUMER

---

[1]  Plaintiff also named Equifax, Inc. as a Defendant.  The parties agree that Equifax should be dismissed from this action.

Exhibit Q

DECEASED." (Pl.'s Resp. to Equifax's Mot. for Part. Summ. J., Ex. A at 2.) The report also indicated that the Sears account had been opened in January 1965, several years prior to Plaintiff's date of birth. (*Id.*) On November 29, 2000, Plaintiff contacted Equifax by telephone to dispute the statement in the report that he was deceased. (Pl.'s Resp. to Equifax's Mot. for Part. Summ. J., Ex. A (Fluellen Dep.) at 127.) In a letter dated December 4, 2000, Equifax informed Plaintiff that it had "reinvestigate[d]" the disputed information and had "verified" that the information regarding the Sears account was correct. (Pl.'s Resp. to Equifax's Mot. for Part. Summ. J, Ex. C.) Plaintiff again called Equifax (Fluellen Dep. at 141), and Equifax informed Mr. Sheffer that it had "deleted" the Sears account from his Equifax credit report. (Pl.'s Resp. to Equifax's Mot. for Part. Summ. J, Ex. D.) Nevertheless, an Equifax credit report dated December 28, 2001 included information about the Sears account, including the "CONSUMER DECEASED" notation. (Pl.'s Resp. to Equifax's Mot. for Part. Summ. J, Ex. E at 5; Fluellen Dep. at 150-51.)

In April 2002, Mr. Sheffer's attorney sent a letter to Trans Union disputing a similar "DECEASED" statement in his Trans Union credit report. (Compl., Ex. 11.) In correspondence dated May 6, 2002, Trans Union informed Plaintiff that the results of its investigation with respect to the Sears account was that information was "verified, no change." (Compl., Ex. 14.) In June 2002, Plaintiff's attorney informed Trans Union that he "disavow[ed] ownership" of the Sears account (Compl., Ex. 15), and thereafter Trans Union deleted the information related to the Sears account from Plaintiff's credit report.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *see also*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The moving party bears the burden of showing that the record reveals no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson*, 477 U.S. at 247. Once the moving party has met its burden, the non-moving party must go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989).

## III.    DISCUSSION

### A.    Applicable Standards Under §§ 1681i and 1681e

As a general matter, Congress enacted the requirements set forth in the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, to "insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. 1681(a)(4)(2003).[2] Particularly relevant to the instant action is the FCRA's requirement

---

[2] Equifax does not contend that it is entitled to summary judgment on Plaintiff's claims under §§ 1681e and 1681i, except to the extent that Plaintiff seeks punitive damages.

3

that credit reporting agencies investigate consumers' disputes about the information in their credit files.  Section 1681i provides:

> If the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly of such dispute, the agency shall reinvestigate free of charge and record the current status of the disputed information, or delete the item from the file. . . .

15 U.S.C. § 1681i(a)(1)(A).  Remarking on the "grave responsibilities" of credit reporting agencies, the Third Circuit has emphasized that such agencies must do more than "merely parrot[] information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Cushman v. Trans Union Corp.*, 114 F.3d 220, 225 (3d Cir. 1997).  Similarly, the Third Circuit has held that "in order to fulfill its obligation under § 1681i(a), a credit reporting agency may be required, in certain circumstances, to verify the accuracy of its initial source of information." *Id*. As the Third Circuit has indicated, the scope of an agency's duty to go beyond the original source depends on a number of factors, including: (1) whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable or the reporting agency knows or should know that the source is unreliable; and (2) the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer.  *See id*.  "Whatever considerations exist, it is for 'the trier of fact [to] weigh these factors in deciding whether [an agency] violated the provisions of section 1681i." *Id*. at 225-26 (*quoting Henson v. CSC Credit Servs.*, 29 F.3d 280, 287 (7th Cir. 1994)).

Section 1681e(b) provides: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information

4

concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).  In order to succeed on his § 1681e(b) claim, Mr. Sheffer must establish each of the following of four elements: (1) inaccurate information was included in his credit report; (2) the inaccuracy was due to a Defendant's failure to follow reasonable procedures to assure maximum possible accuracy; (3) he suffered injury; and (4) his injury was caused by the inclusion of the inaccurate entry.  *See Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 (3d Cir. 1996).

A reasonable jury could find that Trans Union violated either or both of these sections. Regarding Plaintiff's § 1681i claim, the evidence suggests that Trans Union merely parroted information provided by other sources, despite the fact that Plaintiff provided information supporting his assertion that the "DECEASED" statement was incorrect (Compl., Ex. 10), and, consequently, there is sufficient evidence for the issue of whether Trans Union violated § 1681i to be decided by a jury.  *See Cushman*, 227 F.3d at 225.  Turning to the § 1681e(b) claim, the Third Circuit has discussed three approaches – without endorsing any of the three – for determining whether a plaintiff has presented sufficient evidence to survive summary judgment.  *See Philbin*, 101 F.3d at 964-65. Under the most stringent approach, Mr. Sheffer "must minimally present some evidence from which a trier of fact can infer that the consumer reporting agency failed to follow reasonable procedures in preparing a credit report."  *Stewart v. Credit Bureau, Inc.*, 734 F.2d, 47 51 (D.C. Cir. 1984); *see also Philbin*, 101 F.3d at 965 (characterizing *Stewart* approach as "more stringent"); *Cousin v. Trans Union Corp.*, 246 F.3d 359, 368 (5th Cir. 2001) (holding that question of whether agency followed reasonable procedures is typically a fact question reserved for jury) (*citing Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991)).  Here, the Trans Union report indicated

both that Plaintiff was born in 1969 and that the account was opened in 1965.[3]  Furthermore, the Sears account was the only account among approximately two dozen that included the "deceased" notation.  These inconsistencies provide a basis from which a jury could infer that the procedures were unreasonable.

Trans Union also argues that it is entitled to summary judgment because Plaintiff has not produced any evidence of actual damages.  This argument is unpersuasive.  At the very least, Plaintiff may be entitled to damages for the emotional distress he may have suffered in connection with his efforts to correct the error in his Trans Union consumer file and in obtaining credit from a jewelry store around the time he was attempting to have the error corrected.  *Cf. Philbin*, 101 F.3d at 963 n.3 (noting that plaintiff in FCRA case is not required to produce evidence of emotional damages with high degree of specificity); *Fischl v. Gen. Motors Acceptance Corp.*, 708 F.3d 143, 151 (5th Cir. 1983) ("Even where no pecuniary or out-of-pocket loss has been shown, the FCRA permits recovery for humiliation and mental distress.").

### B.    Punitive Damages

Under § 1681n, "[a]ny person who willfully fails to comply with any requirement imposed under [the FCRA] with respect to any consumer is liable to that consumer in an amount equal to the sum of . . . such amount of punitive damages as the court may allow."  15 U.S.C. § 1681n.  "To show willful noncompliance with the FCRA, [a plaintiff] must show that defendants 'knowingly and

---

[3]  Trans Union takes the position that this inconsistency does not show that its procedures were unreasonable because in the case of jointly-held accounts the date an account is opened may precede the consumer's date of birth.  However, in the instant case it is disputed whether there was a reasonable basis for not acting on this inconsistency, i.e., whether one could have reasonably believed that Plaintiff's account was actually a joint account, and, as such, summary judgment is inappropriate.

