UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

PENNY LEE ANDERSON and
RUSSELL D. ANDERSON, SR.,

    Plaintiffs,

v.

TRANS UNION, LLC; EXPERIAN
INFORMATION SOLUTIONS, INC.; CSC
CREDIT SERVICES, INC.; EQUIFAX, INC.
d/b/a EQUIFAX INFORMATION SERVICES,
LLC; APPLIED CARD SYSTEMS, INC.; and
CROSS COUNTRY BANK, INC.,

    Defendants.

CASE NO. 03-C-0510-C

JUDGE BARBARA B. CRABB

---

### AFFIDAVIT OF EILEEN LITTLE

---

I, Eileen Little, hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I am Group Manager of Consumer Relations for Trans Union, LLC ("Trans Union"). In the ordinary course of my employment I have personal knowledge of Trans Union's practices and procedures relating to consumer disputes, including the investigation thereof.

2. I also have personal knowledge of Plaintiffs' disputes of their Cross County Bank ("**CCB**") accounts with Trans Union and Trans Union's investigations thereof.

3. Trans Union maintains procedures to conduct reinvestigations of disputes.

4.	In general, when Trans Union receives a dispute from a consumer, Trans Union investigates the dispute using one of two systems developed for the purpose of processing and tracking disputes, the Consumer Dispute Verification process ("**CDV**") and, relevant to this case, the Automated Consumer Dispute Verification process ("**ACDV**").

5.	Through the ACDV process, Trans Union contacts the furnisher and, via an automated process, asks the furnisher to verify that the indicative information on the consumer matches the indicative information maintained in the furnisher's records and is associated with the particular account being disputed.    6.	Further Trans Union asks the furnisher to verify the accuracy of the account information, e.g. account balance, payment history, credit limit, etc., being reported to Trans Union by the furnisher.

7.	If the furnisher verifies that the reported information is correct, Trans Union updates the information on the consumer's credit file and notifies the consumer of that fact.

8.	If the furnisher reports that the information is inaccurate or specific items can no longer be verified, or if the creditor does not respond within the required time, Trans Union deletes the information from the consumer's credit file and notifies the consumer of that fact.

9.	Trans Union provides the consumer with the opportunity to have a 100-word consumer statement regarding the information inserted into the consumer's file in accordance with 15 U.S.C. 1681i(b) and that Trans Union will assist them in writing such a statement.

10. Trans Union also recommends to consumers that when they have a dispute pending they should not apply for credit, as the results of the reinvestigation may affect a new credit decision.

11. Trans Union may employ additional or different procedures for processing disputes depending on the precise dispute involved and the circumstances of the case.

## RUSSELL ANDERSON

12. On August 8, 2000, Russell advised Trans Union by telephone for the first time of a dispute over the deceased information on Cross Country Bank MasterCard Account No. XXXX-XXXX-XXX-3912 (the "**MasterCard Account**").

13. At that time, the MasterCard Account was being reported to Trans Union by CCB under a number assigned to CCB by Trans Union (CCB's "**subscriber number**").

14. On that day, Trans Union mailed a copy of Russell's consumer disclosure to Russell which contained the following information regarding the MasterCard Account being reported to Trans Union by CCB:

```
CROSS COUNTRY BANK      XXXX-XXXX-XXX-3912        REVOLVING ACCOUNT
DECEASED                                          CREDIT CARD
  UPDATED      06/2000   BALANCE       $170       CONSUMER DECEASED
  OPENED       04/1999   MOST OWED:    $210       PAY TERMS:     MINIMUM $35
                                                  CREDIT LIMIT:       $900
  STATUS AS OF 06/2000: PAID OR PAYING AS AGREED
  IN PRIOR 23 MONTHS FROM LAST UPDATE NEVER LATE
```

Exhibit A.

15. On August 8, 2000, Russell's Trans Union credit file also contained eleven (11) tradelines all reporting adverse credit information including a Chapter 7 Bankruptcy,

3

a profit and loss writeoff, seven paid collection accounts, and a placed for collection account.  Exhibit A.

