Document Number Case Number
127    03-C-0510-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
03/31/2005 09:48:01 PM CST

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN
## COURT FILE NO.: 03-CV- 0510 C

Penny Lee Anderson and
Russell D. Anderson, Sr.,

                 Plaintiffs,

-vs-

                               **SUPPLEMENTAL AFFIDAVIT OF JOHN H. GOOLSBY IN OPPOSITION TO DEFENDANT TRANS UNION'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**

Trans Union, L.L.C.;
Experian Information Solutions Inc.;
CSC Credit Services, Inc.;
Equifax, Inc. d/b/a Equifax Information Services
LLC,

                 Defendants.

John H. Goolsby, Esq., being duly sworn and upon oath, deposes and says as follows:

1. That I am one of the attorneys representing Plaintiff in the above-entitled matter. I submit this affidavit in connection with Plaintiff's Supplemental Proposed Findings of Fact and Memorandum of Law in Opposition to Defendant Trans Union's Supplemental Motion for Summary Judgment.

2. That attached hereto as Exhibit A is a true and correct copy of the March 22, 2002 deposition of William Stockdale, with exhibits.

3. That attached hereto as Exhibit B is a true and correct copy of transcript (excerpts) of Nov. 17, 2004 trial testimony of William Stockdale in <u>McKeown v. Trans Union, LLC</u>, Civ. Case 03-C-0528-C (W.D. Wisc.).

4. That attached hereto as Exhibit C is a true and correct copy of excerpts from the March 23, 2005 deposition of Trans Union Rule 30(b)(6) representative Lynn Romanowski taken in <u>Schmitt v. Chase Manhattan Bank, et al.</u>, File No. 03-3295 (D. Minn.).

5. That attached hereto as Exhibit D is a true and correct copy of Plaintiff's December 7, 2004 Subpoena and 3rd Amended Notice of Taking Deposition of Cross Country Bank's/Applied Card Systems FRCP 30(b)(6) Representative(s), Duces Tecum.,

6. That the deposition noticed in Exhibit D could not take place because of the Court's order staying discovery.

7. That attached hereto as Exhibit E are true and correct copies of Claimants' Notice of Taking Deposition of Cross Country Bank's/Applied Card Systems Representative(s) Duces Tecum in <u>Anderson v. Cross Country Bank, Inc.</u>, National Arbitration Forum File No. FA0406000286852, with cover letter.

8. That Plaintiff's sent Exhibit E to counsel for Defendant Trans Union on January 6, 2005.

9. That attached hereto as Exhibit F is a true and correct copy of the February 17, 2005 deposition of CCB/ACS's representative Christine Cintron in <u>Anderson v. Cross Country Bank, Inc.</u>, National Arbitration Forum File No. FA0406000286852.

10. That attached hereto as Exhibit G is a true and correct copy of the February 17, 2005 deposition of CCB/ACS's representative Michael Giuliani in <u>Anderson v. Cross Country Bank, Inc.</u>, National Arbitration Forum File No. FA0406000286852.

11. That attached hereto as Exhibit H is a true and correct copy of Plaintiffs' March 21, 2005 Subpoena and Notice of Taking Deposition of Applied Card Systems' FRCP 30(b)(6) Representative(s), Duces Tecum, with Affidavit of Service.

12. That CCB/ACS would not make a witness available before the week of April 4, 2005.

13. That Plaintiffs believe that the evidence presently in the record is more than sufficient to defeat Defendant's Supplemental Motion for Summary Judgment; that Plaintiffs, despite their persistent attempts, have been unable to take the deposition in this federal court case

of the additional Rule 30(b)(6) representative of Cross Country Bank (CCB) (to answer questions CCB's initial Rule 30(b)(6) representative Edward McKenna could not); that if the present record would somehow not be sufficient for Plaintiff to survive Defendant's Supplemental Motion for Summary Judgment, then Plaintiff seeks a continuance of Defendants' motion pursuant to Fed. R. Civ. P. 56(f), for the specific and limited purpose of taking such deposition of CCB/ACS during or near the week of April 4, 2005.

FURTHER YOUR AFFIANT SAYETH NOT.

s/John H. Goolsby
John H. Goolsby

Subscribed and sworn before me
this 31st day of March, 2005.

s/Sue Wolsfeld
Notary Public

1

1            IN THE UNITED STATES DISTRICT COURT
2             WESTERN DISTRICT OF WISCONSIN
              Court File No: 03-C 510C
3

PENNY LEE ANDERSON and    )
4  RUSSELL D. ANDERSON,     )
    SR.,                    )
5                      )
             Plaintiffs,   )
6                      )
         -vs-          )
7                      )
TRANS UNION, LLC;      )
8  EXPERIAN INFORMATION     )
    SOLUTIONS, INC.; CSC    )
9  CREDIT SERVICES, INC.    )
    And EQUIFAX, INC., d/b/a  )
10 EQUIFAX INFORMATION      )
    SERVICES, LLC.,        )
11                      )
           Defendants.   )
12

13

14       The deposition of WILLIAM STOCKDALE,

15  called by the Plaintiff for examination, taken

16  pursuant to the Federal Rules of Civil Procedure of

17  the United States District Courts pertaining to the

18  taking of depositions before MAUREEN A. WOODMAN, a

19  notary public within and for the County of Cook and

20  State of Illinois, Chicago Hilton O'Hare Hotel,

21  Chicago, Illinois, on the 22nd day of March, 2005, at

22  the hour of 1:00 o'clock p.m.

23

24

25

COPY

William Stockdale

**Page 2**

```
1   PRESENT:
2     CONSUMER JUSTICE CENTER P.A.
      BY:  MR. JOHN GOOLSBY
3       342 East County Road D
        Little Canada, MN  55117,
4
          on behalf of the Plaintiffs;
5
    KATZ & KORIN, P.C.
6     BY:  MR. GUERINO JOHN CENTO
      The Emelie Building
7     334 North Senate Ave.
      Indianapolis, IN  46204,
8
          on behalf of the Defendants.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
              I N D E X
   WITNESS                      PAGE
   WILLIAM STOCKDALE
     Examination by Mr. Goolsby ......... 4-78


          - - - - - - - - - - - - - - - - -


             E X H I B I T S
   DEPOSITION EXHIBIT            PAGE
     1 ................................. 4
     2 ................................. 40
     3 ................................. 67
```

**Page 4**

```
1              (Witness was duly sworn.)
2             WILLIAM STOCKDALE,
3    called as a witness herein, after having been first
4    duly sworn, was examined and testified as follows:
5              EXAMINATION
6    BY MR. GOOLSBY:
7      Q.  Mr. Stockdale, as you know, I am John
8    Goolsby, and I represent the plaintiff in this
9    matter, which is Anderson versus Trans Union and
10   others.
11           I'm going to skip some of formalities
12   because I know you've had your deposition taken
13   before.  And as Mr. Cento said, we have a two-hour
14   time limit today.
15           I will ask you, is there any reason
16   that you can't give complete and truthful answers
17   today?
18     A.  No.
19     MR. GOOLSBY:  I want to have marked as Exhibit
20   1, please.
21              (WHEREUPON, said document was
22              marked as Stockdale Deposition
23              Exhibit No. 1 for
24              Identification.)
25   BY MR. GOOLSBY:
```

**Page 5**

```
1      Q.  Mr. Stockdale, Exhibit 1 is an affidavit
2    that you have given this matter, correct?
3      A.  Yes.
4      Q.  And I want to turn your attention to
5    paragraph six first, please.  And that says, "Trans
6    Union's experience with CCB is that CCB is a reliable
7    source of credit information and is unlikely to
8    report inaccurate information, except in isolated
9    instances."  Did I read that correctly?
10     A.  Yes.
11     Q.  And is that a true statement?
12     A.  Yes.
13     Q.  Before an information furnisher such as CCB
14   becomes a subscriber of Trans Union, does Trans Union
15   do a site inspection?
16     A.  Yes.
17     Q.  So Trans Union did a site inspection of CCB
18   before CCB became a subscriber?
19     A.  Yes.
20     Q.  And where was that inspection done?
21     A.  I am not aware.  That is not part of my
22   business unit.
23     Q.  How do you know that it was done?
24     A.  Because they have to provide my department
25   with paperwork that shows that they have done all of
```

William Stockdale

6

1  the due diligence to make sure that this is a
2  creditworthy financial institution.
3      Q.  Did you look at that paperwork before you
4  completed your affidavit?
5      A.  No.
6      Q.  And did you do a site inspection of Applied
7  Card Systems, I don't mean you personally, Trans
8  Union?
9      A.  Yes, they would be -- they would go through
10  the same process, yes.
11      Q.  So are CCB and ACS both subscribers to Trans
12  Union?
13      A.  I know both of those -- I know that they are
14  affiliated with each other.  I don't know of the
15  details behind the affiliation.
16      Q.  And you don't know where the site was that
17  you inspected for ACS either?
18      A.  I know the requirement to furnish data is
19  that they have to go through a due diligence process.
20  So I don't know -- right now I don't know where those
21  processes were held.
22      Q.  Part of that due diligence process is an
23  inspection of the site of the company that's hoping
24  to become a subscriber of Trans Union; is that
25  correct?

7

1      A.  Part of the procedure is that there has to
2  be a site visit, yes.
3      Q.  And what does Trans Union look for on those
4  site visits?
5      A.  Again that is --
6      MR. CENTO:  Objection, lack of foundation.  You
7  can answer.
8      THE WITNESS:  Again, that is outside of my area
9  of responsibility.
10      I know it's a compliance policy that we
11  have.
12      My portion of the responsibility is to
13  make sure that I receive the appropriate paperwork
14  that that process has been done.
15      I don't know of all of the procedures
16  that are done within the process.
17  BY MR. GOOLSBY:
18      Q.  So you testified in your affidavit that it
19  was your experience that CCB is a reliable source.
20  You made that testimony without knowing what happens
21  in the site inspections; is that correct?
22      MR. CENTO:  Objection, mischaracterizes the
23  witness' testimony.
24      THE WITNESS:  No, not correct.
25  BY MR. GOOLSBY:

8

1      Q.  So what happens in the site inspections?
2      A.  I don't know the detail that goes behind the
3  inspections.  I know that the process has to be
4  handled by Trans Union.  That our compliance
5  department handles the process.  And it's my
6  accountability to make sure that we got the
7  appropriate paperwork that the process has been
8  performed that illustrates that it is a reliable
9  process, as well as all of the information that is
10  sent to my group that verifies the data that is sent
11  from that subscriber.
12      Q.  Did you bring any documentation with you
13  today?
14      A.  No.
15      Q.  Has any furnisher or potential furnisher
16  ever been deemed unreliable on the basis of a site
17  inspection?
18      A.  I don't know.
19      Q.  In paragraph four of your affidavit you
20  testified that Trans Union collects information from
21  more than 85,000 furnishers.  What are you basing
22  that on?
23      A.  The number of subscribers that report data
24  to Trans Union.
25      Q.  And is that as of the date of your

9

1  affidavit?
2      A.  Yes.
3      Q.  And has it been approximately 85,000 since
4  1999?
5      A.  Yes.
6      Q.  Trans Union has contracts with its
7  subscribers; is that correct?
8      A.  Yes.
9      Q.  And does an entity have to be a subscriber
10  to be a furnisher of information to Trans Union?
11      A.  No.
12      Q.  So an entity might furnish information
13  without having a subscriber contract; is that
14  correct?
15      A.  Yes.
16      Q.  But it's your testimony that both CCB and
17  ACS are subscribers; is that correct?
18      A.  Yes.
19      Q.  I asked you if you did a site inspection.
20  Do you also inspect subscriber's or would-be
21  subscriber's policies and procedures manuals before
22  you allow them to be subscribers?
23      MR. CENTO:  Objection, lack of foundation.
24      THE WITNESS:  We would either distribute a
25  manual to a subscriber or make sure that they have

William Stockdale

10

1　access to a manual, which could have been provided
2　from a competitor or through an on-line service
3　through the CDIA.
4　BY MR. GOOLSBY:
5　　Q.　Okay．And the CDIA is?
6　　A.　It is the association for credit reporting
7　agency.
8　　Q.　What does CDIA stand for?
9　　A.　I believe it's consumer data -- I'm really
10　not sure．They just changed it a couple of years
11　ago．It was ACB, Associated Credit Bureaus, but I
12　don't know what the new acronym stands for unless I
13　saw the book.
14　　Q.　Does it stand for Credit Data Industry
15　Association?
16　　A.　Yes, that's it．Thank you.
17　　Q.　So getting back to my question, I believe
18　you testified that you or one of your -- by you I
19　mean Trans Union, Trans Union or one of your
20　competitors or the CDIA provides would-be subscribers
21　with procedural manuals．Did I understand that
22　correctly?
23　　A.　For subscribers that provide financial data
24　to Trans Union, they would have to have a manual to
25　create a format to send to Trans Union.

11

1　　　　The only way to receive a format is
2　either by requesting it through us, one of our
3　competitors, or through the CDIA on-line request
4　mechanism.
5　　Q.　I am not sure that exactly answered my
6　question．I just want to make sure I understand
7　correctly, that when somebody wants to become a
8　subscriber, a manual is provided to them by you, one
9　of your competitors or the CDIA; is that correct?
10　　MR. CENTO:　I am going to enter an objection.
11　I think we're confusing the meaning of two terms,
12　subscriber and furnisher and using them
13　interchangeably when I don't think they mean the same
14　thing.
15　　THE WITNESS:　When you referred to manual, I
16　thought you were referring to the manual that is sent
17　to subscribers to provide data.
18　　　　If you could rephrase your question
19　about what type of manual.
20　BY MR. GOOLSBY:
21　　Q.　Well, I guess that gets back to my original
22　question.
23　　　　I understand that there is a -- some
24　sort of manual that you, your competitors or the CDIA
25　provides to information furnishers.

12

1　　MR. CENTO:　Objection, vague with respect to
2　what kind of manuals we're talking about.
3　BY MR. GOOLSBY:
4　　Q.　Is it correct that some sort of instruction
5　manual is provided?
6　　A.　There is a --
7　　MR. CENTO:　Same objection.
8　　THE WITNESS:　There is a credit reporting
9　guide．It is known as the Metro II is the manual
10　that I was referring to.
11　BY MR. GOOLSBY:
12　　Q.　Okay．And that's provided by Trans Union,
13　one of its competitors or the CDIA to information
14　furnishers; is that correct?
15　　A.　Correct.
16　　Q.　Actually my original question was actually
17　about a different kind of manual．And what I am
18　asking about is a furnisher's internal policies and
19　procedures manuals.
20　　　　My question is specifically does Trans
21　Union ever inspect an information -- furnisher's
22　internal policy and procedures manuals?
23　　A.　Again, that is outside of my area of
24　responsibility．I don't know the answer to that
25　question.

13

1　　Q.　But you testified that in paragraph six of
2　your affidavit that CCB is a reliable source without
3　knowing the answer to that question; is that right?
4　　A.　Yes.
5　　Q.　So if a furnisher is incorrectly instructing
6　its employees in its own internal procedures manuals,
7　you don't have any information about how Trans Union
8　would become aware of that?
9　　MR. CENTO:　Objection, incomplete hypothetical,
10　calls for speculation, lack of foundation．Answer if
11　you can.
12　　THE WITNESS:　I audit the information that I
13　receive from the customer．So when we receive data
14　for the first time with a customer, the first thing
15　we do is process their input, and we look at the
16　output, and then we respond back to the customer to
17　make sure that we're processing the data correctly.
18　So if there was a procedural mistake internally, then
19　it should be detected there by the data furnisher.
20　BY MR. GOOLSBY:
21　　Q.　And by customer you mean a subscriber?
22　　A.　Yes, subscriber.
23　　Q.　Now is a furnisher also a customer?
24　　A.　Most of the time a furnisher is the
25　customer, most of the time.

4 (Pages 10 to 13)

William Stockdale

14

1    Q.  Are all subscribers furnishers?
2    A.  No.
3    Q.  How would a subscriber not be a furnisher?
4    A.  There are subscribers that do not furnish
5    information.
6    Q.  So subscribers are entities that obtain
7    information from Trans Union; is that correct?
8    A.  Correct.
9    Q.  And a furnisher is an entity that supplies
10   information to Trans Union for Trans Union to share
11   with all of its subscribers?
12   A.  A furnisher provides data to place on to
13   consumer credit reports.
14   Q.  So there is a lot of overlap between
15   furnishers and subscribers?
16   A.  Yes.
17   Q.  But there are some entities that are
18   subscribers and not furnishers, right?
19   A.  Correct.
20   Q.  And some entities that may be furnishers and
21   not be subscribers?
22   A.  Correct.
23   Q.  But CCB and ACS are both furnishers and
24   subscribers?
25   A.  Yes.  I would like to double check.  I'm

15

1    sorry.  CCB is definitely a subscriber.
2         Applied I know there is a relationship.
3    I don't know if there's -- I don't know about the
4    agreement if there is an agreement.  If they are
5    providing me data, then, yes, they would be a
6    subscriber.
7    BY MR. GOOLSBY:
8    Q.  When you say Applied, Applied Card Systems?
9    A.  Thank you.  Sorry.
10   Q.  In your affidavit you didn't testify that
11   Applied Card Systems was a reliable source, did you?
12   A.  No.
13   Q.  Are they?
14   A.  I believe so, but I would like to double
15   check that.
16   Q.  So you didn't know when you signed your
17   affidavit whether Applied Card Systems was a reliable
18   source or not, right?
19   A.  Yes, I did not research Applied.  Like I
20   said earlier, we have 85,000 customers.
21   Q.  By customer you mean subscriber; is that
22   right?
23   A.  Yes, I refer to them as customers.
24   Q.  We talked about site inspections.  We talked
25   about inspections of furnishers, internal policy

16

1    manuals.  How about inspections of furnishers'
2    internal computer programs that they use, does Trans
3    Union ever inspect a furnisher's internal computer
4    programs?
5    A.  No.
6    Q.  Does Trans Union ever check to see if the
7    information a furnisher is reporting can be
8    independently verified?
9    MR. CENTO:  Object to the form.
10   THE WITNESS:  I don't understand the question.
11   BY MR. GOOLSBY:
12   Q.  Well, maybe I can illustrate my question to
13   you with an example.
14        For example, some furnishers will
15   report a trade line as included in bankruptcy, right?
16   A.  Yes.
17   Q.  And a bankruptcy is something that would be
18   reflected in public records, right?
19   A.  Yes.
20   Q.  So my question is, does Trans Union ever
21   check to see if when a furnisher is reporting a trade
22   line as included in bankruptcy, if, in fact, there is
23   an associated bankruptcy in the public records?
24   A.  No.
25   Q.  And you are aware in this case that the

17

1    plaintiffs' claim is that they were falsely reported
2    as deceased on their Trans Union credit report,
3    right?
4    A.  Yes.
5    Q.  Let me ask you the same question for
6    deceased as I did for bankruptcy.
7         If a furnisher is reporting a consumer
8    as deceased, does Trans Union ever independently
9    verify whether that deceased notation is accurate?
10   A.  That's not the same question.
11   Q.  Okay.  Well then it's a new question.
12   A.  Trans Union audits at an aggregate level the
13   data coming in from a customer.  So we would give --
14   we would show the customer/subscriber, we would show
15   them here is a trade line that you are giving me as a
16   deceased, just like we would show them several
17   examples of every different type of condition that
18   they provided data to us from.  And they would then
19   sign off on it being accurate or not accurate when
20   they first become a subscriber for Trans Union.
21        We do that type of work to make sure
22   that the data that they are providing is accurate and
23   that they have given us -- they have confirmed that
24   it is, because they have the relationship with the
25   consumer.  And we want to make sure that they are

18

1  processing the data accurately.  So they confirm
2  that.  They're going forward.  We then trend out the
3  information --
4      Q.  Okay.  If you weren't finished, go ahead.
5      A.  And if from there going forward as the data
6  is in production, if it exceeds any limits, again at
7  the aggregate level, not at a granular level, not one
8  specific consumer level, because it would be
9  systemically impossible to be able to verify every
10  single trade line.  We receive over 2 billion trade
11  lines a month at times.  So it would be humanly
12  impossible to verify every single trade line.  But
13  that's how we would do the audit check and the
14  verification check that a subscriber/customer's
15  reporting data accurately.
16      Q.  I want to ask you about a couple of terms
17  you used there.  You talked about doing an audit
18  check in the aggregate; is that correct?
19      A.  Correct.
20      Q.  And by that do I understand correctly that
21  you do a sampling of a customer's reporting?
22      A.  Sampling of every type of condition, yes.
23      Q.  But you don't look at every single account
24  that a customer has reported in a given way, you do a
25  sampling?

19

1      A.  Humanly impossible.  You are referring to
2  millions and millions of accounts.
3      Q.  So, you pull a -- strike that.
4          Let me ask you this.  When you do a
5  sample, how large is the sample?
6      A.  It depends on the condition that we're
7  looking for and the presence of the condition.  But
8  we usually try to locate a minimum of five examples
9  per condition.
10      Q.  And deceased would be a condition?
11      A.  Yes.
12      Q.  So if an entity is reporting some trade
13  lines as deceased, Trans Union will look at a minimum
14  of five of those; is that correct?
15      A.  Yes.
16      Q.  Paragraph 18 of your affidavit you testify,
17  "At the present time Trans Union maintains more than
18  5 million trade lines which are reporting a deceased
19  code."  Did I read that correctly?
20      A.  Yes.
21      Q.  And is that true?
22      A.  Yes.
23      Q.  I am not going to ask you to do the math
24  here, but if we wanted to figure out the average
25  number of trade lines that a given furnisher is

20

1  reporting as deceased, would it be a fair
2  approximation to divide 5 million trade lines by
3  85,000 furnishers?
4      A.  It would require more research than that,
5  because not all providers may provide deceased
6  information.
7      Q.  Can you tell me of those furnishers that
8  provide deceased information, approximately what on
9  average is the number of trade lines that are
10  reported as deceased?
11      A.  No, I'd have to research that.
12      Q.  Can you give me any approximation?
13      A.  How much per subscriber -- how many report
14  deceased information?
15      Q.  Yes.
16      A.  I don't know that off the top of my head.
17      Q.  Is it more than -- likely to be more than
18  10,000?
19      MR. CENTO:  Objection, asked and answered.
20  Lack of foundation.
21      THE WITNESS:  I don't know.
22  BY MR. GOOLSBY:
23      Q.  But it is your testimony that you sample a
24  minimum of five?
25      A.  For every condition for an audit we try to

21

1  find a minimum of five -- five -- five examples of
2  that condition, whether it's deceased, whether it's
3  -- we're talking profit and loss, purchase by another
4  lender.  There's a variety of information that's sent
5  into that field, so we try to find a minimum of five
6  examples of each condition.
7      Q.  Okay.  What's the maximum?
8      A.  1500.
9      Q.  How do you decide whether to do five or 1500
10  or somewhere in between?
11      A.  Just working with subscribers that a
12  reasonable statistic to be able to prove that the
13  program's working correctly and they are providing
14  the information accurately.
15      Q.  So what criteria do you use for a given
16  subscriber to determine if you're going to sample
17  five or 1500?
18      A.  I'm sorry.  There's already programs in
19  place, auditing programs, so we receive their
20  information and then that program runs against the
21  data and starts searching for it.
22      Q.  So a computer program decides if it is going
23  to be a sample of five or a sample of 1500 or
24  somewhere in between?
25      A.  It will go up to 1500.  We look for a

William Stockdale

**22**

1  minimum of five. If we don't find a minimum of five,
2  then we actually do some additional manual checks for
3  -- to see if, in fact, we just missed it within the
4  program. So it will go up -- up to 1500 examples of
5  that condition.
6  Q.  I guess I am still not clear. You say a
7  minimum of five and maximum of 1500. And I am trying
8  to figure out how many --
9  A.  Can we take a break?
10  MR. GOOLSBY:  Sure.
11  (Recess.)
12  BY MR. GOOLSBY:
13  Q.  Back on the record.
14  Mr. Stockdale, we were talking about
15  the samples that Trans Union looks at when it does an
16  audit check. Do I have that term correct?
17  A.  Yes.
18  Q.  And I was trying to determine for a given
19  furnisher how many samples Trans Union looks at, and
20  you said it's a minimum of five?
21  A.  It can be a maximum of 1500.
22  Q.  And a maximum of 1500. Do I understand
23  correctly that if a given furnisher is reporting
24  fewer than 1500, that Trans Union will look at all of
25  them?

**23**

1  A.  They would find all of them, yes.
2  Q.  And then all of them would be part of the
3  sample that Trans Union assesses?
4  A.  Yes.
5  Q.  And if an entity is reporting more than 1500
6  trade lines with deceased, Trans Union will look at
7  1500; is that right?
8  A.  Yes.
9  Q.  So when you say a minimum of five, that
10  would happen if a furnisher was only reporting five
11  trade lines as deceased; do I understand that
12  correctly?
13  A.  The program would look for a minimum of
14  five. If it didn't locate a minimum of five, it
15  would raise a flag to us to say I could only find
16  this condition less than five times.
17  So we would then take the audit to a
18  different route in the procedure of handling that
19  audit to see if, in fact, this is applicable to that
20  subscriber. Because many times the condition itself
21  is not applicable. For instance deceased, some
22  providers may say I don't provide deceased so that's
23  okay.
24  Q.  So if it's zero, one, two, three or four,
25  you don't use the automatic sampling model; is that

**24**

1  correct?
2  A.  Correct. We use it to -- where it raises a
3  flag to say we need to take a look at this condition
4  because we don't see it on our audit.
5  Q.  Okay. I don't mean to beat a dead horse
6  here, but I do want to understand how your
7  statistical sampling is in any given case.
8  So then if a furnisher is reporting
9  anywhere from five to 1500 trade lines with a
10  deceased notation, Trans Union will look at all of
11  them; is that correct?
12  A.  It would show us, yes.
13  Q.  If a furnisher is reporting any more than
14  1500 trade lines, Trans Union will look at the first
15  1500 that the system finds; is that correct?
16  A.  Correct. Perfect condition.
17  Q.  Perfect condition. And is that a random
18  sampling?
19  A.  Yes.
20  Q.  And that process we've just described
21  happens when Trans Union does an audit check of a
22  furnisher; is that right?
23  A.  It happens when that furnisher first
24  provides data to Trans Union, that they actually want
25  to be a data provider to Trans Union. So that

**25**

1  process happens initially.
2  Q.  Does it ever happen again?
3  A.  We do audit customers. Our goal is to audit
4  them on an annual basis. Sometimes it may take
5  longer because it's a partnership and they're very
6  intense, and they take a long time to do and we have
7  to plan them out. It can take up to three months to
8  do an audit of a portfolio.
9  Q.  When was the last time you audited Cross
10  Country Bank?
11  A.  I don't know.
12  Q.  When was the last time you audited ACS?
13  A.  I don't know.
14  Q.  Have you ever done an audit check on CCB
15  since it -- since the time when it first became a
16  subscriber?
17  A.  They've been around a long time, so I don't
18  know when it was, but I would say that yes, we've
19  done an audit since they have been a provider.
20  Q.  Do you know that or are you just assuming
21  that?
22  A.  I'm assuming that based on how long they've
23  been providing data to Trans Union.
24  Q.  Did you review the records of any audit
25  check on CCB before you signed your affidavit?

William Stockdale

26

1    A. No.
2    Q. Did you review the records of any audit
3  check on ACS before you signed your affidavit?
4    A. No.
5    Q. So you don't know how big the sample was for
6  -- strike that.
7        It is your testimony, if I understand
8  correctly, that you do one of these audit checks for
9  each subscriber when they first sign on; is that
10 right?
11   A. Yes.
12   Q. Or maybe to be a little bit more precise,
13 the first time they report a given condition; is that
14 right?
15   A. Correct.
16   Q. You don't know when the first time Cross
17 Country Bank reported deceased on any trade line was,
18 do you?
19   A. No.
20   Q. But you do know they have reported deceased
21 on trade lines, obviously this case for example?
22   A. Yes.
23   Q. Is it your testimony that according to Trans
24 Union's policy, there would have at some point been
25 at least one audit check done on CCB?

27

1    A. Yes.
2    Q. But you don't know in that audit check how
3  big a sample of deceased notations Trans Union looked
4  at?
5    A. I personally did not do that audit, yes,
6  correct.
7    Q. Now let me get back to exactly what happens
8  in this audit check for a given condition, for
9  example deceased. Do I understand correctly that
10 what Trans Union does is it takes its sample, whether
11 it's five or 1500 or something in between, and then
12 goes to the furnisher and says does this match what
13 you thought you were reporting to us?
14   A. What we do is provide before and after
15 examples. So that it's at the detail level and then
16 at an aggregate level we actually count the
17 conditions. So we provide to say here are five
18 examples of your customers, consumers that you sent
19 us, for example, deceased indicator, here are five
20 examples of where you sent a deceased indicator.
21 Have we read your information accurately and
22 translated it to a Trans Union trade line correctly?
23 That's what we do with that audit.
24   Q. You talked about before and after. Let me
25 make sure I understand that. So say it's five

28

1  examples for a given furnisher. You take those five
2  examples to the furnisher and let's say for the first
3  example started reporting deceased on January 1st,
4  2000. Just made that date up. You would look before
5  and after and say, hey, furnisher, we show that you
6  weren't reporting this deceased before January 1st,
7  2000, and that you were reporting deceased after
8  January 1st, 2000. Is that what you show -- do I
9  understand the before and after correctly?
10   A. No. Before and after the before is the
11 record that they sent us, the actual trade line of
12 the consumer.
13        So if the condition that we were
14 auditing was the remarks code field and in the
15 remarks code field we would have deceased indicators,
16 so if -- so this would give me -- they would give me
17 an indicator of deceased and their input record. I
18 would find five conditions of those input records
19 with an indicator of deceased, and I would show them
20 that I translated it to the Trans Union credit report
21 as deceased within the remarks code field. So the
22 before is the record that they gave me, the after is
23 the way I show the record on a credit report.
24   Q. Okay. So what you're doing is you're making
25 sure that you're accurately putting out on the credit

29

1  reports what they told you to put on there; is that
2  correct?
3    A. That's correct. As well as the number of
4  how many times we've experienced that condition. So,
5  for instance, I would say that we received 500
6  deceased in your entire portfolio that you sent me
7  and here are five examples of that condition.
8    Q. So your audit check is actually checking to
9  see if you're doing what you're supposed to, right?
10   A. My audit check is making sure we are both
11 doing what we are supposed to.
12   Q. I guess I don't understand that. Let me see
13 if I can get you to clarify your testimony, because I
14 am confused here.
15        I understood you to say when you do an
16 audit check you look at how they were reporting
17 something to you, and then you check to see if that
18 matches how you subsequently put it on their file; is
19 that correct?
20   A. Correct.
21   Q. And if the before and after match, then for
22 that sample it passes the check; is that right?
23   A. They would come back and confirm that, yes,
24 that person is deceased. If that person wasn't
25 deceased, they would come back and say, well, I gave

William Stockdale

30

1  the wrong code for that condition, we need to rectify
2  it.
3      Q.  Okay.  So you take to them what you think
4  they reported to you or what you show that they
5  reported to you, and you take to them what you then
6  thereafter put on their file, on the consumer's file;
7  is that right?
8      A.  Yes.
9      Q.  And then you go to the furnisher and you say
10 here's what we did based on what you sent us, is this
11 what you intended?
12     A.  Is this correct.
13     Q.  And by correct you mean you ask them if
14 that's what their records show?
15     A.  If we were checking for the deceased
16 indicator, we would send those examples back to the
17 data provider, the data furnisher, and we would say
18 here are the five examples that you've given me that
19 showed an indicator of deceased.  Is, in fact, this
20 consumer deceased?
21         That's what the procedure would be.
22 And if it wasn't they would correct it.
23     Q.  Let me ask you this.  If a furnisher is
24 wrong about something -- strike that.
25         Let me first ask a preliminary

31

1  question.  Is it your experience that sometimes
2  furnishers have incorrect information?
3      A.  They strive for perfection but they are not
4  perfect.
5      Q.  So sometimes furnishers have incorrect
6  information, right?
7      A.  Yes.
8      Q.  So if a furnisher reports to you that this
9  consumer is deceased, and then you apply that to that
10 consumer's file at Trans Union, and then you go back
11 to the furnisher when you do your audit check and you
12 say we show that this consumer was reported by you as
13 deceased and we put in our file as deceased, and then
14 the furnisher says, yes, our records show that person
15 is deceased, that would pass the audit check, right?
16     A.  Yes.
17     Q.  And that would pass the audit check even if
18 that person really wasn't deceased, right?
19     A.  Yes.
20     Q.  So, in other words, what you're checking of
21 the furnisher is whether they are consistent, right?
22     A.  Wrong.
23     Q.  Explain your answer, please.
24     MR. CENTO:  Objection.  Vague.  Answer if you
25 can.

32

1      THE WITNESS:  Trans Union and the furnisher are
2  at that point going through an accuracy audit.  So
3  we're working with the data provider to make sure
4  that they were providing the data accurately.
5         Consistency is a very important part
6  because consistency plays a big role in the area of
7  accuracy.
8         But we also are utilizing that data to
9  verify the accuracy of it, that someone is actually
10 paid as agreed, because that's what you gave me.
11         Somebody's date of birth is the actual
12 date of birth because that's when the person was
13 born.  Somebody is deceased because they received a
14 death certificate that showed that the person was
15 deceased.
16         That's the intention of on -- and
17 that's what the process is when we are performing an
18 audit.
19 BY MR. GOOLSBY:
20     Q.  But you rely on the furnisher to tell you
21 whether the person really is deceased, right?
22     A.  Yes.
23     Q.  So if the furnisher was wrong from day one
24 and continued to be wrong about the person's deceased
25 status but consistently told you yes that person is

33

1  deceased, your audit check wouldn't catch that, would
2  it?
3      A.  Just one specific consumer?
4      Q.  Well, one of the consumers that's in your
5  sampling of five to 1500, however many it is.
6      A.  Yes.
7      Q.  Yes, what I said was correct?  Just so the
8  record is clear.
9      A.  Yes.  If one consumer came in and it came in
10 as deceased, and we were provided that information
11 back to the provider and said that you said this
12 consumer is deceased, we would -- we would output
13 deceased into the remarks code field.
14     Q.  I am not sure that answered my question.  I
15 don't want to belabor the point, but I want to make
16 sure the record is clear as to your answer.
17         If the furnisher incorrectly says
18 someone is deceased when they first report it to you
19 and then you do your audit check and they still say
20 yes this person is deceased, your audit check is
21 never going to discover that that's in error, right?
22     A.  Yes, correct.
23     Q.  Now in one of your previous answers you
24 talked -- you used the term trend out, I think you
25 said trend out data.  What does that mean?