6

intentionally committed an act in conscious disregard for the rights of others,' but need not show 'malice or evil motive.'" *Philbin*, 101 F.3d at 970 (*quoting Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986)).  "[T]o justify an award of punitive damages, a defendant's actions must be on the same order as willful concealments or misrepresentations [such as the adoption of a] reinvestigation policy either knowing that policy to be in contravention of the rights possessed by consumers pursuant to the FCRA or in reckless disregard of whether the policy contravened those rights." *Cushman*, 115 F.3d at 226.

Equifax and Trans Union contend that Plaintiff cannot show "wilfulness" under the FCRA. I disagree with both Defendants.  As another court has held, punitive damages may be warranted where the evidence shows that inaccuracies in credit reports arise from something more than "an isolated instance of human error which [the agency] promptly cure[s]." *Boris v. Choicepoint Servs.*, 249 F. Supp. 2d 851, 862 (W.D. Ky. 2003).  Here, there is evidence regarding the conduct of Equifax and Trans Union suggesting that the problems that Mr. Sheffer experienced were not the result of mere human error and that the errors were not promptly cured. (Fluellen Dep. at 85-85; 97-99, 150; Pl.'s Resp. to Trans Union's Mot. for Summ. J., Ex. E at 61-64.)  On this basis, a jury may be able to find that Defendants acted with conscious or reckless disregard to the rights of consumers. For these reasons, I reject Defendants' arguments that they are entitled to summary judgment on Plaintiff's punitive damages claims.  However, I note that I will be in a better position to assess the merits of these claims when they are put into a fuller context at trial, and, consequently, I deny Defendants' motions without prejudice to their rights to reassert their arguments regarding punitive damages in an appropriate motion under Federal Rule of Civil Procedure 50.

7

**C.     Credit Defamation**

Defendants Sears, Equifax, and Trans Union argue that they are entitled to the summary judgment on Plaintiff's claims for defamation under Pennsylvania law.  Although there is relatively little discussion of defamation claims under Pennsylvania law in cases involving credit reports, precedent suggests that a false statement in a credit report may qualify as defamatory if it tends to deter third persons from dealing with the plaintiff.  *See McCain v. Pennbank*, 549 A.2d 1311, 1314 (Pa. Super. Ct. 1988).   Moreover, because the parties have not addressed the defamation claims in detail and such claims are preempted by the FCRA absent a showing of malice or willfulness, 15 U.S.C. § 1681h(e), I will deny Defendants' motions with respect to the defamation claims without prejudice to their rights to raise their arguments again at trial.


**IV.     CONCLUSION**

Accordingly, I deny Defendants' motions for summary judgment.  An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICHARD SHEFFER,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EXPERIAN INFORMATION** | : | |
| **SOLUTIONS, INC., et al.,** | : | **No. 02-7407** |
| **Defendants.** | : | |

<u>**ORDER**</u>

**AND NOW**, this **24th** day of **July, 2003**, upon consideration of Trans Union, LLC's Motion for Summary Judgment, Equifax Information Services, LLC's Motion for Partial Summary Judgment, Plaintiff Richard L. Sheffer's responses thereto, and Defendant Sears Roebuck & Co.'s Joinder to Motions for Summary Judgment, and for the foregoing reasons, it is hereby **ORDERED** that:

1.    By agreement of the parties, Equifax, Inc. is **DISMISSED** as a Defendant in this action.

2.    Trans Union, LLC's Motion for Summary Judgment (Document No. 37) is **DENIED.**

3.    Equifax Information Services, LLC's Motion for Partial Summary Judgment (Document No. 38) is **DENIED**.

4.    Defendant Sears Roebuck & Co.'s Joinder to Motions for Summary Judgment (Document No. 44) is **DENIED**.

**BY THE COURT:**

_____
**Berle M. Schiller, J.**



*GE Consumer Finance*

---

GE Consumer Finance
1600 Summer Street, Stamford, CT 06927

September 9, 2004

Ms. Sue Wolsfeld
Consumer Justice Center
324 East County Road D
Little Canada, MN 55117

RE:                          Penny Lee Anderson
Your File Number:   8228
Court File Number:  WD WI 03-C-0510-C

Dear Ms. Wolsfeld:

In further compliance with your subpoena dated May13, 2004, enclosed you will find a copy of the Archived Application Information for Penny L. Anderson. This information will supplement the previously provided information dated June 14, 2004. This response is made on behalf of Monogram Credit Card Bank of Georgia.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Should you have any additional questions upon review of this information, please feel free to call Ms. Charlene Porter at (800) 419-5010, ext. 7064. Thank you for your patience in this matter.

Very truly yours,

Nicola Corea
Corporate Consumer Relations
GE Consumer Finance

Enclosures

**GECCS/PLA  0001**

Exhibit R

JUL-08-2004 THU 02:18 PM GE CCCC                    FAX NO. 8882222178           P. 02

APPLICATION DATE: 10/28/2002                SELECT COMFORT                    ARCHIVE DATE: 12/13/2002
                                      SELECT COMFORT RETAIL PROGRAM                  PAGE:    33082
                                   ARCHIVED APPLICATION INFORMATION

ORGANIZATION: 810    TYPE: 002    SOURCE CODE:    APPL: INDIVIDUAL    OPER:  HLL    STATUS: DECLINED
APPLICATION NUMBER: 2002301130828                CREDIT DESIRED:       .00
ACCOUNT NUMBER:                                  CREDIT APPROVED:   2,800.00

BORROWER INFO:                           CURRENT EMPLOYMENT INFO:
  NAME:         PENNY L ANDERSON            EMPLOYER: LAKEVIEW HOSPITAL
  SOC. SECURITY: 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                TIME EMPLOYED:  00 YEARS  00 MONTHS    POSITION:
  DATE OF BIRTH: 12/11/1970                 MTHLY INCOME:    30,000.00
  AGE:           31                         PHONE NUMBER:   (651) 439-8330
                                            ADDRESS:
CURRENT ADDRESS INFO:
  ADDRESS STATUS: (O/R/B) O
  TIME AT RESID:  00 YEARS  00 MONTHS       OTHER INCOME:        .00
  MONTHLY MNT:    25.00
  PHONE NUMBER:   (715) 246-2212            TOTAL APPL INCOME:  30,000.00
  ADDRESS:        1614 HALLEWOOD BLVD
                  NEW RICHMOND WI 54017     APPL PROCESSING STEPS      STATUS     RESULT
                                              EDIT                       C
                                              PRE-VALIDATION             C          AC
PREVIOUS ADDRESS INFO:                        CROSS CHECK                C          AC
                                              APPL SCORING               C          AC
  ADDRESS:                                    VERIFICATION               N
                                              CREDIT BUREAU              C          AC
                                              COMBINE SCORING            C          AC
                                              FINAL JUDGEMENT            S          RD
                                              SETUP
COMMENTS:


CREDIT SCORING:

  APPLICATION SCORING:              CREDIT BUREAU SCORING:

                                    AGE OF OLDEST TRADE       32-     TOTAL # TRADES OPEN > 12 MOS    01
                                    30+DOG+PRD+TLD           161-     REVOLVING TRADE BALANCES         0
                                    TOTAL # FINANCE TRADES     0     RATIO BAL/HIGH CREDIT REV        78
                                    TOTAL # INQUIRIES LAST 3 MOS  54-  RATIO SAT/TOTAL TRADES          0
                                    TOTAL # INQUIRIES LAST 12 MOS  28-  TRADES W/MORRT EVER 30/60      0

  APPL SCORING TOTAL:       0       CRED BUREAU TOTAL:        782

  TOTAL SCORE:           782

  FICO HIGH SCORE:

GECCS/PLA  0002

JUL-08-2004 THU 02:18 PM GE CCCC    FAX NO. 8882222178

APPLICATION DATE: 10/28/2002

SELECT COMFORT
SELECT COMFORT RETAIL PROGRAM
ARCHIVED APPLICATION INFORMATION

ARCHIVE DATE: 12/12/2002
PAGE: 53983

ORGANIZATION: 810   TYPE: 002   SOURCE CODE:   APPL: INDIVIDUAL   OFFR: NLL   STATUS: DECLINED
APPLICATION NUMBER: 2002301130835                     CREDIT DESIRED:      .00
ACCOUNT NUMBER:                                       CREDIT APPROVED:  2,500.00

CO-BORROWER INFO:                       PRESENT EMPLOYMENT INFO:
  NAME:                                   EMPLOYER:
  SOC. SECURITY: 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
  DATE OF BIRTH: 00/00/0000               TIME EMPLOYED: 00 YEARS  00 MONTHS
  AGE: 000                                MTHLY INCOME:          .00
                                          PHONE NUMBER: (000) 000-0000
CURRENT ADDRESS INFO:                     ADDRESS:
  TIME AT RESID: 00 YEARS  00 MONTHS
  MONTHLY PMT:        .00                 OTHER INCOME:        .00
  PHONE NUMBER: (000) 000-0000
  ADDRESS:

**** APPLICATION MEMOS ****

10/28/2002  NLL  THE FOLLOWING DECLINE LETTER WAS REQUESTED: 100
10/28/2002  NLL  DECLINE: UNABLE TO GRANT CREDIT UNDER THE TERMS
10/28/2002  NLL  DECLINE: AND CONDITIONS REQUESTED
10/28/2002  NLL  THE FOLLOWING WERE NON-LETTER DECLINE REASONS:
10/28/2002  NLL  MEMO: BAD DEBT OR PUBLIC RECORD ACTION
10/28/2002  NLL  MEMO: LIMITED CREDIT EXPERIENCE
10/28/2002  NLL  MEMO: EXCESSIVE INQUIRIES ON CREDIT BUREAU
10/28/2002  NLL  MEMO: INSUFFICIENT CURRENT RATED ACCOUNTS
10/28/2002  NLL  MEMO: AMOUNT OF INDEBTEDNESS
10/28/2002  NLL  MEMO: APPLICANT DECEASED PER BUREAU
10/28/2002  NLL  CREDIT BUREAU INFO: (031)
10/28/2002  NLL       CSC CREDIT SERVICES
10/28/2002  NLL       P O BOX 674402
10/28/2002  NLL       HOUSTON            TX  77267-4402
10/28/2002  NLL       800-392-7816

**** CREDIT BUREAU REPORT ****

RPT DATE 10/28/02     CREDIT BUREAU SUMMARY REPORT      PAGE 1
RPT TIME 10:15:20  REF # C810002200230113082EA11 BUR URRD (CB) ALT (      )
NAM  ANDERSON PENNY L    (A)  ANDERSON PENNY L      ( )   Y    VAR HIT IND
SPHM                                                            -BUR  Y
STR  1614 HALLEWOOD    (C)  1614 WILDWOOD      ( )   N   AI  -BUR  Y
CTY  NEW RICHMOND WI       NEW RICHMOND WI          Y       -REC  VR
ZIP  54017                 54017                     Y       -TYPE C
SSN  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           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               Y       # MULT N/I
                                                     Y       $ TME-ADDR

JUL-08-2004 THU 02:18 PM GE CCCC                    FAX NO. 8882222178

APPLICATION DATE: 10/28/2002              SELECT COMFORT                        ARCHIVE DATE: 12/13/2002
                                  SELECT COMFORT RETAIL PROGRAM                 PAGE:        33994
                                  ARCHIVED APPLICATION INFORMATION

ORGANIZATION: 810    TYPE: 002    SOURCE CODE:        APPL: INDIVIDUAL   OPER:  NLL    STATUS: DECLINED
APPLICATION NUMBER: 2002301130025                    CREDIT DESIRED:         .00
ACCOUNT NUMBER:                                      CREDIT APPROVED:     2,500.00

          DOB  12111970                12111970                        Y         00/16
          PHON 715-246-2213              -         -                   N    109 CB# 313
          FILE-DT 11/07/90   LAST ACTIVITY  10/00/02   LATEST INQUIRY  08/15/02
          RT E/H  900  L2   G2   L3 1 DG  1  0   1   2   3   4   5   6   7   8  9 TOTAL
          #3G          #PAST          BANK          3  1              1                 8
          #60          ADJ LNK  999 BANKCARD          1                1                2
          #90          DEATH         Y RETAIL          1                                 1
          PA DERG  1 TR DERG          FINANCE    1  0                                    8
          FIN TR   2 TR DISP          MEDICAL
          OLD TR 111 INQ6       4 OTHER                1                              1
          R SAT   1D TR12      14 TOTAL        4  15                 2                  21
          TOT TR  21 RAT  8/T   71 SATEC  2 RUGOPN9999999 PTBAL                  BNKRBAL99999999
          FICO     DELPHI       OFRAUD    OPN12 300NG 2REV12  5RECDLG 99RECMDLD 99RECTR 1
          L6   G6    L24 1DC6M  1N30   N60   N3080   COMP 0 BNTRD  3 DGTRD  2 CUSTRES N
          MSG                                           AUR NNPAY  2965NITEAT     2900
          RPT DATE 10/28/02          CREDIT BUREAU SUMMARY REPORT              PAGE  2
          RPT TIME 13:15:23   REF # C81000220023011300025A11 BUR USED (CB) ALT  (       )
          IND  SAFESCAN WARNING: YOUR INQUIRY HAS GONE THROUGH OUR SAFESCAN DATA BASE
               HOUSE#        STREET NAME         STR TYPE  BOX   ROUTE  DR  AFT
          ADR  1300    HERITAGE                DR                          17
               NEW RICHMOND          WI 54017                           11/99
               CITY/ZIP MATCHED
          ADR  12      BATCHELDER                AVE                        1
               MANCHESTER          NH  03103                           08/99
               NOTHING MATCHED
               PRIOR NAMES / SPOUSE / SSN
          NAM  PENNY                 L     ROSSO
          NAM  PENNY                 L     URMSTON
          EMP  LAKEVIEW HOSPITAL
          RPT DATE 10/28/02          CREDIT BUREAU SUMMARY REPORT              PAGE  3
          RPT TIME 13:15:23   REF # C81000220023011300025A11 BUR USED (CB) ALT  (       )
               RPT-DT   STATUS   LIAB SETTL  BALG  COURT #              PLTY/ATTY
          CASE#                              COURT
          0001 761819        COL-PAID       248  10/01     0  668YC04021
          WORLDCOM
               RTG  DESC     MEMBER NAME   MEMBER#     ECOA         TERMS  STA-DT
               ACCOUNT#    RPT-DT OPN-DT HI-CRS BALG  D/DS   30 60 90  LNTYPE
          TRD  I1  PAYS AS AGR  WELLSFARGO   FM 613FMG0449  JOINT          M  1565
          0001 4729/1/02      10/02FMG6/01 H 170000  168000   0   0  0  0
               *********************   REAL ESTATE MORTGAGE
               LST ACT/CLSD DT 10/02    FHA MORTGAGE
                                       # PAY   0 LAST       PAID
          TRD  R1  PAYS AS AGR  NFFINANCE   FP 468FP04401  JOINT          0
          0002 1P6-28428478     08/02FP07/01 H  1500     0     0   0  0  0
               *********************   CHARGE