16. On August 9, 2000, Trans Union initiated an investigation into the accuracy of the "deceased" codes being reported on the MasterCard Account by sending CCB an ACDV.

17. CCB failed to return to the ACDV and, therefore, on September 6, 2000 Trans Union concluded its reinvestigation and "cloaked" the MasterCard Account which means that Trans Union deleted the information permanently from a publicly available consumer report, while at the same time, tracking the account to make sure that it did not appear on a credit report even though the furnisher may continue to provide electronic update information for the Account.

18. If Trans Union were to remove the Account from its records entirely, the furnisher could "reinsert" the Account via regular tape reporting.

19. On September 6, 2000, Trans Union mailed Russell the results of this reinvestigation (showing that the MasterCard Account had been "DELETED") along with his consumer disclosure dated September 6, 2000.  Exhibit B.

20. Trans Union never reported the MasterCard Account on any consumer report after September 6, 2000.

21. Starting in May 2002, CCB began reporting the Visa Account to Trans Union under a different account number and different subscriber number than the numbers associated with the MasterCard Account in Trans Union's system.

22. As a result, CCB's reporting of the Visa Account eluded Trans Union's cloaking mechanism.

4

23.     Thus, starting in May 2002, Plaintiffs' Visa Account was maintained in Plaintiffs' Trans Union consumer files with notations of "consumer deceased."

## RUSSELL'S FIRST DISPUTE OF THE VISA ACCOUNT

24.     On November 6, 2002, Trans Union received written correspondence from Penny on behalf of Russell requesting an investigation into the deceased information being reported by CCB in the Visa Account. Exhibit C.

25.     On November 13, 2002 the Visa Account contained the following information all of which had been reported to Trans Union by CCB:

```
CROSS COUNTRY BANK       XXXX-XXXX-XXX-6736      REVOLVING ACCOUNT
DECEASED                                         CREDIT CARD
  UPDATED    10/2002    BALANCE       $1847     CONSUMER DECEASED
  OPENED     04/1999    MOST OWED:    $1959     PAY TERMS:    MINIMUM $56
                                                 CREDIT LIMIT:    $1900
  STATUS AS OF 10/2002: PAID OR PAYING AS AGREED
  IN PRIOR 28 MONTHS FROM LAST UPDATE NEVER LATE
```

Exhibit D.

26.     On November 13, 2002, Trans Union initiated a reinvestigation into the accuracy of the deceased information on the Visa Account by sending an ACDV to CCB. Exhibit E.

27.     The ACDV sent to CCB on November 13, 2002 communicated to CCB that as of that day the Remark Field contained the verbiage "DECEASED" and the ECOA Code contained the code "X" which stands for "CONSUMER DECEASED". Exhibit E.

28.     On November 26, 2002, CCB returned the ACDV to Trans Union. Exhibit E.

5

29. CCB responded by verifying the accuracy of Plaintiff's first name and last name, address and social security number and by verifying the Visa Account information as reported, including the accuracy of the Remark Field and the ECOA Code.  Exhibit E.

30. On November 26, 2002 Trans Union mailed Plaintiff the results of this reinvestigation along with Plaintiff's consumer disclosure dated November 26, 2002.  Exhibit F.

### RUSSELL'S SECOND DISPUTE OF THE VISA ACCOUNT

31. On January 8, 2003, Trans Union received a fax correspondence sent by Plaintiffs, enclosing correspondence from CCB to Penny.  Exhibit G.

32. The CCB correspondence, dated December 9, 2002, states in pertinent part as follows:

> We have received your correspondence concerning the information appearing on your credit report.  Due to our system conversion, your MasterCard account was reassigned to the above Visa account.  All pertinent information regarding your account remained unchanged, however refer to the new account number in future correspondence.
>
> As a result of this issue, we have submitted a request to the credit bureaus for removal of the account XXX-XXX-XXXX-2260 entirely.  In addition, account XXXX-XXXX-XXXX-6736 has been updated and the deceased status removed.  Please allow 30-60 days for the credit bureaus to update their records.  We apologize for any inconvenience this may have cause and trust we have satisfactorily addressed your concerns.