9 (Pages 30 to 33)

CIVIL ACTION GROUP 763-576-8832

34

1    A.   After we perform the audit and that Trans
2   Union -- Trans Union has approved working with the
3   customer that the information is reliable, from that
4   point going forward we now will trend the information
5   that they send us and we monitor -- we monitor the
6   conditions that I spoke of earlier. We monitor those
7   conditions and every single month that we receive
8   data from that provider we set thresholds.
9         So for an example, if a customer would
10  normally send me a hundred consumers as charged off
11  and the final month we receive 200 consumers, we
12  would raise a flag with that submission, with that
13  data that was provided and make sure that there
14  wasn't any program or system error at their end,
15  because it would hit a threshold. So that's why we
16  trend the data.
17    Q.   So I think you testified about this in
18  previous cases. I was not familiar with the term
19  trend out, but that's what you mean by that, is if
20  there is a sudden jump in the number of trade lines
21  that a furnisher is reporting as deceased, for
22  example, that will raise a flag with Trans Union; is
23  that what you mean by trending out data?
24    A.   Correct.
25    Q.   I want to go back to one of my previous

35

1   questions that you may have answered, but I don't
2   recall exactly what your answer was.
3         We talked about you don't independently
4   verify including bankruptcies against the public
5   records I believe you said; is that correct?
6     A.   I believe the question -- if I can repeat
7   your question to make sure I understand it. I
8   believe your question was if a trade line comes in
9   with an indicator of bankruptcy, would we look to see
10  if there was a public record on the file of
11  bankruptcy before we placed that trade line with the
12  indicator bankruptcy on it.
13    Q.   Well, let me refine my question a little bit
14  then. I don't mean on the granular level, I mean on
15  the aggregate level when you're doing an audit check,
16  does that become part of your audit check process
17  comparing a sampling of trade lines reporting as
18  bankruptcy to the public records?
19    MR. CENTO:   Objection, vague with respect to
20  public -- the public reports section of the report or
21  the public record itself?
22    MR. GOOLSBY:   That's a fair clarification.
23  BY MR. GOOLSBY:
24    Q.   You mean the public record itself?
25    A.   When we're auditing the data, we haven't

36

1   placed the information on the consumer's credit
2   report, we're just translating the information from a
3   -- from a data provider to a Trans Union -- to a
4   Trans Union record. We're not doing any comparisons
5   of that record to any other trade line within the
6   file itself.
7     Q.   Okay. And I think maybe you've -- I've
8   confused you in the way your attorney anticipated.
9         I am not asking if you are comparing to
10  other information in that consumer's file. I am
11  asking if when you do an audit check on a given
12  condition, for example bankruptcy, if those -- that
13  sample of five to 1500 that you are looking at that a
14  given furnisher has reported as bankruptcy, if you
15  compare that to the actual public records that would
16  independently verify whether, in fact, there is a
17  bankruptcy?
18    A.   I think I understood your question
19  correctly. I think I answered it correctly. The
20  public record would be on the credit report itself.
21  I don't compare anything that I am receiving from the
22  data provider to any trade lines, including public
23  records. I don't compare any other trade lines with
24  the trade line that I am receiving from the new
25  customer, from the new subscriber.

37

1     Q.   Even when you are doing an audit check, just
2   so I make sure --
3     A.   Even when it is a first-time provider, yes.
4     Q.   So then the following question is with
5   respect to deceased. When you do an audit check, do
6   you compare those five to 1500 samples that you are
7   looking at that have a trade line with deceased
8   remark, do you compare that to anything to see if any
9   other source verifies that deceased?
10    MR. CENTO:   Objection, vague and ambiguous with
11  respect to the term you. Does who, Trans Union or
12  the furnisher?
13  BY MR. GOOLSBY:
14    Q.   When I say you, I mean Trans Union.
15    A.   The answer is the same as it was before.
16  When we receive the data, we're verifying the
17  reliability of the information with the data provider
18  and Trans Union's accuracy and processing with that
19  record, we're not comparing that record to other
20  records within the credit report.
21    Q.   So you're comparing it with information
22  provided from the same entity that you're monitoring
23  to see if they're reliable?
24    A.   Yes.
25    Q.   Do you keep a tally by a furnisher of how

William Stockdale

38

1  many disputes Trans Union receives from consumers?
2      A.  We do.  That is outside my area.  That's
3  handled by consumer relations group.
4      Q.  When you signed your affidavit, you didn't
5  know how many consumers had made disputes with Cross
6  Country Bank over any given period of time; is that
7  right?
8      A.  Right.  I would only know that if it was an
9  excessive amount, then consumer relations may call me
10  to have me check the data being sent by CCB.
11      Q.  They may call you or they will?
12      A.  They will call me.
13      Q.  What's an excessive amount?
14      A.  Again, that's outside of my area.  They
15  monitor the score card.  I don't know the percent
16  that they would determine this appears to be a data
17  reporting issue, not a granular consumer issue --
18  consumer issue at the granular level.
19      Q.  You don't know how many disputes from
20  consumers it would take before the number of disputes
21  was brought to your attention; is that correct?
22      A.  Correct.
23      Q.  Do you keep a tally of how many times a
24  furnisher says we reported wrong information to you?
25      A.  No.  You're asking do I receive information

39

1  from furnisher where they send me a report of how
2  often they report inaccurate data to me?
3      Q.  Well, I would say that that would be one way
4  that a furnisher could report inaccurate -- that it
5  was providing inaccurate information to you.  That's
6  part of my question, yes.
7      A.  If Trans Union knowingly is aware that a
8  data provider is reporting data inaccurately, we
9  would immediately take action on that data, meaning
10  that we would remove it from the file until it was --
11  became accurate.
12      Q.  Were you finished?
13      A.  Go ahead.
14      Q.  You know what an ACDV is?
15      A.  Yes.
16      Q.  When a furnisher responds to an ACDV and
17  they want to make a change to the trade line, they're
18  supposed to indicate change data as shown?
19      MR. CENTO:  Objection.  This is beyond the
20  scope of what you're allowed to ask him about in this
21  deposition.  I will instruct him not to answer.
22      BY MR. GOOLSBY:
23      Q.  Well, Mr. Stockdale, do you know the answer
24  to that question?
25      MR. CENTO:  Same objection, same instruction.

40

1      MR. GOOLSBY:  I want to mark this as Exhibit
2  No. 2.
3              (WHEREUPON, said document was
4              marked as Stockdale Deposition
5              Exhibit No. 2 for
6              Identification.)
7  BY MR. GOOLSBY:
8      Q.  Mr. Stockdale, have you seen this document
9  before?
10      A.  I don't think I did.  I may have.  I don't
11  think I did.
12      Q.  I won't make you take the time to read it,
13  but I will represent to you there are no specific
14  topics listed on this deposition notice.  And I am
15  asking you if you have personal knowledge of when a
16  furnisher responds to an ACDV if they're supposed to
17  check data shown if they want changes to be made?
18      MR. CENTO:  Same objection, same instruction,
19  don't answer.
20      MR. GOOLSBY:  I --
21      MR. CENTO:  Do you want to go off the record
22  and talk about it or put it on the record if you
23  want.
24      MR. GOOLSBY:  Why don't you put it on the
25  record.

41

1      MR. CENTO:  Okay.  Your motion, the motion that
2  was granted that you filed that allows you to take
3  this deposition, asked for permission to take
4  Mr. Stockdale's deposition for the purpose of
5  cross-examining him on this affidavit.
6              Anything outside the scope of that is
7  beyond the scope of the order is our position.
8  BY MR. GOOLSBY:
9      Q.  Let me ask you a preliminary question,
10  Mr. Stockdale.
11              In paragraph six of your affidavit when
12  you testified that CCB is a reliable source, did you
13  mean that they are reliable in the first instance
14  only when they report information to you, or did you
15  also mean that they are reliable when they respond to
16  disputes that you send to them?
17      A.  When I use the term reliable, I'm using the
18  term that they -- that they report data accurately to
19  Trans Union based on all the experiences and based on
20  the procedures and the quality control checks that I
21  have in place in my business unit.  I have no reason
22  to believe that they're unreliable.  I've never seen
23  any instance of it anywhere.
24      Q.  When you say all the information that's
25  available to you, does that include how CCB responds

11 (Pages 38 to 41)

William Stockdale

42

1  to disputes that you send to them?
2      A.   Yes.
3      Q.   And how -- what format does CCB use to
4  respond to disputes that you send them?
5      A.   Again, this is outside of my area of
6  responsibility, but I would believe they would use
7  the E-Oscar system.
8      Q.   Does that include ACDVs?
9      A.   ACDVs are reported in the E-Oscar system.
10      Q.   When you made your testimony in paragraph
11  six, were you testifying about areas outside the
12  scope of your responsibility at Trans Union?
13      A.   No, I was referring to the reporting of data
14  by CCB to Trans Union, the reporting of account
15  receivable information that they send us.
16      Q.   And did they send you account receivable
17  information in ACDVs?
18      A.   I would use that in the term of consumer
19  information, not AR data, though it's the same
20  information.
21      Q.   Do you know it to be the same information?
22      MR. CENTO:   Objection, vague.
23      THE WITNESS:   I know that both mechanisms are
24  talking about the trade line.   That they provide --
25  that they provide to us.

43

1  BY MR. GOOLSBY:
2      Q.   So does your paragraph six of your affidavit
3  apply to ACDVs when you said CCB is a reliable
4  source?
5      A.   No, it -- no.
6      Q.   You don't know whether CCB reliably responds
7  to ACDVs?
8      A.   That is outside of my area of
9  responsibility.
10      Q.   So you don't know whether CCB reliably
11  responds to ACDVs?
12      A.   Correct.
13      Q.   How long has -- I may have asked you this.
14  How long has CCB been a Trans Union subscriber?
15      A.   I don't know.
16      Q.   And you don't know how many disputes Trans
17  Union received from consumers on CCB accounts for any
18  given year; is that right?
19      A.   Correct.
20      Q.   Now you say you monitor trends.   Has there
21  ever been an instance where there was a sudden jump
22  or -- strike that.
23          Has there ever been an instance where
24  there was an issue with a trend in CCB's report that
25  would raise a flag for Trans Union?

44

1      A.   I don't know.   I personally don't have
2  responsibility -- I oversee that area but that's
3  handled by one of my analysts, so I am not sure if
4  they ever exceeded a threshold.
5      Q.   What's the consequence if a furnisher is
6  deemed unreliable?
7      A.   We would suppress their information, remove
8  it from the credit report until the information was
9  fixed.
10      Q.   When you say their information, are you
11  talking on the granular level or the aggregate?
12      A.   Either or.   If we knew that it was at the --
13  if we knew that it was at the granular, we could mask
14  that as well.   But in my area, 99.9 percent of the
15  time it's at the entire portfolio level, the
16  aggregate level.
17      Q.   How often does that happen?
18      A.   I don't have a number of how often that it
19  happens.   It doesn't happen very often.
20          Financial providers do a great job
21  because it is financial and the type of information
22  that we are dealing with, reliable information that
23  we receive, so it does happen but not very often.
24      Q.   Now subscribers pay for Trans Union
25  services; is that right?

45

1      A.   Yes.
2      Q.   If a furnisher who is also a subscriber is
3  one of those rare instances where they're found to be
4  unreliable and you suppress the information they are
5  furnishing, can they still be a subscriber?
6      A.   Potentially.
7      Q.   Let me make sure I understand correctly.
8  When a furnisher is found to have a problem at the
9  portfolio level, I believe you called it, and you
10  will suppress all the information that furnisher is
11  providing until you can be assured that the problems
12  have been resolved; is that correct?
13      A.   Yes.
14      Q.   What does the error rate have to be before
15  Trans Union will determine that there is a problem at
16  the portfolio level?
17      A.   Our thresholds are set.   It depends on the
18  condition three to five percent before that would --
19  before that would raise a flag that we would call the
20  customer for verification, the subscriber for
21  verification of why we exceeded that threshold.
22          At that time after talking with the
23  provider we would determine if this is something that
24  the provider can fix and we can rectify immediately
25  or if this is something that we need to suppress.

CIVIL ACTION GROUP 763-576-8832

46

1  Q.  When you say three to five percent, do you
2  mean if there is an error rate of more than three to
3  five percent you'll deem that there is a problem with
4  the entire portfolio?
5  A.  No, it's not an error rate, it's just an --
6  it's the condition itself.
7  So if normally a customer sends me 15
8  percent of their portfolio, 15 percent of their
9  portfolio is charged off, charged off the profit and
10  loss, and the next month they come in three percent
11  higher than the previous month, we would call the
12  customer to find out is this accurate, isn't it
13  accurate?  Did three percent of your customers or
14  consumers actually go to a charge-off status.  They
15  confirm that, then we would leave it alone.  If they
16  said no, we had a systemic problem, some type of
17  glitch, then we would say we are going to suppress
18  your portfolio information, you can rectify the
19  problem and then we will reaudit you to turn you back
20  on.
21  Q.  So again that's going back to what you
22  referred to as the trend analysis?
23  A.  Correct.
24  Q.  But a trend analysis wouldn't catch if they
25  were reporting the same trade lines wrong all along,

47

1  right?
2  A.  Correct.  If the original audit came in and
3  it was inaccurate right from the start, then it would
4  not be caught until a consumer, somebody disputed it
5  and consumer relations called and said that there was
6  a problem.
7  Q.  If the trend analysis or for that matter
8  anything else calls in to question a furnisher's
9  reliability, does Trans Union coach the furnisher to
10  make sure they're sending the information correctly?
11  A.  We don't need to coach the consumer.  They
12  have no reason not to report information
13  inaccurately.  They want to report accurately.  We
14  work with them to make sure that they are, in fact,
15  reporting accurately.  I wouldn't call it coaching, I
16  would call it partnering with the data furnishers.
17  Q.  Well, for example, if a data furnisher has
18  misunderstood something in the manual that Trans
19  Union or one of its competitors or CDIA provides to
20  the furnishers, will Trans Union explain to that
21  furnisher what the manual means?
22  MR. CENTO:  Objection, incomplete hypothetical,
23  calls for speculation.  Go ahead.
24  THE WITNESS:  Yes.  If there are anomalies
25  detected, we would definitely talk to the subscriber

48

1  and work through what the anomaly is and rectify it.
2  BY MR. GOOLSBY:
3  Q.  Does that ever happen?
4  A.  Yes.
5  Q.  After you have worked with the furnisher in
6  that manner, do you then subsequently check to make
7  sure that the furnisher got the message?
8  A.  First of all, we would know they got the
9  message because the data is coming in accurately.
10  Again this is a hypothetical.  I don't know of the
11  condition.
12  If we had an example -- you can give me
13  an example of what the situation is, it would be
14  easier for me to answer.
15  But yes we would -- there would be
16  confirmation that the problem was resolved.
17  Q.  You said it does happen sometimes that you
18  -- I think the word you used partner with the
19  furnisher to make sure they are understanding the
20  manual that is provided to them.
21  Have you ever had to have one of those
22  -- one of those partnering with CCB or ACS?
23  A.  I only recall one time with CCB that I
24  personally was involved.  I'm -- I have analysts that
25  work with their approval, that they may have been

49

1  involved in the situation.  I have personally been
2  involved in one.
3  Q.  That was related to this case?
4  A.  No.
5  Q.  What was that related to?
6  A.  Reporting of data and not following -- not
7  following -- inquiring about not following the
8  guideline, not following the industry standard
9  guideline.  They wanted to do an exception to the
10  guideline.
11  Q.  Can you be more specific what exception they
12  were asking for?
13  A.  They wanted to -- they wanted to cleanse
14  charge-off information from some of their consumers.
15  So they wanted to remove the history from some
16  consumers although it was accurate.
17  Q.  Why did they want to do that?
18  A.  Because they would work out a deal with the
19  consumer that if you start paying as agreed, I will
20  remove all of your history that showed that you
21  weren't paying as agreed.
22  Q.  Do I understand correctly that CCB wanted
23  Trans Union to report those trade lines in a way that
24  wasn't accurate?
25  A.  I don't believe they felt that it was an

William Stockdale

50

1  accurate issue.  It was more of a standard of
2  following the guideline, that they were inquiring
3  could we report information that way and we said they
4  couldn't.
5           You cannot change consumers from a
6  charge-off status to a paid-as-agreed status.
7      Q.  So CCB wanted to do something outside the
8  guidelines?
9      A.  Correct.
10     Q.  And you testified that you're only
11  personally aware of that one instance?
12     A.  That I was involved in with CCB.
13     Q.  You testified that some of your subordinates
14  may have been involved in other instances with CCB
15  that you don't know about?
16     A.  I don't have any personal knowledge of any
17  other issues.
18     Q.  How about with ACS?
19     A.  No.
20     Q.  Do you know what a rejection rate is?
21     A.  Yes.
22     Q.  What's a rejection rate?
23     A.  Would be the number of records that are
24  rejected and was not placed on a credit report.
25  That's how I view rejection rate.

51

1      Q.  When you say a number of records, do you use
2  the term records to refer to an entire trade line?
3      A.  Yes, records as trade lines.
4      Q.  So a rejection rate is the number of trade
5  lines for a given furnisher that aren't placed onto a
6  consumer's file?
7      A.  Yes.
8      Q.  As a percentage of the entire number of
9  trade lines reported by that furnisher?
10     A.  Yes.
11     Q.  Why would a trade line be rejected?
12     A.  For a variety of reasons.
13     Q.  Can you give me some examples?
14     A.  It's a commercial record, not a consumer
15  record.  We only process consumer records.  So we
16  would reject those.
17     Q.  Is anything ever rejected on the basis that
18  the information is inaccurate?
19     A.  Yes.
20     Q.  How does that come about?
21     A.  Again, a variety of different ways, reasons.
22     Q.  How does Trans Union -- let me see if I can
23  focus my question a little bit.  I thought I might
24  draw an objection from your attorney for vagueness on
25  that question.  Let me see if I can focus it a little

52

1  bit.
2      MR. CENTO:  Objection as to vague.
3  BY MR. GOOLSBY:
4      Q.  How does Trans Union know that a trade line
5  it rejects is -- strike that.
6           How does Trans Union know that a trade
7  line that it rejected should, in fact, be rejected,
8  whether the rejection is for inaccuracy?
9      A.  We have criteria that identifies inaccuracy
10  when we can detect it.
11     Q.  Is there any way to detect an inaccurate
12  deceased remark?
13     A.  No.
14     Q.  So is there ever a rejection for inaccuracy
15  on a trade line because it's reporting a deceased?
16     A.  A trade line with an indicator of deceased
17  could be rejected but it would never be rejected
18  based on an indicator of deceased.
19     Q.  It could be rejected for other reasons?
20     A.  Correct.
21     Q.  Because commercial trade line instead of a
22  consumer trade line?
23     A.  Correct.  Because it's a derogatory trade
24  line, you didn't give me first date of delinquency.
25     Q.  What's a score card?

53

1      A.  Score card are -- to me are -- in the
2  industry are two mechanisms, one is from our consumer
3  relation area.  Both are outside of my area of
4  responsibility.
5      Q.  One is the consumer relation area.  What's
6  the other kind of score card?
7      A.  And customers also maintain score cards.
8      Q.  So the consumer relation score cards, that's
9  Trans Union's consumer relations, right?
10     A.  Correct.
11     Q.  One kind of score card is generated by Trans
12  Union, right?
13     A.  Yes.
14     Q.  And the other kind of score card is
15  generated by customers?
16     A.  Subscribers, yes.
17     Q.  And what's on the score card that Trans
18  Union generates?
19     MR. CENTO:  Objection.  Beyond the scope of
20  this deposition.  Don't answer.  Also lack of
21  foundation.
22  BY MR. GOOLSBY:
23     Q.  Did you look at any score cards before you
24  signed your affidavit?
25     A.  No.

William Stockdale

54

1   Q.  Do I understand correctly that Trans Union
2 relies on the furnisher to tell Trans Union whether a
3 consumer is deceased; is that right?
4   A.  I don't agree with the way that that
5 question was stated to me.  Trans Union will place a
6 deceased indicator on a trade line that was received
7 from that specific subscriber, if that answers your
8 question.
9   Q.  Let me ask a follow-up related to that.  Do
10 I understand correctly then that what Trans Union
11 puts on the consumer's file is based entirely on what
12 the furnisher provides for deceased remarks?
13   A.  I don't believe that's the only mechanism to
14 put on -- that's the only mechanism that I have
15 responsibility for is to put an indicator on -- you
16 know, an indicator of deceased from a trade line that
17 I receive from a subscriber onto the credit report.
18   Q.  I think you may have testified in another
19 case that sometimes Trans Union receives information
20 that a consumer is deceased from sources other than
21 the trade lines that are reported to Trans Union; is
22 that correct?
23   A.  Yes.
24   Q.  I am not talking about those.  I'm talking
25 about whether there is a deceased on a trade line,

55

1 Trans Union attempts to accurately transcribe that
2 into the consumer's file based on what the subscriber
3 or let me say what the furnisher has provided to
4 Trans Union; is that correct?
5   A.  It actually keeps it within that trade line
6 itself.  So, for instance, Cross Country Bank comes
7 in with an indicator of deceased, we will leave it in
8 the remarks code field under the Cross Country Bank.
9 That Cross Country Bank has an indicator of deceased,
10 and we place that on the file within the trade line.
11   Q.  So you view your job as to accurately
12 transcribe what they are reporting to you, right?
13   A.  Yes.
14   Q.  You don't view your job as to know whether
15 it's really true that the consumer is deceased,
16 right?
17   A.  I feel like you're asking me the same
18 question in a different way now a couple of times.
19     If you want, we can go through the
20 audit process again how the data comes in, what
21 happens.
22     I don't view that -- I think that is
23 assuring that the data is reliable from the consumer.
24 I do not call the consumer and ask them if they are
25 deceased, if that's what your question is.

56

1     I work with the provider to make sure
2 that they are reporting data to us accurately.  I
3 don't know of any reason why a data provider would
4 want us to -- want to report a deceased indicator on
5 a consumer that wasn't deceased.  Just doesn't make
6 any sense to me at all.
7     We will make sure that we work with
8 reasonable procedures as best as possible to make
9 sure that they are reporting the data accurately.
10   Q.  That's fair and I may not have worded my
11 question very well.
12     And I understand that if your audit
13 checks or for any other reason you find out somehow
14 that information is incorrect, it's your testimony
15 that you won't continue to report it that way.  But I
16 guess I want to make sure I understand.  Absent some
17 sort of indication like that, you consider it your
18 obligation to report as the subscriber sent it to
19 you?
20   A.  Yes.  We want to make sure that we are
21 processing the data accurately.  If I start running
22 -- I think I answered your question.  Yes.
23   Q.  Can you turn, please, to paragraph 21 of
24 your affidavit.  And I will read it into the record
25 quickly.  "Trans Union's experience is that it is not

57

1 unusual for deceased consumers to have apparently
2 active accounts, either because transactions are not
3 reconciled until after the consumer has died or
4 because a spouse or personal representative is paying
5 off the decedent's debt or incurring new ones on the
6 same account or for a variety of other reasons
7 including identity fraud."  Did I read that
8 correctly?
9   A.  Yes.
10   Q.  If you rely on what the subscriber sends to
11 you and it's your job to accurately transcribe what
12 the subscriber sends, then how do you know whether
13 the explanation is that a spouse is paying on the
14 account or that the explanation is that the deceased
15 is incorrect?
16   A.  I don't know.  That's why I am relying --
17 that's why we're relying -- we're relying on the
18 customer at that point with the relationship with the
19 consumer that the information as provided is
20 accurate.
21   Q.  So what experience are you talking about in
22 this paragraph?
23   A.  We looked at our credit reports and we see
24 that -- I believe the numbers were close to almost a
25 hundred percent.  I think it was like 99.5 percent

William Stockdale

58

1  that after we receive a deceased indicator there's
2  still activity going on with that credit report.
3     Q.  So you speculated the reason for that in
4  paragraph 21?
5     A.  I don't know what you mean by speculate.
6     Q.  Well, how do you know that the reason wasn't
7  that all of those trade lines were reporting
8  inaccurately?
9     A.  I am stating why a report would still be
10  accurate.
11    Q.  But my question is, how do you know that it
12  is accurate and that the explanation for the activity
13  on the other accounts is that spouses or personal
14  representatives are paying and the explanation is not
15  instead that the deceased notation is inaccurate?
16    MR. CENTO:  Objection, asked and answered.  Go
17  ahead.
18    THE WITNESS:  I don't know that.  I am giving
19  you valid reasons of why there would still be active
20  accounts on a file even though you received
21  indicators of deceased.  But if someone's reporting
22  someone who is alive as deceased, I wouldn't know
23  that.
24  BY MR. GOOLSBY:
25    Q.  In your experience that you talk about in

59

1  paragraph 21, how long after you first get a deceased
2  report on a trade line do you continue to see
3  activity on other accounts?
4     A.  I don't have the -- I don't have the
5  percents.  I do know there are accounts -- I have
6  personal experience.  I know my mother maintained an
7  individual credit card on my dad and he was passed
8  away for ten years.  I am sure his credit report was
9  still being updated and still being processed.
10       I don't have specific numbers of how
11  long do -- what's the -- at what point does no more
12  activity show on a credit report after someone is
13  actually deceased.  I don't have that number.  I just
14  know that activity happens after you receive an
15  indicator.
16    Q.  Well, you gave me a number a moment ago
17  99.something percent of accounts -- of files that
18  have one or more account with an indicator of
19  deceased continuing to have activity on other
20  accounts.  What period of time were you looking at
21  for that 99 percent?
22    A.  The next month.
23    Q.  So, 99.9 percent of accounts of files that
24  have a trade line showing deceased have activity the
25  next month?

60

1     A.  Right.
2     Q.  But you don't know --
3     A.  I don't know how that --
4     Q.  In two months?
5     A.  Correct.
6     Q.  How about two years?
7     A.  I don't know.
8     Q.  Have you ever heard of a company called FDR?
9     A.  Yes.
10    Q.  What is FDR?
11    A.  They are a processor of account receivable
12  information.
13    Q.  Does FDR send information to Trans Union?
14    A.  Yes.
15    Q.  Is FDR a subscriber?
16    A.  Yes.
17    Q.  Does Trans Union have a contract with FDR?
18    A.  That is outside my area.  I'm not sure.
19    Because they are a subscriber I would say that they
20  do.  But again, I haven't personally witnessed the
21  contract.
22    Q.  Did Trans Union do a site inspection for
23  FDR?
24    A.  I'm not sure.  I personally have visited
25  that FDR three times in my career.  They have been in

61

1  place since 1989.  So when that site visit --
2     Q.  I don't mean to interrupt.
3     MR. CENTO:  Let him finish his answer.
4  BY MR. GOOLSBY:
5     Q.  I didn't understand what you said.  So I can
6  backtrack and fit your answer into the first part of
7  it.  You said you personally visited FDR in your
8  career?
9     A.  Yes.
10    Q.  Please continue.
11    A.  So they have been reporting data since I
12  have been working for Trans Union since 1989.
13       So I am not sure when that site visit
14  or when we first originally started to receive data
15  from FDR.  They are the biggest processor in the
16  country.
17    Q.  And was the purpose of your site visit to
18  FDR to determine if they were a reliable source of
19  information?
20    A.  That wasn't the primary goal.  Visits were
21  -- again, because they are -- they have such a high
22  volume of information that they provide to Trans
23  Union, just to talk about ways to make processing
24  more efficient.  Technology, technology changes.
25  Trying to find out what systems that they're building

62

1   versus what systems Trans Union is building to make
2   sure we are compatible and all that kind of stuff.
3       Q.   Is FDR a reliable source of information?
4       A.   Yes.
5       Q.   How do you know that?
6       A.   As I said earlier, we have been processing
7   data for them since I have been with the company, and
8   they process data for over I believe 6,000 customers.
9   And have not received any disputes that they are
10  processing inaccurately, as well as nothing exceeded
11  thresholds from the systems that I talked about
12  earlier.
13      Q.   Does FDR extend credit to consumers?
14      A.   I don't know.
15      Q.   Do trade lines show up as FDR trade lines?
16      A.   I don't know for sure.  I do not believe so.
17      Q.   It's true, isn't it, that FDR provides
18  information to Trans Union on behalf of certain
19  furnishers such as CCB, right?
20      A.   Yes.  They serve as third-party processor.
21      Q.   And you testified earlier, and correct me if
22  I am wrong, that Trans Union keeps a tally of
23  disputes it gets from consumers by furnisher, right?
24      A.   Yes.
25      Q.   If a consumer disputes a trade line that is

63

1   reported by a furnisher that uses FDR, that dispute
2   will be tallied under the furnisher such as CCB that
3   uses FDR and not under FDR, right?
4       A.   Correct.
5       Q.   So you don't have a tally of the disputes
6   that Trans Union receives from consumers broken down
7   by how many relate to FDR?
8       MR. CENTO:   Object to the form.
9       THE WITNESS:   Yes, there is a link to the
10  subscriber code number that shows that is a processor
11  of FDR, so we would have a mechanism to show that.
12  BY MR. GOOLSBY:
13      Q.   You have a mechanism to discover that
14  information, but you don't routinely sort by that; is
15  that correct?
16      A.   Score cards are delivered by the subscriber,
17  not by FDR.  But there is a link to the subscriber
18  code that FDR is the processor of the information.
19      Q.   So if you wanted to find out how many
20  disputes Trans Union had received from consumers who
21  were disputing trade lines that are reported through
22  FDR, you could find that information out.  Do I
23  understand that correctly - --
24      A.   I believe there would have to be some
25  development work based on what the procedures are,

64

1   but, yes, there is a link.
2       Q.   Have you ever done that -- strike that.
3       Has Trans Union ever done that?
4       A.   We have had situations where information was
5   reported -- where errors in reporting of information
6   had occurred at FDR.  That was detected through a
7   score card.  And the error resided at FDR, not at the
8   subscriber itself.
9       Q.   When was that?
10      A.   And vice versa.  I don't have specific
11  times.  I know of times that that has happened.
12      Q.   How many times has it happened?
13      A.   Less than five.  But I don't know the exact
14  number.  I can give you some examples of what has
15  happened.
16      Q.   Okay.  If you would, please.
17      A.   A data system glitch where they closed
18  everybody's account.  So consumers were calling
19  saying -- for example, Bank of America who FDR
20  processes for said my account's open, it's not
21  closed.  So we called FDR right away to get it
22  rectified.  And it was FDR's site, it wasn't at the
23  application BOA site.
24      Q.   And did that happen for -- was it more than
25  just BOA that was affected by that --

65

1       A.   I don't recall if it was global or that
2   specific subscriber.  I believe it was that specific
3   subscriber in that case that I gave you.  In fact, I
4   don't ever recall it being a global, usually at the
5   portfolio level.
6       Q.   So you give me one example.  I think you
7   said there were maybe five.  Can you give me some
8   others?
9       A.   They keep track, they keep track of all of
10  their subscribers.  There is a link with an ID, they
11  call it a SISPRIN number.  So sometimes those numbers
12  have gotten out of sync.  So if it gets out of sync
13  we could put down the wrong subscriber name on the
14  trade line.
15      Q.   And that's happened?
16      A.   That's happened, yes.
17      Q.   That's two.
18      A.   So somebody has said, you know, I have a
19  Visa not a Master Card, how did this happen, and we
20  called FDR and got it fixed or caught it within our
21  audit itself.
22      Q.   That's two.  Can you tell me any more
23  examples?
24      A.   They may have had some date errors with date
25  fields.  I remember there were a couple of date

**66**

1 issues where they weren't reporting the date
2 correctly.
3    Q.  They may have an issue or they did?
4    A.  They did have an issue.  Sorry.  They did
5 have an issue with a date.  It was the close date was
6 matching the open date, which is -- isn't logical or
7 they fixed that.
8    Q.  I know you've testified about this before,
9 but tell me again how long you've worked at Trans
10 Union?
11    A.  Since 1989.
12    Q.  And in that entire period, have you been in
13 a position where these sorts of issues with FDR would
14 have come to your attention?
15    A.  Yes.
16    Q.  So when you say roughly five issues, you're
17 talking about over the past roughly 16 years?
18    A.  Yes.
19    Q.  You've talked about three.  Can you remember
20 any others?
21    A.  Those are the only three I remember.
22    Q.  Do you know what a dump report is?
23    A.  I know what a dump -- I know what a computer
24 dump is.  Just a dump of information.  But I don't
25 recognize any dump report.  You need to be more

**67**

1 specific.
2    Q.  Is a computer dump how Trans Union receives
3 information on a monthly basis from furnishers?
4    A.  I don't refer to this as a dump, no.  I just
5 refer to that as a transmission.
6    Q.  Okay.  And that's through the Metro system;
7 is that correct?
8    A.  They utilize Metro format.  They can send it
9 different ways.
10    Q.  Do all furnishers use the Metro format?
11    A.  Yes.
12    Q.  And there are different versions of the
13 Metro version; is that correct?
14    A.  There's two, there's the Metro I and then
15 there is the Metro II.
16    Q.  And which version does CCB use?
17    A.  I am not sure.
18    MR. GOOLSBY:  Mark this as Exhibit No. 3.
19        (WHEREUPON, said document was
20        marked as Stockdale Deposition
21        Exhibit No. 3 for
22        Identification.)
23 BY MR. GOOLSBY:
24    Q.  Mr. Stockdale, have you ever seen a document
25 in this format before?

**68**

1    A.  No.
2    MR. GOOLSBY:  Then I don't have any questions
3 for you about it.
4       When furnishers such as CCB report
5 information to Trans Union through the Metro I or
6 Metro II format, does all the information that Trans
7 Union receives get put into the consumer's file at
8 Trans Union?
9    A.  Could you rephrase that question.
10    Q.  Sure.  That was a little weird with the
11 subject/verb placement.
12       When information is transmitted to
13 Trans Union through the Metro I or Metro II formats
14 on a monthly basis, does all the information that
15 comes end up in the consumer's file at Trans Union?
16    A.  No.
17    Q.  So there is some information that's sent to
18 Trans Union that doesn't end up in Trans Union's file
19 for the consumer?
20    A.  Yes.
21    Q.  How does Trans Union decide what information
22 it's going to put in its file?
23    A.  We have algorithms and edits in place.
24    Q.  Algorithm is a formula that's plugged into a
25 computer program; is that fair?