GECF/PLA  0004

JUL-08-2004 THU 02:18 PM GE CCCC                    FAX NO. 8882222178         P. 05

APPLICATION DATE: 10/28/2002                    SELECT COMFORT                    ARCHIVE DATE: 12/13/2002
                                          SELECT COMFORT RETAIL PROGRAM                    PAGE:        32585
                                         ARCHIVED APPLICATION INFORMATION

ORGANIZATION: #10    TYPE: OC2    SOURCE CODE:        APPL: INDIVIDUAL    OPER:   HLL    STATUS: DECLINED
APPLICATION NUMBER: 2002300113082A                    CREDIT DESIRED:        .00
ACCOUNT NUMBER:                                       CREDIT APPROVED:    2,500.00

            LST ACT/CLSD DT 12/01    AMOUNT IN H/C COLUMN IS CREDIT LIMIT
                                          # PAY   0 LAST      PAID
            RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT        PAGE 4
            RPT TIME 13:15:23  REF # C81000220023011308285A11 BUR USED (CB) ALT (     )
                RTG    DESC    MEMBER NAME    MEMBER#       ECOA       TERMS  STA-DT
                 ACCOUNTS    RPT-DT OPN-DT HI-CRS BAL#   P/DS   30 60 90  LNTYPE
            TRD  I1  PAYS AS AGR  FMCC       FA 644FA0404C JOINT         M    J51
            0003 JWA2183DN0       08/02FA06/99 H  31060     0    0   0   0   0
            ***************************  AUTO
            LST ACT/CLSD DT 08/02
            TRD  I1  PAYS AS AGR  FMCC       FA 644FA04640 JOINT         M    J83
            0004 2BA36.21N7       09/02FA11/00 H  16996  10461    0   0   0   0
            ***************************  AUTO
            LST ACT/CLSD DT 09/02
                                          # PAY   0 LAST      PAID
            TRD  I0  TOO NEW/NONE FMCC      FA 644FA06640 JOINT         M    J86
            0005 EBA15&CV1Y       08/02FA08/02 H  27398  26939    0   0   0   0
            ***************************  AUTO
            LST ACT/CLSD DT 09/02
                                          # PAY   0 LAST      PAID
            RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT        PAGE 5
            RPT TIME 13:15:23  REF # C81000220023011308285A11 BUR USED (CB) ALT (     )
                RTG    DESC    MEMBER NAME    MEMBER#       ECOA       TERMS  STA-DT
                 ACCOUNTS    RPT-DT OPN-DT HI-CRS BAL#   P/DS   30 60 90  LNTYPE
            TRD  E  CSM DECEASED CROSSENTRY  ON 43BGN080094
            0006 423708746440     10/02ON04/99     0      0    0   0   0   0
            ***************************  CREDIT CARD
            LST ACT/CLSD DT 10/02    AMOUNT IN H/C COLUMN IS CREDIT LIMIT
                                          # PAY   0 LAST      PAID
            TRD  I1  PAYS AS AGR  SALLIE MAE  FE 845FZ00120 INDIVIDUAL    M    L1
            0007 1589006102P      09/02FZ03/01 H  3625    510    0   0   0   0
            ***************************
            LST ACT/CLSD DT 09/02
                                          # PAY   0 LAST      PAID
            TRD  I1  PAYS AS AGR  SALLIE MAE  FE 845FZ00120 INDIVIDUAL    M    J6
            0008 1589006101P      09/02FZ03/01 H  2000    239    0   0   0   0
            ***************************
            LST ACT/CLSD DT 09/02
                                          # PAY   0 LAST      PAID
            RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT        PAGE 6
            RPT TIME 13:15:23  REF # C81000220023011308285A11 BUR USED (CB) ALT (     )
                RTG    DESC    MEMBER NAME    MEMBER#       ECOA       TERMS  STA-DT
                 ACCOUNTS    RPT-DT OPN-DT HI-CRS BAL#   P/DS   30 60 90  LNTYPE
            TRD  I0  TOO NEW/NONE NW AIR CU  FC 61XFC15148 JOINT         M    J15
            0009 13523774         10/02FC09/02 H  25000  25000    0   0   0   0
            ***************************  SECURED
            LST ACT/CLSD DT 10/02

**GECF/PLA  0005**

JUL-08-2004 THU 02:19 PM GE CCCC                    FAX NO. 8882222178

APPLICATION DATE: 10/28/2002          SELECT COMFORT                ARCHIVE DATE: 12/13/2002
                              SELECT COMFORT RETAIL PROGRAM                    PAGE:        3I966
                              ARCHIVED APPLICATION INFORMATION

ORGANIZATION: 810    TYPE: 002   SOURCE CODE:        APPLY: INDIVIDUAL    OPER:    HLL    STATUS: DECLINED
APPLICATION NUMBER: 2002301130825                    CREDIT DESIRED:        .00
ACCOUNT NUMBER:                                      CREDIT APPROVED:    2,000.00