Exhibit G.

33. Trans Union accepted this correspondence without further investigation and on January 13, 2003 attempted to remove the deceased information from the Visa Account by removing the "DECEASED" verbage from the Remark Field.

6

34. However, this correction did not take affect because the operator failed to also update the ECOA Code.

35. Because the operator failed to remove both the Remark and the ECOA deceased codes, the deceased status remained unchanged.

36. Because the CCB correspondence indicated that CCB's records had been updated there was no reason to cloak the Account.

37. Not knowing that the attempted correction was not made, Trans Union mailed investigation results along with Russell's consumer disclosure to Russell on January 13, 2003. Exhibit H.

38. On January 20, 2003, Plaintiff contacted Trans Union's Consumer Contact Department via telephone and informed Trans Union that the deceased status on the Visa Account remained unchanged on the January 13, 2003 consumer disclosure.

39. The operator who received this call recognized that the previous operator who processed Russell's January 8, 2003 dispute had failed to change the ECOA Code.

40. Therefore, on that same day, January 20, 2003, the operator removed the deceased codes from both the Remarks Field and the ECOA Code field.

41. Also, on that same day, January 20, 2003, Trans Union mailed Russell a copy of his current Trans Union disclosure demonstrating that the Visa Account was now being accurately reflected in Russell's credit file. Exhibit I.

42. Specifically, the Visa Account appeared as follows on Plaintiff's January 20, 2003 disclosure:

| CROSS COUNTRY BANK | | XXXX-XXXX-XXX-6736 | | REVOLVING ACCOUNT | |
|---|---|---|---|---|---|
| | | | | CREDIT CARD | |
| UPDATED | 01/2003 | BALANCE | $1141 | JOINT ACCOUNT | |
| OPENED | 04/1999 | MOST OWED: | $1959 | PAY TERMS: | MINIMUM $35 |

7

|  |  |
|---|---|
|  | CREDIT LIMIT:     $1900 |

STATUS AS OF 01/2003: PAID OR PAYING AS AGREED
IN PRIOR 31 MONTHS FROM LAST UPDATE NEVER LATE

Exhibit I.

## PENNY'S FIRST DISPUTE OF THE VISA ACCOUNT

43. On November 6, 2002, Trans Union received written correspondence from Penny requesting an investigation into the deceased information being reported by CCB in the Visa Account. Exhibit C.

44. On November 13, 2002 the Visa Account contained the following information all of which had been reported to Trans Union by its furnisher, CCB:

| CROSS COUNTRY BANK | | XXXX-XXXX-XXX-6736 | | REVOLVING ACCOUNT | |
| DECEASED | | | | CREDIT CARD | |
| UPDATED | 10/2002 | BALANCE | $1847 | CONSUMER DECEASED | |
| OPENED | 04/1999 | MOST OWED: | $1959 | PAY TERMS: | MINIMUM $56 |
| | | | | CREDIT LIMIT: | $1900 |

STATUS AS OF 10/2002: PAID OR PAYING AS AGREED
IN PRIOR 28 MONTHS FROM LAST UPDATE NEVER LATE

Exhibit J.

45. On November 13, 2002, Trans Union initiated a reinvestigation into the accuracy of the deceased information on the Visa Account by sending an ACDV to CCB. Exhibit K.

46. The ACDV sent to CCB on November 13, 2002 communicated to CCB that as of that day the Remark Field contained the verbiage "DECEASED" and the ECOA Code contained the code "X" which stands for "CONSUMER DECEASED". Exhibit K.