**69**

1    A.  Yes.
2    Q.  And those algorithms are put into effect by
3 a computer, right?
4    A.  Yes.
5    Q.  But they are designed by humans?
6    A.  Correct.
7    Q.  What criteria do the humans who design those
8 algorithms use for determining what information that
9 Trans Union receives via Metro tape ends up in the
10 consumer's file?
11    A.  I don't even know where to begin with a
12 question like that.
13       Algorithms -- algorithms are designed
14 by statisticians, by computer engineers, benchmarking
15 off of a variety of companies that specialize in the
16 matching and the updating of financial information.
17 So that's how the algorithms are built.
18    Q.  When you say a variety of companies, are the
19 algorithms designed by people outside of Trans Union?
20    A.  No, we receive information -- we develop --
21 we develop the algorithms themselves, but we seek out
22 source advice to create those algorithms.
23    Q.  So do you know what criteria go into the
24 algorithms, either the Trans Union devices or that
25 Trans Union is advised by outsiders to put into the

William Stockdale

70

1  algorithms?
2     A.   Again we're getting a little bit outside of
3  my area, but we have -- as I stated earlier, we have
4  computer engineers, computer designers, we have
5  statisticians, we would work with outsource companies
6  for matching purposes, for standardization purposes
7  in the areas of name processing, address processing.
8     Q.   So is there some information that's reported
9  to Trans Union via the Metro tape that Trans Union
10  determines is not important enough to be included on
11  in Trans Union's file?
12     A.   Again, that would hit our edits, our reject
13  criteria.  If there wasn't enough information in the
14  address fields, if there wasn't enough information in
15  the name fields, that may cause a record to reject,
16  because I didn't have enough information to match it
17  to a credit report.
18     Q.   I guess I am actually asking about the
19  opposite circumstance where you get more information
20  than what you would put into a consumer's file, is
21  there some information that's determined to be
22  superfluous or unnecessary to put in the consumer's
23  file?
24     A.   Yes.  There's some information that's used
25  for matching purposes, but it's not placed in the

71

1  file.
2     Q.   So is it true -- well, let me ask a
3  preliminary question.
4           Do you know what a name scan is?
5     A.   Yes.
6     Q.   Is it true when we look at a name scan,
7  we're not seeing everything that has been reported to
8  Trans Union by a given furnisher for that trade line?
9     A.   Correct.
10     Q.   Does Trans Union have a way to access a
11  record of the totality of what was reported to Trans
12  Union through the Metro tape?
13     A.   There's a header report that gives you
14  identification about the subscriber, and then there's
15  a trailer that would count -- that have counts in it.
16  So, for instance, it would say that this portfolio
17  contains a hundred-thousand consumers.
18     Q.   Is a trailer then -- does that go with an
19  entire portfolio as reported by a given furnisher?
20     A.   Yes.
21     Q.   So that would have statistics on how many
22  accounts there are in this -- I called it dump, and I
23  forget the word you used, but transmission, and it
24  would have other statistical information of the
25  totality of the portfolio's transmission?

72

1     A.   Yes.
2     Q.   So is that what Trans Union looks at to
3  discover these trends that we talked about earlier?
4     A.   No, we actually literally count every
5  record.  We don't utilize that field, we actually
6  count it.
7     Q.   So the trailer is the furnisher's count; is
8  that right?
9     A.   Yes.
10     Q.   Trans Union does its own count?
11     A.   Yes.
12     Q.   Does Trans Union ever compare its count to
13  the trailer?
14     A.   We have.
15     Q.   Does that happen as part of the audit check?
16     A.   No.
17     Q.   When would that happen or -- strike that.
18           When has that happened?
19     A.   I'm sorry.  I answered it correctly.  During
20  the audit check, yes, this is what you said you gave
21  us, this is what we show.
22     Q.   That's not just on a specific count, it is
23  your totals of numbers?
24     A.   Yes.
25     Q.   Tell me more about the header record.

73

1  That's the -- that's got identifying information in
2  it?
3     A.   Yes.  When the data was processed, who
4  processed it, the date of activity.  There's a
5  variety of different fields within the header.
6     Q.   And when you say the header record shows who
7  processed it, doesn't it happen all automatically in
8  the computer?
9     A.   Uh-huh.  But we still -- for identification
10  purposes that we still have them put that in there.
11     Q.   You have the furnisher put in?
12     A.   The furnisher would provide who processed
13  information.  So, for instance, if it was FDR, FDR
14  would put in there that I processed the data.
15     Q.   So FDR is what would you call a processor;
16  is that right?
17     A.   Whoever is sending the data is -- I should
18  have said provider.  Data provider.  Whoever is
19  processing the data.  I apologize.  I continue to
20  flip-flop terms.
21     Q.   Sure.  That's okay.  I think I understand
22  you.
23           Would it be okay if we took a short
24  break so I can review my notes and then we can wrap
25  up.

William Stockdale

74

1   MR. CENTO:  Sure.
2   MR. GOOLSBY:  Off the record.
3       (Recess.)
4   MR. GOOLSBY:  Back on the record.
5   BY MR. GOOLSBY:
6   Q.  Mr. Stockdale, you talked about the audit
7   check that you do.  And I want to ask specifically
8   how that works when you're dealing with a furnisher
9   that utilizes a third-party data processor or data
10  provider such as FDR.  Does Trans Union involve FDR
11  in the audit check?
12  A.  It depends on the portfolio that we're
13  auditing and if -- we rely -- we already -- FDR we
14  already know is a very reliable processor.  However,
15  it's up to the actual subscriber themselves to
16  determine if they want FDR involved or not.  So it
17  depends.
18  Q.  But you let the furnisher decide if FDR is
19  involved; is that right?
20  A.  Yes.  We can just work directly with the
21  subscriber or we can bring FDR in and work together,
22  all three of us together.
23  Q.  And I think you may have answered this, but
24  tell me again, do you do separate audit checks of FDR
25  itself?

75

1   A.  Yes.
2   Q.  How often?
3   A.  Again, they're in the same stream as
4   everybody else as far as checking the information.
5   We have one analyst that solely does nothing but work
6   with FDR and they're checking portfolios all the time
7   with FDR.
8   Q.  Do you know what a customer audit report is?
9   A.  I don't.
10  Q.  We talked about the two different types of
11  score cards, and you talked a little bit about the
12  kind that Trans Union creates in its consumer
13  relations department.  And you said there was also a
14  type of score card that's created by the subscriber.
15  Do I recall that correctly?
16  A.  Yes.
17  Q.  Does Trans Union use the score cards that
18  the subscribers create in any way?
19  A.  They're basically the subscriber actually
20  keeps a score card on Trans Union.  And they monitor
21  different fields, different fields that we provide to
22  them when we provide a credit report to them, and
23  they give us feedback how we are doing compared to
24  our competition.
25  Q.  Does CCB or ACS have that type of a score

76

1   card for Trans Union?
2   A.  Like I said before, I know they're a
3   reliable provider, but I'm not personally involved in
4   the actual process of doing the day-to-day with them,
5   so I would have to check with my analyst.
6   Q.  Does Trans Union ever review the score cards
7   that subscribers provide to see if Trans Union agrees
8   with those score cards?
9   A.  Yes, we see those score cards.
10  Q.  I understand you see them.  My question is,
11  do you ever disagree with the score a furnisher gives
12  you in its score card?  For example, do you ever say
13  -- if they say, Trans Union, you did something wrong
14  here, do you ever come back and say, well, no,
15  actually, furnisher, that was your error.  We
16  shouldn't be marked for that?
17  A.  Yes, because they are developing the
18  measurements on the score card.  I'm sure there are
19  -- there would be times that Trans Union would
20  disagree with the measurement.  However, we probably
21  would not dispute it because it is their score card
22  and you can measure it any way you want to measure
23  it.
24  Q.  So Trans Union doesn't use that itself?
25  A.  We use -- some score cards add a lot of

77

1   value to our process, others don't utilize any value
2   to our process.  When I say the word values, that is
3   in the area of quality and accuracy.
4       If it doesn't provide that type of
5   information for us, we really don't utilize it.  If
6   it does, then we utilize it.
7   Q.  Does Trans Union and its two main
8   competitors Equifax and Experian use a third-party
9   vendor for transmitting information?
10  A.  I'm sorry.  Can you repeat that.
11  Q.  Do the three -- you know what I mean by the
12  big three?
13  A.  Right.
14  Q.  Do the big three use a third-party vendor to
15  transmit information?
16  MR. CENTO:  Objection, vague.
17  THE WITNESS:  I don't -- at what point in the
18  process?
19  BY MR. GOOLSBY:
20  Q.  I believe in one of the other cases you
21  testified that some correspondence with furnishers
22  goes through or possibly goes through AT & T.  Do you
23  remember that?
24  A.  I do and I think I was referring to the
25  E-Oscar system, the equivalent of the ACDV process

William Stockdale

---

78

1   was at that time.

2      Q.  Do you ever do an audit check on third-party

3   vendor such as AT & T?

4      A.  Again, that's outside of my area of

5   responsibility.  That's handled in the consumer

6   relations side.  But it's -- it was a joint venture

7   between, you know, working with the CDIA to make sure

8   that the development of that system, the development,

9   the design of the system was by that group of people,

10  Trans Union being a part of that group that developed

11  that, certified the two connection points, the point

12  at the customer subscriber and the point at the

13  bureaus.

14          And again you would need to talk to

15  Eileen Little or somebody from consumer relations on

16  that.

17      MR. GOOLSBY:   I believe I have about used up

18  my time.  I have no further questions.

19      MR. CENTO:   Thanks.  We'll read and sign and we

20  both want expedited I imagine.

21          AND FURTHER DEPONENT SAYETH NAUGHT

22

23

24

25

---

79

1          IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WISCONSIN
2          Court File No: 03-C 510C
3   PENNY LEE ANDERSON and   )
    RUSSELL D. ANDERSON,     )
4   SR.,                     )
                             )
5          Plaintiffs,       )
                             )
6          -vs-              )
                             )
7   TRANS UNION, LLC;        )
    EXPERIAN INFORMATION     )
8   SOLUTIONS, INC.; CSC     )
    CREDIT SERVICES, INC.    )
9   And EQUIFAX, INC., d/b/a  )
    EQUIFAX INFORMATION      )
10  SERVICES, LLC.,          )
                             )
11         Defendants.  )
12         I hereby certify that I have read the
    foregoing transcript of my deposition given at the
13  time and place aforesaid, and I do again subscribe
    and make oath that the same is a true, correct and
14  complete transcript of my deposition given as
    aforesaid, with corrections, if any, appearing on the
15  attached correction sheet(s).
16
17              Correction sheets attached
18              WILLIAM STOCKDALE
19
20
    SUBSCRIBED AND SWORN TO
21  before me this   day
    of          A.D., 2005
22
23
    Notary Public
24
25

---

80

1   STATE OF ILLINOIS )
                      ) SS:
2   COUNTY OF C O O K )

3       I, MAUREEN A. WOODMAN, Certified Shorthand

4   Reporter and Notary Public in and for the County of

5   Cook and State of Illinois, do hereby certify that

6   WILLIAM STOCKDALE was first duly sworn to testify the

7   whole truth and that the above deposition was

8   recorded stenographically by me, and was reduced to

9   typewriting under my personal direction.

10      I further certify that the said deposition

11  was taken at the time and place specified.

12      I further certify that I am not a relative

13  nor employee or attorney nor counsel of any of the

14  parties, nor a relative or employee of such attorney

15  nor counsel nor financially interested directly nor

16  indirectly in this action.

17      In witness whereof, I have hereunto set my

18  hand and affixed my seal of office at Chicago,

19  Illinois, this   day of

20  A.D., 2005.

21

22          MAUREEN A. WOODMAN, C.S.R.

23          License No.  084-002740

24

25

---

21 (Pages 78 to 80)

# CERTIFICATE OF REPORTER

I, MAUREEN A. WOODMAN, Certified Shorthand Reporter for the State of Illinois, do hereby certify that the foregoing was reported by stenographic and mechanical means, which matter was held on the date, and at the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

I have hereunder subscribed my hand on the _____24th_____ day of _____March_____, ____2005____ .

MAUREEN A. WOODMAN, CSR

OFFICIAL SEAL
MAUREEN A WOODMAN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES: 05-22-07

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

------------------------------------------------------------

JAMES M. McKEOWN,

        Plaintiff,

    vs.

TRANS UNION, LLC,

       Defendant.

Madison, Wisconsin
November 18, 2004
9:01 a.m.

Civil Case 03-C-0528-C

VOLUME 3-A.

------------------------------------------------------------

STENOGRAPHIC TRANSCRIPT OF THIRD DAY OF JURY TRIAL HELD BEFORE
THE HONORABLE BARBARA B. CRABB, and a Jury.
(**Morning Session Only**.)

APPEARANCES:

For the Plaintiff:      Thomas J. Lyons & Associates
                      BY:  THOMAS J. LYONS
                      342 East County Road D
                      Little Canada, MN  55117
                      - and by -
                      Consumer Justice Center, P.A.
                      BY:  JOHN GOOLSBY
                      342 East County Road D
                      Little Canada, MN  55117

For the Defendant:      Katz & Korin, PC
                      BY:  ROBERT J. SCHUCKIT
                          GUERINO JOHN CENTO
                      The Emelie Building
                      334 North Senate Avenue
                      Indianapolis, IN  46204

                      KATHLEEN BANKS
                      Official Court Reporter
                      120 North Henry Street
                      Room 520
                      Madison, WI  53703
                      1-608-255-3821

Exhibit B

3-A-2

1  <u>APPEARANCES</u>:   (Continued.)

2  <u>Also Present</u>:

3  James M. McKeown, Plaintiff.
   William Stockdale, Senior Director of Customer Information
4  Services, Trans Union.

5           * * *  I N D E X  * * *

6  <u>Witnesses for the Plaintiff</u>:

7

   <u>Name</u>              <u>Direct</u>      <u>Cross</u>     <u>Redirect</u>
8
   TED MATTHEW GERBER deposition read, See Page 7.
9
   CHRISTINE ERICKSON deposition read, See Page 20.
10
   JOAN C. McKEOWN          48          66          80
11

12

13 <u>Witnesses for the Defendant</u>:

   <u>Name</u>              <u>Direct</u>      <u>Cross</u>     <u>Redirect</u>
14
   WILLIAM STOCKDALE         85          --          --
15

16 <u>Exhibits for the Plaintiff</u>:

17

   <u>Number</u>      <u>Description</u>                  <u>Offered</u>   <u>Received</u>
18
   110          Joanie McKeown's 6/27/2003 letter  58        58
19               to Sears

20 111          Sears 7/2/2003 faxed letter to     62        --
                Plaintiff
21
   112          Excerpt of Plaintiff's credit       7         7
22              application to Community Bank of
                Cameron-Grantsburg with the bank's
23              notes

24 113          6/27/2003 Denial letter from        7         7
                Community Bank of Cameron-Grantsburg
25              to Plaintiff

3-A-3

1                        ***   INDEX  ***  (Continued.)

2  <u>Exhibits for the Plaintiff</u>:   (Cont.d)

3  <u>Number</u>        <u>Description</u>
                                                      <u>Offered</u>   <u>Received</u>
4  114      Plaintiff's Trans Union 6/27/2003      7         7
            credit report sent to Community Bank
5           of Cameron-Grantsburg

6  116      7/11/2003 Denial letter from US        39        39
            Bank-Grantsburg to Plaintiff
7
   117      US Bank-Grantsburg's internal          39        39
8           documents dated 6/27/2003

9  118      7/16/2004 e-mail from Thomas           39        39
            Johnson to Chris Erickson
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STOCKDALE - DIRECT

3-A-93

1  mine.  They're calling saying it's paid or closed.  They're
2  calling disputing the payment pattern; whether it's, you know,
3  30 days late or not, or they are disputing inaccuracies.  I'm
4  sorry.  They're disputing an address, and normally it's a
5  previous address they no longer live at.
6  Q    And how often are those audited and checked to determine
7  whether there are deviations or issues to be addressed?
8  A    The scorecards are processed at the consumer relations
9  level.
10 Q    What is a scorecard?
11 A    A scorecard is that we monitor the relationship that we
12 have with the lender to make sure that they're engaged into the
13 investigation process.  So we want to make sure that when we're
14 sending or when we're sending a dispute from a consumer, and
15 the day we receive the dispute we're sending it right to the
16 lender that same day.  We want to make sure that they're
17 responding; because what the law says is if -- the law says if
18 I don't receive it within thirty -- if I don't rectify the
19 dispute within thirty days, I'm going to do whatever the
20 consumer says.  So we monitor that.
21      And if we're just doing what the consumer says because the
22 lender's not responding back, then we're going to talk to the
23 lender to make sure they're engaged.  Because if they're not
24 engaged in that process, perhaps the data that they're sending
25 could be an issue as well.

1                IN THE UNITED STATES DISTRICT COURT

2                     DISTRICT OF MINNESOTA

3                  COURT FILE NO.: 03-3295

4    PEGGY MARIE SCHMITT,                )

5                     Plaintiff,          )

6       vs.                              )

7    CHASE MANHATTAN BANK, NA, et al )       COPY

8                     Defendants.         )

9         The deposition of LYNN ROMANOWSKI, called by

10   the Defendant for examination, taken pursuant to

11   notice, agreement and by the provisions of the

12   Rules of Civil Procedure for the United States

13   District Courts pertaining to the taking of

14   depositions, taken before SANDRA DRECHSLER, CSR

15   No. 84-1676, a Notary Public within and for the

16   County of Cook, State of Illinois, and a

17   Certified Shorthand Reporter of said State, at

18   Chicago O'Hare Hilton, Superior Room, Chicago,

19   Illinois, on the 23rd of March, 2005, at 9:15

20   a.m.

21

22

23

24

Exhibit C

Lynn Romanowski

14

1   Q   Okay.
2   A   I believe it is after, because I'm
3 just basing that based on looking at trade number
4 22.
5   Q   Okay.
6   A   I think they are the same account
7 numbers on both files.
8   Q   Okay.
9   A   And the one on the type date of May of
10 2003 says it was reported in May of 2005 -- no,
11 May of 2003, and the one with the handwritten
12 date on it says it was updated in June 2003.
13   Q   Okay. Then if you compare the one
14 with the handwritten June 2003 to the printed
15 July 2003, the handwritten June 2003 appears to
16 come before the printed July 2003, is that
17 correct?
18   A   Yes.
19   Q   Okay. So if you just look at the
20 printed ones, we have a period apparently of a
21 month and a half from the May 2003 to the July
22 2003. If we were to insert the handwritten June
23 2003, we would then have either a half month from
24 May to June and then a month from June to July,

15

1 or a month from May to June and then a half month
2 from June to July, is that correct?
3   A   Yes.
4   Q   Okay. What I would ask you to do then
5 is to take TU 190 and 191 and insert that between
6 the printed May 2003 and the printed July 2003.
7 And we're going to take that whole batch and mark
8 it Exhibit 1, please.
9     (Romanowski Exhibit No. 1 marked
10     for identification.)
11 BY MR. GOOLSBY:
12   Q   Here's binder clip. You can keep that
13 all together. All right. Now, I just want to
14 talk in general about how you read these
15 documents, and I know you have testified to some
16 of this before, so I will try to go over this
17 fairly quickly. Let's start with the one that's
18 labeled December 2001 and go down to where it
19 says TR 24. TR stands for trade line, is that
20 correct?
21   A   Yes.
22   Q   And then for each trade line it's got
23 a number of things that follow. For example, on
24 TR 24 we have DR equals 12012001; MA equals 9; SB

16

1 equals something, and so forth. What do you call
2 each of those units of information within a trade
3 line?
4   A   Well, each them are pieces of
5 information for the trade line.
6   Q   Okay. Is there a name for them that
7 you use, a generic name for DR equals something
8 is one and MA equals something is another? You
9 called them pieces of information. Is that a
10 formal term that you use in your job or do they
11 have some other formal term?
12   A   Each field has its own name. Like DR
13 would be date reported and MA would be market
14 area. I don't know if that was what you were
15 looking for.
16   Q   I understand that. Is there something
17 that they call it in the generic?
18   A   No. Just we would refer to it as the
19 date reported for trade 24 or the market area of
20 trade 24.
21   Q   Do you ever call them items of
22 information?
23   A   They could be called items of
24 information. I have never had any need to refer

17

1 to them collectively.
2   Q   Okay. If I call them items of
3 information, will you understanding what I mean?
4   A   Yes.
5   MR. CENTO:  I object to the use of the term
6 items of information.
7 BY MR. GOOLSBY:
8   Q   Now, Miss Romanowski, you're aware
9 that in this case the plaintiff's claim is that
10 she was falsely reported as deceased, aren't you?
11   A   Yes.
12   Q   And when do you first see any entity
13 reflected as reporting to Trans Union that
14 Ms. Schmitt was deceased?
15   A   For all the trade lines?
16   Q   Yes, for all the trade lines. Well,
17 let me ask you a preliminary question, actually.
18 On this December 2001 page, there are two trade
19 lines that have an asterisk by them, TR 22 and TR
20 15. Do you see that?
21   A   Yes.
22   Q   What is the significance of that
23 asterisk?
24   A   I marked those trades with an asterisk

Lynn Romanowski

30

```
1     Q    First name Peggy?
2     A    Yes.
3     Q    And middle name M.  And Peggy M.
4  Schmitt is the person for whom these name scans
5  are, right?
6     A    Yes.
7     Q    So would you agree with me that there
8  appears to be a match here in general?
9     MR. CENTO:  Objection.  Lack of foundation.
10    THE WITNESS:  Well, I agree there is a match
11  on account number and match on consumer's name.
12  BY MR. GOOLSBY:
13    Q    Okay.  On TR 15 on the name scan, says
14  DR equals, and I believe you testified that DR
15  equals date reported.  And that says 11-01-2002,
16  right?
17    A    Yes.
18    Q    And I would refer you to the Exhibit 2
19  in the top of the middle column, just above that
20  middle column it says reporting date 11-05-2002
21  do you see where I am?
22    A    Yes.
23    Q    And I will represent to you that that
24  date of 11-05-2002 is what Bank One represents is
```

31

```
1  the date that it does its monthly reporting.
2  It's -- they call it a cycle, their monthly
3  reporting cycle.  And I'm wondering if you know
4  why your records show November 1, 2002, when Bank
5  One is saying its November 5, 2002.
6     MR. CENTO:  Objection.  Lack of foundation.
7     THE WITNESS:  Yes.  At this point in time 01
8  was the default date, which would indicate that
9  it happened sometime within the month of
10  November.
11  BY MR. GOOLSBY:
12    Q    In fact, we see on most of these trade
13  lines on the November name scan they have 01.
14  Actually it looks like all of them on this
15  particular one, is that correct?
16    A    Yes.
17    Q    So is it your testimony that that
18  doesn't necessarily mean that it was actually
19  reported on the first of the month?
20    A    Yes.
21    Q    And then I would ask you to look at
22  trade line 15, where it says DO.  Does that stand
23  for date opened?
24    A    Yes.
```

32

```
1     Q    And then also says 11-01-1995 -- well,
2  it also says first day of the month is perhaps a
3  better way for me to say that.  Is it true that
4  in that field also it's not necessarily actually
5  the first date of the month that that account was
6  opened?
7     A    Yes.
8     Q    Okay.  And then if you look back at
9  Exhibit 2, in fact you will see in the first
10  column about a quarter of the way down, open
11  date, 11-20-1995.
12    Q    So do you have any reason to doubt
13  that the account was actually opened on the 20th
14  of the month rather than the first?
15    A    No.
16    Q    And do you have any reason to doubt
17  that the reporting date was actually the fifth of
18  November, 2002, rather than the first?
19    A    No.
20    MR. CENTO:  Objection.  Lack of foundation.
21  BY MR. GOOLSBY:
22    Q    Okay.  Now, on the November 2002 name
23  scan in the inquiry section, do you see any new
```

33

```
1  inquiries that weren't on the previous month?
2     A    Yes.
3     Q    And that has a KB code that begins
4  with an F, right?
5     A    Yes.
6     Q    And do you know what F, a KB code that
7  begins with an F signifies?
8     A    No.
9     Q    And in that particular instance it
10  says DA.  What does DA stand for?
11    A    Date of activity.
12    Q    And that says 11-02-2002, right?
13    A    Yes.
14    Q    So there we have a date that's
15  different from 01.  Does that mean that we know
16  that the date of the activity really was on the
17  second day of the month?
18    A    Yes.
19    Q    So that's not a default.  That's when
20  you know the date, the actual date, you put it in
21  there?
22    A    Yes.
23    Q    And just to finish the thought, if we
24  see a 01 for the first date of the month, is
```

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# United States District Court

## DISTRICT OF DELAWARE

Penny Lee Anderson and
Russell D. Anderson, Sr.,

|  |  |
|---|---|
| Plaintiffs, | **SUBPOENA IN A CIVIL CASE**<br>**WESTERN DISTRICT OF WISCONSIN**<br>**CASE NUMBER: 03-C- 0510 C** |

-vs-

Trans Union, L.L.C.;
Experian Information Solutions Inc.;
CSC Credit Services, Inc.;
Equifax, Inc. d/b/a Equifax Information Services LLC.,

Defendants.

TO:   GENERAL COUNSEL CROSS COUNTRY BANK/APPLIED CARD SYSTEMS , 800 DELAWARE STREET,
WILMINGTON, DE 19801:

YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

| [X]   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. SEE ATTACHED 3RD AMENDED NOTICE OF TAKING DEPOSITION ||
|---|---|
| PLACE OF DEPOSITION: **Ballard Spahr Andrews & Ingersoll, LLP, 919 North Market Street, Wilmington , DE 19801** | DATE AND TIME:<br>**9: 30 AM, January 13, 2005** |

| [X]   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):  **SEE ATTACHED 3RD AMENDED NOTICE OF TAKING DEPOSITION** ||
|---|---|
| PLACE: **Ballard Spahr Andrews & Ingersoll, LLP, 919 North Market Street, Wilmington , DE 19801** | DATE AND TIME<br>**9:30 AM ET, January 13, 2005** |

| YOU ARE COMMANDED to produce and permit inspection of the following premises at the date and time specified below. ||
|---|---|
| PREMISES | DATE AND TIME |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| Issuing Officer Signature and Title (Indicate if attorney for Plaintiff or Defendant)<br>ATTORNEY FOR PLAINTIFF<br><br>*[signature]* | Date<br><br>12/7      /2004 |
|---|---|

Issuing Officers Name, Address, and Phone Number
THOMAS J. LYONS
JOHN H. GOOLSBY
342 East County Road D
Little Canada, MN 55117
(TELEPHONE)  651-770-9707

(See Rule 45, Federal Rules of Civil Procedure Parts C & D on Reverse)

Exhibit D

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| | |
|---|---|
| SERVED ON (PRINT NAME) | MANNER OF SERVICE |

| | |
|---|---|
| SERVED BY (PRINT NAME) | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

### Rule 45, Federal Rules of Civil Procedure, Parts C & D

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(2)(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection is made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, of commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d) DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**
**COURT FILE NO.: 03-C-0510 C**

Penny Lee Anderson and
Russell D. Anderson, Sr.,

                    Plaintiffs,

      -vs-

Trans Union, L.L.C.;
Experian Information Solutions Inc.;
CSC Credit Services, Inc.; and,
Equifax, Inc. d/b/a Equifax Information Services
LLC;

               Defendants.

**PLAINITFFS' 3RD AMENDED NOTICE**
**OF TAKING DEPOSITION OF**
**CROSS COUNTRY BANK'S/APPLIED**
**CARD SYSTEMS**
**FRCP 30 (b)(6) REPRESENTATIVE(S),**
**DUCES TECUM**

---

**TO:   CORPORATE COUNSEL, LEGAL DEPARTMENT, CROSS COUNTRY BANK,**
**INC./APPLIED CARD SYSTEMS, INC., 800 DELAWARE AVENUE,**
**WILMINGTON, DELAWARE 19801:**

PLEASE TAKE NOTICE, that the TELEPHONIC deposition of Cross Country Bank's Rule

30(b)(6) Representative(s) having the most knowledge/information about:

1. The contents, mailing and receipt of Exhibit 14 to E. McKenna's June 28, 2004

    deposition *(attached hereto as Exhibit A.)*

2. The E-Oscar Web Reports dated 01-08-2003 *(attached hereto as Exhibit B.)*

3. The contents, comments and notes in Exhibit 18 of E. McKenna's June 28, 2004

    deposition *(attached hereto as Exhibit C.)*

1

Andersons 8228
3rd Amended NOD
CCB/ACS 30b6 Rep.

4.  The contents and notes in Exhibit 25 of E. McKenna's June 28, 2004 deposition *(attached hereto as Exhibit D.)*

5.  all audits, communications or correspondence dated January 1, 1998 to the present between CCB or ACS and any credit reporting agency relating to the reliability of information produced by CCB or ACS to the credit reporting agencies.

6.  All systems or procedures in place for verifying that manual or electronic updates sent by CCB or ACS to the credit reporting agencies are in fact received by the credit reporting agencies

7.  all AUDFs or UDFs *(e.g., Exhibit E attached hereto)* dated January 1, 2000 to the present that were sent by CCB or ACS to the credit reporting agencies concerning the Andersons' CCB accounts

8.  all systems in place to assure that changes made pursuant to UDFs or AUDFs sent are also corrected and updated on monthly tape reporting to the credit reporting agencies.

9.  all information concerning whether or not manual updates (UDFs/AUDFs) override or are suppressed to override monthly tape reporting.

10. all instructions provided to CCB/ACS by any credit reporting agency on how to complete a UDF or AUDF.

by oral examination will be taken before a qualified notary public at the law offices of **Ballard Spahr Andrews & Ingersoll, LLP, 919 North Market Street, Wilmington , DE 19801 at**

2

**9:30 AM ET on the 13th Day of January 2005** thereafter by adjournment until the same shall be completed.

IN DESIGNATING a person to appear for deposition under Rule 30(b)(6), an organization must make a conscientious good-faith endeavor to designate persons having knowledge of matters sought by the interrogator. Protective Nat. Ins. Co. of Omaha v. Commonwealth Ins. Co., 137 F.R.D. 267, 278 (D. Neb. 1989) (applying identical federal rule). If an organization fails to designate a person with knowledge, sanctions may be imposed. Arctic Cat Inc., v. Injection Research Specialists, Inc., 210 F.R.D. 680, 682-83 (D. Minn.).

An organization must not only produce such number of persons as will satisfy the request, but must also prepare them so that they may give complete, knowledgeable and binding answers on behalf of the organization. Prokosch v. Catalina Lighting, Inc., 193 F.R.D. 633, 638 (D. Minn 2000). An organization's duty to prepare its designee(s) so that they can give knowledgeable and binding answers attaches not just to matters personally known to the designee(s), but also to subjects that the organization should reasonably know. Hooker v. Norfolk So. Ry. Co., 204 F.R.D. 124, 126 (S.D. Ind. 2001); Poole ex. rel. Elliot v. Textron, Inc., 192 F.R.D. 494, 504 (D. Md. 2000).

The scope of the deposition is not limited to the matters specified in the Notice of Deposition, but is limited only as provided generally in F. R. Civ. P. 26. The matters set forth in the deposition notice therefore constitute the minimum, not the maximum, about which the

3

deponent must be prepared to speak. <u>Detoy v. City and County of San Francisco</u>, 196 F.R.D. 362, 366-67 (N.D. Cal. 2000).

**YOU ARE DIRECTED,** pursuant to Rule 30 and 34 of the Federal Rules of Civil Procedure to produce the following documents and things at the time of your deposition, if not already produced:

1. all "credit bureau record dump reports" dated August 2000 to the present not already produced in Exhibit 25 of E. McKenna's June 28, 2004 deposition (attached hereto.)

2. all instructions provided to CCB/ACS by any credit reporting agency on how to complete a UDF or AUDF.

3. Any and all policy and procedure manuals regarding:

   a.) manual updates (UDFs/AUDFs) override or are suppressed to override monthly tape

   b.) reporting all systems in place to assure sure that changes made pursuant to UDFs or AUDFs sent are also corrected and updated on monthly tape reporting to the credit reporting agency

   c.) All systems or procedures in place for verifying that manual or electronic updates sent by CCB or ACS to the credit reporting agencies are in fact received by the credit reporting agencies

4

Andersons 8228
3rd Amended NOD
CCB/ACS 30b6 Rep.

## DEFINITIONS

The term "documents" means all the writings of any kind, including the original and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, including, without limitation, correspondence, memoranda, notes, diaries, statistics, e-mails, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, interoffice and intra-office communications, notations of any sort of conversations, telephone calls, meetings or communications, bulletins, printed matter, computer printouts, teletypes, telefax, invoices, worksheets, all drafts, alterations, and modifications, changes and amendments of any of the foregoing, graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotapes, recordings, motion pictures) and any electronic, mechanical, or electrical records or representations of any kind (including, without limitation, tapes, cassettes, disks, recordings and computer memories).

Dated: __12|1__ 2004

By:  /s/ Thomas J. Lyons .

**THOMAS LYONS & ASSOCIATES, P.A.**
Thomas J. Lyons, Sr.(# 65699)
WI Att. ID #: 1019127
342 East County Road D
Little Canada, Minnesota 5517
(651) 770-9707

**CONSUMER JUSTICE CENTER, P.A.**
Thomas J. Lyons, Jr. (# 249646)
John H. Goolsby (#0320201)
342 East County Road D
Little Canada, Minnesota 5517
Telephone:  (651) 770-9707

Attorneys for Plaintiffs

5

Andersons 8228
3rd Amended NOD
CCB/ACS 30b6 Rep.

# C J C

## CONSUMER JUSTICE CENTER, P.A.

*342 East County Road D*
*Little Canada, MN 55117*
*Telephone: (651) 770-9707*
*Facsimile: (651) 770-5830*
*Internet Address: http://www.consumerjusticecenter.com*
*Email Address: tommycjc@aol.com*

January 6, 2005
*Via Fed Ex*

Martin C. Bryce, Jr.
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Flr.
Philadelphia, PA 19103

Ross A. Anderson, Esq.
Whyte Hirschboeck Dudek S.C.
555 East Wells Street, Suite 1900
Milwaukee, WI 53202

Re:     **Anderson v. Cross Country Bank et al**
        **Our File No.: 8228**
        **NAF File: FA0406000286852**

Dear Counsel:

Enclosed and served upon you please find:

- *Notice of Taking Deposition of CCB/ACS FRCP 30(b)(6) Representative, duces tecum*
- *Notice of Taking Deposition of CCB/ACS employee, EmileEmildare*
- *Notice of Taking Deposition of CCB/ACS employee, Ruth Echols*
- *Notice of Taking Deposition of CCB/ACS employee, Cassandra Harmon*
- *Notice of Taking Deposition of CCB/ACS employee, Linneir Clarke*

Please call with any questions.

Very truly yours,

Sue Wolsfeld

/ssw
Enclosures
cc:     Lewis Perling, Esq. (via US Mail)
        G. John Cento, Esq. (via US Mail)
        Christopher Lane, Esq. (via US Mail)
        Dustin B. Rawlin, Esq. (via US Mail)
        Eric Girvan, Esq. (via US Mail)

Exhibit E

## NATIONAL ARBITRATION FORUM
### NAF File No.: FA0406000286852

Penny Lee Anderson and
Russell D. Anderson, Sr.,

               Claimants,

    -vs-

Cross Country Bank, Inc. and
Applied Card Systems, Inc.

           Respondents.