                                                     # PAY   0 LAST      PAID
        TRD  R1  PAYS AS AGR   SEARS        DC 645DC09266  INDIVIDUAL   M      18
        0010 10781349          10/02DC06/98 H   750   779    0   0   0   0
        ********************** CHARGE
            LST ACT/CLSD DT 10/02   AMOUNT IN H/C COLUMN IS CREDIT LIMIT
                                                     # PAY   0 LAST      PAID
        TRD  R1  PAYS AS AGR   JCP/MCCBG     FF 404FF03555  INDIVIDUAL            0
        0011 -1516560337        10/02FF08/98 H   1500      0   0   0   0
        ********************** ACCT CLOSED BY CONSUMER
            LST ACT/CLSD DT 12/01   PAID ACCOUNT / ZERO BALANCE
                                                     # PAY   0 LAST      PAID
        RPT DATE 10/28/02       CREDIT BUREAU SUMMARY REPORT        PAGE  7
        RPT TIME 13:15:23  REF # C010002200230113082SA11 BUR USED (CB) ALT (      )
            ATC    DESC   MEMBER NAME      MEMBER#       ECOA        TERMS  STA-DT
            ACCOUNT#       RPT-DT OPN-DT HI-CRS BALS   P/DS   30 60 90  LNTYPE
        TRD  I1  PAYS AS AGR   NSC BANK     BR 568RA44029  JOINT        M   I51
        0012 409995201287126  09/02UB12/01 H   22774   22262   0   0   0   0
        ********************** HOME IMPROVEMENT LOAN
            LST ACT/CLSD DT 09/02
                                                     # PAY   0 LAST      PAID
        TRD  R1  PAYS AS AGR   CHOBSUNTRY    ON 485CN06054  INDIVIDUAL            0
        0013 422709724010      06/02CN05/98 H   4300      0   0   0   0
        ********************** ACCT CLOSED BY CONSUMER
            LST ACT/CLSD DT 12/01   PAID ACCOUNT / ZERO BALANCE
                                                     # PAY   0 LAST      PAID
        TRD  R1  PAYS AS AGR   CAP 1 BANK    HB 050HB01499  INDIVIDUAL            0
        0014 41217415283I      02/02SB01/98 H   1293      0   0   0   0
        ********************** ACCT CLOSED BY CONSUMER
            LST ACT/CLSD DT 02/02   PAID ACCOUNT / ZERO BALANCE
                                                     # PAY   0 LAST      PAID
        RPT DATE 10/28/02       CREDIT BUREAU SUMMARY REPORT        PAGE  8
        RPT TIME 13:15:23  REF # C010002200230113082SA11 BUR USED (CB) ALT (      )
            ATC    DESC   MEMBER NAME      MEMBER#       ECOA        TERMS  STA-DT
            ACCOUNT#       RPT-DT OPN-DT HI-CRS BALS   P/DS   30 60 90  LNTYPE
        TRD  I1  PAYS AS AGR   USAG LOAN     FE 655VZ09868  INDIVIDUAL   M        0
        0015 15690060147/024  04/01FZ08/93 H   2000      0   0   0   0
        ********************** STUDENT LOAN
            LST ACT/CLSD DT 02/01   ACCOUNT TRANSFERRED OR SOLD
                                                     # PAY  79 LAST      PAID
        TRD  I1  PAYS AS AGR   USAG LOAN     FE 655VZ09868  INDIVIDUAL   M        0
        0016 15690060138/025  04/01FZ07/93 H   2625      0   0   0   0
        ********************** STUDENT LOAN
            LST ACT/CLSD DT 02/01   ACCOUNT TRANSFERRED OR SOLD
                                                     # PAY  68 LAST      PAID
        TRD  J                 AAMS          BB 100HU00821  JOINT        M   I338
        0017 0300C1214615S2   06/01SB10/00 H 106000      0   0   0   0
        ********************** REAL ESTATE MORTGAGE
            LST ACT/CLSD DT 00/00   FHA MORTGAGE

                                                    GECF/PLA  0006

JUL-08-2004 THU 02:19 PM GE CCCC                    FAX NO. 8882222178

APPLICATION DATE: 10/28/2002          SELECT COMFORT          ARCHIVE DATE: 12/13/2002
                                SELECT COMFORT RETAIL PROGRAM          PAGE:          35987
                              ARCHIVED APPLICATION INFORMATION

ORGANIZATION: 610   TYPE: 002   SOURCE CODE:          APPL: INDIVIDUAL   OPER:   NLL   STATUS: DECLINED
APPLICATION NUMBER: 2002901150825                     CREDIT DESIRED:          .00
ACCOUNT NUMBER:                                       CREDIT APPROVED:   2,500.00

```
                                             # PAY    0 LAST        PAID
        RPT DATE 10/28/02          CREDIT BUREAU SUMMARY REPORT          PAGE  9
        RPT TIME 13:15:23   REF # C81000220023011308253A11 BUR USED (CB) ALT (          )
               RTG    DESC     MEMBER NAME    MEMBER#          ECOA        TERMS   STA-DT
                    ACCOUNT#    RPT-DT OPN-DT HI-CRS BALS   P/DS    30 60 90  LNTYPE
        TRD  11  PAYS AS AGR  KEUSA-ASF     PA 1357A00737  CO-MAKER       M   957
        0018 515447          02/00PA08/95 H  21448        0     0    0  0  0
        *******************   PAID ACCOUNT / ZERO BALANCE
            LST ACT/CLSD DT 02/00     AUTO
                                             # PAY    0 LAST        PAID
        TRD  80  TOO NEW/NONE CROSS CNTY   NB 4588802969  JOINT          0
        0019 541490709116    04/99NB04/99 H    500        0     0    0  0  0
        *******************   CREDIT CARD
            LST ACT/CLSD DT 04/99     AMOUNT IN H/C COLUMN IS CREDIT LIMIT
                                             # PAY    0 LAST        PAID
        TRD  11  PAYS AS AGR  BANK ONE      BB 1528N00795  INDIVIDUAL     0
        0020 100001660000001  03/94BB07/93 H  2620        0     0    0  0  0
        *******************
            LST ACT/CLSD DT 03/94
                                             # PAY    0 LAST        PAID
        RPT DATE 10/28/02          CREDIT BUREAU SUMMARY REPORT          PAGE 10
        RPT TIME 13:15:23   REF # C81000220023011308253A11 BUR USED (CB) ALT (          )
               RTG    DESC     MEMBER NAME    MEMBER#          ECOA        TERMS   STA-DT
                    ACCOUNT#    RPT-DT OPN-DT HI-CRS BALS   P/DS    30 60 90  LNTYPE
        TRD  16  TOO NEW/NONE BANK ONE      BB 1528N00793  INDIVIDUAL     0
        0021 100001660000603  10/93BB08/93 H  2000        0     0    0  0  0
        *******************
            LST ACT/CLSD DT 10/93
                                             # PAY    0 LAST        PAID
             DATE        MEMBER NAME          MEMBER #
        INQ  03/10/01   FACTL DTA            2B   146XB1361K
        INQ  03/14/01   CBSF                 2B   6162U04898
        INQ  02/01/01   FACTL DTA            2B   146XB13618
        INQ  08/15/02   FORD MOTOR           AN   613AN18734
        INQ  08/07/02   STWTR FORD           AN   613AN18404
        RPT DATE 10/28/02          CREDIT BUREAU SUMMARY REPORT          PAGE 11
        RPT TIME 13:15:23   REF # C81000220023011308253A11 BUR USED (CB) ALT (          )
             DATE        MEMBER NAME          MEMBER #
        INQ  08/00/02   TOWSLEY FO           AN   613AN00404
        INQ  07/08/02   BANKAMERIC           BB   241BB02480
        INQ  07/30/01   SLUMBERLAND          HF   286HF03566
        INQ  03/30/01   WELLSFARGO           FM   491FM03166
        INQ  02/02/01   CENTENNIAL           FM   234FM31033
        INQ  12/22/00   T-MOBILE             UT   810UT04130
        INQ  12/07/00   JAFONEBANK           BA   484BA00672
        INQ  11/06/00   TOWSLEY FO           AN   613AN00604
               SSN VARIATION    SSN     ST  DTE      DTH FLG      CODE
        SSN        Y          001589006  NH  00/76
```