47. On November 26, 2002, CCB returned the ACDV to Trans Union. Exhibit K.

48. CCB responded by verifying the accuracy of Plaintiff's first name and last name, address and social security number and by verifying the Visa Account information as reported including the accuracy of the Remark Field and the ECOA Code. Exhibit K.

49. On November 26, 2002 Trans Union mailed Plaintiff the results of this reinvestigation along with Plaintiff's consumer disclosure dated November 26, 2002. Exhibit L.

## PENNY'S SECOND DISPUTE OF THE VISA ACCOUNT

50. On January 7, 2003 Russell Anderson contacted Trans Union via telephone on Penny Anderson's behalf stating that he was going to fax a letter to Trans Union from CCB.

51. On January 7, 2003, Penny's Trans Union credit file contained the Visa Account which was being reported to Trans Union by CCB as follows:

```
CROSS COUNTRY BANK        XXXX-XXXX-XXX-6736        REVOLVING ACCOUNT
DECEASED                                            CREDIT CARD
  UPDATED     12/2002    BALANCE      $1141        CONSUMER DECEASED
  OPENED      04/1999    MOST OWED:   $1959        PAY TERMS:      MINIMUM $35
                                                   CREDIT LIMIT:   $1900
  STATUS AS OF 12/2002: PAID OR PAYING AS AGREED
  IN PRIOR 30 MONTHS FROM LAST UPDATE NEVER LATE
```

Exhibit M.

52. On January 7, 2003, Trans Union initiated an investigation into the Visa Account by ending an ACDV to CCB.

53. However, on January 8, 2003, before the investigation was completed, Trans Union did receive fax correspondence from Penny enclosing correspondence from CCB. Exhibit G.

9

54. This was the same December 9, 2002 correspondence referred to above in paragraph 31. Exhibit G.

55. Trans Union accepted this correspondence without further investigation and on January 13, 2003 attempted to remove the deceased information from the Visa Account by removing the "DECEASED" verbage from the Remark Field.

56. However, this correction did not take effect because the operator failed to also update the ECOA code.

57. Because the operator failed to remove both the Remark and the ECOA deceased codes, the deceased status remained unchanged.

58. Because the CCB correspondence indicated that CCB's records had been updated there was no reason to cloak the Account.

59. Not knowing that the attempted correction was not made, Trans Union mailed investigation results along with Penny's consumer disclosure to Penny on January 13, 2003. Exhibit N.

60. On January 20, 2003, Plaintiff contacted Trans Union's Consumer Contact Department via telephone and informed Trans Union that the deceased status on the Visa Account remained unchanged on the January 13, 2003 consumer disclosure.

61. The operator who received this call recognized that the operator who processed Russell's January 8, 2003 dispute had failed to change the ECOA Code.

62. Therefore, on that same day, January 20, 2003, the operator removed the deceased codes from both the Remarks Field and the ECOA Code.

63. Also, on that same day, January 20, 2003, Trans Union mailed Penny a copy of her current Trans Union disclosure demonstrating that the Visa Account was now being accurately reflected in Penny's credit file.  Exhibit O.

64. Specifically, the Visa Account appeared as follows on Penny's January 20, 2003 disclosure:

| CROSS COUNTRY BANK | | XXXX-XXXX-XXX-6736 | | REVOLVING ACCOUNT | |
|---|---|---|---|---|---|
| | | | | CREDIT CARD | |
| UPDATED | 01/2003 | BALANCE | $1141 | JOINT ACCOUNT | |
| OPENED | 04/1999 | MOST OWED: | $1959 | PAY TERMS: | MINIMUM $35 |
| | | | | CREDIT LIMIT: | $1900 |

STATUS AS OF 01/2003: PAID OR PAYING AS AGREED
IN PRIOR 31 MONTHS FROM LAST UPDATE NEVER LATE

Exhibit O.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE AND ACCURATE, TO THE BEST OF MY KNOWLEDGE AND BELIEF.

           _s/ Eileen Little_
           Eileen Little
           Consumer Relations Group Manager
           TRANS UNION, LLC