**CLAIMANTS' NOTICE OF TAKING
DEPOSITION OF
CROSS COUNTRY BANK'S/
APPLIED CARD SYSTEMS
REPRESENTATIVE(S),
DUCES TECUM**

**TO:   CORPORATE COUNSEL, LEGAL DEPARTMENT, CROSS COUNTRY BANK, INC./APPLIED CARD SYSTEMS, INC., 800 DELAWARE AVENUE, WILMINGTON, DELAWARE 19801:**

PLEASE TAKE NOTICE, that the TELEPHONIC deposition of Cross Country Bank's

employee(s)/representative(s) having the most knowledge/information about:

1. The contents, mailing and receipt of Exhibit 14 to E. McKenna's June 28, 2004

   deposition *(attached hereto as Exhibit A.)*

2. The E-Oscar Web Reports dated 01-08-2003 *(attached hereto as Exhibit B.)*

3. The contents, comments and notes in Exhibit 18 of E. McKenna's June 28, 2004

   deposition *(attached hereto as Exhibit C.)*

4. The contents and notes in Exhibit 25 of E. McKenna's June 28, 2004 deposition

   *(attached hereto as Exhibit D.)*

1

Andersons 8228
NAF-CCB/ACS 30b6 Rep.

5. all audits, communications or correspondence dated January 1, 1998 to the present between CCB/ACS and any credit reporting agency relating to the reliability of information produced by CCB or ACS to the credit reporting agencies.

6. All systems or procedures in place for verifying that manual or electronic updates sent by CCB or ACS to the credit reporting agencies are in fact received by the credit reporting agencies

7. all AUDfs or UDFs *(e.g., Exhibit E attached hereto)* dated January 1, 2000 to the present that were sent by CCB or ACS to the credit reporting agencies concerning the Andersons' CCB accounts

8. all systems in place to assure that changes made pursuant to UDFs or AUDFs sent are also corrected and updated on monthly tape reporting to the credit reporting agencies.

9. all information concerning whether or not manual updates (UDFs/AUDFs) override or are suppressed to override monthly tape reporting.

10. all instructions provided to CCB/ACS by any credit reporting agency on how to complete a UDF or AUDF.

11. the relationship between the ECOA "X" mark and the "REMARKS,"

by oral examination will be taken before a qualified notary public at the law offices of **Ballard Spahr Andrews & Ingersoll, LLP, 919 North Market Street, Wilmington , DE 19801 at 9:30 AM ET on the 13th Day of January 2005** thereafter by adjournment until the same shall be completed.

2

IN DESIGNATING a person to appear for deposition under Rule 30(b)(6), an organization must make a conscientious good-faith endeavor to designate persons having knowledge of matters sought by the interrogator. <u>Protective Nat. Ins. Co. of Omaha v. Commonwealth Ins. Co.</u>, 137 F.R.D. 267, 278 (D. Neb. 1989) (applying identical federal rule). If an organization fails to designate a person with knowledge, sanctions may be imposed. <u>Arctic Cat Inc., v. Injection Research Specialists, Inc.</u>, 210 F.R.D. 680, 682-83 (D. Minn.).

An organization must not only produce such number of persons as will satisfy the request, but must also prepare them so that they may give complete, knowledgeable and binding answers on behalf of the organization. <u>Prokosch v. Catalina Lighting, Inc.</u>, 193 F.R.D. 633, 638 (D. Minn 2000). An organization's duty to prepare its designee(s) so that they can give knowledgeable and binding answers attaches not just to matters personally known to the designee(s), but also to subjects that the organization should reasonably know. <u>Hooker v. Norfolk So. Ry. Co.</u>, 204 F.R.D. 124, 126 (S.D. Ind. 2001); <u>Poole ex. rel. Elliot v. Textron, Inc.</u>, 192 F.R.D. 494, 504 (D. Md. 2000).

The scope of the deposition is not limited to the matters specified in the Notice of Deposition, but is limited only as provided generally in F. R. Civ. P. 26. The matters set forth in the deposition notice therefore constitute the minimum, not the maximum, about which the deponent must be prepared to speak. <u>Detoy v. City and County of San Francisco</u>, 196 F.R.D. 362, 366-67 (N.D. Cal. 2000).

3

**YOU ARE DIRECTED,** pursuant to Rule 30 and 34 of the Federal Rules of Civil Procedure to produce the following documents and things at the time of your deposition, if not already produced:

1. all "credit bureau record dump reports" dated August 2000 to the present not already produced in Exhibit 25 of E. McKenna's June 28, 2004 deposition (attached hereto.)

2. all instructions provided to CCB/ACS by any credit reporting agency on how to complete a UDF or AUDF.

3. Copies of any and all communications via email or letter between CCB/ACS and the credit reporting agencies that reference Claimants regarding the relationship between ECOA "X" marks and the "REMARKS" area of an ACDV/CDV.

4. Any and all policy and procedure manuals regarding:

    a.) manual updates (UDFs/AUDFs) override or are suppressed to override monthly tape

    b.) reporting all systems in place to assure sure that changes made pursuant to UDFs or AUDFs sent are also corrected and updated on monthly tape reporting to the credit reporting agency

    c.) All systems or procedures in place for verifying that manual or electronic updates sent by CCB or ACS to the credit reporting agencies are in fact received by the credit reporting agencies

4

Andersons 8228
NAF-CCB/ACS 30b6 Rep.

## DEFINITIONS

The term "documents" means all the writings of any kind, including the original and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, including, without limitation, correspondence, memoranda,  notes, diaries, statistics, e-mails, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, interoffice and intra-office communications, notations of any sort of conversations, telephone calls, meetings or communications, bulletins, printed matter, computer printouts, teletypes, telefax, invoices, worksheets, all drafts, alterations, and modifications, changes and amendments of any of the foregoing, graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotapes, recordings, motion pictures) and any electronic, mechanical, or electrical records or representations of any kind (including, without limitation, tapes, cassettes, disks, recordings and computer memories).

Dated: 1|6 _____ 2005                 By:   /s/ Thomas J. Lyons

**THOMAS LYONS & ASSOCIATES, P.A.**        **CONSUMER JUSTICE CENTER, P.A.**
Thomas J. Lyons, Sr.(# 65699)              Thomas J. Lyons, Jr. (# 249646)
WI Att. ID #: 1019127                      John H. Goolsby (#0320201)
342 East County Road D                     342 East County Road D
Little Canada, Minnesota 5517              Little Canada, Minnesota 5517
(651) 770-9707                             Telephone:  (651) 770-9707

Attorneys for Claimants

5

Andersons 8228
NAF-CCB/ACS 30b6 Rep.

Christine Cintron

NATIONAL ARBITRATION FORUM

NAF File No.: FA0406000286852

Penny Lee Anderson and                    )
Russell D. Anderson, Sr.,                 )
                                          )
            Claimants,                    )
                                          )
v.                                        )
                                          )
Cross Country Bank, Inc. and              )
Applied Card Systems, Inc.,               )
                                          )
            Respondents.                  )

              Deposition of Cross Country Bank, Inc. and
Applied Card Systems, Inc. taken pursuant to Rule
30(b)(6) through its designee CHRISTINE A. CINTRON at
Applied Card Systems, 50 Applied Card Way, Glen Mills,
Pennsylvania, beginning at 2:05 p.m. on Thursday,
February 17, 2005, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

        JOHN H. GOOLSBY, ESQ. (Via teleconference)
        CONSUMER JUSTICE CENTER, P.A.
            342 East County Road D
            Little Canada, Minnesota  55117
          For the Claimants

        MARTIN C. BRYCE, JR., ESQ.
        BALLARD SPAHR ANDREWS & INGERSOLL, LLP
            1735 Market Street - 51st Floor
            Philadelphia, Pennsylvania  19103-7599
            for the Respondents

ALSO PRESENT:
        FRANK BORZIO, ESQ. - CORPORATE COUNSEL
        CROSS COUNTRY BANK, INC.
        APPLIED CARD SYSTEMS, INC.

Exhibit F

Christine Cintron

Page 2

1        CHRISTINE A. CINTRON,
2    the deponent herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5        EXAMINATION
6    BY MR. GOOLSBY:
7    Q.   Good afternoon, Ms. Cintron.  My name is John
8    Goolsby and I'm one of the attorneys for the claimants
9    in this matter, Penny Anderson and Russell Anderson.
10        I understand that you have been designated
11   to testify about certain matters on behalf of Cross
12   Country Bank and ACS.
13        Could I please get you to state your full
14   name for the record?
15   A.   Christine Cintron.
16   Q.   Could you spell your last name, please?
17   A.   C-i-n-t-r-o-n.
18   Q.   All right.  Besides the documents that were
19   discussed in the deposition this morning, do you have
20   any further documents that you brought with you today?
21   A.   No.
22   Q.   Can I get your home address, please?
23   A.   20 Club Lane.  That's Wilmington, Delaware,
24   19810.

Page 3

1    Q.   Have you ever had your deposition taken before?
2    A.   Yes.
3    Q.   How many times?
4    A.   Once.
5    Q.   How recently?
6    A.   It's been a couple of years, at least two years
7    ago.
8    Q.   Was that in a case involving the Fair Credit
9    Reporting Act?
10   A.   No.
11   Q.   Was that in your capacity as a representative
12   of Cross Country Bank or ACS?
13   A.   Yes.
14   Q.   But it was not the Fair Credit Reporting Act?
15   A.   No.
16   Q.   Is there any reason you can't give complete and
17   truthful answers today?
18   A.   No.
19   Q.   Having had your deposition taken before, you
20   probably know the general idea.  I'm going to ask you
21   factual questions.  If you don't understand anything I
22   say or if I talk too fast, please stop me and ask me
23   to clarify.
24        And if you need a break, please let me

Page 4

1    know.  The one thing I will ask though is that you
2    wait until a question is no longer pending before you
3    ask for a break so that I get the answer to the
4    question I asked before you take a break.
5        Does that make sense?
6    A.   That makes sense.
7    Q.   Who is your employer, please?
8    A.   Back Room Services.
9    Q.   I beg your pardon?
10   A.   Back Room Services, which is an affiliate of
11   Cross Country Bank.
12   Q.   Back Room Services.  What is your title with
13   Back Room Services?
14   A.   Vice president of credit risk.
15   Q.   When you say Back Room Services is an affiliate
16   of Cross Country Bank, can you describe that
17   relationship a little bit?
18   A.   It's the same ownership.  We're located in
19   Pennsylvania, where Cross Country Bank is in
20   Wilmington, Delaware.  So it's for servicing.
21   Q.   Does Back Room Services also affiliate with
22   Applied Card Systems?
23   A.   No.  Back Room Services is an affiliate of
24   Cross Country Bank.

Page 5

1    Q.   Can you summarize what the nature of the
2    service Back Room Services provides for Cross Country
3    Bank?
4    A.   We provide the credit risk services.  Also
5    there is financial analysis and accounting.
6    Q.   How long have you been at Back Room Services?
7    A.   Back Room Services?  I became a Back Room
8    Services employee as of February 2004.  And I've been
9    working with Cross Country Bank since 1999.
10   Q.   Does Back Room Services provide its services to
11   other entities besides Cross Country Bank?
12   A.   No.
13   Q.   Have you been vice president of credit risk
14   since February of 2004?
15   A.   Yes.
16   Q.   What title did you hold at Cross Country Bank
17   before that?
18   A.   I was vice president of deposit operations for
19   Cross Country Bank.
20   Q.   Was that from 1999 until 2004?
21   A.   In 1999 I was director of deposit operations
22   and I think since 2000 I was vice president.
23   Q.   So you held two different positions during your
24   tenure at Cross Country Bank?

2 (Pages 2 to 5)

Page 6

1   A.  Yes.
2   Q.  Can you briefly summarize your duties as vice
3   president of credit risk at Back Room Services?
4   A.  Okay.  Credit risk, we're responsible for
5   acquisitions, risk review or account review and
6   account management once the accounts are on the
7   system.
8         And we also have credit bureau management
9   as well in the credit risk area.
10  Q.  When you say, "account management," do you mean
11  consumer accounts?
12  A.  Yes.
13  Q.  You don't mean your Back Room Services accounts
14  with Cross Country Bank?  You're talking about
15  individual credit card accounts?
16  A.  Individual consumer credit card accounts, yes.
17  Q.  And when you say, "credit bureau management,"
18  can you describe what you mean by that?
19  A.  It is the communications between the credit
20  bureaus for our acquisitions, so it's the prescreen
21  list names that we order, as well as the back end
22  bureaus that are pulled during the acquisition
23  process.
24  Q.  Okay.  So when you say, "the acquisition

Page 7

1   process," are those new accounts that Cross Country
2   Bank is setting up?
3   A.  Yes.
4   Q.  Do you have any responsibility for
5   communication with the credit bureaus regarding
6   existing Cross Country Bank accounts?
7   A.  Yes.  That falls in my department as well and
8   there's an individual that works for me that has that
9   responsibility.
10  Q.  We marked a number of exhibits this morning and
11  I'm going to refer to the exhibits by the numbers that
12  we gave them this morning.  I would like you to take a
13  look at first, please, Exhibit No. 1.
14        That has several sub-exhibits to it and I
15  would like to have you look first at the notice of
16  taking deposition itself.  When you're ready, please
17  let me know if you have seen this document before.
18  A.  Yes, I have seen this document.
19  Q.  When did you first see this?
20  A.  I saw it on Tuesday.
21  Q.  I understand from this morning's deposition
22  that you have been designated to testify about topic
23  No. 5 and topics 7 through 12?
24  A.  Correct.

Page 8

1   Q.  And you are prepared to testify on CCB/ACS's
2   behalf about those topics?
3   A.  Yes.
4   Q.  And you are prepared to testify on their behalf
5   even though you actually work for Back Room Services.
6   Is that correct?
7   A.  Yes.
8   Q.  Did you do anything to prepare for today's
9   deposition?
10  A.  I reviewed documents with counsel.
11  Q.  Which documents did you review?
12  A.  This one and the deposition given by Ed McKenna
13  and some of the exhibits included in that deposition.
14  Q.  Do you know Mr. McKenna?
15  A.  Yes.
16  Q.  Based on your reading of his deposition, are
17  you aware of anything that was inaccurate about his
18  testimony?
19  A.  No.
20  Q.  In your responsibility for overseeing
21  communications with the credit bureaus, my
22  understanding is that there is actually a company
23  called FDR that reports to the credit bureaus.  Is
24  that correct?

Page 9

1   A.  That's correct.
2   Q.  Can I have you look at, please, Exhibit B to
3   the deposition notice, which is Exhibit 1?
4   A.  I have it.
5   Q.  Mr. Giuliani testified this morning that this
6   is a record of information that's transmitted to the
7   credit bureau.  Is that your understanding?
8   A.  That's my understanding, yes.
9   Q.  Do you know Mr. Giuliani?
10  A.  Yes.
11  Q.  Do you have any reason to doubt anything about
12  his testimony?
13        MR. BRYCE:  Well, hold on.  I mean, she
14  wasn't here for his testimony, so I don't know how she
15  could possibly answer that.
16  BY MR. GOOLSBY:
17  Q.  Do you have any reason to believe that he
18  wouldn't have given truthful answers during his
19  testimony?
20        MR. BRYCE:  You can answer.
21  A.  No.
22  Q.  I'll represent to you that he testified that he
23  believed that everything in these credit dump reports
24  is transmitted to the credit bureaus but that he

Christine Cintron

Page 10

1  couldn't say that for certain.
2      Can you say for certain whether everything
3  in these dump reports is transmitted to the credit
4  bureaus?
5    A.  No.
6    Q.  Is it also your belief that everything in here
7  is transmitted to the credit bureaus?
8    A.  Yes.  I would believe what's here is what's
9  transmitted.
10   Q.  How does CCB/ACS know that what it intends to
11 send to the credit bureaus is, in fact, what the
12 credit bureaus receive?
13   A.  It's FDR that sends the information directly to
14 the credit bureaus, so it's our understanding that,
15 it's our understanding that the information on the
16 account is what's going to be sent to the bureaus.
17   Q.  Does Cross Country Bank/ACS ever audit what FDR
18 is sending to make sure that it is, in fact, what
19 CCB/ACS intends to be sent?
20   A.  We do a credit bureau audit, including
21 information that's on the credit bureau compared to
22 what's on the FDR system.
23   Q.  How often do you do that?
24   A.  There's monthly audits that are completed.

Page 11

1    Q.  Is that a sampling of accounts or does CCB/ACS
2  look at every account?
3    A.  That's a sampling of accounts.
4    Q.  And that compares, if I understand you
5  correctly, that compares what the credit bureaus show
6  they have with what is in the FDR database.  Is that
7  correct?
8    A.  That's correct.
9    Q.  I guess my question is though:  Does CCB/ACS
10 ever check to make sure that what is in the FDR
11 database is what CCB/ACS intends?
12   A.  Can you repeat that, please?
13   Q.  Does CCB/ACS ever audit what's in the FDR
14 database to make sure that it is what CCB/ACS intends?
15   A.  We are looking at the FDR system when we're
16 comparing the bureau in the audit.
17   Q.  Okay.  I see this as a two-step process though.
18     Am I correct that CCB/ACS provides
19 information to FDR which is then provided to the
20 credit bureaus?
21   A.  The information is housed on the FDR platform
22 and it's that information that's provided to the
23 credit bureaus.
24   Q.  Okay.  So CCB/ACS does an audit to make sure

Page 12

1  that what FDR has in its database and what the credit
2  bureaus have is the same, correct?
3    A.  Correct.
4    Q.  But does CCB/ACS do an audit to determine
5  whether what CCB/ACS has intended to put on the FDR
6  database is, in fact, what's on the FDR database?
7    A.  I believe that's covered in the audit that we
8  do perform.  There's not a separate database of
9  information other than the accounts that are housed on
10 the FDR platform.
11   Q.  Well, this morning Mr. Giuliani talked about a
12 history transaction report.  Are you familiar with
13 that?
14   A.  No.
15   Q.  I'm sorry?
16   A.  No.
17   Q.  Are you familiar with a non-mon 146
18 transaction?
19   A.  I saw a non-mon 146 transaction in the
20 documents that we reviewed for this, but other than
21 that I'm not familiar with that transaction.
22   Q.  So do I understand correctly that you're not
23 aware of any audit that's done to make sure that
24 non-mon 146 transactions are actually reflected in the

Page 13

1  FDR database?
2    A.  No, I'm not aware of an audit of individual
3  non-mons.
4    Q.  Are you aware of a sampling of non-mon
5  transactions to see if they're reflected in the FDR
6  database?
7    A.  I don't know if there's a sampling of non-mons
8  that are reflected in the FDR database.
9    Q.  So you don't know if what's in the FDR database
10 is what CCB/ACS intended to be there?
11     MR. BRYCE:  Objection to the form.
12     You can answer if you're able.
13   A.  We know from our audits that we do comparing
14 credit bureau to what's on the system if we have any
15 issues.
16   Q.  I understand from your audit that you make sure
17 that the information in the FDR database matches what
18 the credit bureau is reporting.  But my question is:
19 You don't have any way of knowing whether what's in
20 the FDR system in the first place is, in fact, what
21 CCB/ACS intended?
22     MR. BRYCE:  I'll object, John, because I
23 think you and the witness are talking past each other
24 and you're free to question her about this, but I

Page 14

1 think what she will tell you is what's on the FDR
2 database is what we put there, and by "we" I mean ACS.
3          MR. GOOLSBY: Okay. I appreciate that
4 testimony, but what I am asking the witness is how do
5 you know that that actually reflects what you intend,
6 that there wasn't somehow an error or mistake in
7 transmitting ACS/CCB's intent to the FDR database?
8          MR. BRYCE: See, again, I'll object
9 because I don't know what you mean by "intent" and I
10 don't know what you mean by "error." Error on whose
11 part? You haven't established that anyone else has
12 access to that database but ACS.
13          Subject to my objection, you can answer if
14 you're able.
15    A.   I'm not able.
16    Q.   Well, let me give you an example. If an
17 employee at ACS determined that an indication of
18 deceased was inaccurate and that employee attempted to
19 do something to change that in the FDR database, does
20 CCB/ACS have any way of monitoring or auditing whether
21 the FDR database does, in fact, ultimately reflect
22 that change?
23          MR. BRYCE: Same objections.
24          Answer if you're able.

Page 15

1    A.   The information would be reflected on the FDR
2 account. What's on the FDR account is what is
3 transmitted to the bureaus. So if there was a
4 deceased status that was on the FDR account on a
5 screen that we can visually see, then, yes, that
6 individual would correct it if the information was
7 reporting incorrectly.
8    Q.   I think we're still talking past each other and
9 I don't feel like I had an answer to my question.
10          If the change isn't made correctly and, in
11 fact, the FDR database isn't changed the way the ACS
12 employee meant to change it, does CCB/ACS ever know
13 about that?
14          MR. BRYCE: Well, see, I'm going to object
15 because you haven't established from this witness that
16 that can even occur; that, in other words, an ACS
17 associate wants to change my address from A to B and
18 she does that on the FDR system, I mean you haven't
19 established from this witness that there's any way to
20 her knowledge that what that is associate puts in that
21 something different can happen.
22          That's what I think you need to get out
23 with her so that maybe she can answer your question.
24          MR. GOOLSBY: Okay.

Page 16

1 BY MR. GOOLSBY:
2    Q.   Ms. Cintron, is it possible that an ACS
3 employee could make a mistake in attempting to change
4 information in the FDR database?
5    A.   Yes.
6    Q.   How does CCB/ACS ever know if such a mistake
7 has happened?
8    A.   We come across some mistakes during the monthly
9 audits and the monthly audits consist of reviewing a
10 report from E-Oscar, which is the database on where we
11 respond, reviewing the dispute and the response to
12 make sure that it was handled correctly.
13    Q.   Okay. I think that's getting at my question.
14          So CCB/ACS monitors how its employees
15 handle disputes with the E-Oscar system?
16    A.   Yes.
17    Q.   And how is that monitoring done?
18    A.   That monitoring is done by reviewing a report
19 on a monthly basis from the E-Oscar system and from
20 the information on that report the actual dispute from
21 the consumer is reviewed and it is reviewed against
22 the FDR system, as well as a report from the bureau
23 may also be pulled.
24    Q.   Again, is that a sampling or is that done on

Page 17

1 every dispute that's taken from the E-Oscar system?
2    A.   That's a sampling. We receive over 15,000
3 disputes per month.
4    Q.   From the E-Oscar system or from consumers
5 directly?
6    A.   From the E-Oscar system.
7          Many of the disputes that come from that
8 E-Oscar system are consumers who have a legitimate
9 delinquent history that are attempting to get that
10 history removed hoping that we won't respond in time.
11    Q.   Are you familiar with the nature of the
12 allegations in this case?
13    A.   Yes.
14    Q.   What do you understand the allegations to be?
15    A.   I understand that the individual account in
16 this particular instance was being reported as
17 deceased and the account owners were not deceased.
18    Q.   And is it your understanding that CCB/ACS was
19 reporting them as deceased?
20          MR. BRYCE: Objection to the form.
21          You can answer.
22    A.   According to what we saw on FDR, it didn't
23 appear that we were reporting them as deceased. On
24 the screens that were utilized it showed that it was

Page 18

1  an open active account.
2      Q.  And what screens are you talking about?
3      A.  It would be the BS screen, which reflects
4  internal and external status.
5      Q.  Would you agree that the BS screen does not
6  reflect everything that's reported to the credit
7  bureau?
8      A.  I don't know that for sure.
9      Q.  Would you agree that the BS screen does not
10  reflect everything that's in the account dump report?
11     A.  Again, I'm not familiar enough with the account
12  dump report to answer that.
13     Q.  If you look at, please, again the first page of
14  the account dump report, in the middle column about a
15  third of the way down do you see where it says CHD
16  deceased flag B?
17     A.  Yes.
18     Q.  Would you agree that that field does not show
19  up on the BS report?
20     A.  Yes. It's the BS screen. It's not a report.
21     Q.  I beg your pardon. The BS screen.
22         And so when CCB/ACS is monitoring to make
23  sure that disputes in the E-Oscar system were
24  accurately entered into the FDR system, would you

Page 19

1  agree that CCB and ACS don't look at this flag field?
2      A.  In the monitoring of the screens that we
3  utilize on FDR, we would not have seen this flag.
4      Q.  Do I understand correctly that an ACS employee
5  can by starting a non-mon 146 transaction but not
6  going through with it view the deceased flag field?
7      A.  Are you asking if the ACS employee can start a
8  non-mon transaction and view this field?
9      Q.  Yes.
10     A.  Okay. I'm not aware that they would proceed
11  that way. That's not the procedures to set a deceased
12  status on an account.
13     Q.  That wasn't my question actually.
14         My question is: Can ACS employees view
15  that field?
16     A.  I don't know.
17     Q.  Can an ACS employee change that field?
18     A.  I don't know. I don't know what their profiles
19  would allow.
20     Q.  But when monitoring to see if changes were made
21  correctly, CCB/ACS doesn't look at that field. Is
22  that correct?
23     A.  We do not look at that field because we don't
24  look at the dump report on a regular basis. The

Page 20

1  credit bureau dump report is something that has to be
2  requested from FDR because it reports on every account
3  that's actively reporting on the system.
4      Q.  I believe I understood that from Mr. Giuliani's
5  testimony this morning. Maybe I didn't word my
6  question very well.
7          I guess instead of referring to that
8  field, I mean the information that's in that field.
9  And Mr. Giuliani I'll represent to you testified this
10  morning that position 4 in a non-mon 146
11  transaction ACS employees can change.
12     A.  Okay.
13     Q.  Do you have any reason to doubt that?
14     A.  I don't have a reason to doubt that. ACS
15  employees may be able to change that field in a
16  non-mon, but it is not a field that is viewed on the
17  FDR screens when reviewing the account.
18     Q.  So it's not a screen that's reviewed when
19  you're checking to see if changes were made correctly?
20     A.  That's correct.
21     Q.  Why not?
22     A.  Because that is not a field or a flag that
23  would be set during normal procedures. This was set
24  inadvertently and I'm not sure what that

Page 21

1  representative was trying to do. But procedurally if
2  an individual is going to report an account deceased,
3  they would set an external status of I and that would
4  be reflected on the BS screen and procedurally that is
5  the process to follow and that's what we would review.
6      Q.  I guess that leaves me a little bit confused
7  because it seems to me like if you knew the employee
8  followed the procedure, there wouldn't be any need to
9  conduct a review.
10         Isn't the point of the review to find out
11  if the procedure wasn't followed?
12     A.  The point of the review is to try to find
13  errors that may have occurred if the procedure was not
14  followed.
15     Q.  But the review would not detect if an error was
16  made in the deceased flag?
17     A.  It would detect it if the external status was
18  incorrect.
19     Q.  If the internal and external statuses were
20  correct but the deceased flag field was incorrectly
21  changed, the reviewer would never detect that?
22     A.  This particular field would never normally
23  occur in the normal processes. This occurred in an
24  error that I believe was probably attempting to do

Page 22

1 something else. There wouldn't be a non-mon to change
2 the status to deceased in the process that we
3 currently have.
4    Q. And the review wouldn't detect that error is my
5 question?
6    A. No, it would not because this is not something
7 that we use and it was inadvertently set. We didn't
8 know that this would cause that reporting since it's
9 not something that we use in our procedures.
10    Q. Do you know why that field was called a
11 deceased flag?
12    A. No. I mean obviously it sets a deceased flag,
13 but it's not something that we would have known at
14 that time because it appears that it's a
15 subtransaction and within a non-mon it wasn't utilized
16 in that area.
17    Q. Do you know if FDR ever conducted any sort of
18 audit to make sure that the changes ACS employees have
19 attempted to make is reflected in what FDR reports to
20 the credit bureaus?
21    A. I don't know that.
22    Q. I believe you testified that ordinarily ACS
23 doesn't look at a dump report like this. Is that
24 correct?

Page 23

1    A. That's correct.
2    Q. What's the point of it then?
3    A. The point of it would be if there is an issue
4 and it becomes escalated and we have to request a dump
5 report from FDR. This is not a report that could be
6 reviewed on a regular basis due to the sheer size of
7 the report. It's over a million records.
8    Q. What does it take for a dispute to become
9 escalated?
10    A. It could be a dispute coming from our executive
11 correspondence area that handles escalated disputes or
12 it could be a dispute coming from our legal area.
13    Q. So does it require a lawsuit before a report
14 like this would be generated?
15       MR. BRYCE: Objection to the form.
16       You can answer.
17    A. No, it does not require a lawsuit.
18    Q. You mentioned the executive -- I'm sorry. Can
19 you fill in the rest of that for me? The executive
20 something department?
21    A. Executive correspondence.
22    Q. Executive correspondence. What does that
23 department handle?
24    A. That department handles disputes that come from

Page 24

1 regulatory agencies.
2    Q. Is that all?
3    A. No. They may handle some legal disputes as
4 well.
5    Q. How do you define a legal dispute?
6    A. That's not my area, so I don't know how they
7 define what gets forwarded to that area.
8    Q. At any rate, any time a dispute is escalated
9 ACS can request FDR to generate one of these reports.
10 Is that correct?
11    A. ACS can request FDR to generate one of these
12 reports, but I wouldn't use the terminology any time
13 we have an escalated dispute. It could be a dispute
14 that the cause is determined that has nothing to do
15 with this.
16    Q. What criteria are used for deciding whether ACS
17 will request FDR to generate such a report?
18    A. If the information can't be found on the
19 screens that we're reviewing on FDR and it's an
20 ongoing dispute, then we would request this report as
21 another tool to try and find out where the error is
22 occurring.
23    Q. Are you familiar with the term ACDV?
24    A. Yes.

Page 25

1    Q. What do you understand an ACDV to be?
2    A. An ACDV is an automated consumer dispute
3 verification.
4    Q. And what is that? What is your understanding
5 of what that is?
6    A. That is a dispute from a consumer that has gone
7 to the bureau and then the bureau has forwarded that
8 information for verification that the information is
9 correct or a correction from us, the data furnisher.
10    Q. Now, who is the data furnisher? FDR or ACS?
11    A. We would respond to those. In that case it
12 would be Cross Country Bank.
13    Q. Does the ACDV's ever go to FDR?
14    A. No.
15    Q. Even though FDR is actually supplying the
16 information?
17    A. FDR houses their account activity with us. If
18 we have something reported incorrectly on a history,
19 it's from an account with Cross Country Bank.
20    Q. But FDR is the entity that actually transmits
21 the information to the credit bureau?
22    A. Correct.
23    Q. Can I have you take a look, please, at the
24 McKenna deposition exhibits, specifically Exhibit

Page 26

1  No. 20?
2       MR. BRYCE:  Okay.
3    A.   And do you see the line 42 where it says
4  association code?
5    A.   Yes.
6    Q.   Are you able to interpret that line?
7    A.   No.
8    Q.   Do you recognize this document?
9    A.   This is the first time that I'm looking at this
10  particular document.
11       From reading from the headers, it appears
12  that the consumer has two claims and the subscriber
13  has two responses.
14   Q.   Okay.  Do you recognize this as an ACDV?
15   A.   This form itself?  No.
16   Q.   You will see on the second line from the top
17  you have auto ACDV response activity report?
18   A.   Yes.
19   Q.   Does that identify this as an ACDV to you?
20   A.   According to this title.  I just haven't seen
21  an actual printout of this before.
22   Q.   In this specific case do you know when the
23  dispute became sufficiently escalated first at FDR to
24  generate the dump report?

Page 27

1    A.   According to the documents that I reviewed in
2  preparation for this, it appears we asked for the dump
3  report late fall 2003.
4    Q.   Okay.  I'll represent to you that Mr. McKenna
5  testified that CCB/ACS had received multiple ACDV's
6  from the credit bureaus prior to that disputing the
7  deceased notation on the credit report.
8       And my question to you is:  Why didn't ACS
9  ask FDR to produce a dump report sooner?
10   A.   It's not unusual to receive multiple disputes.
11  If we saw that it was incorrect and we looked at the
12  system and the reporting codes on the system were
13  correct and we responded again, we would have no
14  reason to believe that information would not update
15  correctly.
16   Q.   Except if you received another ACDV on the same
17  dispute, right?
18       MR. BRYCE:  Objection to the form.
19   A.   Again, if we received another ACDV and it was a
20  couple of months down the road, we would respond
21  again, make sure the information on the FDR was
22  correct and assume that it wouldn't remain on the
23  account as we responded.
24   Q.   But you could have requested FDR to generate a

Page 28

1  dump report sooner, right?
2    A.   Operationally there wouldn't have been a reason
3  to have FDR generate a dump report due to a response
4  to a consumer dispute.  Like I said, we get 15,000
5  responses on E-Oscar alone.  We can't look through a
6  million records.
7    Q.   I appreciate that testimony, but that wasn't
8  actually my question.
9       My question is:  You could have requested
10  FDR to generate a dump report sooner, couldn't you?
11   A.   I would assume we could request a report from
12  our servicer as needed.
13   Q.   But you didn't request one before the fall of
14  2003.  Isn't that correct?
15   A.   That's correct because I don't think we
16  realized that it continued to report incorrectly.
17  According to what we saw on the system, everything was
18  set correctly and we had no way of knowing that an
19  inadvertent flag could override what we were sending
20  as updates to the bureau.  So it wouldn't justify
21  requesting a dump report from FDR at that time.
22   Q.   What if the consumer called you and said, "I'm
23  not deceased," would that justify requesting a dump
24  report if you had previously tried to change it and

Page 29

1  then the consumer said, "Hey, it's still showing
2  deceased on my credit report"?
3    A.   No, it wouldn't.
4    Q.   Why not?
5    A.   That could justify an AUD, which is us
6  initiating an update to the bureau.  And, again, if
7  the information that was on FDR that we reviewed was
8  correct and did not have that external status of I to
9  report this individual as deceased, it would be our
10  assumption that we could send that AUD to the bureaus
11  and the information would report correctly.
12   Q.   How does ACS/CCB make sure that the information
13  was subsequently reported correctly after CCB/ACS sent
14  an AUD?
15   A.   Again, that could be picked up in our monthly
16  auditing of consumer disputes and AUD's that we
17  process.
18   Q.   But on any individual account there's no check
19  to make sure that, in fact, the subsequent information
20  has been reported correctly.  Is that correct?
21   A.   There's not a 100 percent check.  The volume
22  prohibits that.
23       Again, this report that you referenced in
24  this exhibit, I think it has Deposition No. 20,

Page 30

1  looking at it, it says experience auto ACDV response
2  activity report.  If you look here at the ECOA code,
3  it has number 2, which means joint.
4      Q.  I'm sorry.  Where are you talking about?  Which
5  exhibit?
6      A.  I'm looking at the last exhibit that you had me
7  review.
8          MR. BRYCE:  No. 20, McKenna 20.
9      Q.  No. 20 of the McKenna deposition.  Say what you
10  said again, please.
11      A.  Again, if this report that is titled ACDV
12  response activity report, if you look at line number
13  5, ECOA 2, that equals joint account.  And our
14  response in line number 22 is verified as reported.
15      Q.  Okay.  You understand line number 5 to be what
16  the credit bureau is reporting or what the consumer
17  states the credit bureau should be reporting?
18      A.  I understand it to be what the consumer states
19  the credit bureau should be reporting and, again, the
20  response code says verified as reported, which is in
21  agreement with that.
22      Q.  So are you testifying that when ACS or CCB said
23  verified as reported that means that the way the
24  consumer is requesting the account should be reported

Page 31

1  is correct?
2      A.  Yes.
3      Q.  So verified as reported means that the credit
4  bureau should change it from what they have been
5  reporting to what the consumer states should be
6  reported?
7      A.  Verified as reported means that the consumer,
8  it should report as the consumer states, that we are
9  agreeing with that.
10      Q.  That you're agreeing with what the consumer
11  states?
12      A.  That in this case that ECOA 2 we're agreeing
13  with that.
14      Q.  And, again, it is your understanding that ECOA
15  2 is what the consumer wants it to state?
16      A.  Yes.
17      Q.  And you're agreeing with that?
18      A.  It says verified as reported.
19      Q.  On what do you base your understanding of what
20  verified as reported means?
21      A.  Verified as reported means that we agree with
22  the consumer, we agree with this reporting that's on
23  this form.
24      Q.  That would verify as reported to the credit

Page 32

1  bureau?
2      A.  I can't answer that.
3      Q.  Well, when you communicate to the credit bureau
4  and they verify as reported, you expect them to put on
5  the credit report what the consumer says it should be?
6      A.  If we're in agreement with the consumer, we
7  would respond.
8      Q.  If you're in agreement with the consumer you
9  would respond what?
10      A.  Verified as reported.  If the consumer has a
11  dispute and something is wrong on their system, then
12  we would make that correction.
13      Q.  Don't you want to be sure that the credit
14  bureau has the same understanding of verified as
15  reported as you do?
16      A.  I'm sure there is the same understanding for
17  the process, yes.
18      Q.  But you're sure that the credit bureau
19  understands that verified as reported means reported
20  the way the consumer wants it to be reported?
21      A.  In this case there was no dispute.  What the
22  consumer wanted reported and what we had on the FDR
23  system that we were reviewing was the same, so that
24  would mean we would send it back verified as reported

Page 33

1  and we wouldn't make any changes.
2      Q.  Please take a look at line number 6, please.
3      A.  Line number 6?
4      Q.  Yes.
5      A.  Yes.
6      Q.  What does that line mean to you?
7      A.  It means consumer says this account is being
8  reported incorrectly; they are not deceased.
9      Q.  So what is the credit bureau trying to attempt
10  to communicate to CCB on that line?
11      A.  On this one it's to make sure that the
12  reporting for the account is correct.  And on our
13  system we didn't have the internal status I that said
14  that they were deceased, so we would be in agreement
15  that it wasn't ECOA of 2, which is joint, and we would
16  respond verified as reported because on that screen
17  that's what was reporting.
18      Q.  I will have you take a look, please, at McKenna
19  depo Exhibit 14.  In particular, the first page of
20  that document.
21          Do you recognize this document?
22      A.  This would be the unverified automated consumer
23  dispute verification.
24      Q.  I see that it says that.  Do you know it to be

Christine Cintron

Page 34

1    that or are you just reading from it?
2    A.   The first time I've seen this document again
3    was on Tuesday.
4    Q.   Have you ever seen a document in this format
5    before?
6    A.   No.
7    Q.   How about on the next page, do you recognize
8    this document?
9    A.   I recognize it from looking at it two days ago.
10   Q.   But you never have seen this document before
11   two days ago?
12   A.   This actual printout of the report document?
13   No.
14   Q.   Have you seen this format of a document before?
15   A.   No.
16   Q.   Do you see on here where it says ECOA?  Let me
17   see if I can direct you to it.  It's about two-thirds
18   of the way down and two-thirds of the way across the
19   page from left to the right.
20   A.   Yes.
21   Q.   The box below says X and the box below that
22   says 1.
23        Do you know what those three boxes mean?
24   A.   I see them.  Did you ask anything else?