Case: 3:03-cv-00510-bbc   Document #: 70   Filed: 10/15/04   Page 433 of 437

APPLICATION DATE: 10/28/2002                                    ARCHIVE DATE: 12/13/2002
                          SELECT COMFORT                              PAGE: 33586
                     SELECT COMFORT RETAIL PROGRAM
                   ARCHIVED APPLICATION INFORMATION

ORGANIZATION: 810    TYPE: 002   SOURCE CODE:     APPL: INDIVIDUAL   OPER: BLL   STATUS: DECLINED
APPLICATION NUMBER: 3002301130825                CREDIT DESIRED:        .00
ACCOUNT NUMBER:                                  CREDIT APPROVED:    2,500.00

          RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT       PAGE 12
          RPT TIME 13:18:23  REF # C81000220023011130825A11 BUR USED (CB) ALT (      )
          *******************  END OF REPORT  *******************
          RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT       PAGE 1
          RPT TIME 13:08:29  REF # C81000220023011130825A11 BUR USED (TU) ALT (      )
          ....INPUT....              ....BUREAU....           M VAR HIT IND
          NAM  ANDERSON PENNY L   (A)  ANDERSON PENNY L    (  )  Y        -NUR  Y
          SPNM                                                            -UUR  Y
          STR  1614 HALLWOOD      (C)  1614 WILDWOOD WI    (  )  N  534    -REC  VR
          CTY  NEW RICHMOND WI         NEW RICHMOND WI          Y     -TYPE C
          ZIP  54017                   54017                    Y     # MULT NI/1
          SSN  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             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              Y     # TME-ADDR
          DOB  12111970               12001970                 Y        00/11
          PHON 715-246-2213           000-246-2213             N   38 CBX  O9RA
          FILE-ST  08/00/91  LAST ACTIVITY 10/31/08  LATEST INQUIRY 10/28/02
          RT B/W 3400 12    G2   L3 2 BG 2  0   1   2   3   4   5  *  7  8  9 TOTAL
          #30       HPAST        BANK        1  7                              8
          #60       AGE UKP  999 BANKCARD
          #90       DEATH      Y RETAIL         2                              2
          PR DEROG    TR DEROG  3 FINANCE       3                              3
          FIN TR   6 TR DI9P      MEDICAL
          OLD TR 111 INOG        B OTHER        7                          2  0
          # INT   17 TRI2        1L TOTAL   1  10                          2  22
          TOT TR  22 RAT R/T  77 SATBC  3 RBCOPN     112 BYBAL  30443 BNKBAL    1047
          FICO    DLLPHI      DMRAUD     OPN12 2OPNG 2REV12  6RECDLQ 12RECMDLQ 98RBSTR 3
          L5    65   L24 2DG10 2N3G   N6G  30060  COMP 6 BKYRD  3 RBTRD  8 CUOTMDG N
          MSG                                                   ADA NMPAY  3295RBTRAT    2000
          RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT       PAGE 2
          RPT TIME 13:08:29  REF # C81000220023011130825A11 BUR USED (TU) ALT (      )
          *TRANS-ALERT: INPUT ADDRESS MATCH                        *CODE: 0---
          *TRANS-ALERT: INPUT SSN MATCHES FILE SSN                 *CODE:- 0--
          *TRANS-ALERT: YIP CODE IS VALID                          *CODE:-- 0-
          *TRANS-ALERT: INPUT SURNAME MATCHED FILE                 *CODE:--- 0
          *BANK-ALERT: PHONE AND SSN CLEAR                         *CODE: I---
          *TRANS-ALERT: NUMBER OF INQUIRIES IN THE LAST 60 DAYS    *CODE:-I---
          *BANK-ALERT: CURRENT ADDRESS CLEAR                       *CODE:- 1--
          *BANK-ALERT: PREVIOUS ADDRESS CLEAR                      *CODE:-- -

             PRIOR NAMES / SPOUSE / SSN
          NAM                            ROSSO,PENN
          NAM                            URMSTON,PE
               HOUSE#          STREET NAME    STR TYPE  BOX  ROUTE DR APT
               CITY           UT    ZIP       PHONE  R/O/B RES DT RPD DT CB
          ADR  1614    WILLWOOD              AV
               NEW RICHMOND  WI  54017                       11/00
          ADR  1300    MERITAGE             DR              17
               NEW RICHMOND  WI  54017                       10/99
          ADR  820     97TH                 ST