Page 35

1    Q.   Do you know what those three boxes mean?
2    A.   Okay.  ECOA, X and 1?
3    Q.   Yes.
4    A.   ECOA is Equal Credit Opportunity Act.  X would
5    mean deceased under that particular coding.  And I
6    don't know what the 1 is.
7    Q.   Do you see on this form where the box verified
8    as reported is checked?
9    A.   Yes.
10   Q.   Do you know why this form would have verified
11   as reported checked while having an X underneath the
12   ECOA box?
13   A.   No.  Because I don't know who checked that box.
14   At the top it says returns dispute 2 Trans Union, so I
15   don't know if it came in that way or if that was our
16   return.
17   Q.   Do the credit bureaus give CCB/ACS any
18   instruction on how to complete the forms that are used
19   to communicate between the two?
20   A.   Instructions reside on an on-line tutorial on
21   E-Oscar and when they brought the Oscar system up they
22   supplied some material in hard copy.
23   Q.   "They supplied" meaning the credit bureaus did?
24   A.   Yes.

Page 36

1    Q.   They supplied them to CCB?
2    A.   Yes.
3    Q.   And have you taken that on-line tutorial?
4    A.   No.
5    Q.   Have employees in your department taken that
6    on-line tutorial?
7    A.   I'm not sure.  I know they have the written
8    documents.
9    Q.   Why haven't you taken that on-line tutorial?
10   A.   Because I don't actually process the disputes
11   on-line myself as a user.  That process is done by ACS
12   and we monitor that through our audit sampling to make
13   sure that they're answered correctly.
14   Q.   But if you haven't taken the tutorial, how do
15   you know if the forms are being completed correctly?
16   A.   How do I know if the forms are being completed
17   correctly?
18   Q.   Yes.
19   A.   I review the error rates according to the
20   audit, the monthly audit responses.
21   Q.   How do you determine the error rate if you
22   don't know, if you haven't taken the tutorial to
23   understand the process?
24   A.   Because I'm not the one that is actually

Page 37

1    processing the review of this.  The individual that
2    does the actual audits is familiar with the process,
3    may have even taken the tutorial, but they were
4    involved in the training for E-Oscar and have the hard
5    copy documents.
6    Q.   Okay.  But you are testifying today on behalf
7    of CCB and ACS on topic 7 through 12 of the deposition
8    notice.  Is that correct?
9    A.   That's correct.
10   Q.   Can you turn back to Deposition Exhibit 20?
11        I'll represent to you that representatives
12   of the credit bureaus have said that stating verified
13   as reported was the wrong thing for ACS/CCB to do if
14   it wanted the deceased code removed.  Would you
15   dispute that?
16   A.   Well, here the ECOA code says joint.  And I'm
17   not sure who produced this document.  I don't know if
18   this was produced by one of the bureaus.
19        MR. BRYCE:  I'll note that the Bates
20   number indicates it was produced by the bureaus.
21        MR. GOOLSBY:  I will confirm that.
22   A.   Okay.  If that's the case, if the bureau is
23   producing a document that says ECOA 2 and we're
24   agreeing with that, I don't see how that would be

Page 38

1  incorrect for us.
2     Q.  A moment ago I believe you testified that X
3  stands for deceased.  Is that correct?
4     A.  Yes.  I said that X stands for deceased if it
5  is the ECOA code.  In this case the ECOA says 2.
6     Q.  This document says consumer states ECOA 2,
7  right?
8     A.  Yes.  But I don't see any other ECOA code here
9  with any different setting.
10    Q.  Do you know what the association code in line
11 42 is?
12    A.  I said I didn't know the association code.  I
13 read the titles at the top regarding responses and
14 claims.
15    Q.  How about the payment status in line 31, do you
16 know what that refers to?
17    A.  On this particular form?  I've never seen this
18 form before.  It's blank under response.  It's blank
19 under claims.  And then on profile it has 21,
20 deceased, so no.
21    Q.  Some time ago you testified about AUD.  What's
22 an AUD?
23    A.  Automated universal dispute.
24    Q.  Are you familiar with the term UDF?

Page 39

1     A.  Universal data form.
2     Q.  Are those the same things?
3     A.  I believe the UDF was the paper format that was
4  utilized prior to the AUD and the Oscar system.
5     Q.  I'm sorry.  Prior to the what?
6     A.  The E-Oscar system and the AUD form.
7     Q.  Now I want you to take a look at the deposition
8  notice Exhibit D.
9     A.  I have the form.
10    Q.  This is actually two pages.  Do you recognize
11 either of these pages?
12    A.  Again, from the documents that I reviewed on
13 Tuesday.
14    Q.  You saw the document for the first time on
15 Tuesday?
16    A.  Yes.
17    Q.  No one at CCB/ACS can testify any more about
18 these documents than you can?
19    A.  There may be somebody that could testify about
20 the documents itself more than me.  This document I
21 don't believe is utilized anymore because we utilize
22 the AUD.  This looks like a paper response, a hard
23 copy response if you look at page 1 and 2.
24    Q.  Well, I'll represent to you that that's

Page 40

1  actually two separate documents.
2     A.  Okay.
3     Q.  When did ACS/CCB start using the AUD format?
4     A.  I think we started using E-Oscar in 2002.
5     Q.  So AUD came in with E-Oscar?
6     A.  Yes.
7     Q.  I will have you take a look at Exhibit D again,
8  the first page.  Do you see at the top left where it
9  says "E-Oscar Web - Reports"?
10    A.  Mm-hmm.
11    Q.  Then it says, "Universal Data Form"?
12    A.  Yes.
13    Q.  Can you explain why it says universal data form
14 if the E-Oscar system is the AUD system?
15    A.  Well, the AUD is a response that we -- it's a
16 correction that we initiate and the universal data
17 form would be an electronic response back to a
18 bureau-initiated dispute.
19    Q.  What's the difference between UDF and ACDV?
20    A.  ACDV's also come from the bureau.  And I can't
21 explain that difference, unless one was in paper and
22 one was in electronic form.
23    Q.  Does CCB/ACS create the forms that we see for
24  the UDF in Exhibit D?

Page 41

1     A.  No, we don't create the form.
2     Q.  Who creates those forms?
3     A.  That form would be part of E-Oscar.
4     Q.  And before E-Oscar was implemented?
5     A.  Before E-Oscar was implemented -- I believe I
6  was confusing my acronyms -- it was ACDV.  And then
7  after E-Oscar, the automated version of it is the UDF.
8  And the UDF is a response to a bureau-initiated
9  dispute where the AUD is a correction that we are
10 making on behalf of our customers ourselves.
11    Q.  I apologize, Ms. Cintron, if I repeat some
12 questions here.  Some of the questions I asked this
13 morning to Mr. Giuliani and I can't remember if some
14 of these questions were what I asked him or you
15 earlier today, so bear with me if I'm a little bit
16 redundant and I apologize in advance.
17          We did talk about the CHD deceased flag B
18 on the dump report, did we not?
19    A.  Yes, we talked about the dump reports.
20    Q.  And we did talk about that specific field where
21 it says CHD deceased flag B?
22    A.  I would have to go back to that exhibit.  I
23 don't know that number.  That's not a report I'm
24 familiar with.

Christine Cintron

Page 42

1    CHD, yes, we talked about that.
2    Q.   To your knowledge, is there any field on the
3  UDF's or ACDV's or, for that matter, AUD's to indicate
4  a change to the deceased flag B field?
5    A.   The form, these forms would not be specific to
6  our platform. So, no, the form would not have CHD
7  deceased flag B on the form.
8    Q.   Now, when disputes come from the credit bureaus
9  do they go to CCB or ACS?
10    A.   I believe they go directly to ACS.
11    Q.   If I represent to you that the credit bureaus
12  testified that at least some ACDV's went to CCB, would
13  you disagree with that?
14    A.   The mailing address could be CCB. But, again,
15  in the past I'm not sure where they were being
16  processed, but right now we have a division in Applied
17  Card Systems that processes them.
18    So, no, I would not dispute that as a
19  statement overall.
20    Q.   You said, you referred to the mailing address
21  that the disputes for the credit bureaus went to in
22  the past.
23    A.   Right, in the past before E-Oscar.
24    Q.   Now on E-Oscar they're all electronic?

Page 43

1    A.   On E-Oscar we get electronic disputes. They
2  may still get some mail disputes as well. And I
3  believe as normal processing Applied Card Systems
4  handles those disputes.
5    Q.   But it is part of your job to audit to make
6  sure whether the disputes are processed correctly. Is
7  that correct?
8    A.   It's part of the job within my department, yes.
9    Q.   I ask you to turn to Exhibit 2, please. When
10  you're ready, please tell me if you recognize this
11  exhibit.
12    A.   Yes, I've seen this before.
13    Q.   What is this, what is it?
14    A.   This is a procedure for resolution of consumer
15  disputes.
16    Q.   When you say a consumer dispute, you mean one
17  that comes directly from the consumer or one that's
18  forwarded from one of the credit bureaus?
19    A.   This says consumer disputes, so this doesn't
20  reference directly where it's coming from.
21    Q.   So is it your testimony that the procedures
22  described herein apply to disputes wherever they come
23  from?
24    A.   If a customer has a dispute directly with us

Page 44

1  and we have a correction, we will do an AUD. Most
2  likely if this is coming through and they're talking
3  about a dispute verification request or a universal
4  data form, it's coming from the bureau. We're not
5  going to ignore a customer dispute either.
6    Q.   I'm sorry? I beg your pardon?
7    A.   If it comes in through customer service, again
8  it's going to get forwarded to the same unit, which is
9  credit investigations.
10    Q.   I see it says credit investigations down on the
11  lower left here.
12    A.   Mm-hmm.
13    Q.   And that's a department within ACS?
14    A.   Yes.
15    Q.   Is that part of account services?
16    A.   It's part of, yeah, it's part of the same
17  department. This unit works credit investigations,
18  but it's part of the account servicing department with
19  ACS, yes.
20    MR. GOOLSBY:  Perhaps we can take a
21  five-minute break. Is that okay?
22    MR. BRYCE:  Sure. Of course.
23    MR. GOOLSBY:  Let's come back in five.
24    (A brief recess was taken.)

Page 45

1  BY MR. GOOLSBY:
2    Q.   Ms. Cintron, tell me again please when CCB
3  started using E-Oscar.
4    A.   I believe it was in 2002.
5    Q.   On this Exhibit 2 do you see down in the bottom
6  right-hand corner where it says, "Revised January 9,
7  2003"?
8    A.   Yes.
9    Q.   So this would be after the E-Oscar system was
10  in place. Is that correct?
11    A.   Yes. I believe E-Oscar was in place then.
12    Q.   I want to direct you to the middle section
13  where it says Policy, the paragraph that begins after
14  the bullet.
15    A.   Yes.
16    Q.   Do you see the third sentence where it says,
17  "The credit reporting agencies are contacted using a
18  UDF"?
19    A.   Yes.
20    Q.   Do you see where I am reading?
21    A.   Yes.
22    Q.   Then it says, "The UDF can be automated or
23  physically mailed/faxed to the credit reporting
24  agency"?

Christine Cintron

Page 46

1   A.   Yes.
2   Q.   Is that true?
3   A.   It could have been true then because there
4 could be a time when they would accept both mail as
5 well as electronic.  We still receive some requests by
6 mail that we can respond to by mail, but the request
7 that we receive electronically we respond to
8 electronically.
9        Now, I don't know the time frames when the
10 bureau told us that if we receive it electronically we
11 have to respond electronically or they would no longer
12 accept it.  But I know there was an overlap and,
13 again, we still do receive some requests by mail that
14 we can respond to by mail.
15   Q.   Okay.  You say those are requests from the
16 credit bureau?
17   A.   This particular procedure would cover requests
18 from the credit bureau as well as requests from
19 consumers.
20   Q.   So if you receive a request from a consumer by
21 mail, you're going to send it by mail to the credit
22 bureau?
23   A.   If we receive a request from a consumer by
24 mail, then we would go ahead and process an AUD

Page 47

1 procedurally now.  You were asking me specifically
2 about the bureau's procedures.
3   Q.   And the AUD you're testifying is the electronic
4 version?
5   A.   The AUD is if we are initiating the change.
6 We're not responding to a bureau request.  We're
7 initiating a change on behalf of the consumer.
8   Q.   Okay.  And an UDF is where, it's your testimony
9 that the UDF is where disputes come from the credit
10 bureau?
11   A.   Yes.
12   Q.   Then I'm confused because on this Exhibit 2 you
13 testified this procedure applies to disputes both from
14 the credit bureau and directly from consumers.
15   A.   This procedure covers disputes that are
16 received from credit bureaus or the customer.  If you
17 look at the Introduction at the top, it says, "The
18 requests that are completed by the Credit
19 Investigations Unit are received from the Customer via
20 mail, or from the credit bureau via mail.  Customer
21 Service and Customer Service Specialty Associates."
22   Q.   Okay.  And then the next paragraph it talks
23 about UDF or the next section I should say talks about
24 UDF.

Page 48

1   A.   In the Introduction paragraph where do you see
2 UDF?
3   Q.   I'm sorry.  I'm not talking about the
4 Introduction paragraph.  In the Policy section, the
5 paragraph after the bullet, the third sentence.
6   A.   "The credit reporting agencies are contacted
7 using a UDF" form, correct.
8   Q.   Okay.  So, then, is this instruction only for
9 disputes that are received from the credit bureaus?
10   A.   If a customer has a dispute with a credit
11 bureau and the credit bureau is initiating the
12 correction, then we use the UDF.
13        If we're going to make a change on the
14 consumer account, we can use an AUD.  Basically, the
15 same result occurs in either case, universal data form
16 or an automated or an AUD.  It updates all three
17 bureaus.
18   Q.   Is it universal data form or universal date
19 form?
20   A.   Data -- or date.  I'm sorry.  This has date.
21   Q.   So which is it?
22   A.   It's data.  That's a typo.
23   Q.   Okay.
24   A.   On this one particular reference under Policy

Page 49

1 there should be an A on the end.
2   Q.   If this Exhibit 2 covers both disputes that
3 comes to ACS from the credit bureaus and disputes that
4 come to ACS directly from the customer, why do I only
5 see a reference to UDF and not to AUD?
6   A.   It would be the UDF form that's utilized now on
7 E-Oscar, and I can't answer the difference of the
8 specifics for that.
9   Q.   You don't know why this document doesn't
10 reference AUD?
11   A.   No.  I don't know why they don't have it
12 incorporated into one procedure.
13   Q.   On the first page of this document it says,
14 "adjustments must be made to FDR."  That's in the
15 Policy section, that same paragraph that we were
16 talking about.
17        Do you see that?
18   A.   Yes.
19   Q.   Is that true whether it's a dispute from a
20 bureau or a dispute from the customer?
21   A.   "Any necessary changes or adjustments must be
22 made to FDR," that is true.  If a change is required
23 and a correction is required on the account, it has to
24 be corrected on FDR.

13 (Pages 46 to 49)

Page 50

1  Q.  And does that apply even when it's not a UDF
2  circumstance?
3    A.  Yes.  That would apply any time there needed to
4  be a change or an adjustment because the information
5  was incorrect.  It would have to be corrected on FDR.
6    Q.  Would you agree that's a little bit confusing
7  when this paragraph is only talking about UDF?
8    A.  No.
9    Q.  In the paragraph that's talking about UDF it
10  says, "adjustments must be made to FDR."  You don't
11  think that's confusing that it doesn't say you also
12  have to make adjustments to FDR in an AUD
13  circumstance?
14    A.  In that paragraph it refers to both.  You have
15  to make changes or adjustments to FDR, which is a
16  platform, and then, again, it says that "The credit
17  reporting agencies are contacted using a UDF with the
18  correct reporting information."
19    Q.  Where does it refer to AUD?
20    A.  We already established this particular document
21  doesn't refer to AUD.
22    Q.  But you do have to make the adjustment to FDR
23  even in an AUD circumstance, don't you?
24    A.  If there was an AUD process and something

Page 51

1  needed to be changed then, again, it would have to be
2  made on FDR, yes.
3    Q.  But this document doesn't say anything about an
4  AUD process?
5    A.  Because this document references the UDF and if
6  we send the UDF to the bureaus to change information,
7  we're also stating that the information has to be
8  changed on FDR, so they would both be corrected.  One
9  would go to the bureau; one would be on the platform.
10    Q.  Turn to page 41, please.  By "page 41," I'm
11  referring to the Bates stamp where it says ACS-A00041.
12    A.  Okay.
13    Q.  Then about two-thirds of the way down do you
14  see it says, "Once the requests have been forwarded to
15  the Credit Investigations Unit, the Credit
16  Investigations Associates will complete the
17  following"?
18    A.  Yes.
19    Q.  And within that it appears that the credit
20  investigations associate is supposed to make changes
21  to the FDR.
22        Do you see that?
23    A.  Can you let me know what section?  Are you
24  referring to bullet four?

Page 52

1    Q.  It's the fourth little arrow there.
2    A.  Mm-hmm.
3    Q.  "Make all necessary adjustments to FDR."  Do
4  you see that?
5    A.  Yes.
6    Q.  My question is:  Do you know what level of
7  access the credit investigations associate has to FDR?
8    A.  No.
9    Q.  Do they have complete access to FDR as far as
10  you know?
11    A.  I don't know their individual profiles with
12  their access, no.
13    Q.  But this is done in conjunction with sending
14  UDF's to the credit bureaus, right?
15    A.  Yes.  The information that's referenced in this
16  procedure is information that's updated by the credit
17  investigations unit, so they do have that access to
18  FDR.
19    Q.  And it's part of your job to make sure that
20  they make the necessary adjustments in FDR, correct?
21    A.  That's correct.
22    Q.  On the next page do you see step 9 where it
23  says, "Access the FDR system"?
24    A.  Yes.

Page 53

1    Q.  Then it refers to a number of screens, the BS,
2  the CPH, the CSS and the CDA in the subsequent
3  numbers?
4    A.  Yes.
5    Q.  And the CIS screen?  Do you see that in 10
6  through 13?
7    A.  Yes.
8    Q.  And those are all FDR screens that the
9  associates have access to?
10    A.  Yes.
11    Q.  Will you turn to page 43, please?
12        Now, a moment ago I understood you to
13  testify that the UDF's are the disputes that come from
14  the credit bureaus.  Did I understand that correctly?
15    A.  Yes.  UDF's can come from the credit bureau.
16    Q.  They can or they do?
17    A.  They do.  The universal data form is a form
18  that the credit bureaus have out on E-Oscar.
19    Q.  And I understood you to testify that the UDF is
20  the form that the credit bureaus use to communicate
21  disputes to CCB.  Is that correct?
22    A.  (Pause).
23    Q.  I'm sorry?
24    A.  I'm just reviewing the documents.

Christine Cintron

Page 54

1    I know the UDF is our communication with
2  the credit bureau. I don't know if the actual initial
3  dispute that we get comes on a form called UDF or when
4  it comes in through the E-Oscar database if it's
5  called UDF, but I know that universal data form is our
6  response to the bureaus. We're working with the
7  bureau to update the information.
8    Q.  That's your response to a dispute that comes
9  from the bureau?
10   A.  Yes. We would send them a UDF.
11   Q.  In response to a dispute that they sent you?
12   A.  In response to a dispute that they sent us,
13  yes.
14   Q.  Now I want to direct you on this page 43 about
15  two-thirds of the way down it says, "Common Scenarios
16  Regarding UDF's."
17   A.  Yes.
18   Q.  "The following scenarios are common occurrences
19  and/or requests made by Customers in reference to
20  their credit reports (UDF requests)."
21   A.  Mm-hmm.
22   Q.  I'm confused. I thought you said a UDF was a
23  dispute that came from the credit bureau, not from the
24  customer.

Page 55

1    A.  We could respond if the dispute comes directly
2  from the credit bureau, but also in the introduction I
3  said that the disputes can also come from the customer
4  via mail. They can come from the credit bureau or
5  they can come from the customer service unit via phone
6  call.
7    Q.  Okay. But I thought you said the AUD is used
8  when the dispute comes from the customer.
9    A.  An AUD is us updating the bureau. We haven't
10  received -- it doesn't necessarily mean we received a
11  dispute from the bureau. We're making a correction.
12  A UDF can be used if it comes from the bureau or if it
13  comes from the customer or if it comes from the
14  customer via phone or if it comes from the bureau.
15   Q.  What did you say ACDV's were again?
16   A.  They are automated consumer dispute
17  verifications.
18   Q.  I understand what the acronym is for. But what
19  are they?
20   A.  They are consumer disputes.
21   Q.  Directly from the consumers or from the credit
22  bureaus?
23   A.  I believe they're from the credit bureaus on
24  the Oscar system.

Page 56

1    Q.  So is it your testimony that an ACDV comes from
2  a credit bureau and a UDF is used to respond to that?
3    A.  (Pause).
4    Q.  Sorry. I didn't hear the answer.
5    A.  I didn't answer you yet.
6    Q.  Is that your understanding?
7    A.  That's my understanding.
8    Q.  I ask you to turn to page 45, please.
9      About two-thirds of the way down do you
10  see where it says, "check truncation errors"?
11   A.  Yes.
12   Q.  Do you know what a check truncation error is?
13   A.  Yes.
14   Q.  What is it, please?
15   A.  A check truncation error could mean that a
16  payment that we submitted via ACH had incorrect
17  numbers on it.
18   Q.  Does that have anything to do with, can that
19  have anything to do with a deceased status on a credit
20  report?
21   A.  I don't believe so.
22      MR. GOOLSBY: I want to have marked as the
23  next exhibit the one thing we didn't mark this
24  morning. I think we're up to Exhibit 10.

Page 57

1      I want to have pages 48 through 54 marked
2  as Exhibit 10, please.
3      (CCB/ACS Deposition Exhibit No. 10 was
4  marked for identification.)
5  BY MR. GOOLSBY:
6    Q.  When you're ready, can you tell me whether you
7  recognize this Exhibit 10?
8    A.  I don't think I've read through it. It looks
9  like a revision to the exhibit we just went through.
10  It looks like a more recent date.
11   Q.  What makes you think it's more recent?
12   A.  Well, because it has February 13th, 2002.
13  Okay. It's an older date. I'm sorry.
14   Q.  I'll represent to you that based on my
15  comparison of these two documents it looks like
16  Exhibit 2 is the newer version. I'm wondering if you
17  know why on Exhibit 2 at the bottom it says, "Account
18  Services Policies and Procedures" but on Exhibit 10 it
19  says, "Credit Investigations Policies And Procedures"?
20      Do you know why that is?
21   A.  My assumption would be that account services --
22  credit investigations is part of account services.
23   Q.  But you don't know that?
24   A.  I don't know that.

15 (Pages 54 to 57)

Civil Action Group 763-576-8832

Page 58

1    Q.   Okay.  Looking back at 10 at the top, near the
2    the top it says, "Chapter Three."  Do you know what it
3    is chapter three of?
4    A.   No.  Not from 2002, no.
5    Q.   Looking back to Exhibit 2, can you turn to page
6    47, please?
7         Under Step 2 in the box do you see where
8    it says, "This is an ACDV request"?
9    A.   Yes.
10   Q.   Do you understand why it is referencing ACDV in
11   that box?
12   A.   It's instructing them to memo the account in
13   this manner.  And the ACDV stands for automated
14   consumer dispute verification.
15   Q.   Why is it necessary to memo the account to show
16   that it was an ACDV request?
17   A.   Because if it came through as an ACDV request
18   on E-Oscar and that memo is on the account, one of the
19   reasons could be when we do an audit on our monthly
20   audit we know how the request was received.
21   Q.   Okay.  I don't see a reference to an ACDV
22   request on any other kind of change that's talked
23   about in this document.  Do you know why that would
24   be?

Page 59

1    A.   No.
2    Q.   Would that make it harder for you to audit?
3    A.   We would like to know where the request comes
4    from.  So, yeah, it could make it harder for us to
5    audit, to find the original dispute if we don't know
6    where it originated from, yes.
7    Q.   The last whole underlined section on page 47
8    where it refers to "the ACDV group," what is the ACDV
9    group?
10   A.   I don't know if they have a specific group that
11   works these disputes versus other disputes.
12   Q.   Did you play any role in drafting any of ACS's
13   policies and procedures manual?
14   A.   I did not have any role in drafting these
15   manuals from 2002 and 2003 because I arrived in credit
16   risk in 2004.
17   Q.   Okay.  Are you aware of any subsequent
18   revisions to these manuals?
19   A.   Other than what's in process right now, no.
20   Q.   Okay.  Let's take a look, please, at Exhibit 4.
21        When you're ready, please let me know if
22   you have seen this document.
23   A.   I've seen the title page as being included in
24   the exhibits, but I have not read through it.

Page 60

1    Q.   Do you recognize this as an ACS policies and
2    procedures manual?
3    A.   It says on the title "Applied Card Systems
4    Policies & Procedures Manual," so yes.  But, again,
5    this is the first time I'm looking through the
6    document.
7    Q.   Please turn to page 58.
8    A.   Okay.
9    Q.   I want to direct your attention to the last
10   paragraph on that page and I believe it's the fourth
11   sentence that says, "The Credit Reporting Agencies are
12   contacted using an ACDV form."
13        Do you see where I am?
14   A.   Yes.
15   Q.   I thought you said the credit reporting
16   agencies were contacted with a UDF form?
17   A.   There have been UDF form responses.  And if the
18   title on this particular system is ACDV, again to
19   respond back to the bureaus that could be.
20   Q.   So when is a UDF form used to communicate to
21   the bureaus as opposed to an ACDV form?
22   A.   As opposed to the two?
23   Q.   Yes.
24   A.   I don't know.  I would have to look at that.

Page 61

1    It may be depending on how the request comes in.
2    Q.   Okay.  But you are prepared to testify today
3    about all AUDF's or UDF's sent by CCB or ACS to credit
4    reporting agencies, correct?
5    A.   Yes.  I'm prepared to testify about the systems
6    and, again, the communications and audits of the
7    information, yes.
8    Q.   But you don't know when a UDF would be sent as
9    opposed to an ACDV?
10   A.   I don't key the actual production.  I don't key
11   the actual forms.  So, no, I don't know when they
12   would use a UDF versus an ACDV.
13        An ACDV is when they pull the request from
14   that system and they respond on that.  And I would
15   have to -- I don't know the difference between when we
16   would use one and when we would use the other.
17   Q.   Would you turn to page 59, please?
18   A.   Okay.
19   Q.   The last arrow where it says, "In the comment
20   section, a valid reason must be given as to why any
21   action has been taken and/or not taken (Verified As
22   Reported VAR)," do you see where I am?
23   A.   Yes.
24   Q.   Is it your understanding that that says that

Page 62

1 verified as reported is what you do when an action is
2 not taken or is taken?
3    A.  I would have to compare this to the form.
4    Q.  Which form?
5    A.  Well, for example, if you look at the UDF form
6 it has Special Comments/Removals and it gives "Removal
7 of deceased status."
8    Q.  Where are you looking?
9    A.  I'm looking at Exhibit D, page 2.  Again, this
10 is in 2002.
11    Q.  "Special Comments/Remarks, Removal of deceased
12 status"?
13    A.  Yes.  And that's a valid reason given as to why
14 action has been taken or not taken.  It doesn't have
15 VAR specific right there.
16    Q.  When would you use the VAR?
17    A.  In trying to interpret these procedures from
18 two years ago and the way that this reads right here,
19 I can't answer that.
20    Q.  Would you agree with me then that that sentence
21 in the credit investigations policies and procedures
22 manual is confusing?
23    A.  I would agree looking back on it two years
24 later.

Page 63

1        MR. BRYCE:  Objection to the form.
2    A.  Just looking at page 59 without the form, I
3 can't give you an answer on that.
4    Q.  I beg your pardon?
5    A.  I said I can't give you an answer on that just
6 looking at this bullet without having the form for
7 procedures that are two years old.
8    Q.  Let me ask you to turn, please, to page 67.
9 I'll direct you to the first paragraph that's in
10 italics where it says, "Note."
11        Do you see where I am?
12    A.  Yes.
13    Q.  In that sentence it says, "some additional
14 steps may need to be taken to decision the dispute
15 correctly."
16        Do you see that?
17    A.  Yes.
18    Q.  Can such additional steps include making a
19 request to the FDR development department to print one
20 of these, to have FDR print one of these dump reports?
21    A.  That wouldn't be included in this normal scope
22 of answering a dispute.
23    Q.  I'm sorry.  Did you say it would or wouldn't?
24    A.  Would not.  We would have no reason to believe,

Page 64

1 especially at this time, that there could possibly be
2 any other flags set that wasn't reflected on the
3 system that would have any effect on these
4 corrections.
5        So, no, we would not pull, we would not
6 request from FDR this dump report an an additional
7 step.
8    Q.  If the credit bureau is telling CCB/ACS that
9 the deceased notation is still being reported by
10 CCB/ACS, wouldn't that be a circumstance where ACS
11 would want to check and, in fact, see what FDR was
12 reporting?
13    A.  Yes.  And ACS did check to see.  The credit
14 bureau was saying it was being reported as deceased.
15 ACS processed updated information to correct that and
16 forwarded it back to the bureau.
17    Q.  But it didn't look at the dump report, right?
18    A.  No.  They would not look at the dump report.
19    Q.  Even on a subsequent notification from the
20 credit bureau that the item was still being reported
21 as deceased?
22        MR. BRYCE:  Objection to the form.
23        Go ahead and answer.
24    A.  When you're referring to page 67 and these

Page 65

1 policies, it's not saying subsequent.  We received
2 information that it was being reported as deceased.
3 We checked the system.  We sent a request to the
4 bureau to report it as joint.
5    Q.  Well, when it says depending on the dispute, is
6 the fact that you received multiple disputes of the
7 same information on the same account make this a
8 dispute where some additional steps might need to be
9 taken?
10        MR. BRYCE:  Objection to the form.
11    A.  Again, we're looking at this document from
12 2002.  I don't know the timing of when the disputes
13 came in.  The disputes came in, were processed, the
14 information was sent back to the credit bureau to
15 report it as a joint account.  We wouldn't believe
16 that there would be any additional steps that would
17 have to be taken for this account.
18    Q.  Why not if you kept getting the same disputes?
19        MR. BRYCE:  Objection.  Asked and answered
20 the third or fourth time.
21        Answer it again.
22    A.  It's not the same dispute.  It's a dispute that
23 comes in on a different date.  And, again, they would
24 look at the system, they would see the system setting

Page 66

1  was correct, so then they would respond back to the
2  bureau on what the bureau should report.
3    Q.  But if in the next monthly report CCB is still
4  reporting it wrong and the credit bureau tells CCB
5  that, wouldn't CCB want to take some additional steps
6  then?
7        MR. BRYCE:  Objection.  Lacks foundation.
8  Assumes facts not in evidence.  And, again, you're
9  going over the same thing three or four times.
10        MR. GOOLSBY:  Well, I don't know that I
11  have gotten a clear answer.  I keep getting the same
12  answer, but it's not really the answer to my question.
13        It's when there are multiple sequential
14  disputes of the same information, of the same
15  information on the credit report that CCB/ACS keeps
16  telling the credit bureau to change but the credit
17  bureau keeps coming back with the same dispute.
18        Is that a dispute where some additional
19  steps may need to be taken?
20        MR. BRYCE:  Look, John, that's your
21  argument to the arbitrator, frankly.  What you're
22  doing now is arguing with this witness.  She's told
23  you what she thinks.  You're free to argue about
24  whether it's right or wrong, but an attempt to

Page 67

1  browbeat her into agreeing with you is just patently
2  improper.  She's given you her answer.
3  BY MR. GOOLSBY:
4    Q.  I guess what my question is is:  It says
5  depending on the dispute.  Well, what about the
6  dispute does it depend on?
7    A.  I believe in the reference that you're making
8  on these procedures it outlines depending on the
9  dispute the different types below, which is Not
10  His/Hers, Possible Credit Clinic Disputes, Disputes
11  Current Balance.  Obviously, disputes of current
12  balances are going to have some additional steps.
13  That associate is going to have to review the payment
14  history on the account.  That would count as an
15  additional step.
16    Q.  That paragraph says below you see some of the
17  additional steps.  So are there other additional steps
18  that could be taken besides those listed?
19    A.  Depending on the type of dispute, yes.  If it's
20  a dispute that says not his/hers, additional steps
21  would be to pull the original credit application.
22  Each different type of dispute can have additional
23  steps to resolve it.
24    Q.  Let's take a look at Exhibit No. 5, please.