                                                        GECF/PLA  0008

```
APPLICATION DATE: 10/28/2002                    SELECT COMFORT                          ARCHIVE DATE: 12/13/2002
                                       SELECT COMFORT RETAIL PROGRAM                          PAGE:      33999
                                     ARCHIVED APPLICATION INFORMATION

ORGANIZATION: 810   TYPE: 002   SOURCE CODE:          APPL: INDIVIDUAL   OPER:   NLL      STATUS: DECLINED
APPLICATION NUMBER: 2002301130826                      CREDIT DESIRED:       .00
ACCOUNT NUMBER:                                       CREDIT APPROVED:   2,500.00

          AMERY              WI 54001
          RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT        PAGE  3
          RPT TIME 13:08:29  REF # C810002200230113082BA11 BUR USED (TU) ALT (    )
                EMPLOYER            CITY          STATE DATE   OCCUPATION
          EMP                                                02/02
          EMP       LAKEVIEW HOSPITAL                        05/01
          FMP       LAKEVIEW HOSPITAL
                RTG  DESC   MEMBER NAME     MEMBER#       ECOA        TERMS  STA-DT
                   ACCOUNT#  RPT-DT OPN-DT HI-CRE BAL$   P/DE   30 60 90  LNTYPE
          TRD  O8P PD CHG OFF   OBI COLLECT Y  J813006     INDIVIDUAL          0
          0001 741819           10/01Y 07/99 M   248     0    0   0  0  0 UNKNOWN
          ***************** PAID COLLECTIONS
          LST ACT/CLSD DT 00/00
                                        # PAY  0 LAST      PAID 02/00
          TRD  O8P PD CHG OFF   OBI COLLECTN Y  LVCK001     INDIVIDUAL          0
          0002 7643787           01/01Y 07/99 H   173     0    0   0  0  0 COLLECT
          ***************** PAID COLLECTIONS
          LST ACT/CLSD DT 00/00
                                        # PAY  0 LAST      PAID
          RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT        PAGE  4
          RPT TIME 13:08:29  REF # C810002200230113082BA11 BUR USED (TU) ALT (    )
                RTG  DESC   MEMBER NAME     MEMBER#       ECOA        TERMS  STA-DT
                   ACCOUNT#  RPT-DT OPN-DT HI-CRE BAL$   P/DE   30 60 90  LNTYPE
          TRD  R01 PAID/PAY AGR SEARS       D  6286443     INDIVIDUAL    N   18
          0003 35701349           10/02D 00/99 C   900     779    0   0  0  0 CHARGE A
          CCCCCCCCCCCCCCCCCCCCCCCCCCC
          LST ACT/CLSD DT 00/00
                                        # PAY  0 LAST      PAID
          TRD  R01 PAID/PAY AGR MACY&/JCPENN D 1372187     INDIVIDUAL          0
          0004 1916902337           10/02D 00/98 C  1900     0    0   0  0  0 CHARGE A
          CCCCCCCCCCCCCCCCCCCCCCCCCCC ACCOUNT CLOSED BY CONSUMER
          LST ACT/CLSD DT 12/01
                                        # PAY  0 LAST      PAID
          TRD  R01 PAID/PAY AGR CHS CNTY BK  N 2408126     DECEASED      N   56
          0005 422700746440        10/02D 04/99 H  1988    1847    0   0  0  0 CREDIT C
          CCCCCCCCCCCCCCCCCCCCCCCCCCC DECEASED
          LST ACT/CLSD DT 00/00
                                        # PAY  0 LAST      PAID
          RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT        PAGE  5
          RPT TIME 13:08:29  REF # C810002200230113082BA11 BUR USED (TU) ALT (    )
                RTG  DESC   MEMBER NAME     MEMBER#       ECOA        TERMS  STA-DT
                   ACCOUNT#  RPT-DT OPN-DT HI-CRE BAL$   P/DE   30 60 90  LNTYPE
          TRD  I01 PAID/PAY AGR NWA FED CU   O 1044008     JNT-CONTRA    N   315
          0006 13539774           10/02D 08/02 H  25000   25000    0   0  0  0 SECURED
          *****************
          LST ACT/CLSD DT 00/00
                                        # PAY  60 LAST     PAID
          TRD  M01 PAID/PAY AGR WELS MRG MTGE D 47NG003     JNT-CONTRA    N  1565
          0007 4728571702         09/02D 05/01 H 170000  165784    0   0  0  0 FHA R/E
```

JUL-08-2004 THU 02:27 PM GE CCCC                    FAX NO. 8882222178

```
APPLICATION DATE: 10/28/2002            SELECT COMFORT              ARCHIVE DATE: 12/13/2002
                                 SELECT COMFORT RETAIL PROGRAM            PAGE:   11990
                                 ARCHIVED APPLICATION INFORMATION

ORGANIZATION: 810   TYPE: 002   SOURCE CODE:      APPL: INDIVIDUAL    OPER:   NLL     STATUS: DECLINED
APPLICATION NUMBER: 2002301130825                 CREDIT DESIRED:            0
ACCOUNT NUMBER:                                   CREDIT APPROVED:    2,500.00

                      CCCCCCCCCCCCCCC**********
                      LST ACT/CLSD DT 00/00
                                                # PAY 360 LAST       PAID
               TRD  R01 PAID/PAY AGR WFFINANCIAL F 4462810     JNT-CONTRA        0
               0008 107300128424475  07/02F 07/01 C   1500       0    0   0  0 CHARGE A
                      CCCCC***********************
                      LST ACT/CLSD DT 00/00
                                                # PAY  0 LAST       PAID 12/01
               RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT       PAGE  6
               RPT TIME 13:08:29  REF # C81U002200230113082AA11 BUR USED (TU) ALT (        )
                      RTG   DESC    MEMBER NAME    MEMBER#         ECOA       TERMS  STA-DT
                           ACCOUNT#      RPT-DT OPN-DT HI-CRS BAL$   P/D#    30 60 90  LNTYPE
               TRD  I01 PAID/PAY AGR S&C BANK   R 4560002     JNT-CONTRA    M  281
               0009 4069952012071126  09/02R 12/01 H  22774  22362     0    0   0  0 HOME IMP
                      CCCCCCCCCC**********
                      LST ACT/CLSD DT 00/00
                                                # PAY 60 LAST       PAID
               TRD  I01 PAID/PAY AGR FRD MOTOR CR O 3796842     JNT-CONTRA    M  361
               0010 JHA119IENO       08/02Q 06/99 H  21060   8073    0    0   0  0 AUTO
                      CCCC*CCCCCCCCCCCCCCCCCCCC
                      LST ACT/CLSD DT 00/00
                                                # PAY  60 LAST      PAID
               TRD  I01 PAID/PAY AGR FRD MOTOR CR F 3796743     JNT-CONTRA    M  283
               0011 EBA16412LR/      08/02F 11/00 H  18696  11047     0    0   0  0 AUTO
                      CCCC*CCCCCCCCCCCCCCCCCCCC**
                      LST ACT/CLSD DT 00/00
                                                # PAY  60 LAST      PAID
               RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT       PAGE  7
               RPT TIME 13:08:29  REF # C81U002200230113082AA11 BUR USED (TU) ALT (        )
                      RTG   DESC    MEMBER NAME    MEMBER#         ECOA       TERMS  STA-DT
                           ACCOUNT#      RPT-DT OPN-DT HI-CRS BAL$   P/D#    30 60 90  LNTYPE
               TRD  R01 PAID/PAY AGR CASE CNTY BK B 2440063     INDIVIDUAL      0
               0012 422708724010     08/02R 06/98 H   4360      0    0    0   0  0 CREDIT C
                      CCCCCCCCCCCCCCCCCCCCCCCCC   ACCOUNT CLOSED BY CONSUMER
                      LST ACT/CLSD DT 01/02
                                                # PAY  0 LAST       PAID
               TRD  I01 PAID/PAY AGR FRD MOTOR CR F 3796743     JNT-CONTRA    M  456
               0013 EBA156C71Y       08/02F 08/02 H  27396  27396     0    0   0  0 AUTO
                      C*********************
                      LST ACT/CLSD DT 00/00
                                                # PAY  60 LAST      PAID
               TRD  I01 PAID/PAY AGR LRCF/3RDPRTY W 6372038     INDIVIDUAL    M   26
               0014 15880081U1Y      06/02F 03/01 H   2000    313    0    0   0  0 STUDENT
                      CCCCCC*CCCCCC*********
                      LST ACT/CLSD DT 00/00
                                                # PAY  0 LAST       PAID
               RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT       PAGE  8
               RPT TIME 13:08:29  REF # C81U002200230113082AA11 BUR USED (TU) ALT (        )
```

**GECF/PLA  0010**

JUL-08-2004 THU 02:28 PM GE CCCC                    FAX NO. 8882222178

APPLICATION DATE: 10/28/2002                                                    ARCHIVE DATE: 12/13/2002
                                    DIRECT COMFORT                                       PAGE:    33591
                               SELECT COMFORT RETAIL PROGRAM
                            ARCHIVED APPLICATION INFORMATION