Page 68

1    A.  Okay.  I have it.
2    Q.  This is Chapter Two, Procedures For
3  Transmitting From The Automatic Data Verification
4  System.
5        What's the automatic data verification
6  system?
7    A.  That is how we respond back to the bureaus.  I
8  don't know if this is prior to E-Oscar or not.
9    Q.  On page 79 are you familiar with the condition
10  codes listed there?
11    A.  This is the first time I'm looking at them.
12    Q.  I'm sorry.  I didn't hear the answer.
13    A.  I said I'm looking at them right now.
14    Q.  And are you familiar with them?
15    A.  No.
16    Q.  Okay.  Let's look at Exhibit 6, please.  Have
17  you seen this exhibit before?
18    A.  No.  I know it was included in the deposition
19  documents as exhibits, but I haven't read through it.
20    Q.  Can you turn to page 82, please?
21    A.  Okay.
22    Q.  The first paragraph refers to a change that's
23  apparently going to occur during the fourth quarter
24  2000.  So I understand that that paragraph was written

Page 69

1  before the fourth quarter 2000.
2        Would you agree with that?
3    A.  Well, according to this document, it says
4  fourth quarter of 2000 and the revision date was
5  February 15th, 2002.
6    Q.  That was going to be my next question.  I don't
7  understand how the paragraph could be talking about
8  the fourth quarter of 2000 being in the future when
9  it's a February 15th, 2002 revision.
10        Can you explain that?
11    A.  I can't explain that.
12    Q.  You have never seen this document before --
13    A.  No.
14    Q.  -- prior to this deposition?
15    A.  No.
16    Q.  How about Exhibit 7?  When you're ready, please
17  tell me if you have seen this before.
18    A.  I think it was included as part of the exhibits
19  from the deposition that I reviewed but, no, I have
20  not read this either.
21    Q.  Can you turn to page 98, please?
22        Do you recognize this form?
23    A.  It says this is a universal data request form.
24    Q.  I see what it says.  My question is:  Do you

Christine Cintron

Page 70

1  recognize it or are you seeing this for the first
2  time?
3     A.  I'm seeing this for the first time, this page
4  for the first time.  Again, as I mentioned earlier,
5  the first UDF form copy that I saw was on Tuesday
6  reviewing documents.
7     Q.  How about Exhibit 8, have you ever seen that
8  document before?
9     A.  No.
10    Q.  How about page 21 of Exhibit 8, which again
11  says Universal Data Form at the top of it, do you
12  recognize that format?
13    A.  It appears to be the UDF format but a blank
14  copy.
15    Q.  My question is though do you recognize it
16  except for preparing for this deposition?
17    A.  No.
18    Q.  McKenna Deposition Exhibit 14, I believe we
19  talked about the first two pages.  I ask you to look
20  at the third and fourth and fifth pages.
21    A.  Yes.
22    Q.  Do you recognize those pages except in
23  preparing for this deposition?
24    A.  No.  I only recognize them from preparing for

Page 71

1  this deposition.
2     Q.  Do you recognize those formats?
3     A.  I recognize them as looking at them from
4  Tuesday in preparation for this, yes.  I recognize the
5  format.
6     Q.  Do you use UDF in the normal course of your
7  job?
8     A.  No, not in my normal course of my job.
9     Q.  So your only experience with UDF is in
10  preparing for this deposition?  Do I understand
11  correctly?
12    A.  With the UDF form itself, yes.
13    Q.  On the third page of McKenna depo 14 can you
14  explain why it says subscriber code?
15    A.  A subscriber code would be our code with the
16  bureau.  We have multiple subscriber codes.
17    Q.  How many subscriber codes do you have?
18    A.  I don't know how many we have.  I know we have
19  multiple subscriber codes.
20    Q.  Do the bureaus know you have multiple
21  subscriber codes?
22    A.  Yes, they do.  That's how they do their
23  billing.
24    Q.  Why do you have multiple subscriber codes?

Page 72

1     A.  We would have a subscriber code for the credit
2  bureau terminal that's set up in human resources.  We
3  would have a subscriber code for a credit bureau
4  terminal that could be set up in our department for
5  audits.  We would have a subscriber code for back end
6  bureaus that we pull as part of the acquisition
7  process.
8     Q.  So you have different subscriber codes for each
9  terminal that you report to the credit bureau through?
10    A.  Yes.  Yes, we can.  Because some billing would
11  then be charged to Applied Card Systems and some
12  billing would be charged to Cross Country Bank.
13    Q.  Was it Cross Country Bank's and ACS's decision
14  to have multiple subscriber codes or was that the
15  credit bureaus' decision to assign multiple subscriber
16  codes?
17    A.  I would assume that was made at either ACS or
18  CBB for billing purposes to make it easier for us to
19  recognize the charges and where they were originated
20  from and the business unit that's responsible for
21  those charges.
22    Q.  Does FDR have a subscriber code?
23    A.  I don't know.
24    Q.  Can you tell from the dump reports you looked

Page 73

1  at which subscriber code was used to make the report
2  to the credit bureaus?
3     A.  I don't know that I would be able to recognize
4  a subscriber code on the dump report.
5     Q.  I beg your pardon?
6     A.  I said I don't think I would be able to
7  recognize a subscriber code on the dump report.  I
8  believe FDR reports multiple clients to the bureaus at
9  the same time they're reporting.  Our work is included
10  with multiple other clients to the bureaus.
11    Q.  By FDR you mean?
12    A.  Yes.
13    Q.  Multiple other clients of FDR?
14    A.  Yes.  I don't believe they break out our work
15  and transmit our work alone.  I think it's
16  consolidated with other clients that are transmitting
17  to the bureaus.
18    Q.  McKenna Depo Exhibit 14 on the third page, the
19  universal data form, what prompted CCB/ACS to send the
20  universal data form?
21    A.  I can assume it was due to a bureau dispute.
22    Q.  But you don't know?
23    A.  We wouldn't respond if there wasn't a dispute
24  so, yes, it was in response to a consumer dispute.

Christine Cintron

Page 74

1  Q.  When was that dispute?
2  A.  The response was 12-12-02.
3  Q.  When did CCB receive the dispute from the
4  bureau?
5  A.  I can't answer that with the information that's
6  in front of me.
7  Q.  You don't have any other knowledge about why
8  this UDF was sent?
9  A.  You asked me about a particular UDF that's
10  dated 12-12-02.  That's all the information that I
11  have in front of me.
12  Q.  Well, I'm asking you if you have any
13  information besides what's in front of you?
14  A.  No.
15      MR. GOOLSBY:  Marty, I'm going to have to
16  object that the person that's been produced is not
17  prepared to testify about the UDF's as stated in the
18  deposition notice.
19      MR. BRYCE:  Well, John --
20      MR. GOOLSBY:  So I'll have to reserve the
21  right to ask additional questions upon production of a
22  witness who is prepared to testify about those UDF's
23  as noticed in No. 8.
24      MR. BRYCE:  Look, you can certainly

Page 75

1  proceed as you see fit.  I mean, let me state for the
2  record that in setting these depositions up I had at
3  least two different conversations with Tommy Lyons and
4  I never understood these depositions as being directed
5  to the very same UDF forms that Mr. McKenna was
6  already deposed about.
7      What Tommy had told me on day one that he
8  was after with respect to this second round of
9  depositions was information vis-a-vis FDR.  And this
10  apparently has morphed into something more than that
11  that I didn't understand.  But we can talk and we can
12  figure out what we can figure out.
13      MR. GOOLSBY:  Okay.  It may not be
14  necessary for us to take any further depositions, but
15  I just want to put on the record that -- well, I
16  already put it on the record.
17      MR. BRYCE:  Yes.  I understand.
18      MR. GOOLSBY:  Subject to review of my
19  notes, that may be all I have.  Can we take five again
20  and I will see if my notes remind me of anything else
21  I need to ask?
22      MR. BRYCE:  Sure.
23      MR. GOOLSBY:  Okay.  Thank you.
24      (A brief recess was taken.)

Page 76

1      MR. GOOLSBY:  I don't think I have any
2  more questions for you, Ms. Cintron.  Thank you very
3  much for your testimony.
4      I do want to state on the record that
5  besides what I already stated that there may be other
6  topics here that appear we haven't had a witness
7  produced that's knowledgeable to testify, including
8  all of the references to FDR and the policies and
9  procedures manual.  So I just want to state on the
10  record the option to continue this deposition subject
11  to production of somebody who can testify about all of
12  the documents that we have got here.
13      MR. BRYCE:  I understand that's your
14  position, and let's just say we agree to disagree.
15      MR. GOOLSBY:  That's fair, Marty.  We can
16  discuss off the record the need to continue.
17      MR. BRYCE:  Sure.
18      MR. GOOLSBY:  I just want to put that on
19  the record.  Other than that, I have nothing further.
20      MR. BRYCE:  I understand.  Okay.  So I
21  guess we're done.
22      MR. GOOLSBY:  I guess we're done.  Thank
23  you very much.
24      MR. BRYCE:  Thank you, John.

Page 77

1      (Deposition concluded at 4:30 p.m.)
2          I N D E X
3  DEPONENT:  CHRISTINE A. CINTRON       PAGE
4    Examination by Mr. Goolsby        3
5          E X H I B I T S
6  CCB/ACS DEPOSITION EXHIBIT          MARKED
7      10            57
8  ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 78
9  CERTIFICATE OF REPORTER           PAGE 79
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Christine Cintron

Page 78

1
2
3         REPLACE THIS PAGE
4         WITH THE ERRATA SHEET
5         AFTER IT HAS BEEN
6         COMPLETED AND SIGNED
7         BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 79

1   State of Delaware   )
                        )
2   New Castle County   )
3
4            CERTIFICATE OF REPORTER
5
        I, Kurt A. Fetzer, Registered Diplomate
6   Reporter and Notary Public, do hereby certify that
    there came before me on the 17th day of February,
7   2005, the deponent herein, CHRISTINE A. CINTRON, who
    was duly sworn by me and thereafter examined by
8   counsel for the respective parties; that the questions
    asked of said deponent and the answers given were
9   taken down by me in Stenotype notes and thereafter
    transcribed by use of computer-aided transcription and
10  computer printer under my direction.
11      I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13      I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17          Kurt A. Fetzer, RDR, CRR
            Certification No. 100-RPR
18          (Expires January 31, 2008)
19
    DATED:
20
21
22
23
24

Michael Giuliani

NATIONAL ARBITRATION FORUM

NAF File No.: FA0406000286852

Penny Lee Anderson and          )
Russell D. Anderson, Sr.,       )
                                )
          Claimants,            )
                                )
v.                              )
                                ) .
Cross Country Bank, Inc. and    )
Applied Card Systems, Inc.,     )
                                  )
          Respondents.          )

          Deposition of Cross Country Bank, Inc. and
Applied Card Systems, Inc. taken pursuant to Rule
30(b)(6) through its designee MICHAEL J. GIULIANI at
Applied Card Systems, 50 Applied Card Way, Glen Mills,
Pennsylvania, beginning at 10:20 a.m., on Thursday,
February 17, 2005, before Kurt A. Fetzer, Registered
Diplomate Reporter and Notary Public.

APPEARANCES:

          JOHN H. GOOLSBY, ESQ. (Via teleconference)
          CONSUMER JUSTICE CENTER, P.A.
               342 East County Road D
               Little Canada, Minnesota   55117
            For the Claimants

          MARTIN C. BRYCE, JR., ESQ.
          BALLARD SPAHR ANDREWS & INGERSOLL, LLP
               1735 Market Street - 51st Floor
               Philadelphia, Pennsylvania   19103-7599
               for the Respondents

     ALSO PRESENT:
          FRANK BORZIO, ESQ. - CORPORATE COUNSEL
          CROSS COUNTRY BANK, INC.

          APPLIED CARD SYSTEMS, INC.

Exhibit G

Page 2

1          MICHAEL J. GIULIANI,
2     the deponent herein, having first been
3     duly sworn on oath, was examined and
4     testified as follows:
5                EXAMINATION
6   BY MR. GOOLSBY:
7     Q.   Mr. Giuliani, my name is John Goolsby and I'm
8   the attorney representing the claimants in this
9   arbitration matter, Russell and Penny Anderson.
10         Can you please give for the record your
11  full name?
12    A.   Michael James Giuliani.
13    Q.   Would you spell your last name, please?
14    A.   Sure.  G-i-u-l-i-a-n-i.
15    Q.   And let me ask you this:  Do you have with you
16  today the deposition notice with its exhibits?
17         MR. BRYCE:  I have a copy of that, yes.
18         MR. GOOLSBY:  Okay.  And do we also have a
19  copy of all of the documents that you sent us earlier
20  this week, Marty?
21         MR. BRYCE:  Yes.
22         MR. GOOLSBY:  And McKenna's depo?
23         MR. BRYCE:  I have my copy of the McKenna
24  depo with its exhibits, yes.

Page 3

1          MR. GOOLSBY:  Okay.  Great.
2   BY MR. GOOLSBY:
3     Q.   Mr. Giuliani, besides those documents, did you
4   bring any other documents with you today?
5     A.   No.
6     Q.   Can I get your home address, please?
7     A.   Sure.  1806 North Lincoln street, Wilmington,
8   Delaware, 19806.
9     Q.   Have you ever had your deposition taken before?
10    A.   Yes.
11    Q.   How many times?
12    A.   Can you repeat the question?
13    Q.   How many times have you had your deposition
14  taken before?
15    A.   Oh, one time.
16    Q.   When was that?
17    A.   Last Monday and Tuesday.
18    Q.   Was that in a case related to the Fair Credit
19  Reporting Act?
20    A.   I'm not sure.
21    Q.   Do you know the name of that case?
22    A.   Yes.
23    Q.   What's the name of that case, please?
24    A.   I believe it was the Klusman case.

Page 4

1     Q.   Kauffman?
2     A.   Klusman.
3     Q.   Okay.  Do you know the spelling of Kauffman?
4     A.   I'm sorry?  I couldn't understand you.
5     Q.   How do you spell Kauffman?
6     A.   It was Klusman.  K-l-u-s-m-a-n.
7     Q.   So you understand the basic ground rules
8   of the deposition, I'm going to be asking you some of
9   the fact questions.  And if you don't understand me,
10  please let me know and I'll try to restate the
11  question in a way that's meaningful to you.
12         And if you need a break, please let me
13  know.  Sometimes I get carried away and I forget about
14  taking breaks, so please let me know if you need a
15  break.  But the one thing I will ask you is to not ask
16  for a break while a question is pending and to answer
17  the question before asking for a break.
18    A.   Okay.
19    Q.   Is there any reason you can't give complete and
20  truthful answers today?
21    A.   No.
22    Q.   Who is your employer?
23    A.   Applied Card Systems of Pennsylvania.
24    Q.   Do you also work for Cross Country Bank?

Page 5

1     A.   No.
2     Q.   When did you start with ACS?
3     A.   November 1995.
4     Q.   What is your current job title?
5     A.   Vice president of application development.
6     Q.   How long have you held that position?
7     A.   About fifteen months.
8     Q.   What was your job before that?
9     A.   I was vice president, immediately prior to that
10  I was vice president of FDR development.
11    Q.   Vice president of FDR development?
12    A.   Correct.
13    Q.   FDR stands for?
14    A.   First Data Resources.
15    Q.   Okay.  How long did you hold that job?
16    A.   For approximately two years.
17    Q.   What were you before that?
18    A.   I was vice president in risk management.
19    Q.   Okay.  What was your job when you first came on
20  with ACS in 1995?
21    A.   I was a credit analyst.
22    Q.   Can you briefly describe your job duties in
23  your current job as vice president of application
24  development?

Page 6

1   A.  What I am responsible for is the programing and
2 development team at ACS, so all of our internal
3 applications that we build and I'm responsible for
4 that.
5       In addition, I'm responsible for FDR
6 development as well, which basically means all of the
7 settings and controls related to the FDR system.
8   Q.  Okay.  I take it as vice president of FDR
9 development, your previous position, you also had some
10 responsibility for overseeing the FDR system?
11   A.  Correct.
12   Q.  And did you have any responsibility related to
13 FDR when you were vice president of risk management?
14   A.  I had one aspect of that system.  It's called
15 the adaptive control system.
16   Q.  I'm sorry?  What system?
17   A.  Adaptive.
18   Q.  Now, you referred to an FDR system.  Is FDR a
19 system or a company or both?
20   A.  I think that's just the way we refer to it.
21 Actually, First Data Resources is a company and they
22 have a system which we use to process our, do a lot of
23 the core processing for our credit cards.  So it's
24 also a company, but we also call it the system, the

Page 7

1 FDR system.
2   Q.  Does FDR perform its functions for other
3 companies besides CCB and ACS?
4   A.  Yes.
5   Q.  Do you know how many companies?
6   A.  I don't know how many, but they're considered
7 the leader in the industry.  They process for many,
8 many large banks, Chase Manhattan, et cetera.
9   Q.  Is there any common ownership between FDR and
10 CCB/ACS?
11   A.  No.
12   Q.  Does CCB/ACS have a contract with FDR?
13   A.  Cross Country Bank has a contract with FDR.
14       MR. GOOLSBY:  Marty, I don't think that
15 contract has been produced to us.  Is that something
16 that you can produce to us?
17       MR. BRYCE:  I'll take a look at that and
18 get back to you.  I'm not sure whether it's relevant
19 or not, but I'll certainly take a look and get back to
20 you on that.
21       MR. GOOLSBY:  Thank you.
22       I would like to have marked as Exhibit 1
23 the deposition notice with all of its exhibits.  Let's
24 call it CCB/ACS 1.

Page 8

1       (CCB/ACS Deposition Exhibit No. 1 was
2 marked for identification.)
3 BY MR. GOOLSBY:
4   Q.  Mr. Giuliani, I would like to take a look
5 at the deposition notice.  Have you ever seen this
6 document before?
7   A.  Yes.
8   Q.  When was the first time you saw it?
9   A.  Tuesday this week.
10   Q.  I understand that you've been designated as the
11 person to testify about the technical elements.
12       And are you prepared to testify about the
13 technical elements, the topics designated in this
14 notice?
15   A.  I'm prepared to speak to some of the items on
16 the list.
17   Q.  Okay.  Which items are you not prepared to
18 speak to?
19   A.  I'm prepared not -- I guess I shouldn't say not
20 prepared.  I'm not the person to speak to about 5, 7,
21 8, 9, 10, 11 and 12.
22   Q.  And that would be Christine Cintron who would
23 be prepared to speak about those as far as you know?
24       MR. BRYCE:  Yes.  That is correct.

Page 9

1 BY MR. GOOLSBY:
2   Q.  Besides looking at this deposition notice, did
3 you do anything else to prepare for today's
4 deposition?
5   A.  I met with counsel.
6   Q.  Did you review the documents that were attached
7 to the deposition notice?
8   A.  Yes.
9   Q.  Did you review any other documents?
10   A.  I read Ed McKenna's transcript.
11   Q.  I take it then that you looked at the exhibits
12 to that deposition as well?
13   A.  Yes.
14   Q.  Did you review any other documents?
15   A.  I went to the FDR manual to do some additional
16 research on what you reference as the obscure flag or
17 McKenna referenced the obscure flag.
18       MR. GOOLSBY:  And, Marty, is the FDR
19 manual something that's been produced to us?
20       MR. BRYCE:  I don't believe so.  And I
21 will also look into that.
22       MR. GOOLSBY:  Thank you.
23 BY MR. GOOLSBY:
24   Q.  Mr. Giuliani, did you review any other

Michael Giuliani

Page 10

1  documents?
2  A.  Some of the, I guess some of the other
3  exhibits.  I think there was some -- I briefly looked
4  at some cardholder statements.  I think that was about
5  it.
6  Q.  Okay.  Do you know Ed McKenna?
7  A.  Yes.
8  Q.  Do you work with him regularly?
9  A.  Yes.
10  Q.  From reading his deposition, are you aware of
11  anything that was inaccurate about his testimony?
12  A.  No.
13  Q.  Do you have any reason to doubt the accuracy of
14  his testimony?
15  A.  No.
16  Q.  Okay.  I would like you then to please look at
17  what is Exhibit B to the deposition notice.  It's also
18  marked as Exhibit No. 25 in the McKenna depo.
19  A.  Okay.
20  Q.  Do you recognize this package of documents?
21  A.  Yes, I do.
22  Q.  What do you call these?
23  A.  A credit bureau account dump.
24  Q.  And are these documents part of the FDR system?

Page 11

1  A.  This document or this report was produced via
2  FDR, yes.
3  Q.  Okay.  When was this report generated?  That
4  might be a little ambiguous.  Let me rephrase that.
5  This is a hard copy that we have.  When
6  was the hard copy generated?
7  A.  I guess there's two dates.  I'm confused with
8  the question.
9  Q.  This series of -- I don't know how many pages
10  it is -- 30 or so pages, when were they generated in a
11  hard copy format?
12  A.  The run date indicates October 8th, 2003.
13  Q.  Okay.  And did they exist in electronic form
14  before that?
15  A.  I don't believe so.
16  Q.  So this information was compiled on 10-8-03 and
17  never existed in this format in an electronic form
18  prior to that?
19  A.  When you say, "in this format," you're saying
20  this same report in electronic format?  Is that what
21  you mean?
22  Q.  That's what I mean.
23  A.  Not that I'm aware of.
24  Q.  So prior to October 8th, 2003 there was no

Page 12

1  screen that you could look at that would look
2  essentially like, for example, this first page?
3  A.  As far as I know, no.  This report, in order to
4  get this report you have to make a specific request to
5  FDR to produce it.
6  Q.  When you say you have to, can anyone at CCB or
7  ACS make that request?
8  A.  No.  We have a specific team of people that are
9  authorized to work with FDR.
10  Q.  What is that team called?
11  A.  The FDR development department.
12  Q.  So if someone in the FDR development
13  department -- let me back up a step.
14  The FDR development department is a
15  department of CCB or ACS?
16  A.  ACS.
17  Q.  And did somebody in the FDR development
18  department ask FDR to produce this report on or about
19  October 8th, 2003?
20  A.  Yes.
21  Q.  Presumably this information that's in this
22  report existed in some form prior to October 8, 2003.
23  Is that correct?
24  A.  Correct.

Page 13

1  Q.  Was that in an electronic or hard copy format?
2  A.  The information would be housed in the FDR
3  system.
4  Q.  That's a computer system?
5  A.  Correct.
6  Q.  So was the information in this report that was
7  housed in the FDR system available to CCB/ACS prior to
8  October 8th, 2003?
9  A.  Are you asking -- I guess can you rephrase
10  that?
11  Q.  Sure.  That was perhaps a little ambiguous.
12  Let me back up a step.
13  So, in general, does CCB/ACS have to make
14  a request through the FDR development department to
15  FDR to get information from FDR?
16  A.  In general, yes.
17  Q.  So would the information in this report have
18  been available to ACS employees without making a
19  request to FDR through the FDR development department?
20  MR. BRYCE:  Let me just object to the
21  form, John, because I think the word "information" is
22  awful broad because, for instance, I think the
23  Andersons' address might appear on the first page of
24  Exhibit B and obviously I think we would all admit or

Michael Giuliani

Page 14

1   accept that CCB and ACS also knew the Andersons'
2   address.
3           So I don't know if -- maybe you want to
4   narrow the question some.
5           MR. GOOLSBY:  Let me put it this way.
6   BY MR. GOOLSBY:
7   Q.   Was the entirety of the information in this
8   report available, even if not organized as we see it
9   here, was it available to ACS employees without making
10  a request to FDR through the FDR development
11  department?
12  A.   I don't believe all of the report would be
13  available.
14  Q.   Well, some of the report, some of the
15  information in this report was only available by
16  making a request through the FDR development
17  department.  Is that correct?
18  A.   I believe so.
19  Q.   Are you familiar with the term ACDV?
20  A.   I'm familiar with the term.  It's not my area
21  of expertise.
22  Q.   What do you understand an ACDV to be?
23  A.   It's the -- it's information related to the
24  credit bureau.

Page 15

1   Q.   Is there an ACDV department in ACS?
2   A.   No.
3   Q.   Are there people whose role it is to process
4   ACDV's?
5   A.   Can you just clarify what you consider to be
6   the ACDV just to make sure I'm talking about the same
7   thing?
8   Q.   ACDV I'll represent to you stands for automated
9   consumer dispute verification and I'll represent to
10  you that it's a communication that comes from a credit
11  bureau to investigate a dispute that the credit bureau
12  has received from a consumer.
13          What I am ultimately trying to get at is
14  are the people who handle the ACDV part of the FDR
15  development department?
16  A.   They are not.
17  Q.   Can the people who process the ACDV make a
18  request to the FDR development department?
19  A.   To do what?
20  Q.   To obtain the information that is in this
21  report, either in this format or any other format.
22  A.   Yes, they could.
23  Q.   Does that happen regularly?
24  A.   I don't know.  I don't know that it happens

Page 16

1   regularly.  I would think that it has happened in the
2   past.
3   Q.   Okay.  I want to ask you some specifics about
4   the information that's contained in this report.  Bear
5   with me one moment, please.
6           Okay.  Do I understand correctly that FDR
7   creates this FDR, created this report that we're
8   looking at?
9   A.   Yes.
10  Q.   And FDR created the format that this report is
11  in?
12  A.   Yes.
13  Q.   I want to direct you to the middle column, not
14  quite halfway down.  Do you see where it says CHD
15  deceased flag B?
16  A.   Yes.
17  Q.   Can you interpret that line, please?
18  A.   That is a flag that can have certain values
19  that indicate whether the cardholder is deceased or
20  not.
21  Q.   What does B indicate?
22  A.   B indicates both the primary and the secondary
23  cardholder are deceased.
24  Q.   Why is the field called the deceased flag

Page 17

1   field?
2   A.   I'm not sure.
3   Q.   Does CHD stand for cardholder?
4   A.   Correct.
5   Q.   Who set the CHD deceased flag to B?
6   A.   A customer service representative.
7   Q.   At ACS?
8   A.   Correct.
9   Q.   How do you know that?
10  A.   There's a, there's a, I guess a history of
11  non-monetary transactions on the account and from that
12  you can determine that it was done by an individual at
13  ACS.
14  Q.   I have seen a reference in some of the
15  documents that have been produced to non-mon.  Is that
16  what you're talking about?  Does that stand for
17  non-monetary?
18  A.   Correct.
19  Q.   And is that history of non-mon transactions
20  something that can be printed out?
21  A.   Yes.
22  Q.   Do you know when this B flag was set?
23  A.   Approximately May 21st, I believe, I think it
24  was May 21st, 1999.

Page 18

1      MR. GOOLSBY:  Marty, have those non-mon
2  history transactions been produced to us?
3      MR. BRYCE:  They should have been because
4  I believe we produced everything concerning the
5  Andersons to you and their accounts.
6      MR. GOOLSBY:  Okay.
7      MR. BRYCE:  I will double-check that, but
8  sitting here now I think they should have been
9  produced, yes.
10      MR. GOOLSBY:  Okay.  Thank you.
11  BY MR. GOOLSBY:
12  Q.  How did the ACS employees set the B flag?
13  A.  I'm not sure exactly how they did it, but the
14  end result is they submitted a non-monetary
15  transaction and I would think erroneously put a B in
16  that field.
17  Q.  Is that field used for anything else?
18  A.  That specific -- let me clarify.
19      There's a transaction that can be done
20  that affects nine to ten settings on an account.  This
21  particular field, which is a subset of those ten, only
22  controls the deceased flag.
23  Q.  Okay.  So let me see if I understand you
24  correctly.

Page 19

1      There's something that an ACS employee can
2  do that will affect nine or ten of the fields that we
3  see on this report.  Is that correct?
4  A.  They're not necessarily on this report.
5  Q.  Okay.  They're not on the report at the time
6  but when they make, when they do whatever it is that
7  they do, it affects the information that we see in
8  nine or ten fields on this report.  Do I understand
9  that correctly?
10  A.  No.  No.  The other nine or ten fields may have
11  nothing to do with the credit bureau report.
12  Q.  I see.  So all of nine or ten are reflected in
13  what we are looking at?
14  A.  Correct.
15  Q.  Okay.  Are any of the other nine to ten
16  reflected on this report?
17  A.  I'm not sure.
18  Q.  What is it the ACS employee does with respect
19  to the nine to ten fields?
20  A.  I'm not sure of the exact -- can you rephrase
21  that?  Sorry.
22  Q.  What is it that -- well, I'm not sure I can
23  rephrase it.
24      You said that there's something an ACS

Page 20

1  employee does that affects nine to ten pieces of
2  information.  That's why I need to rephrase it because
3  they are not all fields on this report.
4  A.  Right.
5  Q.  What is it that the ACS employee does that
6  affects those nine to ten pieces of information?
7  A.  I'm not sure what this person was trying to do
8  or, in general, what these fields, these other fields
9  are used for internally.
10  Q.  Well, my question is you said that there's
11  something an ACS employee can do that will affect nine
12  to ten pieces of information.  Is that correct?
13  A.  Correct.
14  Q.  What is it that the ACS employee does that
15  affects the nine to ten pieces of information?
16  A.  There's a non-monetary transaction, in this
17  case it's called a non-mon 146.  I'm going to the
18  specifics of the transaction.
19  Q.  You're referring to the non-mon history report?
20  A.  No.  No.  This is actually a transaction.  This
21  is a transaction that allows you to change the values
22  within these individual fields.
23  Q.  So my question is:  Are you looking at a
24  specific record in this case as this transaction was

Page 21

1  done?
2  A.  I'm not sure what you mean by "specific
3  record."
4  Q.  Well, when you say 146, a non-mon 146, are you
5  saying that's in general what causes these nine to ten
6  pieces of information to change or are you saying that
7  in this specific case that's what happened?
8  A.  No.  The non-mon 146 is used to change specific
9  information on the account record.  There's ten fields
10  that can be changed via the non-mon 146.  Each of them
11  is like, each of them is an individual position.
12      For instance, non-mon 146 position 1 is an
13  address indicator:  Is the address on the account
14  valid or not?  Position 2 is something else.  Position
15  4 is the deceased flag.
16  Q.  Okay.
17  A.  So if somebody entered a non-mon 146 position
18  4, the value they entered there would change the
19  deceased flag you're looking at on this report.
20  Q.  Okay.  Is a non-mon 146 transaction the only
21  way that the deceased flag can be changed to a B?
22  A.  As far as I know, yes.
23  Q.  So as far as you know, an employee can't change
24  that individual field in isolation from all other

Page 22

1  information?
2    A.  No.  They can change it.  When you submit the
3  transaction, you can specify what position you're
4  changing.  So they would say non-mon 146 position 4
5  and then they would put the new value.  That would
6  only affect the deceased flag.  They wouldn't have to
7  submit changes to the other fields.
8    Q.  I see.  So when you do a non-mon 146
9  transaction or when an ACS employee does a non-mon 146
10  transaction, they have the option of changing any of
11  the nine to ten positions covered by non-mon 146.  Is
12  that correct?
13    A.  They can do that, but typically you would
14  specify the one position that you wanted to change.
15    Q.  But typically it's used just to change one
16  particular position?
17    A.  Correct.
18    Q.  Do you know in this case whether the non-mon
19  146 transaction that changed this position 4 to a B
20  changed anything else?
21    A.  I don't believe so from what I saw.
22    Q.  The non-mon 146 transaction is a transaction
23  that ACS employees do in the FDR system?
24    A.  Yes.

Page 23

1    Q.  Before doing a non-mon 146 transaction, for
2  example, to change the deceased flag to B, does the
3  ACS employee see what the previous value in that
4  position was?
5    A.  It depends how they enter the transaction.
6  There's two different ways to change that field.  One
7  is called an unformatted transaction where you don't
8  see the value that's already there.  You just enter
9  the new value.
10       The other one is what's called a formatted
11  transaction and actually at that point you go to a
12  screen that displays this field along with other
13  fields and you can see what it was and change it.
14    Q.  Can you see what it is and opt not to change it
15  through the formatted transaction?
16    A.  Yes.
17    Q.  So an ACS employee can go and look at that
18  field without changing it?
19    A.  Yes.
20    Q.  Is that only people in the FDR development
21  department that can do that?
22    A.  I'm not sure who has access to that screen.
23    Q.  What do you call that when you go and look at,
24  for example, the deceased flag but you don't change

Page 24

1  it?
2    A.  But you don't change it?  I'm not sure if
3  there's, I'm not sure if there's a term for that.
4    Q.  Would it be fair to call it an aborted non-mon
5  146 transaction?
6    A.  No.  I don't think so.  Maybe a -- I wouldn't
7  call it aborted.
8    Q.  A non-mon 146 transaction that was not
9  completed maybe?
10    A.  Right.  Or you can just call it viewing the
11  screen.
12    Q.  Viewing the screen.  Again, you don't know
13  specifically who at ACS has the ability to view the
14  screen?
15    A.  I do not.
16    Q.  But some people at ACS definitely do?
17    A.  Yes.
18    Q.  Do people at Cross Country Bank?
19    A.  I'm not sure if they have access to the screen.
20    Q.  Okay.  I believe you testified you don't know
21  specifically who set the deceased flag code to B.  Is
22  that right?
23    A.  Correct.
24    Q.  But you know it was an ACS I think you said

Page 25

1  customer service employee?
2    A.  Correct.
3    Q.  Where are they located?
4    A.  We have customer service in the Boca Raton site
5  and the Huntington site.  I believe this was in
6  Huntington, but I'm not sure.
7    Q.  Why do you believe that?
8    A.  There's a code, like a three-digit operator
9  code on the account.  I believe it started with an H
10  and that typically means Huntington.
11    Q.  These reports that we have start in October
12  2001 as I read this.  I see a reporting date of
13  October 2001.
14       Do I read that correctly?
15    A.  Yes.
16    Q.  But may you say that the position 4 was changed to
17  a B on May 21st, 1999?
18    A.  Correct.
19    Q.  Is it possible to get the account dump dumped
20  for the period between May 1999 and October 2001?
21    A.  I'm not sure.  I believe there is a time frame
22  that FDR can only go back so far.
23    Q.  Okay.  Again, looking at this first page I see
24  it says credit bureau reporting to Equifax.  If I read

Michael Giuliani

Page 26

1 this package of documents correctly, it appears that
2 at that time in October 2001 there was separate dumps
3 going to each of the three credit bureaus, but on a
4 subsequent date they were combined into all one. Do I
5 understand that correctly?
6    A.   I don't believe so.
7    Q.   Okay. Let me have you take a look at Exhibit C
8 to the deposition notice.
9    A.   Okay.
10    Q.   And compare that, compare the first page of
11 Exhibit B and C.
12    A.   Okay. I see what you're saying.
13    Q.   The first page of B says just Equifax while the
14 first page of C says Equifax, Trans Union and
15 Experian.
16        And the question is: Why the difference?
17    A.   I'm not sure. I would think that FDR made a
18 change to their report to reflect all of the same
19 information that was being sent to all three bureaus.
20    Q.   That would be something that I would have to
21 ask somebody at FDR.
22    A.   Or it's something that we could ask FDR.
23    Q.   Okay. Referring back to the first page of
24 Exhibit B where it says cardholder key about four

Page 27

1 lines from the top, do you see that?
2    A.   Yes.
3    Q.   What does that refer to?
4    A.   The account number.
5    Q.   Why is it called cardholder key?
6    A.   I'm not sure. I would think that's how they
7 identify -- that's the identifier of the record.
8    Q.   Okay.
9    A.   But it's the account number.
10    Q.   All right. I'm going to ask you about a
11 handful of these specific fields.
12        In the base segment column about three
13 lines down do you see where it says correction
14 indicator?
15    A.   Yes.
16    Q.   What does that field mean?
17    A.   I don't know what that, I don't know what that
18 field means.
19    Q.   How about identification number?
20    A.   Identification number?
21    Q.   Right below correction indicator.
22    A.   Let's see. I recognize the numbers, some of
23 the numbers in that field, but I'm not sure exactly
24 the purpose. It probably is used to identify the

Page 28

1 bank, but I'm not certain.
2    Q.   Does all of the information contained in this
3 report go to the credit bureaus?
4    A.   I believe so.
5    Q.   You believe so but you don't know for certain?
6    A.   I don't know for certain.
7    Q.   Who would know for certain?
8    A.   I would probably need to validate that with
9 FDR.
10    Q.   So your guess is the identification number
11 identifies Cross Country Bank?
12    A.   Yes. For instance, the 2012 indicates it's a
13 MasterCard and that would be MasterCard would know or
14 they would know that that 2012 is owned by Cross
15 Country Bank and then 7090 is like a further
16 distinction.
17        So without knowing for sure, it seems like
18 that's used to identify Cross Country Bank.
19    Q.   Are you familiar with the term subscriber code?
20    A.   Yes.
21    Q.   What does the term subscriber code mean to you?
22    A.   From what I understand, it's another way to
23 identify the bank. The bureaus use it to identify the
24 bank.