ORGANIZATION: 010    TYPE: 002    SOURCE CODE:         APP#: INDIVIDUAL        OPER:  HLL    STATUS: DECLINED
APPLICATION NUMBER: 200230113082A                          CREDIT DESIRED:       .00
ACCOUNT NUMBER:                                            CREDIT APPROVED:    2,500.00

              RTG    DESC       MEMBER NAME      MEMBER#           ECOA        TERMS  STA-DT
                    ACCOUNT#    RPT-DT OPN-DT  HI-CRS BAL$    P/D$      30 60 90  LNTYPE
          TRD  I01 PAID/PAY AGR LAGF/3RDPRTY K  6373C3B      INDIVIDUAL    M   G2
          0015 1589006102Y     06/02R 03/01 H    262R    $5$      0    0   0  0 STUDENT
               CCCCCCC*CCCCCCC********
                                                 # PAY  0 LAST      PAID
          TRD  R01 PAID/PAY AGR CAPITAL 1 BK B 10TV001      INDIVIDUAL         0
          0016 412174158283I     02/03B 01/99 H    1253     0      0    0  0 CREDIT C
               CCCCCCCCCCCCC/CCCCCCCCCCCCC  ACCOUNT CLOSED BY CONSUMER
               LST ACT/CLSD DT 02/02
                                                 # PAY  0 LAST      PAID
          TRD  I01 PAID/PAY AGR DSA CF LNSVS V 4268001      INDIVIDUAL    M    0
          0017 1585006013079935  04/01V 07/93 H    262R     0      0    0  0 STUDENT
               *CCCCCCCCCCCC-C*C***C** TRANSFERRED TO ANOTHER LENDER
               LST ACT/CLSD DT 03/01
                                                 # PAY 68 LAST      PAID
          RPT DATE 10/28/02           CREDIT BUREAU SUMMARY REPORT           PAGE  9
          RPT TIME 13:08:29  REF # CB1000220033011308225A11 BUR USED (TU) ALT (     )
              RTG    DESC      MEMBER NAME      MEMBER#        ECOA       TERMS  STA-DT
                    ACCOUNT#    RPT-DT OPN-DT  HI-CRS BAL$    P/D$     30 60 90  LNTYPE
          TRD  I01 PAID/PAY AGR DSA CF LNSVS V 4268001     INDIVIDUAL   M    0
          0018 1589006013079024  04/01V 08/93 H    2000      0      0    0  0 STUDENT
               *CCCCCCCCCCCCCCCCC-CC*C*  TRANSFERRED TO ANOTHER LENDER
               LST ACT/CLSD DT 03/01
                                                 # PAY 70 LAST      PAID
          TRD  I01 PAID/PAY AGR NUUDA-ASF     Q 9UNK002     CO-MAKER    M    0
          0019 316497        03/00G 08/96 H   2160G      0      0    0  0 AUTO
               ******CCCCCCCCCCCCCCC  CLOSED
               LST ACT/CLSD DT 05/99
                                                 # PAY 60 LAST      PAID
          TRD  I01 PAID/PAY AGR SKI AZ UFLN B 33NP001     INDIVIDUAL    0
          0020 1000018590006G1  03/94B 09/93 H   262R      0      0    0  0 STUDENT
               **********/******* TRANSFERRED ACCT
               LST ACT/CLSD DT 06/00
                                                 # PAY  0 LAST      PAID
          RPT DATE 10/28/02           CREDIT BUREAU SUMMARY REPORT          PAGE 10
          RPT TIME 13:08:29  REF # CB1000220033011308226A11 BUR USED (TU) ALT (     )
              RTG    DESC      MEMBER NAME      MEMBER#        ECOA      30 60 90  LNTYPE
                    ACCOUNT#    RPT-DT OPN-DT  HI-CRS BAL$    P/D$                LNTYPE
          TRD  I01 PAID/PAY AGR DSI AZ UFLN B 33NP001     INDIVIDUAL        0
          0021 1000018590060Y  10/93B 08/93 H   2000      0      0    0  0 STUDENT
               ***********  TRANSFERRED ACCT
               LST ACT/CLSD DT 06/00
                                                 # PAY  0 LAST      PAID
          TRD  TUR UNRATED     ASN-ADKO      R  634F004     JNT-CONTRA  M    133W
          0022 3300612148152   06/01B 10/00 H  164108      0      0    0  0 FHA R/E
               *************** CLOSED

                                                              GECF/PLA  0011

```
APPLICATION DATE:  10/26/2002                                              ARCHIVE DATE:  12/13/2002
                              SELECT COMFORT                                     PAGE:       33492
                       SELECT COMFORT RETAIL PROGRAM
                      ARCHIVED APPLICATION INFORMATION

ORGANIZATION:  810   TYPE:  002   SOURCE CODE:       APPL:  INDIVIDUAL    OPER:    HLL   STATUS:  DECLINED
APPLICATION NUMBER: 2002301130026                    CREDIT DESIRED:        .00
ACCOUNT NUMBER:                                      CREDIT APPROVED:    2,500.00


                   LST ACT/CLSD 07 05/01          N PAY 360 LAST         PAID
               DATE      MEMBER NAME              MEMBER #
        INQ  10/26/02  CONAFCO FIN.               F   0500019
        INQ  10/21/02  WFFINANCE                  F   0020014
        RPT DATE 10/19/02        CREDIT BUREAU SUMMARY REPORT     PAGE 11
        RPT TIME 13:08:29  REF # C810002200230113002BA11 BUR USED (TU) ALT (       )
               DATE      MEMBER NAME              MEMBER #
        INQ  08/15/02  FORD MOTOR                 N   1232207
        INQ  08/05/02  FORD MOTOR                 N   1238207
        INQ  07/02/02  B OF A                     B   2300014
        INQ  05/23/02  CAP ONE BANK               B   0131718
        INQ  02/12/02  SCHLW DPT ST               D   0000814
        INQ  11/19/01  S & C BANK                 S   00A1090
        INQ  11/05/01  NB/BESTBUY                 F   0000077
        INQ  07/30/01  WFFINANCE                  F   0020014
        INQ  03/20/01  FDC                        S   0001208
        INQ  02/20/01  F.MAC/WELLS                R   0001959
        RPT DATE 10/28/02        CREDIT BUREAU SUMMARY REPORT     PAGE 12
        RPT TIME 13:08:29  REF # C810002200230113002BA11 BUR USED (TU) ALT (       )
               DATE      MEMBER NAME              MEMBER #
        INQ  03/14/01  CBC MORTGAGE               B   0214799
        INQ  02/02/01  CENTENNIAL M               R   0007091
        INQ  02/01/01  FDC                        S   0001208
        INQ  12/02/00  CAP ONE BANK               B   0131943
        INQ  12/02/00  NEXTCARD                   F   2200003
        INQ  11/07/00  FORD MOTOR                 N   1232207
        **************************** END OF REPORT ****************************
```

**GECF/PLA  0012**