Page 29

1    Q.   So this identification number the subscriber
2 code?
3    A.   It may be. I'm not sure.
4    Q.   Let me have you skip down to about eight or ten
5 lines from the bottom of that column where it says
6 ECOA code X. Do you know what that means?
7    A.   I'm not certain.
8    Q.   Do you have any idea?
9    A.   I believe it's, I believe it indicates if this
10 is an individual, a joint account or something else,
11 but I'm not certain.
12    Q.   Do you know what X stands for?
13    A.   No.
14    Q.   Moving to the cardholder data column, the first
15 line, CHD credit bur flag 2, can you interpret that?
16    A.   Yes. That's a field on the FDR system that
17 indicates that it's a joint account.
18    Q.   Okay. The next line, the spacing is different
19 but it says the same thing. Is that the same
20 information?
21    A.   The spacing is different? Are you referring to
22 credit bureau flag 2?
23    Q.   Yes.
24    A.   I'm not sure of the difference between the

Civil Action Group 763-576-8832

Page 30

1  first and the second flag.
2    Q.   Skipping down to I believe it's the sixth line
3  of that column, CHD XREF account number and then a big
4  long number, what does that field mean?
5    A.   That's just a way to identify if the customer
6  has a savings account or multran, what we call a
7  multran account with us.
8    Q.   Multran?
9    A.   Yes. It's, in essence, a savings account.
10  It's a way to that if the cardholder chooses to could
11  submit a secured, I guess submit a deposit on their
12  account.
13    Q.   So this is reference to another account that
14  the same consumer has with Cross Country Bank?
15    A.   It's actually just a -- I don't know if they
16  ever opened a savings account with us. This number is
17  just actually a placeholder. It's a number reserved
18  for them. If they chose or if they choose to submit a
19  deposit, we would open an account for them with that
20  number and that's where the deposit would go. If they
21  never submit a deposit, the account would never be
22  opened.
23    Q.   But you can't tell from this if, in fact, they
24  submitted a deposit?

Page 31

1    A.   Correct.
2    Q.   How about CHD new XREF No. 1 and then a bunch
3  of zeros, what does that mean?
4    A.   That's just another field to show a related
5  account and there's nothing, there's nothing, there's
6  no account number in that field.
7    Q.   Then how about the next line, No. 2, what does
8  that mean?
9    A.   This is the previous account number that the
10  cardholder had prior to I guess a lost or stolen
11  report being submitted.
12    Q.   So that XREF No. 2 field is used for a lost or
13  stolen card?
14    A.   Correct. That identifies the previous account
15  number that the cardholder had.
16    Q.   And does the information in that field go to
17  the credit bureaus?
18    A.   I believe so.
19    Q.   FDR would know for certain?
20    A.   Right. My belief is that everything on this
21  report goes to the bureau, but I'm not 100 percent on
22  that.
23    Q.   Let me ask you up at the top do you see where
24  it says reporting date?

Page 32

1    A.   Yes.
2    Q.   What does that refer to?
3    A.   That refers to when the information was sent to
4  the credit bureau.
5    Q.   Can I ask you to look at within the same
6  exhibit the document that has a reporting date of
7  5-10-2002? There's actually several of them. I'll
8  ask you to turn to the first of them.
9    A.   Is it the one that says Experian?
10    Q.   Let's see. In the order of the pages that I
11  have, the first 5-10-2002 is Equifax. I actually
12  count six, I believe there are six pages that say
13  5-10-2002 on them. The first one I show as Equifax.
14    A.   Okay.
15    Q.   I'm sorry these pages weren't produced to us
16  with numbers on them, but that's the best way I know
17  how to identify that. Are you with me?
18        MR. BRYCE:  And I think you said Equifax
19  is the first?
20        MR. GOOLSBY:  That's what I have, yes.
21        MR. BRYCE:  Okay. I think we have it.
22  That was the first Equifax.
23        MR. GOOLSBY:  I show two for each credit
24  bureau on this date or for each of the three credit

Page 33

1  bureaus we're talking about anyway. I want to look at
2  the first Equifax one of 5-10 of 2002.
3        THE WITNESS:  I have it.
4  BY MR. GOOLSBY:
5    Q.   Now I want to refer to the three XREF fields
6  again. And here in the first one CHD XREF account
7  number there's a different account number than we saw
8  back on the first page we looked at. Do you know why
9  that is?
10    A.   Yes. We converted our MasterCard accounts to
11  Visa accounts.
12    Q.   And all MasterCards begin with a 5, right?
13    A.   Correct.
14    Q.   And all the Visas begin with a 4, right?
15    A.   Correct.
16    Q.   But the cardholder key still begins with a 5,
17  correct?
18    A.   Correct.
19    Q.   So why do we have a MasterCard cardholder key
20  and a Visa cross-reference?
21    A.   Because that was a way to demonstrate or for to
22  us realize that this customer had a MasterCard and
23  they now have a Visa.
24    Q.   Okay. With respect to everything we talked

Page 34

1 about on that page with the exception of the fact that
2 it went to Equifax, it looks like the next two pages
3 are identical for Trans Union and Experian.
4      Would you agree with that?
5   A.   It appears that way. I haven't looked at it in
6 detail, but yes.
7   Q.   Okay. Now going to the second Equifax report
8 for that date, 5-10-2002, now the cardholder key we
9 have a Visa number. Is that right?
10  A.   Correct.
11  Q.   In the XREF field we have a different Visa
12 number?
13  A.   Yes. That's the same thing that I indicated
14 before, that that is a placeholder if they ever choose
15 to make a deposit.
16  Q.   And in the XREF No. 2 field we now have the
17 MasterCard number that used to be the cardholder key
18 number. Is that correct?
19  A.   It is the MasterCard account. It's again
20 linking the new Visa account, which is now their
21 active account, with the account they had previously.
22  Q.   Okay. And that is the same number, is it not,
23 that formerly was reported in the cardholder key
24 field, right?

Page 35

1   A.   Yes. Yes. All that is it's -- you know,
2 really in essence what happened is the person had a
3 MasterCard. They then had a Visa card, which is now
4 the card to use. And both of these pages are just,
5 you know, there's cross-reference fields. It's just
6 establishing that link between those two accounts.
7   Q.   And it's really all the same account, isn't it?
8   A.   Yes. It became -- it's a different account
9 number, but it's the same, you know, the same
10 information, the same data. So, in essence, it's the
11 same account.
12  Q.   And as far as you know, all that information
13 went to credit bureaus?
14  A.   On the Visa account, yes.
15      On the MasterCard account, it doesn't
16 appear so.
17  Q.   I'm not sure I understand what you're saying.
18  A.   If you look at the credit bureau flag, if you
19 go back to that first Equifax report that we were
20 talking about --
21  Q.   The 5-10-2002 or the very first one?
22  A.   The 5-10-2002.
23  Q.   Okay. So.
24  A.   If you look at the middle column, cardholder

Page 36

1 data, and you look at the credit bureau flag of a D.
2   Q.   Yes.
3   A.   What that means is to remove -- I guess the
4 information is going to the bureau, but it's saying to
5 remove the information from the MasterCard account.
6 And then if you look at the Visa account key where the
7 credit bureau flag is set to a 2, it's saying this is
8 a joint account.
9      So, in essence, what was happening was
10 since we replaced the MasterCard with the Visa, we are
11 now going to report the Visa, you know, the Visa
12 information is going to appear on the credit bureau
13 while the MasterCard information is not. So, in
14 essence, there's going to be one trade line.
15  Q.   You're up to the three reports that have the D
16 in the credit bureau flag field?
17  A.   Yes.
18  Q.   So do I understand your testimony correctly
19 that this report indicates to the credit bureaus that
20 you're changing the MasterCard to a Visa?
21  A.   It does not indicate that. What it's
22 indicating is the account record that ends in 3912,
23 we're deleting that record from the bureau.
24  Q.   That's what D stands for?

Page 37

1   A.   That's what D means. And then when you look at
2 the information for report 6736, that's saying report
3 that account number.
4   Q.   And it's cross-referencing the old MasterCard
5 number?
6   A.   Can you say that again?
7   Q.   And it's cross-referencing the old MasterCard
8 number?
9   A.   Yes. And then the Visa account will have all
10 of the information that the MasterCard account had
11 previously so it -- you know, there's no reason to
12 report both trade lines because it's, in essence, as
13 we said, the same account. It's just a different
14 account number.
15  Q.   Okay. Let me take you back to the very first
16 page then, the 10-10-2001.
17  A.   Okay.
18  Q.   I want to take you in the middle column, the
19 cardholder data column, about a third way up from the
20 bottom do you see where it says CHD PREV EXT status C?
21  A.   I think I lost you. Can you say that again?
22  Q.   PREV EXT status.
23  A.   Oh, previous external status, yes.
24  Q.   What does that line mean?

10 (Pages 34 to 37)

Michael Giuliani

Page 38

1    A.   This tells you what the external status was on
2    the account.
3    Q.   What do you mean by "external status"?
4    A.   External status is an indicator on FDR that
5    tells you I guess the current status or the status of
6    the account.  A C means it is closed.  A blank would
7    mean it is open.  And then there's other values as
8    well.
9    Q.   Are there any values for deceased?
10   A.   Yes.  We use an I.
11   Q.   And that field would show up as far as you know
12   as an I to the credit bureaus if you were reporting
13   deceased in that field?
14   A.   Yes.
15   Q.   Okay.  Then almost every line in that column
16   has a CHD at the beginning of it.  I want to direct
17   your attention to one that doesn't.  About a quarter
18   of the way up, reason date YYMM.
19        Do you see where I am?
20   A.   Yes.
21   Q.   What does that mean?
22   A.   (Pause).
23   Q.   I'm sorry.  I didn't hear an answer.
24   A.   Yeah.  I'm thinking.

Page 39

1        I'm not sure what that field means.
2    Q.   Okay.  About four lines up from the bottom, CHD
3    CRBR CNSM, et cetera.  Do you see where I am?
4    A.   Four lines from the bottom where it says last
5    credit?
6    Q.   I beg your pardon.  Five lines from the bottom.
7    Q.   Okay.  Yes.
8    Q.   Do you know what that means?
9    A.   I do not.
10   Q.   How about any of those last four lines, do you
11   know what they mean?
12   A.   Well, the one that says credit life flag, that
13   indicates whether the customer has some type of credit
14   insurance or account protection with their account.
15   Q.   Okay.  That has nothing to do with whether
16   they're alive or not?
17   A.   Correct.
18   Q.   Do you know what any of those other last four
19   fields, last four lines mean?
20   A.   No.  I'm not sure.
21   Q.   Then in the third column, BS fact data, what
22   does that mean?
23   A.   That's another section of FDR's cardholder
24   master file.  I believe it has something to do with

Page 40

1    the history on the account, but I'm not sure
2    specifically what these fields exactly are doing.
3    Q.   Do you know what BS stands for?
4    A.   BS?  Typically, it means balance and status,
5    but the way it's used here I'm not sure.
6    Q.   You referred to the FDR master file.  What's
7    that?
8    A.   The master file is I guess a file that FDR
9    maintains on accounts that has all -- I shouldn't say
10   "all," but has probably thousands of fields related to
11   the account and how the account is set in those
12   fields.
13   Q.   Is that in an electronic file?
14   A.   It's an enormous file that FDR has.  It's
15   within their I guess computer system.
16   Q.   Okay.  So it's not a paper file that they have?
17   A.   No, it's not paper.
18   Q.   All of the information that we see on these
19   reports is contained within the FDR master file?  Is
20   that correct?
21   A.   I can't say for 100 percent certainty, but they
22   should be.  I believe so.
23   Q.   But there's a lot more information in addition
24   to the FDR master file.  Is that correct?

Page 41

1    A.   Yes.
2    Q.   Let me take you back to the deceased flag.  You
3    may have answered this already.  If you did, I
4    apologize.  But I asked you if that field was ever
5    used for anything else.  We got talking about non-mon
6    146 transactions.  I'm not sure I ever got the answer
7    as to whether that field was ever used for anything
8    besides deceased.
9    A.   This actual deceased flag that you're
10   referencing here is an obscure flag.  It is not used
11   for anything else.
12   Q.   Okay.  Now, it is actually FDR that sends the
13   information to the credit bureau.  Is that correct?
14   A.   Yes.
15   Q.   Do you know if FDR uses Metrotape?
16   A.   They use the Metro standard format.
17   Q.   Do you know if that's Metro 2 or some other
18   version?
19   A.   Currently I believe it's Metro 2.
20   Q.   Do you know when they started using Metro?
21   A.   It was sometime within the last, you know,
22   maybe four to five years.  I know there was a change
23   made from the Metro to the Metro 2.  I just don't know
24   the exact timing of that.

11 (Pages 38 to 41)

Page 42

1  Q.  On what day of the month are the monthly
2  reports to the CRA -- let me stop there.  Do you know
3  what I mean when I say, "CRA"?
4  A.  No.
5  Q.  By "CRA" I mean consumer reporting agencies,
6  which is synonymous with credit bureaus.  So if I say
7  CRA's, I mean the credit bureaus.
8  A.  Okay.
9  Q.  Do you know what day of the month the monthly
10  reports to the CRA's are made by FDR on CCB/ACS's
11  behalf?
12  A.  Are you asking in the past or are you asking
13  currently?
14  Q.  Well, let's start with May 21st or May 1999.
15  A.  Well, I don't know, you know, when it was
16  changed, but previously FDR used to send our data to
17  the credit bureaus on a monthly basis.  When they
18  switched, I believe it coincided with the switch to
19  the Metro 2 format.
20      Now files are sent on a daily basis to
21  FDR -- I mean to the credit bureau from FDR.  What
22  happens is when an account cycles, you know, when
23  their statement is produced and that process occurs on
24  the FDR system, all the accounts that cycle on that

Page 43

1  day are sent to the credit bureau, a file is sent to
2  the credit bureau at that time.
3  Q.  Let me see if I understand you correctly then.
4      FDR reports to the credit bureaus on a
5  daily basis, but CCB/ACS on any given account will
6  update to FDR on a monthly basis?
7  A.  No.  FDR -- it's not that ACS is updating FDR.
8  FDR has all this information already in their system.
9  It's basically how the account is processing on their
10  system.
11  Q.  Okay.
12  A.  What happens is once a month an account the
13  term is called cycles, which means FDR produces a
14  billing statement that's mailed to the cardholder
15  address and that's called a cycle.
16  Q.  Is that the same day of the month for all
17  CCB/ACS accounts?
18  A.  No.
19  Q.  So it can be any day of the month?
20  A.  Yes.  That's an individual setting at the
21  account level, so it can go from 1 to 28.
22  Q.  I understand that.
23  A.  Right.
24  Q.  So I think I interrupted your explanation.

Page 44

1  A.  Yes.  Maybe I can just elaborate a little bit
2  more.
3      This account here has a cycle code of a
4  10.
5  Q.  How do you know that?
6  A.  If you go to the -- you know, again, I looked
7  at some cardholder statements, but even on this report
8  if you look on any of the reports we're talking about,
9  if you go and look in the first column, the fifth
10  number down or the fifth item down is called the cycle
11  identifier.
12  Q.  Yes.
13  A.  That's equal to a 10.
14  Q.  Okay.
15  A.  So what that means is on the 10th of every
16  month is when this account cycles.  So at that time
17  they will receive their cardholder billing statement
18  and the information is sent to the bureau.
19  Q.  Okay.
20  A.  So it happens once a month on the 10th for this
21  account.
22  Q.  Okay.  And that would appear to correspond up
23  top where it says reporting date 10-10-2001?
24  A.  Correct.

Page 45

1  Q.  The reporting cycle, if I understand what you
2  just explained, that means that it happens on a
3  monthly basis?
4  A.  Correct.
5  Q.  And it appears that most, if not all, of these
6  occur on the 10th of each month?
7  A.  Correct.
8  Q.  I see at least one here that's on the 9th of
9  the month.  Would that be because of a weekend?  For
10  example, the November 2001 reporting date is
11  11-9-2001.
12  A.  Without checking the dates for sure, that
13  sounds like the explanation.
14  Q.  Okay.  How does CCB/ACS know that what it
15  intends to send to the CRA is, in fact, what the CRA
16  receives?
17  A.  Well, again, the FDR system and the FDR, the
18  company itself is the largest servicer in the
19  industry.  They do this for many other credit card
20  companies, so it's just part of their systematic
21  process to send all this information to the bureau.
22  Q.  Does CCB/ACS ever audit what FDR does?
23  A.  That would probably be a better question for
24  Christine Cintron.

Michael Giuliani

Page 46

1   Q.   You can tell me these other questions maybe are
2   better directed to her too, but I will ask you them.
3   A.   Okay.
4   Q.   In general, does anyone at CCB/ACS ever look at
5   what FDR is sending to the credit bureau on CCB/ACS's
6   behalf in the account dumps?
7   A.   I think that's for Christine as well.
8   Q.   Under what circumstances will the FDR
9   development department at ACS request FDR to generate
10  these account dump reports?
11  A.   It would have to be a special circumstance.
12  You know, someone from one of the user departments,
13  perhaps credit risk, will be researching something on
14  a particular account and they need to know or need to
15  see the raw data that FDR is sending to the bureaus.
16  Q.   Would that happen if a consumer contacts
17  CCB/ACS and says there is something inaccurate that's
18  being reported to the credit bureaus?
19  A.   I think it probably depends on the situation.
20  Q.   Do you know what factors are involved in
21  determining whether or not the FDR development
22  department will make such a request to FDR?
23  A.   No. It's basically driven by the business
24  units whether they would like to see it or not, so I

Page 47

1   don't know what goes into their decision-making.
2   Q.   But there are people in various business units
3   that have the authority to request the FDR development
4   department to make such a request to FDR?
5   A.   It would typically come from the credit risk
6   area.
7   Q.   What's the credit risk area?
8   A.   That's the area at Cross Country Bank that it
9   performs many functions, but one of the functions is
10  working with the credit bureaus, credit bureau
11  reporting, et cetera.
12  Q.   So is it your understanding that the credit
13  risk area would process communications from a credit
14  bureau forwarding a consumer dispute?
15  A.   They would have the interaction with the credit
16  bureau.
17  Q.   I represent to you that an ACDV is a
18  communication from the credit bureau. Is it your
19  understanding that such communications would be
20  handled by the credit risk area?
21  A.   That's my understanding.
22  Q.   In this case what prompted CCB/ACS to ask FDR
23  to generate the account dump report we have been
24  looking at?

Page 48

1   A.   I wasn't involved in the discussions at that
2   time, but from what I've seen it appears that the
3   cardholder dispute, they tried to address the
4   cardholder dispute in the usual manner by submitting a
5   UD form to correct, to remove the deceased status from
6   the account after being notified by the cardholder.
7   That is the standard way of fixing the credit bureau.
8        When it was determined that that did not
9   work, they had to pursue -- I guess they couldn't
10  explain why it did not work, so they had to pursue
11  other options and see if something else was happening
12  to keep that deceased status on the account.
13  Q.   How did CCB/ACS know that the UD form didn't
14  work to remove the deceased status?
15  A.   I don't know the details, but from what I've
16  gathered they submitted the form and that typically
17  would correct any of these type of situations at the
18  account level.  And when it was discovered that it did
19  not correct it, that's when they contacted FDR
20  development.
21  Q.   FDR development could have been contacted at
22  any time once CCB/ACS discovered that the UD form
23  didn't correct the problem.  Is that correct?
24  A.   Yes.  Once they discovered that, they could

Page 49

1   have contacted us. Again, I'm not sure of the time
2   frames, but yes.
3   Q.   Who figured out that the B in the deceased flag
4   field was what was causing the deceased to remain on
5   the credit reports?
6   A.   I'm not 100 percent certain, but I believe it
7   was Sunil Singh.
8   Q.   Is that a woman?
9   A.   It's a man.
10  Q.   Can you spell that name, please?
11  A.   S-u-n-i-l and the last name is S-i-n-g-h.
12  Q.   What department does he work in?
13  A.   He currently works in the marketing department.
14  At that time he worked in FDR development.
15  Q.   For ACS?
16  A.   Correct.
17  Q.   He doesn't work at FDR?
18  A.   Correct.
19  Q.   When CCB/ACS asked FDR to generate this account
20  dump report, did CCB/ACS ask FDR to try and figure out
21  what was causing the deceased notation to remain on
22  the credit report?
23       MR. BRYCE: I don't know if he has the
24  foundation to answer that question, but I will let him

Michael Giuliani

Page 50

1  if he's able.
2      A.  I don't know.  I wasn't part of any of those
3  conversations.
4      Q.  How did Mr. Singh discover, how did he discover
5  that it was the B in the flag field that was causing
6  the deceased to remain on the credit report?
7          MR. BRYCE:  Again, I don't know if there's
8  a foundation, but I will let him answer if he's able.
9      A.  Again, I don't know exactly how he discovered
10  that.
11      Q.  Who has the most knowledge at CCB/ACS of how
12  the problem was investigated?
13      A.  I don't know if I could -- I don't even know
14  all of the parties who were involved at that time with
15  the problem.
16      Q.  If you wanted to find out more about the
17  investigation, who would you ask?
18      A.  I would probably contact Sunil Singh.
19      Q.  What was his job title at the time?
20      A.  I believe it was assistant vice president of
21  FDR development.
22      Q.  Did he report to you?
23      A.  These reports were pulled October 8, 2003.
24      Q.  I beg your pardon.  I'm not sure you heard my

Page 51

1  question.
2          My question was:  Did Mr. Singh report to
3  you at the time?
4      A.  I believe when the reports were pulled which
5  says October 8, 2003, yes, he would have reported to
6  me at that time.
7      Q.  Do I understand correctly that the
8  investigation was not done at your direction?
9      A.  Correct.
10      Q.  Was it done at Mr. Singh's direction?
11      A.  Someone would have instructed him to research
12  the issue.
13      Q.  Who would have instructed him to research the
14  issue?
15      A.  It would have been someone -- again, I don't
16  know the person.  It would have been someone from one
17  of the business areas.  Perhaps, perhaps the risk
18  department.
19      Q.  Can I have you take a look at Exhibit C to the
20  deposition notice?
21      A.  Okay.
22      Q.  This appears to me to be more of the same from
23  Exhibit B or a continuation of Exhibit B.  I see that
24  Exhibit B leads off with 10-10-2002 and Exhibit C

Page 52

1  starts out at 11-10-2002, so it appears to be a
2  continuation.
3          Is that your understanding?
4      A.  Yes.
5      Q.  Later in Exhibit C if you turn to the reporting
6  date 10-10-2003, it appears to be in a slightly
7  different format, but it appears to me to be
8  essentially the same kind of report.  Would you agree?
9      A.  Yes.
10      Q.  And it also appears to have a different run
11  date.  It's a little blury on my copy, but on some of
12  these pages it looks like it's June of 2004.  Do you
13  agree?
14      A.  I agree that it appears to be a different run
15  date, but I can't read what the run date is either.
16      Q.  Okay.
17          MR. GOOLSBY:  Maybe this is a good point
18  to take a short break.  Is that okay with everyone?
19          MR. BRYCE:  Sure.  Five minutes?
20          MR. GOOLSBY:  Five minutes sounds good.
21  I'll leave the phone line open.
22          MR. BRYCE:  Okay.  That makes the most
23  sense.
24          MR. GOOLSBY:  See you in five.

Page 53

1          Off the record.
2          (A brief recess was taken.)
3  BY MR. GOOLSBY:
4      Q.  Mr. Giuliani, you mentioned a moment ago UD
5  form.  What's that?
6      A.  That's not my area of expertise, but it's a
7  form that is used to change something on the credit
8  bureau report.
9      Q.  Okay.  What does UD stand for?
10      A.  Universal data.
11      Q.  I ask you to take a look at Exhibit D to the
12  deposition notice.  Can you identify the two
13  documents?
14      A.  It's a universal data form.
15      Q.  Why are they different?
16          MR. BRYCE:  John, this is outside his
17  designation and his area.  You're better off asking
18  Christine these questions.
19          MR. GOOLSBY:  Okay.
20          MR. BRYCE:  I don't know if he's able to
21  answer.
22          THE WITNESS:  No.  I agree.  Christine is
23  the best person to ask.
24          MR. GOOLSBY:  I will save those questions

14 (Pages 50 to 53)

Michael Giuliani

Page 54

1  for Christine.
2  BY MR. GOOLSBY:
3    Q.  Let me ask you this.  If I understood your
4  testimony correctly, the credit card is on a monthly
5  cycle so at the end of each cycle new information is
6  being reported.  Is that correct?
7    A.  At the end of each cycle new information is
8  being reported or updated information?  Is that what
9  you said?
10   Q.  Yes.
11   A.  Yes.
12   Q.  Is it possible to change information on an
13 account in the middle of the cycle?
14   A.  Via the UDF form?  It wouldn't be done by FDR.
15 FDR only does it at cycle.
16   Q.  FDR only does it at cycle?
17   A.  Right.
18   Q.  Okay.  So if a UDF is sent on, say, the 1st of
19 the month, that change won't be reflected in the FDR
20 system until the end of the cycle?  Is that correct?
21   A.  The UDF, my understanding is the UDF has
22 nothing to do with the FDR system.  The UDF goes
23 strictly to the credit bureaus.
24   Q.  Now, if CCB/ACS received notice that a consumer

Page 55

1  had died, how would CCB/ACS reflect that change in the
2  FDR system?
3    A.  They would put an external status of I on the
4  account.
5    Q.  In the field that we talked about that has a C
6  in it on those documents that we looked at?
7    A.  Well, I guess technically that field that we
8  looked at was called the previous external status, so
9  that was the status that used to be on the account.
10 It would be in the external status field, not the
11 previous external status field.
12   Q.  On the account dump where is the external
13 status field?
14   A.  It's in that same column.  It's about the 12th
15 one from the bottom.  It says cardholder external
16 status.  That's what currently is on the account.  The
17 previous was what was on the account.
18   Q.  Now, I'm looking at the 10-10-2001 account dump
19 report.
20   A.  Okay.
21   Q.  And I see a field that says external status and
22 then on the same line it says CHD internal status?
23   A.  Correct.
24   Q.  Are those two separate fields on the same line?

Page 56

1    A.  Correct.
2    Q.  It looks like they're both blank?
3    A.  Correct.
4    Q.  What does blank mean?
5    A.  Blank means there's no external status on the
6  account.  That means it's opened.
7        Internal status blank means it's a current
8  account, meaning it's not delinquent and not over the
9  limit.
10   Q.  Okay.  So when it says previous external status
11 C, does that mean the account was closed and then
12 since the current external status is blank that it was
13 reopened?
14   A.  Correct.
15   Q.  And is there any indication of how much
16 previous the previous external status field is
17 referring to?
18   A.  Are you asking when it was done?
19   Q.  Right.  When did it change from closed to open?
20 Is there any indication on this account dump?
21   A.  I'm not sure if there is an indication on this
22 report.
23   Q.  But the previous external status just means
24 sometime in the past it was closed, we don't know

Page 57

1  when, is that correct, or we don't know when for these
2  reports anyway?
3    A.  Correct.
4        Actually, I think I do see it now.
5    Q.  Okay.  Where is that?
6    A.  In the middle of that same column, right in the
7  middle it says cardholder date status change.
8    Q.  Yes.  9-19-01.
9    A.  Yes.  I believe that's what that is.
10   Q.  Okay.  Bear with me for just one moment,
11 please.
12   A.  Okay.
13       MR. GOOLSBY:  I would like to have marked
14 as Exhibit 2 documents Bates stamped ACS A40 through
15 47.
16       (CCB/ACS Deposition Exhibit No. 2 was
17 marked for identification.)
18 BY MR. GOOLSBY:
19   Q.  Mr. Giuliani, I want to direct your attention
20 to -- well, first of all, let me ask you do you
21 recognize this document?
22   A.  No, I do not.
23   Q.  Okay.  Let me back up a step.
24       Do you see down at the bottom where it

15 (Pages 54 to 57)

Michael Giuliani

Page 58

1 says, "Account Services Policies and Procedures"?
2   A.  Correct.
3   Q.  Is there an account services department of ACS,
4 FDR or CCB that you know of?
5   A.  There's an account services department in ACS.
6   Q.  Do you see below that it says, "Credit
7 Investigations: Resolution of Consumer Disputes"?  Is
8 there also a credit investigations department?
9   A.  I'm not sure if it's a department or if it's
10 just a function within a department.
11       MR. BRYCE:  To the extent, John, you're
12 going to start asking him about this or policies or
13 procedures, it's really outside of his area and his
14 designation.  That would be Christine.
15       MR. GOOLSBY:  Okay.
16 BY MR. GOOLSBY:
17   Q.  But, Mr. Giuliani, you do know about a
18 relationship between FDR and CCB and ACS.  Is that
19 correct?
20   A.  Correct.
21   Q.  I want to refer you then to the middle section
22 of this page where it says Policy and after the bullet
23 points the paragraph that starts "All disputes must be
24 investigated and resolved.  Any necessary changes or

Page 59

1 adjustments must be made to FDR, with the appropriate
2 comments."
3       Do you see where I am?
4   A.  Yes.
5   Q.  Do you know what that's referring to?
6   A.  Just give me a second to read it.  (Reviewing
7 document).
8       From reading the document -- again, I'm
9 not familiar with this document -- it seems that
10 they're instructed to make changes to the FDR system,
11 as well as submitting a UDF form.
12   Q.  Okay.  And having been vice president of FDR
13 development, are you aware of which employees at ACS
14 have access to the FDR system to make changes as
15 described in this document?
16   A.  I'm not sure of the changes described in the
17 document, number one.
18       Number two, it depends on what level, what
19 department the associate is, along with their title, I
20 guess, or position with the organization.  That
21 determines what access level that they have on the FDR
22 system.
23   Q.  So different people in different positions have
24 different levels of access to FDR.  Is that correct?

Page 60

1   A.  Correct.
2   Q.  Turning to the next page of this document,
3 about a third of the way from the bottom do you see
4 where it says, "Once the requests have been forwarded
5 to the Credit Investigation Unit, the Credit
6 Investigations Associates will complete the
7 following"?
8   A.  Yes.
9   Q.  And then you see a number of, well, they're not
10 bullets but they're little arrows.  The fourth one
11 says, "Make all necessary adjustments to FDR including
12 all appropriate memos."
13       Do you see that?
14   A.  Yes.
15   Q.  Do you know what level of FDR access the credit
16 investigations associates have?
17   A.  No, I do not.
18   Q.  Do you know if the credit investigations
19 associates are able to do a view of the screen which
20 would show the CHD deceased flag B status that we
21 talked about before?
22   A.  I don't know.
23   Q.  Who would you ask if you wanted to know that?
24   A.  We have a department, the information security

Page 61

1 department.  They control who has what access to the
2 FDR system.  That's not in my area.
3   Q.  I ask you to turn to the page Bates stamped 45
4 in this exhibit.
5   A.  Okay.  I'm there.
6   Q.  Then about a third of the way from the bottom
7 there's a bullet point that says, "The Customer claims
8 there are check truncation errors."
9       Do you see that?
10   A.  Yes.
11   Q.  Do you know what a check truncation error is?
12   A.  I have an understanding of what it is, but I'm
13 not sure what they're I guess exactly referring to in
14 this document.
15   Q.  What's your understanding of what a check
16 truncation error is?
17   A.  Something happened in the processing of the
18 check where not all of the information on the check
19 was received or processed correctly.
20   Q.  Okay.  Let me have you look at the document
21 Bates stamped 48 through 54.
22       MR. BRYCE:  Do you want those marked?
23       MR. GOOLSBY:  Well, let me ask a couple of
24 preliminary questions first.

16 (Pages 58 to 61)

Michael Giuliani

Page 62

1  BY MR. GOOLSBY:
2    Q.  Mr. Giuliani, do you recognize this document?
3    A.  No, I do not.
4    Q.  We needn't mark that document then.
5        MR. GOOLSBY:  Can we please mark documents
6  Bates stamped 1 through 19 as Exhibit 3, I guess this
7  would be?
8        (CCB/ACS Deposition Exhibit No. 3 was
9  marked for identification.)
10  BY MR. GOOLSBY:
11    Q.  When you are ready, Mr. Giuliani, do you
12  recognize this document?
13    A.  No, I do not.
14    Q.  Do you see near the top where it says,
15  "Automated Consumer Dispute Verification Procedure
16  Utilizing E-Oscar"?  Do you see where I am?
17    A.  Yes.
18    Q.  Do you know what E-Oscar is?
19    A.  I have an idea of what it is, but Christine
20  Cintron is more familiar than I.
21    Q.  Can you turn, please, to the page Bates stamped
22  7?
23    A.  Okay.
24    Q.  At the bottom do you see where it says,

Page 63

1  "Narrative Remarks (Experian and Equifax only)"?
2    A.  Yes.
3    Q.  Do you have any information, do you know
4  anything about that paragraph?
5    A.  No.
6    Q.  So you don't know why narrative remarks would
7  be for Experian and Equifax only?
8    A.  No, I do not.
9    Q.  Can you turn to page 16, please?
10    A.  Okay.
11    Q.  Do you see where it says, "ECOA Code Select"
12  near the very bottom?
13    A.  Yes.
14    Q.  Now, we talked about the ECOA code field before
15  on the account dump report and I believe you said you
16  didn't know what X stood for?
17    A.  Correct.
18    Q.  Do I recall that testimony correctly?
19    A.  Yes.
20    Q.  If you flip to the next page, there's a code
21  description here.  Have you ever seen a code
22  description table like this?
23    A.  I've seen similar tables to this, but I don't
24  know if it was related to the ECOA or not.

Page 64

1    Q.  Okay.  Do you see where it says, "X Consumer
2  Deceased"?
3    A.  Yes.
4    Q.  Do you have any reason to doubt that ECOA code
5  X stands for consumer deceased?
6        MR. BRYCE:  Objection.
7    Q.  You can go ahead and answer, Mr. Giuliani.
8    A.  Assuming this document is accurate, I have no
9  reason to --
10    Q.  Okay.  Fair enough.
11        I would like to now have you look at
12  documents Bates stamped 55 through 70.
13        MR. BRYCE:  Do you want that marked?
14        MR. GOOLSBY:  Not yet.  Actually, yes,
15  let's go ahead and mark that Exhibit 4, please.
16        (CCB/ACS Deposition Exhibit No. 4 was
17  marked for identification.)
18  BY MR. GOOLSBY:
19    Q.  Have you ever seen this document before?
20    A.  No.
21    Q.  Will you turn to page Bates stamp page 58,
22  please?
23    A.  Okay.
24    Q.  I believe you testified that before today you

Page 65

1  did not know what ACDV meant.  Is that correct?
2    A.  I didn't know the acronym, but once I read the
3  description I have an understanding of what ACDV
4  means.
5    Q.  Looking at the last paragraph on this page, the
6  third sentence, do you see where it says, "Therefore,
7  all disputes must be investigated and resolved"?
8    A.  Yes.
9    Q.  Then you see the next sentence, "Any necessary
10  changes or adjustments must be made to FDR with
11  appropriate comments if necessary"?
12    A.  Yes.
13    Q.  Are you familiar with that part of the ACDV
14  investigation procedures where changes would be made
15  to FDR?
16    A.  I'm not familiar with the procedures at all.
17    Q.  Can you turn to Bates stamp page 61, please?
18    A.  Okay.
19    Q.  Do you see about a quarter of the way down it
20  says, "Verifying Consumer Identification Information
21  On FDR Or PROD1?"
22    A.  Yes.
23    Q.  What's PROD1?
24    A.  PROD1 is an internal system at ACS.

17 (Pages 62 to 65)

Michael Giuliani

Page 66

1  Q.  Below that it refers to FDR accounts and
2  Recovery One accounts.  Is Recovery One the same as
3  PROD1?
4  A.  No, it is not.
5  Q.  What's Recovery One?
6  A.  Recovery One is a system we use to handle other
7  charged-off accounts.
8  Q.  Okay.  You say PROD1 is an internal ACS system?
9  A.  Yes.  It's basically our AS-400.  We have
10  internal applications built on the PROD, PROD1 or the
11  AS-400.
12  Q.  Can you explain the relationship between FDR
13  and PROD1?
14  A.  There are certain applications that we have
15  built on PROD1 or certain processes that are on PROD1
16  that can send information to the FDR system, I guess
17  send and receive information from FDR.
18  Q.  Okay.  So PROD1 is a program for interfacing
19  with the FDR system?  Is that a fair way to describe
20  it?
21  A.  It's not really a program.  PROD1 is I guess in
22  laymen's terms like a huge computer and on there we
23  have different applications or different, you know,
24  different programs, different processes that generate

Page 67

1  from that computer that are sent over to FDR.
2  Q.  When we talked about 146 transactions, is that
3  something that's done through PROD1?
4  A.  No.
5  Q.  Are any of these things we talked about earlier
6  done through PROD1?
7  A.  I don't believe so.
8  Q.  On this page near the middle of the page,
9  actually several times this document refers to BS
10  screen.  Do you know what that means?
11  A.  Yes.  That's the balance and status screen on
12  FDR.
13  Q.  And is that related to the third column on the
14  account dump where it says BS Fact Data?
15  A.  I need to look at that dump again.  Let me just
16  take a look at it.
17  Q.  Please.
18  A.  No.  None of that information, none of that
19  information is displayed on the BS screen.
20  Q.  Okay.  Can you go, please, to page 67?
21  A.  Okay.
22  Q.  Do you see the second bullet point from the
23  bottom where it says, "Claims Account Closed by
24  Consumer"?

Page 68

1  A.  Yes.
2  Q.  Then it says, "Review the CIS screen (Memos) on
3  FDR."  Do you know what the CIS screen is?
4  A.  Yes.
5  Q.  What is it?
6  A.  It's a screen that displays notes or memos on
7  the account.
8  Q.  As part of the FDR system?
9  A.  Correct.
10  Q.  Does it display the deceased flag field?
11  A.  I'm sorry.  Could you repeat that one?
12  Q.  Yes.
13      Does the CIS screen display the deceased
14  flag field that we talked about?
15  A.  No.  Well, I should say I don't believe so.
16  Q.  Okay.
17  A.  It would -- the CIS screen typically is a place
18  where you can make notes regarding the account.  In
19  addition, if certain non-monetary transactions are
20  made, it can produce a memo that would say that a
21  field was changed.
22      I don't believe the non-mon 146 appears
23  anywhere on that, on the memo screen.
24      MR. GOOLSBY:  Can we please have marked as

Page 69

1  Exhibit 5 pages 71 through 79?
2      (CCB/ACS Deposition Exhibit No. 5 was
3  marked for identification.)
4  BY MR. GOOLSBY:
5  Q.  Mr. Giuliani, do you recognize this document?
6  A.  No.
7  Q.  Can you turn to page 79, please?
8      Do you know what condition codes are?
9  A.  I'm not familiar with the term condition code.
10  Q.  Okay.
11      MR. GOOLSBY:  Let's have marked as Exhibit
12  6 pages 80 through 95.
13      (CCB/ACS Deposition Exhibit No. 6 was
14  marked for identification.)
15  BY MR. GOOLSBY:
16  Q.  Do you recognize this document?
17  A.  No, I do not.
18  Q.  I ask you to turn to page 82, please.
19  A.  Okay.
20  Q.  The paragraph that starts with "Introduction,"
21  the second complete sentence there, "Currently, the
22  system creates a tape for each credit bureau," et
23  cetera.
24      Do you see where I am?

18 (Pages 66 to 69)

Michael Giuliani

Page 70

1   A.   Yes.
2   Q.   This sentence appears to state that at the time
3   it was written at least the information was submitted
4   to the credit bureaus two Saturdays after the month
5   end.  Do you know if that was, in fact, at one time
6   true?
7   A.   Yes, I believe so.
8   Q.   And then it says, "During the 4th quarter of
9   2000 this process will change."  So according to this
10  at least, this apparently was written before the
11  fourth quarter of 2000 and it indicated there was
12  going to be a change in fourth quarter of 2000.
13       Do you know if there was a change in the
14  fourth quarter of 2000?
15  A.   I'm not sure of the timing of that change but,
16  as I mentioned earlier today, and that's what the next
17  line states, FDR does send files to the credit bureaus
18  each day.
19  Q.   So would you agree that the way this paragraph
20  explains what's going to happen starting fourth
21  quarter 2000 is the fact the way it happened?
22  A.   So starting with the sentence "Instead of
23  sending an update after month-end, FDR will create a
24  tape each day" through the rest of that paragraph?

Page 71

1   Q.   Yes.
2   A.   Okay.  Hold on.  (Reviewing document).
3        Yes, that is my understanding.
4   Q.   Turn to the next page, please, and about the
5   middle of the page where it says Step 2.
6   A.   Yes.
7   Q.   We already talked about the BS screen.  Do you
8   know what the BS9 screen is?
9   A.   Yes, I do.
10  Q.   What is that, please?
11  A.   It's another balance and status screen that you
12  can modify, I guess, modify to display the information
13  that you want or ACS wants to appear on that screen.
14  Q.   Does the BS9 screen include the deceased flag
15  field?
16  A.   No.
17  Q.   Is there a BS1 through 8?
18  A.   Yes.
19  Q.   Do any of those BS screens show the deceased
20  flag field?
21  A.   I don't believe so.
22  Q.   Is there a BS10 or higher?
23  A.   No.  Just BS1, BS and then BS1 through BS9.
24  Q.   Turn to page 89, please.

Page 72

1        Do you see in the first paragraph where it
2   refers to video display history?
3   A.   Yes.
4   Q.   Do you know what that is?
5   A.   Yes.  This is a screen that displays cardholder
6   information for the last two years, plus the year-to-
7   date information.
8   Q.   So is the video display history part of the FDR
9   system?
10  A.   Yes, it is.
11  Q.   Does the video display history show the
12  deceased flag field?
13  A.   No, it does not.
14  Q.   Page 91, please.
15       "Reporting Changes to Credit Bureaus and
16  Lenders," do you see where I am?
17  A.   Yes.
18  Q.   And that first paragraph, the last two
19  sentences, "Since the tapes are not created and sent
20  until 2 weeks," et cetera, do you see where I am?
21  A.   Yes.
22  Q.   It says here that at that time "the credit
23  bureaus will not reflect the updated information until
24  almost two months after the corrections are made."

Page 73

1        Do I understand correctly that that's no
2   longer true and under the new system changes will be
3   reflected daily?
4   A.   I'm not sure how quickly the credit bureaus
5   process the information that is sent to them by FDR.
6        MR. GOOLSBY:  Can I have marked as Exhibit
7   7 documents 96 through 105?
8        (CCB/ACS Deposition Exhibit No. 7 was
9   marked for identification.)
10  BY MR. GOOLSBY:
11  Q.   Do you recognize this document?
12  A.   No, I do not.
13  Q.   Would you turn to page 97, please?
14  A.   I'm here.  Sorry.
15  Q.   Do you see it indicates attachment 1 is BS
16  screen?  I don't see anything labeled as such in the
17  subsequent pages of this document.
18       Is there anything in this exhibit that you
19  recognize as a BS screen?
20  A.   No.
21  Q.   Can I have you look at the McKenna depo
22  exhibits, specifically Exhibit No. 18?
23  A.   Yes.
24  Q.   Is that a BS screen?

Michael Giuliani

Page 74

1    A.   Correct.
2    Q.   The subsequent page is a CIS screen?
3    A.   Correct.
4    Q.   And it looks like the subsequent pages are CMM
5  screens?
6    A.   Yes.
7         MR. GOOLSBY:   Let's have marked as Exhibit
8  8 the pages 20 through 28.
9         (CCB/ACS Deposition Exhibit No. 8 was
10 marked for identification.)
11 BY MR. GOOLSBY:
12   Q.   Do you recognize this stack of documents?
13   A.   No, I do not.
14   Q.   In the middle of the first page do you see
15 where it says, "Account located on:  FDR," et cetera?
16   A.   Yes.
17   Q.   I understand from this that some accounts are
18 on FDR and some are on Recovery One and some are on
19 both.  Is that true?
20   A.   Yes.
21   Q.   The account we have been looking at in the
22 account dump, the Andersons' account that was at one
23 time a MasterCard and then was converted to a Visa, do
24 you know if that was on FDR only or both FDR and

Page 75

1  Recovery One?
2    A.   As I mentioned earlier, the Recovery One houses
3  accounts that have been charged off.
4    Q.   You don't know without looking if the Anderson
5  account was charged off?
6    A.   Right.  My answer is yes, exactly.  Most likely
7  the account would be only on FDR, but again I would
8  have to look at the account.
9    Q.   Would you turn, please, to page 25?
10        Are you familiar with internal status
11 codes?
12   A.   Yes.
13   Q.   I'm sorry.  I didn't hear an answer.
14   A.   Yes.
15   Q.   What are internal status codes used for?
16   A.   They're I call them status reason codes, but
17 basically some of them are client defined; some of
18 them are designated by the FDR system.  And basically
19 the two-digit number gives you additional information
20 on the account.
21   Q.   Does that information go to the credit bureaus?
22 Let me ask that a different way.
23        Do the internal status codes go to the
24 credit bureaus?

Page 76

1    A.   I'm not sure if that's on the credit bureau
2  dump.
3    Q.   Let's take a look at the credit bureau dump
4  again.  For example, the first one we looked at, the
5  10-10-2001 to Equifax, if you look about ten lines up
6  from the bottom in the middle column, we talked about
7  there's two fields on that line, external status and
8  internal status.
9    A.   Right.
10   Q.   Does that help you answer the question whether
11 the internal status codes go to credit bureaus?
12   A.   No.  This is -- the internal status codes
13 referenced in this document has nothing to do with the
14 internal status on the credit bureau dump.  On the
15 credit bureau dump if it was there it would say
16 something like status reason code.
17   Q.   On that same credit bureau dump report of
18 10-10-2001 about in the middle of that column I do see
19 a field that says status reason.
20   A.   Right.  I just spotted that at the same time.
21   Q.   Is that where these internal status codes would
22 go?
23   A.   I believe so.
24   Q.   I see a 00 in that field.  Does that mean this

Page 77

1  account is in default?
2    A.   Well, most of these codes again are internal to
3  us.  So like a 00 would probably have no meaning at
4  all to the bureau.  The majority of these fields are
5  codes internally.
6         For instance, 01, we said account closed
7  due to annual fee, that's something that we set up in
8  internally.  01, if we wanted to, that could have
9  been, you know, account is reopened.  That's a totally
10 client-defined field.  That's just a way for us to
11 have additional information.
12   Q.   So do I understand your testimony that these
13 codes go to credit bureaus but they don't have any way
14 of interpreting them?
15   A.   Not all of the fields.  There are certain
16 fields that are pre -- I'm trying to think of the
17 word.
18        There are certain words or certain codes
19 that are restricted to FDR only.
20   Q.   I see on page 26 and 27 for 85 through 99, with
21 the exception of one, all say FDR?
22   A.   Yes.
23   Q.   Are those the ones that you talked about that I
24 think you said are exclusive to FDR only?

20 (Pages 74 to 77)

Michael Giuliani

Page 78

1   A.   Without double-checking the accuracy of this
2   document --
3   Q.   You can't attest to the accuracy of this
4   because you have never seen it before, right?
5   A.   Right.
6   Q.   So based on your reading of this document,
7   assuming that it's accurate, those would be the codes
8   that are for FDR?
9   A.   Right.  FDR would own those reason codes and
10  I'm not sure how the bureau would interpret those
11  codes, however.
12  Q.   Let me ask you specifically about code 48.
13  A.   Okay.
14  Q.   It says here Visa Conversion, MasterCard to
15  Visa.
16  A.   Yes.
17  Q.   And 49 actually has your name on it?
18  A.   Yes.
19  Q.   What are those codes for?
20  A.   These codes when we converted from MasterCard
21  to Visa, we used those codes as another way to
22  identify or mark these accounts.  They had no bearing
23  on the credit bureau.
24  Q.   Let's go back and look at the account dump

Page 79

1   reports and let's look again at the May 2002, May 10,
2   2002 dump reports, of which there are six as I recall.
3   A.   We're trying to pull it out now.
4   Q.   Sure.  Tell me when you're ready.
5   A.   So you're looking at the Equifax?
6   Q.   Let's start with Equifax, the first of the two
7   Equifax, the one that's still reporting under the
8   MasterCard number.
9   A.   Yes.
10  Q.   In that status reason code right about in the
11  middle of the page now we have got 48.
12  A.   Yes.
13  Q.   You testified earlier that this information
14  goes to the credit bureaus?
15  A.   Yes.
16  Q.   Okay.  And the next two also have a 48?
17  A.   Yes.
18  Q.   Let's look at now the second batch of dump
19  reports for May 10, 2002.  Those three appear to have
20  a 49.  Would you agree?
21  A.   Yes.  I guess the difference being, again, that
22  the first account with the 48 is the MasterCard
23  account.  And, remember, with that credit bureau flag
24  of D we're deleting that record from the bureau.

Page 80

1        So the 48 it's just an internal code for
2   us to identify that this account was converted to a
3   Visa.  And then on the other account, the Visa
4   account, this account is now being reported to the
5   bureau.  And, again, the 49 is just an internal code
6   for us to know that this was part of the Visa
7   conversion.  It used to be a MasterCard.
8        Again, the bureau would have no idea what
9   49 or 48 means.
10  Q.   Do you know about internal status code 77?
11  A.   I see it on the sheet saying, "Deceased
12  Charge-Off," but that's all I know about it.
13  Q.   Turn to page 28, please.
14       Do you see number 2, "Click the 'Look in'
15  box and navigate to the fdrstatements"?
16  A.   Yes.  I see that.
17  Q.   Do you know what that's referring to?
18  A.   I believe what they're talking about is the
19  ability to pull up old statements.  It's a process if
20  you wanted to pull up old statements on a customer
21  account.
22  Q.   The statements that would have actually gone to
23  the customer?
24  A.   Correct.

Page 81

1        MR. GOOLSBY:  Can we have marked as I
2   guess it would be Exhibit 9 pages 29 through 39?
3        (CCB/ACS Deposition Exhibit No. 9 was
4   marked for identification.)
5   BY MR. GOOLSBY:
6   Q.   Do you recognize that document?
7   A.   No, I do not.
8   Q.   In that case, I don't have any questions for
9   you about that document.
10       Earlier we talked about subscriber codes.
11  Do you know if FDR is a subscriber?
12  A.   I'm not sure.
13  Q.   Do you know if FDR has a subscriber code?
14  A.   I'm not sure.
15  Q.   When we looked at the account dump report and
16  looked at the identification number, for example, on
17  that October 10, 2001 about the fourth line down in
18  the first column, you testified that that refers to
19  CCB or ACS and not to FDR.
20       Do I understand that correctly?
21  A.   Again, my understanding is that that
22  identification number is identifying Cross Country
23  Bank.
24  Q.   Go back to the May 2002 account dump again,

21 (Pages 78 to 81)

Michael Giuliani

Page 82

1  please.
2  A.  Okay.
3  Q.  And the first set of May 2002 account dumps
4  that has the D have one identification number and then
5  when you look at the second set of three -- well,
6  actually hold everything.
7      Would you agree that the identification
8  number for the Equifax and Trans Union May 10, 2002
9  dump reports that have the D that that number is
10  different from the identification number for the
11  Experian dump report of the same date that has the D?
12  A.  Yes.
13  Q.  Do you know why?
14  A.  There must be a difference in how Experian
15  receives their identification number than the other
16  two bureaus, but I don't know for sure but that's kind
17  of the logical answer.
18  Q.  Now, when you go to the second set of dump
19  reports for the same date, there's still a different
20  identification number for the Equifax and Trans Union
21  reports.
22      Do you see that?
23  A.  Are you saying the Equifax and Trans Union are
24  different than Experian or that they're different than

Page 83

1  the MasterCard report?
2  Q.  Well, let's take that in two pieces.
3      They are different from the MasterCard
4  report for Equifax and Trans Union.  Would you agree?
5  A.  Correct.  Because the new account is in a
6  different -- it is a Visa now and it's in a different
7  system print, so it would make sense that the number
8  would be different.
9  Q.  But still Cross Country Bank?
10  A.  Correct.
11  Q.  So why are there different identifiers for
12  Cross Country Bank?
13  A.  Because each system in print has its own
14  identifier, so a Visa would have a different
15  identifier than a MasterCard.
16  Q.  Even though it's all coming from Cross Country
17  Bank?
18  A.  Correct.
19  Q.  And does Cross Country Bank control the
20  identification number?
21  A.  I believe we work with FDR and the credit
22  bureaus so everyone is in synch, but the
23  identification number would be unique to every system
24  print.  So Cross Country Bank might have 40

Page 84

1  identification numbers.
2  Q.  And the credit bureaus know that?
3  A.  Yes.
4  Q.  How do you know they know that?
5  A.  It's on, it's on different reports.  I guess
6  probably Christine and them would be better to answer,
7  but there is communication back and forth regarding
8  this and we know that the accounts are being reported
9  under Cross Country Bank.
10  Q.  Mr. Giuliani, I believe I may be done with my
11  questions for you, but I would like to take a short
12  break to review my notes and make sure I don't have
13  anything else for you before we start the other part
14  of this deposition.
15      MR. GOOLSBY:  So can we maybe take five
16  minutes?
17      MR. BRYCE:  Yes.  Five minutes is fine.
18      MR. GOOLSBY:  We're off the record now.
19      (A brief recess was taken.)
20  BY MR. GOOLSBY:
21  Q.  I want to go back to what prompted CCB/ACS to
22  request FDR to generate this credit dump report or, in
23  general, what does prompt CCB/ACS to make such a
24  request.

Page 85

1      Is it necessary that a lawsuit had been
2  filed before the FDR development department will make
3  such a request to FDR?
4  A.  No.
5  Q.  So whenever someone in one of the business
6  units with sufficient authority decides that such a
7  request should be made to FDR, that can be done?
8  A.  Yes.
9  Q.  Will FDR always generate a report upon request
10  or does CCB/ACS have to meet certain criteria before
11  FDR will say okay, here's the report?
12  A.  I believe FDR would always provide the report
13  upon request.
14  Q.  Let me ask you again about the record, I think
15  you called it the history of non-mon transactions.
16      You said you reviewed the exhibits to
17  Mr. McKenna's depo in preparation for today.  Did you
18  see among those exhibits anything that was the history
19  of non-mon transactions?
20  A.  I saw a document that had a history of
21  non-monetary transactions.  I'm not sure if it was, if
22  it's part of the exhibits or not.
23  Q.  So you looked at it, but you don't know where
24  you saw it.  Is that right?



Page 86

1   A.   Right.  I'm just not sure if it was an exhibit
2   or not.
3        MR. GOOLSBY:  Marty, I would ask you, as I
4   already said, have you check and see if that's been
5   produced to us.
6   BY MR. GOOLSBY:
7   Q.   Let me ask you this, Mr. Giuliani:  Does the
8   history of non-mon transactions, in general, show when
9   an ACS employee does a screen view without actually
10  making a change?
11  A.   No.
12  Q.   So we don't know when the screen was viewed.
13  There's no record of that.  Is that right?
14  A.   Right.  A non-monetary transaction report would
15  only or non-monetary transaction would only produce if
16  a change was submitted or something was entered.  If
17  you just look at something, there's no record.
18       MR. GOOLSBY:  Mr. Giuliani, that is all
19  the questions I have for you.  I thank you very much
20  for your time today.
21       THE WITNESS:  Thank you.
22       MR. BRYCE:  Okay.  So we're going to start
23  up again at 2:00 o'clock our time here.
24       (Deposition concluded at 1:05 p.m.)

Page 88

1
2
3        REPLACE THIS PAGE
4        WITH THE ERRATA SHEET
5        AFTER IT HAS BEEN
6        COMPLETED AND SIGNED
7        BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 87

1            I N D E X
2   DEPONENT:  MICHAEL J. GIULIANI         PAGE
3    Examination by Mr. Goolsby          2
4           E X H I B I T S
5   CCB/ACS DEPOSITION EXHIBITS            MARKED
6       1                8
7       2               57
8       3               62
9       4               64
10      5               69
11      6               69
12      7               73
13      8               74
14      9               81
15  ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 88
16  CERTIFICATE OF REPORTER              PAGE 89
17
18
19
20
21
22
23
24

Page 89

1   State of Delaware   )
                        )
2   New Castle County   )
3
4            CERTIFICATE OF REPORTER
5
6        I, Kurt A. Fetzer, Registered Diplomate
    Reporter and Notary Public, do hereby certify that
    there came before me on the 17th day of February,
7   2005, the deponent herein, MICHAEL J. GIULIANI, who
    was duly sworn by me and thereafter examined by
8   counsel for the respective parties; that the questions
    asked of said deponent and the answers given were
9   taken down by me in Stenotype notes and thereafter
    transcribed by use of computer-aided transcription and
10  computer printer under my direction.
11       I further certify that the foregoing is a true
    and correct transcript of the testimony given at said
12  examination of said witness.
13       I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
14  interested in the event of this suit.
15
16
17       Kurt A. Fetzer, RDR, CRR
         Certification No. 100-RPR
18       (Expires January 31, 2008)
19
    DATED:
20
21
22
23
24

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the

# United States District Court

### DISTRICT OF DELAWARE

Penny Lee Anderson and
Russell D. Anderson, Sr.,

       Plaintiffs,

   -vs-

Trans Union, L.L.C.;
Experian Information Solutions Inc.;
CSC Credit Services, Inc.;
Equifax, Inc. d/b/a Equifax Information Services LLC.,

      Defendants.

**SUBPOENA IN A CIVIL CASE**
**WESTERN DISTRICT OF WISCONSIN**
**CASE NUMBER: 03-C- 0510 C**

TO:   **GENERAL COUNSEL, APPLIED CARD SYSTEMS, INC., 50 APPLIED CARD SYSTEMS, GLENN MILLS, PA**

    YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

| ☒   **YOU ARE COMMANDED** to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. |
|---|

| PLACE OF DEPOSITION: **APPLIED CARD SYSTEMS, INC., 50 APPLIED CARD SYSTEMS, GLENN MILLS, PA** | DATE AND TIME: **10:30 AM ET, March 28, 2005** |
|---|---|

| ☒   **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): **SEE ATTACHED NOTICE OF TAKING DEPOSITION** |
|---|

| PLACE: **APPLIED CARD SYSTEMS, INC., 50 APPLIED CARD SYSTEMS, GLENN MILLS, PA** | DATE AND TIME **10:30 AM ET, March 28, 2005** |
|---|---|

|    YOU ARE COMMANDED to produce and permit inspection of the following premises at the date and time specified below. |
|---|

| PREMISES | DATE AND TIME |
|---|---|

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| Issuing Officer Signature and Title (Indicate if attorney for Plaintiff or Defendant)  ATTORNEY FOR PLAINTIFF | Date  March 21, 2005 |
|---|---|

Issuing Officers Name, Address, and Phone Number
THOMAS J. LYONS
JOHN H. GOOLSBY
342 East County Road D
Little Canada, MN 55117
(TELEPHONE) 651-770-9707

(See Rule 45, Federal Rules of Civil Procedure Parts C & D on Reverse)

Exhibit H

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN
### COURT FILE NO.: 03-C-0510 C

Penny Lee Anderson and
Russell D. Anderson, Sr.,

                    Plaintiffs,

        -vs-

Trans Union, L.L.C. et al,

                    Defendants.

**PLAINTIFFS' NOTICE OF
TAKING DEPOSITION OF
APPLIED CARD SYSTEMS' FRCP
30(b)(6)
REPRESENTATIVE(S),
DUCES TECUM**

---

TO:    **CORPORATE COUNSEL, LEGAL DEPARTMENT, APPLIED CARD SYSTEMS, INC., 50 APPLIED CARD SYSTEMS, GLENN MILLS, PA :**

PLEASE TAKE NOTICE, that the TELEPHONIC deposition of Applied Card Systems'

FRCP 30(b)(6) Representative(s) having the most knowledge/information about:

1.  The "obscure flag" referenced in E. McKenna's June 28, 2004 deposition

    (*McKenna Deposition transcript,* p. 15:14-17:2 *attached hereto as Exhibit A.)*

2.  The contents, codes and markings of Exhibit 25 to E. McKenna's June 28, 2004

    deposition *(attached hereto as Exhibit B.)*

3.  The contents, codes and markings of *Exhibit C* attached hereto.

4.  The extent to which the information in Exhibits B and C is transmitted to the

    CRAs.

1

Andersons 8228

4. The extent to which the information in Exhibits B and C is transmitted to the CRAs.

5. The relationship between First Data Research and CCB/ACS regarding Plaintiffs between July 1999 and the present.

6. All audits, communications or correspondence dated January 1, 1998 to the present between CCB/ACS and any credit reporting agency relating to the reliability of information produced by CCB or ACS to the credit reporting agencies.

7. Any and all communications between CCB/ACS and First Data Resources regarding Plaintiffs dated July 1999 and the present.

8. All systems or procedures in place for verifying that manual or electronic updates sent by CCB or ACS to the credit reporting agencies are in fact received by the credit reporting agencies

9. All AUDfs or UDFs *(e.g., Exhibit D attached hereto)* dated January 1, 2000 to the present that were sent by CCB or ACS to the credit reporting agencies concerning the Andersons' CCB accounts

10. All systems in place to assure that changes made pursuant to UDFs or AUDFs sent are also corrected and updated on monthly tape reporting to the credit reporting agencies.

11. All information concerning whether or not manual updates (UDFs/AUDFs) override or are suppressed to override monthly tape reporting.

2

12. All instructions provided to CCB/ACS by any credit reporting agency on how to complete a UDF or AUDF.

13. The relationship between the ECOA "X" mark and the "REMARKS,"

by oral examination will be taken before a qualified notary public at the law offices of **Ballard Spahr Andrews & Ingersoll, LLP, 919 North Market Street, Wilmington , DE 19801 at 10:30 AM ET on March 28, 2005** thereafter by adjournment until the same shall be completed.

IN DESIGNATING a person to appear for deposition under Rule 30(b)(6), an organization must make a conscientious good-faith endeavor to designate persons having knowledge of matters sought by the interrogator. <u>Protective Nat. Ins. Co. of Omaha v. Commonwealth Ins. Co.</u>, 137 F.R.D. 267, 278 (D. Neb. 1989) (applying identical federal rule). If an organization fails to designate a person with knowledge, sanctions may be imposed. <u>Arctic Cat Inc., v. Injection Research Specialists, Inc.</u>, 210 F.R.D. 680, 682-83 (D. Minn.).

An organization must not only produce such number of persons as will satisfy the request, but must also prepare them so that they may give complete, knowledgeable and binding answers on behalf of the organization. <u>Prokosch v. Catalina Lighting, Inc.</u>, 193 F.R.D. 633, 638 (D. Minn 2000). An organization's duty to prepare its designee(s) so that they can give knowledgeable and binding answers attaches not just to matters personally known to the designee(s), but also to subjects that the organization should reasonably know. <u>Hooker v. Norfolk So. Ry. Co.</u>, 204 F.R.D. 124, 126 (S.D. Ind. 2001); <u>Poole ex. rel. Elliot v. Textron, Inc.</u>, 192 F.R.D. 494, 504 (D. Md. 2000).

The scope of the deposition is not limited to the matters specified in the Notice of Deposition, but is limited only as provided generally in F. R. Civ. P. 26. The matters set forth in the deposition notice therefore constitute the minimum, not the maximum, about which the deponent must be prepared to speak. <u>Detoy v. City and County of San Francisco</u>, 196 F.R.D. 362, 366-67 (N.D. Cal. 2000).

3

Andersons 8228

**YOU ARE DIRECTED,** pursuant to Rule 30 and 34 of the Federal Rules of Civil Procedure to produce the following documents and things at the time of your deposition, if not already produced:

a.  All instructions provided to CCB/ACS by any credit reporting agency on how to complete a UDF or AUDF.

b.  Copies of any and all communications via email or letter between CCB/ACS and the credit reporting agencies that reference Plainitffs regarding the relationship between ECOA "X" marks and the "REMARKS" area of an ACDV/CDV.

c.  Copies of any and all communications via email or letter between CCB/ACS and First Data Resources regarding Plaintiffs dated July 1999 and the present

d.  Any and all policy and procedure manuals regarding:

1.) manual updates (UDFs/AUDFs) override or are suppressed to override monthly tape

2.) reporting all systems in place to assure sure that changes made pursuant to UDFs or AUDFs sent are also corrected and updated on monthly tape reporting to the credit reporting agency

3.) All systems or procedures in place for verifying that manual or electronic updates sent by CCB or ACS to the credit reporting agencies are in fact received by the credit reporting agencies

e.  The contract between CCB/ACS and FDR relating to the CRAs

f.  Subscriber contracts between CCB/ACS and the CRAs.

4

Andersons 8228

## DEFINITIONS

The term "documents" means all the writings of any kind, including the original and all non-identical copies, whether different from the originals by reason of any notation made on such copies or otherwise, including, without limitation, correspondence, memoranda, notes, diaries, statistics, e-mails, letters, telegrams, minutes, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, interoffice and intra-office communications, notations of any sort of conversations, telephone calls, meetings or communications, bulletins, printed matter, computer printouts, teletypes, telefax, invoices, worksheets, all drafts, alterations, and modifications, changes and amendments of any of the foregoing, graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotapes, recordings, motion pictures) and any electronic, mechanical, or electrical records or representations of any kind (including, without limitation, tapes, cassettes, disks, recordings and computer memories).

Dated:  3/21/2005

By:  /s/ John h. Goolsby

**CONSUMER JUSTICE CENTER, P.A.**
Thomas J. Lyons, Jr. (# 249646)
John H. Goolsby (#0320201)
342 East County Road D
Little Canada, Minnesota 5517
Telephone: (651) 770-9707

**THOMAS LYONS & ASSOCIATES, P.A.**
Thomas J. Lyons, Sr.(# 65699)
WI Att. ID #: 1019127
342 East County Road D
Little Canada, Minnesota 5517
(651) 770-9707

Attorneys for Plaintiffs

5

Andersons 8228

## AFFIDAVIT OF SERVICE BY MAIL

STATE OF MINNESOTA      )
                                     )ss.

COUNTY OF RAMSEY       )

Sue Wolsfeld, being first duly sworn, deposes and says that on March  21, 2005 she served

- *Plaintiffs' subpoena duces tecum and Notice of Taking Deposition of Applied Card Systems' FRCP's 30(b)(6) Representative*

upon

- Martin Bryce, Jr , attorney for non-party Applied Card Systems, Inc.
- G. John Cento, Esq. and Christopher Lane, Esq., attorneys for Defendant Trans Union

by placing a true and correct copy thereof in an envelope addressed to:

Martin C. Bryce, Jr.
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Flr.
Philadelphia, PA 19103

Christopher T. Lane, Esq.
G. John Cento, Esq.
Katz & Korin, PC
334 North Senate
Indianapolis, IN 46204

which is the last-known address of said attorneys, by depositing same, with Federal Express prepaid, in the United States  in St. Paul, Minnesota.

_____
Sue Wolsfeld

Subscribed and sworn to before me
this 21st day of  March 2005.

_____
Notary Public

John Herbert Goolsby
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2008

-1-